# Exhibit A

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | Civ. A. No. 1:21-cv-00264 |
| v. | ) | |
| LIMETREE BAY REFINING, LLC | ) | |
| and | ) | |
| LIMETREE BAY TERMINALS, LLC | ) | |
| Defendants. | ) | |

## JOINT STIPULATION

WHEREAS, the United States of America, by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") filed a civil action against defendants Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively, "Limetree Bay") under Section 303 of the Clean Air Act ("CAA"), 42 U.S.C. § 7603.

WHEREAS, the complaint seeks injunctive relief under Section 303 of the CAA requiring Limetree Bay to comply with a CAA Emergency Order ("EPA Order," Exhibit 1 hereto) that EPA issued on May 14, 2021, and other relief.

WHEREAS, on June 16, 2021, EPA issued an information request to Limetree Bay under Section 114(a) of the CAA, 42 U.S.C. § 7414(a) ("114 Request," Exhibit 2 hereto) requiring Limetree Bay to install and operate ambient air monitoring equipment for hydrogen sulfide ($H_2S$) and sulfur dioxide ($SO_2$) at nine specified locations.

WHEREAS, Limetree Bay began to idle the Refinery on May 12, 2021, and represents that it does not intend to restart the Refinery or any Refinery Process Unit at the current time, except as necessary to purge hydrocarbons from process units and other equipment as part of the process of bringing the Refinery to a state of indefinite shutdown.

WHEREAS, Limetree Bay continues to operate the Terminal and intends to conduct the activities identified in Paragraph 13.

WHEREFORE, the Parties hereby stipulate and agree as follows:

1.      Limetree Bay certifies that the Refinery[1] has been idled.

2.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, Limetree Bay shall notify the United States and the Court not less than ninety (90) days before restarting the Refinery, or any Refinery Process Unit for any purpose.

3.      The Audit Reports required by Paragraph 115.d of the EPA Order were submitted to EPA by June 25, 2021, in compliance with the deadline set forth in Paragraph 115.d of the EPA Order.

4.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, by no later than ninety (90) days prior to any restart of the Refinery or any refinery Process Unit, Limetree Bay shall submit to EPA the Plan required by Paragraph 115.*l* of the EPA Order (the "303 Order Plan") that addresses all findings, conclusions, and observations set forth in each Audit Report, with a schedule for implementation of all corrective measures. The 303 Order Plan shall specify which measures must be completed prior to restart of the Refinery or any refinery Process Unit.

---

[1]Terms used in this Stipulation that are defined in the Clean Air Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in the Complaint, EPA Order, Consent Decree or First Modification of the Consent Decree.

5.      As part of the 303 Order Plan submitted under Paragraph 4, Limetree Bay shall identify any changed conditions at the Refinery that occurred since May 12, 2021, including but not limited to any corrective measures taken.

6.      Before Limetree Bay restarts the Refinery or any Refinery Process Unit, it shall complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment posed by the Refinery or Refinery Process Unit.

7.      Except as provided pursuant to Paragraphs 9, 10 and 13, no later than ninety (90) days prior to restart of the Refinery or any Refinery Process Unit, Limetree Bay shall submit to EPA an ambient air monitoring plan ("Monitoring Plan") that includes the operation of $H_2S$ and $SO_2$ monitors at the nine (9) monitoring sites specified in Table A of the 114 Request ("Monitoring Sites"), as required by the 114 Request.

8.      Except as provided pursuant to Paragraphs 9, 10 and 13, Limetree Bay shall install and operate the $H_2S$ and $SO_2$ monitors at the Monitoring Sites, as well as a meteorological tower, as required by the 114 Request, no later than thirty (30) days prior to any restart of the Refinery or any refinery Process Unit.

9.      Limetree Bay shall submit to EPA a plan ("Hydrocarbon Purge Plan") for purging hydrocarbons from Refinery Process Units and other equipment at the Refinery as part of the process of bringing the Refinery to a state of indefinite shutdown. The Hydrocarbon Purge Plan shall identify the activity or activities that Limetree Bay intends to undertake under the Hydrocarbon Purge Plan, as well as the measures Limetree Bay has taken or will take prior to restarting, or during the operation of, any Refinery Process Unit covered by the Hydrocarbon Purge Plan, to ensure that the purging process and any associated activities do not present an imminent and substantial endangerment to public health or welfare or the environment, including

3

but not limited to measures in response to recommendations contained in the Audit Reports. The Hydrocarbon Purge Plan shall include, among other things: the operation of ambient air monitoring during all purging operations and compliance with applicable requirements of 40 C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC.

10.     The purging process and any associated activities shall be conducted in accordance with the EPA-approved Hydrocarbon Purge Plan, subject to any modifications necessary based on monitoring data or other information received by EPA suggesting that operations under the Hydrocarbon Purge Plan may present an imminent and substantial endangerment to public health or welfare, or the environment. Before EPA makes or requires any modifications to an approved Hydrocarbon Purge Plan, the Parties shall meet and confer. Any proposed modification by Limetree Bay to the EPA-approved Hydrocarbon Purge Plan shall be subject to Paragraph 12, below. Limetree Bay shall not begin the purging process or any associated activities without EPA's approval, nor shall Limetree Bay use any Refinery Process Unit other than as specified in the EPA-approved Hydrocarbon Purge Plan.

11.     Limetree Bay may submit and EPA may approve one or more Hydrocarbon Purge Plans subject to Paragraphs 9 and 10.

12.     Any plan required by this stipulation shall be submitted to EPA for its review, comment, and approval or approval with modifications, and shall be sent by email to the EPA and VIDPNR representatives listed in Paragraph 116 of the EPA Order.

13.     For the avoidance of doubt, nothing in the 303 Order or this Stipulation prevents Limetree Bay from operating equipment necessary for Terminal operations, or necessary to generate electricity or provide drinking water or wastewater management for the Facility, the HOVENSA Environmental Response Trust, and for the worker residences dependent on the

4

Facility for such services.

14.     The Parties agree that further proceedings in this case should be stayed for a period of ninety (90) days from the date of filing this Joint Stipulation, and Limetree Bay does not oppose the United States' Unopposed Motion for Stay filed simultaneously with this Stipulation; and the Parties shall submit a joint status report sixty days after the date this Stipulation is filed.

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR PLAINTIFF THE UNITED STATES OF AMERICA:

JEAN WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Date: _July 12, 2021_

_Myles E. Flint, II_

MYLES E. FLINT, II, Senior Counsel
ERIC D. ALBERT, Senior Attorney
SHEILA McANANEY, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY
TERMINALS, LLC:

Date: 07/12/2021

MARK CHAVEZ
General Counsel
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

7

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY REFINING, LLC:

Date: _____07/12/2021_____

MARK DELAQUIL
MATTHEW THURLOW
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue NW
Washington, D.C.  20036
(202) 861-1500

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 2**

| | | |
|---|---|---|
| _____ ) | | |
| In the matter of ) | | |
| ) | | |
| **Limetree Bay Terminals, LLC** ) | | **CLEAN AIR ACT** |
| ) | | **EMERGENCY ORDER** |
| 1 Estate Hope ) | | **CAA-02-2021-1003** |
| Christiansted, Virgin Islands 00820 ) | | |
| ) | | |
| And ) | | |
| ) | | |
| **Limetree Bay Refining, LLC** ) | | |
| ) | | |
| 1 Estate Hope ) | | |
| Christiansted, Virgin Islands 00820 ) | | |
| ) | | |
| Respondents. ) | | |
| ) | | |
| Proceeding under Section 303 of ) | | |
| the Clean Air Act, 42 U.S.C. § 7603 ) | | |
| _____) | | |

## STATEMENT OF AUTHORITY

This emergency order ("Order") is issued to Limetree Bay Terminals, LLC ("LBT") and

Limetree Bay Refining, LLC ("LBR") (collectively, "Limetree" or "Respondents") pursuant to

the authority granted to the Administrator of the United States Environmental Protection Agency

("EPA") by Section 303 of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7603, to

protect public health or welfare, or the environment.  The authority to issue this Order has been

delegated by the Administrator of EPA to the Regional Administrator for EPA Region 2, and

redelegated to the Director of the Caribbean Environmental Protection Division, by Delegation

No. 7-49.  This Order is issued by the Director of the Caribbean Environmental Protection

Division, of EPA Region 2.

Section 303 of the Act provides that:

[T]he Administrator, upon receipt of evidence that a pollution source or

combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary.  If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment.  Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based.  Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period.  Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

## **PARTIES BOUND**

1.      This Order applies to and is binding upon the Respondents, their officers, directors, employees, agents, trustees, receivers, successors, assigns, and all other persons, including but not limited to firms, corporations, limited liability companies, subsidiaries, contractors, consultants, and lessees acting under or on behalf of Respondents in connection with the implementation of this Order.

2.      Respondents shall be responsible and liable for conducting the activities specified pursuant to this Order, regardless of who performs the activities.  Respondents shall be liable for the conduct of employees, agents, contractors, consultants, or lessees to satisfy the requirements of this Order.

3.      No change in the ownership of the facility affected by this Order or the ownership or corporate status of Respondents shall in any way alter, diminish, or otherwise affect the responsibilities of Respondents under this Order.  Respondents shall provide a copy of this Order to any successor(s) during the pendency of this Order.

## FINDINGS OF FACT

The Director of the Caribbean Environmental Protection Division in EPA Region 2 makes the following Findings of Fact:

4.      Prior to issuing this Order, EPA consulted with representatives of the Virgin Islands Department of Planning and Natural Resources ("DPNR") as required by Section 303 of the Act.

5.      This Order concerns a facility located at 1 Estate Hope in Christiansted, Virgin Islands ("Facility"). The Facility includes a marine loading terminal (including storage capacity) and an integrated petroleum refinery ("Refinery" or "Refinery Operations"). The Facility is located on approximately 1,500 acres on the south central coast of St. Croix, U.S. Virgin Islands ("USVI").

6.      Limetree Bay Terminals, LLC is a corporation that owns and/or operates some or all of the Facility. LBT is registered to do business in the U.S. Virgin Islands.

7.      The Facility operates under a number of air permits, such as Prevention of Significant Deterioration ("PSD") and CAA Title V operating permits. LBT is named as the owner and/or operator of the Facility and responsible for Facility Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits.

8.      The Facility's Title V operating permit is permit number STX-TV-003-10 (the "Title V Permit"), and it is currently issued to "Limetree Bay Terminals LLC." The Title V Permit covers the Facility's Refinery Operations, among others.

9.     The Facility also operates under three PSD permits (the "PSD Permits")
that were amended on November 5, 2018 to reflect the transfer of ownership of the
Facility from HOVENSA, LLC to "Limetree Bay Terminals, LLC."  Some or all of these
PSD permits encompass Refinery Operations.

10.     Limetree Bay Refining, LLC is a corporation that owns and/or operates
some or all of the Facility, including its Refinery Operations.  LBR is registered to do
business in the U.S. Virgin Islands.

11.     On its website, Limetree describes LBR as "executing a project to
refurbish and restart its St. Croix, USVI, deep conversion [petroleum] refinery" with peak
processing capacity of 650,000 barrels of petroleum feedstock per day.

12.     On July 30, 2018, the Legislature of the Virgin Islands approved an
agreement with LBR titled "Refinery Operating Agreement by and among the
Government of the Virgin Islands and Limetree Bay Refining, LLC," dated July 2, 2018.

13.     According to the Limetree Title V Permit, the Facility was originally
owned and/or operated by Hess Oil Virgin Islands Corporation ("HOVIC").  Facility
operations began in 1965.  On October 30, 1998, Amerada Hess Corporation, the parent
company of HOVIC, and Petroleos de Venezuela, S.A. ("PDVSA") formed a new
corporation, HOVENSA L.L.C. ("HOVENSA"), which acquired ownership and
operational control of the St. Croix Refinery formerly known as HOVIC.  Limetree
and/or its corporate parent or associated business entities acquired the Facility in 2016.

14.     Petroleum refineries separate crude oil into a wide array of petroleum
products through a series of physical and chemical separation techniques.  These
techniques include fractionation, cracking, hydrotreating, combination/blending
processes, and manufacturing and transport.

4

15.     Limetree has described the Facility's refining operations as being conducted in the East Refinery, which includes crude units, a vacuum unit, a delayed coker unit ("DCU"), platformers, hydrotreaters, fluid catalytic cracking ("FCC"), an alkylation complex, an ultra-low sulfur gasoline unit, and a sulfolane complex.  The East Refinery was developed in the 1970s, with the FCC added in 1993 and the DCU built in 2002.  LBR Refinery Operations also include two flares (Flare #3 and Flare #8), two sulfur recovery units, one incinerator and a power generation complex.

16.     According to Limetree, LBR started conducting activities to restart the operation of the Refinery in 2018.  Among the units that Limetree has since restarted were the following: crude units #5 and #6 (limited capacity), vacuum unit #3, par-isom unit, platformer unit, sulfur recovery units, east incinerator, DCU, hydro-treating units (6, 7, and 9), reverse osmosis water plant, and gas turbines (GT-8, GT-9, GT-10, GT-11, and GT-13).

17.     The Facility is located on the island of St. Croix.  St. Croix is an island in the Caribbean Sea that is approximately 22 miles long (east to west) and 7 miles wide (north to south).  As of the 2010 United States Census, the population of St. Croix was 50,601.  The island of St. Croix is divided into nine subdistricts (population): East End (2,453), Anna's Hope Village (4,041), Christiansted (2,626), Sion Farm (13,003), Southcentral (8,049), Northcentral (4,977), Northwest (4,863), Southwest (7,498) and Frederiksted (3,091).  The Facility is located on the southern shore of St. Croix, near the middle of the island east to west, within the Southcentral subdistrict.

18.     According to EPA review of the National Weather Service data for February through May 2021 for St. Croix's Henry E. Rohlsen Airport meteorological station, the prevailing wind blows from the east and east-southeast to the west and west-

northwest. Wind direction prevalence indicates that communities located within Southcentral, Southwest, Frederiksted, Northwest, and portions of Northcentral are located downwind of the Facility. Among such communities are the following: Clifton Hill, Profit Hills, Kingshill, University of Virgin Islands Campus, Hannah's Rest, Frederiksted, Estate Northside, Smithfield, Upper Bethlehem, Mars Hill, Estate Carlton, Golden Grove, Grove Place, Negro Bay, Williams Delight, Whim, Sandy Point, La Grange, and Prosperity. Many residents live and work in these communities.

**The Limetree Refinery**

19.     Refineries in general emit a whole host of pollutants, ranging from nitrous oxides ("$NO_X$"), sulfur dioxide ("$SO_2$"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("$H_2S$"), and particulate matter "(PM"). $NO_x$, $SO_2$, and CO are typically emitted from combustion sources such as heaters, boilers and gas turbines. The VOCs contain light hydrocarbons. During start up, any VOCs are usually conveyed to a flare to be combusted.

20.     The Refinery Operations separate crude oil into various components. Light ends (refinery fuel gas ("RFG")) are sent to the Facility's fuel gas system ("East Fuel Gas System"), while naphtha, jet fuel, kerosene, and No. 2 oil are further processed to remove sulfur. The $H_2S$ gas generated from the desulfurization process is sent to the sulfur recovery plant to be treated by two sulfur recovery units.

21.     RFG is a mixture of $H_2S$ and other gases that is used to supply fuel to the various process heaters at the Refinery. This RFG collection and distribution system is referred to as the East Fuel Gas System. $H_2S$ is removed from the Refinery fuel gas system using amine scrubbers. The gas that enters amine unit is high in $H_2S$, and is then processed in a sulfur recovery unit to convert $H_2S$ into elemental sulfur.

6

22.     LBR uses a flare known as Flare #8 to combust excess Refinery gas that contains a mix of $H_2S$, $CO_2$, and other gases such as hydrocarbons.

23.     Emissions from flaring may include carbon particles (soot), unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOx and, if sulfur containing material such as hydrogen sulfide is flared, $SO_2$.

24.     Sulfur compounds going to a flare are converted to $SO_2$ when burned, though flare efficiency is not 100%. The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.

25.     The Refinery has a flare header system that collects and routes gases from process units, ancillary equipment, and the fuel gas system from locations throughout the Refinery to Flare #8. The Flare #8 header system collects gases from numerous areas of the Refinery, including but not limited to the amine units (Nos. 4, 5, 6 and 7), the sulfur recovery units (Nos. 3 and 4), the Coker Unit, and the East Fuel Gas System.[1]

26.     Flare #8 is a steam assisted flare 230 feet above grade. Gas enters the flare for burning up through 41 staged burner tips.

27.     Flare #8 is subject to an $H_2S$ concentration limit specified in 40 C.F.R. § 60.103a(h) (162 parts per million ("ppm")) determined hourly on a 3-hr rolling average basis), as well as total sulfur ("TS") root-cause analysis requirements and monitoring requirements specified in 40 C.F.R. § 60.103a(c), and operating limits specified in 40 C.F.R. § 63.670.

---

[1] The full list of areas that send gas to Flare #8 includes crude unit No. 5; liquified propane gas ("LPG") treater No. 1; utility area No. 3 (Boilers 6, 7, 8, and 9); powerhouse No. 2 (Gas Turbines); utility area No. 3 (Boiler 10); crude unit No. 6; lean oil absorber/disulfide oil recovery; LPG treater No. 2; amine units (No. 4, 5, 6 and 7); high pressure fuel gas treater; gas recovery unit No. 2; LPG fractionation unit No. 3; deisopentanizer/IC5 Sweetener; vacuum unit No. 3; distillate desulfurizers (No. 6, 7 and 9); platformer & hydrobon No. 3; platformer No. 4; dimersol; flare system (East); benzene stripper (East); sour water strippers (No. 3 and 4); sulfur recovery units (No. 3 and 4); tail gas treating unit; sour water stripper No. 5; flares – low and high pressures; coker unit; coker nitrogen system; west interconnects; East Fuel Gas System; hydrogen tie-ins (east); and butane and propane system.

28.     Flare #8 has a maximum vent gas flow rate of 1,500,000 lb/hr, and is not equipped with a Flare Gas Recovery System ("FGRS").

29.     The Flare #8 header is equipped with monitoring instruments to measure volumetric flow, hydrogen sulfide content, total sulfur content, and vent gas composition, to demonstrate compliance with CAA requirements at 40 C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC. The monitoring instrumentation also measures certain other Flare #8 vent gas constituents.

30.     The Facility's Title V permit, citing 40 C.F.R. § 60.104(a)(1), bars combustion in various locations at the Facility of fuel gas that contains hydrogen sulfide in excess of 0.1 gr/dscf. Two of these locations include Flare #8 and the East Fuel Gas System.

**Refinery Restart**

31.     On February 1, 2021, EIG Global Energy Partners ("EIG"), a controlling investor in Limetree Bay Ventures, LLC[2], announced that the Refinery had successfully resumed operations and begun production and commercial sales of refined products.

32.     According to a recent statement from LBT and LBR, "Limetree Bay Refining, LLC, restarted [Refinery] operations in February 2021, and is capable of processing around 200,000 barrels per day. Key restart work at the site began in 2018, including the 62,000 barrels per day modern, delayed Coker unit, extensive desulfurization capacity, and a reformer unit to produce clean, low-sulfur transportation fuels that will meet International Marine Organization ("IMO") standards required under

---

[2] Limetree's website describes Limetree Bay Ventures, LLC, as "a large-scale energy complex strategically located in St. Croix, U.S. Virgin Islands. The complex consists of Limetree Bay Refining, a refinery with peak processing capacity of 650 thousand barrels of petroleum feedstock per day, and Limetree Bay Terminal, a 34-million-barrel crude and petroleum products storage and marine terminal facility serving the refinery and third-party customers."

international law in 2020. The restart project provided much needed economic development in the U.S.V.I. and created more than 4,000 construction jobs at its peak and more than 600 full-time jobs currently."

33. Since February 1, 2021, at least four incidents have occurred at the Facility that have each had an immediate and significant health impact on multiple downwind communities.

**February 4, 2021 Incident**

34. On February 4, a mixture of oil and water, in the form of an oily mist, was emitted as air emissions from Flare #8 at the Facility (the "Feb. 4 Incident"). These emissions included liquid droplets of oil.

35. In a letter sent from Limetree to DPNR on March 3, 2021, Limetree explained the cause of the Feb. 4 Incident as follows ("Limetree 3/3/21 Letter"):

"On February 4, 2021, the Coker unit was shut down for repairs. Operations was preparing to quench and open coke drum D-8504 as part of the normal shut down process. At approximately 02:30hrs, the Coker Drum D-8504 was being prepared to start the procedure for water quenching. The quench water control valve was 100% open, resulting in a large quantity of water entering the drum. The water evaporated quickly after contacting the hot coke. . . . [T]he pressure safety valves opened to relieve pressure . . . A mixture of oil and water vapor was sent to the containment system, exceeding its capacity and ultimately exiting through the No.8 flare."

36. The Limetree 3/3/21 letter further explains the immediate impact of the Feb. 4 Incident on the surrounding community, stating:

"Around 14:30 hrs, calls were received by the Limetree Command Center from residents in the Clifton Hill area complaining of oil droplets on their vehicles and homes. Thereafter, Limetree immediately activated its Incident Command Response to address the impact on the community. . . . Complainants were contacted and told to disconnect their cisterns from the roof spouts if possible. A total of 11 complaints were received on February 4, 2021. On February 5, 2021, Limetree teams were dispatched to follow-up with residents in person and confirmed the presence of oil droplets on cars and homes. Plans were put in place to clean residents' cars and roofs. Additional complaints were made in following

days."

37.     Limetree was aware of the impact this event had on the surrounding community, and paid for various cleaning and decontamination work and provided bottled water to the community.  In a March 3, 2021 press release, Limetree stated, "Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community."

38.     As of March 16, 2021, Limetree had reported to EPA that the Feb. 4 Incident resulted in 193 residences with potential contamination and 148 roofs and 245 cars that required cleaning.  Samples were taken from 163 cisterns, and at the time the results of 135 of those samples had been received.  70 of those 135 cisterns were identified as contaminated.  At the time, 65 had been reportedly cleaned.

39.     Many in the community nearby the Facility rely on cisterns for their household water use.  A March 21, 2021 news article explained that, "Ever since the refinery contaminated St. Croix's groundwater [under HOVENSA's prior operation], cisterns have become a necessity on the island—catching rain to provide water for residents to drink, wash with or . . . irrigate their vegetable gardens."

40.     Residents also reported that the Feb. 4 Incident resulted in the oily mixture depositing on their vegetable gardens.  One resident said that she and her husband ate only from their garden, but that the Feb. 4, 2021 Incident "destroyed all our foods" and "[e]verything was dead."

41.     In an April 29, 2021 meeting with EPA officials, another resident living in the impacted Clifton Hill area explained that he collected water from his roof in a cistern, for filtration for drinking water and for his sheep.  The Feb. 4 Incident resulted in oil on his roof and in his cistern.  Limetree cleaned his cistern 2-3 weeks after the Feb. 4

Incident, but did not conduct follow-up sampling. Limetree provided bottled water, but he is concerned about the incident's impact on his plants and the produce he grows in his garden.

42.     During an April 30, 2021, site visit to the Facility by staff from EPA and DPNR, Limetree representatives said that Limetree believes that the release was a mist with heavy oil in it, and acknowledged that the mist reached areas in Clifton Hill. When asked, Limetree representative said that the droplets passed through a lit flare flame, though they did not believe that flaming droplets of oil had been recorded.

43.     Emissions of oil droplets from a flare is called "flare rainout." Flare rainout can create both environmental and physical safety hazards. Oil contamination of soil and water bodies creates environmental and public health hazards. While there is no evidence that "flaming rain" occurred during the Feb. 4 Incident, flare rainout can also result in physical and safety hazards such as "flaming rain" where the oil droplets ignite as they pass through the flare flame and rain down while on fire in the refinery and nearby neighborhoods, creating sources of ignition for vapors in the refinery and igniting combustible materials and starting fires inside the refinery and in adjacent neighborhoods. Because of these concerns, flare systems are designed with process vessels called "knockout drums." Knockout drums are vessels whose function is to remove or "knockout" large liquid droplets from the gas sent to the flare.

44.     Knockout drums are sized for expected maximum load of liquid droplets. When that capacity is exceeded, the liquid droplets pass through the knockout drum and can cause flare rainout and flaming rain. The rainout during the February 4, 2021 Incident may indicate the Flare #8 knockout drum(s) were not designed with sufficient

capacity to prevent liquid carryover to the flare.  This type of event is not common for a refinery startup.

**Refinery Operating Pause**

45.     In early April, the Refinery stopped operations for a period of time due to undisclosed operational issues.  LBR stated in a letter to EPA that the "refinery is shut down while we make operational adjustments."

**Late April 2021 Incident**

46.     After Refinery operations restarted, on April 19, 20, 21, 22, and 23, 2021, Limetree reported to DPNR exceedances of the 162 ppm emission standard for $H_2S$ concentrations measured at the flare header for Flare #8 at the Facility.

47.     According to the Agency for Toxic Substances and Disease Registry ("ATSDR") $H_2S$ is a flammable, colorless gas that smells like rotten eggs.  People can usually smell $H_2S$ at low concentrations in air when $H_2S$ concentrations are in the range of from 0.0005 to 0.3 ppm.  Exposure to low concentrations of $H_2S$ may cause irritation to the eyes, nose, or throat.  It may also cause difficulty in breathing for some asthmatics.  Respiratory distress or arrest has been observed in people exposed to very high concentrations of $H_2S$.

48.     According to ATSDR, $SO_2$ is a colorless gas with a pungent odor (often described as the smell of a struck match).  Exposure to very high levels of $SO_2$ can be life threatening.  Exposure to 100 ppm of $SO_2$ is considered immediately dangerous to life and health.  Burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

49.     Between April 19 and April 22, 2021, hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162

ppm based on a 3-hr rolling average. High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively (on a 3-hr rolling average basis).

50.    Limetree has explained the exceedances on April 19-22, 2021 as follows:

"On April 19th, the Coker unit was starting up and off gases generated were vented to the flare until the wet gas compressor was successfully brought online. The wet gas compressor was brought online around 1:34 AM on April 20th and the $H_2S$ in the flare decreased as startup progressed. Since the $H_2S$ level did not decrease below the emission limit once startup of the wet gas compressor was complete, Operations immediately began their search for another source of the $H_2S$ by methodically isolating each unit's battery flare valves. On April 21st, Operations discovered a malfunctioning pressure safety valve (PSV) on the low-pressure flash drum (D-4603) at the No. 6 Distillate Desulfurizer Unit (DD6). The PSV was taken out of service for maintenance."

51.    Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 at the Facility during the evening of April 22 and into April 23, 2021. Hydrogen sulfide readings rose throughout the evening on April 22, and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23 – over 565 times higher than the concentration limit of 162 ppm.

52.    Limetree has explained the exceedances on these days as follows:

"At approximately 4:45 AM on April 23, 2021, the No. 4 Sulfur Recovery Unit (4SRU) tripped due to both "fire-eye" flame scanners not detecting a flame. At about 5:29 AM, the 4SRU was re-lit and at 7:07 AM the Clean Acid Gas (CAG) control valve at 4SRU started to slowly open but not quick enough to alleviate the pressure in the CAG header. Due to the backpressure in the CAG header, a pressure safety valve (PSV) at the No. 5 Amine Regeneration Unit (5ARU) relieved to the No. 8 Flare. The $SO_2$ generated from the combustion of the $H_2S$ in the flare header caused odors which impacted our neighbors. Further investigation showed that there was another malfunctioning PSV at the No. 6 Distillate Desulfurizer Unit (DD6), contributing to the elevated $H_2S$ before the 4SRU trip event. The PSV was taken out of service for maintenance."

13

H2S production units were shut down or placed on circulation to reduce the load on the

amine regeneration system and the sulfur recovery plant.  Limetree shut down 5ARU

because the PSV continued to leak to the flare even below the PSV setpoint.  Limetree

stated that one of its corrective actions included responding to odor complaints.

53.    Two days later, on April 25, Limetree once again exceeded the 162 ppm

limit for $H_2S$ at Flare #8 from 3 to 11 p.m.  That day, Limetree also exceeded that limit at

the East Fuel Gas System from 1-10 PM.  The maximum 3-hour average concentrations

for $H_2S$ that day were 842.4 ppm at Flare #8 and 629 ppm at the East Fuel Gas System.

54.    Limetree has explained these exceedances as follows:

"On April 25, 2021 the No. 3 and No. 4 Sulfur Recovery Units got contaminated
with hydrocarbon carryover via the acid gas.  Operations blocked in the acid gas
header to the sulfur recovery units (SRUs) which overloaded the No. 4 Amine
Regeneration unit (4ARU) preventing it from properly removing the $H_2S$ in the
fuel gas.  The No. 5 Amine Regeneration unit was not operational at the time.
Soon after, the 4ARU reboilers overpressured and relieved to the flare."

55.    As a result of the "noxious" odor created by the Refinery's emissions, on

April 23, 2021, the Virgin Islands Department of Education ("VIDOE") closed in-person

instruction at three schools.  In its press announcement, it stated that "[s]tudents and staff

have reported feelings of nausea due to the smell, which was detected on April 22[,

2021]."

56.    A Reuters news article also reported the April 23, 2021, closing of a St.

Croix community coronavirus vaccination center due to the odor.

57.    On April 23, 2021, DPNR issued a press release advising the community

of "a foul, gaseous smell permeating throughout the Frederiksted area for the past few

days."  DPNR notes that it has been receiving citizen complaints, and that it "has

discovered that the Limetree Bay Refinery is experiencing an exceedance of Hydrogen

sulfide."  DPNR advised that people with respiratory ailments such as allergies, lung

disease, and asthma should consider taking protective actions, including staying indoors

or relocating to less affected areas of the island.

58.     On April 24, 2021, the Virgin Island Department of Health ("VIDOH")

issued a press release alerting St. Croix residents to potential health effects from the

Facility's Refinery emissions.  It noted Limetree's confirmation of elevated hydrogen

sulfide concentrations from Flare #8 and said that a "foul, gaseous smell, which can smell

similar to rotten eggs, has permeated throughout the Frederiksted area for the past few

days."  It explained the potential health effects of breathing hydrogen sulfide, and

encouraged residents to report symptoms such as headaches, nausea, and symptoms of a

respiratory nature to their healthcare providers.

59.     On April 24, 2021, Limetree issued a press release denying any release of

hydrogen sulfide occurred from April 22 to 23, 2021.  Limetree claimed that the incident

involved only an unusually high level of sulfur dioxide emissions, and that the odor of

sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level

normally considered dangerous to health.

60.     During an April 30, 2021, site visit to the Facility by staff from EPA and

DPNR ("April Site Visit"), Limetree staff explained that the April 23, 2021 incident was

related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus

diverting the acid gas to the flare rather than treating it.  The flare itself had a flame

burning at the time that would have burned the hydrogen sulfide, producing sulfur

dioxide.

61.     During the April Site Visit, Limetree staff said that, although the Facility's

Refinery Operations have two sulfur recovery units (SRUs Nos. 3 and 4), one (No. 3) was

out of service when the April 23, 2021 event occurred. The out of service unit was thus unable to act as a backup when the operating unit (No. 4) malfunctioned.

62.    During the April Site Visit, EPA and DPNR were escorted by Limetree representatives to several areas of the Refinery, including the east part of the Facility where Flare #8 is located. Based on conversation with Limetree staff and EPA observation at the Facility, EPA staff learned that due to the significant elevation of Flare #8, the emissions from Flare #8 are often not measurable, nor are odors and other impacts from Flare #8's emissions detectable by olfaction on the grounds within the Facility's Refinery. Rather, emissions plumes from Flare #8 downwash at (i.e. lowers to) ground level well beyond the Facility's fenceline.

63.    During the April Site Visit, DPNR staff noted that several residents provided very specific descriptions of odors and other impacts resulting from the April 23rd incident's emissions, and those odor characteristics and other impacts were consistent with both $H_2S$ and $SO_2$ being released.

64.    During the April Site Visit, EPA staff asked Limetree representatives if the Refinery was using a Sulfix™ $H_2S$ scavenger system to reduce the levels of $H_2S$ at the Flare #8 header. Limetree representatives confirmed that the Refinery is using a Sulfix™ $H_2S$ scavenger system, and explained that it consists of the injection of an additive in several points of the Flare #8 header to absorb and recover some of the $H_2S$ in the gas that is conveyed through the Flare #8 header. Limetree representatives informed EPA staff that although the $H_2S$ scavenger system was in operation during the Late April 2021 Incident, the system was not designed to manage the gas flow and $H_2S$ concentrations that were generated during the Incident. According to Limetree

representatives, the system is designed to manage flow into the Sulfix$^{TM}$ system up to 1 million standard cubic feet (scf) and concentrations of no more than 1000 ppm of $H_2S$.

65.     During the April Site Visit, Limetree staff acknowledged that the Facility does not have any $SO_2$ monitor to measure concentrations of $SO_2$ entering the atmosphere from Flare #8 post-flaring.  Limetree believes the April 23, 2021 event only emitted $SO_2$ but does not know how much $SO_2$ was emitted.

66.     Limetree also does not conduct any fenceline monitoring for $SO_2$ or $H_2S$; it only conducts fenceline monitoring for benzene.  Limetree's predecessor, HOVENSA, operated five $SO_2$ monitors near the perimeter of the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those $SO_2$ monitors.  On April 30, 2021, EPA issued a Notice of Violation ("NOV") to Limetree for its failure to operate the five $SO_2$ monitors.

67.     As indicated in EPA's AP-42 Chapter 13.5 (Industrial Flares), sulfur compounds contained in a flare gas stream are converted to $SO_2$ when burned.  The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.  The quantity of sulfur compounds and hydrocarbon emissions generated relate to the degree of combustion and the unit destruction efficiency.  The degree of combustion depends largely on the rate and extent of fuel-air mixing and on the flame temperature achieved and maintained.  A flare does not provide 100% destruction efficiency, so any changes in the degree of combustion, such as a sudden increase of flow and $H_2S$ concentrations such as the one reported on April 23, 2021, can trigger the release of unburned sulfur compounds such as $H_2S$, as well as hydrocarbons, and an increase in $SO_2$ emissions.

68.     Modeling of the Late April Incident by an expert EPA contractor showed that concentrations of sulfur dioxide exceed the Acute Exposure Guideline Level-1

17

(AEGL-1) for S at ground level. Above AEGL-1 level, asthmatics are at risk of bronchoconstriction, which results in increased airway resistance. The expert determined that subsequently exposed individuals in the community were faced with imminent and substantial danger to their health. The "notable discomfort, irritation, or certain asymptomatic non-sensory effects" associated with AEGL-1 exposure is consistent with citizen complaints received surrounding the Late April Event for the No. 8 Flare. Modeled 1-hour concentrations of SO2 also exceeded the lower bound of the taste threshold, and modeled 1-hour concentrations of H2S exceeded the odor threshold assuming a 98% conversion of H2S to SO2 associated with a well-operating flare (i.e., good combustion mechanics).

**May 5, 6, and 7, 2021 Incident ("First May Incident")**

69.     On May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility. They described the odor as "sulfur," "gassy," "burnt eggs," and "rotten." On May 6, 2021, community members continued to report odor emitting from the Facility. At 7:08 PM est, a citizen caller reported that the odor was continuing and described the fumes as "noxious." The caller also stated that the "materials in the air were causing health problems" for community members, including "head ache, sore throat, ear ache, nausea, and lips and tongue tingling."

70.     In an article published on May 7, 2021, the Washington Post reported that roughly 100 members of the community had contacted the Virgin Islands Territorial Emergency Management Agency ("VITEMA") describing a gaseous odor emitting from the Facility.

71.     Initially, on May 5, 2021, Limetree issued a statement on Facebook denying that there were any problems at the Facility. Having received "several

community complaints of a strong odor," Limetree stated in its Facebook post that

Facility personnel had conducted a preliminary investigation, and Limetree had

concluded that "units are operating normally, and there is no activity that would result in

an odor."

72.     On May 5, 2021, Limetree environmental personnel reported to DPNR

and EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 9 PM

est on May 5.  At the time the email notification was sent to DPNR and EPA at 10:12 PM

est, Limetree environmental personnel stated that $H_2S$ was back below the limit.

73.     On May 6, 2021, at 12:45 pm, Limetree issued another statement

acknowledging that releases were occurring at the Facility.  The statement read:

> "Limetree Bay has become aware of an odor affecting areas west of the facility.
> We are conducting maintenance activity at the Coker unit, which has resulted in
> light hydrocarbon odors.  We will continue to monitor the situation, but there is
> the potential for additional odors while maintenance continues.  We apologize for
> any impacts this may have caused the community.  Thank you."

74.     On May 6, 2021, around 11 AM est, an EPA On Scene Coordinator

("OSC"), was driving towards the Facility in order to investigate the source of odor

complaints on May 5, 2021.  The OSC submitted the following summary of his

experience:

> While driving to the facilities, I intermittently had my car windows slightly open but at
> the time of this experience, my car windows were rolled up, with A/C circulating
> internally.  I noticed an odor and pulled over.  I rolled down my car window down to ask
> a worker on the side of the road what location I was at?  What facility was he working at?
> The worker informed me it was "Container Port. I was surprised how unaffected the
> workers were by the odor.  As if there was nothing different going on.  They had no
> respiratory protection at all.  I immediately closed my window and pulled away driving
> north.  I determined that I was slightly west of the Limetree facility.  The odor I briefly
> encountered was overwhelming and nauseating.  I normally am suited up with respiratory
> protection and other [personal protective equipment] prior to being exposed to something
> like this.  It was unexpected.  The smell was gasoline-like in nature, but it was stronger
> than gasoline. I have experience inspecting refineries and other facilities, as well as
> general life experience mowing lawns and pumping gasoline, and I am familiar [with]

what gasoline smells like and what many other substances emitted by refineries smell like. This odor was stronger, more pungent than others I have encountered. The odor was overwhelming and felt as if I would be sick. I sent an email to EPA Region 02 [Regional Emergency Operations Center (REOC)] with a Google maps screenshot to my location. The REOC was receiving multiple calls from the National Response Center regarding similar odor complaints. The DPNR Environmental Director also contacted me with similar odor complaints. I then planned to visit those two locations which were described as Whim Estates and Mars Hill. As I drove away, even with the A/C on and recirculating air, I continued to smell the odor. I did not detect any orders [sic] in the towns that I investigated which were on the southwest side of the island. I did feel sick throughout the afternoon. It was obvious[] to me the odor was emitting from Limetree and not the asphalt plant(s). I could tell due to my location, the wind direction at the time, and other factors. When I returned to the hotel, the woman at the front desk referenced the facility restarting the coker plant and said that it was the source of the smell. Throughout the afternoon, my head felt 'cloudy' and [I] needed to shower because I felt 'contaminated.'"

75.     As a result of the odor, the Virgin Islands Department of Education closed three schools on May 6, 2021. Due to concerns of continuing odor releases, the school closures remained in effect through May 7, 2021.

76.     Also as a result of the odor, the VI Bureau of Motor Vehicles ("VIBMV") closed early on May 6, 2021 and remained closed on May 7, 2021. The VIBMV stated that, "[t]his closure is necessary because the employees at the BMV are affected by the strong unpleasant, gas like odor, in the atmosphere surrounding the BMV."

77.     On May 7, 2021, VI Governor Albert Bryan activated the VI National Guard and the VITEMA to address continuing reports of odor and heightened concern from the community. The Director of the VI Department of Health ("VIDOH") stated during the same briefing that at least three members of the community had sought medical attention at an area hospital for headaches and nausea allegedly caused by the continuing odors. VIDOH then advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors.

78.     On May 7, 2021, Limetree environmental personnel reported to EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 11 PM EST on May 7, 2021. Limetree environmental personnel stated in the email that "there was an instrumentation/communications error that caused a short spike." The notification did not indicate the extent of the exceedance.

**May 12, 2021 Incident ("Second May Incident")**

79.     On May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the pressure in the coker drum rose, causing fire or flames. At the time, Limetree was still unsure what specifically caused the flaring incident. Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility. Limetree contacted VITEMA, and VITEMA had or was going to close the road. Liquid droplets of oil had also been reported on properties in the Enfield Green neighborhood.

80.     Photographs and video of the Second May Incident show a large flame coming off Flare #8, with a large trailing plume of visible emissions extending a long distance.

81.     At 4:15 PM on May 12, 2021, VITEMA issued an alert stating the following: "Limetree Bay Emergency Response Teams are responding to a fire onsite. DPNR has deployed the Virgin Islands Nation Guard for air quality monitoring and the VI Fire Service is standing by to support."

82.     At 6:55 PM on May 12, 2021, Limetree emailed EPA to report the following: "We exceeded the 162 ppm $H_2S$ limit in the flare header (3-hr average) starting on the hour of 3 to 4pm. We will follow up with a letter."

21

83.     At 7:12 PM on May 12, 2021, Limetree sent EPA the following
information by email: "At 6pm we exceeded the Reportable Quantity (RQ) of 500lbs of
SO$_2$ in a 24hr period from a flaring event at Flare #8.  Limetree issued a statement on
social media and is preparing a press release.  We temporarily suspended production in
response to the incident."  In a subsequent email, Limetree clarified that it "temporarily
suspended production on all process units."

84.     At 8:50 PM on May 12, 2021, Limetree staff told EPA staff by phone that
Limetree was stopping production after such a "big" incident.  This would not be a full
shutdown of the Refinery, but Limetree would stop production.  Limetree would run
some units on circulation and the utilities/wastewater would still be in operation.  The
Limetree staff was not sure how long production would be suspended.

85.     At 7:10 PM on May 12, 2021, an EPA employee currently deployed to St.
Croix emailed colleagues and informed them that, "[t]here is oil on my windshield."

86.     During the evening of May 12, 2021, a Reuters news article reported the
following:  "'The troubled Limetree Bay refinery in St. Croix will temporarily suspend
production activities until further notice after a flaring incident dropped oil on a nearby
neighborhood', the company said on Wednesday.  The company urged residents in the
nearby Enfield Green community not to consume the water following the incident.
'Water distribution will be established for affected communities,' the company said in a
statement, adding that processing units will be brought to a 'safe, stable condition.'"

87.     During a call with EPA staff on the morning of May 13, 2021, Limetree
staff said that at that time no oil was being added to the Refinery system.  The shutdown
of production will take a couple of days.  The oil from the incident that was deposited on
roads and neighborhoods to the west of the Facility or elsewhere was a heavy oil like

pitch oil, and not crude oil.  Limetree was, at this time, still using some pumps in generating electricity and running wastewater treatment operations.

88.     Later in the morning on May 13, 2021, around 11:40 AM, Limetree staff clarified to EPA staff that all process units at the Refinery are shut down with the exception of the platformer, which supplies hydrogen to the desulfurization unit and is needed during the ramping down process.  As soon as the Refinery is completely "ramped down", that unit will be shut down too.  Limetree staff stated that they expected this to be completed by the end of the day on May 13, 2021.

89.     The May 12, 2021 Incident resulted in flare rainout from Flare #8, and was likely caused by overloading the flare knockout drum with liquid droplets that reportedly originated from a process upset at the coker unit.  As discussed in paragraph 44 above, this type of event – let alone two such events in a few months – is not common for a refinery startup.

90.     Flare #8 has been the only flare in service at the Refinery, and refinery process units rely on it as a safeguard for process safety and environmental protection. Based on photos of the Second May Incident, it appears that Flare #8's flare tip, flare riser, and/or associated components were likely damaged in the Second May Incident. Due to the potential for release of uncombusted hydrocarbons and hydrogen sulfide, oil droplet rainout, and/or "burning rain", the refining process units that rely on Flare 8 may not be able to operate safely until Flare 8 is repaired and its capacity and fitness-for-service evaluated.

**Limetree Environmental Staffing**

91.　　During the April Site Visit, Limetree representatives stated that Limetree has a single Environmental Department, known as the Health, Safety, and Environmental ("HSE") Department, serving the entire Facility, including the Refinery and marine loading terminal operations.  In addition to managing environmental compliance at the Facility, the HSE department also oversees safety and implementation of COVID-19-related procedures.  The entire HSE department consists of 5 employees.  Limetree representatives noted they did have consultant support.

92.　　A Refinery of this size and complexity would be expected to have 10-20 full time onsite staff in its health, safety and environment department.

93.　　 On April 1, 2021, EPA issued a Clean Air Act § 114 information request to Limetree that provided Limetree with 30 days to respond.  In an April 7, 2021 letter from LBR, LBR expressed that, "this is a very intense time for the [environmental, health, and safety] team in terms of work load in general."  In large part given the heavy workload on its environmental, health, and safety staff, LBR requested that it be given an extra 180 days to respond to the information request, an amount of time far exceeding any extension typically provided by the EPA.

94.　　On April 19, 2021, Limetree replaced its Refinery General Manager.

**Health and Welfare Risks of Hydrogen Sulfide, Sulfur Dioxide, and Fuel Oils**

95.　　According to an April 24, 2021, DPNR advisory regarding the Late April 2021 incident, DNPR warned:

> "Exposure to low concentrations of hydrogen sulfide may cause irritation to the eyes, nose, or throat.  It may also cause difficulty in breathing for some asthmatics.  Respiratory distress or arrest has been observed in people exposed to very high concentrations of hydrogen sulfide.

Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high concentrations of hydrogen sulfide can cause loss of consciousness. In most cases, the person appears to regain consciousness without any other effects. However, in some individuals, there may be permanent or long-term effects such as headaches, poor attention span, poor memory, and poor motor function.

Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected."

This language echoes the information provided by ATSDR in its "TOXFAQ" and "Public Health Statement" (a summary about a hazardous substance taken from its ATSDR Toxicological Profile) documents for hydrogen sulfide.

96. ATSDR's "TOXFAQ" for hydrogen sulfide further notes that "[s]tudies in humans suggest that the respiratory tract and nervous system are the most sensitive targets of hydrogen sulfide toxicity."

97. According to ATSDR's "TOXFAQ" for hydrogen sulfide, while there is very little information on possible health problems in children who have been exposed to hydrogen sulfide, exposed children probably will experience effects similar to those experienced by exposed adults. Whether children are more sensitive to hydrogen sulfide exposure than adults is not known.

98. ATSDR's "Public Health Statement" on hydrogen sulfide further specifies that you can have respiratory and neurological effects if you are exposed to higher concentrations of hydrogen sulfide, at least 100 times higher than typical environmental levels. The ATSDR Public Health Statement elsewhere says that, "[h]ydrogen sulfide air concentrations from natural sources range between 0.00011 and 0.00033 ppm. In urban areas, the air concentrations are generally less than 0.001 ppm."

25

99.     ATSDR's "Public Health Statement" on hydrogen sulfide notes that, "If you are exposed to very high concentrations of hydrogen sulfide, you may have severe problems breathing even if you do not have a pre-existing respiratory condition.  You could lose consciousness if you are briefly exposed to very high concentrations (more than 1 million times higher than the amount typically found in the environment).  If this happens, you may regain consciousness without any other effects.  However, some people may have longer lasting effects such as headaches, poor attention span, poor memory, and poor motor function."

100.     ATSDR has also said that hydrogen sulfide can remain in the air from 1 to 42 days, depending on the season.

101.     Breathing high levels of $SO_2$ can cause immediate health impacts.   Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult.  People with asthma, particularly children, are sensitive to these effects of $SO_2$.  $SO_2$ emissions that lead to high concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ("SOx").  SOx can react with other compounds in the atmosphere to form small particles.  These particles contribute to particulate matter (PM) pollution.  Small particles may penetrate deeply into the lungs and in sufficient quantity can contribute to health problems.

102.     According to ATSDR's "Public Health Statement" on sulfur dioxide:

"Short-term exposures to high levels of sulfur dioxide can be life-threatening. Exposure to 100 parts of sulfur dioxide per million parts of air (ppm) is considered immediately dangerous to life and health.  Previously healthy nonsmoking miners who breathed sulfur dioxide released as a result of an explosion in an underground copper mine developed burning of the nose and throat, breathing difficulties, and severe airway obstructions.  Longterm exposure to persistent levels of sulfur dioxide can also affect your health.  Lung function changes have been observed in some workers exposed to 0.4–3.0 ppm sulfur dioxide for 20 years or more.   However, these workers were also exposed to

26

other chemicals, making it difficult to attribute their health effects to sulfur dioxide exposure alone. Additionally, exercising asthmatics are sensitive to the respiratory effects of low concentrations (0.25 ppm) of sulfur dioxide. . . .

Most of the effects of sulfur dioxide exposure that occur in adults (i.e., difficulty breathing, changes in the ability to breathe as deeply or take in as much air per breath, and burning of the nose and throat) are also of potential concern in children, but it is unknown whether children are more vulnerable to exposure. Children may be exposed to more sulfur dioxide than adults because they breathe more air for their body weight than adults do. Children also exercise more frequently than adults. Exercise increases breathing rate. This increase results in both a greater amount of sulfur dioxide in the lungs and enhanced effects on the lungs. . . .

Long-term studies surveying large numbers of children have indicated possible associations between sulfur dioxide pollution and respiratory symptoms or reduced breathing ability. Children who have breathed sulfur dioxide pollution may develop more breathing problems as they get older, may make more emergency room visits for treatment of wheezing fits, and may get more respiratory illnesses than is typical for children. However, studies like these are unable to provide conclusive evidence about sulfur dioxide's effects on children's health because many other pollutants are also present in the air. . . .

It is known that exercising asthmatics are sensitive to low concentrations of sulfur dioxide. Therefore, increased susceptibility is expected in children with asthma, but it is not known whether asthmatic children are more sensitive than asthmatic adults. Additionally, asthma occurs most often in African Americans, children between the ages of 8 and 11, and people living in cities. For unknown reasons, the death rates associated with asthma are also higher in non-Caucasian people. Therefore, it is expected that asthmatic, African American children living in urban areas have increased sensitivity to sulfur dioxide."

103. The Center for Disease Control's ATSDR has developed a "ToxFAQ" document (a fact sheet that answers the most frequently asked questions about a contaminant and its health effects) for fuel oils. This document describes "fuels oils" as "a variety of yellowish to light brown liquid mixtures that come from crude petroleum. Some chemicals found in fuel oils may evaporate easily, while others may more easily dissolve in water. Fuel oils are produced by different petroleum refining processes, depending on their intended uses." The document notes that, "[d]rinking or breathing fuel oils may cause nausea or nervous system effects," although it also notes that, "[l]ittle

information is available about the health effects that may be caused by fuel oils." It says that "Breathing some fuel oils for short periods may cause nausea, eye irritation, increased blood pressure, headache, light-headedness, loss of appetite, poor coordination, and difficulty concentrating. Breathing diesel fuel vapors for long periods may cause kidney damage and lower your blood's ability to clot."

104.    According to an expert EPA contractor, for the oil droplets released during two events, ". . . the oil [released during the Feb. 4 Incident and the Second May Incident] is likely composed of a mixture of petroleum hydrocarbons. Potential exposures include inhalation of volatile components, dermal contact with the residues, and ingestion of or contact with impacted water. Human health impacts depend on the specific petroleum constituents in a particular media or matrix, but total petroleum hydrocarbons as well as individual constituents have been associated with a variety of adverse health impacts. Skin and eye irritation, for example, are associated with short-term exposures to different hydrocarbon fractions. Longer term oral exposures to the semi-volatile fractions such as polyaromatic hydrocarbons (PAHs) have shown liver effects to be a common endpoint. Dermal contact with some PAHs have been shown to elicit skin hypersensitivity reactions. Some oil constituents have been classified as known or possible carcinogens.

> The expert EPA contractor found that: "The information available to date indicates that the incidents which occurred at the Limetree Bay Terminals and Refining facility present an imminent and substantial endangerment to both public health and welfare. This conclusion is based on multiple lines of evidence that demonstrate that the facility has already placed the health and welfare of the nearby community at risk. Additionally, the repeated nature of the flare failures coupled with the events associated with the release of noxious sulfur compounds and other potential hazardous air pollutants elevates the degree of harm."

28

The expert EPA contractor noted that, in addition to the impacts on physical health, the repeated incidents emitting oil droplets in a short time period have resulted in fear and anxiety about the next possible event and the severity of that event. The frequency of Limetree flare incidents raises the concern that events could continue to escalate and result in an even more significant or catastrophic incident, which could lead to injury or loss of life. The contractor also notes that improper maintenance or process safety management of flare systems has historically caused serious harm to people (killing or injuring workers and people living and working off site) and the environment, as well as damage and loss to property.

## CONCLUSIONS OF LAW

EPA concludes the following:

105.     Respondent LBT is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

106.     Respondent LBR is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

107.     In its current state, the Facility is a "pollution source" or "combination of sources" within the meaning of Section 303 of the Act, 42 U.S.C. § 7603.

108.     The Feb. 4, 2021 Incident's emissions of an "oily mist," consisting in part of heavy oil, including a mixture of many heavy organic compounds; the Late April Incident emissions of $H_2S$ and/or $SO_2$; the First May Incident's emissions of light hydrocarbons and/or volatile organic compounds; and the Second May Incident's

emissions of heavy oil droplets, particulate matter, and visible emissions are all "air pollutants" within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603.

109. Respondents are "causing or contributing" to the emission of air pollutants within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603, by continuing to operate the Facility's Refinery Operations in the current manner.

110. EPA is in receipt of evidence that, in less than four months, the air emissions from the Facility's Refinery Operations have, on at least four occasions, harmed the public health, welfare or the environment, as described *supra* at Paragraphs 33-90, and 95-104.

111. EPA is in receipt of evidence that the Refinery, if allowed to continue to operate as it is currently operated, presents an imminent and substantial endangerment to the public health or welfare or the environment.

112. Issuance of this Order is necessary to assure prompt protection of public health or welfare or the environment because it is not practicable to wait for the commencement of a civil action in United States District Court to assure prompt protection from additional air emissions events.

113. The Director of the Caribbean Environmental Protection Division has found that the Refinery's current operations, as described above, if allowed to continue, are presenting an imminent and substantial endangerment to public health or welfare or the environment, and it is therefore appropriate for the issuance of an Order under Section 303 of the Act, 42 U.S.C. § 7603.

114.    The Director of the Caribbean Environmental Protection Division is vested with the authority of the Administrator under Section 303 of the Act, 42 U.S.C. § 7603.

## ORDER

115.    Based on the foregoing, and pursuant to Section 303 of the Act, 42 U.S.C. § 7603, in order to abate or prevent an imminent and substantial endangerment to public health or welfare or the environment, the Director of the Caribbean Environmental Protection Division hereby orders Respondents, their agents, employees, successors, and assigns, to address the endangerment posed by frequent incidents at the Refinery that have endangered public health and welfare, as follows:

a.    Within one (1) business day of receipt of this Order, Respondents shall submit to EPA in writing a statement explaining whether Respondents intends to and is able to comply with this Order.

b.    Upon receipt of this Order, Respondents shall ensure all Refinery Operations cease until the termination of this Order in accordance with paragraph 125 unless, based on the auditor reports and Respondents' implementation plan, EPA determines, in consultation with VIDPNR, that operations can resume before the expiration of the Order.

c.    Respondents shall notify EPA electronically, in accordance with paragraph 116, as soon as possible once Refinery operations have ceased.

d.    Respondents shall retain, at their expense, independent third party auditors ("Auditors") consistent with the requirements set forth below. The Auditors shall be retained to conduct one or more comprehensive

audits ("Audits"), to be completed by the earlier of 30 days after EPA's approval of a list of auditors for a given Audit Category pursuant to subparagraph (f) of this paragraph or 42 days after issuance of this Order. The Audits shall include a review of the items specified in subparagraphs (i) and (j) of this paragraph. Respondents shall require that the Auditors act independently and objectively when performing all activities. Respondents shall provide the Auditors with full access to the Facility and provide or otherwise make available any necessary personnel, documents, and Facility environmental, health, and safety training to fully perform all audit activities.

e.   Within 7 days of this Order's issuance, Respondents shall submit to EPA the name and qualifications of at least three (3) proposed Auditors (the "Proposed Auditors") in each Audit Category discussed in subparagraphs (h), (i) and (j) of this paragraph – and more if necessary to provide competency in all of an Audit Category's scope – that Respondents certify meet the following conditions:

   i.   A Proposed Auditor for the Environmental Compliance Audit has demonstrated experience in audits for compliance with Clean Air Act regulations and has completed at least a bachelors degree in science or engineering.

   ii.   A Proposed Auditor for the Process Unit Audit has demonstrated experience in refinery process operation and optimization and has completed at least a bachelors degree in chemical or mechanical engineering.

      iii.   The Proposed Auditor and its personnel have not conducted research, development, design, construction, financial, engineering, legal, consulting nor other advisory services for Respondents or any other entity associated with the Refinery within the last three years.  However, a Proposed Auditor with personnel who, before working for the audit firm, conducted research, development, design, construction, or consulting services for Respondents (as an employee or contractor) may meet the requirements of independence by ensuring such personnel do not participate on, manage, or advise the audit team;

      iv.   The Proposed Auditor was not involved in efforts since 2016 to restart or operate the Facility.

      v.   The Proposed Auditor and its personnel will not provide any other commercial, business, or voluntary services to Respondents for a period of at least three years following the Proposed Auditor's submittal of the final Audit Report.

      vi.   Respondents will not provide future employment to any of the Proposed Auditor's personnel who managed, conducted, or otherwise participated in the Audit for a period of at least three (3) years following the Proposed Auditor's submittal of its final Audit Report.

f.   EPA will notify Respondents in writing whether it approves of any of the three (3) proposed Auditors in each Audit Category.  Within 7

days of EPA approval, Respondents shall retain one or more of the
EPA-approved Proposed Auditors for each Audit Category, who shall
then become the Auditor(s) for that Audit Category, to perform the
audit activities set forth in subparagraphs (i) and (j) of this paragraph
of this Order.  Respondents shall ensure that all audit personnel who
conduct or otherwise participate in audit activities shall certify that
they satisfy the conditions set forth in subparagraph (e) of this
paragraph above before receiving any payment from Respondents.

    i. If EPA rejects all three of the Proposed Auditors proposed for
an Audit Category, within 48 hours of receipt of EPA's
rejection notification, Respondents shall submit to EPA for
approval another three (3) Proposed Auditors that meet the
qualifications set forth in subparagraph (e) of this paragraph.
EPA will review the proposed replacements in accordance
with this subparagraph (f).

g. Each Auditor shall commence auditing onsite within 5 days of
contracting.

h. The Audit Categories shall include Category A (Environmental
Compliance Audit) and Category B (Process Unit Audit).

i. <u>Audit Category A: Environmental Compliance Audit</u>.  Respondents
shall ensure that the contract with the Auditor(s) retained to perform
the Environmental Compliance Audit explicitly requires the
Auditor(s) to perform the activities specified in this paragraph and its
subparagraphs.  However, the contents of the Audit shall not be

limited to the below items if the Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

   i. An evaluation of staffing within the environmental, health and safety program at the Refinery including staffing levels and whether staff have proper academic background, experience, and training to ensure the Refinery operates within required environmental, health, and safety limits and avoids situations or condition that endanger public health or welfare or the environment;

   ii. A review of CAA compliance at the Refinery since February 2021, with a summary of all non-compliance and recommended steps to prevent future noncompliance, including at a minimum:

   1. Exceedances of NSPS Subpart J and Ja and permit $H_2S$ limits at Flare #8 and the East Mix Drum and Coker Mix Drum Fuel Gas Systems;

   2. Compliance with all NSPS Subpart Ja requirements for flare incidents that exceed the 500 pound per day threshold;

   3. Compliance with the obligations of the Flare Management Plan submitted pursuant to NSPS Subpart Ja and NESHAP Subpart CC; and

35

4. An evaluation of compliance for releases at the coker unit with particular emphasis on the miscellaneous process vent requirements of NESHAP Subpart CC and the coker steam vent requirements of NESHAP Subpart CC.

j. <u>Audit Category B: Process Area Audits</u>.  Respondents shall retain one or more Auditors, as necessary to ensure the Auditors have the requisite expertise to perform the activities in this paragraph and its subparagraphs.  Respondents shall ensure that its contract with each Auditor retained to perform Process Area Audits explicitly requires the Auditor to perform the activities specified in this paragraph and its subparagraphs.  However, the contents of the Audit shall not be limited to the below items if an Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

1. Flare system audit.

a. An evaluation of the condition of the tip on Flare #8;

b. Capacity of the knockout pot to handle liquids loading to prevent flare rainout;

c. Capacity of flare #3 to serve as backup to Flare #8;

  d. Other damage already incurred by and to the flare system due to high liquid loading or other causes;

  e. Review of procedures that can be implemented to avoid and minimize the impact of future flaring events, including:

    i. Operation of redundant amine treatment units and redundant SRU trains operated in hot standby; and

    ii. Sulfur shedding practices;

  f. A review of whether and how installation of a flare gas recovery system to eliminate or minimize Flare #8 non-compliance can be expedited; and

  g. An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

 2. Coker audit.

  a. Releases to Flare #8, particularly high liquid loading that has occurred, what caused them,

and physical changes and operating changes to prevent them from happening in the future;

b. Releases since February 2021 of volatile organics directly to the atmosphere from the coker unit, and particularly from the steam vent prior to decoking, what caused them, and physical changes and operational changes to prevent such releases from happening again in the future; and

c. An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

3. Amine/Sulfur Recovery Unit (SRU).

a. Acid gas flaring events at Flare #8, particularly including hydrocarbon carryover from the amine units to the SRUs, what caused them, and physical changes and operational changes to prevent them from happening again in the future;

      b.  Review of procedures that can be implemented to avoid and minimize the impact of future acid gas flaring events, including:

         i.  Operation of redundant amine treatment units and redundant SRU trains operated in standby; and

        ii.  Sulfur shedding practices; and

      c.  An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

k.  Respondents shall ensure that its contract with each Auditor requires that the Auditor shall simultaneously submit an audit report ("Audit Report") to Respondents, EPA (at the contacts listed in paragraph 116 below), and VIDPNR (at the contacts listed in paragraph 117). Concurrently, Respondents shall represent that the Audit Report submittal meets the following requirements:

      i.  Respondents shall ensure that the Auditor does not share any draft or preliminary audit findings or reports with Respondents in any format (electronic, paper, or verbal).

      ii.  Respondents shall conduct no post-audit oral or written communications with the Auditor except to request, for the

purposes of the audit, additional audit-related data or information.  EPA and VIDPNR shall be simultaneously copied (at the contacts listed in paragraphs 116 and 117 below) on any such communication.

   iii.  Respondents shall ensure that the Auditor does not share its audit conclusions with Respondents until the Auditor submits its Audit Report(s) to EPA and VIDPNR.

   iv.  The Audit Report shall include all findings, conclusions, monitoring results, and other observations of the Auditor.

   v.  The Auditor shall provide EPA and VIDPNR with copies of all documents reviewed and identify all Facility personnel interviewed in support of the Audit Report.

   vi.  Respondents shall require the Auditor to include in the final Audit Report, submitted to EPA and VIDPNR pursuant to this Order, a certification that the Auditor has remained in compliance with all of the conditions set forth in subparagraph (e) of this paragraph, above.

l.  Within 56 days of the issuance of this Order, Respondents shall submit to EPA a detailed plan that addresses all findings, conclusions, and observations set forth in each Audit Report, with an expeditious schedule for implementation of all corrective measures ("the Plan").

   i.  Respondents shall also describe each completed or proposed action to correct each deficiency identified in each Audit Report submitted to EPA, including the date(s) that such corrections occurred or are

40

scheduled to occur. The Plan shall provide for the implementation of
each Auditor's recommendations in each Audit Report or provide a
detailed explanation for why an Auditor's given recommendation is
impracticable.

ii. The Plan shall ensure that the Refinery operates in a manner that
complies with environmental statutory, regulatory and permit
requirements such that said operation does not present an imminent
and substantial endangerment to public health or welfare or the
environment, and the Plan shall include adequate measures to protect
the health and welfare of residents living near the Facility.

iii. The Plan shall be submitted to EPA, for EPA review, comment, and
approval, or approval with modifications.

m. Upon commencing operation of any Refinery process unit following
the ceasing of Refinery Operations required in subparagraph (b) of this
paragraph, Respondents shall electronically notify EPA as soon as
possible but no later than 24 hours after commencement.

116. Note: Respondents shall submit all notices, schedules, work plans,
analyses, certifications and documentation required by this Order by email to:

Robert Buettner, Chief
Air Compliance Branch
Enforcement and Compliance Assurance Division
buettner.robert@epa.gov

And

Nancy Rodríguez, Chief
Multimedia Permits and Compliance Branch
Caribbean Environmental Protection Division
U.S. Environmental Protection Agency, Region 2

41

rodriguez.nancy@epa.gov

And

Harish Patel, Team Leader
Air Compliance Branch
Enforcement and Compliance Assurance Division
Patel.harish@epa.gov

And

Patrick Foley, Senior Environmental Engineer
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Foley.patrick@epa.gov

And

Liliana Villatora, Chief, Air Branch
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
villatora.liliana@epa.gov

And

Sara Froikin, Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
froikin.sara@epa.gov

117.    Note: Whenever submittal to VIDPNR is required in paragraph 115,

Respondents shall submit all notices, schedules, work plans, analyses, certifications and

documentation required by this Order by email to:

Verline Marcellin, Air Program Supervisor
Virgin Island Department of Planning and Natural Resources
verline.marcellin@dpnr.vi.gov

And

Jean-Pierre Oriol, Commissioner
Virgin Island Department of Planning and Natural Resources
jp.oriol@dpnr.vi.gov

## ACCESS

118.     Respondents shall allow EPA and its authorized representatives and contractors to enter and freely move about all areas subject to this Order, using equipment to gather information, for the purposes of inspecting conditions, activities, records, and contracts related to the presence of emissions in the Facility and other CAA compliance concerns and operation of the Refinery.  Respondents shall allow EPA and its authorized representatives to enter the areas subject to this Order to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to carrying out this Order.

119.     Nothing in this Order is intended to limit, affect or otherwise constrain EPA's rights of access to property and records pursuant to applicable law.

## RESERVATION OF RIGHTS

120.     EPA reserves the right to take any necessary action to enforce this Order, including obtaining injunctive relief or civil or criminal penalties, in accordance with Section 113 of the CAA, 42 U.S.C. § 7413.

121.     Be advised that issuance of this Order does not preclude EPA from electing to pursue any other remedies or sanctions authorized by law that are available to address these and other violations.  This Order does not resolve Respondents' liability for past violations of the Act or for any violations that continue from the date of this Order up to the date of compliance.  At any time after the issuance of this Order, EPA may take any or all of the following actions: issue a further order requiring compliance with the Act; issue an administrative penalty order for up to $48,762 per day for each violation; or bring a civil or criminal action seeking an injunction and penalties.  See Sections 113(a)-

43

(d) of the CAA, 42 U.S.C. §§ 7413(a)-(d); 40 C.F.R. Part 19; and 85 Fed. Reg. 83818 (December 20, 2020) (raising CAA penalties to $48,762 for violations occurring after Nov. 2, 2015 and assessed on or after Dec. 23, 2020).

122.    Nothing in this Order shall limit the power and authority of EPA to take, direct or order all action necessary to protect public health or welfare or the environment to prevent, abate or minimize an imminent and substantial endangerment resulting from the continued operation of the Refinery as it is currently operated.  Further, nothing in this Order shall be construed to prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, or from taking other legal or equitable action as EPA deems appropriate and necessary, pursuant to the CAA, and any other applicable law. Nothing herein shall be construed to prevent EPA from requiring Respondents to perform further actions pursuant to the CAA or other applicable law.

123.    Neither EPA nor the United States, by the issuance of this Order, assumes any liability for any acts or omissions by Respondents or Respondents' employees, agents, contractors or consultants engaged to carry out any action or activity pursuant to this Order; nor shall EPA or the United States be held as a party to any contract entered into by Respondents or Respondents' employees, agents, contractors or consultants engaged to carry out the requirements of this Order.

## EFFECTIVE DATE

124.    This Order is effective immediately upon issuance by EPA. Although this Order is effective immediately, Respondents may contact EPA to confer about compliance with the Order by contacting Sara Froikin, Esq. of EPA at 212-637-3263.

125.    This Order shall be effective for a period of not more than 60 days unless

the United States files a civil action in the appropriate United States district court

pursuant to Section 303 of the Act, 42 U.S.C. § 7603.


_____          _____
Carmen R. Guerrero, Director                                      Date
Caribbean Environmental Protection Division
United States Environmental Protection Agency, Region 2



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

<u>**VIA Electronic Mail – nmorgan@lbenergy.com & jhersperger@lbenergy.com**</u>

Jeffrey Hersperger, Senior Vice President
Limetree Bay Terminals, LLC
1 Estate Hope
Christiansted, VI 00820
jhersperger@lbenergy.com

Neil Morgan, Vice President, Refinery and General Manager
Limetree Bay Refining, LLC
1 Estate Hope
Christiansted, VI 00820
nmorgan@lbenergy.com

**Re:**     <u>**Request to Provide Information Pursuant to the Clean Air Act,
Reference Number: CAA-02-2021-1462**</u>

Dear Messrs. Morgan and Hersperger:

The U.S. Environmental Protection Agency (EPA), Region 2 is requiring Limetree Bay Terminal, LLC & Limetree Bay Refining, LLC (Limetree) to submit certain information about your facility at 1 Estate Hope, Christiansted, VI 00820 (the Facility). Enclosure 1, Part I provides the instructions needed to answer this information request, including instructions for electronic submissions. Enclosure 1, Part III specifies the information and monitoring that you must submit and conduct as well as the reporting schedule.

We are issuing this information request under Section 114(a) of the Clean Air Act (CAA), 42 U.S.C. § 7414(a). Section 114(a) authorizes the Administrator of EPA to require the submission of information. This authority has been delegated to the Director of the Enforcement and Compliance Assurance Division. Limetree owns and operates emission sources at the Facility.

Limetree must send all required information to:

       Robert Buettner, Chief
       Air Compliance Branch
       U.S. Environmental Protection Agency
       Region 2
       290 Broadway
       New York, New York 10007
       Buettner.Robert@epa.gov

Limetree must submit all required information under an authorized signature with the following certification:

I certify under penalty of law that I have examined and am familiar with the information in the enclosed documents, including all attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are, to the best of my knowledge and belief, true and complete. I am aware that there are significant penalties for knowingly submitting false statements and information, including the possibility of fines or imprisonment pursuant to Section 113(c)(2) of the Clean Air Act and 18 U.S.C. §§ 1001 and 1341.

You may assert a claim of business confidentiality under 40 C.F.R. Part 2, Subpart B for any part of the information you submit to us. Information subject to a business confidentiality claim is available to the public only to the extent, and by means of the procedures, set forth at 40 C.F.R. Part 2, Subpart B. If you do not assert a business confidentiality claim when you submit the information, EPA may make this information available to the public without further notice. You should be aware, moreover, that pursuant to Section 114(c) of the CAA and 40 C.F.R. § 2.301(a) and (f), emissions data, standards and limitations are not entitled to confidential treatment.

This information request is not subject to the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, because it seeks collection of information from specific individuals or entities as part of an administrative action or investigation.

We may use any information submitted in response to this request in an administrative, civil or criminal action.

Failure to comply fully with this information request may subject Limetree to an enforcement action under Section 113 of the CAA, 42 U.S.C. § 7413.

You should direct any questions about this information request to Harish Patel in the EPA Region 2 Air Compliance Branch at patel.harish@epa.gov or by phone at 212-637-4046.

Sincerely,



Dore LaPosta, Director
Enforcement and Compliance Assurance Division
Environmental Protection Agency – Region 2

Enclosures

Cc:     Catherine Elizee, Environmental Superintendent
        Limetree Bay Terminals LLC and Limetree Bay Refining LLC
        celizee@lbenergy.com

        Jean-Pierre Oriol, Commissioner
        US Virgin Islands Department of Planning and Natural Resources
        JP.Oriol@dpnr.vi.gov

CAA-02-2021-1462

Austin Callwood, Director of Environmental Protection
US Virgin Islands Department of Planning and Natural Resources
Austin.Callwood@dpnr.vi.gov

Verline Marcellin, Air Quality Program Manager
US Virgin Islands Department of Planning and Natural Resources
Verline.Marcellin@dpnr.vi.gov

CAA-02-2021-1462

## ENCLOSURE 1

## INFORMATION REQUEST PURSUANT TO SECTION 114 OF THE CLEAN AIR ACT

The U.S. Environmental Protection Agency (EPA) requires the submittal of information regarding operations and compliance of the Limetree facility located at 1 Estate Hope, Christiansted, St. Croix, VI.

### Part I: Instructions

In preparing your responses, please refer to the following instructions:

1.  A complete and separate response must be provided for each numbered information request paragraph below. Identify each response with the same paragraph number to which it corresponds.

2.  Provide all supporting documentation for each response. Supporting documentation includes, but is not limited to, company records (such as logs, receipts, ledgers, etc.), notifications or reports that have been submitted to EPA and/or the Virgin Islands Department of Planning and Natural and Resources (VIDPNR), manufacturer's equipment specifications and equipment certifications, and other similar types of documents. For each document submitted, indicate the paragraph number to which it responds.

3.  Provide as precise and complete a response as possible, even if the information sought was never documented in writing, or if the written documents are no longer available. Consult with all present and past employees and agents whom you or other employees or officers have reason to believe may be familiar with the matter to which the question pertains. Provide the name of each person responding to each information request paragraph, along with the names of all persons consulted in the preparation of each response.

4.  If the requested information or documentation cannot be made available, state the reason(s) why it cannot be made available, and provide all information that could lead to obtaining it. If you cannot provide a precise answer to a question, please approximate, but in any such instance, state the reason for your inability to be specific.

5.  In response to each question below, please provide, in detail, all relevant information. Please submit your responses to the EPA electronically. You may submit your responses electronically using any of the following methods: a) via electronic mail sent to Robert Buettner at the following address: buettner.robert@epa.gov; b) by providing the EPA with a link to the file sharing service of your preference where we may download the documents; or c) by requesting a link from the EPA to our file sharing service where you may upload the documents. If the information requested is not in existence or is not available, submit a statement certifying that fact, along with an explanation supporting such certification.

6.  Pursuant to Section 114 of the Clean Air Act (the Act), Limetree must supply the requested information. The requested information must be submitted in accordance with the schedules in Part III, Specific Information Request, unless EPA grants, in writing, an extension of time to respond.

CAA-02-2021-1462

## **Part II: Definitions**

All terms used in this Information Request will have their ordinary meaning unless such terms are defined in the Act, 42 U.S.C. § 7401 *et seq.*, and its implementing regulations. Where reference is made to the EPA regulatory provisions only, however, you should also apply the applicable federally approved state provisions when appropriate. Specific terms are defined as follows:

A.  The terms "document" and "documents" shall mean any object that records, stores, or presents information, and includes writings, memoranda, records, or information of any kind, formal or informal, whether wholly or partially handwritten or typed, whether in computer format, memory, or storage device, or in hardcopy, including any form or format of these.

B.  The term "Facility" shall mean the Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC facility located at 1 Estate Hope, Christiansted, St. Croix, VI 00820.

C.  The terms "you," "your" or "Limetree" means the following: the addressees of this Information Request, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC.

CAA-02-2021-1462

## Part III: Specific Information Request

### Information Request

1. Within fifteen (15) days of receipt of this Request, Limetree shall submit for EPA review and approval an ambient air monitoring plan that includes the operations of sulfur dioxide ($SO_2$) and hydrogen sulfide ($H_2S$) monitors at the five existing air monitoring sites and an additional four offsite monitoring sites identified in Table A below (the Limetree Monitoring Plan). The $SO_2$ monitoring must be performed using an EPA approved methodology. Approved methodologies for $SO_2$ monitoring are available in the List of Designated Reference and Equivalent Methods: https://www.epa.gov/sites/production/files/2019-08/documents/designated_reference_and-equivalent_methods.pdf. The minimum specifications for the $H_2S$ monitor are: minimum detection level of 3 parts per billion (ppb), maximum span of 1000 ppb, and an accuracy factor of +/- 15-20 percent.

Table A

| Monitor Number | AQS Address | Coordinates |
|---|---|---|
| Site 1 | West Gate Martin Marietta | 17.706014  -64.781737 |
| Site 2 | Estate Anguilla, The Ruins | 17.717197  -64.774590 |
| Site 3 | Plot 25 Estate Clifton Hill | 17.718683  -64.776514 |
| Site 4 | Plot 487 Estate Barren Spot | 17.732244  -64.765214 |
| Site 5 | Plot 214 Estate Ruby | 17.736911  -64.751889 |
| Site 6 | Approx. 3.75 miles NNW of refinery | 17.7697       -64.7800 |
| Site 7 | Good Hope Country Day School 2.25 North of refinery | 17.7518       -64.7659 |
| Site 8 | St. Croix Educational Complex High School –2.50 miles WNW of refinery | 17.7223       -64.7985 |
| Site 9 | School of Good Shepherd 5.00 miles WSW of refinery | 17.7008       -64.8350 |

2. Limetree shall follow all monitoring, siting, and quality assurance criteria in 40 CFR Part 58.

3. EPA will review the Limetree Monitoring Plan and approve it, approve it with specified changes, or require Limetree to make changes to it and submit the revised version to EPA for review and approval. If EPA requires Limetree to make changes to the Limetree Monitoring Plan and submit the revised version to EPA, Limetree shall do so within seven (7) days of receiving such communication from EPA. Limetree shall implement the plan once it is approved by EPA.

4. Limetree shall commence monitoring at Sites 1-5 within thirty (30) days of the date of this Information Request. Limetree shall commence monitoring at Sites 6-9 within ninety (90) days of the date of this Information Request.

5. Limetree shall also follow the operating procedures identified in the "Quality Assurance Handbook for Air Pollution Measurement Systems, Volume II, Ambient Air Quality Measurement Program (EPA-454/B-17-001, January 2017)", located at http://www.epa.gov/amtic/ambient-air-monitoring-

6

CAA-02-2021-1462

quality-assurance#documents, 40 CFR Part 58, Appendix A, and any specified procedures in the manufacturer's maintenance manual for the units used to monitor $SO_2$ and $H_2S$.

6. Limetree shall be responsible for all operation and maintenance associated with the $SO_2/H_2S$ monitors. Maintenance shall include, at a minimum, the replacement of any equipment and cleaning on a schedule specified in the manufacturer's maintenance manual and the EPA requirements as specified in the items above.

7. All monitoring shall take place for as long as the refinery operations remain in service.

8. Limetree shall re-install a meteorological tower at the Facility within thirty (30) days of the date of this Information Request and shall operate and maintain it. At a minimum, the meteorological tower must be comprised of instrumentation that continuously measures and records wind speed and wind direction at one-hour average intervals throughout the entire ambient monitoring period. Limetree shall correlate 1-hr ambient $SO_2/H_2S$ measurements with wind speed and wind direction data to determine source direction and the effects of wind speed on $SO_2/H_2S$ concentrations. The meteorological tower must also include calibrated ambient temperature and pressure instrumentation for purposes of determining corrected (actual) $SO_2/H_2S$ concentrations as recorded by the monitors. Limetree shall maintain and submit reports and records in accordance with the reporting requirements in this Information Request.

9. With respect to the meteorological tower, Limetree shall follow the "Quality Assurance Handbook for Air Pollution Measurement Systems Volume IV: Meteorological Measurements Version 2.0 (Final)" (EPA -454/DB-068-0012), located at https://www.epa.gov/sites/production/files/2020-10/documents/volume_iv_meteorological_measurements.pdf, and the "Meteorological Monitoring Guidance for Regulatory Modeling Applications" (EPA-454/R-99-005), located at https://www.epa.gov/sites/production/files/2020-10/documents/mmgrma_0.pdf.

10. The internal clocks of all $SO_2/H_2S$ analyzers, data loggers, and the wind speed and wind direction data logger shall be synchronized to within 60 seconds of each other (local time and not adjusted for Daylight Savings Time) and shall be checked against a calibrated reference clock at least once every thirty (30) days. Instrument clocks that are not within 60 seconds from the reference clock shall be reset to within 60 seconds of the reference clock. Each of these inconsistencies and each reset time shall be noted in the study log.

11. Limetree shall be responsible for all operation and maintenance associated with the meteorological tower. Maintenance shall include, at a minimum, the replacement of any equipment and cleaning on a schedule specified in the manufacturer's maintenance manual.

12. Within 30 days of EPA approval of the Limetree Monitoring Plan, Limetree shall submit a Quality Assurance Project Plan (QAPP) to the EPA. The guidance document for writing a QAPP is "U.S. EPA Guidance for Quality Assurance Project Plans," EPA QA/G-S, EPA/600/R-02/009 - December 2002. The guidance is available at https://www.epa.gov/quality/guidance-preparing-quality-assurance-project-plan. Any measures identified by this Information Request should be incorporated into the QAPP.

13. Limetree shall provide the EPA and VIDPNR access to the monitor sites and expeditiously respond to any inquiries from the EPA and/or VIDPNR regarding monitor siting, operations, or maintenance.

CAA-02-2021-1462

In the event that an EPA and/or VIDPNR inspector or auditor identifies problems, Limetree shall take appropriate corrective actions.

14. Limetree shall keep a daily log and monthly reports (Calibration/Maintenance Reports) of the following information:
    a. Each site visit and operator activities at the monitors;
    b. Any monitoring system downtime (date, time, duration, and reason) along with any corrective actions taken; and
    c. Any calibration data provided by the manufacturer or performed by Limetree.

15. EPA will provide additional written instructions to Limetree regarding the reporting, submittal, uploading, and posting of data and reports gathered or compiled pursuant to this Information Request, and Limetree shall comply with those instructions.

16. Limetree shall retain all records related to this Information Request for as long as the refinery operations remain in service.

CAA-02-2021-1462

**ATTACHMENT 1 TO ENCLOSURE 1**

**<u>CERTIFICATION OF RESPONSE</u>**

State/Territory of _____:

County of _____:

     I certify, under penalty of law, that I have personally examined and am familiar with the information submitted in response to the Information Request and all documents submitted with this response, and that based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate, and complete, and that all documents submitted with this response are complete and authentic unless otherwise indicated. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. I am also aware that for one year from the date of the Information Request, I am under an obligation to supplement my response to the Information Request if any additional information relevant to the matters should become known or available to me.

_____
NAME (print or type)

_____
TITLE (print or type)

_____
SIGNATURE

Sworn to before me this ___ day of _____, 2021

_____
Notary Public

9

CAA-02-2021-1462