IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

| | |
|---|---|
| NICOLE WOOTEN,<br><br>        PLAINTIFF,<br><br>VS.<br><br>LIMETREE BAY TERMINALS, LLC, ET AL.<br><br>        DEFENDANTS. | CASE NO. 1:23-CV-00012 |

**CROSSCLAIM OF PORT HAMILTON REFINING AND TRANSPORTATION, LLLP**

Now Comes Port Hamilton Refining and Transportation, LLLP ("Port Hamilton") and for its crossclaim against Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals ("Ocean Point"), respectfully avers:

1. Port Hamilton is a limited liability limited partnership that owns the oil refinery on St. Croix, including the coke domes located at the facility.

2. Ocean Point is a limited liability company that owns the oil terminal facility adjacent to Port Hamilton's refinery.

3. Ocean Point operates and administers the Title 33 CFR Part 165 D security zone on behalf of the Department of Homeland Security and the US Coast Guard that encompasses both Port Hamilton's refinery and Ocean Point's terminal.

4. As part of the operation of this security zone, Ocean Point controls access to the security zone and the buildings within the security zone.

1

5. In 2022 and at all material times, Port Hamilton and Limetree Bay were parties to a US Coast Guard and US Environmental Protection Agency required Integrated Contingency Plan ("ICP") that specified how both entities would jointly respond to emergencies such as fires within the fence line surrounding the combined refinery and terminal complex.

6. Under the ICP, an employee of Limetree Bay was designated as the Fire Chief for responding to all fire emergencies within the fence line of the combined refinery and terminal complex.

7. In the early morning of August 4, 2022, carbon monoxide sensors in the North Coke Dome ("NCD") owned by Port Hamilton activated, indicating the presence of higher than normal levels of carbon monoxide within the NCD. The alarm was investigated by a Port Hamilton operator on duty but there was no sign of smoke or fire at the time.

8. The NCD was a storage site for petroleum coke leftover from a joint venture between Ocean Point and Limetree Bay Refining, LLC to restart the refinery.

9. At approximately 0615 on August 4, 2022, Port Hamilton's Refinery Shift Superintendent ("RSS") followed up on the activated alarm and noticed smoke inside the NCD and alerted Port Hamilton's Refinery Manager and Ocean Point's fire chief.

10. The Refinery Manager promptly went to the NCD and confirmed the presence of smoke.

11. The smoke was created because the coke leftover from the Ocean Point/Limetree

Bay Refining joint venture was "smoldering" (smoking, but not on fire).

12. At approximately 0900 on August 4, 2022, Ocean Point's Fire Chief called Port Hamilton's Refinery Shift Superintendent and informed him that he had been instructed by Ocean Point's management not to assist with the response to the incident.

13. Port Hamilton's Total Safety On Site Operations Manager at the time of the incident also spoke with Ocean Point's fire chief and asked him if he was going to respond to the emergency and the fire chief responded that he had been instructed not to respond.

14. Ocean Point's Fire Chief informed Port Hamilton's Refinery Shift Superintendent that despite these instructions, "between us," he was putting aside some fire hoses and a Blitz fire nozzle and that he had instructed his employees to allow Port Hamilton to pick up this equipment.

15. Port Hamilton owned 100% of the fire house, the fire hoses, and Blitz fire nozzle along with numerous other items of firefighting equipment stored within the fire house; however, Ocean Point used its control over security, which included controlling access to the firehouse, to deny Port Hamilton access to its own facility and its own equipment.

16. By 1000 on August 4, 2022, Port Hamilton had activated an Incident Command and deployed fire hoses, a 500 gpm portable fire monitor, the Blitz nozzle and a handheld nozzles and hoses to attempt to keep the smoldering coke situation under control and from getting worse.

17. Port Hamilton monitored the NCD throughout the day and continued to keep wetting the smoldering coke.

18. At 1950 on August 4, 2022, Port Hamilton's Refinery Manager, Fermin Rodriguez, texted Charles (Ocean Point's Chief Operating Officer) and informed him that he would call him in the morning but that Port Hamilton needed to increase the volume and pressure in the fire main that serves the entire facility in order to be able to have the water reach areas within the NCD where the smoldering coke was located. Mr. Charles did not respond to this text.

19. At 0647 on August 5, 2022, Port Hamilton's Rodriguez emailed Ocean Point's Charles and informed him that Port Hamilton needed the following equipment, *all of which was owned by Port Hamilton* but maintained under lock and key by Ocean Point and controlled by Ocean Point's Fire Chief:

    a. Six Self-Contained Breathing Apparatuses with 18 spare cylinders;

    b. The pumper fire truck;

    c. Additional hoses;

    d. A Screaming Eagle 2,000 GPM Portable Monitor Base;

    e. The Handheld & Aerial Thermal Imaging Camera

    f. Bunker gear;

    g. Personal Protective Equipment; and

    h. Gas detection equipment.

20. In this email, Port Hamilton also asked Ocean Point to increase the volume and pressure of water at the high pressure manifold so that Port Hamilton's fire

fighting team would have the ability to discharge water into areas within the NCD where the coke was smoldering.

21. Neither Charles, nor anyone else from Ocean Point, responded to the email for at least 24 hours.

22. Over the night of August 5–6, 2022, the smoldering grew more intense.

23. The intensified smoldering would not have occurred had Ocean Point not denied to Port Hamilton the use of Port Hamilton's own equipment to deploy at the incident scene.

24. It was not until August 6, 2022 at 1019—27 hours after Port Hamilton first requested access to its own equipment—that Ocean Point finally responded and agreed to give Port Hamilton the requested access.

25. Although Ocean Point was not responding to the emergency, it did manage to find the time to make inquiry about payment of disputed invoices it had submitted to Port Hamilton. The invoices were disputed because Port Hamilton believed that Ocean Point was over billing it and Ocean Point would not provide the necessary documentation to substantiate the bills and validate that the bills were correct.

26. Ocean Point has subsequently admitted over billing Port Hamilton by an average of $141,319 per month over an 18-month period from January 2022 through June 2023. For the six months preceding the coke incident, the *admitted* over billing exceeded $800,000.

27. Port Hamilton contends that Ocean Point has still not properly accounted for or supported its invoices and that the over billing is substantially higher than what

5

Ocean Point admits to.

28. Because of the commercial dispute between Ocean Point and Port Hamilton, Ocean Point illegally and improperly used its security control over Port Hamilton's firehouse and fire equipment in an attempt to extort payment from Port Hamilton of the disputed invoice and to attempt to gain an upper hand in the commercial dispute.

29. Ocean Point's actions delayed Port Hamilton's response to the smoldering coke and directly caused the smoldering coke areas to spread within the coke dome and the situation to worsen.

30. The Port Hamilton personnel who were attempting to access the firehouse and equipment inside were "firefighters" or "first responders" within the meaning of 14 V.I.C. § 1508(a), which makes it illegal to "prevent, obstruct, or delay the performance by a . . . firefighter, or first responder" or to hamper or impede a firefighter or first responder in the performance of lawful duties.

31. Ocean Point's actions, as described above, prevented, obstructed or delayed the performance of Port Hamilton's first responders and impeded their performance of their lawful duties in violation of 14 V.I.C. § 1508(a).

32. Had Ocean Point not delayed Port Hamilton's response, the smoldering coke situation would have been contained to a much smaller area; far less smoke would have been released to the atmosphere; and Port Hamilton would have been able to control the situation in a much shorter period of time and at less cost.

33. Furthermore, plaintiff Wooten alleges that she entered the terminal facility on

August 8, 2022 to perform duties at a tugboat located in Ocean Point's Marine Terminal.

34. Based upon plaintiff Wooten's allegations, she entered the terminal facility as a business invitee of Ocean Point to perform work related to Ocean Point's operations and was granted access to the facility by Ocean Point.

35. Based upon plaintiff Wooten's allegations, she was located on Ocean Point's property at the time of her alleged exposure.

36. Port Hamilton did not grant plaintiff Wooten access to the facility; she was not present as a business invitee of Port Hamilton; and on information and belief she was not on Port Hamilton property or accessing any Port Hamilton facilities.

37. Port Hamilton had no knowledge that plaintiff Wooten was inside of the facility and thus was not in a position to warn her of any potential hazards related to the situation at the coke dome.

38. On information and belief, Ocean Point did not ensure that she had appropriate personal protective equipment, in violation of Ocean Point's own safety policies.

39. Because Ocean Point controlled access to both the refinery and terminal and the conditions under which it would allow individuals such as plaintiff Wooten to enter the refinery, it owed a duty to warn her of the situation at the coke dome and the potential hazard it presented when it allowed her into the facility.

40. If plaintiff Wooten was exposed to smoke, which is denied, it was because Ocean Point failed to warn her of the potential hazards or give her instructions to avoid areas of risk; and did not provide her with appropriate personal protective

7

equipment.

41. Port Hamilton was not aware that plaintiff Wooten was within the facility at any time during the coke smoldering incident and did not learn that she claimed to be in the facility on August 8, 2022 until it was served with the original complaint in this matter.

42. On August 11, 2022 at 0827, Ocean Point's Charles texted Port Hamilton's Rodriguez and claimed (despite the August 5, 2022 email to the contrary) that there had never been a discussion about using anything other than the fire truck and the thermal camera and claimed that Port Hamilton had breached an "agreement" and that Ocean Point had not agreed to give Port Hamilton full access to full firehouse (which is, and was, 100% owned by Port Hamilton). In this text, rather than focusing on the emergency at hand, which created a risk to personnel, including Ocean Point personnel, the environment in general, and the community at large, Ocean Point's Charles also demanded payment of $7.8 million in disputed invoices. Charles also demanded that Port Hamilton provide him with an update on negotiations regarding various agreements that Ocean Point wished to compel Port Hamilton to join.

43. These acts of trying to use the emergency situation to compel Port Hamilton to pay money it did not owe and sign agreements it did not agree with constituted attempted extortion within the meaning of 14 V.I.C. § 701.

44. On August 11, 2022 at 1444, Port Hamilton's Rodriguez advised Ocean Point's Charles that Port Hamilton was wiring Ocean Point $200,000 to cover, in advance,

various expenses relating to responding to the coke incident.

45. The wire was initiated on Friday, August 12, 2022; and Ocean Point acknowledged receipt on Monday, August 15, 2022.

46. On August 17, 2022, Port Hamilton's Rodriguez texted Ocean Point's Charles to advise him as to what Port Hamilton needed to keep the rescue team on at night and to request personnel from Ocean Point to assist in the effort to contain the fire.

47. Ocean Point's Charles refused to respond to Rodriguez and went "radio silent" for the next eight days and did not respond to follow up texts.

48. On August 21, 2022, at 0711, a fire broke out in the overhead coke conveyor system above the NCD.

49. At 0812 on August 21, 2022, Port Hamilton's Rodriguez texted Ocean Point's Charles to request assistance from Ocean Point in responding to this fire, which was in the vicinity of Ocean Point's docks and posed a threat to Ocean Point's own property.

50. Ocean Point's Charles did not respond to this text and Ocean Point did not respond with any assistance.

51. Instead, Ocean Point's emergency response personnel, including Charles, chose to observe the situation from a safe distance:



52. The cause of this fire was the excessive heat emanating from the NCD, which heated and dried out the conveyor belt and caused it to spontaneously combust.

53. Had Ocean Point not repeatedly interfered with Port Hamilton's efforts to contain the coke smoldering situation, the fire in the coke conveyor system would never have occurred.

## COUNT I

54. But for Ocean Point's improper and illegal conduct, the smoldering coke would have been controlled such that it would not have reached a point where it could have injured plaintiff Wooten.

55. Further, Ocean Point should have used its control over access to the facility to prevent plaintiff Wooten from entering any area of the facility where she could be exposed to smoke and to require her to be equipped with, and wear, appropriate personal protective equipment.

56. Ocean Point should also have warned plaintiff Wooten of the danger associated with the smoldering coke at the coke dome and on information and belief it failed to do so.

57. While Port Hamilton denies that it is liable to plaintiff Wooten for her alleged injuries, to the extent that it is found liable, then Ocean Point is liable to Port Hamilton because Ocean Point's acts and omissions of Ocean Point are superseding or intervening causes of the plaintiff's alleged injuries.

## COUNT II

58. Ocean Point's illegal and improper conduct substantially delayed Port Hamilton's response to the smoldering coke situation.

59. As a result of the delay caused by Ocean Point, the smoldering coke spread to other parts of the coke stored in the coke dome and a situation that could have been contained in a short period of time ended up instead taking several weeks to extinguish.

60. The delay and resulting increase in the size of the smoldering area in turn made it far more expensive for Port Hamilton to get the situation under control and damaged the coke dome in ways that would not have occurred but for Ocean Point's interference in Port Hamilton's efforts to fight the smoldering coke.

61. The delay in getting the smoldering coke under control allowed temperatures within the NCD to spike, and the high temperatures migrated throughout the coke handling system at the refinery.

62. When the high temperatures migrated to the coke handling conveyor system, it

caused the coke handling conveyor belt to dry out and then catch fire, causing further damage to Port Hamilton's equipment.

63. Port Hamilton incurred additional expenses to control the coke smolder/conveyor fire in excess of $2.3 million that it would not have incurred but for Ocean Point's illegal and improper conduct.

64. In addition, the delays in responding to the coke smolder/conveyor fire caused an estimated $2–4 million in damage to Port Hamilton's equipment that would not have occurred but for Ocean Point's illegal and improper conduct.

65. The acts of Ocean Point in delaying the response to an emergency were outrageous and taken with reckless indifference to the rights of Port Hamilton, plaintiff Wooten, Port Hamilton's personnel, Ocean Point's own personnel, the public- at-large and the environment such that a large award of punitive damages should be imposed to ensure that Ocean Point never again puts its claimed (and disputed) pecuniary interests ahead of the significant safety, health and environmental interests of anyone associated with either the refinery or the terminal.

Wherefore, Port Hamilton demands judgment against Ocean Point for any sums for which Port Hamilton may be found liable to plaintiff Nicole Wooten; for all of the damages it sustained as a result of Ocean Point's illegal and improper conduct; for punitive damages; and for all other relief available under the law.

Respectfully submitted,

**ANDREW C. SIMPSON, P.C.,**
Counsel for Port Hamilton Refining and Transportation, LLLP

Dated: February 8, 2024

          /s/ Andrew C. Simpson
By: Andrew C. Simpson, Esq.
VI Bar No. 451
ANDREW C. SIMPSON, P.C.
2191 Church Street, Suite 5
Christiansted, VI 00820
Tel: 340.719.3900
asimpson@coralbrief.com