DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| NICOLE WOOTEN,<br><br>    Plaintiff,<br><br>  v.<br><br>LIMETREE BAY TERMINALS d/b/a OCEAN POINT TERMINALS, PORT HAMILTON REFINING & TRANSPORTATION, WEST INDIES PETROLEUM LTD., and LIMETREE BAY REFINERY, LLC, as a nominal Defendant<br><br>    Defendants. | Case No.  1:23-cv-00012-WAL-EAH |

**OCEAN POINT'S CROSSCLAIMS
AGAINST PORT HAMILTON REFINING AND TRANSPORTATION**

  Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals ("Ocean Point"), pursuant to Rule 13 of the Federal Rules of Civil Procedure, hereby files its Crossclaim against Port Hamilton Refining and Transportation, LLLP ("Port Hamilton") and in support thereof, states as follows:

**THE PARTIES AND THE SITE**

  1.  Ocean Point is a limited liability company registered in the U.S. Virgin Islands with a principal place of business in St. Croix.

  2.  Port Hamilton is a limited liability limited partnership registered in the U.S. Virgin Islands with a principal place of business in St. Thomas.

  3.  Port Hamilton and West Indies Petroleum Limited ("WIPL") own the assets comprising the oil refinery located on St. Croix (the "Refinery").

  4.  Ocean Point owns the assets comprising the oil storage terminal facility on St. Croix (the "Terminal").

1

5. The Refinery and the Terminal are adjacent to one another on an approximately 2,000-acre site on St. Croix (the "Site").

6. One of the facilities included on the Site is a firehouse (the "Firehouse"), jointly owned by Port Hamilton and Ocean Point but located on the Terminal property.

7. Port Hamilton also owned two concrete coke dome buildings (the "North Coke Dome" or the "South Coke Dome" collectively the "Coke Domes") at the Site. [ECF No. 51 at ¶1].

8. On August 8, 2022, the North Coke Dome contained several tons of petroleum coke owned by Port Hamilton.

## NATURE OF THE CROSSCLAIM

9. Port Hamilton has proven that it is inept and ill-equipped to operate the Refinery and safely maintain its assets.

10. Contrary to the allegations asserted in Port Hamilton's Crossclaim [ECF No. 51], this Action is less about a commercial dispute between Port Hamilton and Ocean Point, and more about Port Hamilton's gross mishandling and negligent misconduct regarding its duties and responsibilities associated with the Refinery and the related assets.

11. Indeed, but for Port Hamilton's negligent and gross mishandling of the operations associated with the Refinery and the related assets, Plaintiff Nicole Wooten's ("Wooten") alleged injuries likely would not have occurred.

12. Port Hamilton is the proximate cause of any injuries Wooten allegedly sustained on August 8, 2022, and is therefore liable for any associated damages.

## FACTUAL BACKGROUND

**A.     The Coke Dome's Maintenance Under LBR's Ownership**

13.     Limetree Bay Refining, LLC ("LBR") is the Refinery's former owner, a separate and district entity from Ocean Point.

14.     Petroleum coke is a potentially hazardous and combustible material that must be properly stored and controlled in coke handling operation at an optimum moisture level to prevent petroleum coke emissions.

15.     LBR, to assist with maintaining the petroleum coke stored at the North Coke Dome, entered into a certain Petroleum Coke and Sulphur Services Agreement dated July 10, 2019, with Savage Services Corporation ("Savage").

16.     Savage was responsible for handling and storing the petroleum coke and was tasked with implementing, among others, the following safeguards:

   a. Maintaining the petroleum coke piles height and compaction, consistent with the facility's water application capabilities to reduce potential dust emissions;

   b. Wetting the petroleum coke with water to control dust emissions and to maintain optimum moisture level; and

   c. When applicable, applying an anti-dust chemical agent/treatment to maintain the integrity of the petroleum coke pile.

17.     After LBR filed for Chapter 7 bankruptcy in July 2021, Savage suspended its agreement with LBR for services concerning handling and storing of petroleum coke in the North Coke Dome.

### B. Port Hamilton and WIPL's Acquire the Refinery and Assume Its Responsibilities

18. On January 21, 2022, Port Hamilton and WIPL purchased the Refinery and related assets, free and clear of liens, claims, encumbrances, and interests.

19. Upon purchasing the Refinery, Port Hamilton and WIPL assumed duties, responsibilities, and costs associated with operating and maintaining the Refinery, including the North Coke Dome and handling and storing of the petroleum coke located therein.

20. Before the August 4, 2022 petroleum coke smoldering incident, Port Hamilton failed to retain Savage or any other contractor to assist in handling and storing their petroleum coke like its predecessor, LBR.

#### i. The EPA

21. In the summer of 2022, federal regulators at the Environment Protection Agency (the "EPA") inspected the Refinery and subsequently issued a report detailing multiple safety issues at the Refinery (the "EPA Report").

22. The EPA warned that the conditions at the Refinery demonstrated a risk of imminent release of extremely hazardous substances.

23. Specifically, the EPA inspectors observed conditions demonstrating a systemic lack of maintenance.

24. The Report noted that the Refinery had exposed wires in areas where flammable substances are located, which could spark a fire.

25. To make matters worse, during the EPA's inspection, Port Hamilton representatives could not confirm whether the exposed wires were live.

26. The EPA found numerous examples of corrosion, including extreme corrosion, and, in many cases, resulting in extreme deterioration of process valves, flanges, pipes, nuts/bolts, and pressure relief devices in all unit processes.

27. The EPA found that many process components were not adequately inspected or maintained for significant periods of time, and many were not be operable for routine service or emergency.

28. Gaskets were also in poor condition, and many exhibited severe corrosion.

29. The EPA found corrosion on the process components to such a visible degree that it demonstrated severely compromised integrity and operability.

30. Because of this degree of corrosion, the EPA found that the vessels, piping, and/or valves could fail and result in a catastrophic release of hazardous substances.

31. During the inspection, the EPA noted that:

   a. Port Hamilton failed to perform the required Process Hazard Analysis for the Refinery since it owned the Refinery and could not provide the analysis done by the prior owner.

   b. Port Hamilton could not provide a current hazard assessment for the processes that contain extremely hazardous substances at the Refinery.

   c. Port Hamilton failed to perform the required hazard identification and review, including process configuration, maintenance, hazard recognition, and the effectiveness of emergency shutdown and response procedures.

   d. Port Hamilton could not provide documentation that its process design complies with recognized and generally accepted industry practices.

   e. Port Hamilton could not provide pressure relief design and inspection records.

    f.   Port Hamilton could not provide current operating procedures and operator training records.

    g.   Port Hamilton did not have access to the prior owner's most recent three-year Process Safety Management/Risk Management Plan audit for the facility, and Port Hamilton did not perform a process safety audit.

    h.   Port Hamilton claimed that safety walk-throughs are performed daily by refinery operators and Lead Area Supervisors, but Port Hamilton did not provide documentation to support it.

32.    The Refinery's condition when the EPA inspected it was substantially similar to the Refinery's condition on August 8, 2022, when Wooten was allegedly injured.

33.    Port Hamilton's systemic lack of maintenance of the Refinery caused a significant safety risk to Wooten and the people of St. Croix.

34.    In December 2022, the EPA entered an order requiring Port Hamilton to hire experts to safely remove chemicals not being properly managed at the facility.

    ii.    **OSHA**

35.    On November 2022, the U.S. Occupational Safety and Health Administration ("OSHA") inspected the Refinery.

36.    OSHA expressed concern about Port Hamilton's gaps in its emergency response operation.

37.    OSHA found that Port Hamilton's fire brigade did not meet the requirements of 29 CFR § 1910.156.

38. OSHA found that Port Hamilton has no specific procedures for responding to chemical releases, no procedures for responding to fires, and a lack of onsite trained personnel available to respond.

39. OSHA noted that due to Port Hamilton's lack of pre-planned and coordinated efforts, it needed to establish its own independent emergency response with the Refinery's employees (or contracted professional service companies) and with pre-arranged support from St. Croix's local emergency services.

40. The issues OSHA identified during the Refinery's inspection also existed on August 8, 2022, when Wooten was allegedly injured.

### C. Petroleum Coke Smoldering at the North Coke Dome

41. Upon information and belief, for several days preceding August 4, 2022, automatic carbon monoxide alarms had been activated at the North Coke Dome and repeatedly silenced by Port Hamilton employees.

   i. **August 4, 2022**

42. On August 4, 2022, at or around 4:20 a.m., an automatic air monitor alarm was activated in the North Coke Dome, that indicated the presence of "higher than normal levels of carbon monoxide" within the North Coke Dome.

43. Despite this, Port Hamilton's night shift supervisor, Christopher Thomas ("Thomas"), did not inspect the North Coke Dome until around 5:00 a.m. on August 4, 2022.

44. Despite being notified of high levels of carbon monoxide, Thomas unsuccessfully attempted to silence the alarm because he did not smell any smoke or see any glow or fire. [ECF No. 51 at ¶ 7].

45. Carbon monoxide is an invisible, odorless, tasteless, and highly toxic gas that human senses cannot always detect, hence the importance of a carbon monoxide detector.

46. At or around 6:15 a.m. on August 4, 2022, Port Hamilton's Refinery Shift Superintendent followed up on the activated alarm and noticed smoke inside the North Coke Dome at the highest point of the ceiling. [ECF No. 51 at ¶ 9].

47. Upon information and belief, a Port Hamilton employee again silenced the alarm.

48. Port Hamilton did not seek the assistance of local or federal firefighting authorities to control the smoke.

49. At or around 7:15 a.m., Ocean Point's Marine Manager (the "Manager") arrived at the North Coke Dome after hearing an activated alarm and met with Curtis Green, a Port Hamilton employee.

50. Upon arrival and entry into the North Coke Dome, the Manager saw a plume of smoke emanating from the northeast corner behind a large pile of petroleum coke.

51. The cause of the smoldering was the result of dry petroleum coke that had been improperly handled and stored by Port Hamilton at the North Coke Dome since it purchased and assumed all obligations and responsibilities related to the Refinery.

52. The catalyst for the dry petroleum coke and consequent smoldering was a result of Port Hamilton's failure to take the necessary steps to maintain and store the petroleum coke at the North Coke Dome.

53. At the time, Port Hamilton had a water sprinkler system in the North Coke Dome that was necessary to keep the petroleum coke at an optimum moisture level, and that could have been utilized for cooling and extinguishing the smoldering petroleum coke.

54. However, the water sprinkler system was inoperable due to Port Hamilton's lack of maintenance.

55. Had Port Hamilton properly maintained the petroleum coke following its purchase and assumption of duties/responsibilities associated with the Refinery, the smoldering at the North Coke Dome would never have occurred.

56. At or around 7:30 a.m., Ocean Point's Fire Chief ("Fire Chief") and an Ocean Point employee ("ERT Member") arrived on the scene.

57. The Fire Chief recommended that Port Hamilton rotate the smoldering pile of petroleum coke while adding water to cool it to control and extinguish the smoldering.

58. Rather than following the Fire Chief's recommendation, Port Hamilton was more concerned with the hygiene of the dome building.

59. Specifically, Port Hamilton indicated that it did not want to follow the Fire Chief's recommendation because it would require them to dirty Port Hamilton's conveyor track system, which Port Hamilton had recently cleaned.

60. Despite having no duty to assist, Ocean Point initially offered to bring a truck, set up the hose, and assist in their efforts.

61. Underestimating the severity of the situation, Port Hamilton told the Fire Chief that there was no need for assistance besides some additional hoses.

62. Despite the rejected offer of assistance, Ocean Point allowed Port Hamilton access to the Firehouse.

63. Several Port Hamilton personnel requested and received various firefighting equipment, including hoses, blitzfire monitors, thermal imagers, and specialized remote nozzles

9

that could be left inside the dome without manual intervention to spray water on the petroleum coke continuously.

64. Some of the equipment taken by Port Hamilton from the Firehouse was equipment owned by Ocean Point, for which Ocean Point had no obligation to provide.

65. At approximately 6:30 p.m., smoke was still emanating from the North Coke Dome, and the carbon monoxide alarms were still activated.

66. Still, Port Hamilton did not seek the assistance of local or federal firefighting authorities to control the smoldering petroleum coke.

        ii.        **August 5, 2022**

67. On August 5, 2022, at or around 7:15 a.m., the Manager presented to the Refinery to evaluate and assess the smoldering petroleum coke incident at the North Coke Dome.

68. At this time, the alarms were audible in the Coke Domes, and visible smoke was emanating from the Coke Domes.

69. Despite having no duty, Ocean Point continued to allow Port Hamilton access to the Firehouse, and Port Hamilton obtained additional fire-related equipment.

70. Additionally, some of the equipment taken by Port Hamilton from the Firehouse was equipment owned by Ocean Point, for which Ocean Point had no obligation to provide.

71. On August 5, 2022, at or around 7:00 p.m., smoke was emanating from the North Coke Dome.

72. Still, Port Hamilton did not seek the assistance of local or federal firefighting authorities to control the smoldering petroleum coke.

      iii.      **August 6, 2022 and August 7, 2022**

73. On August 6, 2022, at or around 6:30 a.m., smoke was still emanating from the Coke Domes.

74. Ocean Point continued to allow Port Hamilton and its employees access to the Firehouse, wherein Port Hamilton was able to retrieve, among many things, the following:

    a. Fire Pumper Truck;

    b. Two Screaming Eagle Monitors; and

    c. Infrared thermal imaging cameras.

75. Moreover, Ocean Point supplied Port Hamilton with the necessary water and fuel supply for the Fire Pumper Truck.

76. Had Port Hamilton retained a contractor to assist with handling and storing petroleum coke following its purchase and assumption of responsibilities associated with the Refinery and the North Coke Dome, the smoke caused by the smoldering petroleum coke in the North Coke Dome likely would not have happened, or at the very least, been extinguished before Wooten arrived at the Site.

    **D.**    **The Mutual Aid Agreement**

77. Between August 4, 2022, when the smoldering petroleum coke was allegedly discovered, and August 8, 2022, when Wooten alleges she arrived at the Refinery, Ocean Point had no right or duty to assist with the operation and maintenance of the Refinery, including the Coke Domes.

78. By August 21, 2022, neither Port Hamilton nor its contractors were able to extinguish the smoldering petroleum coke, resulting in a fire to occur within the North Coke Dome.

79. As a result, Port Hamilton requested Ocean Point's assistance with extinguishing the smoldering petroleum coke and consequent fire at the North Coke Dome.

80. Accordingly, Port Hamilton and Ocean Point entered into a Mutual Aid Agreement, wherein Ocean Point agreed to provide Port Hamilton access to Ocean Point's assets and personnel to respond to the ongoing fire at the North Coke Dome. The Mutual Aid Agreement is attached hereto as **Exhibit A**.

81. In the Mutual Aid Agreement, Port Hamilton released Ocean Point from "any and all liability arising from any and all obligations, causes of action, suits, promises, agreements, losses, damages, charges, expenses, challenges, contests, liabilities, costs, claims, and demands of whatsoever nature, known or unknown, which may ever accrue in connection with the assistance rendered by Ocean Point to Port Hamilton pursuant to [the Mutual Aid] Agreement."

82. In the Mutual Aid Agreement, Port Hamilton agreed to "defend, indemnify, and hold harmless Ocean Point for any and all obligations, causes of action, suits, promises, agreements, losses, damages, charges, expenses, challenges, contests, liabilities, costs, claims, and demand of whatsoever nature that may arise or may be incurred by Ocean Point as a result of [the Mutual Aid] Agreement and any assistance it provides pursuant thereto."

83. Accordingly, Ocean Point is not liable to Port Hamilton for any assistance rendered.

## COUNT I – CONTRIBUTION

84. Ocean Point repeats and realleges each allegation set forth in Paragraphs 1 through 83 of this Crossclaim.

85. Port Hamilton and WIPL own the Refinery, including the Coke Domes.

86. Following its purchase of the Refinery, Port Hamilton owed Wooten and the people of St. Croix a duty to ensure that the petroleum coke was handled and properly stored.

87. Indeed, Port Hamilton breached its duty to Wooten by failing to take the necessary steps to ensure the petroleum coke was properly handled and stored.

88. But for Port Hamilton's negligence, Wooten would not have sustained any of her alleged injuries caused by smoldering petroleum coke.

89. Port Hamilton is the proximate cause of Wooten's alleged injuries.

90. Ocean Point denies liability to Wooten for her alleged injuries.

91. But, to the extent Ocean Point is found liable to Wooten, then Port Hamilton is liable to Ocean Point because its acts and omissions are the superseding and intervening causes of Wooten's injuries.

## **COUNT II – GROSS NEGLIGENCE**

92. Ocean Point repeats and realleges each allegation set forth in Paragraphs 1 through 83 of this Crossclaim.

93. From its inception, Port Hamilton was inept and ill-equipped to operate the Refinery or properly handle and store its petroleum coke.

94. Port Hamilton was abundantly aware of the necessary precautions its predecessor, LBR, took to operate the Refinery, including the steps taken to ensure the proper handling and storing of petroleum coke stored within the North Coke Dome.

95. Despite this awareness, Port Hamilton purchased the Refinery and assumed all responsibilities and duties related to the North Coke Dome but failed to take any necessary steps to ensure the proper handling and storing of the inherently dangerous petroleum coke.

96. Port Hamilton's failure to properly handle and store the petroleum coke caused it to dry and subsequently smolder within the North Coke Dome building.

97. Port Hamilton further failed to listen to the recommendations of Ocean Point's Fire Chief to control the petroleum coke smoldering incident because it was concerned with dirtying equipment that Port Hamilton had recently cleaned.

98. Port Hamilton failed to seek the assistance of local or federal firefighting authorities.

99. Port Hamilton's failures in its maintenance of the Refinery and its emergency response protocols are well documented by federal authorities.

100. As a result of Port Hamilton's gross negligence, multiple pieces of Ocean Point's equipment was destroyed or significantly damaged.

101. Ocean Point sustained compensatory and consequential damages and is entitled to punitive damages for Port Hamilton's outrageous conduct.

**COUNT III – BREACH OF CONTRACT**

102. Ocean Point repeats and realleges each allegation set forth in Paragraphs 1 through 83 of this Crossclaim.

103. In the Mutual Aid Agreement, Port Hamilton agreed to defend and hold Ocean Point harmless "for any and all obligations, causes of action, suits, promises, agreements, losses, damages, charges, expenses, challenges, contests, liabilities, costs, claims, and demand of whatsoever nature that may arise or may be incurred by Ocean Point as a result of [the Mutual Aid] Agreement and any assistance it provides pursuant thereto."

104. In the Mutual Aid Agreement, Port Hamilton also agreed to release Ocean Point from "any and all liability arising from any and all obligations, causes of action, suits, promises, agreements, losses, damages, charges, expenses, challenges, contests, liabilities, costs, claims, and

demands of whatsoever nature, known or unknown, which may ever accrue in connection with the assistance rendered by Ocean Point to Port Hamilton pursuant to [the Mutual Aid] Agreement."

105. Despite this defense, release, and hold harmless agreement being executed on August 21, 2022, the *same* day Port Hamilton acknowledges the fire at the refinery started (Crossclaim ¶ 48), Port Hamilton forces Ocean Point to respond to a Crossclaim filed on February 8, 2024 in the instant action, which asserts the following:

  a) At 0812 on August 21, 2022, Port Hamilton's Rodriguez texted Ocean Point's Charles to request assistance from Ocean Point in responding to this fire, which was in the vicinity of Ocean Point's docks and posed a threat to Ocean Point's own property. Ocean Point's Charles did not respond to this text and Ocean Point did not respond with any assistance. Instead, Ocean Point's emergency response personnel, including Charles, chose to observe the situation from a safe distance. The cause of the fire was the excessive heat emanating from the [North Coke Dome], which heated and dried out the conveyor belt and caused it to spontaneously combust. (*See* Crossclaim ¶¶ 49-52), and

  b) When the high temperatures migrated to the coke handling conveyor system, it caused the coke handling conveyor belt to dry out and then catch fire, causing further damage to Port Hamilton's equipment. Port Hamilton incurred additional expenses to control the coke smolder/conveyor fire in excess of $2.3 million that it would not have incurred but for Ocean Point's illegal and improper conduct. In addition, the delays in responding to the coke smolder/conveyor fire caused an estimated $2–4 million in damage to Port Hamilton's equipment that would not have occurred but for Ocean Point's illegal and improper conduct.

*See* Crossclaim ¶¶ 62-65.

106. In the Mutual Aid Agreement, Port Hamilton unequivocally agrees to release, defend, and hold Ocean Point harmless for these allegations.

107. Port Hamilton's choice to bring the Crossclaim and its failure to defend Ocean Point is a material breach of the Mutual Aid Agreement.

15

108. As a result of Port Hamilton's breach Ocean Point has suffered compensatory and consequential damages.

## **REQUEST FOR JURY TRIAL**

Ocean Point requests a trial by jury for all issues triable by the right to a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Ocean Point hereby demands judgment against Port Hamilton as follows:

a. Compensatory, consequential, and punitive damages, in addition to costs and disbursements, in an amount to be determined at trial;

b. For such other and further relief as the Court deems just and proper.

DATED: February 29, 2024              **AKERMAN LLP**
                                      201 East Las Olas Boulevard,
                                      Suite 1800
                                      Fort Lauderdale, Florida 33301
                                      Telephone: (954) 463-2700
                                      Facsimile: (954) 463-2224


                                      By: /*s/Donnie M. King*
                                          Donnie M. King
                                          Virgin Islands Bar No. 1237
                                          Primary e-mail: donnie.king@akerman.com
                                          Secondary e-mail: sharon.luesang@akerman.com
                                          David J. Awoleke (admitted *pro hac vice*)
                                          david.awoleke@akerman.com

                                          *Counsel for Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals*

**CERTIFICATE OF SERVICE**

    I certify that the foregoing document was filed with the Court's electronic filing system on March 4, 2024 which will send a notice of electronic filing to all counsel of record.

                                                */s/Donnie M. King*
                                                Donnie M. King