## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

NICOLE WOOTEN,

          Plaintiff,

          v.

LIMETREE BAY TERMINALS d/b/a
OCEAN POINT TERMINALS, PORT
HAMILTON REFINING AND
TRANSPORTATION, and WEST
INDIES PETROLEUM LTD.,

          Defendants.

Case No.  1:23-cv-00012-WAL-EAH

### DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION FOR EXTENSION OF TIME TO SERVE EXPERT REPORTS

Defendants Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals ("Ocean Point") and Port Hamilton Refining and Transportation, LLLP ("Port Hamilton") (collectively, "Defendants"), by and through undersigned counsel, respectfully submit this Reply in Support of Defendants' Joint Motion for Extension of Time to Serve Expert Reports.

## I.    Plaintiff Mischaracterizes Defendants' Efforts and Diligence

Plaintiff asserts that Defendants failed to act diligently in securing experts and waited "too long" to begin the process. This is incorrect. Defendants began the process of securing rebuttal experts immediately after Plaintiff served her expert reports on August 8 and 12, 2025. The suggestion that Defendants idled until September 2, 2025 ignores the practical difficulties inherent in locating a pulmonologist willing to conduct an independent medical examination ("IME") in this matter, as well as other experts. Expert retention in a case of this complexity is not instantaneous, especially where multiple layers of medical, toxicological, vocational, and economic expertise are required.

Defendants acted reasonably and promptly by (1) identifying a qualified pulmonologist in Florida, (2) offering to cover Plaintiff's travel expenses to facilitate the IME, and (3) when Plaintiff refused, shifting efforts to locate a pulmonologist in Atlanta. Far from showing a lack of diligence, this demonstrates Defendants' commitment to accommodate Plaintiff's demands and move forward without burdening the Court. The intervening weeks were spent actively seeking to resolve these issues cooperatively rather than through immediate motion practice.

## II.      Plaintiff's Position on Travel Is Inconsistent with the Record

Plaintiff argues that Defendants acted unreasonably in first scheduling the IME in Florida, knowing Plaintiff's ability to travel was limited. That argument misrepresents Plaintiff's own testimony. Plaintiff made clear at deposition that she was specifically told by her medical providers not to travel to St. Croix, Virgin Islands because of her health. Her medical providers did not place any restrictions on her travel. *See* Excerpts of May 19, 2025 Deposition of Nicole Wooten, attached hereto as **Exhibit A** at 225:22 – 228:3. Indeed, she has traveled elsewhere since the date of her alleged injury, and Defendants offered Florida as a convenient location with expenses paid. *See* e.g., Exh. A at 129:21-141:18, *see also* ECF No. 199-1 at p.1. When Plaintiff refused, Defendants accommodated her by finding an Atlanta pulmonologist.

Thus, the record establishes that Defendants were both reasonable and flexible. Plaintiff cannot now recast Defendants' efforts as improper when Defendants attempted to work within the self-imposed parameters Plaintiff set.

## III.     The Compressed Timeline Necessitates a Brief Extension

Plaintiff's Opposition insists that Defendants had "ample time" to complete its pulmonologist report by September 22, 2025, after completing the IME on September 17, 2025. The IME was conducted on September 17, 2025, despite Defendants requests to complete it

sooner. Plaintiffs are now asking Defendants to serve an expert pulmonologist report five days after the IME, with two of those days falling on a weekend. Preparing a comprehensive expert report under Rule 26(a)(2), which requires full disclosure of opinions, bases, and supporting data, cannot be accomplished responsibly in that timeframe.

Plaintiff's suggestion that five days is sufficient trivializes the process of producing a reliable expert report and risks reducing the IME to a perfunctory exercise rather than a substantive analysis. The need for a short extension arises directly from Plaintiff's refusal to attend the Florida IME and the necessary time spent locating an Atlanta substitute.

## IV.    Sequential Dependence of Expert Reports Establishes Good Cause

Plaintiff further argues that Defendants should have already produced a toxicology report. This is legally and factually mistaken. The toxicologist cannot provide a reliable causation analysis in a vacuum. The toxicologist must rely on the pulmonologist's conclusions regarding the extent and permanence of Plaintiff's pulmonary condition to determine whether the alleged exposures caused that condition. Likewise, Defendants' vocational rehabilitation expert cannot opine on Plaintiff's functional capacity without the pulmonologist's medical conclusions, and Defendants' damages expert relies on the vocational expert's findings to assess economic loss.

This chain of dependency is exactly why good cause exists. Requiring Defendants to produce the toxicologist's report, or any other expert report, without the foundational pulmonologist's analysis would result in incomplete, speculative, and potentially unreliable opinions.

## V.    Plaintiff's Claims of Prejudice Are Overstated

Plaintiff contends that the requested extension "cuts significantly" into time available for depositions and will "delay" the case. This argument is overstated. The expert discovery cutoff is

November 20, 2025, nearly two months after the requested extension date of October 6, 2025. Plaintiff identifies six expert depositions to be scheduled within that timeframe. Courts routinely manage schedules with similar or shorter windows for depositions, and nothing prevents the parties from coordinating efficiently once reports are exchanged.

Moreover, Plaintiff herself previously requested and was granted an extension of her expert deadlines. Defendants' request for a modest extension is consistent with the principle of parity and fairness. Granting this extension will ensure both sides' experts are fully developed, which benefits not only Defendants but also the Court and the truth-finding process.

## VI.    Rule 16(b)(4) Standard Is Satisfied

Under Rule 16(b)(4), the test is good cause, measured by diligence. Here, Defendants acted diligently under the circumstances, adjusted to Plaintiff's self-imposed restrictions, and scheduled the IME at the earliest possible opportunity. Plaintiff's Opposition seeks to hold Defendants to a rigid, unrealistic standard divorced from the practical realities of expert retention and medical examinations. Defendants' request is narrowly tailored: two weeks, their first such request, made in good faith, with no intent to delay or prejudice. This satisfies Rule 16(b)(4).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Joint Motion for Extension of Time and extend the deadline to serve expert reports to **October 6, 2025**.

Dated:  September 19, 2025                    Respectfully submitted,

**AKERMAN LLP**                              **ANDREW C. SIMPSON P.C.**
201 East Las Olas Boulevard, Suite 1800      2191 Church Street, Suite 5,
Fort Lauderdale, Florida 33301               Christiansted, VI 00820
Telephone: (954) 463-2700                    Telephone: (340) 719-3900
Facsimile: (954) 463-2224

By: /s/ Donnie M. King                        By: /s/Andrew C. Simpson
                                             **Andrew C. Simpson**
                                             Virgin Islands No. 451

4

**Donnie M. King**
Virgin Islands No. 1237
donnie.king@akerman.com
tyresa.thompson@akerman.com
**Eric D. Coleman** (admitted *pro hac vice*)
eric.coleman@akerman.com
lauren.chang-williams@akerman.com
**Reginald E. Janvier** (admitted *pro hac vice*)
reginald.janvier@akerman.com
sharon.luesang@akerman.com

*Counsel for Defendant Limetree Bay Terminals,
LLC d/b/a Ocean Point Terminals*

asimpson@coralbrief.com

*Counsel for Defendant Port Hamilton
Refining and Transportation, LLLP*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed with the Court's electronic filing system on

September 19, 2025 which will send a notice of electronic filing to all counsel of record.

*/s/Donnie M. King*
Donnie M. King

# EXHIBIT A

Page 1

1              DISTRICT COURT OF THE VIRGIN ISLANDS
                    DIVISION OF ST. CROIX
2

3   NICOLE WOOTEN,
4          Plaintiff,
                                    Civil Action No.:
5       vs.
                                    1:23-cv-00012
6   LIMETREE BAY TERMINALS
    d/b/a OCEAN POINT
7   TERMINALS, PORT
    HAMILTON REFINING AND
8   TRANSPORTATION, and WEST
    INDIES PETROLEUM LTD.,
9
           Defendants.
10  _____
11
12          VIDEOTAPED DEPOSITION OF NICOLE WOOTEN
13
                        May 19, 2025
14
                        10:09 a.m.
15
16
                        Akerman, LLP
17
                999 Peachtree Street, N.E.
18
                        Suite 1700
19
                      Atlanta, Georgia
20
21
22
23          LAURA R. SINGLE, CCR-B-1343
24
25

Page 129

1      A.   No.

2      Q.   And Aaron Curtis?

3      A.   (601) 597-4018.

4      Q.   Any other info on him?

5      A.   No.

6      Q.   No job info?

7      A.   No.

8      Q.   No address?

9      A.   No.

10     Q.   No other telephone numbers?

11     A.   No.

12     Q.   And just to be clear, those are all of

13  the -- all of your intimate partners since 2022?

14     A.   Yes.

15     Q.   And there's no one else?

16     A.   No.

17     Q.   I want to talk about your travel.

18          THE COURT REPORTER:  I'm sorry?

19          MR. KING:  Travel.

20  BY MR. KING:

21     Q.   I want to talk about your travel.  Please

22  tell me all the places that you visited by airplane

23  since -- since 2022.

24     A.   Are we saying before this incident or after?

25     Q.   Let's just do -- do you know what?  Let's

Page 130

1    start at August 8th, 2022, every place you ever

2    jumped on an airplane.

3         A.    I came home.

4         Q.    Home is Atlanta?

5         A.    Yes.  So there was a layover, so that means

6    I had to be in Florida.

7         Q.    Okay.

8         A.    I've been to New York and back to St. Croix.

9    And there was probably a layover again, so I was

10   probably in Florida again when I came back to

11   St. Croix.  And Louisiana.

12        Q.    That's everywhere?

13        A.    Yes.

14        Q.    Have you traveled outside the country at

15   all?

16        A.    No.

17        Q.    Did you travel to anybody's birthday to any

18   states?

19        A.    No.  You said for their birthday?

20        Q.    Or your birthday.

21        A.    Uh-uh (negative).  I took my mom to New

22   York.  That was an early birthday trip for her, but

23   her birthday isn't until October.

24        Q.    All right.  Why did you go to Louisiana?

25        A.    It was a trip to kind of just celebrate

Page 131

1    being out of the house in a sense.

2         Q.   Being out of the house.

3              When was this trip?

4         A.   I believe this was 2023.

5         Q.   You wanted to celebrate being out of the

6    house you said?

7         A.   Yes.

8         Q.   Did you see Aaron Curtis while in Louisiana?

9         A.   No.

10         Q.   What did you do in Louisiana?

11         A.   Ate at restaurants.  I spent most of the

12    time going to restaurants.

13         Q.   And what airline did you take?

14         A.   I don't recall the airline.

15         Q.   And who did you go with?

16         A.   Shamia, S-H-A-M-I-A.

17         Q.   Who is that?

18         A.   A friend of mine.

19         Q.   Last name?

20         A.   Gathers, G-A-T-H-E-R-S.

21         Q.   How did you celebrate?  What did you guys

22    do?  You ate.  What else did you do?

23         A.   That's the majority of the things that we

24    did.

25         Q.   Did you travel to Louisiana to eat?

Page 132

1      A.   I have never been to Louisiana as an adult,

2   so it was her idea.  She's like you've never been,

3   let's go.

4      Q.   What did you see while there?  What cities?

5   Where were you in Louisiana?

6      A.   On Bourbon Street.

7      Q.   So you went to New Orleans?

8      A.   Yes.

9      Q.   Do you remember what month you went to New

10  Orleans?

11     A.   No, I don't recall.

12     Q.   Do you remember if it was in the spring,

13  fall, winter, summer?

14     A.   It wasn't cold outside.  That's what I can

15  remember.  I don't remember when.  Possibly shorts,

16  so it wasn't cold outside.

17     Q.   Was it Mardi Gras?

18     A.   No.

19     Q.   Was it around Mardi Gras?

20     A.   No.

21     Q.   So was it hot outside?

22     A.   I guess so.  It was probably hot.

23     Q.   Did you guys go to bars in Louisiana?

24     A.   Yeah.  I guess restaurants.  I consider them

25  restaurants more so than bars.

Page 133

1       Q.   Was there anyone else there?

2       A.   No.

3       Q.   Did you meet anyone there?

4       A.   We met random people.

5       Q.   Like who?

6       A.   Nobody I could necessarily remember.

7       Q.   Where did you meet them?

8       A.   On the street.

9       Q.   Just walking down the street?

10      A.   On the street or in a restaurant.

11      Q.   Why were you just meeting people down the

12   street?

13      A.   I wasn't meeting people.  People were

14   meeting me.  I don't --

15      Q.   She's from there?

16      A.   She --

17      Q.   Shamia is from there?

18      A.   No, she's not.

19      Q.   What do you mean people were meeting you but

20   you weren't meeting them?

21      A.   So I don't walk up to people and say, hi, my

22   name is Nicole.

23      Q.   You don't?

24      A.   People would walk up to me and say

25   something, but I'm not walking up to them to say

Page 134

1    anything.

2        Q.    Okay.  So walk me through this trip.  Okay?

3    You get on a plane.  You don't remember the airline.

4        A.    Uh-huh (affirmative).

5        Q.    Fair?

6        A.    Fair.

7        Q.    How many days were you there?

8        A.    I don't recall how long we stayed.

9        Q.    Okay.  It was hot outside?

10       A.    Yes, it was hot.

11       Q.    Okay.  And you spent a lot of your time on

12   Bourbon Street?

13       A.    No, I wouldn't say that; but the trip -- my

14   time was spent there.  That's along where the hotel

15   was, but a lot of my time was spent in the hotel if I

16   wasn't at a restaurant.

17       Q.    Okay.  What hotel was it?

18       A.    I don't recall the name of the hotel.

19       Q.    Was it in the French Quarter?

20       A.    Is that on Bourbon Street?

21       Q.    Kind of.

22       A.    I'm not -- I don't make me laugh, please.

23       Q.    I'm trying to not to give too much info.

24       A.    I don't -- I don't recall.  I don't

25   remember.

Page 135

1      Q.   Okay.  But you went to restaurants while

2   there?

3      A.   Yes.

4      Q.   Okay.  And went to some bars?

5      A.   Yes.

6      Q.   Did you dance?

7      A.   Yes.

8      Q.   You can tell me.

9      A.   No.  I'm thinking.  I'm thinking.  Yes, I

10   danced for a little bit.  Yes, I did.  That's

11   probably why I ended up on my machine later that

12   night, but go ahead.

13      Q.   Do you remember where you went, where you

14   danced?

15      A.   No, I do not.

16      Q.   Was it only one night of dancing or did you

17   dance on a couple of nights?

18      A.   I probably danced one night.

19      Q.   Okay.  But you don't specifically recall how

20   many nights; is that fair?

21      A.   I can strongly say I probably danced one

22   night.

23      Q.   Okay.  Did you do any tours while there?

24      A.   No.

25      Q.   Any excursions?  Did you see the city?  Did

Page 136

1    you walk the city?

2         A.   No.  I can't do any of that.

3         Q.   So you didn't walk around at all?  You

4    didn't do any driving tours?

5         A.   No driving tours.

6         Q.   Okay.  You said Florida a few times, but you

7    always said you went to Florida -- have you driven to

8    Florida?

9         A.   Just recently, yes.  I didn't drive, but I

10   rode with my brother and my dad.

11        Q.   And what city did you go to in Florida?

12        A.   I can't think of the name of it.  It was my

13   first time visiting this city.

14        Q.   Do you know if it was north Florida, south

15   Florida, central Florida?

16        A.   Are we talking about for flights or are we

17   talking about just the drive --

18        Q.   Just this past trip.

19        A.   Okay.

20        Q.   Your flights you said you just flew through,

21   right?

22        A.   Yes.

23        Q.   So this was your first time in the state of

24   Florida since 2022 to visit?

25        A.   Yes.

Page 137

1       Q.    So you went to Florida?

2       A.    Yes.

3       Q.    Recently?

4       A.    Yes.

5       Q.    How recently?

6       A.    April for my aunt's birthday.

7       Q.    April what?

8       A.    This year, 2025.

9       Q.    What date?

10      A.    Around the 12th or so.

11      Q.    Okay.  And you drove down with your dad and

12  your brother?

13      A.    Yes.

14      Q.    And dad's name is?

15      A.    Royal Smith.

16      Q.    Royal Smith, okay.

17            Why did you go to Florida?

18      A.    To celebrate my aunt's 65th birthday.

19      Q.    Who is your aunt?

20      A.    Cynthia Hoskins, H-O-S-K-I-N-S.

21      Q.    All right.  And what -- what did you do

22  there?

23      A.    After this can we take a break?

24      Q.    Yes.

25      A.    Okay.  I didn't get to do as much as

1    everybody else unfortunately.  I did -- I stayed in

2    the house a majority of the time.  I went to the

3    grocery store with my brother.  I rode in the car

4    with him.  I think I went to -- once we first got

5    there, we did a grocery run.  I pretty much stayed to

6    my side while everybody else did the big shopping.

7    Everybody else was going to the beach.  I stayed by

8    the pool at the house because the beach was a walk.

9    I did go to the beach one day because we took

10   pictures on the beach for my aunt while we were

11   there.  I slept on the couch because the place that

12   my aunt rented was three levels; and when I first got

13   there, I went upstairs to go see where I was sleeping

14   and I was out of breath, so I didn't go back up

15   except for one more time to go get my computer bag so

16   I can try to work.

17       Q.   You went to any restaurants?

18       A.   Did we -- if we grabbed -- oh, we did.  We

19   went -- I thought about it.  We did go to a

20   restaurant.  We met my aunt and my dad and them at a

21   restaurant, my brother and I.

22       Q.   Okay.  Did you go to -- to any bars while

23   there?

24       A.   No, I did not.

25       Q.   No bars, no club, nothing like that?

1      A.    No, I did not.

2      Q.    Your trip to New York.

3      A.    Yes.

4      Q.    Tell me about that.  You wanted to take a

5   break.  Do you want to take a break now?

6      A.    Yes, please.

7            MR. KING:  Let's take a break.

8            THE VIDEOGRAPHER:  The time is 3:13 p.m.,

9       and we are off the record.

10           (A recess was taken.)

11           THE VIDEOGRAPHER:  The time is 3:20 p.m.,

12      and we are on the record.

13  BY MR. KING:

14     Q.    Can I ask you about some -- some of these --

15  just a follow-up on some of these gentlemen.

16  Mr. Marz, did you have intimate relations with him

17  before August of 2022?

18     A.    No.

19     Q.    What about Mr. Horace Austin?

20     A.    No.

21     Q.    And what about Aaron Curtis?

22     A.    No.

23     Q.    So all of those were after August of '22?

24     A.    Yes.

25     Q.    Okay.  What about Cruz?

```
                                                Page 140

 1        A.    Before August.

 2        Q.    That was before August?

 3        A.    (Witness nods head affirmatively.)

 4        Q.    Before and after?

 5        A.    No.  That was just before.

 6        Q.    Just before.

 7              Okay.  We were -- we were talking about some

 8   of your trips and we were on New York.  But before we

 9   get there, the place that you listed for me so far

10   are Atlanta, Florida, New York, St. Croix, and

11   Louisiana.  Is that everywhere you have taken a

12   flight since August of '22?

13        A.    Yes.

14        Q.    Did you go to Charlotte?

15        A.    No.

16        Q.    Okay.  Did you go to a Dear Black Woman

17   chapter information session?

18        A.    No.

19              THE COURT REPORTER:  I'm sorry.  I need you

20        to say that again.

21              MR. KING:  Dear Black Woman chapter

22        information session.

23              THE COURT REPORTER:  Thank you.

24   BY MR. KING:

25        Q.    Okay.  Now -- okay.  Back to New York.  Tell
```

1   me about that.  When was it?

2        A.   Around August the 25th or so of 2022.

3        Q.   August 25th of 2022.

4             And who did you go with?

5        A.   My mom, Mae Wade, M-A-E.

6        Q.   And you guys flew in the plane together?

7        A.   I think we had separate flights because I

8   initially had this trip booked.

9        Q.   Got it.

10            She met you there?  Who got there first?

11       A.   I don't recall.

12       Q.   Did anybody else fly with you guys?

13       A.   No.

14       Q.   Okay.  So you flew up first and then -- one

15  of you flew up first and then one of you followed?

16       A.   Yes.

17       Q.   Okay.  Did you fly up on the same day?

18       A.   Yes.

19       Q.   Okay.  Before I go into this, Louisiana --

20  did Shamia fly with you?

21       A.   Yes.

22       Q.   Okay.  Talking about New York, when you

23  got -- what was the purpose of your trip to New York?

24       A.   My mom has never been, so it was to

25  celebrate -- an early birthday celebration for her.

Page 225

1       Q.   She only knew you after that?

2       A.   Yes.

3            MR. KING:  Do you have the affidavit?  I'll

4       do this quick.

5            Do you know what number we're on?

6            MS. SEILA:  5.

7            (Exhibit 5 was marked for

8       identification, attached at the end of

9       the original transcript.)

10  BY MR. KING:

11      Q.   I'm showing you what has been premarked as

12  Exhibit 5.

13           MS. SEILA:  Sorry.  Can I get a copy?

14           MR. KING:  Oh, yeah, sure.

15  BY MR. KING:

16      Q.   Which is an affirmation under penalty of

17  perjury that you signed last week; is that fair?

18      A.   Yes.

19      Q.   And is that an e-signature it looks like

20  maybe?

21      A.   Yes.

22      Q.   And you had -- through your counsel, you

23  indicated that you could not travel to St. Croix.

24      A.   Yes.

25      Q.   Okay.  And you said that the reason that

Page 226

1  you -- according to this, that you said that

2  Dr. Olivia West has specifically advised you not to

3  travel to St. Croix because of your mental health

4  disability.

5        Do you see that?

6  A.   Yes.

7  Q.   When did she advise you of that for the

8  first time?

9  A.   I don't remember the dates, but I believe it

10  was -- it was sometime in 2023.

11  Q.   Okay.  Have you spoken to her about that

12  since then?

13  A.   Yes.

14  Q.   When was the most recent time?

15  A.   I think it was sometime after Monday last

16  week.

17  Q.   What did she tell you?

18  A.   This still stands.

19  Q.   Is this only in regards to St. Croix or is

20  it in regards to an aircraft anywhere?

21  A.   St. Croix.

22  Q.   Specific to St. Croix; is that fair?

23  A.   Yes.

24  Q.   Did any other doctor tell you that you

25  should not travel to St. Croix?

Page 227

```
 1        A.   Dr. Acker may have stated it.  I'm not too
 2   certain if she did.
 3        Q.   And when was that?
 4        A.   Possibly 2023.
 5        Q.   But you don't remember if she did or didn't;
 6   is that right?
 7        A.   Yes; between her and Dr. -- and Dr. Graham.
 8        Q.   Both of them or either of them?
 9        A.   Both.
10        Q.   And what was her reason?
11        A.   Initially, they really -- their reasons were
12   because they thought that my job was trying to get me
13   to come back there to work.
14        Q.   And you didn't want to work at that job
15   any --
16        A.   It's not that I didn't want to work at that
17   job.  I loved -- I actually liked my job.  I could
18   not go back to St. Croix and work, specifically
19   St. Croix.  I can't go back.  I have people that are
20   still there that ask, oh, you're going to come and
21   visit like the Georges.  I'm not coming back.
22        Q.   Okay.  You said Dr. Acker and Dr. Graham.
23   Were their recommendations specific to St. Croix?
24        A.   Yes.
25        Q.   Okay.  So they're okay with you traveling to
```

1    New York and Louisiana and those other places?

2        A.    We never talked about travel anywhere else.

3        Q.    Okay.  So it's a specific St. Croix problem?

4        A.    Yes.

5        Q.    And at some point in time, you tried to file

6    a workman's comp claim; is that fair?

7        A.    Yes.

8        Q.    Okay.  And when you filed that workman's

9    comp claim initially Customs and Border Patrol denied

10   you, right?

11       A.    No.  They paid out for the first 45 days.

12       Q.    Did they ever decline to cover you?

13       A.    Yes, they did.

14       Q.    And when was that?

15       A.    I believe this was October of 2023.

16       Q.    Okay.  So do you remember when you filed the

17   claim?

18       A.    Before I left the island.

19       Q.    Okay.  But they paid you for the first 45

20   days and then made a determination that in their

21   belief you have preexisting conditions; is that fair?

22       A.    Yes.

23       Q.    Okay.  And subsequent to that you hired a

24   lawyer?

25       A.    Yes.