IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

NICOLE WOOTEN,

PLAINTIFF,

VS.

LIMETREE BAY TERMINALS, LLC, ET AL.

DEFENDANTS.

CASE NO. 1:23-CV-00012

PORT HAMILTON'S MOTION TO EXCLUDE OPINION AND TESTIMONY OF
PLAINTIFF'S EXPERT MARC WILKENFELD, M.D.,
PURSUANT TO FEDERAL RULE OF EVIDENCE 702

Port Hamilton moves to exclude the opinion of Nicole Wooten's designated medical

causation expert, Marc Wilkenfeld, M.D., pursuant to Federal Rule of Evidence 702.

TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.   Dr. Wilkenfeld's opinion does not satisfy Rule 702(a)—he lacks
        specialized knowledge that will help the jury . . . . . . . . . . . . . . . . . . . . . . . . 5

i

II.   Dr. Wilkenfeld's opinion does not satisfy Rule 702(b)—it is not based
      upon sufficient facts or data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  Dr. Wilkenfeld's opinion does not satisfy Rule 702(c)—it is not the
      product of reliable principles and methods . . . . . . . . . . . . . . . . . . . . . . . . 9

   A.   Dr. Wilkenfeld's general causation opinion fails to satisfy
        Rule 702(d)—he failed to establish the dose and duration of
        exposure that *can* cause Wooten's alleged injury in the
        general population of asthmatics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   B.   Dr. Wilkenfeld's specific causation opinion also fails to
        satisfy Rule 702(d)—he failed to conduct a differential
        diagnosis and failed to rule out alternative causes for
        Wooten's complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.   Dr. Wilkenfeld's opinion does not satisfy Rule 702(d)—it was not
      reliably applied to the facts of the case . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.    Dr. Wilkenfeld's opinion should be excluded Under Rule 403 . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**TABLE OF AUTHORITIES**

**CASES**

*Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir. 1996) . . . . . . . . . 10

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) . . . . . . . . . . . . . . . 19

*Boulac v. SMG*, 736 F. Supp. 3d 1101 (N.D. Okla. 2024). . . . . . . . . . . . . . . . . . . . . . 4

*Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). . . . . . . . . 4, 5, 19

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) . . . . . . . . . 8, 10, 13, 14

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999), amended,
    199 F.3d 158 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
    Case No. MDL 19-2875, 2025 WL 1024048 (D.N.J. Apr. 7, 2025). . . . . . . . . . . 5

*In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*,
    No. 12-MD-2342, 2015 WL 314149 (E.D. Pa. Jan. 23, 2015) . . . . . . . . . . . . . 19

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . 4, 5

*Leake v. United States*, 843 F. Supp. 2d 554 (E.D. Pa. 2011). . . . . . . . . . . . . . . . . . 9

*Lemmermann v. Blue Cross Blue Shield of Wis.*,
    713 F. Supp. 2d 791 (E.D. Wis. 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005) . . . . . . . . 10, 13, 14

*Milward v. Acuity Specialty Prods. Grp., Inc.*, 969 F. Supp. 2d 101
    (D. Mass. 2013), aff'd sub nom. *Milward v. Rust-Oleum Corp.*,
    820 F.3d 469 (1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir. 1999). . . . . . . . . . . . . . . . . . 11, 12

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir.1998) . . . . . . . . . . . . . . . 11

*Sommerville v. Union Carbide Corp.*, 149 F.4th 408 (4th Cir. 2025 . . . . . . . . . . . . 12

*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . 8

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir. 1996) . . . . . . . . . . . . 10, 12

**RULES**

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4-10, 13, 18, 19

**OTHER AUTHORITIES**

Bernstein, I.L., et al. (2006). Reactive Airways Dysfunction
    Syndrome and Irritant-Induced Asthma. ASTHMA IN
    THE WORKPLACE (3rd ed.), Chapter 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Del Giacco S, Cappai A, Gambula L, *et al.*, The asthma-anxiety
    connection, RESPIRATORY MEDICINE (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Edith Chen, Gregory E. Miller, Stress and inflammation in
    exacerbations of asthma, BRAIN, BEHAVIOR, AND IMMUNITY,
    Vol. 21, Issue 8, 993-999 (Nov. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 4th Ed. (2025) . . . . . . . . . . . . . . . 12

Stuart M. Brooks, Irritant-Induced Asthma and Reactive
    Airways Dysfunction Syndrome (RADS),
    5 J. ALLERGY & THERAPY 174 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## INTRODUCTION

Plaintiff, Nicole Wooten, proffers Dr. Wilkenfeld to prove both general and specific causation of her claimed permanent severe asthma/RADS from a brief exposure on August 8, 2022 to smoke from smoldering petroleum coke. Dr. Wilkenfeld opines in his August 5, 2025 report that this brief exposure caused Wooten to sustain permanent lung injury. Exh. 1, Wilkenfeld Report at 1, 8-9.

Dr. Wilkenfeld's opinions must be excluded under Rule 702 of the Federal Rules of Evidence. He lacks specialized knowledge regarding short-term exposures to smoke from smoldering petroleum coke. The opinion was not based upon sufficient facts or data; was not the product of reliable principles and methods; and was not reliably applied to the facts of this case. In particular, Dr. Wilkenfeld failed to quantify either (1) the threshold level of safe exposure and the dose required to cause Wooten's alleged complaints and (2) his differential diagnosis was invalid for failure to rule out plausible alternative causes.

## FACTUAL BACKGROUND

Wooten, a Customs and Border Protection employee, had a long-standing history of asthma with documented flare-ups. She attributed an April 2021 flare-up on St. Croix to Saharan Dust. Exh. 2, Wooten Depo. at 28:2–20. On July 15, 2022, she underwent a pulmonary-function test because "I was concerned that my asthma may have been getting worse, I thought, because of the air quality there [referring to St. Croix]. *Id.* at 29:10–12.

1

On August 8, 2022, less than three weeks after having the pulmonary function test due to her complaints of worsening asthma, Wooten drove a Customs and Border Protection vehicle toward the tugboat dock at Ocean Point Terminals to perform a passport inspection. *Id.* at 41:1—41:23. At the time, the North Coke Dome at Port Hamilton's refinery was the scene of an ongoing smoldering incident that had begun four days earlier. Doc. No. Second Amended Complaint, ¶¶19, 24–5.

While approaching the coke domes, Wooten noticed fire trucks in the vicinity and thick black smoke. Exh. 2, Wooten Depo. at 46:15–25 ("Once I got close to the tug area, that's when I noticed because of the fire trucks."); *id.* at 46:18–21 ("I first saw fire trucks. I saw some people standing towards the side and then the street that I usually would park on, once I made it there, I saw -- I saw workers."); *id.* at 49:18–20 ("this black smoke that's thick. In some areas it looked black. In some areas it looked gray.") She did not notice the smoke as she approached the entrance to the facility. *Id.* at 45:17–18 ("No, I couldn't tell upon approaching -- approaching the refinery.")

Once in the vicinity of the North Coke Dome, Wooten saw two unknown workers (employer also unknown, *id.* at 46:20–25). She did not recall if the two workers were wearing any sort of respiratory protection although she had a specific recollection of seeing workers nearer to the coke dome area wearing masks. *Id.* at 47:20—48:5. She rolled down her window for less than one minute—"probably just seconds"—to ask the two workers if it was safe to proceed. *Id.* at 54:14-55:5 ("It was less than one minute. It was probably just seconds.") Wooten did not exit the vehicle, did not enter any visible

2

smoke plume, and rolled the window back up immediately. *Id*. As soon as she rolled the window up, "that's when I started coughing." *Id*. at 54:15–20.

Wooten never reached the tugboat because she turned around and left the refinery due to her coughing. *Id*. at 54:22–23. She did not proceed to either of the two nearby Urgent Care facilities or the Juan F. Luis Hospital and instead returned to her normal work location at the Henry E. Rohlsen Airport. When she got to the airport, she pulled up to the front of the airport and "grabbed my inhaler." *Id*. at 56:23—57:5. She then went inside where she vomited in the bathroom and proceed to the CBP break room. *Id*. at 57:10–12. CBP Officer Henry checked Wooten's vitals and one of her coworkers drove her to urgent care. *Id*. at 57:12–20. At urgent care, Wooten was placed on a nebulizer machine and given a steroid shot. *Id*. at 58:4—58:14.

By the next day, August 9, 2022, Wooten's respiratory symptoms had resolved. *See* Exh. 10, J.F.L Hospital report (stating that Wooten reported her SOB [shortness of breath] "resolved after treatment" and recording that she was "Neg: respiratory distress" with lung sounds being "Bilateral: Clear"). On August 10, 2022, Wooten experienced another "extreme breathing crisis," which she herself attributed to fumes from a nearby landfill fire that she smelled through her vehicle's air-conditioning unit. *Id*. at 53:1-25, 237:15-239:10. Wooten had a telehealth visit with her primary care physician, Dr. Acker on August 11, 2022, complaining of moderate persistent asthma. Exh. 3. Dr. Acker's record does not mention the landfill fire exposure on August 10, 2022, suggesting that Wooten did not inform her of this subsequent event. *Id*.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 "incorporates the principles" announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *Boulac v. SMG*, 736 F. Supp. 3d 1101, 1104 (N.D. Okla. 2024). For that reason, courts continue to apply *Daubert, Kumho Tire*, and other cases interpreting those two decisions after Rule 702 codified them in 2000. *See, e.g.*, *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (applying *Daubert*, *Kuhmo Tire*, and Third Circuit case law predating the 2000 amendment).

As clarified by the 2023 amendment to Rule 702, the proponent of the expert bears the burden of establishing reliability and relevance by a preponderance of the evidence. *See* Fed. R. Evid. 702 (precluding opinion testimony unless "the proponent demonstrates to the court that it is more likely than not that" the opinion meets the

requirements of Fed. R. Evid. 702(a)–(b)); *See also Daubert*, 509 U.S. at 592 n.10; *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, Case No. MDL 19-2875, 2025 WL 1024048, at \*14 (D.N.J. Apr. 7, 2025) ("While the December 2023 Amendments did not materially alter the admissibility requirements for expert testimony, they 'emphasiz[ed] the preponderance standard in Rule 702 [which] specifically was made necessary by the courts that have failed to apply correctly the reliability requirements of that rule.' Fed. R. Evid. 702, advisory committee's note to 2023 amendments." (Alterations to the quotation provided by the *Valsartan* court.))

## ARGUMENT

### I.   DR. WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(A)—HE LACKS SPECIALIZED KNOWLEDGE THAT WILL HELP THE JURY.

Federal Rule of Evidence 702(a) requires that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." This "fit" requirement demands that the expert's knowledge actually apply to the specific facts of the case. *Daubert*, 509 U.S. at 591; *Kumho*, 526 U.S. at 148.

While Port Hamilton does not challenge Dr. Wilkenfeld's *general* qualifications in the field of occupational/environmental medicine, he lacks the *specialized knowledge* needed to assist the jury on general causation in this case. He concedes there are no peer-reviewed studies of acute exposures to coke emissions. Exh. 4, Wilkenfeld Depo. at 122:13 –121:1. The literature he relies upon addresses only chronic or prolonged exposures. *Id.* at 31:19—32:15. Despite his general qualification in occupational/

environmental medicine, Dr. Wilkenfeld has no specialized knowledge, methodology, or literature base that reliably bridges the gap between the available science and the extremely short-term exposure at issue here. When an expert's field offers no scientific foundation for the precise factual scenario presented, the testimony cannot "help the trier of fact" and should be excluded under Rule 702(a). The analytical gap between long-term exposure and a short duration exposure cannot be bridged by Dr. Wilkenfeld because he has no expertise to do so.

An example of the gap that can exist between acute and chronic exposure is found with sulfur dioxide ($SO_2$) (a major irritant and one that has been found in smoldering petroleum-coke smoke). The Agency for Toxic Substances and Disease Registry explains that whether a person is harmed by sulfur dioxide "depends on the dose (how much), the duration (how long), and how you come in contact with it." *See* Exh. 5, ATSDR Toxicological Profile for Sulfur Dioxide (2008) at pdf p.21.

In plain terms, a very short exposure to $SO_2$ may cause temporary discomfort, while longer exposure is more likely to cause lasting harm. With respect to $SO_2$, this is shown by the fact that the federal government has set clear *safe* exposure levels for workers. These levels vary based upon both concentration and duration: the OSHA permissible exposure limit is 5 ppm as an 8-hour time-weighted average, and the NIOSH recommended exposure limit is 2 ppm as a 15-minute ceiling. *Id.* at pdf p.23. The Environmental Protection Agency has also established regulations to protect the

6

general public from harmful levels of sulfur dioxide in the air. *Id.* at pdf p.29.[1]

The effects of $SO_2$ on people with asthma are particularly instructive. Some studies have reported lung function changes in asthmatics exposed by inhalation to 0.25 ppm sulfur dioxide; but, other controlled studies "have reported *a lack of significant lung function changes* in asthmatics following exposures to 0.1–0.5 ppm." *Id.* at pdf pp.30–31 (emphasis added). Even more telling, controlled studies show that when some asthmatics are repeatedly exposed to $SO_2$, their airways actually become *less responsive to the chemical over time. Id.* at pdf p.51. These findings demonstrate that both the dose and the duration of exposure are critical. A one- or two-minute exposure may trigger coughing or a temporary asthma flare, but the scientific literature does not support the conclusion that such a brief encounter causes permanent injury.

So, too, with respect to petroleum coke exposure, Dr. Wilkenfeld himself conceded under oath that he is unaware of any peer-reviewed studies showing that a very brief exposure (on the order of less than one minute) to smoldering petroleum-coke smoke can cause permanent severe asthma or RADS. Exh. 4, Wilkenfeld Depo. at 122:13–123:1 (admitting he was not aware of any studies of acute exposures to coke emissions.). Without that knowledge, he lacks the "specialized knowledge that will help the [jury] to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a).

---

[1] The EPA recommends that the long-term, 1-year average concentration of $SO_2$ should not exceed 0.03 ppm, whereas the short-term, 24-hour average concentration should not exceed 0.14 ppm more than once a year. *Id.* at pdf p.29.

## II.  DR. WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(B)—IT IS NOT BASED UPON SUFFICIENT FACTS OR DATA.

Federal Rule of Evidence 702(b) requires that expert testimony be "based on sufficient facts or data." This factor is critical because an opinion built on an inadequate factual foundation is nothing more than *ipse dixit. General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Such an opinion cannot survive gatekeeping no matter how impressive the expert's credentials. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir.1987) (stating, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible") (cited with approval in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 761 n.32 (3d Cir. 1994)).

Dr. Wilkenfeld omitted critical facts and cherry-picked only those facts that would support his opinion. Wooten herself admitted that she had a flare up in April 2021 (which she attributed to Saharan Dust). Exh. 2, Wooten Depo. at 28:2–20. Moreover, on July 15, 2022, three weeks before the incident, she underwent a pulmonary-function test in Georgia prompted by her own concern that her asthma while on St. Croix was worsening. *Id.* at 29:10—30:25. Dr. Wilkenfeld omitted all of that critical evidence and instead chose to rely on older evidence from Wooten's history. Similarly, he did not consider Wooten's respiratory symptom resolution with clear lungs on August 9, 2022 (one day post-incident) (Exh. 4, Wilkenfeld Depo. at 50:24—52:12; Exh. 10, J.F.L. Hospital Report), and her own attribution of her August 10, 2022 "extreme breathing crisis" two days post-incident to exposure to fumes from a landfill fire upwind from her duty station. Exh. 4, Wilkenfeld Depo. at 53:8—60–1, 64:2–14; Exh. 2, Wooten Depo.

at 237:2—239:12). Without these facts, the foundation for Dr. Wilkenfeld's opinion is insufficient.

### III. DR. WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(C)—IT IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS.

Federal Rule of Evidence 702(c) requires that expert testimony be "the product of reliable principles and methods." This factor is the heart of the gatekeeping inquiry because it ensures the expert is applying the same rigorous, testable methods used in the relevant scientific field rather than reaching conclusions first and reverse-engineering support later. *Daubert*, 509 U.S. at 593-94 (listing testability, peer review, error rate, standards, and general acceptance). Dr. Wilkenfeld admits he applied no specific scientific methodology."Exh. 4, Wilkenfeld Depo. at 25:13–25. He performed no differential diagnosis and ruled out no alternative causes. *Id.* at 111:16—112:10. Because he applied no reliable methodology, his opinion fails to meet the standard of Rule 702(c).

"In toxic tort cases, a plaintiff must demonstrate that the substance at issue is capable of causing the observed harm (general causation), and that the substance actually caused the harm suffered by the plaintiff (specific causation). *Leake v. United States*, 843 F. Supp. 2d 554, 558 (E.D. Pa. 2011) (footnote omitted). "[P]ersonal injury plaintiffs must show that they were exposed to the chemicals released by the defendants, that these chemicals can cause the types of harm they suffered, and that the chemicals in fact did cause them harm." *Paoli*, 35 F.3d at 752.

A. **DR. WILKENFELD'S GENERAL CAUSATION OPINION FAILS TO SATISFY RULE 702(D)—HE FAILED TO ESTABLISH THE DOSE AND DURATION OF EXPOSURE THAT *CAN* CAUSE WOOTEN'S ALLEGED INJURY IN THE GENERAL POPULATION OF ASTHMATICS.**

Establishing general causation requires reliable evidence that the substance at issue is capable of causing the claimed injury in the general population[2] *at exposure levels comparable to those experienced by the plaintiff.* As the Third Circuit explained in *Paoli*, 35 F.3d at 743, "[i]n order for an expert's opinion to be admissible, the expert must have a reliable basis for concluding that *the plaintiff's exposure was sufficient* to cause the injury." (Emphasis added.) The Eleventh Circuit similarly has held that "scientific knowledge *of the harmful level of exposure to a chemical* plus knowledge that plaintiff was exposed *to such quantities* are minimal facts necessary to sustain the plaintiff's burden." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005) (internal quotation omitted). Thus, the general causation analysis in this case requires an expert to opine as to the threshold level of exposure to petroleum coke smoke (duration and dose) that is capable of causing Wooten's claimed injuries in the general population of asthmatics. *See, e.g., Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 195 (5th Cir. 1996) (affirming the exclusion of expert testimony on causation because of its unreliability, its lack of evidence of a link between the chemical and the precise illness, and because there was no evidence of the level of exposure); *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)

---

[2] Here, because Wooten had suffered from asthma since the age of five, the "general population" is people who have asthma.

(concluding that "[a]t a minimum, . . . there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered).

The general causation examination requires a plaintiff to prove a level of exposure using techniques subject to objective, independent validation in the scientific community. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (*en banc*)). At a minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination. *Mitchell*, 165 F.3d at 781.

In Section I of this motion, Port Hamilton established that Dr. Wilkenfeld cannot answer the duration component of the general causation question.[3] But Wilkenfeld is also unable to answer the dose component. One potential source of dosage information could have come from the refinery's ongoing monitoring of $SO_2/H_2S$ levels at and beyond the refinery fence line. Wilkenfeld reviewed but dismissed the 11,107 $SO_2/H_2S$ monitoring readings at the refinery—that showed no measurable quantity of either $SO_2$ or $H_2S$—without any analysis. Exh. 4 at 19:5–18; 43:19—44:7. Admittedly, these monitors measured air quality at a considerable distance from the Coke Domes

---

[3] To summarize, the literature Dr. Wilkenfeld cites addresses chronic, long-term exposures (Morphew 2021: months; Byrwa-Hill 2021: ongoing)—not a single brief encounter. Yet Dr. Wilkenfeld admits the exposure lasted "a matter of minutes," Exh. 4, Wilkenfeld Depo. at 30:7–10. Plaintiff's own testimony confirms the window was down for "less than one minute… probably just seconds." Exh. 2 at 55:5–9.

compared to where Wooten claims she was exposed. But a qualified expert must do more than simply dismiss the data.

Lack of measured air quality is a common situation in many exposure incidents. A reliable expert is required to employ recognized scientific methods to estimate or bound the plaintiff's actual exposure. It is not enough to say, "the data isn't available," because assessing the exposure level is a minimal requirement of an expert in a toxic tort case. *See, e.g.*, *Mitchell*, 165 F.3d at 781; *Wright*, 91 F.3d at1107. When actual data is unavailable, the expert must do more.

The Reference Manual for Scientific Evidence recognizes that "when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the individual." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 4th Ed. (2025) at 1076–77. These methods include air-dispersion modeling such as AERMOD, *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 422 (4th Cir. 2025) or the Gaussian plume model, *In re TMI Litig.*, 193 F.3d 613, 668 n.95 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000) (observing that the Gaussian Plume model is a "generally accepted computer model") as well as the Advanced REACH Tool ("ART") *Milward v. Acuity Specialty Prods. Grp., Inc.*, 969 F. Supp. 2d 101, 105 (D. Mass. 2013), aff'd sub nom. *Milward v. Rust-Oleum Corp.*, 820 F.3d 469 (1st Cir. 2016) (describing ART as a model to predict exposures that can be updated with "actual exposure data when available").

Dr. Wilkenfeld did no modeling such as dispersion modeling. Exh. 4 at 34:1–7. Dr. Wilkenfeld admits that no peer-reviewed study, error-rate analysis, or testable hypothesis supports his opinions. Exh. 4, Wilkefeld Depo., at 116:5—119:15. He offered no substitute methodology to support his conclusion that Plaintiff was exposed to "levels many times higher than those that are toxic." Exh. 1, Wilkenfeld Report at 7. This is precisely the type of *ipse dixit* opinion that Rule 702 prohibits.

**B. DR. WILKENFELD'S SPECIFIC CAUSATION OPINION ALSO FAILS TO SATISFY RULE 702(D)—HE FAILED TO CONDUCT A DIFFERENTIAL DIAGNOSIS AND FAILED TO RULE OUT ALTERNATIVE CAUSES FOR WOOTEN'S COMPLAINTS.**

In toxic-tort cases, specific causation demands a reliable differential diagnosis that rules out other plausible causes and establishes that the plaintiff's particular exposure was a substantial contributing factor. *Paoli*, 35 F.3d at 733 (concluding that expert's opinion is unreliable "[i]n the absence of employment of the standard techniques of differential diagnosis, and in the absence of any good explanation justifying her conclusion in the light of possible alternative causes of plaintiffs' injuries").[4] The differential diagnosis process requires that the expert must rule out possible alternative causes of the plaintiff's injuries. An expert's opinion is unreliable "[i]n the absence of employment of the standard techniques of differential diagnosis, and in the absence of any good explanation justifying her conclusion in the light of

---

[4] The Court need not necessarily reach the specific causation issue because of Dr. Wilkenfeld's failure to render a reliable general causation opinion. A differential diagnosis is not a substitute for the "fundamental failure [to lay] a scientific groundwork for the general toxicity" of the allegedly toxic chemical "and that it can cause the harm a plaintiff suffered." *McClain*, 401 F.3d at 1252.

possible alternative causes of plaintiffs' injuries." *Paoli*, 35 F.3d at 733. The Eleventh Circuit agrees, holding that "the likelihood that the chemical caused the disease or illness in an individual should be considered *in the context of other known causes.*" *McClain*, 401 F.3d at 1243 (emphasis added). In the context of cases involving asthma, the same rule applies. *See Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) (affirming exclusion of plaintiff's expert who failed to eliminate scientifically other possible causes of asthma as part of her differential diagnosis).

Dr. Wilkenfeld failed to perform a reliable differential diagnosis. He admitted as much in his deposition:

Q. Are you familiar with the concept of differential diagnosis?

A. Very much so.

Q. Can you explain what it is?

A. Well, when someone has shortness of breath, you want to make sure it's not heart disease.

Q. Well, in general, a differential diagnosis is you come up with a list of possible causes of the patient's condition and then systematically rule them out, correct?

A. That's correct.

Q. Did you perform a differential diagnosis in this case?

A. I don't think it's -- I don't think it's relevant in this matter really. Did I list all the possible alternative causations in the report and rule them out one by one, no, I did not.

Q. Is there anything in the report that you're going to show us that you did a differential diagnosis?

A. No, there's nothing in the report. No.

14

Exh. 4 at 111:16—112:10.

Dr. Wilkenfeld's specific-causation opinion is further undermined by his diagnosis of Reactive Airways Dysfunction Syndrome ("RADS") despite Wooten's well-documented history of asthma since childhood. By definition, RADS is a condition that occurs only in individuals who had no prior history of asthma.

> A prerequisite of RADS is documenting the onset of a totally new respiratory process. Persons considered to have RADS must not suffer from reactivation of a previously quiescent asthma. RADS is not applicable for the patient with preexisting asthma that worsens with the irritant exposure.

Exh. 6, Bernstein, I.L., et al. (2006). Reactive Airways Dysfunction Syndrome and Irritant-Induced Asthma. ASTHMA IN THE WORKPLACE (3rd ed.), Chapter 28 at 599; Exh. 7, Stuart M. Brooks, Irritant-Induced Asthma and Reactive Airways Dysfunction Syndrome (RADS), 5 J. ALLERGY & THERAPY 174 (2014) at 2 (listing diagnostic criteria for RADS, including "[a]bsence of pre-existing respiratory disorder").

Wooten, however, was diagnosed with asthma at age five, required occasional inhaler use, and had a documented history of mild asthma noted in her 2018 pre-employment evaluation. Wilkenfeld Report at 2. This history rules out a diagnosis of RADS. Dr. Wilkenfeld's report never acknowledges this definitional mismatch or explains how Wooten could still meet the criteria for RADS. By diagnosing RADS in a patient with a clear pre-existing asthmatic condition without addressing or explaining his basis for departing from the diagnostic criteria for RADS, Dr. Wilkenfeld failed to perform a reliable differential diagnosis. In a case where the expert similarly diagnosed the plaintiff with RADS despite the plaintiff's known pre-existing asthma,

15

the court characterized this as a "striking flaw" in the expert's methodology for diagnosing RADS. *See Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 805 (E.D. Wis. 2010).

To compound his errors, Dr. Wilkenfeld did not even "consider" the landfill fire on August 10, 2022 or Wooten's anxiety as possible causes. *Id.* at 112:25—113:6. He simply offered the conclusion that the August 8, 2022 refinery smoke was the cause without systematically addressing or excluding other plausible explanations for Plaintiff's respiratory condition. Critically, he omitted or ignored key facts that undermine temporality and causation.

Plaintiff's own deposition testimony provides a compelling alternative explanation that Dr. Wilkenfeld never addressed. In July 2022—only weeks before the alleged August 8, 2022 refinery exposure—Wooten was experiencing respiratory symptoms while living and working on St. Croix. They were serious enough for her to seek a pulmonary function test in Georgia. She testified that she was "concerned that my asthma may have been getting worse, I thought, *because of the air quality there*." Exh. 2, Wooten Depo. at 29:10-15 (emphasis added). Wooten traveled to Georgia to have the test performed, and the results were normal: "they told me that everything was still within my -- my normal range." *Id.*

From a diagnostic standpoint, the fact that Wooten experienced symptoms on St. Croix but tested normally in Georgia strongly suggests that environmental conditions on St. Croix itself—such as Saharan (African) dust, humidity, or other island air-quality factors—were already affecting Plaintiff's breathing weeks before the brief

16

refinery encounter. Yet Dr. Wilkenfeld's expert report does not discuss these pre-incident symptoms; the normal July 2022 PFT; or St. Croix environmental triggers as an alternative or contributing cause. By failing to rule out these documented alternative explanations, Dr. Wilkenfeld's specific-causation opinion is incomplete and unreliable.

In addition, there was other evidence that Dr. Wilkenfeld omitted as he picked the "cherries" that supported his opinion:

- Wooten's symptom resolution on August 9, 2022, with clear lungs and no respiratory distress noted Exh. 4, Wilkenfeld Depo. at 51:13—52:12; Exh. 10. He had "no reason" for omitting this information from his report. *Id.* at 52:10–12.

- He likewise had no reason for omitting the fact that Wooten was able to return to work the day after the August 8, 2022 incident. *Id.* at 51:22—53:2.

- In Dr. Wilkenfeld's report, he conveniently jumps from August 8 to August 11, 2022 and reports that Wooten's primary care physician had noted during a telehealth care visit "Severe respiratory symptoms as result of coke fire." Exh. 1 at 5–6; Exh. 3. His report thus skips over the fact that Wooten's respiratory symptoms were completely resolved at the time of a followup visit to the J.F.L. Hospital on August 9, the day after the incident (*see* Exh. 10) and that the next day, August 10, 2022, Wooten self-described having an "extreme breathing crisis" following exposure to fumes from a fire at the St. Croix landfill when on her way to work. Exh. 2, Wooten Depo. at 237:15—239:10. This separate and unrelated incident a mere two days after the petroleum coke smoke incident—especially

17

after complete resolution of the respiratory symptoms from August 8, 2022—provides another potential cause of the complaints that Wooten claims continue to bother her to this day.

- Prior environmental triggers such as Saharan (African) dust. Plaintiff had previously experienced asthma flares she attributed to Saharan dust while on St. Croix in April 2021. Exh. 2, Wooten Depo. at 28:10—29:5. Dr. Wilkenfeld's report did not address this history.

- Wooten has a documented history of anxiety/panic attacks, including one that caused hyperventilation. Exh. 2, Wooten Depo. at 63:18—64:16. Anxiety can trigger or exacerbate asthma symptoms. Exh. 8, Edith Chen, Gregory E. Miller, Stress and inflammation in exacerbations of asthma, BRAIN, BEHAVIOR, AND IMMUNITY, Vol. 21, Issue 8, 993-999 (Nov. 2007); Exh. 9, Del Giacco S, Cappai A, Gambula L, *et al.*, The asthma-anxiety connection, RESPIRATORY MEDICINE (2016) 44-53. Dr. Wilkenfeld's report never discusses anxiety as a potential alternative or contributing factor.

Without a reliable application of differential diagnosis or any quantitative exposure analysis applied to the actual facts, Dr. Wilkenfeld's specific causation opinion is *ipse dixit* and provides no assistance to the jury.

## IV.  DR. WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(D)—IT WAS NOT RELIABLY APPLIED TO THE FACTS OF THE CASE.

Federal Rule of Evidence 702(d) requires that the expert "has reliably applied the principles and methods to the facts of the case." This factor prevents an expert from

using a valid methodology in the abstract but then stretching, cherry-picking, or ignoring facts to reach a desired result. For example, in *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437, (7th Cir. 2001) the expert selected weather data that supported his opinion but rejected weather data that contradicted it. The Court found that this cherry-picking of facts supported the district court's exclusion of the expert. And in *In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, No. 12-MD-2342, 2015 WL 314149, at *3 (E.D. Pa. Jan. 23, 2015), the court took issue with the expert's cherry-picking of favorable studies and data to support her opinion as part of its overall conclusion to exclude the expert on *Daubert* grounds.

As described throughout this motion, Dr. Wilkenfeld cherry-picked the data that supported his opinion while ignoring key data that undermined it. As a result, Dr. Wilkenfeld's opinion is unreliable.

## V.    DR. WILKENFELD'S OPINION SHOULD BE EXCLUDED UNDER RULE 403.

Even if the Court concludes that despite this body of evidence Dr. Wilkenfeld's opinion meets the requirements of Fed. R. Civ. P. 702, the deceptive presentation of favorable facts while ignoring unfavorable facts, combined with the lack of rigor in arriving at his opinion renders it inadmissible. Any minimal probative value is substantially outweighed by the danger of confusing the issues and misleading the jury. Fed. R. Evid. 403.

### CONCLUSION

For the foregoing reasons, the Court should grant this motion and exclude Dr. Wilkenfeld's testimony in its entirety.

Respectfully submitted,

**ANDREW C. SIMPSON, P.C.,**
Counsel for Port Hamilton Refining and
Transportation, LLLP

Dated: April 7, 2026

   /s/ Andrew C. Simpson
By: Andrew C. Simpson, Esq.
VI Bar No. 451
ANDREW C. SIMPSON, P.C.
2191 Church Street, Suite 5
Christiansted, VI 00820
Tel: 340.719.3900
asimpson@coralbrief.com