Page 1

3.2 DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX
CIVIL ACTION NO.:  1:23-cv-00012


NICOLE WOOTEN,
            Plaintiff,
versus
LIMETREE BAY TERMINALS d/b/a OCEAN POINT TERMINALS,
PORT HAMILTON REFINING AND TRANSPORTATION,
and WEST INDIES PETROLEUM LTD.,
            Defendants.
_____/


     VIDEO DEPOSITION OF DR. MARC WILKENFELD VIA ZOOM


        DATE TAKEN:   Monday, November 10, 2025


               TIME:   11:03 a.m. until 3:31 p.m.


WITNESS LOCATION:    (Remote Location)
                     Jerusalem, Israel


     This cause came on to be heard at the time and
place aforesaid, when and where the following
proceedings were stenographically reported by:
                  Stacey G. Williams
              Registered Professional Reporter
       Coastal Court Reporters/Veritext Legal Solutions
             St. Augustine/Jacksonville, Florida
                     (904) 824-3525

**Exhibit 4**

Page 2

A P P E A R A N C E S


ROBIN SEILA, ESQUIRE
(Appearing Via Zoom)
        Lee J. Rohn & Associates
        1108 King Street
        Suite 3, Christiansted,
        St. Croix  00820, U.S. Virgin Islands

                Appearing for the Plaintiff


ANDREW C. SIMPSON, ESQUIRE
(Appearing Via Zoom)
        91 Church Street
        Suite 5, Christiansted,
        St Croix  00820, U.S. Virgin Islands

                Appearing for Port Hamilton Refining
                and Transportation

ERIC D. COLEMAN, ESQUIRE
REGINALD E. JANVIER, ESQUIRE
(Appearing Via Zoom)
        Akerman, LLP
        201 East Las Olas Boulevard
        Suite 1800
        Fort Lauderdale, FL  33301
                Appearing for Ocean Point Terminals f/k/a
                Limetree Bay Terminals d/b/a Ocean Point
                Terminals


ALSO PRESENT:  Darin Weaver, Videographer,
                (Appearing Via Zoom)
                Veritext Legal Solutions

**Exhibit 4**

Page 3

                        I N D E X

WITNESS                                          PAGE NO.

DR. MARC WILKENFELD

      Direct Examination by Mr. Simpson            4

      Cross-Examination by Mr. Coleman            139

      Cross-Examination by Ms. Seila             150


CERTIFICATE OF OATH                              153

REPORTER'S DEPOSITION CERTIFICATE                154


                       - - - - -

                        EXHIBITS

      (There were no exhibits to this deposition.)

**Exhibit 4**

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER:  We're going on the record.
The time is 11:03 a.m.  Today is Monday,
November 10th, 2025.  Please note this deposition
is being conducted virtually.  Quality of recording
depends on the quality of camera and internet
connection of participants.  What is seen from the
witness and heard on the screen is what will be
recorded.  Audio and video recording will continue
to take place unless all parties agree to go off
the record.

This is Media Unit 1 of the video-recorded
deposition of Dr. Marc Wilkenfeld, taken by the
counsel for the defendant in the matter of Nicole
Wooten vs. Limetree Bay Terminals d/b/a Oceanfront
[sic] Terminals, Port Hamilton Refining and
Transportation and West Indies Petroleum, LTD,
filed in the 3.2 District Court of the Virgin
Islands, Division of St. Croix, Case
No. 1:23-cv-00012.  This deposition is taking place
via Zoom.

My name is Darin Weaver.  I represent Veritext
Legal Solutions.  I'm the videographer.  The court
reporter is Stacey Williams, also from Veritext

**Exhibit 4**

Page 5

Legal Solutions.  I'm not authorized to administer an oath, I'm not related to any party in this action nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including those remotely, will now state their appearance and affiliation for the record, beginning with the noticing attorney.

MR. COLEMAN:  Good morning.  This is Eric Coleman of Akerman, LLP, on behalf of Defendant Limetree Bay Terminals, LLC, d/b/a Ocean Point Terminals.  Also, today with me at various points during the deposition will be Reginald Janvier and Donnie King.

MR. SIMPSON:  This is Andy Simpson on behalf of Port Hamilton Refining and Transportation, LLLP.

MS. SEILA:  This is Robin Seila of Lee J. Rohn & Associates on behalf of the plaintiff, Nicole Wooten.

THE VIDEOGRAPHER:  Will the court reporter please in the witness.

THE COURT REPORTER:  Okay.  Does counsel consent to me swearing the witness remotely?

**Exhibit 4**

Page 6

MR. SIMPSON:  Yes.

MR. COLEMAN:  Yes.

MS. SEILA:  Yes.

DR. MARC WILKENFELD,

having been first duly sworn, was examined

and testified upon his oath as follows:

THE WITNESS:  I do affirm.

THE COURT REPORTER:  Thank you.

THE VIDEOGRAPHER:  Thank you.  Counsel, you

may proceed.

DIRECT EXAMINATION

BY MR. SIMPSON:

Q    Good afternoon or perhaps evening in your

case, Doctor.  My name is Andy Simpson.  I represent

Port Hamilton in this case.

Can you state your name for the record,

please?

A    My name is M-a-r-c, Wilkenfeld,

W-i-l-k-e-n-f-e-l-d, M.D.

Q    And can you give us a brief description of

your background?

A    Well, I graduated from the University of

Vermont College of Medicine in 1985.  I trained in

internal medicine at Roosevelt Hospital in New York City

in the 1980s.  I then did a residency/fellowship at

Exhibit 4

Page 7

Mount Sinai in occupational and environmental medicine. I've been in practice for over 40 years. I have an adjunct associate professor title at NYU. Previously I had an assistant professor title at Columbia University School of Medicine. I'm board certified in occupational and environmental medicine.

Q    And you've been deposed before, correct?

A    A couple of times, yeah.

Q    Okay. You understand that you're under oath and must tell the truth?

A    I always tell the truth.

Q    Okay. If you need to take a break during the deposition, let me know. As long as a question is not pending, we'll accommodate you for that. If you don't understand a question I ask, please tell me and I will try to clarify it. If you don't, I'll assume that you understood the question I asked. Is that fair?

A    Yes, sir.

Q    If I ask you a question that you don't recall something and you need to refer to a document, that's fine. Just let us know you're referring to a document and what it is.

And with that, I have a lot to cover so I'm going to get right into it.

A    Please.

Exhibit 4

Page 8

Q    Can you tell me what specialized training is required to become board certified in occupational medicine?

A    Right.  So two-year fellowship, which includes clinical research and academic.  The academic is an MPH equivalent.  Following that, you need one year of actual practice in occupational medicine.  Then there's an examination and you pass the examination and you're board certified.

Q    Okay.  And the training includes specific education about workplace exposures and how to evaluate them, correct?

A    Absolutely.

Q    And includes training how to establish causation between workplace exposures and other injuries or illnesses, right?

A    Amongst other things, yes.

Q    Would you agree that establishing causation is one of the core competencies of an occupational medicine physician?

A    One of many competencies that we have.

Q    And in your training were you taught about the difference between general causation and specific causation?

A    Yes, we were.

**Exhibit 4**

Q    Would it be fair to say that general causation addresses what can happen due to an exposure while specific causation addresses what did happen in a particular case of exposure?

A    On a simple level, that's true, yes.

Q    And, in occupational medicine, you need to establish both general and specific causation, true?

A    Yes -- well, usually.  It depends on the reason you're seeing the patient.  Sometimes we're seeing a patient to establish disability, not causation.  Sometimes we're seeing a patient for treatment so --

Q    In this case, you needed to establish both general and specific causation, correct?

MS. SEILA:  Objection, form.  You may still answer.

A    Yes.

Q    And you teach toxicology, you said, as a clinical assistant professor.  When you teach toxicology to medicine -- medical students, you teach them about dose-response relationships, correct?

A    I generally teach many things.  Are you asking me what I teach?

And I'm an associate professor, by the way.

Q    Okay.  I apologize.

A    Yeah.

Exhibit 4

Q    But one of the things you teach them is about dose-response relationships, true?

A    At times, yes.

Q    You teach them that quantifying dose is fundamental to establishing causation in toxicology, correct?

A    I don't understand the question.  I'm sorry.

Q    Okay.  Do you understand that quantifying dose is a fundamental part of establishing causation in toxicology?

A    Well, it depends on the case.

Q    Okay.  Excluding cases where you're trying to establish merely disability, that's an essential part of establishing causation, correct?

A    It depends on the exposure.  I mean every substance is different.

Q    Okay.  You teach your students that the dose makes the poison, correct?

A    Depending on the poison, yes.

I answered I thought.  I'm sorry.

It depends on the exposure.  Some substances don't have that type of curve and don't have that type of relationships.  There are substances where a very tiny, tiny exposure can cause a disease.  Then there are exposures where you need a gradient.  So it's not a yes

Exhibit 4

Page 11

or no question so I can't really tell you yes or no.

Q    Inevitably it's a matter of the amount of the dose, correct?

Whether it's a tiny bit or gradient, it's still the dose, right?

A    Not always, no.  Sometimes -- sometimes it's a black or white question.  It's a yes or no, was there an exposure or was there not an exposure.

Sorry, but you just can't generalize like that, especially when you're teaching medical students.

Q    What kind of circumstances is it where it's black and white without knowing the dose relationship?

A    One I can think of is mesothelioma.

Q    Okay.

A    And asbestos.

Q    If a medical student came to you and said they determined someone was exposed to levels many times higher than toxic, but couldn't tell you the actual level, would you consider that acceptable toxicology?

A    I'm sorry, I just don't understand what you're trying to ask me.

Q    Okay.  Can you explain what a dose-response relationship is?

A    Okay.  The higher the dose -- for some exposures, the higher the dose, the more likely that

**Exhibit 4**

Page 12

you'll develop a disease.

Q    To establish a dose-response relationship, you need to know what was, in this case, inhaled, correct?

A    You need to know what substance was inhaled, yes.

Q    And you need to know how much was inhaled, correct?

A    Well, again, you know, are you talking about studies or are you talking about individual cases?

Q    Let's talk about individual cases.  You need to know how much was inhaled, correct?

A    It would be helpful, yes.

Q    And you need to know -- it would be helpful to know the concentration, correct?

A    It would be helpful, sure.

Q    And the duration of the exposure is important, too, correct?

A    Correct.

Q    Would you agree that without quantifying dose it's difficult to establish causation in an occupational exposure case?

A    No.

Q    Why not?  Why don't you agree with that?

A    Because I think I've tried to explain to you that every case is different, okay, and when you -- when

**Exhibit 4**

you evaluate a clinical case, you're dealing with many, many different issues.  You're looking at the specificity of what the substance was.  You have to look at the temporality.  Okay.  There's just -- you know, you want a yes or no answer and the answer is not yes or no so ...

Q    What specificity did you have with respect to Ms. Wooten's exposure in this case?

A    We knew that she was exposed to coke emissions and we know what's contained in coke emissions.

Q    What about temporality in this case?

A    Right, so she had an immediate reaction to an exposure.

Q    Did you establish the dose of that exposure?

A    We established that it was over the odor threshold, but, no, we did not -- we did not have a reading.

In other words, you're asking me whether we had a personal reading, like we had a machine next to her nose and her mouth so we know exactly how much she breathed in; is that your question?

Q    I'm asking you if you established any sort of dosage level in this case.  And I think you answered it, odor threshold only, correct?

A    That's correct, yes.

Exhibit 4

Page 14

Q     Are you familiar with the Bradford Hill criteria for establishing causation?

A     Sure am.

Q     In your practice, do you apply the Bradford Hill criteria when evaluating causation?

A     At times, yes.

Q     Are the Bradford Hill criteria generally accepted in the field of occupational medicine for establishing causation?

A     Yes.

Q     Do you consider the Bradford Hill criteria to be a reliable methodology?

A     Yes.

Q     You served on the EPA World Trade Center Expert Technical Review Panel from October 2003 to December 2004, correct?

A     I'm very proud of that, yes.

Q     And in that capacity you reviewed scientific evidence about exposures and health effects, correct?

A     Yes.

Q     And you required dose quantification when evaluating health effects from exposures from the World Trade Center terrorism in September 2001, correct?

A     Well, that's a really good point.  I think that's what I've been trying to tell you.  At times we

**Exhibit 4**

Page 15

didn't have clear exposure levels.  You don't have specific for each individual.  You don't know what the exposures are.  I mean that was the whole point of what I was trying to get to before.

Q    And so when you don't have those exposure levels, you look for things like objective evidence of disease to establish causation, correct?

A    Well, again, it depends --

MS. SEILA:  Objection, form.

A    -- you know, you're asking me about -- you're asking me about the World Trade Center?

Q    Yes.

A    It took years to figure it out.

Q    But that's what you relied upon, in the absence of exposure data, correct, objective evidence?

A    No.  No, we relied upon epidemiologic studies of disease, but it took time.  And it was long after the committee was shut down.

Q    What medical records did you have when you prepared your report in this case?

A    I had -- I had everything that was provided with me by the plaintiff's attorney.

Q    What was that?

A    I don't have a list in front of me.

Q    Do you have --

**Exhibit 4**

A   Whatever I cited -- whatever I cited in my report was what I considered to be relevant.

Q   Okay.  Well, your report just generally says you reviewed medical records and there are some specific ones in the report that you mentioned.  So what you're saying is, those ones that you mentioned in the report are the only ones you considered -- I don't want to put words in your mouth -- did you say relevant?

A   No, that's not what I said.

Q   Okay.

A   What I said was that I went through whatever records there were and whatever I considered relevant to the case I cited in the report, after going through all the records.

Q   Okay.  Did you review Ms. Wooten's deposition transcript?

A   Yes, I did.

Q   Did you read the entire transcript or only selected portions?

A   No, I read the whole thing.

Q   Do you recall her testimony about how long her car window was down during the exposure?

A   I don't recall.

Q   Do you recall anything that she told you or that you read about her exposure during the incident on

Exhibit 4

Page 17

August 8th, 2022?

A    I don't recall.

Q    So you can't recall whether she has told healthcare providers she was exposed for one minute or two hours or anything in between or more or less than that; is that correct?

A    I don't recall right now, no.

Q    What would you need to be able to refresh your recollection on that?

A    I would like to look at my report, if that's okay.

Q    Sure.  Absolutely.

A    I don't have the time.  All I know is that she had immediate onset of symptoms after the exposure.

Q    Do you recall her testimony about an incident on August 10th, 2022?

A    Yes, she had -- she got better from the steroids on the 8th and then she had a different exposure on the 10th to I believe it was a landfill near her office.

Q    A landfill fire, correct?

A    Yeah.  Sorry.

Q    After her -- or at her urgent care visit on August 8th, 2022, the date of the incident, she had wheezing and decreased air movement, correct?

**Exhibit 4**

Page 18

A    Correct.

Q    Did you review the medical records from the Governor Juan Luis Hospital for August 9, 2022?

A    Yes, I did.

Q    And can you tell me what those records showed?

A    I would have to check my report again, but I don't know if it's in my report.  But I believe that she had some improvement.

Q    In fact, she indicated her shortness of breath had resolved, correct?

A    Well, that's what --

MS. SEILA:  Objection, form.

A    -- the steroids do.  That's why they blasted her with steroids.

Q    And they indicated that she was not in respiratory distress, correct?

MS. SEILA:  Objection, form.

A    Well, again, she had steroids circulating through her body.  She was in such distress they had to give her intravenous steroids, so you would -- you would expect to her to be better the next day.

Q    What did the physical examination of her lungs show on August 9th, 2022?

A    I don't recall.

THE COURT REPORTER:  And, I'm sorry,

Page 19

Mr. Simpson, to interrupt.

Ms. Seila, if you can please try to speak up. I saw you speak, but I'm not -- it's not coming out audibly over Zoom.

Q   Were you provided any air monitoring data from the refinery?

A   Yes, I was.  I was provided with some samples, results.

Q   And do you recall how many air samples were collected during the relevant time period?

A   Hang on one sec.  May I look at the report?

Q   Yes, absolutely.

A   Thank you.  Thank you very much.

There were a great deal.  I don't know the number.

Q   Okay.  What did those samples show for sulfur dioxide levels?

A   I believe there was no exceedance.

Q   Did you review medical records from before August 8th, 2022?

A   Yes, I did.

Q   I note you mention in your report a visit from I think it was four years before the incident.  Did you have any records between that particular report and the date of the incident, August 8th, 2022?

Exhibit 4

A    You're talking about the occupational medicine examination in 2018 --

Q    Yes.

A    -- when she was clear to work by a specialist because she had a history of asthma, they wanted to document that her lungs were fine and she was able to work; is that the one in 2018?

Q    Yes.  You reviewed that, correct?

A    Yeah.

Q    Okay.  You reviewed records between that record and the August 8th, 2022 record, right -- I mean incident, right?

A    Yes, I did.

Q    But they're not mentioned in your report, are they?

A    No.  The most important examination obviously was the pre-placement evaluation because they were worried about her asthma.  I mean the whole question is, did this lady have severe enough asthma so that it would be dangerous for her to work and she wouldn't be able to do her job duties.  And she went to a special examination to make sure that she was not, and it was documented that her lungs were fine in 2018.

Q    And if it was documented that her lungs were not fine between the date of that examination and

Exhibit 4

Page 21

August 8th, 2022, that would be important for you to know, wouldn't it?

A    The most important thing is that she lowered the window and she breathed in chemicals, she immediately got sick and she had to go to urgent care to get intravenous steroids so that she could stay alive. You know, whether she had episodes of bronchitis or whatever between 2018 and the day of the incident -- yeah, I think you follow what I'm getting to, right?

Q    I get to ask the questions in the deposition. So I can definitely detect your bias though, yes.

A    I'm not biased at all.  I'm a physician and I've seen a lot of cases and I can tell you that when a patient comes in and they have an exposure that makes them sick, it's -- you know, it means something.  That's all.

Q    And if they have incidents in the month before that August 8th incident, that would be important to know, too, wouldn't it?

A    It might have made her more prone to being irritated, so she might have been more sensitive to lower levels of the chemicals, that's true.  That's a very good point.

Q    What did the records show about the status of her asthma in the months before the August 8th, 2022

Exhibit 4

Page 22

incident?

A    I don't recall.

Q    And did you review medical records for the months before the August 8th, 2022 incident?

A    Yes, I did.

Q    And you did not include them in your report so, therefore, you did not consider them relevant, correct?

A    Well, I think I've explained to you that the most relevant evaluation was the pre-placement evaluation in 2018, right.  Now whether she had episodes in between that date and the date of her toxic exposure, the only difference would be that it would make her more prone to react to the toxic chemicals.

Q    Did you review any bronchoscopy reports as part of your rendering your opinion in this case?

A    Yes, I did.

Q    Did you review any CT scan reports as part of your reaching your opinion in this case?

A    Yes, I did.

Q    Did you review any cardiopulmonary exercise testing or CPET testing reports as part of your analysis in this case?

A    Yes, I did.

Q    Did you review any chest X-ray reports as part

**Exhibit 4**

of your analysis in this case?

A    Yes, I did.

Q    Generally speaking, what did all those objective tests show?

A    All of the tests, except for the pulmonary function, test were normal.

Is it okay if I drink some water?

Q    Absolutely.

A    Thank you.

Q    You have extensive clinical experience with individuals experiencing exasperation [sic] of asthma after exposure to smoke or petroleum products, correct?

A    You mean exacerbation?

Q    Yes.

A    Yeah, I do.

Q    And, based upon that extensive clinical experience, when someone has true asthma exacerbation from toxic exposure, do you typically see objective findings on pulmonary function tests?

MS. SEILA:  Objection, form.

A    Usually, yes.  Yeah --

MS. SEILA:  Go ahead.  Sorry.

Q    Do you typically see objective findings on chest imaging?

A    No, usually not.

Exhibit 4

Page 24

Q    Do you typically see findings on a bronchoscopy if the condition is severe?

A    Generally not, no.

Q    Did anyone assist you in preparing your report?

A    Nope.

Q    Did you use artificial intelligence like ChatGPT or Grok in preparing your report?

A    No.  I never do.

Q    Did you use any specific guidelines or standards in preparing your report?

Did you hear my question?

A    You asked if I used specific guidelines and I said no.

Q    Oh, I'm sorry.  I did not hear your answer.  I apologize.

A    I'm sorry.

Q    We could have been looking at each other for a long time.

A    Right, right, eight.

Q    You're familiar with the expression "correlation is not causation," correct?

A    Yes, I am.

Q    Do you agree with that?

A    Again, when someone has an exposure and they

**Exhibit 4**

have immediate response and they get sick, when they wake up in the morning, they're okay and then they have a chemical exposure and they develop symptoms immediately, right, that implies causation.  Okay.  If you're talking about things like cancer and long-term studies and long-term effects, I think that's what you're referring to.  You're not -- you're not referring to acute toxic effects.

Q    Did anyone, other than the counsel for Ms. Wooten, review your draft opinion before it was finalized?

A    No, no.

Q    In reaching your opinions in this case, did you file -- follow any specific scientific methodology?

A    No.

Q    Can you describe the methodology you did follow in this case?

A    I just said no.

Q    You didn't follow any methodology at all?

MS. SEILA:  Objection, form.

A    I don't understand the question.  You asked me if I followed any established guidelines and methodology?

Q    Yes.

A    I said no.

**Exhibit 4**

Q    Okay.  So describe to me how you reached your opinion in this case.

A    Okay.  I'll tell you again, I've been in practice for many, many years, right, I reviewed her history, her test results and the substances that she was exposed to and I provided an opinion as to whether those substances could cause her symptoms.

Q    So it's just your opinion and nothing to back that up, other than she was exposed and she had a reaction?

A    Well, that's --

MS. SEILA:  Objection, form.

A    -- not true.  That's not what I said.

Q    Okay.  Well, that's what I'm trying to understand because I'm assuming you did more than that, but it doesn't sound like you did more than that.

A    Well, the medical literature.

Q    The medical literature cited in your report?

A    Yes.  Correct.

Q    Is the way you rendered your opinion in this case the way that is a generally-accepted method in the field of occupational medicine?

MS. SEILA:  Objection, form.

A    I believe so.

Q    Can you point -- can you point to any

**Exhibit 4**

peer-reviewed articles that describe that as an accepted method?

A    I'm not -- I'm not getting your point about what an accepted method is.

Q    Do you know what is an accepted method of reaching an opinion in a case like this is?

A    I really -- I don't understand what you're saying.  You're going to have to ask the question a different way.

Q    What you described as to how you rendered your report is what I'm calling your method.

A    Okay.

Q    Are there any published peer-reviewed articles that describe that as an acceptable method in the field of occupational medicine for determining whether an exposure caused injury to a patient?

A    You want a peer-reviewed article that explains that taking a history of exposure, a clinical history, a preexisting history and a review of the literature is an accepted measure; is that what you're asking about?

Q    To reach a conclusion that a person is permanently disabled from the result of an exposure in a workplace setting?

A    Well, I don't know whether -- you haven't mentioned permanent disability yet so now I'm even more

**Exhibit 4**

Page 28

confused.

Q   All right.  Now let's talk --

A   Are we talking about causation -- are we talking about causation or disability?  I'm sorry.

Q   Well, let's limit it to causation.

A   Right.

Q   Can you point to me any accepted publication, peer reviewed or not, that says reviewing the medical records, reviewing the clinical history, reviewing the patient's description of how she was exposed and not conducting any sort of toxicological determination of exposure is an accepted method in your field?

A   It's done thousands and thousands of times every year so, you know, if that means it's accepted, then there it is.

Q   So, again, we're stuck -- unless you can point to some sort of treatise or something, we're stuck with accepting your claim that that's accepted, right?

A   Nope.

Q   Okay.  Well, what establishes that?

Where is this methodology, as I call it, I know you don't call it a methodology, but where is this written up anywhere as an accepted way of diagnosing causation?

A   It's taught in every -- every occupational

Exhibit 4

medicine residency.  This is how it's done.

You're asking about three different things. You're asking about studies for causation of cancer, right --

Q    No, I'm not asking that at all.

A    -- okay, then you're asking about disability. And I'm trying to explain to you how we deal with acute exposures, right.  If someone has an exposure, they weren't symptomatic, right, then they're exposed, then they develop severe enough respiratory distress so that they require intravenous steroid treatment, right, because their lungs are so inflamed that they can't breathe, right, you want an article that supports the fact that that's causation?

Is that what you're asking me?

Q    Absolutely.

A    I don't have an article.  If you want, I can try to look one up for you right now and, you know, I'd be happy to do that.  It might take me a couple hours, but I'm happy to do it.

Q    You're here to tell us what you know now, not what you might learn down the road.

A    Okay.

Q    Do you have an understanding as to -- go ahead.

**Exhibit 4**

Page 30

A    What you're saying is either she wasn't exposed or she wasn't sick.  I mean I don't know -- see, I keep trying to understand what you're asking me.  I don't -- I saw your Ph.D. toxicologist's report and all his critiques of mine, but, you know, frankly he's not a physician, I must say.

Q    How long was Ms. Wooten exposed to the substance that you claim caused her condition on August 8th, 2022?

A    Probably a matter of minutes.

Q    Did you read in her deposition where she says it was less than one minute, it was probably just seconds, just time to ask the question to get an answer and then roll my window back up?

A    Well --

MS. SEILA:  Objection, form.

Q    I didn't hear your answer.

A    You'll have to repeat the question.

Q    Did you read in Ms. Wooten's deposition where she states, "It was less than one minute, it was probably just seconds, just time to ask the question, to get an answer and then roll my window back up"?

A    Did I read that --

Q    Yeah.

A    -- is that your question?

**Exhibit 4**

Q    Yeah, that's my question.

A    I don't recall.

Q    Okay.  In your report you cite several studies about health effects from refinery emissions, right?

A    Yes.  May I look at my report?

Q    Absolutely.  Any time you need to look at your report, you may do so.

A    Hang on one sec.  Yes.  Okay.

Q    And you cited --

A    I'm at --

Q    I'm sorry, I did not --

A    Yeah, sorry.

Q    Okay.

A    No, no, I say I'm at that section now.  Thank you.

Q    Okay.  In your report you cite the most relevant studies you found, right?

A    Correct.

Q    What was the duration of exposure in the Morphew study?

A    It was a number of months.

Q    And in the Johnson study it involved a refinery fire that burned for seven weeks, correct?

A    Hang on one second.

Q    Sure.

Exhibit 4

Page 32

A    Correct.

Q    And you were measuring -- that's an article about the effect of seven weeks of exposure, correct?

A    Let's see.  They were looking at the surrounding community, yes.

Q    And in the -- I don't know if it's Byrwa, B-y-r-w-a, Hill study that you cited that involved community residents with an ongoing chronic exposure as well, correct?

A    Correct.

Q    So it's fair to say that all the studies you cited involved exposures measured in weeks or months, true?

A    They were lower exposures measured in weeks or months, yes, correct.

Q    Why is the fact that they were lower exposures relevant?

A    Because obviously a lower exposure over a longer period of time may not be equivalent to a higher exposure over a shorter period of time.

Q    That's the dose response --

A    Not exactly.

Q    Would you agree that comparing an exposure of mere minutes, as you've stated, to exposures lasting weeks or months requires some analysis of dose response?

Exhibit 4

A    I'm sorry, say that again.

Q    Would you agree that comparing Ms. Wooten's exposure, which you said was a couple of minutes I believe is how you termed it, to exposures lasting weeks or months requires some analysis of dose response?

A    Again --

MS. SEILA:  Objection, form.

A    Yeah, sorry.  Clinically she was in a different state, also, because she had preexisting disease, as you pointed out, so I don't know if it's comparable.  I don't know if the dose that she needed to become so sick is the same as someone without the history of asthma would have needed to become sick.

Q    Where was Ms. Wooten's vehicle located distance-wise relative to the coke dome with the smoldering coke at the time of her exposure?

A    I don't recall.

Q    Are you aware that testimony indicates she was approximately 300 feet from the dome?

MS. SEILA:  Objection, form.

A    I'll take your word for it.

Q    Would you agree that atmostpheric concentrations of gases and particulates decrease with distance from the source?

A    That's true.

Exhibit 4

Q    Did you perform any calculations or modeling to estimate what the concentration of various compounds would have been at 300 feet from the source?

A    No, I did not.

Q    Did you consider atmostpheric dispersion in your analysis?

A    No, I did not.

Q    Did you make any determination of which particular chemicals in the smoke caused Ms. Wooten's reaction?

A    I don't think it's possible to say which it was.

Q    What do you understand what were the components of the smoke that she inhaled?

A    VOCs, formaldehyde, toluene, acetone, methylene chloride, probably benzene.

Q    And what's your basis for believing that about those particular chemicals?

A    That's what's typically in coke emissions.

Q    And how --

A    And sulfur dioxide.  Sorry.

Q    And how did you determine what's typical in coke emissions?

A    From experience.

Q    Did you rely upon any sources?

Exhibit 4

A    I don't recall, but it's not the first case I've seen like this, clinically.  I don't mean legally.

Q    Can you tell me what specific VOCs she was exposed to?

A    I think I just did, right.  Probably toluene, acetone, methylene chloride and benzene.  She was also exposed to formaldehyde.

Q    And how do you know that?

A    Because those are the components of coke emissions.

Q    Does it depend upon the type of coke, what's emitted when it smolders?

A    I don't know the answer to that.

Q    Did you review any air sampling data that identified the specific chemicals you've listed as being present?

A    I don't believe --

MR. SIMPSON:  Objection, form.

A    I don't believe they tested for specific chemicals -- for all of those specific chemicals, should I say.

Q    On the fifth page of your report you state, Ms. Wooten was exposed to levels many times higher than those that are toxic to the respiratory system.  Do you stand by that statement?

**Exhibit 4**

Page 36

A   Yes.

Q   Can you tell me specifically what level Ms. Wooten was exposed to?

A   Well, we know two things:  She was exposed to above-the-odor threshold and she was exposed at a high enough level to cause her airways to react.

Q   What -- what odor threshold are you referring to?

A   Just give me one sec, okay?

Q   Sure.

A   I'm looking at the deposition of Mark Johansen.  He noted a strong odor, which is a qualitative indicator of airborne contaminants.

Q   So basically we're talking about an odor of smoke?

A   An odor of coke, yes.

Q   Can you give me the level in some sort of quantitative measure, like parts per million or milligrams per cubic meter?

A   I think I have it in the report.

Q   And what did you determine in the report?

A   You could see it on page -- I'm not sure what page it's on.  Toluene, acetone, methylene chloride, formaldehyde and trimethylamine, those levels are all noted.

Exhibit 4

Page 37

Q    Well, that's not -- those are not the levels that we know she was exposed to, are they?

A    We don't know what levels she was exposed to, exactly.  Yes.

Q    Okay.  So, because she smelled coke smoke, you conclude that she had to have been exposed to all those chemicals at their odor threshold?

MS. SEILA:  Objection, form.

A    No, that's not what I said.

Q    Okay.  I'm trying to understand.  That's why I'm asking the question.

A    I said she had an exposure, right.  She had an exposure above the odor threshold.  I don't -- the only way to know what exposure she had would have been to put on a personal monitor before she went in, right, which obviously nobody could do.  But we do know she was exposed and we do know that she got sick immediately after being exposed.

Q    Did she describe to you or in anything that you have reviewed what the odor was that she was smelling?

A    No, she did not.

Q    So we don't have --

A    I didn't discuss it with her.

Q    Did you meet with her or -- and I say meet --

**Exhibit 4**

A    I met with her -- this is actually very interesting.  I met with her last week very briefly on the phone because I wanted to find out about the defense expert's exam and she told me that he spent three to five minutes with her, which I found a little bit shocking, but -- and that's mainly what we talked about.

Q    How many minutes did you spend with her?

A    I didn't spend -- I didn't spend time with her, but I did not claim to do an independent medical evaluation.  I did a file review.

Q    All right.

A    And I did not put in my report -- I did not put in my report that I obtained the following history through my evaluation.  I said that I did my history through the review of the file.  They're two very, very different things.

Q    So you've never asked her whether what she inhaled had a fishy smell or a sweet smell --

A    No.

Q    -- or a fruity smell --

A    No.

Q    -- or anything like that?

A    Nothing like that, no.

Q    Okay.  So you state it was many times higher than those that are toxic, her exposure, correct?

**Exhibit 4**

A    I believe so, yes.

Q    And how many times higher?

A    I don't know.

Q    In fact, you don't know what the toxic level is, do you?

A    I don't recall.

MS. SEILA:  Objection, form.

Q    You don't recall or you don't know?

A    I don't recall.

Q    Okay.  What would you need to do to be able to recall that?

A    Well, it's not the same for everybody, obviously.  You would have to -- I don't know, okay.

Q    If you don't know the actual level, how can -- how can you say it was many times higher?

MS. SEILA:  Objection, form.

A    Because of her reaction to it.

Q    Didn't you already tell me that she was predisposed to react to this?

A    Right.  That's the point again.  So if you ask me what the level of exposure that people need to get sick is, it's not the same for everyone.

Q    But you're aware that there were other people in her immediate vicinity who were not wearing respiratory equipment who had no reaction whatsoever,

Exhibit 4

Page 40

right?

A   Well, I don't know that they had no reaction. I mean I didn't -- I didn't review anyone else's chart so I really don't know.

Q   Assume that there were no other reports of complaints regarding exposure to the smoldering coke fumes, wouldn't that be relevant to determining whether she was exposed to a toxic level?

A   Well, no, because --

MS. SEILA:  Objection, form.

A   Sorry.  She may have been predisposed because of her -- because of her lung disease.

Q   Do you think any particular component of the chemicals you've described was the most likely to her reaction?

A   It's very difficult to say.

Q   You spent a lot of time in your report talking about sulfur dioxide.  Was there a reason you emphasized that?

A   No.

Q   Can you tell me what the OSHA permissible exposure limit is for sulfur dioxide?

A   I would have to look at it.

Q   Can you tell me what the N-I-O-S-H recommended exposure limit is for sulfur dioxide?

Exhibit 4

Page 41

A    NIOSH?

Q    Yes.

A    Yeah, I would have to look it up.

Q    Can you tell me what the N-I-O-S-H, I-D-L-H level is for sulfur dioxide?

A    I would have to look that up as well.

Q    Did you determine that Ms. Wooten was exposed to a level of smoke that was higher than any regulatory limit related to --

A    No, I did not.

Q    Okay.

A    Sorry.

Q    That's all right.

A    You can finish.  Go ahead.

Q    I was going to say, related to the chemicals that you've described her being exposed to?

A    No, I did not.

Q    Have you seen any report that Ms. Wooten described the smell of sulfer dioxide?

MS. SEILA:  Objection, form.

A    Can I answer?  Is that okay?

MS. SEILA:  Yes.

Q    Yeah.

A    I did (inaudible).

THE COURT REPORTER:  I'm sorry, what was that

Exhibit 4

Page 42

answer, Doctor?

A    Sorry.  No, I did not.

Q    The odor threshold for sulfur dioxide is a hundred to a thousand times lower than the harmful level, correct?

MS. SEILA:  Objection, form.

A    I believe so.  I believe that -- that sounds -- that sounds about correct.

Q    So even if she smelled sulfur dioxide, that wouldn't necessarily mean that she was being exposed to a toxic level, right?

MS. SEILA:  Objection, form.

A    That's not true.  That's not true because it may have been a toxic level -- it may have been a level high enough to have her react.

Q    Can you cite any scientific literature that supports using odor detection as a measure of toxic exposure?

A    Again, I would have to -- I would have to take a look and get it for you, but right now I can't.

Q    In your training in occupational medicine, were you taught that odor thresholds correlate with toxic exposure levels?

A    They can.

Q    But they don't always, do they?

**Exhibit 4**

A    Correct.

Q    And, in fact, many substances have odor thresholds that are far below their toxic thresholds, sulfur dioxide being one example, right?

A    Correct.

Q    So when you wrote that levels were well above the odor threshold, that doesn't really tell us whether the levels were toxic, does it?

MS. SEILA:  Objection, form.

A    I'm sorry, could you repeat that.

Q    Sure.  When you wrote that the levels were well above the odor threshold, that doesn't actually tell us whether the levels were toxic, does it?

MS. SEILA:  Same objection.

A    Well, the other -- the other factors that you're dealing with a mixture of chemicals so -- but to answer your question, I believe the answer would be, yes, you're correct.

Q    Okay.  Would you agree that the air monitoring data that you reviewed would be the most reliable evidence of what level Ms. Wooten was actually exposed to --

A    No.

MS. SEILA:  Objection, form.

Q    -- for the things that were monitored?

**Exhibit 4**

MS. SEILA:  Objection, form.

A    No.

Q    No?

A    No.

Q    Why not?

A    Because we don't know what she was exposed to. We don't have any personal air monitoring data for her.

Q    How many air samples that you reviewed from this case showed sulfur dioxide levels above the OSHA permissible exposure limit?

A    I don't believe I saw any.

Q    How many samples showed levels above the NIOSH recommended exposure limit?

A    I don't recall seeing any.

Q    Did you even discuss the air monitoring data in your report?

A    I believe I did.

MS. SEILA:  Objection, form.

Q    If you can point that out, I'd appreciate it.

A    I said what Mr. Johansen talked about.

Q    So you didn't talk about the actual air monitoring results you had?

A    Give me one second.  Can I take a minute?

Q    Absolutely.

A    So the exhibits attached to his deposition,

Exhibit 4

Page 45

there are measurements of particulate matter at a distance from the coke smoldering.  So we know two things.  As I said, we know that the levels were above the odor threshold and the odors were also above the level that could cause acute symptoms.

Q   You mean above the level to cause her symptoms; is that what you said?

A   Yes.  Yes, yes.

Q   Did you attempt to perform a dose-response analysis in this case?

A   No, I did not.

Q   Why not?

A   Because I did not believe it was relevant.  We talked about that before, right.

Q   Because you had already reached your conclusion?

A   No.

Q   So why not?

A   I didn't see any way to do so in this case.  We didn't have the data.

Q   So when you have a lack of data, what other things do you look for?

A   Well, I think -- again, I think, you know, you're talking about this as if it's a cancer case.  You describe -- the questions you're asking me are referring

**Exhibit 4**

to a chronic exposure, right.  I mean that's really what you keep pointing towards.  And this is not a chronic exposure, this is an acute exposure, which is totally different --

Q    Well, people can --

A    -- I think a lot of -- I'm sorry.

Q    No, I thought you were done.

A    Who's talking?

Q    I thought you were done.  I'm sorry.

A    Yeah.  I lost my train of thought now.

Q    I apologize.

A    What's relevant for a chronic exposure in terms of dose is not relevant to a short acute exposure, clinically.

Q    You keep saying clinical.  Basically what you're saying is you accept what the patient has told you, right?

A    No.

Q    Okay.

A    I really find it very hard to believe that this woman would go to an urgent care and have needles shoved into her arm, have oxygen put on, right, and have all kinds of powerful medications administered to her if she wasn't experiencing these symptoms immediately after exposure.  I mean I know I think you'll agree that would

Exhibit 4

be kind of impossible to believe almost, unless she was a very, very, very disturbed woman, right.

So I do believe that she went to the -- according to the medical records, I believe that she went to the urgent care and I believe that she was given intravenous steroids for respiratory distress. And I don't think anybody would really argue about that.

Q   You do understand that she has been diagnosed with anxiety in the past, correct?

MS. SEILA:  Objection, form.

A   Her and 50 percent of the human race, that's true, yeah.

Q   And anxiety can cause that sort of reaction that she described following the exposure, correct?

MS. SEILA:  Objection, form.

A   Anxiety doesn't get better with steroids. As a matter of fact, anxiety should get worse with steroids.

Q   If you believe they're helpful and you're suffering from anxiety, you might get better, right, sir?

MS. SEILA:  Objection, form.

A   No.  No, you wouldn't.  Steroids, in general, make people have mood swings so I would disagree with what you're saying.

Exhibit 4

Page 48

But you're saying that she really didn't have these symptoms; is that your question?

Q   No, that's not the question I asked.

A   You're saying that she went to the urgent care and got treated and she really wasn't sick; is that what you're asking me?

Q   I'm saying, Doctor, that it does not appear that you ruled out anxiety as a possible cause of her reaction and I don't see anything in your report mentioning anxiety.

A   Well, that's because, again, you don't treat someone with steroids -- unless all the urgent care doctors were wrong, right, and they missed the diagnosis of anxiety, which would present completely differently. You know, I just -- I can't imagine.

It's not -- I wasn't there, right.  I'm reading the records from her emergency visit where they applied life-saving measures to a woman in respiratory distress and not once in that chart did anyone think of anxiety.  I mean they put intravenous into her arms and gave her steroids.  So I would have to -- I would have to disagree with you there.

So did I think of it, I think it would be such a ludicrous thing to think of that, no, I did not think of it.

**Exhibit 4**

Q    When you -- you read her deposition where she said she vomited as a result of the exposure?

A    Yeah, I did.

Q    Temporally, do you understand when she vomited?

A    I don't recall.

Q    Do you recall whether it was immediate or sometime after?

A    I don't recall.

Q    Do you recall whether it was before or after going to urgent care even?

A    I don't recall.

Q    Did you read her testimony where she said after she left the refinery complex she went back to her place of work at the airport and vomited there?

A    I don't recall.

Q    Would that -- is that -- is a reaction of vomiting something you expect from exposure such as what Ms. Wooten describes?

A    If you irritated -- if you irritated the gastrointestinal tract as well as the airways, it could happen, yes.  Or if you had a little bit of reflux, it could happen.  If you had aspiration, it could happen. So it certainly is possible.

Q    And temporally would you expect that to happen

**Exhibit 4**

closer in time to the exposure or later?

A    Well, it depends.  If it was aspiration, it would be later, right.  If it was acute -- if it was an acute toxic effect on the gastrointestinal tract, it would be earlier.  So it really depends on what the cause was.

Q    Did you make any determination as to whether she was exposed to landfill smoke after the exposure on August 8th and in and around the time she returned to her place of employment the same day, which is downwind from the landfill fire?

MS. SEILA:  Objection, form.

A    Say -- did I what?

Q    Did you make any determination that -- actually, let me review my question.

Did you make any determination as to whether she was exposed to landfill smoke on the day of her exposure at the refinery when she returned to her place of employment downwind from the landfill?

MS. SEILA:  Objection, form.

A    No, I didn't.

Q    Okay.

A    No, I did not.

Q    After her visit to urgent care on August 8th, I think the next thing in your report is her visit on

Exhibit 4

August 10th to urgent care, correct?

A    I believe so.  I would have to take a look.

Q    Okay.  Were you aware that she went to the emergency room on August 9, the day after her incident?

A    Hang on one sec.

Q    Sure.

A    So August 8th.  Okay.  Tell me your question again.

Q    One second.

Were you aware that she went to the emergency room on August 9, the day after her accident?

A    I believe I was.

Q    And did you see that when she presented to the emergency room on August 9 she said she was there to get documentation of her exposure?

A    I believe so.  That sounds correct.

Q    And did you see that the emergency room personnel reported that her shortness of breath resolved after treatment?

A    Yeah, well, fortunately the steroids worked.

Q    And on August 9 she no longer felt nauseas, correct?

A    Exactly.  Yes.

Q    And the physical examination showed no respiratory distress, correct?

Exhibit 4

Page 52

A    Yes, fortunately it did not.

Q    And her lungs were clear bilaterally on August 9, 2022, true?

A    That's true, yes.

Q    So on physical examination the day after this alleged exposure she had no respiratory distress and her lungs were clear, correct?

A    Following the treatment with steroids, yes, correct.

Q    Okay.  Any reason you didn't mention any of that in your report?

A    No reason.

Q    Would you agree that this evidence tends to show that the August 8th, 2022 exposure did not cause permanent injury?

MS. SEILA:  Objection, form.

A    I don't know that you can say that a day after, because she was very, very heavily medicated the day before.  So I don't think you can make a judgment about permanent -- permanent changes based on the day after following the medication.

Q    Were you aware that Ms. Wooten returned to work on August 9, 202020 -- excuse me -- 2022?

A    Yes, I believe I was.  Yes.

Q    Is there any reason you didn't include that in

Exhibit 4

Page 53

your report?

A   No reason.

Q   Would you agree that returning to work the day after an exposure is inconsistent with having sustained a permanent disabling injury from that exposure?

A   Well, again, you would have to look at the medication she was taking.

Q   Okay.  You're aware that Ms. Wooten had another respiratory episode on August 10, 2022, right?

A   Yes.

Q   And that she went to urgent care for an "extreme breathing crisis," correct?

A   Yes, correct.

Q   Would you agree that that sounds more severe than her presentation on August 8th?

A   No.

Q   And I think we covered this already.  You were -- you were not aware of the fire at the landfill that she mentioned being exposed to on August 10, correct?

A   Did you say I was not --

MS. SEILA:  Objection, form.

A   Did you say I was not aware?

Q   Yeah.  Were you or were you not?  I don't remember your answer.

**Exhibit 4**

Page 54

A     Yeah, I was aware.  Yes.

Q     Did you do any investigation of what was happening at the landfill on August 10, 2022?

A     What kind of investigation would I do?

Q     Any investigation.

A     I don't understand what you mean by "investigation."

Q     Did you consider whether the landfill fire might be a cause of her respiratory symptoms?

A     Whether it caused her respiratory symptoms the day after she developed them; is that what you're asking?

Q     Whether it caused the respiratory symptoms that she reported on August 10th, 2022, after being exposed to the fire at the landfill?

A     You're asking me two things.  You're asking me whether the landfill fire on August 10th caused her symptoms on August 8th; is that your question?

Q     No, sir, that's not my question.  My question is, did you consider whether the landfill fire exposure caused her -- the symptoms she reported on August 10, 2022?

A     It may have been a cumulative effect between her exposures on the 8th and then her exposures afterwards.  That's possible.

**Exhibit 4**

Page 55

Q    And it's also possible that she was completely resolved of her symptoms from August 8th and the August 10 event was a completely separate causative event, correct?

MS. SEILA:  Objection, form.

A    Well, I'm trying to understand what you're asking me.  So you're saying that the massive doses of steroids cured her and then her lungs were okay and then she had another exposure and that's what's caused her problem; is that your question?

Q    Did you make any effort to determine whether the August 10, 2022 event was the sole cause or a contributing cause of her condition on August 10, 2022?

A    I'm sorry, say it one more time.

Q    Did you make any effort to determine whether the exposure to the landfill fire on August 10, 2022 was a causative event for the respiratory condition she complained of on August 10, 2022?

MS. SEILA:  Objection, form.

A    Now, when you say effort to determine, could you just be a little more specific for me?

Q    Sure, Doctor.  Sure.  You're trying to determine causation, right?

A    Correct.

Q    And you have two events two days apart,

Exhibit 4

Page 56

correct?

A    Correct.

Q    And you are attributing everything to the August 8th event, correct?

A    It may have -- it may have been a cumulative effect of two exposures --

Q    Or it may have been --

A    -- or more.

Q    Or it may have been an effect due to the second exposure only, correct?

MS. SEILA:  Objection, form.

A    I doubt it.  I doubt it very, very much.

Q    I understand you doubt it, but that's a possibility, correct?

MS. SEILA:  Objection, form.

A    It's -- what do you mean, a possibility?  I mean anything is possible.

Q    So you agree that it could be that the August 10, 2022 exposure to landfill fire smoke was the sole cause of her complaints on August 10th; that's a possibility, correct?

A    No -- well, you say possibilities, but it's so, so, so, so unlikely, but, okay, it's a possibility, yes.

Q    So what did you do to determine that

**Exhibit 4**

Page 57

August 8th was the cause rather than August 10?

And that's where I got to my question of isolating the two.

A     What did I do to determine -- say it slowly now.

Q     Sure.  We have two events, August 8th, August 10.

A     Right.

Q     One possibility is the August 8th event caused all of her problems on August 10.  One possibility is the August 10 event caused all of her problems on August 10.  A third possibility is that it was a combination of the two.

You are the expert in this case and you are trying to tell the jury that this is all tied to the August 8th event and the jury wants to know how you ruled out August 10?

A     So you're asking me how I know a hundred percent that she was completely better?

Q     No, sir.  No, sir, that's not what I'm asking.

A     Let me -- I'm trying -- I'm not trying to be -- I'm just trying to understand your question --

Q     I asked you --

A     -- she had an insult to the lungs severe enough to require steroids on the 8th, right.  The

**Exhibit 4**

Page 58

likelihood of her recovering completely the next day, right, and not getting worse again, once the intravenous steroids left her system, is infinitely small, okay.

Now, if you're asking if it's possible that the 10th contributed as well, it is possible, yes.

Q   And it's also possible that the August 10th event is the only thing that has caused her ongoing problems after August 10th, isn't it?

MS. SEILA:  Objection, form.

A   I think it's extremely unlikely, extremely unlikely.

Q   Now, the judge is going to want to know how you quantify that, how you go about -- other than just, It's my opinion and you have to accept it, the judge wants to know the science behind that.  So saying it's infinitely small really doesn't answer that.  And this is going to be before the judge so I'm trying to give you an opportunity to explain how you can scientifically rule out August 10th as being the sole cause of her subsequent problems.

A   Okay.  So it's based on the magnitude of her symptoms on the 8th and the requirements that she had for heavy duty medications on the 8th, okay.  That would be the answer to your question.

And it's due to the knowledge that intravenous

Exhibit 4

steroids don't stay in the body for a long period of time and, when they wear off, you can expect symptoms to recur, particularly with an additional insult to the lungs.

Q    And how long do they remain in your system?

A    At that level, probably about a day, two days.

Q    Do you know?

A    Well, again, it would depend on the person, but probably -- probably up to 48 hours.

Q    How would you go about determining whether they -- it was 24 hours, as you first said, rather than 48 hours?

A    Well, again, it's a range.  There's not -- it's not -- it's a decrease over time.

Q    So we really -- we really just don't know, do we?

A    Well, we know it's not going to be weeks or months and it's not going to be a half hour.

Q    In your opinion, were Ms. Wooten's symptoms more severe on August 8th or August 10th?

A    I think that's hard to say.

Q    Meaning you don't have an opinion on that?

A    I think it's hard to say.  Again, you know, she wasn't intubated or hospitalized on either date.  You know, she had severe symptoms on both dates.  So I

**Exhibit 4**

Page 60

think it's hard to say.

Q    In your training in occupational medicine, you were taught about alternative causation, correct?

A    Absolutely.

Q    What does that mean?

A    It means when something else causes disease. So, for example, exposure to carcinogens and smoking, that kind of thing.

Q    And when there are multiple potential causes of condition, you need to evaluate each one and determine which is the actual cause, correct?

A    For chronic diseases, yes.

Q    Why not for acute diseases, where you have two acute events?

A    You have two acute events separated by time though.

Q    Right.  And so how do you go about evaluating each one and determining which is the actual cause in that situation?

A    The actual cause of what?  That's the question that I keep asking.

Q    The cause of her respiratory distress on August 10th and following.

A    Okay.  I don't think there's a way to say for sure, okay.

**Exhibit 4**

Page 61

Q    Okay.  Is there a way to say within a reasonable degree of medical certainty?

A    I think it's a reasonable degree of medical certainty the toxic insult to her lungs on the 8th was at least strong enough to contribute to what happened to her on the 10th and, in combination, could be responsible for the disease.

Q    But you can't rule out that the August 8th event was not a contributing factor to her symptoms after August 10, correct?

A    You're asking if I could say that August 10th was a contributing factor?

Q    No, I'm asking if you can rule out or rule in, within a reasonable degree of medical certainty, that August 10 was the only causative factor for her --

A    I think it would be -- to a reasonable degree of medical certainty, to say that August 10th was the only factor, I don't see how anybody could say that.

Q    Why not?

A    Because there's no basis for that.

Q    What analysis did you perform to determine that her exposure on August 8th was the cause of her ongoing respiratory problems after August 10?

A    Again, it was based on her clinical presentation, her symptoms and her need for medication.

**Exhibit 4**

Q    Did you do any analysis of the toxic emissions from landfill fires?

A    No, I did not.

Q    Why not?

A    I'm sorry?

Q    Why not?

A    I'm not understanding what you're getting to. When you say -- when you say "analysis," do you mean did I look at the substances that she was exposed to from that landfill fire; is that what you're asking?

Q    Just like you did with the substance from coke, yes.

A    I had nothing available to review.

Q    Did you try to make any determination of what might have been in those landfill fire?

A    No.

Q    Did you do any literature search to find out what are common components of landfill fire smoke?

A    No.

Q    Do you have any knowledge as to what landfill fire smoke contains chemically?

A    I think it depends on the landfill.

Q    And so your answer is, no, you didn't?

A    Again, I think it depends on the landfill.

Q    Okay.  Did you do any analysis, whether it's

Exhibit 4

Page 63

specific to this landfill or landfill fires in general, of what is typically found in a landfill fire -- in landfill fire smoke?

MS. SEILA:  Objection, form.

A    Well, again, I think -- I've said it three times.  It depends.  If you're talking about burn pits, which we have a lot of experience, that's one question. If you're talking about Superfund sites, that's another question.  So it really -- it really depends.

Q    Okay.  But you haven't answered my question the three times I've given it.  So I'm asking you, did you make any effort?

Not why you didn't bother.  Did you make any effort?

A    Make any effort to what?

Q    To determine what is typically contained in landfill fire smoke?

A    Again, it depends on the landfill.  So what effort would I have made?

So you're asking whether I would try to find out what was contained in the landfill that she had exposure to from a fire; is that your question?

Q    Let me say it a different way.

A    Yes, please.

Q    All right.  We have a landfill --

**Exhibit 4**

Page 64

A    Okay.

Q    -- we have the actual landfill fire.

A    Yes.

Q    Did you make any effort to determine what was contained in that smoke?

A    And, again, I think we're disconnecting somehow, not by computer.  But when you say did I make any effort, do you mean that I would request results from that landfill fire?

Q    That could be.  I don't know what you might do.  I'm not the expert.  But did you make any -- so it's really a simple question because it's any effort. So either you did or you didn't?

A    I did not, no.

Q    Okay.  Thank you.

A    Okay.

Q    Now, did you make any effort to determine whether there had been studies showing what is generally contained in landfill fires?

A    Again, we know that it depends on what the substances in the landfill are.

Q    And, again, you haven't answered my question. The question is, did you make the effort?

A    To do what?

Q    To determine whether there are any reports

Exhibit 4

about what is generally found in landfill fires, in their smoke?

A    I do not believe -- I do not believe there are typical components of landfill fires.  I think that's what I've been trying to tell you.

Q    Did you make any effort to determine what is contained in the smoke of any landfill fire?

A    It would depend on the landfill fire so --

Q    No, no, whether you did or did not does not depend upon that.

The question is, did you make that effort to determine the substance in landfill fire smoke from any landfill, any combination of landfills, anything?  It's yes or no.

A    No.  No.

Q    Thank you.  Your report on the second page states that the medical record of 9/14/18, referring to September 14, 2018, documents that she did have a history of asthma, but was asymptomatic without treatment, right?

I didn't hear your answer.

A    I'm sorry.  Correct.

Q    If, in April 2022, four months before the incident, Ms. Wooten went to a doctor who documented that her asthma condition was worsening, that would be

**Exhibit 4**

Page 66

an important fact to know, correct?

          MS. SEILA:  Objection, form.

     A    Can you ask that again.  I'm sorry.

     Q    Sure.  If, in April 2022, four months before the incident, Ms. Wooten went to a doctor who documented that her asthma condition was worsening, that would be important to your analysis, wouldn't it?

          MS. SEILA:  Same objection.

     A    Yes, it would make her -- I can answer?

     Q    Yes.

          MS. SEILA:  Yes.

     A    Okay.  It would make her more likely to react to a toxic exposure so it is relevant, yes.

     Q    Why didn't you mention this in your report?

     A    I'm sorry, say it again.

     Q    Why didn't you mention her April 2022 doctor visit where he documented her worsening asthma condition in your report?

     A    You mean to strengthen the case that her exposure caused her lung disease?

     Q    To give a complete description of what she was undergoing.

     A    I don't recall why I didn't.

     Q    Okay.  If, on July 15, 2022, less than a month before the August 8 incident, Ms. Wooten went to a

Exhibit 4

Page 67

doctor because she was concerned that her asthma may have been getting worse, that's important for your analysis, too, isn't it?

A    For the same reason.

Q    Okay.  Can you tell me what medications were prescribed for her at that July 15, 2022 visit?

A    I cannot.

Q    If she was -- I'll represent to you that she was prescribed Symbicort maintenance inhaler, Zyrtec, Z-y-r-t-e-c --

A    Zyrtec.

Q    Okay, Zyrtec.  Astelin, A-s-t-e-l-i-n, and Flonase.  That would suggest that her asthma condition is worsening, for a doctor to prescribe all of that, wouldn't it?

MS. SEILA:  Objection, form.

A    Yes.

Q    Is there some reason that you did not mention that she had a worsening asthma condition one month -- less than one month before the August 8th exposure?

MS. SEILA:  Objection, form.

A    There is no reason.  I can answer?

MS. SEILA:  Yes.

Q    Yes.

A    Yeah, there is no reason.

Exhibit 4

Page 68

Q   Just so you know, Doctor, if she objects, unless she instructs you not to answer, that's just for the judge to deal with later.

A   Okay.  What does that mean, objection to form? What does that mean though?

Q   It's just -- it's lawyer talk.  She doesn't -- she doesn't like my question.

A   Okay.

THE VIDEOGRAPHER:  Mr. Simpson, this is the videographer.  Sir, I failed to tell you before we started, I have to keep my media units to about 90 minutes or less and we're approaching 90 minutes.

MR. SIMPSON:  Okay.  This is a good time to stop, if it's good for you.

THE VIDEOGRAPHER:  I'm fine with whenever you want to stop, sir.  Just a short break so I can change media.

MR. SIMPSON:  This is actually a good spot to stop so why don't we do that.

THE WITNESS:  Yeah.

THE VIDEOGRAPHER:  Okay.  We're going off the record.  The time is 12:28 p.m.

(Break.)

THE VIDEOGRAPHER:  We're going back on the

**Exhibit 4**

record.  The time is 12:40 p.m.

BY MR. SIMPSON:

Q    Sorry, I lost my place.  There we are.

So we have documentation that Ms. Wooten's asthma was progressively worsening in the months before the August 8th, 2022, incident, correct?

A    Correct.

MS. SEILA:  Objection, form.

Q    And that progression was occurring before any exposure at the refinery, correct?

A    Correct.

Q    Did you perform any analysis to determine whether her post-incident respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the exposure?

A    No.

Q    Is there a way to distinguish between symptoms from natural progression of asthma versus symptoms from the alleged exposure?

A    I'm sorry, I misunderstood your question before.  You were asking if I could tell whether it was from the August 8th exposure, the August 10th exposure or whether the --

Q    No.

A    Was that your question?

**Exhibit 4**

Page 70

Q    No.  Let me restate it.

A    I'm sorry, I misunderstood.

Q    Did you perform any analysis to determine whether her post-incident respiratory symptoms, referring to the August 8th incident --

A    August 8th, not August 10th, right?

Q    Right.

A    Okay.

Q    So whether -- to determine whether her post August 8th respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the August 8th exposure?

A    So the question is whether her acute symptoms and visits for emergency care was a natural gradual progression of this disease -- of a disease versus the result of an exposure --

Q    No, my question --

A    -- an analysis to do that --

Q    No.

A    -- an analysis to determine --

Q    My question is, did you perform any analysis to determine whether her condition, over the last several years, is just a natural progression of her preexisting disease versus new injury from the exposure?

A    Well, I think -- if I understand your question

**Exhibit 4**

Page 71

correctly, I think that they're entwined.  I think that the fact that she had preexisting disease contributes to her progression after the toxic insult to her lungs.

Q    How can you -- or can you determine how much of her current condition is due to natural progression versus the injury from the alleged exposure on August 8?

A    You're asking percentagewise?

Q    I'm asking, how can you do that at all?

A    I can't.

Q    Okay.  Were you aware that Ms. Wooten had asthma flare-ups in December 2019 in South Korea?

A    I don't recall.

Q    Were you aware that she had an asthma flare-up in April of 2021 that she characterized as "really bad"?

A    I don't recall.

Q    Did you consider her history along with the other history of her preexisting asthma in determining whether the August 2022 incident caused new injury or simply triggered her preexisting asthma?

A    Whether it's -- well, as I said before, her preexisting asthma is a factor in her reaction to the toxic exposure.

Q    Okay.  Did you consider that history though in determining whether the August 2022 incident caused new injury versus simply triggering preexisting asthma?

**Exhibit 4**

Page 72

Or do you think it was just that it triggered preexisting asthma?

A    Well, obviously her background of asthma made her more likely to react to the substances.

Q    So do you think that the August 8th incident was a triggering of preexisting asthma or a new injury?

A    It was an injury to a patient with asthma.  So when you say "new injury," I'm not sure what you mean.

Q    We'll get to that.

A    Okay.  I can't wait.

Q    Is progressive worsening of asthma a common pattern in patients with asthma?

A    It can be, yes.

Q    So I asked you earlier, you were aware that Ms. Wooten underwent -- well, actually, we've already covered these questions.  You've said that was normal.

When the bronchoscopy was done, there was no evidence of mucosal injury, correct?

A    Correct.

Q    And there was no evidence of endobronchial lesions, correct?

A    Correct.

Q    And no evidence of significant secretions, correct?

A    Correct.

**Exhibit 4**

Q    And the doctor also did a bronchoalveolar, or BAL, lavage, correct?

A    Bronchoalveolar lavage, correct.

Q    And the BAL was negative for malignant cells, correct?

A    Fortunately, yes.

Q    And there was no evidence of eosinophilia in the BAL, correct?

A    Eosinophilia?

Q    Yes.

A    No, none.

Q    And no evidence of neutrophilia in the BAL, right?

A    Correct.

Q    If Ms. Wooten had sustained permanent lung injury from toxic inhalation, wouldn't you expect to see evidence of the various conditions I've just described?

A    Not necessarily.

Q    Wouldn't you expect it?

A    No.

Q    Okay.  Would you expect to see mucosal injury, inflammation or scarring?

A    Not necessarily, no.

Q    You read the report on the bronchoscopy, right?

Exhibit 4

A    Yes.

Q    And you read where Dr. -- I'll mispronounce his name -- Rabih performed -- who performed the bronchoscopy, that it -- "It is unclear to me the relationship between the inhalation injury and her current symptoms," right?

A    That was his opinion, yes.

Q    Do you dispute that opinion?

A    I disagree with it.

Q    Why?

A    Because my understanding is that you don't need to have any changes on bronchoscopy to have a worsening of asthma or reactive airway disease.

Q    You're aware that Ms. Wooten had multiple CT scans of her chest, right?

A    Correct.

Q    And the August 16, 2022 CT scan had a report of, among other things, normal heart size and clear lungs, correct?

A    Correct.

Q    And the -- there was an October '21, 2022 CT scan that was negative except for minimal subpleural scarring on the left lung, correct?

A    Correct.

Q    And there was a December 21, 2022 CT scan that

Exhibit 4

Page 75

showed the central airways were predominantly clear, no

consolidations, pleural effusions, honeycombing,

traction, bronchiectasis, suspicious --

A   Bronchiectasis.

Q   Thank you.  Suspicious pulmonary mass or

pneumothorax, correct?

A   Correct.

Q   And it found minimal subpleural scarring on

the left lung apex, right?

A   Correct.

Q   None of those CT scans showed any significant

lung pathology, correct?

A   Correct.

Q   If Ms. Wooten had sustained permanent lung

injury from toxic inhalation on August 8th, 2022,

wouldn't you expect to see evidence of that on CT scans

performed in the months following the exposure?

A   Not necessarily, no.

Q   What kind of findings would you normally

expect to see following such an exposure?

A   You could see abnormal pulmonary function

tests.

Q   On the CT scan, what --

A   Oh, on the CT scan?

Q   Yes.

**Exhibit 4**

Page 76

A    Unless she had -- unless she had something severe enough to cause interstitial changes, you wouldn't expect to see anything.

Q    Her chest X-rays have also consistently been normal, correct?

A    Correct.

Q    And we -- you mentioned you had seen the report on the CPET from June 2024, correct?

A    Correct.

Q    And a CPET can identify whether exercise limitation is due to cardiac causes, pulmonary causes, deconditioning or poor effort, correct?

A    Correct.

Q    And the CPET report from June 28, 2024 indicated that Ms. Wooten was "cooperative, but made a poor effort.  The exercise was submaximal, stopped due to fatigue," correct?

MS. SEILA:  Objection, form.

A    Correct.

Q    That means the test was limited by poor effort, not by lung disease, correct?

MS. SEILA:  Objection, form.

A    It means that they didn't get to the point where they could diagnose any lung disease, so poor effort or deconditioning.

Veritext Legal Solutions
800-726-7007                                                              305-376-8800

**Exhibit 4**

Page 77

Q    That explains it, right?

A    Yes.

Q    And the electrocardiogram from that visit was normal before, during and after the test, right?

A    Yes.

Q    So we can rule out cardiac limitation as the result of the poor effort, right?

A    Yes.

MS. SEILA:  Objection, form.

Q    The report shows peak oxygen uptake of 68 percent of predicted.  Were you aware of that?

A    Yes.

Q    And do you recall what the report attributed that to?

A    I don't recall.

Q    You don't recall that it attributed it to reduced exercise capacity?

A    I don't recall, no.

Q    Was pulmonary limitation identified as a cause of her poor effort?

A    I don't believe so.

Q    Would you agree that the CPET result is inconsistent with permanent lung injury causing exercise limitation?

A    It's not diagnostic of it, yes.

Exhibit 4

Page 78

Q     Would you agree that the CPET result is more consistent with deconditioning and poor effort?

A     Say that one more time.  I'm sorry.

Q     Would you agree that this CPET result is more consistent with deconditioning and poor effort?

A     It is conditioning -- it is consistent with deconditioning, yes.

Q     Okay.  You don't think it's consistent with poor effort?

A     I don't know how you judge poor effort.

Q     Okay.  So we have normal bronchoscopy, normal CT scans, normal chest X-rays, a CPET showing no pulmonary limitation, exercise limited by poor effort. Can you point to any objective test that shows evidence of permanent lung injury?

A     These tests were all done when she was medicated, correct?

Q     I don't get to answer the questions, Doctor.

A     Well, I'm sorry.  It was a rhetorical question.

Q     Are you saying that these tests were done when she was medicated?

A     Yes.

Q     What kind of medication?

A     Asthma medicines.

Exhibit 4

Page 79

Q    And are you saying that those would result in normal CT scans?

A    No.  As I explained, the CT -- CT scan is an anatomic test.  It shows you how the lungs look.  The exercise tolerance is a physiologic test and it shows you how the lung functions.  Medication helps the lungs function better.

Q    So, with the medication, we would have expected her to be able to do the CPET without limitation, right?

A    Well, we don't know how she would do without the medication.

Q    Okay.  Would you expect her to do worse or better without the medication?

A    With the medication?

Q    Without.

A    If she was -- sorry.  Finish the question.

Q    Would you expect her to do better on the CPET with medication or without?

A    With.

Q    Can you point to any objective test that shows evidence of permanent lung injury?

A    I believe that her pulmonary function tests were abnormal.

Q    Can you point to any objective test that shows

Exhibit 4

Page 80

evidence of lung damage from toxic inhalation?

A    Anatomical damage, no.

Q    What objective testing that you have seen is abnormal for Ms. Wooten?

A    I believe that her pulmonary function tests weren't normal.

Q    How many times has Ms. Wooten attempted pulmonary function testing that you know of?

A    I don't recall.

Q    Would you agree that over a period of nearly two years she tried it at least five to six times?

A    Yes.

Q    And she was unable to successfully complete valid testing on any of these occasions, correct?

MS. SEILA:  Objection, form.

A    Correct.

Q    When a patient repeatedly cannot complete PFTs, what are the possible explanations?

A    Severe asthma.

Q    Is that the only?

A    That's the most common one.

Q    Could it be poor effort?

A    Could be.

Q    And anxiety or panic can prevent you from completing the test, right?

Exhibit 4

Page 81

MS. SEILA:  Objection, form.

A    We don't see that -- we don't see that very often.

Q    But that is an explanation, correct?

A    It's possible, yes.

Q    Could be that she doesn't understand how to perform the test, right?

A    Possible.

Q    Could be pain behavior, right?

A    Could be.

Q    And given all of her normal objective tests that we've talked about, isn't poor effort or anxiety a more likely explanation as to why she has not been able to complete a successful PFT?

A    I don't believe so, no.

Q    Why not?

A    Given the level of medication that she's taking, she has significant asthma.

Q    If Ms. Wooten truly has severe restrictive or obstructive lung disease, her bronchoscopy would not be normal, true?

A    If she has severe restrictive disease, you would expect her bronchoscopy to show interstitial changes, yes.

Q    Same thing if it was severe obstructive lung

Exhibit 4

Page 82

disease, right?

    A    Not necessarily.

    Q    If she truly had severe lung disease, would her CT scans be normal?

    A    If she had interstitial lung disease, yes.

    Q    If she truly had severe lung disease limiting exercise, would her CPET show no pulmonary limitation?

    A    I'm sorry, say it again.

    Q    If she truly had severe lung disease limiting exercise, would her CPET show no pulmonary limitation?

    A    Both can be present.

    Q    But we know that no pulmonary limitation was present, right?

    A    I'm not sure that we know that, no, because she stopped -- she stopped for other reasons.  So we didn't get to the point where we could really test for her true pulmonary limitation.

    Q    Isn't the most likely explanation that her inability to complete PFTs is due to poor effort or anxiety rather than actual lung disease?

    MS. SEILA:  Objection, form.

    A    No.  No.  I don't think we're able to say that.

    Q    Are you familiar with Dr. Muraina's findings from May 24, 2024?

Exhibit 4

Page 83

A    Yes.

Q    He documented oxygen saturation levels during a six-minute walk test, right?

A    He was the doctor that the insurance and the employer hired to see whether she was disabled or not; is that who you're referring to?

Q    Again, Doctor, I don't get to answer questions in the deposition.

A    I just want to make sure that I'm -- because I'm looking at the note.  I want to make sure that I'm looking at the right doctor.

Q    Okay.  His name is Muraina, M-u-r-a-i-n-a.

A    Okay.

Q    He documented oxygen saturation levels during a six-minute walk test, correct?

A    Yes.  Desaturation.

Q    Okay.  What oxygen desaturation levels did he document?

A    I believe it was significant.  I don't remember the number.

Q    What do you consider to be significant?

A    Anything under 90.

Q    And, based upon this finding, Dr. Muraina diagnosed chronic respiratory failure with hypoxia, correct?

**Exhibit 4**

Page 84

A    Correct.

Q    Did you rely upon his diagnosis in forming your opinions?

A    I relied on all of the medical records I reviewed.

Q    How did you rely upon Dr. Muraina's report then?

A    He found her unfit for duty.  He was asked -- that's what I was trying to get to before.  Because the report I'm reading now from the defense expert says that he was the plaintiff's expert pulmonologist, which he's not.  He was an IME doctor to determine the level of disability and he determined her unable to work.

Q    He was retained by Ms. Wooten, correct?

A    No, he was retained by her employer.  That's why -- that why it's confusing.  He's not a plaintiff's expert.  He's actually an employer insurance company expert.  He did an IME.

Q    And so what --

A    He was looking at the -- I'm sorry.  He was looking at the question of disability.  That's what he was asked to do.

Q    And my question is, what, if anything, specifically did you rely upon in his diagnosis in forming your opinions?

**Exhibit 4**

A    If you give me one minute.

Q    Sure.

A    Thank you.  All right.  So he concluded that she had severe permanent disability.

Q    And my question is, what, if anything, specifically did you rely upon in his diagnosis and in forming your opinions?

A    I relied on his diagnosis of severe permanent disability.

Q    Okay.  You're aware of Ms. Wooten's numerous other medical visits with normal O2 saturations, right?

A    Yes.

Q    You're aware that Dr. Muraina's results have never been replicated before or since, right?

THE COURT REPORTER:  Doctor, I think you answered, but it didn't come through; am I correct?

A    I'm sorry.  Can you repeat the question.

Q    Yep.  You're aware that Dr. Muraina's results have never been replicated before or since, correct?

A    Correct.

Q    If someone truly had chronic respiratory failure with hypoxia, you'd expect to see low oxygen saturation on multiple visits, true?

A    Yes, you would.

Q    You'd expect to see evidence of that on their

**Exhibit 4**

Page 86

CPET, right?

A    With the exception of if they had an acute bronchitis or some type of infectious process on one visit or if they didn't take their medications prior to one visit.

Q    You haven't seen any evidence of either of those events, correct?

A    No, I have not.

Q    And you'd expect to see evidence of chronic respiratory failure with hypoxia on the bronchoscopy, right?

A    Sorry, say that again.  I was just looking at his report.

Q    You'd expect to see evidence of chronic respiratory failure with hypoxia on the bronchoscopy, correct?

A    You may or may not, but usually you would, yes.

Q    And you'd expect to see it on their CT scans, right?

A    Not necessarily, no.

Q    If someone has normal bronchoscopy in March of 2024, normal CT scans on multiple occasions, a CPET showing no pulmonary limitation in June 2024, one month after the alleged hypoxia --

**Exhibit 4**

Page 87

A    Hypoxia.

Q    Thank you -- and normal oxygen saturations on all other visits, is it physiologically possible for them to have chronic respiratory failure with hypoxia?

A    It would be unusual.

Q    What would cause hypoxia in the absence of lung pathology on imaging or bronchoscopy?

A    Cardiac disease.  Heart failure could do it.

Q    We've ruled that out with the CPET, right?

A    Correct.

Q    Okay.  Isn't the more likely explanation that the reading on May 24, 2024 was an artifact or that the test wasn't properly done?

A    It's a very hard test to mess up, a pulse oximetry.  It's a very simple test so I'm not -- I'm not really clear.  It's not something that's usually messed up.  You put the device on the finger and that's it.  So I'm not really sure how it could be messed up, if it's possible.

Q    Well, if you don't have good circulation in your finger, that's one explanation, isn't it?

MS. SEILA:  Objection, form.

A    But that would be consistent so you'd see that over and over again.

Q    Making it more likely that this result was an

Exhibit 4

Page 88

artifact or an error, right?

A   It's possible, yes.

Q   Did you make any effort to verify or replicate that finding?

A   Well, I didn't see her as a patient so there's no way that I could have replicated it.

Q   Did you question the validity of the single outlier result, given all the other evidence that contradicts it?

A   No.

Q   You're familiar with reactive airways dysfunction syndrome, or RADS?

A   Very much so.

Q   And is it your opinion that Ms. Wooten has RADS?

A   It's -- yes.

Q   Okay.

A   It's a matter of semantics, either it's RADS or it's an exacerbation of preexisting asthma due to an occupational exposure.

Q   What are the diagnostic criteria for RADS?

A   It's based on PFT changes, it could be based on methacholine challenge.

Q   Isn't one of the diagnostic criteria that it involves individuals who have no prior history of asthma

Exhibit 4

or airways disease?

A    In general, yes.

Q    That's one of the defining features of RADS, right?

A    Well, there are people who had a history of mild asthma as children and they can go on to develop RADS.

Q    You wouldn't put Ms. Wooten in that category, would you?

A    She would be in an intermediate category because she went so many years without needing medication.

Q    And then had steadily worsening asthma between 2018 and the month before the event, correct?

A    That's correct.

Q    Which would rule out diagnosing her with RADS, correct?

A    It would -- it would make it less likely, yes.

Q    Well, it wouldn't fall within the diagnostic criteria for RADS, would it?

A    Correct.

Q    And isn't it true that RADS, by definition, requires a high level of acute exposure to an irritant gas or chemical?

A    Not always, no.

Exhibit 4

Page 90

Q    That's not the definition of RADS?

A    It's the usual definition, but it's possible to have a lower-level exposure.

Q    Under what circumstances?

A    We've seen it before.

Q    Can you explain to me how -- is that documented in the literature?

A    I would have to find it.  It's been reported.

Q    What level of exposure is typically required to cause RADS?

A    I don't know.  There's no -- there's no specific exposure level.

Q    Is there any evidence that Ms. Wooten received a high level acute exposure as required for the normal presentation of RADS?

A    Not for the normal presentation, no.

Q    Are you aware that Dr. Paramesh concluded that Ms. Wooten's history does not fit the criteria for RADS?

A    Yes, I did read that he wrote that.

Q    Do you agree or disagree with that assessment?

A    Hang on one second.  I want to read the way he wrote it.  Just one second.

Q    Sure.

A    He's saying that her respiratory uncomfortableness is more compatible with either the

Exhibit 4

Page 91

natural progression of her underlying asthma or possibly work-related exacerbated asthma.  So I don't agree with that, no.

Q    And why not?

A    Because it doesn't fit the temporal -- the temporal development of her symptoms.

Q    Well, the temporal onset of symptoms, as you've described them, are consistent, as you've testified, with an exacerbation of asthma, correct?

A    Correct.

Q    So how can you rule out or rule in RADS when there are different explanations for the same symptoms?

A    I don't think anyone can rule it out or in.

Q    In your clinical practice and research, have you diagnosed patients with RADS?

A    Yes.

Q    In those cases, did they have preexisting asthma?

A    Some did, yes, as children.

Q    In those cases, did you diagnose -- I'm sorry -- did you document a high level of acute exposure?

A    In some, yes.

Q    Did you have air monitoring data showing high concentrations in those cases?

**Exhibit 4**

A    Not always, no.

Q    What were the exposure durations measured in, in terms of minutes, hours or days, seconds, in those cases?

A    Usually ranges from hours to months.

Q    Do you know what the diagnostic criteria for RADS is -- or are?

A    I generally do, but I would have to refresh my memory.

Q    Okay.  What, from your memory -- I realize we're asking for memory here.  What, from memory, do you remember?

A    There are acute changes in pulmonary function. You can get -- you get response to bronchial challenge.

Q    Anything else?

A    I'm trying to remember.

Q    Okay.

A    It's been a long time since anyone asked me that question.

Q    Are you done with your answer?

A    I'm sorry.  I think we disconnected for a second.

Q    All right.  So I was asking you, from memory, what the diagnostic criteria for RADS are, and you gave me two --

**Exhibit 4**

A    Right.  It's based on -- it's based on symptoms and it's usually a single high-level exposure. And the symptoms have to -- I'm trying to remember the time period.  I think the symptoms have to develop within 24 hours.

Q    You mentioned a bronchial challenge, a response --

A    Yes.

Q    -- to a bronchial challenge?

A    Yes.

Q    What does that mean?

A    Yes.  It means when you put them in a challenge booth, it's a methacholine challenge.  So they're exposed to a substance and, if they have a decrease in airway functioning, that's indicative of RADS.

Q    Okay.  Has anyone done that in Ms. Wooten's case, to your knowledge?

A    No.  She has not had a methacholine challenge test.

Q    Do you have any idea why that hasn't been done?

A    Well, probably they felt she had severe obstruction, it would be dangerous to do it to her. That's usually why we don't do it.

**Exhibit 4**

Page 94

Q    But we've already established that none of her objective tests show any obstructive ...

A    Well, you know, the other reason would be because she wasn't able to complete the pulmonary function tests, which would probably render the methacholine challenge test useless.

Q    Are you aware that Ms. Wooten has been diagnosed with posttraumatic stress disorder?

A    Yes, I remember reading that from her therapy notes.

Q    Are you aware that she had been diagnosed with generalized anxiety disorder?

A    Yes, I was.

Q    And also diagnosed with major depressive disorder with recurrent severe episodes?

A    Yes, I did know that.

Q    Did you consider these psychiatric conditions when forming your opinions about causation?

A    Did I consider whether a psychiatric illness caused for her to be taken to the urgent care center on August 8th?  No, I didn't consider that.

Q    Did you consider psychiatric conditions at all in forming your opinions about causation?

A    Well, you generally don't start coughing and wheezing because of a psychiatric condition.

**Exhibit 4**

Page 95

Q    What's your basis for that statement?

A    Forty years of clinical experience.

Q    Can you point to any literature or studies that show that?

A    I'm not sure they were done, but I could certainly try to find them for you.

Q    Did you review Ms. Wooten's emergency room record from August 14, 2022, six days after the alleged exposure?

A    I believe I did.

Q    You saw where the physician wrote in his assessment that she "is very anxious, which may be playing a role in symptoms, given other physiological causes have been ruled out"?

A    Yes, I did read that.

Q    And, with that knowledge, what -- how did that impact your opinion?

A    It doesn't change what happened to her on the 8th.  I didn't see any of that in the clinical notes from August 8th.

Q    So you just ignored this statement?

A    Well, "ignore" is a pretty strong word.

Q    Well, it's not mentioned in your report, is it?

A    Well, I don't agree with it so ...

**Exhibit 4**

Q    And why don't you agree with it?

A    Because, again, she had the exposure and she had the acute symptoms.  And I think I explained to you before, it could be that the steroids made her more anxious.  That would be the most likely explanation in that setting.

Q    Was she still getting steroids on August 14th, six days --

A    I believe she was.  I believe she was discharged on a Medrol pack as well.

Q    Are you aware of the emergency record from February 16, 2023 where the physician wrote about her presentation that she was "very anxious appearing, hyperventilating"?

A    I've seen that, yes.

Q    Did you consider that in rendering your opinion?

A    I did.

Q    And what effect, if any, did it have on your opinion?

A    No effect.

Q    Why not?

A    Because I don't believe that was the cause of her symptoms.

Q    In your training and experience, can anxiety

**Exhibit 4**

Page 97

cause shortness of breath?

A    It can cause hyperventilation.

Q    Can it cause shortness of breath?

A    You don't see it very often, no.

Q    Okay.  Can anxiety cause tightness, chest tightness?

A    Yes.  Yeah.

(Mr. Janvier left the proceeding.)

BY MR. SIMPSON:

Q    Can anxiety interfere with the patient's ability to complete PFTs?

A    It's possible.

Q    When you have a patient with documented severe anxiety disorders and respiratory complaints, but all objective testing is normal, what's the most likely explanation for the respiratory complaints?

A    If the pulmonary function tests were normal?

Q    Have the tests been normal or invalid?

A    We don't have normal pulmonary function tests and --

Q    There's no normal ones, are there?

A    What's that?

Q    There are no normal, they're all just invalid, correct, for lack of --

A    Right, but the way to rule out the pulmonary

Exhibit 4

disease would be to see a normal pulmonary function test off medication.

Q    Have you seen any of those?

A    No.

Q    So if we wanted to determine whether anxiety was causing her respiratory complaints, we'd want to have a PFT test when she's off medications, correct?

A    Correct.  And you have to wonder why her doctors keep prescribing the medication for lung disease if it -- if it is truly due to anxiety.

Q    You've completely discounted anxiety as a cause of any of her respiratory symptoms, correct?

A    Yes.

Q    Are toxic exposures normally calculated based upon an individual's tolerance or a population at large tolerance?

A    It depends whether you're looking at acute or chronic effects.

Q    Well, when the -- when OSHA talks about toxicity, are they talking about individuals or are they talking about the overall population?

A    Talking about the overall -- they're talking about the worker population actually.

Q    Right.

A    They don't talk about the overall.  OSHA

Exhibit 4

standards apply to workers.  They don't apply to children.

Q   And have you seen any evidence that any workers were affected by the smoke from the coke dome?

A   I'm not sure how I would see that so --

Q   You haven't seen any of the reports of other exposures with people complaining?

A   I haven't seen it either way.  I haven't seen people complaining or I haven't seen people not complaining.  I have no idea what happened to her coworkers.

Q   I'll represent to you that there were no other complaints.

A   Well, how would you know that?

Q   Because I'm the attorney for the refinery and I have access to them --

A   So you're saying -- you're saying that asked every employee at the refinery whether they had trouble breathing?

Q   I'm telling you -- I'm representing to you that there are no reports of anyone else suffering any problem with exposure to coke smoke from April -- August 4, 2022, when it first broke out, to the conclusion of the incident roughly a month later.

A   And that's based on filing of incident

Exhibit 4

Page 100

reports?  I don't understand how you could say that really.

Q    Well, I'm not --

A    But I'll take your word for it.  I'll accept what you're saying, okay, but honestly I don't see how it's possible for anyone to know that.

Q    Well, let me ask you this:  Given her reaction, would you expect, if the levels were of a toxic level, that there would have been other workers with complaints to the exposure?

A    You would expect some, yes.

Q    Okay.  Would the absence of such complaints inform your opinion?

A    If you had a documented study -- I don't know how many workers there were, but if you had a documented study that a thousand workers had zero respiratory complaints, that would inform my opinion, yes.

Q    Do you have any opinion as to whether sulfur dioxide levels caused any of Ms. Wooten's symptoms or complaints?

A    I don't know for sure.

Q    Do you know within a reasonable degree of medical certainty one way or the other?

A    I can't -- I can't say.

      Did you hear me okay?  I'm sorry.

**Exhibit 4**

Q   Yes.  Thank you.  Yes.

A   Oh, sorry.  The silence is deafening sometimes.

Q   The good news is your answer eliminated some questions.

A   Good.  I'm glad.  Can we take a break in about -- if I could catch the timing on this -- you guys must want to have lunch, right?

Q   I'm good.

A   You don't have lunch in Florida?

Q   I'm in the Virgin Islands.

A   Oh, you don't have lunch in the Virgin Islands?

MR. SIMPSON:  I'm good.  I'm taken care of. Do you need a break?

THE WITNESS:  Not right now, but I'd like -- I'd like to plan one soon.  If you'd give me just one minute.  Can we go off the record for two minutes?

MR. SIMPSON:  Sure.

THE WITNESS:  Thanks.

THE VIDEOGRAPHER:  We're going off the record. The time is 1:26 p.m.

(Break.)

THE VIDEOGRAPHER:  We're going back on the

Exhibit 4

Page 102

record.  The time is 1:30 p.m.

BY MR. SIMPSON:

Q   Sorry, I'm just perusing some of my questions that I'm going to skip over.

A   Take your time.  And the more you skip, the better.

Q   As part of your reaching your opinion in this case, you conducted a literature search to confirm the health effects of individuals exposed to smoke from refinery fires, correct?

A   Correct.

Q   What databases did you search?

A   PubMed.

Q   What search terms did you use?

A   Coke emissions, respiratory symptoms, exposure.

Q   Did you limit it by date range?

A   No.  I limited it to human study -- sorry -- to human studies.

Q   Okay.  Approximately how many articles did you review?

A   Oh, I don't recall.

Q   Did you search for articles about brief exposures as well as chronic exposures?

A   Yes.

**Exhibit 4**

Page 103

Q    Did you find any about brief exposures?

A    Not really, no.

Q    Did you search for articles about anxiety induced respiratory symptoms?

A    No, I did not.

Q    Did you search for articles about the natural progression of asthma?

A    No, I did not.

Q    Did the Morphew study provide any data that would allow you to extrapolate from months of exposure to a few minutes of exposure?

A    It's a difficult extrapolation.

Q    Did you try to do any calculations to determine how their findings could translate to an exposure of a couple of minutes?

A    No.

Q    And the Johnson study we talked about already. That was a seven-week exposure to a community, right?

A    Correct.

Q    And seven weeks is over one million minutes, right?

A    I'll take your word for it.

Q    Okay.  Did you perform any analysis to determine how findings from a seven-week exposure would translate to an exposure of a few minutes?

Exhibit 4

Page 104

A    No.

Q    How does chronic daily exposure over months compare to a single exposure of one or two minutes?

A    It depends on the levels.  It depends on the individual.

Q    Did you do any sort of analysis to determine how the findings from the three studies that you cite in your report translate to an exposure of a couple of minutes?

A    No.

Q    Can you cite any peer-reviewed study that examined respiratory outcomes from brief exposures to refinery smoke measured in let's say under five minutes, rather than days, weeks or months?

A    No.

Q    Can you cite any study that would support the proposition that an exposure of one or two minutes at unmeasured concentrations can cause permanent lung injury?

A    I don't believe those studies exist one way or the other.

Q    Okay.  In your 2016 publication, "Neuropathic Symptoms in World Trade Center Disaster Survivors and Responders" that was published in the Journal of Occupational and Environmental Medicine, your

**Exhibit 4**

publication underwent peer review, correct?

A    Correct.

Q    That means independent experts reviewed your methodology before publication, right?

A    Absolutely.

Q    And in that study you described your methodology clearly in the methods section, correct?

A    Correct.

Q    You explained how you selected subjects, yes?

A    Correct.

Q    And how you -- you explained how -- what instruments you used for the assessment, correct?

A    Correct.

Q    You explained your statistical analysis, correct?

A    Correct.

Q    You acknowledged the limitations of your study, correct?

A    Yes.

Q    Can you show me where in your report in this case you described your methodology with similar rigor?

A    This wasn't a publication and this wasn't -- this wasn't an evaluation of World Trade Center responders with chronic exposure.  This was an individual clinical case.  I don't think you can really

**Exhibit 4**

Page 106

compare them.

Q   So you didn't do any sort of statistical analysis, right?

A   Well, you can't do a statistical analysis on one person.

Q   Can you show me where --

A   If you publish -- I'm sorry.  It's okay if I talk?

Q   Yes, absolutely.

A   Sorry.  If you published it, it would be published as a case report.  Case reports generally don't undergo peer review.

Q   Can you show me in your report where you acknowledge any limitations to it?

A   Again, it's not a publication.  You're comparing apples and lemons.

I mean you read the plaintiff's reports, the defense reports, they don't acknowledge limitations. You don't see reports that acknowledge limitations. It's not -- it's not a publication.

Q   In your report -- or your publication "Paresthesias Amongst Community Members Exposed to the World Trade Center Disaster," you examined potential confounding factors, correct?

A   Correct.

**Exhibit 4**

Q    You looked for alternative explanations, correct?

A    Correct.

Q    You performed statistical analyses to determine if associations were significant, correct?

A    Correct.

Q    You stated your conclusions carefully, distinguishing between association and causation, correct?

A    Absolutely.

Q    And, in fact, you found that some of the reports of paresthesia were associated with anxiety and depression scores, correct?

A    They were associated, yes.

Q    So in your published research you understood that symptoms could be associated with psychological factors rather than toxic exposure, correct?

A    I don't think that you can really compare World Trade Center responders who dug through burning rubbish with body parts to other cases.  I mean it's, you know, it's ludicrous to try to do that, try to extrapolate a World Trade Center responder with severe PTSD to a general population, I mean that's kind of ludicrous.

Q    You think it's ludicrous to consider the

Exhibit 4

Page 108

association of anxiety with -- and posttraumatic stress disorder in a patient who actually has both of those conditions?

A    No, that's not what I said.  I said you're trying to extrapolate what we did in that study with a cohort of people.  Now, there is evidence, and I don't have those papers in front of me, but there's very interesting evidence that patients with PTSD have epigenetic changes which makes it more likely for them to have lung disease.  That's true.  But that's cutting-edge research that's just coming out in the past couple of years.

Q    And that's preexisting lung disease, correct?

A    No, that's World Trade Center related lung disease.  So if you have PTSD and World Trade Center exposure, you're more likely to develop lung disease than patients without PTSD and exposure.  With the same exposure, the addition of PTSD makes the emersion of lung disease more common.  And it's thought to be some kind of activation of genes, epigenetic.  It's very interesting actually.

That would suggest -- and, again, I'm not trying to extrapolate to this individual case, but that would suggest that there is a physiologic component of anxiety that makes it more likely to develop lung

Exhibit 4

Page 109

disease following a chemical exposure.

Q    Okay.  You didn't consider anxiety or PTSD at all in this case, did you?

A    No, I did not.

Q    And in your -- in that report we're talking about, you concluded that paresthesia can result from metabolic disorders, nerve entrapment following repetitive motions, hyperventilation pursuant to anxiety or exposure to neurotoxins, correct?

A    Correct.  That's what I wrote, yes.

Q    So you understood that subjective symptoms can have multiple different causes, correct?

A    Yes.

Q    And you had to do careful analysis to determine which cause was most likely, correct?

A    Yes.

Q    Did you consider that natural progression of Ms. Wooten's asthma could explain her ongoing symptoms?

A    I did not believe that was the reason.

Q    That's not the question I asked.  Did you consider it?

A    I thought about it, but see, I keep trying to understand what you mean by "consider."

Q    Well, it sounds like you arrived at a preexisting determination, a preordained result, rather

**Exhibit 4**

Page 110

than considering them.  It sounds like you just ruled it out because you didn't think that happened because she had an exposure and a reaction?

MS. SEILA:  Objection, form.

A    I wouldn't quite -- I wouldn't quite put it that way.

Q    Well, that's what it sounds like.  So please explain to the Court how it's different from what I've just described, that you just came to your conclusion because she had a condition and exposure and symptoms.

A    Because -- I think I've explained this to you a few times, but I'll try again.  She had a significant exposure, right.  She was rushed to the urgent care and she required steroid treatment, right.  That's indicative of a toxic insult to the lungs.  All right.  That's different from a slow, gradual progression of disease.  It's much different.

Q    It could also be indicative of a psychological response to the exposure, correct?

A    I don't think they would give her intravenous steroids if they thought it was a psychological response.  I highly doubt it.

Q    When doctors are treating something in the emergency room setting, they're not necessarily going through all the potential causes, they're trying to get

**Exhibit 4**

the patient stabilized, right?

A   Well, again, I really -- I find it -- I'd be shocked if -- it would just be shocking.  So I've never seen it happen.

Q   Can you show me in your report where you ruled out alternative causes?

A   I did not discuss alternative causes in my report.

Q   Can you show me in your report where you distinguished between her preexisting asthma and her alleged new injury?

A   No, I cannot show you that.  No.

Q   And you can't show me in your report where you addressed the August 10 landfill exposure, can you?

A   No, I cannot.

Q   Are you familiar with the concept of differential diagnosis?

A   Very much so.

Q   Can you explain what it is?

A   Well, when someone has shortness of breath, you want to make sure it's not heart disease.

Q   Well, in general, a differential diagnosis is you come up with a list of possible causes of the patient's condition and then systematically rule them out, correct?

**Exhibit 4**

Page 112

A    That's correct.

Q    Did you perform a differential diagnosis in this case?

A    I don't think it's -- I don't think it's relevant in this matter really.  Did I list all the possible alternative causations in the report and rule them out one by one, no, I did not.

Q    Is there anything in the report that you're going to show us that you did a differential diagnosis?

A    No, there's nothing in the report.  No.

Q    What alternative causes did you consider for her respiratory symptoms?

A    Cardiac disease.

Q    I'm sorry, what was that?

A    I'm sorry.  Cardiac disease.

Q    Anything else?

A    That was the major concern.

Q    You considered, I think, natural progression of preexisting asthma as a possible cause, right?

A    I thought you meant outside of lung disease. Yes, I did consider it.

Q    Okay.  And you ruled it out because why?

A    Based on her presenting symptoms were so acute.

Q    And I think we've established you did not

**Exhibit 4**

consider the land fire exposure as a possible cause, correct?

A    Correct.

Q    And you did not consider anxiety and psychiatric disorders as a possible cause, correct?

A    Correct.

Q    How did you rule them out?

A    Based on her presentation.

Q    Can you show me in your report where you ruled them out?

A    No.

Q    You didn't consider deconditioning and obesity as possible causes of her exercise intolerance, did you?

A    No, I did not.

Q    Did you consider sleep apnea as a contributing factor to her symptoms?

A    Sleep apnea would not cause these symptoms. They would cause different symptoms.

Q    What symptoms would sleep apnea cause?

A    Fatigue, irritability, depression, snoring.

Q    Did you review any standardized instruments for measuring anxiety and depression that were conducted on Ms. Wooten?

A    No, I did not.

Q    Do you know if any were ever done?

Exhibit 4

A    I know that she was in therapy.  I don't believe I saw anything standardized.

Q    When you're teaching in med school -- first of all, you teach at least the first, second and third years of med school in various courses, right?

A    And residents and fellows, yes.

Q    And residents and fellows are after they've graduated from med school, right?

A    Yes.  And I also lecture attendings.

Q    Okay.  And you teach students about differential diagnosis?

A    Yes.

Q    You teach them about ruling out alternative causes?

A    Yes.

Q    You teach them that objective testing is important?

A    Yes.

Q    Do you actually teach any of your students that they can establish causation without quantifying dose?

A    Well, I teach them how to examine a patient and come to a diagnosis.  You know, if she came into our office with this history, our conclusions would be the same.

Exhibit 4

Page 115

Q    Okay.  And you wouldn't want to know the dosage?

A    Very often we don't know the dosage.

Q    In your CV it indicates you arrange for students and residents to accompany industrial hygienists for home office air testing, right?

A    Correct.

Q    Why is it important for students to observe air testing?

A    Well, first of all, most students don't even know it's even possible to do air testing.  So that's the first reason.

The second reason is to understand what relationship it has to diagnosis, especially in the home.

Q    It's because actual measured concentrations is fundamental to occupational medicine, isn't it?

A    Yes.  When available, yes.

Q    Students need to understand that they can't just guess at exposure levels, right?

A    Well, unfortunately often you don't have exposure levels, but, yes, you're correct.

Q    So we talked about Bradford Hill criteria before.  One of the criteria is strength of association, correct?

**Exhibit 4**

Page 116

A    Correct.

Q    And I take it you think there's a strong association between the August 8th exposure and Ms. Wooten's condition, correct?

A    Yes.

Q    Did you quantify the strength of that association?

A    No.

Q    Given -- another factor in the Bradford Hill criteria is consistency, correct?

A    Yes.

Q    And so that would be consistency across populations, for example?

        Did you answer?

A    Yes, I did.  I said yes.  Sorry.

Q    Okay.  Given that no other -- we're getting a reverb now all of a sudden.

A    Getting a what?

Q    We're getting an echo so it's distracting me.

A    I'm sorry.  I don't think it's me.

Q    No, it's not.

A    If no other workers were injured due to exposure to the smoke from the coke dome, is there consistency for purposes of Bradford Hill in this instance?

Exhibit 4

Page 117

MS. SEILA:  Objection, form.

A   If we knew for sure that the population was the same and that no one else had symptoms, that would be important to know, yes.

Q   And when you say population was the same, are you saying they all would have to have asthma, preexisting asthma?

A   Well, either they would or they wouldn't.

Q   Okay.  Specificity is a factor in the Bradford Hill analysis, correct?

A   Correct.

Q   How do you establish specificity when Ms. Wooten had preexisting asthma and other potential causes of her respiratory symptoms?

A   Well, again, it's an acute exposure.  You're thinking more along the lines of a chronic exposure.

Q   So are you saying specificity does not apply in the Bradford Hill analysis --

A   No.  No, that's not what I said.  No.

Q   You have to let me finish the question.

A   Oh, I'm so sorry.  Yeah.

Q   Are you saying that specificity is not considered in the Bradford Hill criteria when you're dealing with an acute exposure?

A   No, it is.

Exhibit 4

Page 118

Q    Okay.  So how is it considered in the case of acute exposure?

A    I'm sorry, go back to the original question. I'm sorry.

Are you still there?

Q    Yes.  I'm going back to the question.

A    Yeah, thank you.

Q    How do you establish specificity for Bradford Hill purposes when Ms. Wooten had preexisting asthma and other potential causes of her respiratory symptoms?

A    I believe that since she presented with acute symptoms it's still -- it's still a causal relationship.

Q    Temporality is another factor in the Bradford Hill analysis, correct?

A    Correct.

Q    And how do you establish temporality when her asthma was already worsening before August 8th, as documented three weeks before August 8th?

A    Right, because she had an acute decompensation immediately following the exposure, so that's temporal.

Q    And so is the worsening of asthma in the months before her exposure, correct?

A    Not to the point where she required acute intervention.

Q    And we've already talked about dose response.

**Exhibit 4**

You did not establish a dose-response relationship, correct?

A    Correct.  Yeah.

Q    And that's another criteria, correct?

A    Correct.

Q    And then another factor is plausibility, right?

A    Yes.

Q    Is it biologically plausible that an exposure to unmeasured concentrations of smoke causes permanent lung injury?

A    It is plausible that exposure to smoke causes lung injury.  It certainly is plausible, yes.

Q    Okay.  What about -- is it plausible that an exposure of a couple of minutes to smoke in unmeasured quantities causes permanent lung injury?

A    In a susceptible individual it is plausible.

Q    What is the biological mechanism by which exposure for a couple of minutes to coke smoke causes permanent injury?

A    It would be an irritative effect on the lungs, on the bronchiales.

Q    Well, irritative effect means, when you take away the source of irritation, it goes away, right?

A    Not necessarily.  Not if it makes it more

Exhibit 4

Page 120

reactive.

Q   Are we back to RADS?

A   No, not necessarily.

Q   What is -- coherence is a factor in the Bradford Hill methodology, right?

A   I'm sorry, I missed the beginning of that.

Q   Coherence is one of the factors that's considered in the Bradford Hill methodology, right?

A   Yes.  Yes.

Q   Is your opinion coherent with a normal bronchoscopy?

A   I believe it is, yes.

Q   Is it coherent with normal CT scans?

A   Yes.

Q   Is it coherent with normal CPET showing no pulmonary limitation?

A   The CPET was not diagnostic of no pulmonary limitation.  It didn't get to the point where you could determine if it was a pulmonary limitation or not.

Q   Is it coherent with a CPET that does not show one way or the other pulmonary limitation?

A   It's not one way or the other.

Q   Okay.  Is it coherent with zero air monitoring results?

A   There was no personal air monitoring done on

Exhibit 4

Page 121

her so, again, it's irrelevant.

Q    Is it coherent with there being no other reported claims of injury from exposure to coke smoke during the incident?

A    If there were truly no other reports, then no.

Q    This is probably completely inapplicable in this situation, but experiment is another Bradford Hill criteria, right?

A    I think we can just skip over that.  It's not really applicable.

Q    There's no experimental studies supporting or --

A    No.

Q    Okay.

A    No, there are not.

Q    And then I think the final criteria is analogy.  Can you point to any analogous situations where brief exposures cause similar permanent injury?

A    They do exist.  I've seen it in workers before.

Q    Can you point to any studies, peer-reviewed reports, any reliable medical journals, anything that describes --

A    I would have to -- I would have to find them for you, but they do exist.

**Exhibit 4**

MR. SIMPSON:  Okay.  This is a good time to take a break.

THE WITNESS:  Yeah.  Can we take 40 minutes; would that be okay?

MR. SIMPSON:  Sure.

THE WITNESS:  Thank you so much.

THE VIDEOGRAPHER:  So we're going off the record.  The time is 1:58 p.m.

(Break.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 2:39 p.m.

BY MR. SIMPSON:

Q    Doctor, continuing up where we left off, in your report on the seventh page you state, "Multiple studies demonstrate significant increases in asthma exacerbations and residents near facilities with coke emissions even at levels lower than would be present during a fire."  All of these studies deal with long-term -- that's the end of the quote.

All of these studies deal with long-term exposure to coke emissions rather than acute exposures, correct?

A    Correct.

Q    Are you aware of any short studies of acute exposures of -- to coke emissions?

Exhibit 4

Page 123

A    No.

Q    Okay.  And you state at page 7, Unfortunately her condition is permanent despite continued maintenance, medication and steroid courses, correct?

A    Correct.

Q    Is that your conclusion or are you just repeating conclusions of other doctors?

A    It's my conclusion as well, but based on their evaluations.

Q    So it's your opinion that Ms. Wooten sustained permanent lung injury from the August 8th, 2022 exposure?

A    Correct.

Q    Now, the fact that continued maintenance and medication and steroid courses has not remedied the condition could suggest that it's not treating the right condition, right?

A    That's so unlikely.

Q    Well, if she's -- if her complaints are not physiological and are instead psychological, we wouldn't expect maintenance, medication and steroid courses to make a difference, would we?

A    I don't believe that any reputable physician would put someone on steroid courses if they believe that it was a psychological condition.

**Exhibit 4**

Page 124

Q   You didn't answer my question though.

A   Well, repeat the question and I'll try.

Q   All right.  So if the continued -- the continued maintenance, medication and steroid courses are not working, that could be because her complaints are psychological and not physiological, correct?

A   I think it's more likely that she's reached MMI with the medications that she's on.

Q   Again, you're not answering my question.

A   Okay.  Say the question one more time and I'll try.

Q   All right.  The fact that continued maintenance, medication and steroid courses are not working could be because her condition is psychological and not physiological, right?

A   I'm going to say that anything is possible. That's probably the best answer I can give you.

Q   Okay.  How did you rule out psychological as being the reason her medical condition is not improving with medication and steroids?

A   Well, you've asked me that before, right.

Q   I don't think so.  But anyway, you're welcome to --

A   Oh, I thought so.  Okay.  It's more likely that she's at maximum medical improvement.  It's not --

Exhibit 4

Page 125

it's not unusual at all.  It's very, very common to see patients on maintenance medication for asthma and they're still symptomatic --

Q    And it's common --

A    -- the second part of it is --

Q    I'm sorry.  Go ahead.

A    -- no one suggests -- none of her treating doctors or her therapists have suggested that it's psychological.

Q    Are you certain about that?

A    I'm pretty certain about that --

Q    If they have, how would that affect your opinion?

MS. SEILA:  Objection, form.

A    Well, it depends on -- it would depend who, how many, and on what basis.

Q    What objective evidence supports your opinion that her injury is permanent?

A    Well, I'll tell you one of the strongest evidence for it is the fact that her old employer's doctor and the insurer's doctor found her to be permanently disabled.  You wouldn't expect -- you wouldn't expect that to happen if that was not the case.

Q    I asked about objective evidence.  So what objective evidence supports that opinion?

**Exhibit 4**

A    Her symptoms.

Q    Which are consistent with someone who has asthma, right?

A    Yes.

Q    Whether or not caused or exacerbated by the August 8th event, right?

A    Yes.

Q    And we know the bronchoscopy does not support a finding of permanent injury, right?

A    You would not expect it to.

Q    And we know that the CT scans don't support a finding of permanent injury, correct?

A    You would not expect that to either.

Q    We know the chest X-rays don't support a finding of permanent injury, correct?

A    Correct.

Q    And we know that the CPET does not show a -- or does not support a finding of permanent injury, correct?

A    But it does not rule out the finding of permanent injury.

Q    How do you rule it out or in?

A    You would want to see decent PFT test results and perhaps a methacholine challenge, some challenge testing, which she has not had.

**Exhibit 4**

Page 127

Q    And as far as the pulmonary function tests, we haven't had any successfully completed so they don't answer it, right?

A    Correct.

Q    So, in short, at present, there is no objective evidence of permanent lung injury, correct?

MS. SEILA:  Objection, form.

A    She was found by her own employer's -- her own employer's doctor to be permanently disabled.

Q    So I return to objective evidence is my question.  There's no objective evidence of permanent lung injury presently --

A    I want to -- I want to -- take it easy.  I just want to read one thing, okay?

Q    Sure.

A    Thank you.  There are no objective test results, correct.

Q    Given that all of the objective testing available at this time is normal, how can you conclude with a reasonable degree of medical certainty that she has permanent lung injury?

A    I'm basing it in part on the determination of her company's doctor.

Q    Anything else?

A    Her history and the medication that she

**Exhibit 4**

Page 128

requires.

Q   Anything else?

A   Hang on one second.  I just want to look at a couple things here.

Q   Sure.

A   Thank you.  Just give me two more minutes, okay?

Q   Sure.  No problem.

A   I want to make sure I go through all the pulmonary function tests again.

The physicians note she's not able to do any exertional activity.  That's repeated several times in her medical records.

Q   Are you referring to a specific physician?

A   There were a couple.  I can't read the handwriting.

Q   Is there a Bates number at the bottom of the document, like NW something, lower right-hand corner?

A   Yeah.  Yeah, give me one sec.  I'll find it again.

Okay.  So the Bates number's NW001261.

Q   I'm sorry, 1261?

A   Yes, sir.

Q   Okay.

A   Why do they call it a Bates number?

Exhibit 4

Q    It's an old saying.  It goes back years --

A    Nothing to do with the motel?  Nothing to do with the motel, right?

Q    Correct.

A    Okay.

Q    So when you started that review, you wanted to review the PFT tests.  I take it you did not --

A    Yeah.  No, I did not.

Q    Okay.  Have you formed an opinion about whether Ms. Wooten has reached maximum medical improvement?

A    I believe she has.

Q    Is there any -- did you mention that in your report?

A    No, that's not -- it wasn't -- I wasn't asked to opine on her disability.

Q    Okay.  What does maximum medical improvement mean?

A    It means she's not going to get any better no matter what anybody does.

Q    If lung injury is going to heal or improve, when does most of that improvement occur?

A    It depends on whether it's the interstitium or whether it's the bronchiales.  It depends whether it's infectious.  It depends on many, many things.

**Exhibit 4**

Page 130

Q   How do you characterize hers, Ms. Wooten's lung injury?

A   She has a toxic insult.  Probably would improve within a year.

Q   Okay.  Have you formed an opinion about Ms. Wooten's ability to work?

A   Yes, I have.

Q   And what is that opinion?

A   She could probably do sedentary work.

Q   You cannot rule out secondary gain as a factor in her reported inability to work, correct?

MS. SEILA:  Objection, form.

A   You never can.  But, again, you know, it was the company's doctor.  It's actually very unusual that the company's doctor was so insistent that she can't work.

Q   Let's summarize what we've discussed so far. The following --

A   Okay.

Q   The following information does not appear in your report, August 9 symptom resolution, correct?

A   Correct.

Q   August 9 return to work, correct?

A   Correct.

Q   August 10, landfill fire exposure, correct?

**Exhibit 4**

Page 131

A    Correct.

Q    August 10, extreme breathing crisis, correct?

A    Correct.

Q    Ms. Wooten's attribution of the August 10 symptoms to the landfill, correct?

A    Correct.

Q    Okay.  25,000 or more air samples showing sulfer dioxide exposures are amounts of .2 parts per million at the most, correct?

A    Correct.

MS. SEILA:  Objection, form.

Q    April 2022, asthma worsening, correct?

A    Correct.

Q    July 2022, treatment escalation for worsening asthma, correct?

A    Correct.

Q    Numerous emergency room visits attributed to anxiety, correct?

A    Numerous emergency room, that, I don't know.

MS. SEILA:  Objection, form.

A    Were there numerous emergency room visits attributed to anxiety or was she going to the emergency room for shortness of breath with one attributed to anxiety?

Q    Do you recall seeing emergency room visits

**Exhibit 4**

attributed to anxiety?

A    I believe I saw one.

Q    You don't recall more than one?

A    I don't recall.

Q    Okay.  Your report doesn't mention the normal bronchoscopy, right?

A    No, it does not.

Q    It doesn't mention the normal CT scans, correct?

A    Correct.

Q    It doesn't show the CPET results limited by poor effort, correct?

A    Correct.

Q    It doesn't show inability of PFTs due to poor effort, correct?

A    Correct.

Q    It doesn't mention that the hypoxia was never replicated, correct?

MS. SEILA:  Objection, form.

A    Correct.

Q    Were all of those omissions intentional?

A    No.

Q    How is it that all that information is not in your report?

A    I don't understand the question.

Exhibit 4

Page 133

Q    I'll move on.

A    Okay.

Q    Would you agree that you cherry-picked evidence that supports your conclusion while omitting evidence that contradicts it?

MS. SEILA:  Objection, form.

A    No.

Q    Well, you've cited a 2018 record saying the asthma was mild, but omitted 2022 record saying it was worsening.  That's cherry-picking, isn't it?

MS. SEILA:  Objection, form.

A    No.

Q    Is your opinion testable?

A    What you mean "testable"?

Q    Well, what could I do to verify, validate your opinion?

What test could I apply?

A    You mean physical test?

Q    Any test.

A    You could do what I did and review the medical records and literature.

Q    And if came up with a different conclusion, how would we determine who's right and who's wrong?

A    I don't know the answer to that question.

Q    I mean the fact of the matter is, there's no

Exhibit 4

Page 134

way of telling, right?

MS. SEILA:  Objection, form.

A    You could say that about the defense expert as well.  I mean that's true -- that's true in any case.

Q    What test could we perform to falsify your opinion, to determine that it's false?

A    I'm sorry?

Q    What test could we perform to determine that your opinion is wrong?

A    If you could show me a set of normal PFTs off medication, that would be that I was wrong.

Q    And if we could show PFTs that were abnormal, that would be able to verify your opinion, right?

A    Yes.

Q    Is there an error rate to your conclusion?

A    I don't know.

Q    Okay.  Have there ever been any studies of the way you reached your conclusion in this case to determine an error rate?

A    Not that I know of.

Q    Isn't the error rate likely to be high given that you're reaching a conclusion contradicted by all objective evidence?

MS. SEILA:  Objection, form.

A    It's likely to be low given the fact that it's

Exhibit 4

Page 135

in agreement with all of her treating physicians and the physician hired by her employer and the insurance company.  So I would think it's pretty low.

Q    If your opinions in this case were to be peer reviewed, how do you think peer reviewers -- what do you think peer reviewers would say about concluding a toxic exposure, without quantifying dose?

MS. SEILA:  Objection, form.

A    You know, I've been doing peer reviews for 30 years.  Case reports don't get peer reviewed.  It just doesn't happen.  That's why journals -- many journals won't publish a case report.  You know, Journal of Occupational Medicine won't publish a case report because peer review is not possible on either way.  A defense expert couldn't be peer reviewed either.  So it's irrelevant.

Q    Would you expect peer reviewers to at least see if there was a differential diagnosis done?

A    Again, you don't peer review a case report. This is a case report.

You still there?

Q    Yep.  Just reviewing my notes.

A    Okay.  I got worried.

Q    Is there anything in your report that you would like to change?

**Exhibit 4**

Page 136

A    No.

Q    Is there anything you'd like to change about the opinions you reached in the case?

A    No.

Q    So if you were given the opportunity to write a supplemental report, you would not do so, correct?

MS. SEILA:  Did everyone freeze?

MR. SIMPSON:  No.

THE WITNESS:  I'm sorry?

MS. SEILA:  I thought everyone froze.  I'm sorry.

BY MR. SIMPSON:

Q    Did you answer?

A    Did I miss something?  No.  My answer was no.

Q    Okay.  Approximately how many times have you testified as an expert witness?

A    I don't know, ten.

Q    In what percentage of those cases have you testified for plaintiffs or workers' compensation claimants versus defendants or employers?

A    Probably about 50/50.

Q    Do you understand that, as an expert witness, you have an obligation to consider all relevant evidence and not just evidence that supports one side?

A    Absolutely.

**Exhibit 4**

Page 137

Q    Do you understand you have an obligation to present opinions based upon objective scientific principles rather than advocacy?

A    Absolutely.

Q    Have you ever had your testimony excluded by a court under Daubert or similar standards?

A    I believe once.

Q    And what was the name of that case?

A    I don't recall.

Q    Do you remember the name of the individual whose opinion you were -- who you were opining about?

A    No.  It's a while ago, I don't remember.

Q    Okay.

A    I know they were going to appeal it because it was some legal thing.

Q    Was that the McLaughlin -- was that the McLaughlin vs. BNSF Railway case?

A    Honestly, I don't recall.

Q    What were you asked to do in this case?

A    In the case we're talking about today?

Q    Yes.  Yes.

A    I was asked to give an opinion regarding causation and the extent of disease.

Q    And what is your hourly rate for expert witness work?

**Exhibit 4**

Page 138

A    It's 650 an hour.

Q    And how much have you billed in this case to date?

A    Excluding the deposition?

Q    Yes.

A    Probably about $10,000.

Q    Have you received any additional medical records from Ms. Wooten since you rendered your opinion in this case?

A    I don't believe so.

Q    Were the records that you were provided all stamped with or mostly stamped with a Bates number like we looked at earlier?

A    You know, I didn't notice.  I didn't know what a Bates number was.

Q    Okay.  Did you request any additional materials beyond what you were initially provided?

A    No.

Q    Is there anything you wish you had been provided but did not get?

A    No.

MR. SIMPSON:  I believe I have no further questions.  I'll probably come up with some more, but we'll let Attorney Coleman take over and -- to speed things up.

**Exhibit 4**

Page 139

THE WITNESS:  Okay.  Great speaking with you.

MR. SIMPSON:  Same here.

CROSS-EXAMINATION

BY MR. COLEMAN:

Q    All right.  Good afternoon, Dr. Wilkenfeld.

A    Good evening to you.

Q    I only have a few follow-up questions.  I'll let you know now, I'm suffering from a slight cold so, if you cannot understand me, just ask me to restate the question, okay?

A    Absolutely.

Q    All right.  So you talked at length with Mr. Simpson regarding some of the alternative exposures that Ms. Wooten suffered.  I have a few more that I want to ask you about.

Starting with -- let me ask it this way:  Are you aware that Ms. Wooten had an exposure to Saharan dust during her CBP training in 2021?

A    Yes, I remember reading that.

Q    Okay.  Did you take that into account in rendering your opinions in this case?

A    Yes.

Q    How so?

A    Again, it was irrelevant because of her acute exposure and her presenting with acute symptoms

**Exhibit 4**

Page 140

requiring heavy medication, including steroids.

Q    So you were aware of it, but you rendered it irrelevant; did I understand you --

A    Yes.

Q    -- correctly?

A    Yes.

Q    Okay.  Are you aware of her exposure to CS gas, tear gas, in late 2021, also, part of her training?

A    No, I wasn't aware -- aware of that.

Q    Are you aware that --

A    Unprotected -- I'm sorry.  Unprotected tear gas without respiratory protection?

Q    That's my understanding, yes.

A    Is that -- is that definite?

Q    That's my understanding.  So --

A    Okay.

Q    -- let's assume that is unprotected exposure, without protection.  How would that affect your opinion in this case?

A    Well, if you tell me a little more about what happened, how she was exposed, whether she was symptomatic afterwards.  You know, you're asking me a vague -- a very vague question.

Q    Okay.  Under what -- under what scenario would it not have an effect on your opinion?

**Exhibit 4**

Page 141

A    Would it have an effect or would it not have an effect?

Q    Let's go would have an effect first.

A    Would have an effect?

Q    Yes.

A    If she was overcome by tear gas without respiratory protection and she was brought to the emergency room and required -- required treatment.

Q    Okay.  In what scenario would it not have an -- would such an exposure not have an effect on your opinions in this case?

A    If she wore protective equipment during the tear gas exposure and did not develop any significant symptoms after.

Q    Okay.  Does exposure to tear gas have -- or cause prolonged or permanent effects on individuals with preexisting respiratory issues?

A    It's the exposure -- it depends on other exposure, but it's possible, yes.

Q    When you say it depends, what does it depend on?

A    It depends on the exposure.  It depends on the, you know, the scenario, indoors, outdoors, respiratory protection.

Q    Okay.  Let's assume indoors with no

**Exhibit 4**

Page 142

respiratory -- I mean let's assume outdoors with no respiratory protection.  Does it cause a prolonged and permanent effect?  Go ahead.

A    Sorry.  You really have to know the sequela. The most important thing is whether she was brought for medical attention or not.

Q    So the exposure is fine as long as it's not to the point where she needed medical attention; is that what you're saying?

A    I can't understand you.  I apologize.

Q    Well, I'm -- you stated that it all depends on if she was brought for medical attention.  And so my question was -- my follow-up question to that statement was, are you saying that her exposure is okay as long as it's not to the point where she required medical attention?

A    No, it's never okay, but that's not what you asked me.  You asked me whether it would cause permanent damage.

Q    Correct, sir.

A    If she had an exposure -- if she had an exposure and she had no symptoms, right, it's not going to cause permanent damage.

Q    Okay.  Does -- do symptoms require medical attention?

**Exhibit 4**

Page 143

A     It depends on the symptoms.

Q     Okay.

A     It depends -- it depends whether they clear.

Q     Is it possible for her to have exposure, produce symptoms, not require medical attention, but for such exposure to still have prolonged effects on someone with her preexisting conditions?

A     It's extremely unlikely without acute symptoms.

Q     You said extremely unlikely without acute symptoms.  Well, the scenario --

A     Yes.

Q     -- the scenario we discussed was that there were symptoms, however, she did not have those symptoms treated medically.

A     Did they resolve without treatment?

Q     In this -- in this scenario, yes.  Is this --

A     This is hypothetical, right?

Q     This is hypothetical, correct.

A     Yeah, you can't -- so you're saying that she has symptoms and they went away without any treatment and then she was back at baseline within a short period of time.  So it's unlikely.

It would be easier if you told me what happened so that I can give you an opinion.

Exhibit 4

Page 144

Q    Okay.  Well, we're going to move on to another scenario.

A    Okay.

Q    And were you aware that in early 2022, somewhere between February and May, that Ms. Wooten contracted COVID-19?

A    I believe I knew that, yes.

Q    Okay.  Did you consider this in forming your opinions in that case?

A    Well, tell me the dates again.

Q    Sorry.  Between February and May of 2022.

A    No, it's not -- it should not be relevant to a decompensation in August.

Q    Okay.  Did you do any research or analysis as to whether or not COVID-19 has any lasting effects on an individual with preexisting respiratory conditions?

A    It does, but it doesn't -- temporally it doesn't work like that.  I've seen many cases.

Q    When you state it doesn't work like that, what do you mean?

A    It's usually continuous -- just a continuous gradual worsening of symptoms.

Q    Okay.  Well, we're talking February, May --

A    Right.

Q    -- she contracted COVID-19, correct?

**Exhibit 4**

Page 145

And then you spoke with Mr. Simpson earlier regarding an April worsening of her asthma conditions, correct?

A    Correct, yeah.

Q    And then you spoke with Mr. Simpson earlier regarding a July incident, where she had to see doctors in Atlanta, Georgia due to her worsening asthma conditions, correct?

A    But it still doesn't -- it doesn't explain the precipitous events of August.

Q    Well, we're not in August yet.  We're speaking just from the time period of February to July of 2022.

A    Right.

Q    Right.  So -- and I'll go back.  You stated that typically you see a contemporaneous exacerbation of her asthma symptoms after -- directly after COVID-19, correct?

A    It's usually during.  So it's during and then after.

Q    Okay.  And so you go from February -- sometime between February and May, COVID-19, we talked about April she had worsening and we talked about July she had worsening.  So from February all the way up to at least the month before August there is signs of worsening asthma symptoms, based off her medical history; is that

**Exhibit 4**

fair?

MS. SEILA:  Objection, form.

A    I did not see anything in the records attributing symptoms to COVID-19, but it is possible, yes.

Q    Okay.  Thank you.  And I know you spoke earlier with Mr. Simpson regarding the landfill fires in August of 2022, but were you aware that she had -- that Ms. Wooten had made various complaints regarding the landfill fires starting back in at least 2021?

MS. SEILA:  Objection, form.

A    No, I was not.

Q    Okay.  Would that -- would that knowledge change your opinions in this case in any way?

A    I don't think it's related to her exposure of August 8th so, no, it would not change my conclusions.

Q    Okay.  Well, the question is just whether or not Ms. Wooten being exposed to the landfill fires for months, if not years prior to August of 2022, would change your opinions as to the cause of her respiratory conditions?

A    It would depend on the exposure.

Q    Okay.  And when you say it would depend on the exposure, what do you mean?

A    Levels of exposure, types of exposure,

Exhibit 4

Page 147

proximity.

Q   Okay.  Did you do any research -- well, you said you weren't aware or you weren't made aware that she had prior complaints about exposures to the landfill fire, correct?

A   Right, so I didn't do any research on it.

Q   Is it something that you would have wanted to know about?

A   It would have been helpful to know, yes.

Q   Okay.  Thank you.  All right.  Give me one second.  Let me -- I'm trying not to reask questions that were already asked, sir.

A   Yeah, I really appreciate that.  Thank you.

Q   So just bear with me one moment.

So earlier you spoke -- Mr. Simpson asked you about dose and one of the questions he asked you, and I don't think you ever gave a direct answer so I wanted to go back to it, he said -- the question was, do you teach any of your students that they can establish causation without quantifying dose.  And your answer at that point was, We often don't know the dosage.  But --

A   Correct.

Q   -- I want to reask, the direct question is, do you actually teach your students that they can establish causation without quantifying dose?

**Exhibit 4**

Page 148

A    Well, again, on an individual case we make a clinical decision based on what we have, so if we don't have a dose, we still make a clinical decision.

I hate to do this to you in the middle, but could I go use the bathroom; is that okay?

Q    Yes.

A    Thank you.

Q    Hold on.  Before you go to the restroom, let's finish this one question that we're on and I'll pause there.

A    Okay.  Yeah, thank you.

Q    Because your answer was, we use what we have --

A    Right.

Q    -- so there are instances where you tell your teacher or student that they can establish causation without quantifying dose?

A    Yes.  Yes.

MR. COLEMAN:  Okay.  Thank you.  We'll go off the record now for you to use the restroom.

THE VIDEOGRAPHER:  We're going off the record. The time is 3:21 p.m.

(Break.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 3:27 p.m.

Exhibit 4

Page 149

THE WITNESS:  Okay.

BY MR. COLEMAN:

Q    Dr. Wilkenfeld, you talked with Mr. Simpson about Ms. Wooten's PTSD, her anxiety and her major depressive disorder and he asked you --

A    Yes.

Q    -- whether or not you -- do you recall that discussion?

A    Yes.  Yes.

Q    Okay.  And he asked you whether or not you considered any of these in forming your opinions about causation.  And your statement was, You don't start coughing and wheezing because of a psychiatric condition.  I wanted to see if I could get a more direct answer to that question.

Did you actually consider any of these diagnoses in forming your opinions about causation in this case?

A    Yes, I did.

Q    Okay.  And how did you -- how did you consider those -- well, strike that.

How did they inform your findings in this case?

A    I didn't consider them to be causative, consider the psychiatric condition to be a causative

**Exhibit 4**

Page 150

factor.

Q    Okay.

A    And you can see that in my report I discussed -- I included her psychotherapy.  Right here, I included notes from her psychotherapist.

Q    Dr. Wilkenfeld, are you aware of whether Ms. Wooten is taking more or less medication today than she was taking pre-incident for her respiratory issues, her asthma?

A    I would have to check, but I believe that she's on stronger medication.

Q    Okay.  And what is this belief based on?

A    My recall, but I could try to look it up.

Q    Okay.  If you don't recall right now, you don't have to look it up.

A    Okay.

MR. COLEMAN:  Give me one second.

All right.  Dr. Wilkenfeld, that's all the questions I have for you.  Thank you.

THE WITNESS:  Okay.  Feel better.

MR. COLEMAN:  Thank you.

CROSS-EXAMINATION

BY MS. SEILA:

Q    Good afternoon, Dr. Wilkenfeld.  I just have a few questions for you.

**Exhibit 4**

Have you read all of the expert reports produced by the defendants in this case?

A    Yes, I have.

Q    And do you have any opinions on those reports that you have not already addressed here today with Attorney Simpson and Attorney Coleman?

A    Well, I think -- I think the reports were biased and I think that the -- the pulmonary expert, I was kind of shocked to hear that he only spent three to five minutes doing an evaluation of her.

The Ph.D. wrote his report as if he's a physician, which he's not, so I think he's writing outside his area of expertise.

Q    Do you have any other opinions that you have not already discussed today, Dr. Wilkenfeld, concerning these other -- these defense reports -- defense expert reports?

A    No.

MS. SEILA:  Okay.  No further questions. Thank you very much for your time today, Dr. Wilkenfeld.

THE WITNESS:  Okay.  Sure.

MS. SEILA:  Attorney Simpson may have some follow-up questions for you.

MR. SIMPSON:  I have no further questions.

Exhibit 4

Thank you.

THE COURT REPORTER:  Okay.  Read or waive?

Do y'all know about the right to read or waive?  Does somebody want to inform the witness?

THE WITNESS:  Oh, I'll waive it.  It's okay.

THE VIDEOGRAPHER:  Okay.  We're going off the record.  The time is 3:31 p.m.  This concludes today's testimony by Dr. Marc Wilkenfeld.  The total number of media units is five and will be retained by Veritext Legal Solutions.

THE COURT REPORTER:  Okay.  I have to put on the record, are we ordering the transcript?

MR. SIMPSON:  For Andy Simpson, yes, I'm ordering it.  Just a PDF and TXT.

THE COURT REPORTER:  Okay.  Any copies?

MR. COLEMAN:  Yes, same for me, Coleman.

MS. SEILA:  Yes, same for me.

(Witness excused.)

(The video deposition via Zoom was concluded.)

Exhibit 4

Page 153

CERTIFICATE OF OATH

STATE OF FLORIDA      )
                      )
COUNTY OF DUVAL       )

     I, Stacey G. Williams, Registered Professional Reporter, Notary Public, State of Florida, certify that DR. MARC WILKENFELD, appeared before me via Zoom on this 10th day of November, 2025, and was duly sworn.

     Signed this 23rd day of November, 2025.

                    Stacey G. Williams,
                    Registered Professional Reporter
                    Notary Public - State of Florida
                    My Commission No.:  HH236458
                    Expires:  03/15/2026


                    Personally known
                    OR Produced Identification   X
                    Type of Identification Produced:
                    U.S. Passport ID Card

**Exhibit 4**

Page 154

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA       )
                       )
COUNTY OF DUVAL        )

     I, STACEY G. WILLIAMS, Registered Professional Reporter, Florida Professional Reporter, certify that I was authorized to and did stenographically report the foregoing video deposition of DR. MARC WILKENFELD via Zoom and that the foregoing transcript, pages 4 through 152 is a true and complete record of my stenographic notes.

     I further certify that I am not a

relative, employee, attorney, or counsel of any of

the parties, nor am I a relative or employee of any

of the parties' attorney or counsel connected with

the action, nor am I financially interested in the

action.

     Dated this 23rd

                    *Stacey A. Williams*

                    STACEY G. WILLIAMS,
                    Registered Professional Reporter
                    and Notary Public.

**Exhibit 4**

**[& - 8th]** <span style="float:right">Page 155</span>

| & | |
|---|---|
| **&** | 2:4 5:20 |

| 0 | |
|---|---|
| **00012** | 1:2 4:21 |
| **00820** | 2:5,10 |
| **03/15/2026** | |
| 153:16 | |

| 1 | |
|---|---|
| **1** | 4:13 |
| **10** | 1:14 53:9,19 |
| 54:3,21 55:3,12 | |
| 55:13,16,18 | |
| 56:19 57:1,7,10 | |
| 57:11,12,17 | |
| 61:10,15,23 | |
| 111:14 130:25 | |
| 131:2,4 | |
| **10,000** | 138:6 |
| **10th** | 4:5 17:16 |
| 17:19 51:1 | |
| 54:14,17 56:20 | |
| 58:5,6,8,19 | |
| 59:20 60:23 | |
| 61:6,11,17 | |
| 69:22 70:6 | |
| 153:9 | |
| **1108** | 2:4 |
| **11:03** | 1:15 4:4 |
| **1261** | 128:22 |
| **12:28** | 68:23 |
| **12:40** | 69:1 |

| **139** | 3:4 |
|---|---|
| **14** | 65:18 95:8 |
| **14th** | 96:7 |
| **15** | 66:24 67:6 |
| **150** | 3:5 |
| **152** | 154:11 |
| **153** | 3:7 |
| **154** | 3:7 |
| **16** | 74:17 96:12 |
| **1800** | 2:16 |
| **19** | 144:6,15,25 |
| 145:16,21 146:4 | |
| **1980s** | 6:25 |
| **1985** | 6:23 |
| **1:23** | 1:2 4:21 |
| **1:26** | 101:23 |
| **1:30** | 102:1 |
| **1:58** | 122:8 |

| 2 | |
|---|---|
| **2** | 131:8 |
| **2001** | 14:23 |
| **2003** | 14:15 |
| **2004** | 14:16 |
| **201** | 2:16 |
| **2016** | 104:22 |
| **2018** | 20:2,7,23 |
| 21:8 22:11 | |
| 65:18 89:14 | |
| 133:8 | |
| **2019** | 71:11 |
| **202020** | 52:23 |
| **2021** | 71:14 |
| 139:18 140:8 | |

| | 146:10 |
|---|---|
| **2022** | 17:1,16,24 |
| 18:3,23 19:20 | |
| 19:25 20:11 | |
| 21:1,25 22:4 | |
| 30:9 52:3,14,23 | |
| 53:9 54:3,14,22 | |
| 55:12,13,16,18 | |
| 56:19 65:23 | |
| 66:4,16,24 67:6 | |
| 69:6 71:18,24 | |
| 74:17,21,25 | |
| 75:15 95:8 | |
| 99:23 123:11 | |
| 131:12,14 133:9 | |
| 144:4,11 145:12 | |
| 146:8,19 | |
| **2023** | 96:12 |
| **2024** | 76:8,14 |
| 82:25 86:23,24 | |
| 87:12 | |
| **2025** | 1:14 4:5 |
| 153:9,11 154:20 | |
| **21** | 74:21,25 |
| **23rd** | 153:11 |
| 154:20 | |
| **24** | 59:11 82:25 |
| 87:12 93:5 | |
| **25,000** | 131:7 |
| **28** | 76:14 |
| **2:39** | 122:11 |

| 3 | |
|---|---|
| **3** | 2:5 |
| **3.2** | 1:1 4:19 |
| **30** | 135:10 |
| **300** | 33:19 34:3 |
| **33301** | 2:17 |
| **33411** | 153:14 |
| 154:22 | |
| **3:21** | 148:22 |
| **3:27** | 148:25 |
| **3:31** | 1:15 152:7 |

| 4 | |
|---|---|
| **4** | 3:4 99:23 |
| 154:10 | |
| **40** | 7:2 122:3 |
| **48** | 59:9,12 |

| 5 | |
|---|---|
| **5** | 2:10 |
| **50** | 47:11 |
| **50/50** | 136:21 |

| 6 | |
|---|---|
| **650** | 138:1 |
| **68** | 77:11 |

| 7 | |
|---|---|
| **7** | 123:2 |

| 8 | |
|---|---|
| **8** | 66:25 71:6 |
| **824-3525** | 1:24 |
| **8th** | 17:1,18,24 |
| 19:20,25 20:11 | |
| 21:1,18,25 22:4 | |

Exhibit 4

30:9 50:9,24
51:7 52:14
53:15 54:18,24
55:2 56:4 57:1,6
57:9,16,25
58:22,23 59:20
61:4,8,22 67:20
69:6,22 70:5,6
70:10,12 72:5
75:15 94:21
95:19,20 116:3
118:17,18
123:11 126:6
146:16

**9**

**9** 18:3 51:4,11
51:14,21 52:3
52:23 130:21,23
**9/14/18** 65:17
**90** 68:12,13
83:22
**904** 1:24
**91** 2:9
**9th** 18:23

**a**

**a.m.** 1:15 4:4
**ability** 97:11
130:6
**able** 17:8 20:6
20:20 39:10
79:9 81:13
82:22 94:4
128:11 134:13

**abnormal** 75:21
79:24 80:4
134:12
**above** 36:5
37:13 43:6,12
44:9,12 45:3,4,6
**absence** 15:15
87:6 100:12
**absolutely** 8:13
17:12 19:12
23:8 29:16 31:6
44:24 60:4
105:5 106:9
107:10 136:25
137:4 139:11
**academic** 8:5,5
**accept** 46:16
58:14 100:4
**acceptable**
11:19 27:14
**accepted** 14:8
26:21 27:1,4,5
27:20 28:7,12
28:14,18,23
**accepting** 28:18
**access** 99:16
**accident** 51:11
**accommodate**
7:14
**accompany**
115:5
**account** 139:20
**acetone** 34:15
35:6 36:23

**acknowledge**
106:14,18,19
**acknowledged**
105:17
**action** 1:2 5:3
154:17,18
**activation**
108:20
**activity** 128:12
**actual** 8:6 11:18
39:14 44:21
60:11,18,20
64:2 82:20
115:16
**actually** 38:1
43:12,21 50:15
68:19 72:15
84:17 98:23
108:2,21 114:19
130:14 147:24
149:16
**acute** 25:8 29:7
45:5 46:3,13
50:3,4 60:13,14
60:15 70:13
86:2 89:23
90:14 91:21
92:13 96:3
98:17 112:24
117:15,24 118:2
118:11,19,23
122:21,24
139:24,25 143:8
143:10

**addition** 108:18
**additional** 59:3
138:7,16
**addressed**
111:14 151:5
**addresses** 9:2,3
**adjunct** 7:3
**administer** 5:1
**administered**
46:23
**advocacy** 137:3
**affect** 125:12
140:18
**affected** 99:4
**affiliation** 5:9
**affirm** 6:7
**aforesaid** 1:20
**afternoon** 6:13
139:5 150:24
**ago** 137:12
**agree** 4:11 8:18
12:19,23 24:24
32:23 33:2,22
43:19 46:25
52:13 53:3,14
56:18 77:22
78:1,4 80:10
90:20 91:2
95:25 96:1
133:3
**agreement**
135:1
**ahead** 23:22
29:25 41:14

Exhibit 4

125:6 142:3

**air** 17:25 19:5,9 35:14 43:19 44:7,8,15,21 91:24 115:6,9 115:11 120:23 120:25 131:7

**airborne** 36:13

**airport** 49:15

**airway** 74:13 93:15

**airways** 36:6 49:21 75:1 88:11 89:1

**akerman** 2:15 5:12

**alive** 21:6

**alleged** 52:6 69:19 71:6 86:25 95:8 111:11

**allow** 103:10

**alternative** 60:3 107:1 111:6,7 112:6,11 114:13 139:13

**amount** 11:2

**amounts** 131:8

**analogous** 121:17

**analogy** 121:17

**analyses** 107:4

**analysis** 22:22 23:1 32:25 33:5

34:6 45:10 61:21 62:1,8,25 66:7 67:3 69:12 70:3,18,20,21 103:23 104:6 105:14 106:3,4 109:14 117:10 117:18 118:14 144:14

**anatomic** 79:4

**anatomical** 80:2

**andrew** 2:8

**andy** 5:17 6:14 152:13

**answer** 9:15 13:5,5 24:15 30:14,17,22 35:13 41:21 42:1 43:17,17 53:25 58:16,24 62:23 65:21 66:9 67:22 68:2 78:18 83:7 92:20 101:4 116:14 124:1,17 127:3 133:24 136:13,14 147:17,20 148:12 149:15

**answered** 10:20 13:23 63:10 64:22 85:16

**answering** 124:9

**anxiety** 47:9,13 47:16,17,20 48:8,10,14,20 80:24 81:12 82:20 94:12 96:25 97:5,10 97:14 98:5,10 98:11 103:3 107:12 108:1,25 109:2,8 113:4 113:22 131:18 131:22,24 132:1 149:4

**anxious** 95:12 96:5,13

**anybody** 47:7 61:18 129:20

**anyway** 124:22

**apart** 55:25

**apex** 75:9

**apnea** 113:15,17 113:19

**apologize** 9:24 24:16 46:11 142:10

**appeal** 137:14

**appear** 48:7 130:20

**appearance** 5:6 5:8

**appeared** 153:8

**appearing** 2:3,6 2:9,11,15,18,22 96:13

**apples** 106:16

**applicable** 121:10

**applied** 48:18

**apply** 14:4 99:1 99:1 117:17 133:17

**appreciate** 44:19 147:13

**approaching** 68:12

**approximately** 33:19 102:20 136:15

**april** 65:23 66:4 66:16 71:14 99:22 131:12 145:2,22

**area** 151:13

**argue** 47:7

**arm** 46:22

**arms** 48:20

**arrange** 115:4

**arrived** 109:24

**article** 27:17 29:13,17 32:2

**articles** 27:1,13 102:20,23 103:3 103:6

**artifact** 87:12 88:1

**artificial** 24:7

**asbestos** 11:15

Exhibit 4

**[asked - authorized]**                                              Page 158

asked   7:17
  24:13 25:21
  38:17 48:3
  57:23 72:14
  84:8,22 92:18
  99:17 109:20
  124:21 125:24
  129:15 137:19
  137:22 142:18
  142:18 147:12
  147:15,16 149:5
  149:10
asking   9:21
  13:18,22 15:10
  15:11 27:20
  29:2,3,5,6,15
  30:3 37:11
  45:25 48:6
  54:12,16,16
  55:7 57:18,20
  58:4 60:21
  61:11,13 62:10
  63:11,20 69:21
  71:7,8 92:11,23
  140:22
aspiration
  49:23 50:2
assessment
  90:20 95:12
  105:12
assist   24:4
assistant   7:4
  9:18

associate   7:3
  9:23
associated
  107:12,14,16
associates   2:4
  5:20
association
  107:8 108:1
  115:24 116:3,7
associations
  107:5
assume   7:16
  40:5 140:17
  141:25 142:1
assuming   26:15
astelin   67:12
asthma   20:5,18
  20:19 21:25
  23:11,17 33:13
  65:19,25 66:6
  66:17 67:1,13
  67:19 69:5,18
  71:11,13,17,19
  71:21,25 72:2,3
  72:6,7,11,12
  74:13 78:25
  80:19 81:18
  88:19,25 89:6
  89:13 91:1,2,9
  91:18 103:7
  109:18 111:10
  112:19 117:6,7
  117:13 118:9,17
  118:21 122:15

  125:2 126:3
  131:12,15 133:9
  145:2,7,16,25
  150:9
asymptomatic
  65:19
atlanta   145:7
atmostpheric
  33:22 34:5
attached   44:25
attempt   45:9
attempted   80:7
attendings
  114:9
attention   142:6
  142:8,12,16,25
  143:5
attorney   5:10
  15:22 99:15
  138:24 151:6,6
  151:23 154:14
  154:16
attributed
  77:13,16 131:17
  131:22,23 132:1
attributing   56:3
  146:4
attribution
  131:4
audibly   19:4
audio   4:10
august   17:1,16
  17:24 18:3,23
  19:20,25 20:11

  21:1,18,25 22:4
  30:9 50:9,24
  51:1,4,7,11,14
  51:21 52:3,14
  52:23 53:9,15
  53:19 54:3,14
  54:17,18,21
  55:2,3,12,13,16
  55:18 56:4,19
  56:20 57:1,1,6,7
  57:9,10,11,12
  57:16,17 58:6,8
  58:19 59:20,20
  60:23 61:8,10
  61:11,15,17,22
  61:23 66:25
  67:20 69:6,22
  69:22 70:5,6,6
  70:10,12 71:6
  71:18,24 72:5
  74:17 75:15
  94:21 95:8,20
  96:7 99:23
  111:14 116:3
  118:17,18
  123:11 126:6
  130:21,23,25
  131:2,4 144:13
  145:10,11,24
  146:8,16,19
augustine   1:23
authorized   5:1
  154:8

Exhibit 4

**[available - broke]**

available 62:13 115:18 127:19
aware 33:18 39:23 51:3,10 52:22 53:8,18 53:23 54:1 71:10,13 72:14 74:14 77:11 85:10,13,18 90:17 94:7,11 96:11 122:24 139:17 140:2,7 140:9,9,10 144:4 146:8 147:3,3 150:6

**b**

b 1:8 2:18 4:16 5:13 32:7
back 26:8 30:14 30:22 49:14 68:25 101:25 118:3,6 120:2 122:10 129:1 143:22 145:14 146:10 147:18 148:24
background 6:21 72:3
bad 71:14
bal 73:2,4,8,12
based 23:16 52:20 58:21 61:24 83:23

88:22,22 93:1,1 98:14 99:25 112:23 113:8 123:8 137:2 145:25 148:2 150:12
baseline 143:22
basically 36:14 46:15
basing 127:22
basis 34:17 61:20 95:1 125:16
bates 128:17,21 128:25 138:12 138:15
bathroom 148:5
bay 1:8 2:18 4:16 5:13
bear 147:14
beginning 5:9 120:6
behalf 5:12,17 5:20
behavior 81:9
belief 150:12
believe 17:19 18:7 19:18 26:24 33:4 35:17,19 39:1 42:7,7 43:17 44:11,17 45:13 46:20 47:1,3,4,5 47:19 51:2,12

51:16 52:24 65:3,3 77:21 79:23 80:5 81:15 83:19 95:10 96:9,9,23 104:20 109:19 114:2 118:11 120:12 123:23 123:24 129:12 132:2 137:7 138:10,22 144:7 150:10
believing 34:17
benzene 34:16 35:6
best 124:17
better 17:17 18:21 47:16,20 57:19 79:7,14 79:18 102:6 129:19 150:20
beyond 138:17
bias 21:11
biased 21:12 151:8
bilaterally 52:2
billed 138:2
biological 119:18
biologically 119:9
bit 11:4 38:5 49:22

black 11:7,12
blasted 18:13
bnsf 137:17
board 7:5 8:2,9
body 18:19 59:1 107:20
booth 93:13
bother 63:13
bottom 128:17
boulevard 2:16
bradford 14:1,4 14:7,11 115:23 116:9,24 117:9 117:18,23 118:8 118:13 120:5,8 121:7
break 7:12 68:17,24 101:6 101:15,24 122:2 122:9 148:23
breath 18:9 51:18 97:1,3 111:20 131:23
breathe 29:13
breathed 13:21 21:4
breathing 53:12 99:19 131:2
brief 6:20 102:23 103:1 104:12 121:18
briefly 38:2
broke 99:23

**Exhibit 4**

**[bronchial - causes]** Page 160

**bronchial** 92:14 93:6,9
**bronchiales** 119:22 129:24
**bronchiectasis** 75:3,4
**bronchitis** 21:7 86:3
**bronchoalveolar** 73:1,3
**bronchoscopy** 22:15 24:2 72:17 73:24 74:4,12 78:11 81:20,23 86:10 86:15,22 87:7 120:11 126:8 132:6
**brought** 141:7 142:5,12
**burn** 63:6
**burned** 31:23
**burning** 107:19
**byrwa** 32:6

**c**

**c** 2:1,8 4:1 6:18 67:10
**calculated** 98:14
**calculations** 34:1 103:13
**call** 28:21,22 128:25

**calling** 27:11
**camera** 4:7
**cancer** 25:5 29:3 45:24
**capacity** 14:18 77:17
**car** 16:22
**carcinogens** 60:7
**card** 153:20
**cardiac** 76:11 77:6 87:8 112:13,15
**cardiopulmon...** 22:21
**care** 17:23 21:5 46:21 47:5 48:4 48:12 49:11 50:24 51:1 53:11 70:14 94:20 101:14 110:13
**careful** 109:14
**carefully** 107:7
**case** 4:20 6:14 6:15 9:4,12 10:11 12:3,21 12:25 13:1,8,11 13:23 15:20 16:13 22:16,19 22:23 23:1 25:13,17 26:2 26:21 27:6 35:1 44:9 45:10,19

45:24 57:14 66:19 93:18 102:8 105:21,25 106:11,11 108:23 109:3 112:3 118:1 125:23 134:4,18 135:4,10,12,13 135:19,20 136:3 137:8,17,19,20 138:2,9 139:21 140:19 141:11 144:9 146:14 148:1 149:18,23 151:2
**cases** 10:12 12:9 12:10 21:13 91:17,20,25 92:4 107:20 136:18 144:18
**catch** 101:7
**category** 89:8 89:10
**causal** 118:12
**causation** 8:15 8:18,23,24 9:1,3 9:7,10,13 10:5,9 10:14 12:20 14:2,5,9 15:7 24:22 25:4 28:3 28:4,5,24 29:3 29:14 55:23 60:3 94:18,23 107:8 114:20

137:23 147:19 147:25 148:16 149:12,17
**causations** 112:6
**causative** 55:3 55:17 61:15 149:24,25
**cause** 1:19 10:24 26:7 36:6 45:5,6 47:13 48:8 50:6 52:14 54:9 55:12,13 56:20 57:1 58:19 60:11,18 60:20,22 61:22 76:2 77:19 87:6 90:10 96:23 97:1,2,3,5 98:12 104:18 109:15 112:19 113:1,5 113:17,18,19 121:18 141:16 142:2,18,23 146:20
**caused** 27:16 30:8 34:9 54:10 54:13,17,21 55:9 57:9,11 58:7 66:20 71:18,24 94:20 100:19 126:5
**causes** 60:6,9 76:11,11 95:14

**Exhibit 4**

**[causes - coleman]**

109:12 110:25 111:6,7,23 112:11 113:13 114:14 117:14 118:10 119:10 119:12,16,19

**causing** 77:23 98:6

**cbp** 139:18

**cells** 73:4

**center** 14:14,23 15:11 94:20 104:23 105:23 106:23 107:19 107:22 108:14 108:15

**central** 75:1

**certain** 125:10 125:11

**certainly** 49:24 95:6 119:13

**certainty** 61:2,4 61:14,17 100:23 127:20

**certificate** 3:7,7 153:2 154:1

**certified** 7:5 8:2 8:9

**certify** 153:7 154:7,13

**challenge** 88:23 92:14 93:6,9,13 93:13,19 94:6 126:24,24

**change** 68:18 95:18 135:25 136:2 146:14,16 146:20

**changes** 52:20 74:12 76:2 81:24 88:22 92:13 108:9

**characterize** 130:1

**characterized** 71:14

**chart** 40:3 48:19

**chatgpt** 24:8

**check** 18:6 150:10

**chemical** 25:3 89:24 109:1

**chemically** 62:21

**chemicals** 21:4 21:22 22:14 34:9,18 35:15 35:20,20 37:7 40:14 41:15 43:16

**cherry** 133:3,10

**chest** 22:25 23:24 74:15 76:4 78:12 97:5 126:14

**children** 89:6 91:19 99:2

**chloride** 34:16 35:6 36:23

**christiansted** 2:5,10

**chronic** 32:8 46:1,2,12 60:12 83:24 85:21 86:9,14 87:4 98:18 102:24 104:2 105:24 117:16

**church** 2:9

**circulating** 18:18

**circulation** 87:20

**circumstances** 11:11 90:4

**cite** 31:3,16 42:16 104:7,11 104:16

**cited** 16:1,1,13 26:18 31:9 32:7 32:12 133:8

**city** 6:24

**civil** 1:2

**claim** 28:18 30:8 38:9

**claimants** 136:20

**claims** 121:3

**clarify** 7:16

**clear** 15:1 20:4 52:2,7 74:18

75:1 87:16 143:3

**clearly** 105:7

**clinical** 8:5 9:18 13:1 23:10,16 27:18 28:9 46:15 61:24 91:14 95:2,19 105:25 148:2,3

**clinically** 33:8 35:2 46:14

**closer** 50:1

**coastal** 1:23

**coherence** 120:4 120:7

**coherent** 120:10 120:13,15,20,23 121:2

**cohort** 108:6

**coke** 13:9,10 33:15,16 34:19 34:23 35:9,11 36:16 37:5 40:6 45:2 62:12 99:4 99:22 102:15 116:23 119:19 121:3 122:16,21 122:25

**cold** 139:8

**coleman** 2:14 3:4 5:11,12 6:2 138:24 139:4 148:19 149:2 150:17,21 151:6

Exhibit 4

152:16,16
**collected** 19:10
**college** 6:23
**columbia** 7:4
**combination**
  57:13 61:6
  65:13
**come** 85:16
  111:23 114:23
  138:23
**comes** 21:14
**coming** 19:3
  108:11
**commission**
  153:16
**committee**
  15:18
**common** 62:18
  72:11 80:21
  108:19 125:1,4
**community** 32:5
  32:8 103:18
  106:22
**company** 84:17
  135:3
**company's**
  127:23 130:14
  130:15
**comparable**
  33:11
**compare** 104:3
  106:1 107:18
**comparing**
  32:23 33:2

106:16
**compatible**
  90:25
**compensation**
  136:19
**competencies**
  8:19,21
**complained**
  55:18
**complaining**
  99:7,9,10
**complaints** 40:6
  56:20 97:14,16
  98:6 99:13
  100:10,12,17,20
  123:19 124:5
  146:9 147:4
**complete** 66:21
  80:13,17 81:14
  82:19 94:4
  97:11 154:11
**completed**
  127:2
**completely**
  48:14 55:1,3
  57:19 58:1
  98:11 121:6
**completing**
  80:25
**complex** 49:14
**component**
  40:13 108:24
**components**
  34:14 35:9

62:18 65:4
**compounds**
  34:2
**computer** 64:7
**concentration**
  12:14 34:2
**concentrations**
  33:23 91:25
  104:18 115:16
  119:10
**concept** 111:16
**concern** 112:17
**concerned** 67:1
**concerning**
  151:15
**conclude** 37:6
  127:19
**concluded** 85:3
  90:17 109:6
  152:19
**concludes** 152:7
**concluding**
  135:6
**conclusion**
  27:21 45:16
  99:24 110:9
  123:6,8 133:4
  133:22 134:15
  134:18,22
**conclusions**
  107:7 114:24
  123:7 146:16
**condition** 24:2
  30:8 55:13,17

60:10 65:25
  66:6,17 67:13
  67:19 70:22
  71:5 94:25
  110:10 111:24
  116:4 123:3,16
  123:17,25
  124:14,19
  149:14,25
**conditioning**
  78:6
**conditions**
  73:17 94:17,22
  108:3 143:7
  144:16 145:2,8
  146:21
**conducted** 4:6
  102:8 113:22
**conducting**
  28:11
**confirm** 102:8
**confounding**
  106:24
**confused** 28:1
**confusing** 84:16
**connected**
  154:16
**connection** 4:8
**consent** 5:25
**consider** 11:19
  14:11 22:7 34:5
  54:8,20 71:16
  71:23 83:21
  94:17,19,21,22

Exhibit 4

**[consider - counsel]**

96:16 107:25
109:2,17,21,23
112:11,21 113:1
113:4,12,15
136:23 144:8
149:16,20,24,25
**considered** 16:2
16:7,12 112:18
117:23 118:1
120:8 149:11
**considering**
110:1
**consistency**
116:10,12,24
**consistent** 78:2
78:5,6,8 87:23
91:8 126:2
**consistently**
76:4
**consolidations**
75:2
**contained** 13:10
63:16,21 64:5
64:19 65:7
**contains** 62:21
**contaminants**
36:13
**contemporane...**
145:15
**continue** 4:10
**continued** 123:3
123:14 124:3,4
124:12

**continuing**
122:13
**continuous**
144:21,21
**contracted**
144:6,25
**contradicted**
134:22
**contradicts** 88:9
133:5
**contribute** 61:5
**contributed**
58:5
**contributes**
71:2
**contributing**
55:13 61:9,12
113:15
**cooperative**
76:15
**copies** 152:15
**core** 8:19
**corner** 128:18
**correct** 7:7 8:12
9:13,20 10:6,14
10:18 11:3 12:3
12:7,11,14,17
12:18 13:24,25
14:16,19,23
15:7,15 17:6,21
17:25 18:1,10
18:16 20:8 22:8
23:12 24:22
26:19 31:18,23

32:1,3,9,10,15
38:25 42:5,8
43:1,5,18 47:9
47:14 51:1,16
51:22,25 52:7,9
53:12,13,20
55:4,24 56:1,2,4
56:10,14,21
60:3,11 61:10
65:22 66:1 69:6
69:7,10,11
72:18,19,21,22
72:24,25 73:2,3
73:5,8,14 74:16
74:19,20,23,24
75:6,7,10,12,13
76:5,6,8,9,12,13
76:17,19,21
78:17 80:14,16
81:4 83:15,25
84:1,14 85:16
85:19,20 86:7
86:16 87:10
89:14,15,17,21
91:9,10 97:24
98:7,8,12
102:10,11
103:19 105:1,2
105:7,8,10,12
105:13,15,16,18
106:24,25 107:2
107:3,5,6,9,13
107:17 108:13
109:9,10,12,15

110:19 111:25
112:1 113:2,3,5
113:6 115:7,22
115:25 116:1,4
116:10 117:10
117:11 118:14
118:15,22 119:2
119:3,4,5
122:22,23 123:4
123:5,13 124:6
126:12,15,16,19
127:4,6,17
129:4 130:11,21
130:22,23,24,25
131:1,2,3,5,6,9
131:10,12,13,15
131:16,18 132:9
132:10,12,13,15
132:16,18,20
136:6 142:20
143:19 144:25
145:3,4,8,17
147:5,22
**correctly** 71:1
140:5
**correlate** 42:22
**correlation**
24:22
**coughing** 94:24
149:13
**counsel** 4:15 5:7
5:24 6:9 25:9
154:14,16

**Exhibit 4**

**[county - depend]**

county 153:4 154:4

couple 7:8 29:19 33:3 103:15 104:8 108:12 119:15,19 128:4 128:15

courses 114:5 123:4,15,21,24 124:4,13

court 1:1,23 4:19,24 5:22,24 6:8 18:25 41:25 85:15 110:8 137:6 152:2,11 152:15

cover 7:23

covered 53:17 72:16

covid 144:6,15 144:25 145:16 145:21 146:4

coworkers 99:11

cpet 22:22 76:8 76:10,14 77:22 78:1,4,12 79:9 79:18 82:7,10 86:1,23 87:9 120:15,17,20 126:17 132:11

crisis 53:12 131:2

criteria 14:2,5,7 14:11 88:21,24 89:20 90:18 92:6,24 115:23 115:24 116:10 117:23 119:4 121:8,16

critiques 30:5

croix 1:1 2:5,10 4:20

cross 3:4,5 139:3 150:22

cs 140:7

ct 22:18 74:14 74:17,21,25 75:11,16,23,24 78:12 79:2,3,3 82:4 86:19,23 120:13 126:11 132:8

cubic 36:19

cumulative 54:23 56:5

cured 55:8

current 71:5 74:6

curve 10:22

cutting 108:11

cv 1:2 4:21 115:4

**d**

d 1:8 2:14,18 3:1 4:1,16 5:13

6:19 41:4

daily 104:2

damage 80:1,2 142:19,23

dangerous 20:20 93:24

darin 2:22 4:23

data 15:15 19:5 35:14 43:20 44:7,15 45:20 45:21 91:24 103:9

databases 102:12

date 1:14 17:24 19:25 20:25 22:12,12 59:24 102:17 138:3

dated 154:20

dates 59:25 144:10

daubert 137:6

day 18:21 21:8 50:10,17 51:4 51:11 52:5,17 52:19,20 53:3 54:11 58:1 59:6 153:9,11 154:20

days 55:25 59:6 92:3 95:8 96:8 104:14

deafening 101:2

deal 19:14 29:7 68:3 122:18,20

dealing 13:1 43:16 117:24

december 14:16 71:11 74:25

decent 126:23

decision 148:2,3

decompensation 118:19 144:13

deconditioning 76:12,25 78:2,5 78:7 113:12

decrease 33:23 59:14 93:15

decreased 17:25

defendant 4:15 5:12

defendants 1:10 136:20 151:2

defense 38:3 84:10 106:18 134:3 135:15 151:16,16

defining 89:3

definite 140:14

definitely 21:11

definition 89:22 90:1,2

degree 61:2,3,14 61:16 100:22 127:20

demonstrate 122:15

depend 35:11 59:8 65:8,10

Exhibit 4

125:15 141:20 146:22,23

**depending** 10:19

**depends** 4:7 9:8 10:11,15,21 15:8 50:2,5 62:22,24 63:6,9 63:18 64:20 98:17 104:4,4 125:15 129:23 129:24,25 141:18,20,22,22 142:11 143:1,3 143:3

**deposed** 7:7

**deposition** 1:13 3:7,11 4:5,14,21 5:15 7:13 16:15 21:10 30:11,19 36:11 44:25 49:1 83:8 138:4 152:19 154:1,9

**depression** 107:13 113:20 113:22

**depressive** 94:14 149:5

**desaturation** 83:16,17

**describe** 25:16 26:1 27:1,14 37:19 45:25

**described** 27:10 40:14 41:16,19 47:14 73:17 91:8 105:6,21 110:9

**describes** 49:19 121:23

**description** 6:20 28:10 66:21

**despite** 123:3

**detect** 21:11

**detection** 42:17

**determination** 28:11 34:8 50:7 50:14,16 62:14 109:25 127:22

**determine** 34:22 36:21 41:7 55:11,15,20,23 56:25 57:4 60:11 61:21 63:16 64:4,17 64:25 65:6,12 69:12 70:3,9,20 70:22 71:4 84:12 98:5 103:14,24 104:6 107:5 109:15 120:19 133:23 134:6,8,19

**determined** 11:17 84:13

**determining** 27:15 40:7

59:10 60:18 71:17,24

**develop** 12:1 25:3 29:10 89:6 93:4 108:16,25 141:13

**developed** 54:11

**development** 91:6

**device** 87:17

**diagnose** 76:24 91:20

**diagnosed** 47:8 83:24 91:15 94:8,11,14

**diagnoses** 149:17

**diagnosing** 28:23 89:16

**diagnosis** 48:13 84:2,24 85:6,8 111:17,22 112:2 112:9 114:11,23 115:14 135:18

**diagnostic** 77:25 88:21,24 89:19 92:6,24 120:17

**difference** 8:23 22:13 123:22

**different** 10:16 12:25 13:2 17:18 27:9 29:2 33:9 38:16 46:4

63:23 91:12 109:12 110:8,16 110:17 113:18 133:22

**differential** 111:17,22 112:2 112:9 114:11 135:18

**differently** 48:14

**difficult** 12:20 40:16 103:12

**dioxide** 19:17 34:21 40:18,22 40:25 41:5,19 42:3,9 43:4 44:9 100:19 131:8

**direct** 3:4 6:11 147:17,23 149:14

**directly** 145:16

**disability** 9:10 10:13 27:25 28:4 29:6 84:13 84:21 85:4,9 129:16

**disabled** 27:22 83:5 125:22 127:9

**disabling** 53:5

**disagree** 47:24 48:22 74:9 90:20

Exhibit 4

**[disaster - duval]**

**disaster** 104:23
106:23
**discharged**
96:10
**disconnected**
92:21
**disconnecting**
64:6
**discounted**
98:11
**discuss** 37:24
44:15 111:7
**discussed**
130:17 143:13
150:4 151:15
**discussion**
149:8
**disease** 10:24
12:1 15:7,17
33:10 40:12
60:6 61:7 66:20
69:14 70:11,15
70:15,24 71:2
74:13 76:21,24
81:20,22 82:1,3
82:5,6,9,20 87:8
89:1 98:1,9
108:10,13,15,16
108:19 109:1
110:17 111:21
112:13,15,20
137:23
**diseases** 60:12
60:13

**disorder** 94:8
94:12,15 108:2
149:5
**disorders** 97:14
109:7 113:5
**dispersion** 34:5
**dispute** 74:8
**distance** 33:15
33:24 45:2
**distinguish**
69:17
**distinguished**
111:10
**distinguishing**
107:8
**distracting**
116:19
**distress** 18:16
18:19 29:10
47:6 48:19
51:25 52:6
60:22
**district** 1:1 4:19
**disturbed** 47:2
**division** 1:1
4:20
**doctor** 6:14 42:1
48:7 55:22
65:24 66:5,16
67:1,14 68:1
73:1 78:18 83:4
83:7,11 84:12
85:15 122:13
125:21,21 127:9

127:23 130:14
130:15
**doctors** 48:13
98:9 110:23
123:7 125:8
145:6
**document** 7:20
7:21 20:6 83:18
91:21 128:18
**documentation**
51:15 69:4
**documented**
20:23,24 65:24
66:5,17 83:2,14
90:7 97:13
100:14,15
118:18
**documents**
65:18
**doing** 135:9
151:10
**dome** 33:15,19
99:4 116:23
**donnie** 5:16
**dosage** 13:23
115:2,3 147:21
**dose** 9:20 10:2,4
10:8,17 11:3,5
11:12,22,24,25
12:2,19 13:14
14:21 32:21,25
33:5,11 45:9
46:13 114:21
118:25 119:1

135:7 147:16,20
147:25 148:3,17
**doses** 55:7
**doubt** 56:12,12
56:13 110:22
**downwind**
50:10,19
**dr** 1:13 3:3 4:14
6:4 74:2 82:24
83:23 84:6
85:13,18 90:17
139:5 149:3
150:6,18,24
151:15,21 152:8
153:8 154:9
**draft** 25:10
**drink** 23:7
**due** 9:2 56:9
58:25 71:5
76:11,16 82:19
88:19 98:10
116:22 132:14
145:7
**dug** 107:19
**duly** 6:5 153:9
**duration** 12:16
31:19
**durations** 92:2
**dust** 139:18
**duties** 20:21
**duty** 58:23 84:8
**duval** 153:4
154:4

Exhibit 4

**[dysfunction - evaluation]**

**dysfunction**
88:12

**e**

**e** 2:1,1,14 3:1
4:1,1 6:19,19
67:10,12
**earlier** 50:5
72:14 138:13
145:1,5 146:7
147:15
**early** 144:4
**easier** 143:24
**east** 2:16
**easy** 127:13
**echo** 116:19
**edge** 108:11
**education** 8:11
**effect** 32:3 50:4
54:23 56:6,9
96:19,21 119:21
119:23 140:25
141:1,2,3,4,10
142:3
**effects** 14:19,22
25:6,8 31:4
98:18 102:9
141:16 143:6
144:15
**effort** 55:11,15
55:20 63:12,14
63:15,19 64:4,8
64:12,17,23
65:6,11 76:12

76:16,21,25
77:7,20 78:2,5,9
78:10,13 80:22
81:12 82:19
88:3 132:12,15
**effusions** 75:2
**eight** 24:20
**either** 30:1
59:24 64:13
86:6 88:18
90:25 99:8
117:8 126:13
135:14,15
**electrocardiog...**
77:3
**eliminated**
101:4
**else's** 40:3
**emergency**
48:17 51:4,10
51:14,17 70:14
95:7 96:11
110:24 131:17
131:19,21,22,25
141:8
**emersion**
108:18
**emissions** 13:9
13:10 31:4
34:19,23 35:10
62:1 102:15
122:17,21,25
**emitted** 35:12

**emphasized**
40:18
**employee** 99:18
154:14,15
**employer** 83:5
84:15,17 135:2
**employer's**
125:20 127:8,9
**employers**
136:20
**employment**
50:10,19
**endobronchial**
72:20
**entire** 16:18
**entrapment**
109:7
**entwined** 71:1
**environmental**
7:1,6 104:25
**eosinophilia**
73:7,9
**epa** 14:14
**epidemiologic**
15:16
**epigenetic** 108:9
108:20
**episode** 53:9
**episodes** 21:7
22:11 94:15
**equipment**
39:25 141:12
**equivalent** 8:6
32:19

**eric** 2:14 5:11
**error** 88:1
134:15,19,21
**escalation**
131:14
**especially** 11:10
115:14
**esquire** 2:3,8,14
2:14
**essential** 10:13
**establish** 8:14
9:7,10,12 10:13
12:2,20 13:14
15:7 114:20
117:12 118:8,16
119:1 147:19,24
148:16
**established**
13:15,22 25:22
94:1 112:25
**establishes**
28:20
**establishing**
8:18 10:5,9,14
14:2,9
**estimate** 34:2
**evaluate** 8:11
13:1 60:10
**evaluating** 14:5
14:22 60:17
**evaluation**
20:17 22:10,11
38:10,14 105:23
151:10

Exhibit 4

**[evaluations - exposed]**

**evaluations** 123:9

**evening** 6:13 139:6

**event** 55:3,4,12 55:17 56:4 57:9 57:11,16 58:7 61:9 89:14 126:6

**events** 55:25 57:6 60:14,15 86:7 145:10

**everybody** 39:12

**evidence** 14:19 15:6,15 43:21 52:13 72:18,20 72:23 73:7,12 73:17 75:16 78:14 79:22 80:1 85:25 86:6 86:9,14 88:8 90:13 99:3 108:6,8 125:17 125:20,24,25 127:6,10,11 133:4,5 134:23 136:23,24

**exacerbated** 91:2 126:5

**exacerbation** 23:13,17 88:19 91:9 145:15

**exacerbations** 122:16

**exactly** 13:20 32:22 37:4 51:23

**exam** 38:4

**examination** 3:4 3:4,5 6:11 8:8,8 18:22 20:2,16 20:22,25 51:24 52:5 139:3 150:22

**examine** 114:22

**examined** 6:5 104:12 106:23

**example** 43:4 60:7 116:13

**exasperation** 23:11

**exceedance** 19:18

**except** 23:5 74:22

**exception** 86:2

**excluded** 137:5

**excluding** 10:12 138:4

**excuse** 52:23

**excused** 152:18

**exercise** 22:21 76:10,16 77:17 77:23 78:13 79:5 82:7,10 113:13

**exertional** 128:12

**exhibits** 3:10,11 44:25

**exist** 104:20 121:19,25

**expect** 18:21 49:18,25 59:2 73:16,19,21 75:16,20 76:3 79:13,18 81:23 85:22,25 86:9 86:14,19 100:8 100:11 123:21 125:22,23 126:10,13 135:17

**expected** 79:9

**experience** 23:10,17 34:24 63:7 95:2 96:25

**experiencing** 23:11 46:24

**experiment** 121:7

**experimental** 121:11

**expert** 14:15 57:14 64:11 84:10,11,17,18 134:3 135:15 136:16,22 137:24 151:1,8 151:16

**expert's** 38:4

**expertise** 151:13

**experts** 105:3

**expires** 153:16

**explain** 11:22 12:24 29:7 58:18 90:6 109:18 110:8 111:19 145:9

**explained** 22:9 79:3 96:3 105:9 105:11,14 110:11

**explains** 27:17 77:1

**explanation** 81:4,13 82:18 87:11,21 96:5 97:16

**explanations** 80:18 91:12 107:1

**exposed** 11:17 13:9 17:4 26:6,9 28:10 29:9 30:2 30:7 35:4,7,23 36:3,4,5 37:2,3 37:6,17,18 40:8 41:7,16 42:10 43:21 44:6 50:8 50:17 53:19 54:15 62:9 93:14 102:9 106:22 140:21

Exhibit 4

**[exposed - filed]**                                              Page 169

146:18
**exposure** 9:2,4
10:15,21,24
11:8,8 12:16,21
13:8,13,14 15:1
15:5,15 16:22
16:25 17:14,19
21:14 22:12
23:12,18 24:25
25:3 27:16,18
27:22 28:12
29:8 31:19 32:3
32:8,18,20,23
33:3,16 37:12
37:13,14 38:25
39:21 40:6,22
40:25 42:18,23
44:10,13 46:1,3
46:3,12,13,25
47:14 49:2,18
50:1,8,18 51:15
52:6,14 53:4,5
54:20 55:9,16
56:10,19 60:7
61:22 63:22
66:13,20 67:20
69:10,15,19,22
69:22 70:12,16
70:24 71:6,22
75:17,20 88:20
89:23 90:3,9,12
90:14 91:22
92:2 93:2 95:9
96:2 99:22

100:10 102:16
103:10,11,15,18
103:24,25 104:2
104:3,8,17
105:24 107:17
108:16,17,18
109:1,9 110:3
110:10,13,19
111:14 113:1
115:20,22 116:3
116:23 117:15
117:16,24 118:2
118:20,22 119:9
119:12,15,19
121:3 122:21
123:12 130:25
135:7 139:17,25
140:7,17 141:10
141:13,15,18,19
141:22 142:7,14
142:21,22 143:4
143:6 146:15,22
146:24,25,25
**exposures** 8:11
8:15 10:25
11:25 14:19,22
15:3 29:8 32:12
32:14,16,24
33:4 54:24,24
56:6 98:14 99:7
102:24,24 103:1
104:12 121:18
122:21,25 131:8
139:13 147:4

**expression**
24:21
**extensive** 23:10
23:16
**extent** 137:23
**extrapolate**
103:10 107:22
108:5,23
**extrapolation**
103:12
**extreme** 53:12
131:2
**extremely** 58:10
58:10 143:8,10

**f**

**f** 2:18 6:19
**facilities** 122:16
**fact** 18:9 29:14
32:16 39:4 43:2
47:17 66:1 71:2
107:11 123:14
124:12 125:20
133:25 134:25
**factor** 61:9,12
61:15,18 71:21
113:16 116:9
117:9 118:13
119:6 120:4
130:10 150:1
**factors** 43:15
106:24 107:17
120:7

**failed** 68:10
**failure** 83:24
85:22 86:10,15
87:4,8
**fair** 7:17 9:1
32:11 146:1
**fall** 89:19
**false** 134:6
**falsify** 134:5
**familiar** 14:1
24:21 82:24
88:11 111:16
**far** 43:3 127:1
130:17
**fatigue** 76:17
113:20
**features** 89:3
**february** 96:12
144:5,11,23
145:12,20,21,23
**feel** 150:20
**feet** 33:19 34:3
**fellows** 114:6,7
**fellowship** 6:25
8:4
**felt** 51:21 93:23
**field** 14:8 26:22
27:14 28:12
**fifth** 35:22
**figure** 15:13
**file** 25:14 38:10
38:15
**filed** 4:19

Exhibit 4

**[filing - further]**

**filing** 99:25

**final** 121:16

**finalized** 25:11

**financially** 5:3
154:17

**find** 38:3 46:20
62:17 63:20
90:8 95:6 103:1
111:2 121:24
128:19

**finding** 83:23
88:4 126:9,12
126:15,18,20

**findings** 23:19
23:23 24:1
75:19 82:24
103:14,24 104:7
149:22

**fine** 7:21 20:6
20:23,25 68:16
142:7

**finger** 87:17,21

**finish** 41:14
79:17 117:20
148:9

**fire** 17:21 31:23
50:11 53:18
54:8,15,17,20
55:16 56:19
62:10,15,18,21
63:2,3,17,22
64:2,9 65:7,8,12
113:1 122:18
130:25 147:5

**fires** 62:2 63:1
64:19 65:1,4
102:10 146:7,10
146:18

**first** 6:5 35:1
59:11 99:23
114:3,4 115:10
115:12 141:3

**fishy** 38:18

**fit** 90:18 91:5

**five** 38:5 80:11
104:13 151:10
152:9

**fl** 2:17

**flare** 71:11,13

**flonase** 67:13

**florida** 1:23
101:10 153:3,7
153:15 154:3,7

**follow** 21:9
25:14,17,19
139:7 142:13
151:24

**followed** 25:22

**following** 1:20
8:6 38:13 47:14
52:8,21 60:23
75:17,20 109:1
109:7 118:20
130:18,20

**follows** 6:6

**foregoing** 154:9
154:10

**form** 9:14 15:9
18:12,17 23:20
25:20 26:12,23
30:16 33:7,20
35:18 37:8 39:7
39:16 40:10
41:20 42:6,12
43:9,24 44:1,18
47:10,15,22
50:12,20 52:16
53:22 55:5,19
56:11,15 58:9
63:4 66:2 67:16
67:21 68:4 69:8
76:18,22 77:9
80:15 81:1
82:21 87:22
110:4 117:1
125:14 127:7
130:12 131:11
131:20 132:19
133:6,11 134:2
134:24 135:8
146:2,11

**formaldehyde**
34:15 35:7
36:24

**formed** 129:9
130:5

**forming** 84:2,25
85:7 94:18,23
144:8 149:11,17

**fort** 2:17

**fortunately**
51:20 52:1 73:6

**forty** 95:2

**found** 31:17
38:5 63:2 65:1
75:8 84:8
107:11 125:21
127:8

**four** 19:23
65:23 66:4

**frankly** 30:5

**freeze** 136:7

**front** 15:24
108:7

**froze** 136:10

**fruity** 38:20

**fumes** 40:7

**function** 23:6,19
75:21 79:7,23
80:5,8 92:13
94:5 97:17,19
98:1 127:1
128:10

**functioning**
93:15

**functions** 79:6

**fundamental**
10:5,9 115:17

**further** 138:22
151:19,25
154:13

Exhibit 4

**[g - hh236458]**

| g | | | |
|---|---|---|---|
| **g** 1:22 4:1 153:6 153:14 154:6,22 | 128:6,19 137:22 143:25 147:10 150:17 | 152:6 | **happen** 9:2,3 49:22,23,23,25 111:4 125:23 135:11 |
| **gain** 130:10 | **given** 47:5 63:11 | **good** 5:11 6:13 14:24 21:23 | **happened** 61:5 |
| **gas** 89:24 140:8 140:8,12 141:6 141:13,15 | 81:11,17 88:8 95:13 100:7 116:9,16 127:18 134:21,25 136:5 | 68:14,15,19 87:20 101:4,6,9 101:14 122:1 139:5,6 150:24 | 95:18 99:10 110:2 140:21 143:25 |
| **gases** 33:23 | **glad** 101:6 | **governor** 18:3 | **happening** 54:3 |
| **gastrointestinal** 49:21 50:4 | **go** 4:11 21:5 23:22 29:24 | **gradient** 10:25 11:4 | **happy** 29:19,20 |
| **general** 8:23 9:1 9:7,13 47:23 63:1 89:2 107:23 111:22 | 41:14 46:21 58:13 59:10 60:17 89:6 101:18 118:3 125:6 128:9 | **gradual** 70:14 110:16 144:22 | **hard** 46:20 59:21,23 60:1 87:14 |
| | | **graduated** 6:22 114:8 | **harmful** 42:4 |
| | | **great** 19:14 139:1 | **hate** 148:4 |
| **generalize** 11:9 | 141:3 142:3 145:14,20 | | **heal** 129:21 |
| **generalized** 94:12 | 147:18 148:5,8 148:19 | **grok** 24:8 | **health** 14:19,22 31:4 102:9 |
| **generally** 9:21 14:7 16:3 23:3 24:3 26:21 64:18 65:1 92:8 94:24 106:11 | **goes** 119:24 129:1 | **guess** 115:20 | **healthcare** 17:4 |
| | | **guidelines** 24:10 24:13 25:22 | **hear** 24:12,15 30:17 65:21 100:25 151:9 |
| | **going** 4:3 7:24 16:13 27:8 41:15 49:11 58:12,17 59:17 59:18 68:22,25 101:22,25 102:4 110:24 112:9 118:6 122:7,10 124:16 129:19 129:21 131:22 137:14 142:22 144:1 148:21,24 | **guys** 101:7 | |
| **genes** 108:20 | | h | **heard** 1:19 4:9 |
| **georgia** 145:7 | | **h** 40:24 41:4,4 | **heart** 74:18 87:8 111:21 |
| **getting** 21:9 27:3 58:2 62:7 67:2 96:7 116:16,18,19 | | **half** 59:18 | **heavily** 52:18 |
| | | **hamilton** 1:8 2:11 4:17 5:18 6:15 | **heavy** 58:23 140:1 |
| | | **hand** 128:18 | **helpful** 12:12,13 12:15 47:19 147:9 |
| **give** 6:20 18:20 36:9,17 44:23 58:17 66:21 85:1 101:17 110:20 124:17 | | **handwriting** 128:16 | |
| | | **hang** 19:11 31:8 31:24 51:5 90:21 128:3 | **helps** 79:6 |
| | | | **hh236458** 153:16 |

800-726-7007 305-376-8800

Exhibit 4

**high** 36:5 42:15 89:23 90:14 91:21,24 93:2 134:21

**higher** 11:18,24 11:25 32:19 35:23 38:24 39:2,15 41:8

**highly** 110:22

**hill** 14:1,5,7,11 32:7 115:23 116:9,24 117:10 117:18,23 118:9 118:14 120:5,8 121:7

**hired** 83:5 135:2

**history** 20:5 26:5 27:18,18 27:19 28:9 33:13 38:13,14 65:19 71:16,17 71:23 88:25 89:5 90:18 114:24 127:25 145:25

**hold** 148:8

**home** 115:6,15

**honestly** 100:5 137:18

**honeycombing** 75:2

**hospital** 6:24 18:3

**hospitalized** 59:24

**hour** 59:18 138:1

**hourly** 137:24

**hours** 17:5 29:19 59:9,11 59:12 92:3,5 93:5

**human** 47:11 102:18,19

**hundred** 42:4 57:18

**hygienists** 115:6

**hyperventilati...** 96:14

**hyperventilati...** 97:2 109:8

**hypothetical** 143:18,19

**hypoxia** 83:24 85:22 86:10,15 86:25 87:1,4,6 132:17

**i**

**idea** 93:21 99:10

**identification** 153:19,20

**identified** 35:15 77:19

**identify** 76:10

**ignore** 95:22

**ignored** 95:21

**illness** 94:19

**illnesses** 8:16

**imagine** 48:15

**imaging** 23:24 87:7

**ime** 84:12,18

**immediate** 13:12 17:14 25:1 39:24 49:7

**immediately** 21:5 25:4 37:17 46:24 118:20

**impact** 95:17

**implies** 25:4

**important** 12:16 20:16 21:1,3,18 66:1,7 67:2 114:17 115:8 117:4 142:5

**impossible** 47:1

**improve** 129:21 130:4

**improvement** 18:8 124:25 129:11,17,22

**improving** 124:19

**inability** 82:19 130:11 132:14

**inapplicable** 121:6

**inaudible** 41:24

**incident** 16:25 17:15,24 19:23 19:25 20:12 21:8,18 22:1,4 51:4 65:24 66:5 66:25 69:6,13 70:4,5 71:18,24 72:5 99:24,25 121:4 145:6 150:8

**incidents** 21:17

**include** 22:6 52:25

**included** 150:4 150:5

**includes** 8:4,10 8:14

**including** 5:7 140:1

**inconsistent** 53:4 77:23

**increases** 122:15

**independent** 38:9 105:3

**indicated** 18:9 18:15 76:15

**indicates** 33:18 115:4

**indicative** 93:15 110:15,18

**indicator** 36:13

**indies** 1:9 4:18

Exhibit 4

**individual** 12:9
12:10 15:2
104:5 105:25
108:23 119:17
137:10 144:16
148:1
**individual's**
98:15
**individuals**
23:11 88:25
98:20 102:9
141:16
**indoors** 141:23
141:25
**induced** 103:4
**industrial** 115:5
**inevitably** 11:2
**infectious** 86:3
129:25
**infinitely** 58:3
58:16
**inflamed** 29:12
**inflammation**
73:22
**inform** 100:13
100:17 149:22
152:4
**information**
130:20 132:23
**inhalation**
73:16 74:5
75:15 80:1
**inhaled** 12:3,4,6
12:11 34:14

38:18
**inhaler** 67:9
**initially** 138:17
**injured** 116:22
**injuries** 8:15
**injury** 27:16
52:15 53:5
69:15 70:11,24
71:6,18,25 72:6
72:7,8,18 73:16
73:21 74:5
75:15 77:23
78:15 79:22
104:19 111:11
119:11,13,16,20
121:3,18 123:11
125:18 126:9,12
126:15,18,21
127:6,12,21
129:21 130:2
**insistent** 130:15
**instance** 116:25
**instances**
148:15
**instructs** 68:2
**instruments**
105:12 113:21
**insult** 57:24
59:3 61:4 71:3
110:15 130:3
**insurance** 83:4
84:17 135:2
**insurer's** 125:21

**intelligence** 24:7
**intentional**
132:21
**interested** 5:3
154:17
**interesting** 38:2
108:8,21
**interfere** 97:10
**intermediate**
89:10
**internal** 6:24
**internet** 4:7
**interrupt** 19:1
**interstitial** 76:2
81:23 82:5
**interstitium**
129:23
**intervention**
118:24
**intolerance**
113:13
**intravenous**
18:20 21:6
29:11 47:6
48:20 58:2,25
110:20
**intubated** 59:24
**invalid** 97:18,23
**investigation**
54:2,4,5,7
**involved** 31:22
32:7,12
**involves** 88:25

**irrelevant** 121:1
135:16 139:24
140:3
**irritability**
113:20
**irritant** 89:23
**irritated** 21:21
49:20,20
**irritation**
119:24
**irritative**
119:21,23
**islands** 1:1 2:5
2:10 4:20
101:11,13
**isolating** 57:3
**israel** 1:17
**issues** 13:2
141:17 150:8

---

**j**

---

**j** 2:4 5:19
**jacksonville**
1:23
**janvier** 2:14
5:15 97:8
**jerusalem** 1:17
**job** 20:21
**johansen** 36:12
44:20
**johnson** 31:22
103:17
**journal** 104:24
135:12

Exhibit 4

**[journals - levels]**

**journals** 121:22
135:11,12
**juan** 18:3
**judge** 58:12,14
58:17 68:3
78:10
**judgment** 52:19
**july** 66:24 67:6
131:14 145:6,12
145:22
**june** 76:8,14
86:24
**jury** 57:15,16

**k**

**k** 2:18 6:19
**keep** 30:3 46:2
46:15 60:21
68:11 98:9
109:22
**kind** 11:11 47:1
54:4 60:8 75:19
78:24 107:23
108:20 151:9
**kinds** 46:23
**king** 2:4 5:16
**knew** 13:9 117:2
144:7
**know** 7:13,21
12:3,4,6,8,11,13
12:14 13:4,10
13:20 15:2,10
17:13 18:7
19:14 21:2,7,15

21:19 27:5,24
28:14,22 29:18
29:21 30:2,5
32:6 33:10,11
35:8,13 36:4
37:2,3,14,16,17
39:3,4,8,13,14
40:2,4 44:6 45:2
45:3,23 46:25
48:15 52:17
57:16,18 58:12
58:15 59:7,15
59:17,23,25
64:10,20 66:1
68:1 78:10
79:11 80:8
82:12,14 90:11
92:6 94:3,16
99:14 100:6,14
100:21,22
107:21 113:25
114:1,23 115:1
115:3,11 117:4
126:8,11,14,17
130:13 131:19
133:24 134:16
134:20 135:9,12
136:17 137:14
138:14,14 139:8
140:22 141:23
142:4 146:6
147:8,9,21
152:3

**knowing** 11:12
**knowledge**
58:25 62:20
93:18 95:16
146:13
**known** 153:19
**korea** 71:11

**l**

**l** 6:19,19 41:4
67:12
**lack** 45:21 97:24
**lady** 20:19
**land** 113:1
**landfill** 17:19,21
50:8,11,17,19
53:18 54:3,8,15
54:17,20 55:16
56:19 62:2,10
62:15,18,20,22
62:24 63:1,1,2,3
63:17,18,21,25
64:2,9,19,21
65:1,4,7,8,12,13
111:14 130:25
131:5 146:7,10
146:18 147:4
**landfills** 65:13
**large** 98:15
**las** 2:16
**lasting** 32:24
33:4 144:15
**late** 140:8

**lauderdale** 2:17
**lavage** 73:2,3
**lawyer** 68:6
**learn** 29:22
**lecture** 114:9
**lee** 2:4 5:19
**left** 49:14 58:3
74:23 75:9 97:8
122:13
**legal** 1:23 2:23
4:24 5:1 137:15
152:10
**legally** 35:2
**lemons** 106:16
**length** 139:12
**lesions** 72:21
**level** 9:5 11:19
13:23 36:2,6,17
39:4,14,21 40:8
41:5,8 42:5,11
42:14,14 43:21
45:5,6 59:6
81:17 84:12
89:23 90:3,9,12
90:14 91:21
93:2 100:9
**levels** 11:17
15:1,6 19:17
21:22 35:23
36:24 37:1,3
42:23 43:6,8,11
43:13 44:9,12
45:3 83:2,14,17
100:8,19 104:4

Exhibit 4

115:20,22
122:17 146:25
**life** 48:18
**likelihood** 58:1
**likely** 11:25
40:14 66:12
72:4 81:13
82:18 87:11,25
89:18 96:5
97:15 108:9,16
108:25 109:15
124:7,24 134:21
134:25
**limetree** 1:8
2:18 4:16 5:13
**limit** 28:5 40:22
40:25 41:9
44:10,13 102:17
**limitation** 76:11
77:6,19,24
78:13 79:10
82:7,10,12,17
86:24 120:16,18
120:19,21
**limitations**
105:17 106:14
106:18,19
**limited** 76:20
78:13 102:18
132:11
**limiting** 82:6,9
**lines** 117:16
**list** 15:24 111:23
112:5

**listed** 35:15
**literature** 26:17
26:18 27:19
42:16 62:17
90:7 95:3 102:8
133:21
**little** 38:5 49:22
55:21 140:20
**llc** 5:13
**lllp** 5:18
**llp** 2:15 5:12
**located** 33:14
**location** 1:16,16
**long** 7:13 15:17
16:21 24:19
25:5,6 30:7 59:1
59:5 92:18
122:19,20 142:7
142:14
**longer** 32:19
51:21
**look** 13:3 15:6
17:10 19:11
29:18 31:5,6
40:23 41:3,6
42:20 45:22
51:2 53:6 62:9
79:4 128:3
150:13,15
**looked** 107:1
138:13
**looking** 13:2
24:18 32:4
36:11 83:10,11

84:20,21 86:12
98:17
**lost** 46:10 69:3
**lot** 7:23 21:13
40:17 46:6 63:7
**low** 85:22
134:25 135:3
**lower** 21:22
32:14,16,18
42:4 90:3
122:17 128:18
**lowered** 21:3
**ludicrous** 48:24
107:21,24,25
**luis** 18:3
**lunch** 101:8,10
101:12
**lung** 40:12
66:20 73:15
74:23 75:9,12
75:14 76:21,24
77:23 78:15
79:6,22 80:1
81:20,25 82:3,5
82:6,9,20 87:7
98:9 104:18
108:10,13,14,16
108:19,25
112:20 119:11
119:13,16
123:11 127:6,12
127:21 129:21
130:2

**lungs** 18:22 20:6
20:23,24 29:12
52:2,7 55:8
57:24 59:4 61:4
71:3 74:19 79:4
79:6 110:15
119:21

**m**

**m** 6:18 83:12
**m.d.** 6:19
**machine** 13:19
**made** 21:20
63:19 72:3
76:15 96:4
146:9 147:3
**magnitude**
58:21
**maintenance**
67:9 123:4,14
123:21 124:4,13
125:2
**major** 94:14
112:17 149:4
**make** 20:22
22:13 34:8
47:24 50:7,14
50:16 52:19
55:11,15 62:14
63:12,13,15
64:4,7,11,17,23
65:6,11 66:9,12
83:9,10 88:3
89:18 111:21

Exhibit 4

**[make - method]**

123:22 128:9
148:1,3
**makes** 10:18
21:14 108:9,18
108:25 119:25
**making** 87:25
**malignant** 73:4
**marc** 1:13 3:3
4:14 6:4 152:8
153:8 154:9
**march** 86:22
**mark** 36:11
**mass** 75:5
**massive** 55:7
**materials**
138:17
**matter** 4:15
11:2 30:10 45:1
47:17 88:18
112:5 129:20
133:25
**maximum**
124:25 129:10
129:17
**mclaughlin**
137:16,17
**mean** 10:15
15:3 20:11,18
23:13 30:2 35:2
40:3 42:10 45:6
46:1,25 48:20
54:6 56:16,17
60:5 62:8 64:8
66:19 68:4,5

72:8 93:11
106:17 107:20
107:23 109:23
129:18 133:14
133:18,25 134:4
142:1 144:20
146:24
**meaning** 59:22
**means** 21:15
28:14 60:6
76:20,23 93:12
105:3 119:23
129:19
**meant** 112:20
**measure** 27:20
36:18 42:17
**measured** 32:12
32:14 92:2
104:13 115:16
**measurements**
45:1
**measures** 48:18
**measuring** 32:2
113:22
**mechanism**
119:18
**med** 114:3,5,8
**media** 4:13
68:11,18 152:9
**medical** 9:19
11:10,16 15:19
16:4 18:2 19:19
22:3 26:17,18
28:8 38:9 47:4

61:2,3,14,17
65:17 84:4
85:11 100:23
121:22 124:19
124:25 127:20
128:13 129:10
129:17 133:20
138:7 142:6,8
142:12,15,24
143:5 145:25
**medically**
143:15
**medicated**
52:18 78:17,22
**medication**
52:21 53:7
61:25 78:24
79:6,8,12,14,15
79:19 81:17
89:12 98:2,9
123:4,15,21
124:4,13,20
125:2 127:25
134:11 140:1
150:7,11
**medications**
46:23 58:23
67:5 86:4 98:7
124:8
**medicine** 6:23
6:24 7:1,5,6 8:3
8:7,19 9:6,19
14:8 20:1 26:22
27:15 29:1

42:21 60:2
104:25 115:17
135:13
**medicines** 78:25
**medrol** 96:10
**meet** 37:25,25
**members**
106:22
**memory** 92:9,10
92:11,11,23
**mention** 19:22
52:10 66:14,16
67:18 129:13
132:5,8,17
**mentioned** 16:5
16:6 20:14
27:25 53:19
76:7 93:6 95:23
**mentioning**
48:10
**mere** 32:24
**merely** 10:13
**mesothelioma**
11:13
**mess** 87:14
**messed** 87:16,18
**met** 38:1,2
**metabolic** 109:7
**meter** 36:19
**methacholine**
88:23 93:13,19
94:6 126:24
**method** 26:21
27:2,4,5,11,14

**Exhibit 4**

28:12
**methodology** 14:12 25:14,16 25:19,23 28:21 28:22 105:4,7 105:21 120:5,8
**methods** 105:7
**methylene** 34:16 35:6 36:23
**middle** 148:4
**mild** 89:6 133:9
**milligrams** 36:19
**million** 36:18 103:20 131:9
**mine** 30:5
**minimal** 74:22 75:8
**minute** 17:4 30:12,20 44:23 83:3,15 85:1 101:18
**minutes** 30:10 32:24 33:3 38:5 38:7 68:12,13 92:3 101:19 103:11,15,20,25 104:3,9,13,17 119:15,19 122:3 128:6 151:10
**mispronounce** 74:2

**missed** 48:13 120:6
**misunderstood** 69:20 70:2
**mixture** 43:16
**mmi** 124:8
**modeling** 34:1
**moment** 147:14
**monday** 1:14 4:4
**monitor** 37:15
**monitored** 43:25
**monitoring** 19:5 43:19 44:7,15 44:22 91:24 120:23,25
**month** 21:17 66:24 67:19,20 86:24 89:14 99:24 145:24
**months** 21:25 22:4 31:21 32:12,15,25 33:5 59:18 65:23 66:4 69:5 75:17 92:5 103:10 104:2,14 118:22 146:19
**mood** 47:24
**morning** 5:11 25:2
**morphew** 31:20 103:9

**motel** 129:2,3
**motions** 109:8
**mount** 7:1
**mouth** 13:20 16:8
**move** 133:1 144:1
**movement** 17:25
**mph** 8:5
**mucosal** 72:18 73:21
**multiple** 60:9 74:14 85:23 86:23 109:12 122:14
**muraina** 83:12 83:23
**muraina's** 82:24 84:6 85:13,18

**n**

**n** 2:1 3:1 4:1 6:19 40:24 41:4 67:12 83:12
**name** 4:23 6:14 6:16,18 74:3 83:12 137:8,10
**natural** 69:14 69:18 70:10,14 70:23 71:5 91:1 103:6 109:17 112:18

**nauseas** 51:21
**near** 17:19 122:16
**nearly** 80:10
**necessarily** 42:10 73:18,23 75:18 82:2 86:21 110:24 119:25 120:3
**need** 7:12,20 8:6 9:6 10:25 12:3,4 12:6,10,13 17:8 31:6 39:10,21 60:10 61:25 74:12 101:15 115:19
**needed** 9:12 33:11,13 142:8
**needing** 89:11
**needles** 46:21
**negative** 73:4 74:22
**nerve** 109:7
**neuropathic** 104:22
**neurotoxins** 109:9
**neutrophilia** 73:12
**never** 24:9 38:17 85:14,19 111:3 130:13 132:17 142:17

Exhibit 4

**new** 6:24 69:15 70:11,24 71:18 71:24 72:6,8 111:11
**news** 101:4
**nicole** 1:5 4:15 5:20
**niosh** 41:1 44:12
**nope** 24:6 28:19
**normal** 23:6 72:16 74:18 76:5 77:4 78:11 78:11,12 79:2 80:6 81:11,21 82:4 85:11 86:22,23 87:2 90:14,16 97:15 97:17,18,19,21 97:23 98:1 120:10,13,15 127:19 132:5,8 134:10
**normally** 75:19 98:14
**nose** 13:20
**notary** 153:7,15 154:23
**note** 4:5 19:22 83:10 128:11
**noted** 36:12,25
**notes** 94:10 95:19 135:22 150:5 154:12

**notice** 138:14
**noticing** 5:10
**november** 1:14 4:5 153:9,11 154:20
**number** 19:15 31:21 83:20 128:17,25 138:12,15 152:9
**number's** 128:21
**numerous** 85:10 131:17,19,21
**nw** 128:18
**nw001261** 128:21
**nyu** 7:3

**o**

**o** 4:1 40:24 41:4
**o2** 85:11
**oath** 3:7 5:2 6:6 7:9 153:2
**obesity** 113:12
**objection** 9:14 15:9 18:12,17 23:20 25:20 26:12,23 30:16 33:7,20 35:18 37:8 39:7,16 40:10 41:20 42:6,12 43:9,14 43:24 44:1,18 47:10,15,22

50:12,20 52:16 53:22 55:5,19 56:11,15 58:9 63:4 66:2,8 67:16,21 68:4 69:8 76:18,22 77:9 80:15 81:1 82:21 87:22 110:4 117:1 125:14 127:7 130:12 131:11 131:20 132:19 133:6,11 134:2 134:24 135:8 146:2,11
**objections** 5:4
**objective** 15:6 15:15 23:4,18 23:23 78:14 79:21,25 80:3 81:11 94:2 97:15 114:16 125:17,24,25 127:6,10,11,16 127:18 134:23 137:2
**objects** 68:1
**obligation** 136:23 137:1
**observe** 115:8
**obstruction** 93:24
**obstructive** 81:20,25 94:2

**obtained** 38:13
**obviously** 20:16 32:18 37:16 39:13 72:3
**occasions** 80:14 86:23
**occupational** 7:1,5 8:2,7,19 9:6 12:20 14:8 20:1 26:22 27:15 28:25 42:21 60:2 88:20 104:25 115:17 135:13
**occur** 129:22
**occurring** 69:9
**ocean** 1:8 2:18 2:18 5:13
**oceanfront** 4:16
**october** 14:15 74:21
**odor** 13:15,24 36:5,7,12,14,16 37:7,13,20 42:3 42:17,22 43:2,7 43:12 45:4
**odors** 45:4
**office** 17:20 114:24 115:6
**oh** 24:15 75:24 101:2,12 102:22 117:21 124:24 152:5

Exhibit 4

**[okay - pack]**

| | | | |
|---|---|---|---|
| **okay** 5:24 7:9 7:12 8:10 9:24 10:8,12,17 11:14,22,24 12:25 13:4 16:3 16:10,15 17:11 19:16 20:10 23:7 25:2,4 26:1 26:3,14 27:12 28:20 29:6,23 31:3,8,13,16 36:9 37:5,10 38:24 39:10,13 41:11,21 43:19 46:19 50:22 51:3,7 52:10 53:8 55:8 56:23 58:3,21,23 60:24,25 61:1 62:25 63:10 64:1,15,16 66:12,24 67:5 67:12 68:4,8,14 68:22 70:8 71:10,23 72:10 73:21 78:8,11 79:13 83:12,13 83:17 85:10 87:11 88:17 92:10,17 93:17 97:5 100:5,12 100:25 102:20 103:23 104:22 106:7 109:2 | 112:22 114:10 115:1 116:16 117:9 118:1 119:14 120:23 121:14 122:1,4 123:2 124:10,18 124:24 127:14 128:7,21,24 129:5,9,17 130:5,19 131:7 132:5 133:2 134:17 135:23 136:15 137:13 138:16 139:1,10 139:20 140:7,16 140:24 141:9,15 141:25 142:14 142:17,24 143:2 144:1,3,8,14,23 145:20 146:6,13 146:17,23 147:2 147:10 148:5,11 148:19 149:1,10 149:20 150:2,12 150:14,16,20 151:19,22 152:2 152:5,6,11,15<br>**olas** 2:16<br>**old** 125:20 129:1<br>**omissions** 132:21<br>**omitted** 133:9 | **omitting** 133:4<br>**once** 48:19 58:2 137:7<br>**ones** 16:5,6,7 97:21<br>**ongoing** 32:8 58:7 61:23 109:18<br>**onset** 17:14 91:7<br>**opine** 129:16<br>**opining** 137:11<br>**opinion** 22:16 22:19 25:10 26:2,6,8,20 27:6 58:14 59:19,22 74:7,8 88:14 95:17 96:17,20 100:13,17,18 102:7 120:10 123:10 125:13 125:17,25 129:9 130:5,8 133:13 133:16 134:6,9 134:13 137:11 137:22 138:8 140:18,25 143:25<br>**opinions** 25:13 84:3,25 85:7 94:18,23 135:4 136:3 137:2 139:21 141:11 144:9 146:14,20 149:11,17 151:4 | 151:14<br>**opportunity** 58:18 136:5<br>**ordering** 152:12 152:14<br>**original** 118:3<br>**osha** 40:21 44:9 98:19,25<br>**outcome** 5:4<br>**outcomes** 104:12<br>**outdoors** 141:23 142:1<br>**outlier** 88:8<br>**outside** 112:20 151:13<br>**overall** 98:21,22 98:25<br>**overcome** 141:6<br>**own** 127:8,8<br>**oximetry** 87:15<br>**oxygen** 46:22 77:10 83:2,14 83:17 85:22 87:2 |
| | | | **p** |
| | | | **p** 2:1,1 4:1<br>**p.m.** 1:15 68:23 69:1 101:23 102:1 122:8,11 148:22,25 152:7<br>**pack** 96:10 |

**Exhibit 4**

**[page - physiological]**

**page** 3:2 35:22 36:22,23 65:16 122:14 123:2
**pages** 154:10
**pain** 81:9
**panel** 14:15
**panic** 80:24
**papers** 108:7
**paramesh** 90:17
**paresthesia** 107:12 109:6
**paresthesias** 106:22
**part** 10:9,13 22:16,18,22,25 102:7 125:5 127:22 140:8
**participants** 4:8
**particular** 9:4 19:24 34:9,18 40:13
**particularly** 59:3
**particulate** 45:1
**particulates** 33:23
**parties** 4:11 154:15,16
**parts** 36:18 107:20 131:8
**party** 5:2
**pass** 8:8
**passport** 153:20

**past** 47:9 108:11
**pathology** 75:12 87:7
**patient** 9:9,10 9:11 21:14 27:16 46:16 72:7 80:17 88:5 97:13 108:2 111:1 114:22
**patient's** 28:10 97:10 111:24
**patients** 72:12 91:15 108:8,17 125:2
**pattern** 72:12
**pause** 148:9
**pdf** 152:14
**peak** 77:10
**peer** 27:1,13,17 28:8 104:11 105:1 106:12 121:21 135:4,5 135:6,9,10,14 135:15,17,19
**pending** 7:14
**people** 39:21,23 46:5 47:24 89:5 99:7,9,9 108:6
**percent** 47:11 57:19 77:11
**percentage** 136:18
**percentagewise** 71:7

**perform** 34:1 45:9 61:21 69:12 70:3,21 81:7 103:23 112:2 134:5,8
**performed** 74:3 74:3 75:17 107:4
**period** 19:10 32:19,20 59:1 80:10 93:4 143:22 145:12
**permanent** 27:25 52:15,20 52:20 53:5 73:15 75:14 77:23 78:15 79:22 85:4,8 104:18 119:10 119:16,20 121:18 123:3,11 125:18 126:9,12 126:15,18,21 127:6,11,21 141:16 142:3,18 142:23
**permanently** 27:22 125:22 127:9
**permissible** 40:21 44:10
**person** 27:21 59:8 106:5

**personal** 13:19 37:15 44:7 120:25
**personally** 153:19
**personnel** 51:18
**perusing** 102:3
**petroleum** 1:9 4:18 23:12
**pft** 81:14 88:22 98:7 126:23 129:7
**pfts** 80:18 82:19 97:11 132:14 134:10,12
**ph.d.** 30:4 151:11
**phone** 38:3
**physical** 18:22 51:24 52:5 133:18
**physician** 8:20 21:12 30:6 95:11 96:12 123:23 128:14 135:2 151:12
**physicians** 128:11 135:1
**physiologic** 79:5 108:24
**physiological** 95:13 123:20 124:6,15

Exhibit 4

| | | | |
|---|---|---|---|
| **physiologically** 87:3 | 44:19 76:23 78:14 79:21,25 82:16 95:3 118:23 120:18 121:17,21 142:8 142:15 147:20 | 87:3,19 88:2 90:2 97:12 100:6 111:23 112:6,19 113:1 113:5,13 115:11 124:16 135:14 141:19 143:4 146:4 | 108:13 109:25 111:10 112:19 117:7,13 118:9 141:17 143:7 144:16 |
| **picked** 133:3 | | | **preordained** 109:25 |
| **picking** 133:10 | **pointed** 33:10 | **possibly** 91:1 | **prepared** 15:20 |
| **pits** 63:6 | **pointing** 46:2 | **post** 69:13 70:4 70:9 | **preparing** 24:4 24:8,11 |
| **place** 1:20 4:11 4:21 49:15 50:10,18 69:3 | **points** 5:14 | **posttraumatic** 94:8 108:1 | **prescribe** 67:14 |
| | **poison** 10:18,19 | | **prescribed** 67:6 67:9 |
| **placement** 20:17 22:10 | **poor** 76:12,16 76:20,24 77:7 77:20 78:2,5,9 78:10,13 80:22 81:12 82:19 132:12,14 | **potential** 60:9 106:23 110:25 117:13 118:10 | **prescribing** 98:9 |
| **plaintiff** 1:6 2:6 5:20 | | **powerful** 46:23 | **present** 2:22 5:7 35:16 48:14 82:11,13 122:17 127:5 137:2 |
| **plaintiff's** 15:22 84:11,16 106:17 | | **practice** 7:2 8:7 14:4 26:4 91:14 | |
| **plaintiffs** 136:19 | **population** 98:15,21,23 107:23 117:2,5 | **pre** 20:17 22:10 150:8 | **presentation** 53:15 61:25 90:15,16 96:13 113:8 |
| **plan** 101:17 | | **precipitous** 145:10 | |
| **plausibility** 119:6 | **populations** 116:13 | **predicted** 77:11 | **presented** 51:13 118:11 |
| **plausible** 119:9 119:12,13,14,17 | **port** 1:8 2:11 4:17 5:18 6:15 | **predisposed** 39:19 40:11 | **presenting** 112:23 139:25 |
| **playing** 95:13 | **portions** 16:19 | **predominantly** 75:1 | **presently** 127:12 |
| **please** 4:5 5:5 5:23 6:17 7:15 7:25 19:2 63:24 110:7 | **possibilities** 56:22 | **preexisting** 27:19 33:9 69:14 70:11,24 71:2,17,19,21 71:25 72:2,6 88:19 91:17 | **pretty** 95:22 125:11 135:3 |
| | **possibility** 56:14,16,21,23 57:9,10,12 | | **prevent** 80:24 |
| **pleural** 75:2 | | | **previously** 7:3 |
| **pneumothorax** 75:6 | **possible** 34:11 48:8 49:24 54:25 55:1 56:17 58:4,5,6 80:18 81:5,8 | | |
| **point** 1:8 2:18 2:18 5:13 14:24 15:3 21:23 26:25,25 27:3 28:7,16 39:20 | | | |

Exhibit 4

**[principles - question]**

**principles** 137:3
**prior** 86:4 88:25
  146:19 147:4
**probably** 30:10
  30:12,21 34:16
  35:5 59:6,9,9
  93:23 94:5
  121:6 124:17
  130:3,9 136:21
  138:6,23
**problem** 55:10
  99:22 128:8
**problems** 57:10
  57:11 58:8,20
  61:23
**proceed** 6:10
**proceeding** 5:5
  97:8
**proceedings**
  1:21
**process** 86:3
**produce** 143:5
**produced** 151:2
  153:19,20
**products** 23:12
**professional**
  1:22 153:6,15
  154:6,7,23
**professor** 7:3,4
  9:18,23
**progression**
  69:9,14,18
  70:11,15,23
  71:3,5 91:1

103:7 109:17
  110:16 112:18
**progressive**
  72:11
**progressively**
  69:5
**prolonged**
  141:16 142:2
  143:6
**prone** 21:20
  22:14
**properly** 87:13
**proposition**
  104:17
**protection**
  140:12,18 141:7
  141:24 142:2
**protective**
  141:12
**proud** 14:17
**provide** 103:9
**provided** 15:21
  19:5,7 26:6
  138:11,17,20
**providers** 17:4
**proximity** 147:1
**psychiatric**
  94:17,19,22,25
  113:5 149:13,25
**psychological**
  107:16 110:18
  110:21 123:20
  123:25 124:6,14
  124:18 125:9

**psychotherapist**
  150:5
**psychotherapy**
  150:4
**ptsd** 107:23
  108:8,15,17,18
  109:2 149:4
**public** 153:7,15
  154:23
**publication**
  28:7 104:22
  105:1,4,22
  106:15,20,21
**publish** 106:7
  135:12,13
**published** 27:13
  104:24 106:10
  106:11 107:15
**pubmed** 102:13
**pulmonary** 23:5
  23:19 75:5,21
  76:11 77:19
  78:13 79:23
  80:5,8 82:7,10
  82:12,17 86:24
  92:13 94:4
  97:17,19,25
  98:1 120:16,17
  120:19,21 127:1
  128:10 151:8
**pulmonologist**
  84:11
**pulse** 87:14

**purposes**
  116:24 118:9
**pursuant** 109:8
**put** 16:7 37:14
  38:12,13 46:22
  48:20 87:17
  89:8 93:12
  110:5 123:24
  152:11

**q**

**qualitative**
  36:13
**quality** 4:6,7
**quantification**
  14:21
**quantify** 58:13
  116:6
**quantifying**
  10:4,8 12:19
  114:20 135:7
  147:20,25
  148:17
**quantitative**
  36:18
**quantities**
  119:16
**question** 7:13
  7:15,17,19 10:7
  11:1,7 13:21
  20:18 24:12
  25:21 27:8
  30:13,18,21,25
  31:1 37:11

**Exhibit 4**

**[question - received]**

43:17 48:2,3
50:15 51:7
54:18,19,19
55:10 57:2,22
58:24 60:20
63:7,9,10,22
64:12,22,23
65:11 68:7
69:20,25 70:13
70:17,21,25
78:20 79:17
84:21,23 85:5
85:17 88:7
92:19 109:20
117:20 118:3,6
124:1,2,9,10
127:11 132:25
133:24 139:10
140:23 142:13
142:13 146:17
147:18,23 148:9
149:15
**questions**  21:10
45:25 72:16
78:18 83:7
101:5 102:3
138:23 139:7
147:11,16
150:19,25
151:19,24,25
**quite**  110:5,5
**quote**  122:19

**r**

**r**  2:1 4:1 6:18
32:7 67:10
83:12
**rabih**  74:3
**race**  47:11
**rads**  88:12,15
88:18,21 89:3,7
89:16,20,22
90:1,10,15,18
91:11,15 92:7
92:24 93:16
120:2
**railway**  137:17
**range**  59:13
102:17
**ranges**  92:5
**rate**  134:15,19
134:21 137:24
**rather**  57:1
59:11 82:20
104:14 107:17
109:25 122:21
137:3
**ray**  22:25
**rays**  76:4 78:12
126:14
**reach**  27:21
**reached**  26:1
45:15 124:7
129:10 134:18
136:3

**reaching**  22:19
25:13 27:6
102:7 134:22
**react**  22:14 36:6
39:19 42:15
66:12 72:4
**reaction**  13:12
26:10 34:10
39:17,25 40:2
40:15 47:13
48:9 49:17
71:21 100:8
110:3
**reactive**  74:13
88:11 120:1
**read**  16:18,20
16:25 30:11,19
30:23 49:1,13
73:24 74:2
90:19,21 95:15
106:17 127:14
128:15 151:1
152:2,3
**reading**  13:17
13:19 48:17
84:10 87:12
94:9 139:19
**realize**  92:10
**really**  11:1
14:24 27:7 40:4
43:7 46:1,20
47:7 48:1,5 50:5
58:16 59:15,15
63:9,9 64:12

71:14 82:16
87:16,18 100:2
103:2 105:25
107:18 111:2
112:5 121:10
142:4 147:13
**reask**  147:11,23
**reason**  9:9
40:18 52:10,12
52:25 53:2 67:4
67:18,22,25
94:3 109:19
115:12,13
124:19
**reasonable**  61:2
61:3,14,16
100:22 127:20
**reasons**  82:15
**recall**  7:19
16:21,23,24
17:2,3,7,15
18:24 19:9 22:2
31:2 33:17 35:1
39:6,8,9,11
44:14 49:6,7,9
49:10,12,16
66:23 71:12,15
77:13,15,16,18
80:9 102:22
131:25 132:3,4
137:9,18 149:7
150:13,14
**received**  90:13
138:7

**Exhibit 4**

**[recollection - report]**                                                      Page 184

| | | | |
|---|---|---|---|
| **recollection** 17:9 | 128:14 | 32:17 40:7 | **repetitive** 109:8 |
| **recommended** 40:24 44:13 | **refinery** 19:6 31:4,23 49:14 | 45:13 46:12,13 66:13 112:5 | **replicate** 88:3 **replicated** 85:14 |
| **record** 4:3,12 | 50:18 69:10 | 136:23 144:12 | 85:19 88:6 |
| 5:9 6:16 20:11 | 99:15,18 102:10 | **reliable** 14:12 | 132:18 |
| 20:11 65:17 | 104:13 | 43:20 121:22 | **report** 15:20 |
| 68:23 69:1 95:8 | **refining** 1:8 | **relied** 15:14,16 | 16:2,3,5,6,13 |
| 96:11 101:18,22 | 2:11 4:17 5:18 | 84:4 85:8 | 17:10 18:6,7 |
| 102:1 122:8,11 | **reflux** 49:22 | **rely** 34:25 84:2 | 19:11,22,24 |
| 133:8,9 148:20 | **refresh** 17:8 | 84:6,24 85:6 | 20:14 22:6 24:5 |
| 148:21,25 152:7 | 92:8 | **remain** 59:5 | 24:8,11 26:18 |
| 152:12 154:11 | **regarding** 40:6 | **remedied** | 27:11 30:4 31:3 |
| **recorded** 4:10 | 137:22 139:13 | 123:15 | 31:5,7,16 35:22 |
| 4:13 | 145:2,6 146:7,9 | **remember** | 36:20,21 38:12 |
| **recording** 4:6 | **reginald** 2:14 | 53:25 83:20 | 38:13 40:17 |
| 4:10 | 5:15 | 92:12,16 93:3 | 41:18 44:16 |
| **records** 15:19 | **registered** 1:22 | 94:9 137:10,12 | 48:9 50:25 |
| 16:4,12,14 18:2 | 153:6,15 154:6 | 139:19 | 52:11 53:1 |
| 18:5 19:19,24 | 154:23 | **remote** 1:16 | 65:16 66:14,18 |
| 20:10 21:24 | **regulatory** 41:8 | **remotely** 5:8,25 | 73:24 74:17 |
| 22:3 28:9 47:4 | **related** 5:2 41:9 | **render** 94:5 | 76:8,14 77:10 |
| 48:17 84:4 | 41:15 91:2 | **rendered** 26:20 | 77:13 84:6,10 |
| 128:13 133:21 | 108:14 146:15 | 27:10 138:8 | 86:13 95:23 |
| 138:8,11 146:3 | **relationship** | 140:2 | 104:8 105:20 |
| **recovering** 58:1 | 11:12,23 12:2 | **rendering** 22:16 | 106:11,13,21 |
| **recur** 59:3 | 74:5 115:14 | 96:16 139:21 | 109:5 111:5,8,9 |
| **recurrent** 94:15 | 118:12 119:1 | **repeat** 30:18 | 111:13 112:6,8 |
| **reduced** 77:17 | **relationships** | 43:10 85:17 | 112:10 113:9 |
| **refer** 7:20 | 9:20 10:2,23 | 124:2 | 122:14 129:14 |
| **referring** 7:21 | **relative** 33:15 | **repeated** 128:12 | 130:21 132:5,24 |
| 25:7,7 36:7 | 154:14,15 | **repeatedly** | 135:12,13,19,20 |
| 45:25 65:17 | **relevant** 16:2,8 | 80:17 | 135:24 136:6 |
| 70:5 83:6 | 16:12 19:10 | **repeating** 123:7 | 150:3 151:11 |
| | 22:7,10 31:17 | | 154:8 |

Exhibit 4

**[reported - reviewed]**

**reported** 1:21 51:18 54:14,21 90:8 121:3 130:11

**reporter** 1:22 4:25 5:22,24 6:8 18:25 41:25 85:15 152:2,11 152:15 153:7,15 154:7,7,23

**reporter's** 3:7 154:1

**reporters** 1:23

**reports** 22:15 22:18,22,25 40:5 64:25 99:6 99:21 100:1 106:11,17,18,19 107:12 121:5,22 135:10 151:1,4 151:7,16,17

**represent** 4:23 6:14 67:8 69:13 70:10 99:12

**representing** 99:20

**reputable** 123:23

**request** 64:8 138:16

**require** 29:11 57:25 142:24 143:5

**required** 8:2 14:21 90:9,14 110:14 118:23 141:8,8 142:15

**requirements** 58:22

**requires** 32:25 33:5 89:23 128:1

**requiring** 140:1

**research** 8:5 91:14 107:15 108:11 144:14 147:2,6

**residency** 6:25 29:1

**residents** 32:8 114:6,7 115:5 122:16

**resolution** 130:21

**resolve** 143:16

**resolved** 18:10 51:18 55:2

**respect** 13:7

**respiratory** 18:16 29:10 35:24 39:25 47:6 48:18 51:25 52:6 53:9 54:9,10,13 55:17 60:22 61:23 69:13 70:4,10 83:24

85:21 86:10,15 87:4 90:24 97:14,16 98:6 98:12 100:16 102:15 103:4 104:12 112:12 117:14 118:10 140:12 141:7,17 141:24 142:1,2 144:16 146:20 150:8

**responder** 107:22

**responders** 104:24 105:24 107:19

**response** 9:20 10:2 11:22 12:2 25:1 32:21,25 33:5 45:9 92:14 93:7 110:19,22 118:25 119:1

**responsible** 61:7

**restate** 70:1 139:9

**restrictive** 81:19 81:22

**restroom** 148:8 148:20

**result** 27:22 49:2 70:16 77:7 77:22 78:1,4 79:1 87:25 88:8

109:6,25

**results** 19:8 26:5 44:22 64:8 85:13,18 120:24 126:23 127:17 132:11

**retained** 84:14 84:15 152:10

**return** 127:10 130:23

**returned** 50:9 50:18 52:22

**returning** 53:3

**reverb** 116:17

**review** 14:15 16:15 18:2 19:19 22:3,15 22:18,21,25 25:10 27:19 35:14 38:10,15 40:3 50:15 62:13 95:7 102:21 105:1 106:12 113:21 129:6,7 133:20 135:14,19

**reviewed** 14:18 16:4 20:8,10 26:4 27:1,13,17 28:8 37:20 43:20 44:8 84:5 104:11 105:3 121:21 135:5,10 135:15

Exhibit 4

**reviewers** 135:5
135:6,17
**reviewing** 28:8
28:9,9 135:22
**reviews** 135:9
**rhetorical** 78:19
**right** 7:24 8:4
8:16 11:5 13:12
17:7 20:11,12
21:9 22:11
24:20,20 25:4
26:4 28:2,6,18
29:4,8,9,11,13
29:18 31:4,17
35:5 37:12,15
38:11 39:20
40:1 41:13
42:11,20 43:4
45:14 46:1,17
46:22 47:2,20
48:13,16 50:3
53:9 55:23 57:8
57:25 58:2
60:17 63:25
65:20 70:6,7
73:13,25 74:6
74:15 75:9 77:1
77:4,7 79:10
80:25 81:7,9
82:1,13 83:3,11
85:3,11,14 86:1
86:11,20 87:9
88:1 89:4 92:23
93:1 97:25

98:24 101:8,16
103:18,21 105:4
106:3 110:13,14
110:15 111:1
112:19 114:5,8
115:6,20 118:19
119:7,24 120:5
120:8 121:8
123:16,17 124:3
124:12,15,21
126:3,6,9 127:3
128:18 129:3
132:6 133:23
134:1,13 139:5
139:12 142:22
143:18 144:24
145:13,14 147:6
147:10 148:14
150:4,14,18
152:3
**rigor** 105:21
**road** 29:22
**robin** 2:3 5:19
**rohn** 2:4 5:19
**role** 95:13
**roll** 30:14,22
**room** 51:4,11,14
51:17 95:7
110:24 131:17
131:19,21,23,25
141:8
**roosevelt** 6:24
**roughly** 99:24

**rubbish** 107:20
**rule** 58:19 61:8
61:13,13 77:6
89:16 91:11,11
91:13 97:25
111:24 112:6
113:7 124:18
126:20,22
130:10
**ruled** 48:8 57:17
87:9 95:14
110:1 111:5
112:22 113:9
**ruling** 114:13
**rushed** 110:13

**s**

**s** 2:1 4:1 40:24
41:4 67:12
**saharan** 139:17
**samples** 19:7,9
19:16 44:8,12
131:7
**sampling** 35:14
**saturation** 83:2
83:14 85:23
**saturations**
85:11 87:2
**saving** 48:18
**saw** 19:3 30:4
44:11 95:11
114:2 132:2
**saying** 16:6 27:8
30:1 46:15,16

47:25 48:1,4,7
55:7 58:15
78:21 79:1
90:24 99:17,17
100:5 117:6,17
117:22 129:1
133:8,9 142:9
142:14 143:20
**says** 16:3 28:8
30:11 84:10
**scan** 22:18
74:17,22,25
75:23,24 79:3
**scans** 74:15
75:11,16 78:12
79:2 82:4 86:19
86:23 120:13
126:11 132:8
**scarring** 73:22
74:23 75:8
**scenario** 140:24
141:9,23 143:11
143:13,17 144:2
**school** 7:5 114:3
114:5,8
**science** 58:15
**scientific** 14:18
25:14 42:16
137:2
**scientifically**
58:18
**scores** 107:13
**screen** 4:9

Exhibit 4

**[search - shows]**

search  62:17
102:8,12,14,23
103:3,6
sec  19:11 31:8
36:9 51:5
128:19
second  31:24
44:23 51:9
56:10 65:16
90:21,22 92:22
114:4 115:13
125:5 128:3
147:11 150:17
secondary
130:10
seconds  30:13
30:21 92:3
secretions  72:23
section  31:14
105:7
sedentary  130:9
see  23:18,23
24:1 30:2 32:4
36:22 45:19
48:9 51:13,17
61:18 73:16,21
75:16,20,21
76:3 81:2,2 83:5
85:22,25 86:9
86:14,19 87:23
88:5 95:19 97:4
98:1 99:5 100:5
106:19 109:22
125:1 126:23

135:18 145:6,15
146:3 149:14
150:3
seeing  9:9,10,11
44:14 131:25
seen  4:8 21:13
35:2 41:18 76:7
80:3 86:6 90:5
96:15 98:3 99:3
99:6,8,8,9 111:4
121:19 144:18
seila  2:3 3:5
5:19,19 6:3 9:14
15:9 18:12,17
19:2 23:20,22
25:20 26:12,23
30:16 33:7,20
37:8 39:7,16
40:10 41:20,22
42:6,12 43:9,14
43:24 44:1,18
47:10,15,22
50:12,20 52:16
53:22 55:5,19
56:11,15 58:9
63:4 66:2,8,11
67:16,21,23
69:8 76:18,22
77:9 80:15 81:1
82:21 87:22
110:4 117:1
125:14 127:7
130:12 131:11
131:20 132:19

133:6,11 134:2
134:24 135:8
136:7,10 146:2
146:11 150:23
151:19,23
152:17
selected  16:19
105:9
semantics  88:18
sensitive  21:21
separate  55:3
separated  60:15
september
14:23 65:18
sequela  142:4
served  14:14
set  134:10
setting  27:23
96:6 110:24
seven  31:23
32:3 103:18,20
103:24
seventh  122:14
several  31:3
70:23 128:12
severe  20:19
24:2 29:10
53:14 57:24
59:20,25 76:2
80:19 81:19,22
81:25 82:3,6,9
85:4,8 93:23
94:15 97:13
107:22

shocked  111:3
151:9
shocking  38:6
111:3
short  46:13
68:17 122:24
127:5 143:22
shorter  32:20
shortness  18:9
51:18 97:1,3
111:20 131:23
shoved  46:22
show  18:23
19:16 21:24
23:4 52:14
81:23 82:7,10
94:2 95:4
105:20 106:6,13
111:5,9,12,13
112:9 113:9
120:20 126:17
132:11,14
134:10,12
showed  18:5
44:9,12 51:24
75:1,11
showing  64:18
78:12 86:24
91:24 120:15
131:7
shows  77:10
78:14 79:4,5,21
79:25

Exhibit 4

shut 15:18
sic 4:17 23:11
sick 21:5,15
  25:1 30:2 33:12
  33:13 37:17
  39:22 48:5
side 136:24
signature
  153:14 154:22
signed 153:11
significant
  72:23 75:11
  81:18 83:19,21
  107:5 110:12
  122:15 141:13
signs 145:24
silence 101:2
similar 105:21
  121:18 137:6
simple 9:5 64:12
  87:15
simply 71:19,25
simpson 2:8 3:4
  5:17,17 6:1,12
  6:14 19:1 35:18
  68:9,14,19 69:2
  97:9 101:14,20
  102:2 122:1,5
  122:12 136:8,12
  138:22 139:2,13
  145:1,5 146:7
  147:15 149:3
  151:6,23,25
  152:13,13

sinai 7:1
single 88:7 93:2
  104:3
sir 7:18 47:21
  54:19 57:20,20
  68:10,17 128:23
  142:20 147:12
sites 63:8
situation 60:19
  121:7
situations
  121:17
six 80:11 83:3
  83:15 95:8 96:8
size 74:18
skip 102:4,5
  121:9
sleep 113:15,17
  113:19
slight 139:8
slow 110:16
slowly 57:4
small 58:3,16
smell 38:18,18
  38:20 41:19
smelled 37:5
  42:9
smelling 37:21
smoke 23:12
  34:9,14 36:15
  37:5 41:8 50:8
  50:17 56:19
  62:18,21 63:3
  63:17 64:5 65:2

65:7,12 99:4,22
  102:9 104:13
  116:23 119:10
  119:12,15,19
  121:3
smoking 60:7
smoldering
  33:16 40:6 45:2
smolders 35:12
snoring 113:20
sole 55:12 56:20
  58:19
solutions 1:23
  2:23 4:24 5:1
  152:10
somebody 152:4
soon 101:17
sorry 10:7,20
  11:9,20 17:22
  18:25 23:22
  24:15,17 28:4
  31:11,12 33:1,8
  34:21 40:11
  41:12,25 42:2
  43:10 46:6,9
  55:14 62:5
  65:22 66:3,15
  69:3,20 70:2
  78:3,19 79:17
  82:8 84:20
  85:17 86:12
  91:21 92:21
  100:25 101:2
  102:3,18 106:7

106:10 112:14
  112:15 116:15
  116:20 117:21
  118:3,4 120:6
  125:6 128:22
  134:7 136:9,11
  140:11 142:4
  144:11
sort 13:22 28:11
  28:17 36:17
  47:13 104:6
  106:2
sound 26:16
sounds 42:8,8
  51:16 53:14
  109:24 110:1,7
source 33:24
  34:3 119:24
sources 34:25
south 71:11
speak 19:2,3
speaking 23:3
  139:1 145:11
special 20:21
specialist 20:4
specialized 8:1
specific 8:10,23
  9:3,7,13 15:2
  16:4 24:10,13
  25:14 35:3,15
  35:19,20 55:21
  63:1 90:12
  128:14

Exhibit 4

**[specifically - suggested]**

specifically 36:2 84:24 85:6
specificity 13:3 13:7 117:9,12 117:17,22 118:8
speed 138:25
spend 38:7,8,8
spent 38:4 40:17 151:9
spoke 145:1,5 146:6 147:15
spot 68:19
st 1:1,23 2:5,10 4:20
stabilized 111:1
stacey 1:22 4:25 153:6,14 154:6 154:22
stamped 138:12 138:12
stand 35:25
standardized 113:21 114:2
standards 24:11 99:1 137:6
start 94:24 149:12
started 68:11 129:6
starting 139:16 146:10
state 5:5,8 6:16 33:9 35:22 38:24 122:14

123:2 144:19 153:3,7,15 154:3
stated 32:24 107:7 142:11 145:14
statement 35:25 95:1,21 142:13 149:12
states 30:20 65:17
statistical 105:14 106:2,4 107:4
status 21:24
stay 21:6 59:1
steadily 89:13
stenographic 154:11
stenographica... 1:21 154:8
steroid 29:11 110:14 123:4,15 123:21,24 124:4 124:13
steroids 17:18 18:13,14,18,20 21:6 47:6,16,18 47:23 48:12,21 51:20 52:8 55:8 57:25 58:3 59:1 96:4,7 110:21 124:20 140:1

stop 68:15,17,20
stopped 76:16 82:15,15
street 2:4,9
strength 115:24 116:6
strengthen 66:19
stress 94:8 108:1
strike 149:21
strong 36:12 61:5 95:22 116:2
stronger 150:11
strongest 125:19
stuck 28:16,17
student 11:16 148:16
students 9:19 10:17 11:10 114:10,19 115:5 115:8,10,19 147:19,24
studies 12:9 15:16 25:6 29:3 31:3,17 32:11 64:18 95:3 102:19 104:7,20 121:11,21 122:15,18,20,24 134:17

study 31:20,22 32:7 100:14,16 102:18 103:9,17 104:11,16 105:6 105:18 108:5
subjective 109:11
subjects 105:9
submaximal 76:16
subpleural 74:22 75:8
subsequent 58:20
substance 10:16 12:4 13:3 30:8 62:11 65:12 93:14
substances 10:21,23 26:5,7 43:2 62:9 64:21 72:4
successful 81:14
successfully 80:13 127:2
sudden 116:17
suffered 139:14
suffering 47:20 99:21 139:8
suggest 67:13 108:22,24 123:16
suggested 125:8

**Exhibit 4**

**suggests** 125:7
**suite** 2:5,10,16
**sulfer** 41:19
  131:8
**sulfur** 19:16
  34:21 40:18,22
  40:25 41:5 42:3
  42:9 43:4 44:9
  100:18
**summarize**
  130:17
**superfund** 63:8
**supplemental**
  136:6
**support** 104:16
  126:8,11,14,18
**supporting**
  121:11
**supports** 29:13
  42:17 125:17,25
  133:4 136:24
**sure** 12:15 14:3
  17:12 20:22
  31:25 36:10,22
  43:11 51:6
  55:22,22 57:6
  60:25 66:4 72:8
  82:14 83:9,10
  85:2 87:18
  90:23 95:5 99:5
  100:21 101:20
  111:21 117:2
  122:5 127:15
  128:5,8,9

151:22
**surrounding**
  32:5
**survivors**
  104:23
**susceptible**
  119:17
**suspicious** 75:3
  75:5
**sustained** 53:4
  73:15 75:14
  123:10
**swearing** 5:25
**sweet** 38:18
**swings** 47:24
**sworn** 6:5 153:9
**symbicort** 67:9
**symptom**
  130:21
**symptomatic**
  29:9 125:3
  140:22
**symptoms** 17:14
  25:3 26:7 45:5,7
  46:24 48:2 54:9
  54:10,13,18,21
  55:2 58:22 59:2
  59:19,25 61:9
  61:25 69:13,17
  69:18 70:4,10
  70:13 74:6 91:6
  91:7,12 93:2,3,4
  95:13 96:3,24
  98:12 100:19

102:15 103:4
104:23 107:16
109:11,18
110:10 112:12
112:23 113:16
113:17,18,19
117:3,14 118:10
118:12 126:1
131:5 139:25
141:14 142:22
142:24 143:1,5
143:9,11,14,14
143:21 144:22
145:16,25 146:4
**syndrome** 88:12
**system** 35:24
  58:3 59:5
**systematically**
  111:24

**t**

**t** 67:10,12
**take** 4:11 7:12
  29:19 33:21
  42:19 44:23
  51:2 86:4 100:4
  101:6 102:5
  103:22 116:2
  119:23 122:2,3
  127:13 129:7
  138:24 139:20
**taken** 1:14 4:14
  94:20 101:14

**talk** 12:10 28:2
  44:21 68:6
  98:25 106:8
**talked** 38:6
  44:20 45:14
  81:12 103:17
  115:23 118:25
  139:12 145:21
  145:22 149:3
**talking** 12:8,9
  20:1 25:5 28:3,4
  36:14 40:17
  45:24 46:8 63:6
  63:8 98:20,21
  98:22,22 109:5
  137:20 144:23
**talks** 98:19
**taught** 8:22
  28:25 42:22
  60:3
**teach** 9:17,18,19
  9:21,22 10:1,4
  10:17 114:4,10
  114:13,16,19,22
  147:18,24
**teacher** 148:16
**teaching** 11:10
  114:3
**tear** 140:8,11
  141:6,13,15
**technical** 14:15
**tell** 7:10,11,15
  8:1 11:1,18
  14:25 18:5

Exhibit 4

**[tell - threshold]**

21:13 26:3
29:21 35:3 36:2
39:18 40:21,24
41:4 43:7,13
51:7 57:15 65:5
67:5 68:10
69:21 125:19
140:20 144:10
148:15
**telling**  99:20
134:1
**temporal**  91:5,6
91:7 118:20
**temporality**
13:4,11 118:13
118:16
**temporally**  49:4
49:25 144:17
**ten**  136:17
**tends**  52:13
**term**  25:5,6
122:19,20
**termed**  33:4
**terminals**  1:8,8
2:18,18,19 4:16
4:17 5:13,14
**terms**  46:13
92:3 102:14
**terrorism**  14:23
**test**  23:6 26:5
76:20 77:4
78:14 79:4,5,21
79:25 80:25
81:7 82:16 83:3

83:15 87:13,14
87:15 93:20
94:6 98:1,7
126:23 127:16
133:17,18,19
134:5,8
**testable**  133:13
133:14
**tested**  35:19
**testified**  6:6
91:9 136:16,19
**testimony**  16:21
17:15 33:18
49:13 137:5
152:8
**testing**  22:22,22
80:3,8,14 97:15
114:16 115:6,9
115:11 126:25
127:18
**tests**  23:4,5,19
75:22 78:16,21
79:23 80:5
81:11 94:2,5
97:17,18,19
127:1 128:10
129:7
**thank**  6:8,9
19:13,13 23:9
31:14 64:15
65:16 75:5 85:3
87:2 101:1
118:7 122:6
127:16 128:6

146:6 147:10,13
148:7,11,19
150:19,21
151:20 152:1
**thanks**  101:21
**therapists**  125:8
**therapy**  94:9
114:1
**thing**  16:20 21:3
48:24 50:25
58:7 60:8 81:25
127:14 137:15
142:5
**things**  8:17 9:21
10:1 15:6 25:5
29:2 36:4 38:16
43:25 45:3,22
54:16 74:18
128:4 129:25
138:25
**think**  11:13
12:24 13:23
14:24 19:23
21:9 22:9 25:6
34:11 35:5
36:20 40:13
45:23,23 46:6
46:25 47:7
48:19,23,23,24
48:24 50:25
52:19 53:17
58:10 59:21,23
60:1,24 61:3,16
62:22,24 63:5

64:6 65:4 70:25
71:1,1 72:1,5
78:8 82:22
85:15 91:13
92:21 93:4 96:3
105:25 107:18
107:25 110:2,11
110:20 112:4,4
112:18,25 116:2
116:20 121:9,16
124:7,22 135:3
135:5,6 146:15
147:17 151:7,7
151:8,12
**thinking**  117:16
**third**  57:12
114:4
**thought**  10:20
46:7,9,10
108:19 109:22
110:21 112:20
124:24 136:10
**thousand**  42:4
100:16
**thousands**
28:13,13
**three**  29:2 38:4
63:5,11 104:7
118:18 151:9
**threshold**  13:16
13:24 36:5,7
37:7,13 42:3
43:7,12 45:4

**Exhibit 4**

**[thresholds - trying]**

**thresholds** 42:22 43:3,3
**tied** 57:15
**tightness** 97:5,6
**time** 1:15,19 4:4 5:5 15:17 17:13 19:10 24:19 30:13,21 31:6 32:19,20 33:16 38:8 40:17 50:1 50:9 55:14 59:2 59:14 60:15 68:14,23 69:1 78:3 92:18 93:4 101:23 102:1,5 122:1,8,11 124:10 127:19 143:23 145:12 148:22,25 151:20 152:7
**times** 7:8 10:3 11:17 14:6,25 28:13 35:23 38:24 39:2,15 42:4 63:6,11 80:7,11 110:12 128:12 136:15
**timing** 101:7
**tiny** 10:24,24 11:4
**title** 7:3,4
**today** 4:4 5:14 137:20 150:7 151:5,15,20

**today's** 152:8
**told** 16:24 17:3 38:4 46:16 143:24
**tolerance** 79:5 98:15,16
**toluene** 34:15 35:5 36:23
**took** 15:13,17
**total** 152:9
**totally** 46:3
**towards** 46:2
**toxic** 11:18 22:12,14 23:18 25:8 35:24 38:25 39:4 40:8 42:11,14,17,23 43:3,8,13 50:4 61:4 62:1 66:13 71:3,22 73:16 75:15 80:1 98:14 100:9 107:17 110:15 130:3 135:6
**toxicity** 98:20
**toxicological** 28:11
**toxicologist's** 30:4
**toxicology** 9:17 9:18 10:5,10 11:19
**tract** 49:21 50:4

**traction** 75:3
**trade** 14:14,23 15:11 104:23 105:23 106:23 107:19,22 108:14,15
**train** 46:10
**trained** 6:23
**training** 8:1,10 8:14,22 42:21 60:2 96:25 139:18 140:8
**transcript** 16:16 16:18 152:12 154:10
**translate** 103:14 103:25 104:8
**transportation** 1:8 2:12 4:18 5:18
**treat** 48:11
**treated** 48:5 143:15
**treating** 110:23 123:16 125:7 135:1
**treatise** 28:17
**treatment** 9:11 29:11 51:19 52:8 65:20 110:14 131:14 141:8 143:16,21
**tried** 12:24 80:11

**triggered** 71:19 72:1
**triggering** 71:25 72:6
**trimethylamine** 36:24
**trouble** 99:18
**true** 9:5,7 10:2 21:22 23:17 26:13 32:13 33:25 42:13,13 47:12 52:3,4 81:21 82:17 85:23 89:22 108:10 134:4,4 154:11
**truly** 81:19 82:3 82:6,9 85:21 98:10 121:5
**truth** 7:10,11
**try** 7:16 19:2 29:18 62:14 63:20 95:6 103:13 107:21 107:21 110:12 124:2,11 150:13
**trying** 10:12 11:21 14:25 15:4 26:14 29:7 30:3 37:10 55:6 55:22 57:15,21 57:21,22 58:17 65:5 84:9 92:16 93:3 108:5,23

Exhibit 4

109:22 110:25 147:11

**two** 8:4 17:5 36:4 38:15 45:2 54:16 55:25,25 56:6 57:3,6,13 59:6 60:13,15 80:11 92:25 101:19 104:3,17 128:6

**txt** 152:14

**type** 10:22,22 35:11 86:3 153:20

**types** 146:25

**typical** 34:22 65:4

**typically** 23:18 23:23 24:1 34:19 63:2,16 90:9 145:15

**u**

**u** 83:12

**u.s.** 2:5,10 153:20

**unable** 80:13 84:13

**unclear** 74:4

**uncomfortabl...** 90:25

**under** 7:9 83:22 90:4 104:13 137:6 140:24,24

**undergo** 106:12

**undergoing** 66:22

**underlying** 91:1

**understand** 7:9 7:15 10:7,8 11:20 25:21 26:15 27:7 30:3 34:13 37:10 47:8 49:4 54:6 55:6 56:13 57:22 70:25 81:6 100:1 109:23 115:13 115:19 132:25 136:22 137:1 139:9 140:3 142:10

**understanding** 29:24 62:7 74:11 140:13,15

**understood** 7:17 107:15 109:11

**underwent** 72:15 105:1

**unfit** 84:8

**unfortunately** 115:21 123:2

**unit** 4:13

**units** 68:11 152:9

**university** 6:22 7:4

**unmeasured** 104:18 119:10 119:15

**unprotected** 140:11,11,17

**unusual** 87:5 125:1 130:14

**ups** 71:11

**uptake** 77:10

**urgent** 17:23 21:5 46:21 47:5 48:4,12 49:11 50:24 51:1 53:11 94:20 110:13

**use** 24:7,10 102:14 148:5,12 148:20

**used** 24:13 105:12

**useless** 94:6

**using** 42:17

**usual** 90:2

**usually** 9:8 23:21,25 86:17 87:16 92:5 93:2 93:25 144:21 145:18

**v**

**vague** 140:23,23

**valid** 80:14

**validate** 133:15

**validity** 88:7

**various** 5:14 34:2 73:17 114:5 146:9

**vehicle** 33:14

**verify** 88:3 133:15 134:13

**veritext** 1:23 2:23 4:23,25 152:10

**vermont** 6:23

**versus** 1:7 69:14 69:18 70:11,15 70:24 71:6,25 136:20

**vicinity** 39:24

**video** 1:13 4:10 4:13 152:19 154:9

**videographer** 2:22 4:3,24 5:22 6:9 68:9,10,16 68:22,25 101:22 101:25 122:7,10 148:21,24 152:6

**virgin** 1:1 2:5 2:10 4:19 101:11,12

**virtually** 4:6

**visit** 17:23 19:22 48:17 50:24,25 66:17 67:6 77:3 86:4,5

Veritext Legal Solutions

800-726-7007

305-376-8800

**Exhibit 4**

**[visits - work]**

**visits** 70:14 85:11,23 87:3 131:17,21,25

**vocs** 34:15 35:3

**vomited** 49:2,5 49:15

**vomiting** 49:18

**vs** 4:16 137:17

**w**

**w** 6:19 32:7

**wait** 72:10

**waive** 152:2,4,5

**wake** 25:2

**walk** 83:3,15

**want** 13:5 16:7 27:17 29:13,17 58:12 68:17 83:9,10 90:21 98:6 101:8 111:21 115:1 126:23 127:13 127:13,14 128:3 128:9 139:14 147:23 152:4

**wanted** 20:5 38:3 98:5 129:6 147:7,17 149:14

**wants** 57:16 58:15

**water** 23:7

**way** 9:23 26:20 26:21 27:9 28:23 37:14

45:19 60:24 61:1 63:23 69:17 88:6 90:21 97:25 99:8 100:23 104:20 110:6 120:21,22 134:1 134:18 135:14 139:16 145:23 146:14

**we've** 72:15 81:12 87:9 90:5 94:1 112:25 118:25 130:17

**wear** 59:2

**wearing** 39:24

**weaver** 2:22 4:23

**week** 38:2 103:18,24

**weeks** 31:23 32:3,12,14,25 33:4 59:17 103:20 104:14 118:18

**welcome** 124:22

**went** 16:11 20:21 37:15 47:3,5 48:4 49:14 51:3,10 53:11 65:24 66:5,25 89:11 143:21

**west** 1:9 4:18

**whatsoever** 39:25

**wheezing** 17:25 94:25 149:13

**white** 11:7,12

**wilkenfeld** 1:13 3:3 4:14 6:4,18 139:5 149:3 150:6,18,24 151:15,21 152:8 153:8 154:9

**williams** 1:22 4:25 153:6,14 154:6,22

**window** 16:22 21:4 30:14,22

**wise** 33:15

**wish** 138:19

**witness** 1:16 3:2 4:9 5:23,25 6:7 68:21 101:16,21 122:3,6 136:9 136:16,22 137:25 139:1 149:1 150:20 151:22 152:4,5 152:18

**woman** 46:21 47:2 48:18

**wonder** 98:8

**wooten** 1:5 4:16 5:21 25:10 30:7 35:23 36:3 41:7

41:18 43:21 49:19 52:22 53:8 65:24 66:5 66:25 71:10 72:15 73:15 74:14 75:14 76:15 80:4,7 81:19 84:14 88:14 89:8 90:13 94:7 113:23 117:13 118:9 123:10 129:10 138:8 139:14,17 144:5 146:9,18 150:7

**wooten's** 13:8 16:15 30:19 33:2,14 34:9 59:19 69:4 85:10 90:18 93:17 95:7 100:19 109:18 116:4 130:1,6 131:4 149:4

**word** 33:21 95:22 100:4 103:22

**words** 13:18 16:8

**wore** 141:12

**work** 20:4,7,20 49:15 52:23 53:3 84:13 91:2 130:6,9,11,16

Exhibit 4

130:23 137:25 144:18,19
**worked** 51:20
**worker** 98:23
**workers** 99:1,4 100:9,15,16 116:22 121:19 136:19
**working** 124:5 124:14
**workplace** 8:11 8:15 27:23
**world** 14:14,22 15:11 104:23 105:23 106:23 107:19,22 108:14,15
**worried** 20:18 135:23
**worse** 47:17 58:2 67:2 79:13
**worsening** 65:25 66:6,17 67:14,19 69:5 72:11 74:13 89:13 118:17,21 131:12,14 133:10 144:22 145:2,7,22,23 145:24
**write** 136:5
**writing** 151:12
**written** 28:23

**wrong** 48:13 133:23 134:9,11
**wrote** 43:6,11 90:19,22 95:11 96:12 109:10 151:11

**x**

**x** 3:1 22:25 76:4 78:12 126:14 153:19

**y**

**y** 32:7 67:10
**y'all** 152:3
**yeah** 7:8 9:25 17:22 20:9 21:9 23:15,21 30:24 31:1,12 33:8 41:3,23 46:10 47:12 49:3 51:20 53:24 54:1 67:25 68:21 97:7 117:21 118:7 119:3 122:3 128:19,19 129:8 143:20 145:4 147:13 148:11
**year** 8:4,6 28:14 130:4
**years** 7:2 15:13 19:23 26:4 70:23 80:11 89:11 95:2

108:12 114:5 129:1 135:10 146:19
**yep** 85:18 135:22
**york** 6:24

**z**

**z** 67:10
**zero** 100:16 120:23
**zoom** 1:13 2:3,9 2:15,22 4:22 19:4 152:19 153:8 154:10
**zyrtec** 67:9,11 67:12

**Exhibit 4**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit 4**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

**Exhibit 4**

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit 4**