DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

NICOLE WOOTEN,

          Plaintiff,

          v.

LIMETREE BAY TERMINALS d/b/a
OCEAN POINT TERMINALS, PORT
HAMILTON REFINING &
TRANSPORTATION, WEST INDIES
PETROLEUM LTD., and LIMETREE BAY
REFINERY, LLC, as a nominal Defendant,

          Defendants.

Case No. 1:23-CV-00012

**ACTION FOR DAMAGES**

<u>JURY TRIAL DEMANDED</u>

## <u>OCEAN POINT TERMINALS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. MARC WILKENFELD, M.D.</u>

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND....................................................................................................................2

    A. Dr. Wilkenfeld's Retention and Report ...........................................................................2

    B. The August 8, 2022 Exposure .........................................................................................2

    C. Ms. Wooten's Medical History Prior to August 8, 2022 .................................................3

III. LEGAL STANDARD .........................................................................................................3

IV. ARGUMENT.......................................................................................................................4

    A. Dr. Wilkenfeld Followed No Scientific Methodology, and Plaintiff Cannot Carry Her Burden of Demonstrating That a Reliable One Exists.................................................................4

    B. Dr. Wilkenfeld's Opinion Rests on No Quantitative Foundation and on Scientific Literature He Admitted Does Not Apply to This Case. .............................................................6

        1. The Dose Problem ....................................................................................................6

        2. The Studies Problem..................................................................................................8

    C. Dr. Wilkenfeld Performed No Differential Diagnosis and Failed to Consider or Rule Out Multiple Documented Alternative Causes of Ms. Wooten's Condition. ...................................9

        1. Natural Progression of Preexisting Asthma .........................................................10

        2. The August 10 Landfill Fire Exposure...................................................................10

        3. Anxiety and Psychiatric Disorders .......................................................................11

        4. Deconditioning and Obesity...................................................................................11

        5. The RADS Diagnosis Does Not Cure These Failures.............................................11

    D. Dr. Wilkenfeld's Causation Opinion Is the Product of Circular Reasoning That the Third Circuit Has Specifically Condemned, and It Finds No Support in the Objective Record.......12

V. CONCLUSION ...................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)......................................................................................................3

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...............................................................................................5, 9, 14

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)....................................................................................5, 10, 12

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003).........................................................................................3, 4

*Smith v. Katz*,
    No. CIVIL 2010-39, 2013 WL 1182074 (D.V.I. Mar. 22, 2013), aff'd, 696 F. App'x 582 (3d
    Cir. 2017) ....................................................................................................................9

**Rules**

Federal Rule of Evidence 702 ................................................................................... passim

Rule 56 ...........................................................................................................................1

## I.  INTRODUCTION

When asked at deposition whether he followed any scientific methodology in reaching his opinions, Plaintiff's causation expert said no. What he produced is a letter-format report that reaches a causation conclusion without performing any of the analytical steps that causation requires. There is no dose calculation, no differential diagnosis, no applicable scientific literature, and no methodology capable of connecting a brief, unquantified exposure to the permanent lung injury he claims resulted. He gestured at specific causation. He did not achieve it.

OPT has separately moved for summary judgment on the ground that, even accepting Dr. Wilkenfeld's opinions as admissible, the evidentiary record is legally insufficient to establish specific causation under Virgin Islands law. That motion addresses sufficiency under Rule 56. This motion addresses the threshold question of whether Dr. Wilkenfeld's opinions satisfy the requirements for admissibility under Federal Rule of Evidence 702. The two questions are analytically distinct, governed by different standards, and the Court need not reach the Rule 56 question if it grants this motion.

The record establishes that he conducted no dose analysis, applied no reliable methodology to the specific facts of this case, performed no differential diagnosis, and built his causation opinion on a circular inference unsupported by any applicable science. Every one of those failures is established by his own testimony.

What Dr. Wilkenfeld did was reason in a circle. He inferred toxic exposure levels from symptoms. He then attributed those symptoms to the inferred toxic exposure. There is no independent anchor in that process, because there is no methodology. Federal Rule of Evidence 702, as amended in 2023, requires that expert testimony reflect a reliable application of reliable principles to sufficient

1

facts and data. It places the burden on the proponent to demonstrate that each element of the Rule is satisfied by a preponderance of the evidence. Plaintiff cannot meet that burden here.

Dr. Wilkenfeld also acknowledged at his deposition that a court has previously excluded his testimony under Daubert or similar standards. He could not recall the case. OPT respectfully submits that this Court should reach the same result for the reasons detailed below.

## II.  BACKGROUND

### A.  Dr. Wilkenfeld's Retention and Report

Plaintiff retained Dr. Marc Wilkenfeld, M.D. through Cahn Litigation Services to opine on causation and the extent of Ms. Wooten's alleged disease. Dr. Wilkenfeld is a board-certified occupational and environmental medicine physician and Clinical Assistant Professor of Medicine at New York University Long Island School of Medicine. He issued a letter-format report dated August 5, 2025, addressed to Plaintiff's counsel. He did not examine Ms. Wooten; his opinions are based entirely on a review of the records provided by Plaintiff's counsel.

Dr. Wilkenfeld states that he reviewed the complaint, medical records, workers' compensation file, interrogatory responses, depositions, incident summaries, air monitoring data, and photographs, and conducted a literature search to confirm the health effects of individuals exposed to smoke from refinery fires. His report cites three studies in support of his causation opinion: Byrwa-Hill et al. (2021), Morphew et al. (2021), and Johnson et al. He concluded that Ms. Wooten was exposed to toxic substances at levels many times higher than those that are toxic to the respiratory system, that her condition is permanent, and that she is totally disabled from exertional activity.

### B.  The August 8, 2022 Exposure

Ms. Wooten was employed by U.S. Customs and Border Protection. On August 8, 2022, she drove to the Limetree Bay facility to conduct an inspection at the tugboat dock. While at the entrance to the tugboat parking area, she rolled down her car window for less than a minute, briefly spoke with

2

individuals nearby, and then rolled it back up. No personal air monitoring was conducted on Ms. Wooten during or after the incident.

## C. Ms. Wooten's Medical History Prior to August 8, 2022

Ms. Wooten has had a history of asthma since the age of five. Her 2018 pre-employment physical for U.S. Customs and Border Protection documented that history and noted she was asymptomatic, with normal flow volumes and normal diffusing capacity, requiring no treatment and no restriction on employment.

In the months before August 8, 2022, her asthma was actively worsening. On July 15, 2022, twenty-four days before the incident, her treating physician attributed worsening symptoms to Saharan dust exposure and prescribed four new medications. On August 10, 2022, two days after the refinery incident, she visited a separate urgent care facility and received a steroid injection following exposure to fumes from a landfill fire.

## III.  LEGAL STANDARD

Federal Rule of Evidence 702 permits expert testimony where the proponent demonstrates, by a preponderance of the evidence, that the expert's scientific, technical, or specialized knowledge will help the trier of fact; that the testimony is based on sufficient facts or data; that it is the product of reliable principles and methods; and that the expert has reliably applied those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. The 2023 amendments to Rule 702 made explicit what the rule had always required the court to find that each element is satisfied, not merely that a plausible basis exists, and the burden rests on the proponent throughout. The district court serves as gatekeeper, ensuring that expert testimony meets these requirements before it reaches the jury. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).

Within that framework, the Third Circuit requires that expert testimony satisfy three requirements, which include qualification, reliability, and fit. *See Schneider ex rel. Estate of Schneider*

3

*v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Each is a distinct requirement, and failure on any one is independently sufficient for exclusion.

## IV.  ARGUMENT

**A.  Dr. Wilkenfeld Followed No Scientific Methodology, and Plaintiff Cannot Carry Her Burden of Demonstrating That a Reliable One Exists.**

Rule 702 requires that expert testimony be the product of reliable principles and methods reliably applied to the facts of the case. The proponent bears the burden of demonstrating that requirement is satisfied. *Schneider*, 320 F.3d at 404. Where an expert has followed no methodology at all, there is nothing to evaluate and nothing to defend. That is this case, established not by inference from the structure of his report, but by his own sworn testimony and by the report itself.

Dr. Wilkenfeld was asked directly at deposition whether he followed any specific scientific methodology in reaching his opinions. He said no. He was asked whether he followed any established guidelines. He said no. He was asked to describe the methodology he did follow. He said: "I just said no….I said no." *See* excerpts from the November 10, 2025 Deposition Transcript of Marc Wilkenfeld, attached hereto as **Exhibit 1** ("Wilkenfeld Depo."), at 25:13–25. He later elaborated that his method was to review the medical history, the test results, and the substances she was exposed to and then provide an opinion. When asked whether he could point to any published peer-reviewed article, or any publication at all, that describes that approach as an accepted method for determining causation in an occupational exposure case, he acknowledged he could not. *See* Exh. 1, Wilkenfeld Depo., at 27:13–29:20.

The report confirms the problem independently. Dr. Wilkenfeld states that he conducted his literature search to "confirm the health effects of individuals exposed to smoke from refinery fires." *See* Dr. Marc Wilkenfeld Expert Report attached hereto as Exhibit 2, at NW003810. That framing reveals the analytical sequence. He reached his causation conclusion first and then searched for

4

literature to support it. Scientific methodology runs in the other direction. A reliable expert applies accepted principles to the facts and follows them to a conclusion. An expert who begins with the conclusion and searches for confirmation is not applying methodology at all.

Those admissions are fatal under Rule 702. The rule requires that testimony be the product of reliable principles and methods. An expert who has followed no methodology, who cannot identify the methodology he used, cannot name the guidelines he applied, and cannot point to a single publication recognizing his approach as accepted, provides no basis for the court to find that the reliability requirement is satisfied. The proponent cannot carry a burden she cannot even define. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742–44 (3d Cir. 1994) (expert opinion must be based on "methods and procedures of science," not "subjective belief or unsupported speculation").

Dr. Wilkenfeld's defense was that his approach is how acute occupational exposure cases are handled clinically and that it is "taught in every occupational medicine residency." *See* Exh. 1, Wilkenfeld Depo., at 27:5-29:1. But he could not point to a single text, treatise, guideline, or peer-reviewed article establishing that. Instead, he stated it is "done thousands and thousands of times every year so, you know, if that means it's accepted, then there it is." *See* Exh. 1, Wilkenfeld Depo., at 28:7–15. General acceptance cannot be established by the ipse dixit of the expert whose opinion is under review. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is precisely the kind of bare assertion Rule 702 is designed to exclude.

The contrast with Dr. Wilkenfeld's own published research confirms the gap and was established through his own testimony. In his peer-reviewed publications, he described his methodology explicitly, identified how he selected subjects, reported his statistical analysis, acknowledged limitations, and distinguished carefully between association and causation. *See* Exh. 1, Wilkenfeld Depo., 105:6–107:10. He applied none of that rigor here. When asked whether he could

5

show the court where his report in this case applied similar discipline, he acknowledged he could not. *See* Exh. 1, Wilkenfeld Depo., at 105:20–106:16. His response, that peer review does not apply to clinical case reports, confirms rather than cures the deficiency. If his methodology is not subject to any of the safeguards he applies to his published work, there is no basis to find it reliable.

**B.  Dr. Wilkenfeld's Opinion Rests on No Quantitative Foundation and on Scientific Literature He Admitted Does Not Apply to This Case.**

Rule 702 requires that an expert's opinion be based on sufficient facts or data and that he reliably apply his principles to the facts of the case. Dr. Wilkenfeld's causation opinion fails both requirements. He never calculated or estimated Ms. Wooten's exposure dose. He never performed atmospheric dispersion modeling to estimate what concentrations of any substance would have reached her location. And the three studies he offered as scientific support all address long-term community exposure measured in weeks and months, a factual scenario he acknowledged is not comparable to this one without a dose-response analysis he never performed.

1.  The Dose Problem

Dr. Wilkenfeld's report states that Ms. Wooten was exposed to toxic substances at levels "many times higher than those that are toxic to the respiratory system." *See* Exh. 1, Wilkenfeld Depo., at 35:22-36:1. At deposition, he was asked to identify the specific level she was exposed to. He could not. He was asked how many times higher than toxic her exposure was. He said "I don't know." *See* Exh. 1, Wilkenfeld Depo., at 38:24-39:3. He was asked whether he even knew what the toxic level was. He stated "I don't recall." *See* Exh. 1, Wilkenfeld Depo., at 39:4–6. He was asked how he could state the exposure was many times higher than toxic if he did not know the actual level or the toxic threshold. He gave the answer that defines his entire methodology: "Because of her reaction to it." *See* Exh. 1, Wilkenfeld Depo., at Wilkenfeld Dep. 39:2–17. He used her symptoms to establish that the

6

exposure must have been at toxic levels and then used the inferred toxic level to explain her symptoms. There is no independent measurement to anchor either conclusion.

The basis he did offer, that the levels were "above the odor threshold," does not save the opinion. He acknowledged at deposition that odor thresholds do not establish toxic exposure levels. Sulfur dioxide, for example, has an odor threshold that is a hundred to a thousand times below its harmful level, which he confirmed. *See* Exh. 1, Wilkenfeld Depo., at 42:3–8. When questioned about whether levels were above the odor threshold tells us whether the levels were toxic, he stated "Yes, you're correct", meaning it does not. *See* Exh. 1, Wilkenfeld Depo., at 43:11–18. His own concession eliminates the only quantitative basis he offered.

The deficiency is not merely that the dose was unknown.  It is that Dr. Wilkenfeld lacked the foundational knowledge a competent expert would need to even begin the analysis. Sulfur dioxide is the chemical he emphasized most in his report. *See* Wilkenfeld Depo. at 40:17–20. He could not identify the OSHA permissible exposure limit for sulfur dioxide. *See id*. at 40:21–23. He could not identify the NIOSH recommended exposure limit. *See id*. at 40:24-41:3. He could not identify the NIOSH immediately dangerous to life and health level. *See id*. at 41:4–6. And when asked directly whether he had determined that Ms. Wooten was exposed to a level exceeding any regulatory limit applicable to the chemicals he identified, his answer was unequivocal: "No, I did not." *See id*. at 41:7–17. An expert who cannot identify the regulatory thresholds for the chemical he emphasizes most, and who concedes he never determined whether exposure exceeded those thresholds, has not performed dose analysis. He has avoided it.

Moreover, Dr. Wilkenfeld did not perform atmospheric dispersion modeling to estimate concentrations at Ms. Wooten's location, approximately 300 feet from the dome. *See id.* at 34:1–7. He did not attempt a dose-response analysis because, in his words, "I did not believe it was relevant" and

"I didn't see any way to do so in this case. We didn't have the data." *See id.* 45:9–20. The monitoring data he reviewed showed no exceedances of any regulatory threshold. Not one air sample in the record showed sulfur dioxide levels above the OSHA permissible exposure limit. *See id.* at 44:8–11. Not one showed levels above the NIOSH recommended exposure limit. *See id.* at 44:12–14. He did not mention any of that in his report. *See id.* at 44:15–45:20. When asked why he performed no dose-response analysis, he said he did not see any way to do so because the data was unavailable. *See id*.

The data was not unavailable. It showed no exceedances. Those are different things. Severity of symptoms proves that Ms. Wooten had a reaction; it does not prove the concentration that produced it. That circularity is the subject of Argument D below.

### 2. The Studies Problem

Dr. Wilkenfeld cited three studies in his report to support his causation opinion: Byrwa-Hill et al. (2021), Morphew et al. (2021), and Johnson et al. At deposition, he confirmed that all three involved community residents exposed to coke emissions over weeks or months: Morphew involved months of exposure, Johnson involved a refinery fire that burned for seven weeks, and Byrwa-Hill involved an ongoing chronic community exposure. *See* Exh. 1, Wilkenfeld Depo., at 32:2–15. He acknowledged that comparing those studies to a single exposure of minutes in duration requires some dose-response analysis to bridge the gap. *See* Exh. 1, Wilkenfeld Depo., at 32:18–33:13. He performed none.

At the later portion of his deposition, he was asked whether he could cite any peer-reviewed study examining respiratory outcomes from brief exposures under five minutes. He could not. *See* Exh. 1, Wilkenfeld Depo., at 104:11–15. He was asked whether he could cite any study supporting the proposition that exposure of one to two minutes to unmeasured concentrations of smoke causes permanent lung injury. He could not. *See* Exh. 1, Wilkenfeld Depo., at 104:16–21. He was asked whether he performed any analysis to determine how findings from seven weeks of community

8

exposure would translate to Ms. Wooten's exposure. He said no. *See* Exh. 1, Wilkenfeld Depo., at 103:23–104:10.

This is not a gap in supporting evidence. It is an unbridgeable analytical void. Studies of weeks-long community exposures say nothing about whether a single brief outdoor exposure causes permanent lung injury without a translation methodology applied to the specific facts of this case. *Joiner*, 522 U.S. at 146 (courts need not admit opinion evidence connected to existing data "only by the ipse dixit of the expert"). Dr. Wilkenfeld acknowledged the gap, acknowledged that bridging it would require dose-response analysis, and acknowledged he did not perform that analysis. The studies he cited do not support the opinion he reached, and he cannot explain why they should.

## C. Dr. Wilkenfeld Performed No Differential Diagnosis and Failed to Consider or Rule Out Multiple Documented Alternative Causes of Ms. Wooten's Condition.

In toxic tort cases, the Third Circuit requires that an expert establishing specific causation perform a reliable differential diagnosis: identify the possible causes of the plaintiff's condition and systematically rule out alternatives, providing reasons for accepting one cause while rejecting others. *Smith v. Katz,* No. CIVIL 2010-39, 2013 WL 1182074, at *6 (D.V.I. Mar. 22, 2013), aff'd, 696 F. App'x 582 (3d Cir. 2017) ("Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is, the process of eliminating other possible diagnoses."). The requirement is not a formality. It is the mechanism by which an expert demonstrates that his conclusion follows from analysis rather than assumption. Dr. Wilkenfeld acknowledged the concept, acknowledged that he teaches it to his students, and then acknowledged he did not do it.

When asked whether he performed a differential diagnosis in this case, he stated "[d]id I list all the possible alternative causations in the report and rule them out one by one, no, I did not." *See* Exh. 1, Wilkenfeld Depo., at 112:2–7. When asked whether he could show the court anywhere in his

9

report where he ruled out alternative causes, he said no. *See* Exh. 1, Wilkenfeld Depo., at Wilkenfeld Dep. 111:5–8. When asked whether he could show where he distinguished between Ms. Wooten's preexisting asthma and any alleged new injury, he said no. *See* Exh. 1, Wilkenfeld Depo., at 111:9–12. When asked whether he addressed the August 10 landfill fire exposure in his report, he said no. *See* Exh. 1, Wilkenfeld Depo., at 111:13–15. The only alternative cause he considered was cardiac disease. *See* Exh. 1, Wilkenfeld Depo., at 112:11–13.

The alternatives he failed to consider are not speculative. They are documented in the medical record he reviewed and in his own testimony.

1. Natural Progression of Preexisting Asthma

He acknowledged that Ms. Wooten's asthma was progressively worsening in the months before August 8, 2022. *See* Exh. 1, Wilkenfeld Depo., at 69:4–7. He acknowledged that April 2022 and July 2022 records documenting that worsening were important to his analysis. *See* Exh. 1, Wilkenfeld Depo., at 66:4 – 67:4. He could not explain why he did not mention them in his report. When asked directly whether he performed any analysis to determine whether Ms. Wooten's post-incident symptoms represent natural progression of preexisting disease versus new injury from the August 8 exposure, he said no. *See* Exh. 1, Wilkenfeld Depo., at 69:12–16. When asked how much of her current condition is due to natural progression versus the alleged exposure, he said: "I can't." *See* Exh. 1, Wilkenfeld Depo., at 71:4–9. A causation opinion that cannot separate its proposed cause from a preexisting condition that was already worsening on the same trajectory is not specific causation. It is speculation. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 767 (3d Cir. 1994) (excluding a medical causation expert where the expert failed to rule out possiblealternative causes).

2. The August 10 Landfill Fire Exposure

Two days after the refinery incident, Ms. Wooten was exposed to fumes from a burning landfill. She developed identical symptoms, required a steroid injection, and was treated at a separate

10

urgent care facility. Dr. Wilkenfeld did not analyze the chemical composition of the landfill smoke, performed no literature search on landfill fire emissions, and made no effort to determine what substances she was exposed to on August 10. *See* Exh. 1, Wilkenfeld Depo., at 62:1–3; 64:4–14; 65:11–15. When asked whether he could say with a reasonable degree of medical certainty which event caused her post-August 10 symptoms, he said he could not rule out that the August 10 event was a contributing factor and that the two events were, in his word, entwined. *See* Exh. 1, Wilkenfeld Depo., at 61:1–7. He attributed all ongoing symptoms to August 8 without performing any analysis of the event that occurred two days later and produced the same clinical picture.

> 3. Anxiety and Psychiatric Disorders

Ms. Wooten carries documented diagnoses of anxiety, PTSD, and major depressive disorder. Dr. Wilkenfeld acknowledged these diagnoses and acknowledged that he did not consider them as possible causes of her respiratory symptoms. *See* Exh. 1, Wilkenfeld Depo., at 109:2–4; 113:4–6. He could not show in his report where he ruled them out. *See* Exh. 1, Wilkenfeld Depo., at 113:9–11. He acknowledged in his own published research that symptoms can be associated with psychological factors rather than toxic exposure, and that in that research he was careful to analyze that possibility. He did not do so here.

> 4. Deconditioning and Obesity

He did not consider deconditioning or obesity as possible causes of exercise intolerance. *See* Exh. 1, Wilkenfeld Depo., at 113:12–14.)

> 5. The RADS Diagnosis Does Not Cure These Failures

Dr. Wilkenfeld invokes Reactive Airway Dysfunction Syndrome as the diagnosis. RADS has specific diagnostic criteria, including a high-concentration threshold exposure and objective evidence of persistent airway obstruction. *See* Brooks S.M. et al., *Reactive Airways Dysfunction Syndrome (RADS)*, 88 Chest 376 (1985), attached hereto as **Exhibit 3**. He never established that Ms. Wooten's

11

exposure met the high-concentration threshold because he never calculated or estimated any concentration. He acknowledged that there are no objective test results. *See* Exh. 1, Wilkenfeld Depo., at 127:5–17. Invoking the RADS label without establishing any of its foundational criteria is not a methodology. It is a diagnosis applied to a conclusion already reached by other means.

The differential diagnosis requirement exists precisely to prevent this. An expert who begins with the conclusion that an exposure caused a plaintiff's injury and then fails to consider alternatives that are documented in the record is not performing specific causation analysis. He is advocating a result.

### D. Dr. Wilkenfeld's Causation Opinion Is the Product of Circular Reasoning That the Third Circuit Has Specifically Condemned, and It Finds No Support in the Objective Record.

The Third Circuit has held that an expert in a toxic tort case cannot use a plaintiff's symptoms as proof of exposure and then use the existence of that inferred exposure to explain the symptoms. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759 (3d Cir. 1994). That is precisely what Dr. Wilkenfeld did, and his own testimony establishes it with unusual clarity.

His report states that Ms. Wooten was exposed to toxic substances at levels "many times higher than those that are toxic to the respiratory system." When asked how he knew the levels were many times higher than toxic, he said he did not know how many times higher. When asked whether he knew what the toxic level was, he said he did not recall. When asked how he could state the levels were many times higher than toxic if he did not know the actual level or the toxic threshold, he gave the answer that defines his entire methodology: "Because of her reaction to it." *See* Exh. 1, Wilkenfeld Depo., at Dep. 39:2–17. He used her symptoms to establish the exposure level. He then used the inferred exposure level to explain her symptoms. There is no independent anchor. The opinion proves itself.

12

He acknowledged at deposition that the Bradford Hill criteria are generally accepted in the field of occupational medicine for establishing causation and that he considers them a reliable methodology. *See* Exh. 1, Wilkenfeld Depo., at 14:4–13. Walking through each criterion against the record confirms why the circular reasoning is fatal.

Strength of association: he acknowledged he did not quantify it. *See* Exh. 1, Wilkenfeld Depo., at 116:6–8. Consistency: when asked whether the absence of any other reported injury among workers exposed to the same smoke undermines Bradford Hill consistency, he conceded that if no other workers had symptoms, "that would be important to know." *See* Exh. 1, Wilkenfeld Depo., at 115:23–117:4. He did not establish a dose-response. he did not establish one. *See* Exh. 1, Wilkenfeld Depo., at 118:25-119:3. Coherence: when asked whether his opinion is coherent with there being no other reported injury claims from the incident, he answered: "If there were truly no other reports, then no." *See* Exh. 1, Wilkenfeld Depo., 121:2–5. Analogy: he could not point to any studies, peer-reviewed reports, or reliable medical journals describing analogous situations where brief exposures caused similar permanent injury. *See* Exh. 1, Wilkenfeld Depo., at 121:16–25. Each criterion he invoked as reliable independently failed when applied to the facts of this case.

The objective medical record reinforces the problem. Dr. Wilkenfeld acknowledged at deposition that all objective tests, which include the bronchoscopy, CT scans, chest X-rays, and CPET, were normal. *See* Exh. 1, Wilkenfeld Depo., at 23:3–6. When asked directly whether there is any objective evidence of permanent lung injury, he conceded, stating "[t]here are no objective test results, correct." *See* Exh. 1, Wilkenfeld Depo., at 127:5–17. His report states that her condition is permanent, and he confirmed at deposition that is his own conclusion. But when asked what objective evidence supports a finding of permanent injury, his answer was her symptoms and the conclusion of her employer's examining physician. *See* Exh. 1, Wilkenfeld Depo., at 127:18–128:1. Symptoms that are

13

admittedly consistent with preexisting asthma regardless of any August 8 exposure, and the conclusion of a physician whose basis he did not independently verify, are not objective evidence of permanent injury. They are a restatement of the conclusion he was retained to prove.

*Joiner* requires more than a logical leap from data to conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). There is no data here because there is no measured exposure, no dose calculation, no applicable scientific literature, no differential diagnosis, and no objective evidence of the injury claimed. Dr. Wilkenfeld's conclusion that Plaintiff was exposed at levels many times higher than toxic is based solely on Dr. Wilkenfeld's say-so. Rule 702 does not permit that.

## V.  CONCLUSION

Dr. Wilkenfeld was asked whether he followed any specific scientific methodology in reaching his causation opinion. He said no. That answer, under oath, frames everything that follows: no dose calculation, no applicable scientific literature, no differential diagnosis, and a causation inference built entirely on the symptoms it was retained to explain.

Rule 702 places the burden on Plaintiff to demonstrate by a preponderance of the evidence that his opinion is the product of reliable principles and methods reliably applied to the facts of this case. She cannot. There are no principles to identify and no methods to evaluate.

For the foregoing reasons, Ocean Point Terminals respectfully requests that the Court exclude the expert testimony of Dr. Marc Wilkenfeld, M.D. on the issue of specific causation.

14

Date:  April 7, 2026

**AKERMAN LLP**
201 East Las Olas Boulevard,
Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224


By: /s/Donnie M. King
**Donnie M. King**
Virgin Islands No. 1237
donnie.king@akerman.com
tyresa.thompson@akerman.com
**Eric D. Coleman** (admitted *pro hac vice*)
eric.coleman@akerman.com
lauren.change-williams@akerman.com
**Reginald E. Janvier** (admitted *pro hac vice*)
reginald.janvier@akerman.com
sharon.luesang@akerman.com
*Counsel for Defendant Limetree Bay*
*Terminals, LLC d/b/a Ocean Point Terminals*

15

16

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed with the Court's electronic filing system on

April 7, 2026 which will send a notice of electronic filing to all counsel of record.


*/s/Donnie M. King*
Donnie M. King