# Exhibit 1

Page 1

3.2 DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX
CIVIL ACTION NO.:  1:23-cv-00012


NICOLE WOOTEN,
          Plaintiff,
versus
LIMETREE BAY TERMINALS d/b/a OCEAN POINT TERMINALS,
PORT HAMILTON REFINING AND TRANSPORTATION,
and WEST INDIES PETROLEUM LTD.,
          Defendants.
_____/


     VIDEO DEPOSITION OF DR. MARC WILKENFELD VIA ZOOM


        DATE TAKEN:   Monday, November 10, 2025


             TIME:    11:03 a.m. until 3:31 p.m.


WITNESS LOCATION:    (Remote Location)
                     Jerusalem, Israel


    This cause came on to be heard at the time and
place aforesaid, when and where the following
proceedings were stenographically reported by:
                Stacey G. Williams
             Registered Professional Reporter
     Coastal Court Reporters/Veritext Legal Solutions
            St. Augustine/Jacksonville, Florida
                   (904) 824-3525

you evaluate a clinical case, you're dealing with many, many different issues.  You're looking at the specificity of what the substance was.  You have to look at the temporality.  Okay.  There's just -- you know, you want a yes or no answer and the answer is not yes or no so ...

Q    What specificity did you have with respect to Ms. Wooten's exposure in this case?

A    We knew that she was exposed to coke emissions and we know what's contained in coke emissions.

Q    What about temporality in this case?

A    Right, so she had an immediate reaction to an exposure.

Q    Did you establish the dose of that exposure?

A    We established that it was over the odor threshold, but, no, we did not -- we did not have a reading.

In other words, you're asking me whether we had a personal reading, like we had a machine next to her nose and her mouth so we know exactly how much she breathed in; is that your question?

Q    I'm asking you if you established any sort of dosage level in this case.  And I think you answered it, odor threshold only, correct?

A    That's correct, yes.

Page 14

Q    Are you familiar with the Bradford Hill criteria for establishing causation?

A    Sure am.

Q    In your practice, do you apply the Bradford Hill criteria when evaluating causation?

A    At times, yes.

Q    Are the Bradford Hill criteria generally accepted in the field of occupational medicine for establishing causation?

A    Yes.

Q    Do you consider the Bradford Hill criteria to be a reliable methodology?

A    Yes.

Q    You served on the EPA World Trade Center Expert Technical Review Panel from October 2003 to December 2004, correct?

A    I'm very proud of that, yes.

Q    And in that capacity you reviewed scientific evidence about exposures and health effects, correct?

A    Yes.

Q    And you required dose quantification when evaluating health effects from exposures from the World Trade Center terrorism in September 2001, correct?

A    Well, that's a really good point.  I think that's what I've been trying to tell you.  At times we

Page 22

incident?

A    I don't recall.

Q    And did you review medical records for the months before the August 8th, 2022 incident?

A    Yes, I did.

Q    And you did not include them in your report so, therefore, you did not consider them relevant, correct?

A    Well, I think I've explained to you that the most relevant evaluation was the pre-placement evaluation in 2018, right.  Now whether she had episodes in between that date and the date of her toxic exposure, the only difference would be that it would make her more prone to react to the toxic chemicals.

Q    Did you review any bronchoscopy reports as part of your rendering your opinion in this case?

A    Yes, I did.

Q    Did you review any CT scan reports as part of your reaching your opinion in this case?

A    Yes, I did.

Q    Did you review any cardiopulmonary exercise testing or CPET testing reports as part of your analysis in this case?

A    Yes, I did.

Q    Did you review any chest X-ray reports as part

of your analysis in this case?

A    Yes, I did.

Q    Generally speaking, what did all those objective tests show?

A    All of the tests, except for the pulmonary function, test were normal.

Is it okay if I drink some water?

Q    Absolutely.

A    Thank you.

Q    You have extensive clinical experience with individuals experiencing exasperation [sic] of asthma after exposure to smoke or petroleum products, correct?

A    You mean exacerbation?

Q    Yes.

A    Yeah, I do.

Q    And, based upon that extensive clinical experience, when someone has true asthma exacerbation from toxic exposure, do you typically see objective findings on pulmonary function tests?

MS. SEILA:  Objection, form.

A    Usually, yes.  Yeah --

MS. SEILA:  Go ahead.  Sorry.

Q    Do you typically see objective findings on chest imaging?

A    No, usually not.

Page 24

Q   Do you typically see findings on a bronchoscopy if the condition is severe?

A   Generally not, no.

Q   Did anyone assist you in preparing your report?

A   Nope.

Q   Did you use artificial intelligence like ChatGPT or Grok in preparing your report?

A   No.  I never do.

Q   Did you use any specific guidelines or standards in preparing your report?

Did you hear my question?

A   You asked if I used specific guidelines and I said no.

Q   Oh, I'm sorry.  I did not hear your answer.  I apologize.

A   I'm sorry.

Q   We could have been looking at each other for a long time.

A   Right, right, eight.

Q   You're familiar with the expression "correlation is not causation," correct?

A   Yes, I am.

Q   Do you agree with that?

A   Again, when someone has an exposure and they

have immediate response and they get sick, when they wake up in the morning, they're okay and then they have a chemical exposure and they develop symptoms immediately, right, that implies causation.  Okay.  If you're talking about things like cancer and long-term studies and long-term effects, I think that's what you're referring to.  You're not -- you're not referring to acute toxic effects.

Q    Did anyone, other than the counsel for Ms. Wooten, review your draft opinion before it was finalized?

A    No, no.

Q    In reaching your opinions in this case, did you file -- follow any specific scientific methodology?

A    No.

Q    Can you describe the methodology you did follow in this case?

A    I just said no.

Q    You didn't follow any methodology at all?

MS. SEILA:  Objection, form.

A    I don't understand the question.  You asked me if I followed any established guidelines and methodology?

Q    Yes.

A    I said no.

Page 26

Q    Okay.  So describe to me how you reached your opinion in this case.

A    Okay.  I'll tell you again, I've been in practice for many, many years, right, I reviewed her history, her test results and the substances that she was exposed to and I provided an opinion as to whether those substances could cause her symptoms.

Q    So it's just your opinion and nothing to back that up, other than she was exposed and she had a reaction?

A    Well, that's --

MS. SEILA:  Objection, form.

A    -- not true.  That's not what I said.

Q    Okay.  Well, that's what I'm trying to understand because I'm assuming you did more than that, but it doesn't sound like you did more than that.

A    Well, the medical literature.

Q    The medical literature cited in your report?

A    Yes.  Correct.

Q    Is the way you rendered your opinion in this case the way that is a generally-accepted method in the field of occupational medicine?

MS. SEILA:  Objection, form.

A    I believe so.

Q    Can you point -- can you point to any

peer-reviewed articles that describe that as an accepted method?

A    I'm not -- I'm not getting your point about what an accepted method is.

Q    Do you know what is an accepted method of reaching an opinion in a case like this is?

A    I really -- I don't understand what you're saying.  You're going to have to ask the question a different way.

Q    What you described as to how you rendered your report is what I'm calling your method.

A    Okay.

Q    Are there any published peer-reviewed articles that describe that as an acceptable method in the field of occupational medicine for determining whether an exposure caused injury to a patient?

A    You want a peer-reviewed article that explains that taking a history of exposure, a clinical history, a preexisting history and a review of the literature is an accepted measure; is that what you're asking about?

Q    To reach a conclusion that a person is permanently disabled from the result of an exposure in a workplace setting?

A    Well, I don't know whether -- you haven't mentioned permanent disability yet so now I'm even more

Page 28

confused.

Q    All right.  Now let's talk --

A    Are we talking about causation -- are we talking about causation or disability?  I'm sorry.

Q    Well, let's limit it to causation.

A    Right.

Q    Can you point to me any accepted publication, peer reviewed or not, that says reviewing the medical records, reviewing the clinical history, reviewing the patient's description of how she was exposed and not conducting any sort of toxicological determination of exposure is an accepted method in your field?

A    It's done thousands and thousands of times every year so, you know, if that means it's accepted, then there it is.

Q    So, again, we're stuck -- unless you can point to some sort of treatise or something, we're stuck with accepting your claim that that's accepted, right?

A    Nope.

Q    Okay.  Well, what establishes that?

Where is this methodology, as I call it, I know you don't call it a methodology, but where is this written up anywhere as an accepted way of diagnosing causation?

A    It's taught in every -- every occupational

medicine residency.  This is how it's done.

You're asking about three different things. You're asking about studies for causation of cancer, right --

Q   No, I'm not asking that at all.

A   -- okay, then you're asking about disability. And I'm trying to explain to you how we deal with acute exposures, right.  If someone has an exposure, they weren't symptomatic, right, then they're exposed, then they develop severe enough respiratory distress so that they require intravenous steroid treatment, right, because their lungs are so inflamed that they can't breathe, right, you want an article that supports the fact that that's causation?

Is that what you're asking me?

Q   Absolutely.

A   I don't have an article.  If you want, I can try to look one up for you right now and, you know, I'd be happy to do that.  It might take me a couple hours, but I'm happy to do it.

Q   You're here to tell us what you know now, not what you might learn down the road.

A   Okay.

Q   Do you have an understanding as to -- go ahead.

Q    Yeah, that's my question.

A    I don't recall.

Q    Okay.  In your report you cite several studies about health effects from refinery emissions, right?

A    Yes.  May I look at my report?

Q    Absolutely.  Any time you need to look at your report, you may do so.

A    Hang on one sec.  Yes.  Okay.

Q    And you cited --

A    I'm at --

Q    I'm sorry, I did not --

A    Yeah, sorry.

Q    Okay.

A    No, no, I say I'm at that section now.  Thank you.

Q    Okay.  In your report you cite the most relevant studies you found, right?

A    Correct.

Q    What was the duration of exposure in the Morphew study?

A    It was a number of months.

Q    And in the Johnson study it involved a refinery fire that burned for seven weeks, correct?

A    Hang on one second.

Q    Sure.

Page 32

A     Correct.

Q     And you were measuring -- that's an article about the effect of seven weeks of exposure, correct?

A     Let's see.  They were looking at the surrounding community, yes.

Q     And in the -- I don't know if it's Byrwa, B-y-r-w-a, Hill study that you cited that involved community residents with an ongoing chronic exposure as well, correct?

A     Correct.

Q     So it's fair to say that all the studies you cited involved exposures measured in weeks or months, true?

A     They were lower exposures measured in weeks or months, yes, correct.

Q     Why is the fact that they were lower exposures relevant?

A     Because obviously a lower exposure over a longer period of time may not be equivalent to a higher exposure over a shorter period of time.

Q     That's the dose response --

A     Not exactly.

Q     Would you agree that comparing an exposure of mere minutes, as you've stated, to exposures lasting weeks or months requires some analysis of dose response?

A    I'm sorry, say that again.

Q    Would you agree that comparing Ms. Wooten's exposure, which you said was a couple of minutes I believe is how you termed it, to exposures lasting weeks or months requires some analysis of dose response?

A    Again --

MS. SEILA:  Objection, form.

A    Yeah, sorry.  Clinically she was in a different state, also, because she had preexisting disease, as you pointed out, so I don't know if it's comparable.  I don't know if the dose that she needed to become so sick is the same as someone without the history of asthma would have needed to become sick.

Q    Where was Ms. Wooten's vehicle located distance-wise relative to the coke dome with the smoldering coke at the time of her exposure?

A    I don't recall.

Q    Are you aware that testimony indicates she was approximately 300 feet from the dome?

MS. SEILA:  Objection, form.

A    I'll take your word for it.

Q    Would you agree that atmostpheric concentrations of gases and particulates decrease with distance from the source?

A    That's true.

Q   Did you perform any calculations or modeling to estimate what the concentration of various compounds would have been at 300 feet from the source?

A   No, I did not.

Q   Did you consider atmostpheric dispersion in your analysis?

A   No, I did not.

Q   Did you make any determination of which particular chemicals in the smoke caused Ms. Wooten's reaction?

A   I don't think it's possible to say which it was.

Q   What do you understand what were the components of the smoke that she inhaled?

A   VOCs, formaldehyde, toluene, acetone, methylene chloride, probably benzene.

Q   And what's your basis for believing that about those particular chemicals?

A   That's what's typically in coke emissions.

Q   And how --

A   And sulfur dioxide.  Sorry.

Q   And how did you determine what's typical in coke emissions?

A   From experience.

Q   Did you rely upon any sources?

Page 35

A    I don't recall, but it's not the first case I've seen like this, clinically.  I don't mean legally.

Q    Can you tell me what specific VOCs she was exposed to?

A    I think I just did, right.  Probably toluene, acetone, methylene chloride and benzene.  She was also exposed to formaldehyde.

Q    And how do you know that?

A    Because those are the components of coke emissions.

Q    Does it depend upon the type of coke, what's emitted when it smolders?

A    I don't know the answer to that.

Q    Did you review any air sampling data that identified the specific chemicals you've listed as being present?

A    I don't believe --

MR. SIMPSON:  Objection, form.

A    I don't believe they tested for specific chemicals -- for all of those specific chemicals, should I say.

Q    On the fifth page of your report you state, Ms. Wooten was exposed to levels many times higher than those that are toxic to the respiratory system.  Do you stand by that statement?

Page 36

A    Yes.

Q    Can you tell me specifically what level Ms. Wooten was exposed to?

A    Well, we know two things:  She was exposed to above-the-odor threshold and she was exposed at a high enough level to cause her airways to react.

Q    What -- what odor threshold are you referring to?

A    Just give me one sec, okay?

Q    Sure.

A    I'm looking at the deposition of Mark Johansen.  He noted a strong odor, which is a qualitative indicator of airborne contaminants.

Q    So basically we're talking about an odor of smoke?

A    An odor of coke, yes.

Q    Can you give me the level in some sort of quantitative measure, like parts per million or milligrams per cubic meter?

A    I think I have it in the report.

Q    And what did you determine in the report?

A    You could see it on page -- I'm not sure what page it's on.  Toluene, acetone, methylene chloride, formaldehyde and trimethylamine, those levels are all noted.

A    I met with her -- this is actually very interesting.  I met with her last week very briefly on the phone because I wanted to find out about the defense expert's exam and she told me that he spent three to five minutes with her, which I found a little bit shocking, but -- and that's mainly what we talked about.

Q    How many minutes did you spend with her?

A    I didn't spend -- I didn't spend time with her, but I did not claim to do an independent medical evaluation.  I did a file review.

Q    All right.

A    And I did not put in my report -- I did not put in my report that I obtained the following history through my evaluation.  I said that I did my history through the review of the file.  They're two very, very different things.

Q    So you've never asked her whether what she inhaled had a fishy smell or a sweet smell --

A    No.

Q    -- or a fruity smell --

A    No.

Q    -- or anything like that?

A    Nothing like that, no.

Q    Okay.  So you state it was many times higher than those that are toxic, her exposure, correct?

A    I believe so, yes.

Q    And how many times higher?

A    I don't know.

Q    In fact, you don't know what the toxic level is, do you?

A    I don't recall.

MS. SEILA:  Objection, form.

Q    You don't recall or you don't know?

A    I don't recall.

Q    Okay.  What would you need to do to be able to recall that?

A    Well, it's not the same for everybody, obviously.  You would have to -- I don't know, okay.

Q    If you don't know the actual level, how can -- how can you say it was many times higher?

MS. SEILA:  Objection, form.

A    Because of her reaction to it.

Q    Didn't you already tell me that she was predisposed to react to this?

A    Right.  That's the point again.  So if you ask me what the level of exposure that people need to get sick is, it's not the same for everyone.

Q    But you're aware that there were other people in her immediate vicinity who were not wearing respiratory equipment who had no reaction whatsoever,

Page 40

right?

A   Well, I don't know that they had no reaction. I mean I didn't -- I didn't review anyone else's chart so I really don't know.

Q   Assume that there were no other reports of complaints regarding exposure to the smoldering coke fumes, wouldn't that be relevant to determining whether she was exposed to a toxic level?

A   Well, no, because --

MS. SEILA:  Objection, form.

A   Sorry.  She may have been predisposed because of her -- because of her lung disease.

Q   Do you think any particular component of the chemicals you've described was the most likely to her reaction?

A   It's very difficult to say.

Q   You spent a lot of time in your report talking about sulfur dioxide.  Was there a reason you emphasized that?

A   No.

Q   Can you tell me what the OSHA permissible exposure limit is for sulfur dioxide?

A   I would have to look at it.

Q   Can you tell me what the N-I-O-S-H recommended exposure limit is for sulfur dioxide?

Page 41

A     NIOSH?

Q     Yes.

A     Yeah, I would have to look it up.

Q     Can you tell me what the N-I-O-S-H, I-D-L-H level is for sulfur dioxide?

A     I would have to look that up as well.

Q     Did you determine that Ms. Wooten was exposed to a level of smoke that was higher than any regulatory limit related to --

A     No, I did not.

Q     Okay.

A     Sorry.

Q     That's all right.

A     You can finish.  Go ahead.

Q     I was going to say, related to the chemicals that you've described her being exposed to?

A     No, I did not.

Q     Have you seen any report that Ms. Wooten described the smell of sulfer dioxide?

        MS. SEILA:  Objection, form.

A     Can I answer?  Is that okay?

        MS. SEILA:  Yes.

Q     Yeah.

A     I did (inaudible).

        THE COURT REPORTER:  I'm sorry, what was that

Page 42

answer, Doctor?

A    Sorry.  No, I did not.

Q    The odor threshold for sulfur dioxide is a hundred to a thousand times lower than the harmful level, correct?

MS. SEILA:  Objection, form.

A    I believe so.  I believe that -- that sounds -- that sounds about correct.

Q    So even if she smelled sulfur dioxide, that wouldn't necessarily mean that she was being exposed to a toxic level, right?

MS. SEILA:  Objection, form.

A    That's not true.  That's not true because it may have been a toxic level -- it may have been a level high enough to have her react.

Q    Can you cite any scientific literature that supports using odor detection as a measure of toxic exposure?

A    Again, I would have to -- I would have to take a look and get it for you, but right now I can't.

Q    In your training in occupational medicine, were you taught that odor thresholds correlate with toxic exposure levels?

A    They can.

Q    But they don't always, do they?

A    Correct.

Q    And, in fact, many substances have odor thresholds that are far below their toxic thresholds, sulfur dioxide being one example, right?

A    Correct.

Q    So when you wrote that levels were well above the odor threshold, that doesn't really tell us whether the levels were toxic, does it?

MS. SEILA:  Objection, form.

A    I'm sorry, could you repeat that.

Q    Sure.  When you wrote that the levels were well above the odor threshold, that doesn't actually tell us whether the levels were toxic, does it?

MS. SEILA:  Same objection.

A    Well, the other -- the other factors that you're dealing with a mixture of chemicals so -- but to answer your question, I believe the answer would be, yes, you're correct.

Q    Okay.  Would you agree that the air monitoring data that you reviewed would be the most reliable evidence of what level Ms. Wooten was actually exposed to --

A    No.

MS. SEILA:  Objection, form.

Q    -- for the things that were monitored?

Page 44

MS. SEILA:  Objection, form.

A    No.

Q    No?

A    No.

Q    Why not?

A    Because we don't know what she was exposed to. We don't have any personal air monitoring data for her.

Q    How many air samples that you reviewed from this case showed sulfur dioxide levels above the OSHA permissible exposure limit?

A    I don't believe I saw any.

Q    How many samples showed levels above the NIOSH recommended exposure limit?

A    I don't recall seeing any.

Q    Did you even discuss the air monitoring data in your report?

A    I believe I did.

MS. SEILA:  Objection, form.

Q    If you can point that out, I'd appreciate it.

A    I said what Mr. Johansen talked about.

Q    So you didn't talk about the actual air monitoring results you had?

A    Give me one second.  Can I take a minute?

Q    Absolutely.

A    So the exhibits attached to his deposition,

Page 45

there are measurements of particulate matter at a
distance from the coke smoldering.  So we know two
things.  As I said, we know that the levels were above
the odor threshold and the odors were also above the
level that could cause acute symptoms.

Q    You mean above the level to cause her
symptoms; is that what you said?

A    Yes.  Yes, yes.

Q    Did you attempt to perform a dose-response
analysis in this case?

A    No, I did not.

Q    Why not?

A    Because I did not believe it was relevant.
We talked about that before, right.

Q    Because you had already reached your
conclusion?

A    No.

Q    So why not?

A    I didn't see any way to do so in this case.
We didn't have the data.

Q    So when you have a lack of data, what other
things do you look for?

A    Well, I think -- again, I think, you know,
you're talking about this as if it's a cancer case.  You
describe -- the questions you're asking me are referring

Page 60

think it's hard to say.

Q    In your training in occupational medicine, you were taught about alternative causation, correct?

A    Absolutely.

Q    What does that mean?

A    It means when something else causes disease. So, for example, exposure to carcinogens and smoking, that kind of thing.

Q    And when there are multiple potential causes of condition, you need to evaluate each one and determine which is the actual cause, correct?

A    For chronic diseases, yes.

Q    Why not for acute diseases, where you have two acute events?

A    You have two acute events separated by time though.

Q    Right.  And so how do you go about evaluating each one and determining which is the actual cause in that situation?

A    The actual cause of what?  That's the question that I keep asking.

Q    The cause of her respiratory distress on August 10th and following.

A    Okay.  I don't think there's a way to say for sure, okay.

Page 61

Q    Okay.  Is there a way to say within a reasonable degree of medical certainty?

A    I think it's a reasonable degree of medical certainty the toxic insult to her lungs on the 8th was at least strong enough to contribute to what happened to her on the 10th and, in combination, could be responsible for the disease.

Q    But you can't rule out that the August 8th event was not a contributing factor to her symptoms after August 10, correct?

A    You're asking if I could say that August 10th was a contributing factor?

Q    No, I'm asking if you can rule out or rule in, within a reasonable degree of medical certainty, that August 10 was the only causative factor for her --

A    I think it would be -- to a reasonable degree of medical certainty, to say that August 10th was the only factor, I don't see how anybody could say that.

Q    Why not?

A    Because there's no basis for that.

Q    What analysis did you perform to determine that her exposure on August 8th was the cause of her ongoing respiratory problems after August 10?

A    Again, it was based on her clinical presentation, her symptoms and her need for medication.

Page 62

Q    Did you do any analysis of the toxic emissions from landfill fires?

A    No, I did not.

Q    Why not?

A    I'm sorry?

Q    Why not?

A    I'm not understanding what you're getting to. When you say -- when you say "analysis," do you mean did I look at the substances that she was exposed to from that landfill fire; is that what you're asking?

Q    Just like you did with the substance from coke, yes.

A    I had nothing available to review.

Q    Did you try to make any determination of what might have been in those landfill fire?

A    No.

Q    Did you do any literature search to find out what are common components of landfill fire smoke?

A    No.

Q    Do you have any knowledge as to what landfill fire smoke contains chemically?

A    I think it depends on the landfill.

Q    And so your answer is, no, you didn't?

A    Again, I think it depends on the landfill.

Q    Okay.  Did you do any analysis, whether it's

Page 63

specific to this landfill or landfill fires in general, of what is typically found in a landfill fire -- in landfill fire smoke?

MS. SEILA:  Objection, form.

A    Well, again, I think -- I've said it three times.  It depends.  If you're talking about burn pits, which we have a lot of experience, that's one question.  If you're talking about Superfund sites, that's another question.  So it really -- it really depends.

Q    Okay.  But you haven't answered my question the three times I've given it.  So I'm asking you, did you make any effort?

Not why you didn't bother.  Did you make any effort?

A    Make any effort to what?

Q    To determine what is typically contained in landfill fire smoke?

A    Again, it depends on the landfill.  So what effort would I have made?

So you're asking whether I would try to find out what was contained in the landfill that she had exposure to from a fire; is that your question?

Q    Let me say it a different way.

A    Yes, please.

Q    All right.  We have a landfill --

A    Okay.

Q    -- we have the actual landfill fire.

A    Yes.

Q    Did you make any effort to determine what was contained in that smoke?

A    And, again, I think we're disconnecting somehow, not by computer.  But when you say did I make any effort, do you mean that I would request results from that landfill fire?

Q    That could be.  I don't know what you might do.  I'm not the expert.  But did you make any -- so it's really a simple question because it's any effort. So either you did or you didn't?

A    I did not, no.

Q    Okay.  Thank you.

A    Okay.

Q    Now, did you make any effort to determine whether there had been studies showing what is generally contained in landfill fires?

A    Again, we know that it depends on what the substances in the landfill are.

Q    And, again, you haven't answered my question. The question is, did you make the effort?

A    To do what?

Q    To determine whether there are any reports

Page 65

about what is generally found in landfill fires, in their smoke?

A    I do not believe -- I do not believe there are typical components of landfill fires.  I think that's what I've been trying to tell you.

Q    Did you make any effort to determine what is contained in the smoke of any landfill fire?

A    It would depend on the landfill fire so --

Q    No, no, whether you did or did not does not depend upon that.

The question is, did you make that effort to determine the substance in landfill fire smoke from any landfill, any combination of landfills, anything?  It's yes or no.

A    No.  No.

Q    Thank you.  Your report on the second page states that the medical record of 9/14/18, referring to September 14, 2018, documents that she did have a history of asthma, but was asymptomatic without treatment, right?

I didn't hear your answer.

A    I'm sorry.  Correct.

Q    If, in April 2022, four months before the incident, Ms. Wooten went to a doctor who documented that her asthma condition was worsening, that would be

Page 66

an important fact to know, correct?

MS. SEILA:  Objection, form.

A    Can you ask that again.  I'm sorry.

Q    Sure.  If, in April 2022, four months before the incident, Ms. Wooten went to a doctor who documented that her asthma condition was worsening, that would be important to your analysis, wouldn't it?

MS. SEILA:  Same objection.

A    Yes, it would make her -- I can answer?

Q    Yes.

MS. SEILA:  Yes.

A    Okay.  It would make her more likely to react to a toxic exposure so it is relevant, yes.

Q    Why didn't you mention this in your report?

A    I'm sorry, say it again.

Q    Why didn't you mention her April 2022 doctor visit where he documented her worsening asthma condition in your report?

A    You mean to strengthen the case that her exposure caused her lung disease?

Q    To give a complete description of what she was undergoing.

A    I don't recall why I didn't.

Q    Okay.  If, on July 15, 2022, less than a month before the August 8 incident, Ms. Wooten went to a

Page 67

doctor because she was concerned that her asthma may have been getting worse, that's important for your analysis, too, isn't it?

A    For the same reason.

Q    Okay.  Can you tell me what medications were prescribed for her at that July 15, 2022 visit?

A    I cannot.

Q    If she was -- I'll represent to you that she was prescribed Symbicort maintenance inhaler, Zyrtec, Z-y-r-t-e-c --

A    Zyrtec.

Q    Okay, Zyrtec.  Astelin, A-s-t-e-l-i-n, and Flonase.  That would suggest that her asthma condition is worsening, for a doctor to prescribe all of that, wouldn't it?

MS. SEILA:  Objection, form.

A    Yes.

Q    Is there some reason that you did not mention that she had a worsening asthma condition one month -- less than one month before the August 8th exposure?

MS. SEILA:  Objection, form.

A    There is no reason.  I can answer?

MS. SEILA:  Yes.

Q    Yes.

A    Yeah, there is no reason.

Page 68

Q   Just so you know, Doctor, if she objects, unless she instructs you not to answer, that's just for the judge to deal with later.

A   Okay.  What does that mean, objection to form? What does that mean though?

Q   It's just -- it's lawyer talk.  She doesn't -- she doesn't like my question.

A   Okay.

THE VIDEOGRAPHER:  Mr. Simpson, this is the videographer.  Sir, I failed to tell you before we started, I have to keep my media units to about 90 minutes or less and we're approaching 90 minutes.

MR. SIMPSON:  Okay.  This is a good time to stop, if it's good for you.

THE VIDEOGRAPHER:  I'm fine with whenever you want to stop, sir.  Just a short break so I can change media.

MR. SIMPSON:  This is actually a good spot to stop so why don't we do that.

THE WITNESS:  Yeah.

THE VIDEOGRAPHER:  Okay.  We're going off the record.  The time is 12:28 p.m.

(Break.)

THE VIDEOGRAPHER:  We're going back on the

Page 69

record.  The time is 12:40 p.m.

BY MR. SIMPSON:

Q   Sorry, I lost my place.  There we are.

So we have documentation that Ms. Wooten's asthma was progressively worsening in the months before the August 8th, 2022, incident, correct?

A   Correct.

MS. SEILA:  Objection, form.

Q   And that progression was occurring before any exposure at the refinery, correct?

A   Correct.

Q   Did you perform any analysis to determine whether her post-incident respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the exposure?

A   No.

Q   Is there a way to distinguish between symptoms from natural progression of asthma versus symptoms from the alleged exposure?

A   I'm sorry, I misunderstood your question before.  You were asking if I could tell whether it was from the August 8th exposure, the August 10th exposure or whether the --

Q   No.

A   Was that your question?

Page 70

Q    No.  Let me restate it.

A    I'm sorry, I misunderstood.

Q    Did you perform any analysis to determine whether her post-incident respiratory symptoms, referring to the August 8th incident --

A    August 8th, not August 10th, right?

Q    Right.

A    Okay.

Q    So whether -- to determine whether her post August 8th respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the August 8th exposure?

A    So the question is whether her acute symptoms and visits for emergency care was a natural gradual progression of this disease -- of a disease versus the result of an exposure --

Q    No, my question --

A    -- an analysis to do that --

Q    No.

A    -- an analysis to determine --

Q    My question is, did you perform any analysis to determine whether her condition, over the last several years, is just a natural progression of her preexisting disease versus new injury from the exposure?

A    Well, I think -- if I understand your question

Page 71

correctly, I think that they're entwined.  I think that the fact that she had preexisting disease contributes to her progression after the toxic insult to her lungs.

Q    How can you -- or can you determine how much of her current condition is due to natural progression versus the injury from the alleged exposure on August 8?

A    You're asking percentagewise?

Q    I'm asking, how can you do that at all?

A    I can't.

Q    Okay.  Were you aware that Ms. Wooten had asthma flare-ups in December 2019 in South Korea?

A    I don't recall.

Q    Were you aware that she had an asthma flare-up in April of 2021 that she characterized as "really bad"?

A    I don't recall.

Q    Did you consider her history along with the other history of her preexisting asthma in determining whether the August 2022 incident caused new injury or simply triggered her preexisting asthma?

A    Whether it's -- well, as I said before, her preexisting asthma is a factor in her reaction to the toxic exposure.

Q    Okay.  Did you consider that history though in determining whether the August 2022 incident caused new injury versus simply triggering preexisting asthma?

Page 102

record. The time is 1:30 p.m.

BY MR. SIMPSON:

Q Sorry, I'm just perusing some of my questions that I'm going to skip over.

A Take your time. And the more you skip, the better.

Q As part of your reaching your opinion in this case, you conducted a literature search to confirm the health effects of individuals exposed to smoke from refinery fires, correct?

A Correct.

Q What databases did you search?

A PubMed.

Q What search terms did you use?

A Coke emissions, respiratory symptoms, exposure.

Q Did you limit it by date range?

A No. I limited it to human study -- sorry -- to human studies.

Q Okay. Approximately how many articles did you review?

A Oh, I don't recall.

Q Did you search for articles about brief exposures as well as chronic exposures?

A Yes.

Page 103

Q    Did you find any about brief exposures?

A    Not really, no.

Q    Did you search for articles about anxiety induced respiratory symptoms?

A    No, I did not.

Q    Did you search for articles about the natural progression of asthma?

A    No, I did not.

Q    Did the Morphew study provide any data that would allow you to extrapolate from months of exposure to a few minutes of exposure?

A    It's a difficult extrapolation.

Q    Did you try to do any calculations to determine how their findings could translate to an exposure of a couple of minutes?

A    No.

Q    And the Johnson study we talked about already. That was a seven-week exposure to a community, right?

A    Correct.

Q    And seven weeks is over one million minutes, right?

A    I'll take your word for it.

Q    Okay.  Did you perform any analysis to determine how findings from a seven-week exposure would translate to an exposure of a few minutes?

Page 104

A    No.

Q    How does chronic daily exposure over months compare to a single exposure of one or two minutes?

A    It depends on the levels.  It depends on the individual.

Q    Did you do any sort of analysis to determine how the findings from the three studies that you cite in your report translate to an exposure of a couple of minutes?

A    No.

Q    Can you cite any peer-reviewed study that examined respiratory outcomes from brief exposures to refinery smoke measured in let's say under five minutes, rather than days, weeks or months?

A    No.

Q    Can you cite any study that would support the proposition that an exposure of one or two minutes at unmeasured concentrations can cause permanent lung injury?

A    I don't believe those studies exist one way or the other.

Q    Okay.  In your 2016 publication, "Neuropathic Symptoms in World Trade Center Disaster Survivors and Responders" that was published in the Journal of Occupational and Environmental Medicine, your

Page 105

publication underwent peer review, correct?

    A    Correct.

    Q    That means independent experts reviewed your methodology before publication, right?

    A    Absolutely.

    Q    And in that study you described your methodology clearly in the methods section, correct?

    A    Correct.

    Q    You explained how you selected subjects, yes?

    A    Correct.

    Q    And how you -- you explained how -- what instruments you used for the assessment, correct?

    A    Correct.

    Q    You explained your statistical analysis, correct?

    A    Correct.

    Q    You acknowledged the limitations of your study, correct?

    A    Yes.

    Q    Can you show me where in your report in this case you described your methodology with similar rigor?

    A    This wasn't a publication and this wasn't -- this wasn't an evaluation of World Trade Center responders with chronic exposure.  This was an individual clinical case.  I don't think you can really

Page 106

compare them.

Q   So you didn't do any sort of statistical analysis, right?

A   Well, you can't do a statistical analysis on one person.

Q   Can you show me where --

A   If you publish -- I'm sorry.  It's okay if I talk?

Q   Yes, absolutely.

A   Sorry.  If you published it, it would be published as a case report.  Case reports generally don't undergo peer review.

Q   Can you show me in your report where you acknowledge any limitations to it?

A   Again, it's not a publication.  You're comparing apples and lemons.

I mean you read the plaintiff's reports, the defense reports, they don't acknowledge limitations.  You don't see reports that acknowledge limitations.  It's not -- it's not a publication.

Q   In your report -- or your publication "Paresthesias Amongst Community Members Exposed to the World Trade Center Disaster," you examined potential confounding factors, correct?

A   Correct.

Q    You looked for alternative explanations, correct?

A    Correct.

Q    You performed statistical analyses to determine if associations were significant, correct?

A    Correct.

Q    You stated your conclusions carefully, distinguishing between association and causation, correct?

A    Absolutely.

Q    And, in fact, you found that some of the reports of paresthesia were associated with anxiety and depression scores, correct?

A    They were associated, yes.

Q    So in your published research you understood that symptoms could be associated with psychological factors rather than toxic exposure, correct?

A    I don't think that you can really compare World Trade Center responders who dug through burning rubbish with body parts to other cases.  I mean it's, you know, it's ludicrous to try to do that, try to extrapolate a World Trade Center responder with severe PTSD to a general population, I mean that's kind of ludicrous.

Q    You think it's ludicrous to consider the

Page 108

association of anxiety with -- and posttraumatic stress disorder in a patient who actually has both of those conditions?

A    No, that's not what I said.  I said you're trying to extrapolate what we did in that study with a cohort of people.  Now, there is evidence, and I don't have those papers in front of me, but there's very interesting evidence that patients with PTSD have epigenetic changes which makes it more likely for them to have lung disease.  That's true.  But that's cutting-edge research that's just coming out in the past couple of years.

Q    And that's preexisting lung disease, correct?

A    No, that's World Trade Center related lung disease.  So if you have PTSD and World Trade Center exposure, you're more likely to develop lung disease than patients without PTSD and exposure.  With the same exposure, the addition of PTSD makes the emersion of lung disease more common.  And it's thought to be some kind of activation of genes, epigenetic.  It's very interesting actually.

That would suggest -- and, again, I'm not trying to extrapolate to this individual case, but that would suggest that there is a physiologic component of anxiety that makes it more likely to develop lung

Page 109

disease following a chemical exposure.

Q   Okay.  You didn't consider anxiety or PTSD at all in this case, did you?

A   No, I did not.

Q   And in your -- in that report we're talking about, you concluded that paresthesia can result from metabolic disorders, nerve entrapment following repetitive motions, hyperventilation pursuant to anxiety or exposure to neurotoxins, correct?

A   Correct.  That's what I wrote, yes.

Q   So you understood that subjective symptoms can have multiple different causes, correct?

A   Yes.

Q   And you had to do careful analysis to determine which cause was most likely, correct?

A   Yes.

Q   Did you consider that natural progression of Ms. Wooten's asthma could explain her ongoing symptoms?

A   I did not believe that was the reason.

Q   That's not the question I asked.  Did you consider it?

A   I thought about it, but see, I keep trying to understand what you mean by "consider."

Q   Well, it sounds like you arrived at a preexisting determination, a preordained result, rather

Page 110

than considering them.  It sounds like you just ruled it out because you didn't think that happened because she had an exposure and a reaction?

MS. SEILA:  Objection, form.

A    I wouldn't quite -- I wouldn't quite put it that way.

Q    Well, that's what it sounds like.  So please explain to the Court how it's different from what I've just described, that you just came to your conclusion because she had a condition and exposure and symptoms.

A    Because -- I think I've explained this to you a few times, but I'll try again.  She had a significant exposure, right.  She was rushed to the urgent care and she required steroid treatment, right.  That's indicative of a toxic insult to the lungs.  All right.  That's different from a slow, gradual progression of disease.  It's much different.

Q    It could also be indicative of a psychological response to the exposure, correct?

A    I don't think they would give her intravenous steroids if they thought it was a psychological response.  I highly doubt it.

Q    When doctors are treating something in the emergency room setting, they're not necessarily going through all the potential causes, they're trying to get

the patient stabilized, right?

A    Well, again, I really -- I find it -- I'd be shocked if -- it would just be shocking.  So I've never seen it happen.

Q    Can you show me in your report where you ruled out alternative causes?

A    I did not discuss alternative causes in my report.

Q    Can you show me in your report where you distinguished between her preexisting asthma and her alleged new injury?

A    No, I cannot show you that.  No.

Q    And you can't show me in your report where you addressed the August 10 landfill exposure, can you?

A    No, I cannot.

Q    Are you familiar with the concept of differential diagnosis?

A    Very much so.

Q    Can you explain what it is?

A    Well, when someone has shortness of breath, you want to make sure it's not heart disease.

Q    Well, in general, a differential diagnosis is you come up with a list of possible causes of the patient's condition and then systematically rule them out, correct?

Page 112

A    That's correct.

Q    Did you perform a differential diagnosis in this case?

A    I don't think it's -- I don't think it's relevant in this matter really.  Did I list all the possible alternative causations in the report and rule them out one by one, no, I did not.

Q    Is there anything in the report that you're going to show us that you did a differential diagnosis?

A    No, there's nothing in the report.  No.

Q    What alternative causes did you consider for her respiratory symptoms?

A    Cardiac disease.

Q    I'm sorry, what was that?

A    I'm sorry.  Cardiac disease.

Q    Anything else?

A    That was the major concern.

Q    You considered, I think, natural progression of preexisting asthma as a possible cause, right?

A    I thought you meant outside of lung disease. Yes, I did consider it.

Q    Okay.  And you ruled it out because why?

A    Based on her presenting symptoms were so acute.

Q    And I think we've established you did not

Page 113

consider the land fire exposure as a possible cause, correct?

A    Correct.

Q    And you did not consider anxiety and psychiatric disorders as a possible cause, correct?

A    Correct.

Q    How did you rule them out?

A    Based on her presentation.

Q    Can you show me in your report where you ruled them out?

A    No.

Q    You didn't consider deconditioning and obesity as possible causes of her exercise intolerance, did you?

A    No, I did not.

Q    Did you consider sleep apnea as a contributing factor to her symptoms?

A    Sleep apnea would not cause these symptoms. They would cause different symptoms.

Q    What symptoms would sleep apnea cause?

A    Fatigue, irritability, depression, snoring.

Q    Did you review any standardized instruments for measuring anxiety and depression that were conducted on Ms. Wooten?

A    No, I did not.

Q    Do you know if any were ever done?

Page 115

Q    Okay.  And you wouldn't want to know the dosage?

A    Very often we don't know the dosage.

Q    In your CV it indicates you arrange for students and residents to accompany industrial hygienists for home office air testing, right?

A    Correct.

Q    Why is it important for students to observe air testing?

A    Well, first of all, most students don't even know it's even possible to do air testing.  So that's the first reason.

The second reason is to understand what relationship it has to diagnosis, especially in the home.

Q    It's because actual measured concentrations is fundamental to occupational medicine, isn't it?

A    Yes.  When available, yes.

Q    Students need to understand that they can't just guess at exposure levels, right?

A    Well, unfortunately often you don't have exposure levels, but, yes, you're correct.

Q    So we talked about Bradford Hill criteria before.  One of the criteria is strength of association, correct?

A    Correct.

Q    And I take it you think there's a strong association between the August 8th exposure and Ms. Wooten's condition, correct?

A    Yes.

Q    Did you quantify the strength of that association?

A    No.

Q    Given -- another factor in the Bradford Hill criteria is consistency, correct?

A    Yes.

Q    And so that would be consistency across populations, for example?

Did you answer?

A    Yes, I did.  I said yes.  Sorry.

Q    Okay.  Given that no other -- we're getting a reverb now all of a sudden.

A    Getting a what?

Q    We're getting an echo so it's distracting me.

A    I'm sorry.  I don't think it's me.

Q    No, it's not.

A    If no other workers were injured due to exposure to the smoke from the coke dome, is there consistency for purposes of Bradford Hill in this instance?

Page 117

MS. SEILA:  Objection, form.

A    If we knew for sure that the population was the same and that no one else had symptoms, that would be important to know, yes.

Q    And when you say population was the same, are you saying they all would have to have asthma, preexisting asthma?

A    Well, either they would or they wouldn't.

Q    Okay.  Specificity is a factor in the Bradford Hill analysis, correct?

A    Correct.

Q    How do you establish specificity when Ms. Wooten had preexisting asthma and other potential causes of her respiratory symptoms?

A    Well, again, it's an acute exposure.  You're thinking more along the lines of a chronic exposure.

Q    So are you saying specificity does not apply in the Bradford Hill analysis --

A    No.  No, that's not what I said.  No.

Q    You have to let me finish the question.

A    Oh, I'm so sorry.  Yeah.

Q    Are you saying that specificity is not considered in the Bradford Hill criteria when you're dealing with an acute exposure?

A    No, it is.

Page 118

Q    Okay.  So how is it considered in the case of acute exposure?

A    I'm sorry, go back to the original question. I'm sorry.

Are you still there?

Q    Yes.  I'm going back to the question.

A    Yeah, thank you.

Q    How do you establish specificity for Bradford Hill purposes when Ms. Wooten had preexisting asthma and other potential causes of her respiratory symptoms?

A    I believe that since she presented with acute symptoms it's still -- it's still a causal relationship.

Q    Temporality is another factor in the Bradford Hill analysis, correct?

A    Correct.

Q    And how do you establish temporality when her asthma was already worsening before August 8th, as documented three weeks before August 8th?

A    Right, because she had an acute decompensation immediately following the exposure, so that's temporal.

Q    And so is the worsening of asthma in the months before her exposure, correct?

A    Not to the point where she required acute intervention.

Q    And we've already talked about dose response.

Page 119

You did not establish a dose-response relationship, correct?

A    Correct.  Yeah.

Q    And that's another criteria, correct?

A    Correct.

Q    And then another factor is plausibility, right?

A    Yes.

Q    Is it biologically plausible that an exposure to unmeasured concentrations of smoke causes permanent lung injury?

A    It is plausible that exposure to smoke causes lung injury.  It certainly is plausible, yes.

Q    Okay.  What about -- is it plausible that an exposure of a couple of minutes to smoke in unmeasured quantities causes permanent lung injury?

A    In a susceptible individual it is plausible.

Q    What is the biological mechanism by which exposure for a couple of minutes to coke smoke causes permanent injury?

A    It would be an irritative effect on the lungs, on the bronchiales.

Q    Well, irritative effect means, when you take away the source of irritation, it goes away, right?

A    Not necessarily.  Not if it makes it more

Page 120

reactive.

Q    Are we back to RADS?

A    No, not necessarily.

Q    What is -- coherence is a factor in the Bradford Hill methodology, right?

A    I'm sorry, I missed the beginning of that.

Q    Coherence is one of the factors that's considered in the Bradford Hill methodology, right?

A    Yes.  Yes.

Q    Is your opinion coherent with a normal bronchoscopy?

A    I believe it is, yes.

Q    Is it coherent with normal CT scans?

A    Yes.

Q    Is it coherent with normal CPET showing no pulmonary limitation?

A    The CPET was not diagnostic of no pulmonary limitation.  It didn't get to the point where you could determine if it was a pulmonary limitation or not.

Q    Is it coherent with a CPET that does not show one way or the other pulmonary limitation?

A    It's not one way or the other.

Q    Okay.  Is it coherent with zero air monitoring results?

A    There was no personal air monitoring done on

Page 121

her so, again, it's irrelevant.

Q   Is it coherent with there being no other reported claims of injury from exposure to coke smoke during the incident?

A   If there were truly no other reports, then no.

Q   This is probably completely inapplicable in this situation, but experiment is another Bradford Hill criteria, right?

A   I think we can just skip over that.  It's not really applicable.

Q   There's no experimental studies supporting or --

A   No.

Q   Okay.

A   No, there are not.

Q   And then I think the final criteria is analogy.  Can you point to any analogous situations where brief exposures cause similar permanent injury?

A   They do exist.  I've seen it in workers before.

Q   Can you point to any studies, peer-reviewed reports, any reliable medical journals, anything that describes --

A   I would have to -- I would have to find them for you, but they do exist.

A    Her symptoms.

Q    Which are consistent with someone who has asthma, right?

A    Yes.

Q    Whether or not caused or exacerbated by the August 8th event, right?

A    Yes.

Q    And we know the bronchoscopy does not support a finding of permanent injury, right?

A    You would not expect it to.

Q    And we know that the CT scans don't support a finding of permanent injury, correct?

A    You would not expect that to either.

Q    We know the chest X-rays don't support a finding of permanent injury, correct?

A    Correct.

Q    And we know that the CPET does not show a -- or does not support a finding of permanent injury, correct?

A    But it does not rule out the finding of permanent injury.

Q    How do you rule it out or in?

A    You would want to see decent PFT test results and perhaps a methacholine challenge, some challenge testing, which she has not had.

Page 127

Q    And as far as the pulmonary function tests, we haven't had any successfully completed so they don't answer it, right?

A    Correct.

Q    So, in short, at present, there is no objective evidence of permanent lung injury, correct?

MS. SEILA:  Objection, form.

A    She was found by her own employer's -- her own employer's doctor to be permanently disabled.

Q    So I return to objective evidence is my question.  There's no objective evidence of permanent lung injury presently --

A    I want to -- I want to -- take it easy.  I just want to read one thing, okay?

Q    Sure.

A    Thank you.  There are no objective test results, correct.

Q    Given that all of the objective testing available at this time is normal, how can you conclude with a reasonable degree of medical certainty that she has permanent lung injury?

A    I'm basing it in part on the determination of her company's doctor.

Q    Anything else?

A    Her history and the medication that she

Page 128

requires.

Q   Anything else?

A   Hang on one second.  I just want to look at a couple things here.

Q   Sure.

A   Thank you.  Just give me two more minutes, okay?

Q   Sure.  No problem.

A   I want to make sure I go through all the pulmonary function tests again.

The physicians note she's not able to do any exertional activity.  That's repeated several times in her medical records.

Q   Are you referring to a specific physician?

A   There were a couple.  I can't read the handwriting.

Q   Is there a Bates number at the bottom of the document, like NW something, lower right-hand corner?

A   Yeah.  Yeah, give me one sec.  I'll find it again.

Okay.  So the Bates number's NW001261.

Q   I'm sorry, 1261?

A   Yes, sir.

Q   Okay.

A   Why do they call it a Bates number?

Page 153

CERTIFICATE OF OATH

STATE OF FLORIDA    )
                    )
COUNTY OF DUVAL     )

     I, Stacey G. Williams, Registered Professional Reporter, Notary Public, State of Florida, certify that DR. MARC WILKENFELD, appeared before me via Zoom on this 10th day of November, 2025, and was duly sworn.

     Signed this 23rd day of November, 2025.

                    Stacey G. Williams,
                    Registered Professional Reporter
                    Notary Public - State of Florida
                    My Commission No.:  HH236458
                    Expires:  03/15/2026


                    Personally known
                    OR Produced Identification   X
                    Type of Identification Produced:
                    U.S. Passport ID Card

Page 154

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA      )
                      )
COUNTY OF DUVAL       )

     I, STACEY G. WILLIAMS, Registered Professional Reporter, Florida Professional Reporter, certify that I was authorized to and did stenographically report the foregoing video deposition of DR. MARC WILKENFELD via Zoom and that the foregoing transcript, pages 4 through 152 is a true and complete record of my stenographic notes.

     I further certify that I am not a

relative, employee, attorney, or counsel of any of

the parties, nor am I a relative or employee of any

of the parties' attorney or counsel connected with

the action, nor am I financially interested in the

action.

     Dated this 23rd

                    STACEY G. WILLIAMS,
                    Registered Professional Reporter
                    and Notary Public.