# Exhibit 5

Page 1

3.2 DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX
CIVIL ACTION NO.:   1:23-cv-00012


NICOLE WOOTEN,
          Plaintiff,
versus
LIMETREE BAY TERMINALS d/b/a OCEAN POINT TERMINALS,
PORT HAMILTON REFINING AND TRANSPORTATION,
and WEST INDIES PETROLEUM LTD.,
          Defendants.
_____/

VIDEO DEPOSITION OF DR. MARC WILKENFELD VIA ZOOM


DATE TAKEN:   Monday, November 10, 2025

TIME:   11:03 a.m. until 3:31 p.m.

WITNESS LOCATION:   (Remote Location)
                    Jerusalem, Israel

This cause came on to be heard at the time and place aforesaid, when and where the following proceedings were stenographically reported by:
Stacey G. Williams
Registered Professional Reporter
Coastal Court Reporters/Veritext Legal Solutions
St. Augustine/Jacksonville, Florida
(904) 824-3525

Page 13

you evaluate a clinical case, you're dealing with many, many different issues.  You're looking at the specificity of what the substance was.  You have to look at the temporality.  Okay.  There's just -- you know, you want a yes or no answer and the answer is not yes or no so ...

Q    What specificity did you have with respect to Ms. Wooten's exposure in this case?

A    We knew that she was exposed to coke emissions and we know what's contained in coke emissions.

Q    What about temporality in this case?

A    Right, so she had an immediate reaction to an exposure.

Q    Did you establish the dose of that exposure?

A    We established that it was over the odor threshold, but, no, we did not -- we did not have a reading.

In other words, you're asking me whether we had a personal reading, like we had a machine next to her nose and her mouth so we know exactly how much she breathed in; is that your question?

Q    I'm asking you if you established any sort of dosage level in this case.  And I think you answered it, odor threshold only, correct?

A    That's correct, yes.

Mr. Simpson, to interrupt.

Ms. Seila, if you can please try to speak up. I saw you speak, but I'm not -- it's not coming out audibly over Zoom.

Q    Were you provided any air monitoring data from the refinery?

A    Yes, I was.  I was provided with some samples, results.

Q    And do you recall how many air samples were collected during the relevant time period?

A    Hang on one sec.  May I look at the report?

Q    Yes, absolutely.

A    Thank you.  Thank you very much.

There were a great deal.  I don't know the number.

Q    Okay.  What did those samples show for sulfur dioxide levels?

A    I believe there was no exceedance.

Q    Did you review medical records from before August 8th, 2022?

A    Yes, I did.

Q    I note you mention in your report a visit from I think it was four years before the incident.  Did you have any records between that particular report and the date of the incident, August 8th, 2022?

Page 22

incident?

A    I don't recall.

Q    And did you review medical records for the months before the August 8th, 2022 incident?

A    Yes, I did.

Q    And you did not include them in your report so, therefore, you did not consider them relevant, correct?

A    Well, I think I've explained to you that the most relevant evaluation was the pre-placement evaluation in 2018, right.  Now whether she had episodes in between that date and the date of her toxic exposure, the only difference would be that it would make her more prone to react to the toxic chemicals.

Q    Did you review any bronchoscopy reports as part of your rendering your opinion in this case?

A    Yes, I did.

Q    Did you review any CT scan reports as part of your reaching your opinion in this case?

A    Yes, I did.

Q    Did you review any cardiopulmonary exercise testing or CPET testing reports as part of your analysis in this case?

A    Yes, I did.

Q    Did you review any chest X-ray reports as part

Page 23

of your analysis in this case?

A    Yes, I did.

Q    Generally speaking, what did all those objective tests show?

A    All of the tests, except for the pulmonary function, test were normal.

Is it okay if I drink some water?

Q    Absolutely.

A    Thank you.

Q    You have extensive clinical experience with individuals experiencing exasperation [sic] of asthma after exposure to smoke or petroleum products, correct?

A    You mean exacerbation?

Q    Yes.

A    Yeah, I do.

Q    And, based upon that extensive clinical experience, when someone has true asthma exacerbation from toxic exposure, do you typically see objective findings on pulmonary function tests?

MS. SEILA:  Objection, form.

A    Usually, yes.  Yeah --

MS. SEILA:  Go ahead.  Sorry.

Q    Do you typically see objective findings on chest imaging?

A    No, usually not.

Page 24

Q    Do you typically see findings on a
bronchoscopy if the condition is severe?

A    Generally not, no.

Q    Did anyone assist you in preparing your
report?

A    Nope.

Q    Did you use artificial intelligence like
ChatGPT or Grok in preparing your report?

A    No.  I never do.

Q    Did you use any specific guidelines or
standards in preparing your report?

Did you hear my question?

A    You asked if I used specific guidelines and I
said no.

Q    Oh, I'm sorry.  I did not hear your answer.  I
apologize.

A    I'm sorry.

Q    We could have been looking at each other for a
long time.

A    Right, right, eight.

Q    You're familiar with the expression
"correlation is not causation," correct?

A    Yes, I am.

Q    Do you agree with that?

A    Again, when someone has an exposure and they

Page 25

have immediate response and they get sick, when they wake up in the morning, they're okay and then they have a chemical exposure and they develop symptoms immediately, right, that implies causation.  Okay.  If you're talking about things like cancer and long-term studies and long-term effects, I think that's what you're referring to.  You're not -- you're not referring to acute toxic effects.

Q    Did anyone, other than the counsel for Ms. Wooten, review your draft opinion before it was finalized?

A    No, no.

Q    In reaching your opinions in this case, did you file -- follow any specific scientific methodology?

A    No.

Q    Can you describe the methodology you did follow in this case?

A    I just said no.

Q    You didn't follow any methodology at all?

MS. SEILA:  Objection, form.

A    I don't understand the question.  You asked me if I followed any established guidelines and methodology?

Q    Yes.

A    I said no.

Page 34

Q    Did you perform any calculations or modeling to estimate what the concentration of various compounds would have been at 300 feet from the source?

A    No, I did not.

Q    Did you consider atmostpheric dispersion in your analysis?

A    No, I did not.

Q    Did you make any determination of which particular chemicals in the smoke caused Ms. Wooten's reaction?

A    I don't think it's possible to say which it was.

Q    What do you understand what were the components of the smoke that she inhaled?

A    VOCs, formaldehyde, toluene, acetone, methylene chloride, probably benzene.

Q    And what's your basis for believing that about those particular chemicals?

A    That's what's typically in coke emissions.

Q    And how --

A    And sulfur dioxide.  Sorry.

Q    And how did you determine what's typical in coke emissions?

A    From experience.

Q    Did you rely upon any sources?

Page 35

A    I don't recall, but it's not the first case I've seen like this, clinically.  I don't mean legally.

Q    Can you tell me what specific VOCs she was exposed to?

A    I think I just did, right.  Probably toluene, acetone, methylene chloride and benzene.  She was also exposed to formaldehyde.

Q    And how do you know that?

A    Because those are the components of coke emissions.

Q    Does it depend upon the type of coke, what's emitted when it smolders?

A    I don't know the answer to that.

Q    Did you review any air sampling data that identified the specific chemicals you've listed as being present?

A    I don't believe --

MR. SIMPSON:  Objection, form.

A    I don't believe they tested for specific chemicals -- for all of those specific chemicals, should I say.

Q    On the fifth page of your report you state, Ms. Wooten was exposed to levels many times higher than those that are toxic to the respiratory system.  Do you stand by that statement?

Page 36

A    Yes.

Q    Can you tell me specifically what level Ms. Wooten was exposed to?

A    Well, we know two things:  She was exposed to above-the-odor threshold and she was exposed at a high enough level to cause her airways to react.

Q    What -- what odor threshold are you referring to?

A    Just give me one sec, okay?

Q    Sure.

A    I'm looking at the deposition of Mark Johansen.  He noted a strong odor, which is a qualitative indicator of airborne contaminants.

Q    So basically we're talking about an odor of smoke?

A    An odor of coke, yes.

Q    Can you give me the level in some sort of quantitative measure, like parts per million or milligrams per cubic meter?

A    I think I have it in the report.

Q    And what did you determine in the report?

A    You could see it on page -- I'm not sure what page it's on.  Toluene, acetone, methylene chloride, formaldehyde and trimethylamine, those levels are all noted.

Page 37

Q   Well, that's not -- those are not the levels that we know she was exposed to, are they?

A   We don't know what levels she was exposed to, exactly.  Yes.

Q   Okay.  So, because she smelled coke smoke, you conclude that she had to have been exposed to all those chemicals at their odor threshold?

MS. SEILA:  Objection, form.

A   No, that's not what I said.

Q   Okay.  I'm trying to understand.  That's why I'm asking the question.

A   I said she had an exposure, right.  She had an exposure above the odor threshold.  I don't -- the only way to know what exposure she had would have been to put on a personal monitor before she went in, right, which obviously nobody could do.  But we do know she was exposed and we do know that she got sick immediately after being exposed.

Q   Did she describe to you or in anything that you have reviewed what the odor was that she was smelling?

A   No, she did not.

Q   So we don't have --

A   I didn't discuss it with her.

Q   Did you meet with her or -- and I say meet --

A    I met with her -- this is actually very interesting.  I met with her last week very briefly on the phone because I wanted to find out about the defense expert's exam and she told me that he spent three to five minutes with her, which I found a little bit shocking, but -- and that's mainly what we talked about.

Q    How many minutes did you spend with her?

A    I didn't spend -- I didn't spend time with her, but I did not claim to do an independent medical evaluation.  I did a file review.

Q    All right.

A    And I did not put in my report -- I did not put in my report that I obtained the following history through my evaluation.  I said that I did my history through the review of the file.  They're two very, very different things.

Q    So you've never asked her whether what she inhaled had a fishy smell or a sweet smell --

A    No.

Q    -- or a fruity smell --

A    No.

Q    -- or anything like that?

A    Nothing like that, no.

Q    Okay.  So you state it was many times higher than those that are toxic, her exposure, correct?

Page 39

A    I believe so, yes.

Q    And how many times higher?

A    I don't know.

Q    In fact, you don't know what the toxic level is, do you?

A    I don't recall.

MS. SEILA:  Objection, form.

Q    You don't recall or you don't know?

A    I don't recall.

Q    Okay.  What would you need to do to be able to recall that?

A    Well, it's not the same for everybody, obviously.  You would have to -- I don't know, okay.

Q    If you don't know the actual level, how can -- how can you say it was many times higher?

MS. SEILA:  Objection, form.

A    Because of her reaction to it.

Q    Didn't you already tell me that she was predisposed to react to this?

A    Right.  That's the point again.  So if you ask me what the level of exposure that people need to get sick is, it's not the same for everyone.

Q    But you're aware that there were other people in her immediate vicinity who were not wearing respiratory equipment who had no reaction whatsoever,

A    Correct.

Q    And, in fact, many substances have odor thresholds that are far below their toxic thresholds, sulfur dioxide being one example, right?

A    Correct.

Q    So when you wrote that levels were well above the odor threshold, that doesn't really tell us whether the levels were toxic, does it?

MS. SEILA:  Objection, form.

A    I'm sorry, could you repeat that.

Q    Sure.  When you wrote that the levels were well above the odor threshold, that doesn't actually tell us whether the levels were toxic, does it?

MS. SEILA:  Same objection.

A    Well, the other -- the other factors that you're dealing with a mixture of chemicals so -- but to answer your question, I believe the answer would be, yes, you're correct.

Q    Okay.  Would you agree that the air monitoring data that you reviewed would be the most reliable evidence of what level Ms. Wooten was actually exposed to --

A    No.

MS. SEILA:  Objection, form.

Q    -- for the things that were monitored?

Page 44

MS. SEILA:  Objection, form.

A    No.

Q    No?

A    No.

Q    Why not?

A    Because we don't know what she was exposed to. We don't have any personal air monitoring data for her.

Q    How many air samples that you reviewed from this case showed sulfur dioxide levels above the OSHA permissible exposure limit?

A    I don't believe I saw any.

Q    How many samples showed levels above the NIOSH recommended exposure limit?

A    I don't recall seeing any.

Q    Did you even discuss the air monitoring data in your report?

A    I believe I did.

MS. SEILA:  Objection, form.

Q    If you can point that out, I'd appreciate it.

A    I said what Mr. Johansen talked about.

Q    So you didn't talk about the actual air monitoring results you had?

A    Give me one second.  Can I take a minute?

Q    Absolutely.

A    So the exhibits attached to his deposition,

Page 45

there are measurements of particulate matter at a distance from the coke smoldering.  So we know two things.  As I said, we know that the levels were above the odor threshold and the odors were also above the level that could cause acute symptoms.

Q    You mean above the level to cause her symptoms; is that what you said?

A    Yes.  Yes, yes.

Q    Did you attempt to perform a dose-response analysis in this case?

A    No, I did not.

Q    Why not?

A    Because I did not believe it was relevant.  We talked about that before, right.

Q    Because you had already reached your conclusion?

A    No.

Q    So why not?

A    I didn't see any way to do so in this case.  We didn't have the data.

Q    So when you have a lack of data, what other things do you look for?

A    Well, I think -- again, I think, you know, you're talking about this as if it's a cancer case.  You describe -- the questions you're asking me are referring

Page 55

Q    And it's also possible that she was completely resolved of her symptoms from August 8th and the August 10 event was a completely separate causative event, correct?

MS. SEILA:  Objection, form.

A    Well, I'm trying to understand what you're asking me.  So you're saying that the massive doses of steroids cured her and then her lungs were okay and then she had another exposure and that's what's caused her problem; is that your question?

Q    Did you make any effort to determine whether the August 10, 2022 event was the sole cause or a contributing cause of her condition on August 10, 2022?

A    I'm sorry, say it one more time.

Q    Did you make any effort to determine whether the exposure to the landfill fire on August 10, 2022 was a causative event for the respiratory condition she complained of on August 10, 2022?

MS. SEILA:  Objection, form.

A    Now, when you say effort to determine, could you just be a little more specific for me?

Q    Sure, Doctor.  Sure.  You're trying to determine causation, right?

A    Correct.

Q    And you have two events two days apart,

Page 57

August 8th was the cause rather than August 10?

And that's where I got to my question of isolating the two.

A    What did I do to determine -- say it slowly now.

Q    Sure.  We have two events, August 8th, August 10.

A    Right.

Q    One possibility is the August 8th event caused all of her problems on August 10.  One possibility is the August 10 event caused all of her problems on August 10.  A third possibility is that it was a combination of the two.

You are the expert in this case and you are trying to tell the jury that this is all tied to the August 8th event and the jury wants to know how you ruled out August 10?

A    So you're asking me how I know a hundred percent that she was completely better?

Q    No, sir.  No, sir, that's not what I'm asking.

A    Let me -- I'm trying -- I'm not trying to be -- I'm just trying to understand your question --

Q    I asked you --

A    -- she had an insult to the lungs severe enough to require steroids on the 8th, right.  The

Page 58

likelihood of her recovering completely the next day, right, and not getting worse again, once the intravenous steroids left her system, is infinitely small, okay.

Now, if you're asking if it's possible that the 10th contributed as well, it is possible, yes.

Q     And it's also possible that the August 10th event is the only thing that has caused her ongoing problems after August 10th, isn't it?

MS. SEILA:  Objection, form.

A     I think it's extremely unlikely, extremely unlikely.

Q     Now, the judge is going to want to know how you quantify that, how you go about -- other than just, It's my opinion and you have to accept it, the judge wants to know the science behind that.  So saying it's infinitely small really doesn't answer that.  And this is going to be before the judge so I'm trying to give you an opportunity to explain how you can scientifically rule out August 10th as being the sole cause of her subsequent problems.

A     Okay.  So it's based on the magnitude of her symptoms on the 8th and the requirements that she had for heavy duty medications on the 8th, okay.  That would be the answer to your question.

And it's due to the knowledge that intravenous

Page 59

steroids don't stay in the body for a long period of time and, when they wear off, you can expect symptoms to recur, particularly with an additional insult to the lungs.

Q    And how long do they remain in your system?

A    At that level, probably about a day, two days.

Q    Do you know?

A    Well, again, it would depend on the person, but probably -- probably up to 48 hours.

Q    How would you go about determining whether they -- it was 24 hours, as you first said, rather than 48 hours?

A    Well, again, it's a range.  There's not -- it's not -- it's a decrease over time.

Q    So we really -- we really just don't know, do we?

A    Well, we know it's not going to be weeks or months and it's not going to be a half hour.

Q    In your opinion, were Ms. Wooten's symptoms more severe on August 8th or August 10th?

A    I think that's hard to say.

Q    Meaning you don't have an opinion on that?

A    I think it's hard to say.  Again, you know, she wasn't intubated or hospitalized on either date.  You know, she had severe symptoms on both dates.  So I

Page 60

think it's hard to say.

Q    In your training in occupational medicine, you were taught about alternative causation, correct?

A    Absolutely.

Q    What does that mean?

A    It means when something else causes disease. So, for example, exposure to carcinogens and smoking, that kind of thing.

Q    And when there are multiple potential causes of condition, you need to evaluate each one and determine which is the actual cause, correct?

A    For chronic diseases, yes.

Q    Why not for acute diseases, where you have two acute events?

A    You have two acute events separated by time though.

Q    Right.  And so how do you go about evaluating each one and determining which is the actual cause in that situation?

A    The actual cause of what?  That's the question that I keep asking.

Q    The cause of her respiratory distress on August 10th and following.

A    Okay.  I don't think there's a way to say for sure, okay.

Page 61

Q    Okay.  Is there a way to say within a reasonable degree of medical certainty?

A    I think it's a reasonable degree of medical certainty the toxic insult to her lungs on the 8th was at least strong enough to contribute to what happened to her on the 10th and, in combination, could be responsible for the disease.

Q    But you can't rule out that the August 8th event was not a contributing factor to her symptoms after August 10, correct?

A    You're asking if I could say that August 10th was a contributing factor?

Q    No, I'm asking if you can rule out or rule in, within a reasonable degree of medical certainty, that August 10 was the only causative factor for her --

A    I think it would be -- to a reasonable degree of medical certainty, to say that August 10th was the only factor, I don't see how anybody could say that.

Q    Why not?

A    Because there's no basis for that.

Q    What analysis did you perform to determine that her exposure on August 8th was the cause of her ongoing respiratory problems after August 10?

A    Again, it was based on her clinical presentation, her symptoms and her need for medication.

Page 62

Q    Did you do any analysis of the toxic emissions from landfill fires?

A    No, I did not.

Q    Why not?

A    I'm sorry?

Q    Why not?

A    I'm not understanding what you're getting to. When you say -- when you say "analysis," do you mean did I look at the substances that she was exposed to from that landfill fire; is that what you're asking?

Q    Just like you did with the substance from coke, yes.

A    I had nothing available to review.

Q    Did you try to make any determination of what might have been in those landfill fire?

A    No.

Q    Did you do any literature search to find out what are common components of landfill fire smoke?

A    No.

Q    Do you have any knowledge as to what landfill fire smoke contains chemically?

A    I think it depends on the landfill.

Q    And so your answer is, no, you didn't?

A    Again, I think it depends on the landfill.

Q    Okay.  Did you do any analysis, whether it's

Page 63

specific to this landfill or landfill fires in general, of what is typically found in a landfill fire -- in landfill fire smoke?

MS. SEILA: Objection, form.

A    Well, again, I think -- I've said it three times. It depends. If you're talking about burn pits, which we have a lot of experience, that's one question. If you're talking about Superfund sites, that's another question. So it really -- it really depends.

Q    Okay. But you haven't answered my question the three times I've given it. So I'm asking you, did you make any effort?

Not why you didn't bother. Did you make any effort?

A    Make any effort to what?

Q    To determine what is typically contained in landfill fire smoke?

A    Again, it depends on the landfill. So what effort would I have made?

So you're asking whether I would try to find out what was contained in the landfill that she had exposure to from a fire; is that your question?

Q    Let me say it a different way.

A    Yes, please.

Q    All right. We have a landfill --

Page 64

A    Okay.

Q    -- we have the actual landfill fire.

A    Yes.

Q    Did you make any effort to determine what was contained in that smoke?

A    And, again, I think we're disconnecting somehow, not by computer.  But when you say did I make any effort, do you mean that I would request results from that landfill fire?

Q    That could be.  I don't know what you might do.  I'm not the expert.  But did you make any -- so it's really a simple question because it's any effort.  So either you did or you didn't?

A    I did not, no.

Q    Okay.  Thank you.

A    Okay.

Q    Now, did you make any effort to determine whether there had been studies showing what is generally contained in landfill fires?

A    Again, we know that it depends on what the substances in the landfill are.

Q    And, again, you haven't answered my question.  The question is, did you make the effort?

A    To do what?

Q    To determine whether there are any reports

Page 65

about what is generally found in landfill fires, in their smoke?

A    I do not believe -- I do not believe there are typical components of landfill fires.  I think that's what I've been trying to tell you.

Q    Did you make any effort to determine what is contained in the smoke of any landfill fire?

A    It would depend on the landfill fire so --

Q    No, no, whether you did or did not does not depend upon that.

The question is, did you make that effort to determine the substance in landfill fire smoke from any landfill, any combination of landfills, anything?  It's yes or no.

A    No.  No.

Q    Thank you.  Your report on the second page states that the medical record of 9/14/18, referring to September 14, 2018, documents that she did have a history of asthma, but was asymptomatic without treatment, right?

I didn't hear your answer.

A    I'm sorry.  Correct.

Q    If, in April 2022, four months before the incident, Ms. Wooten went to a doctor who documented that her asthma condition was worsening, that would be

Page 69

record.  The time is 12:40 p.m.

BY MR. SIMPSON:

Q    Sorry, I lost my place.  There we are.

So we have documentation that Ms. Wooten's asthma was progressively worsening in the months before the August 8th, 2022, incident, correct?

A    Correct.

MS. SEILA:  Objection, form.

Q    And that progression was occurring before any exposure at the refinery, correct?

A    Correct.

Q    Did you perform any analysis to determine whether her post-incident respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the exposure?

A    No.

Q    Is there a way to distinguish between symptoms from natural progression of asthma versus symptoms from the alleged exposure?

A    I'm sorry, I misunderstood your question before.  You were asking if I could tell whether it was from the August 8th exposure, the August 10th exposure or whether the --

Q    No.

A    Was that your question?

Page 70

Q    No.  Let me restate it.

A    I'm sorry, I misunderstood.

Q    Did you perform any analysis to determine whether her post-incident respiratory symptoms, referring to the August 8th incident --

A    August 8th, not August 10th, right?

Q    Right.

A    Okay.

Q    So whether -- to determine whether her post August 8th respiratory symptoms represent a natural progression of her preexisting disease versus new injury from the August 8th exposure?

A    So the question is whether her acute symptoms and visits for emergency care was a natural gradual progression of this disease -- of a disease versus the result of an exposure --

Q    No, my question --

A    -- an analysis to do that --

Q    No.

A    -- an analysis to determine --

Q    My question is, did you perform any analysis to determine whether her condition, over the last several years, is just a natural progression of her preexisting disease versus new injury from the exposure?

A    Well, I think -- if I understand your question

Page 71

correctly, I think that they're entwined.  I think that the fact that she had preexisting disease contributes to her progression after the toxic insult to her lungs.

Q    How can you -- or can you determine how much of her current condition is due to natural progression versus the injury from the alleged exposure on August 8?

A    You're asking percentagewise?

Q    I'm asking, how can you do that at all?

A    I can't.

Q    Okay.  Were you aware that Ms. Wooten had asthma flare-ups in December 2019 in South Korea?

A    I don't recall.

Q    Were you aware that she had an asthma flare-up in April of 2021 that she characterized as "really bad"?

A    I don't recall.

Q    Did you consider her history along with the other history of her preexisting asthma in determining whether the August 2022 incident caused new injury or simply triggered her preexisting asthma?

A    Whether it's -- well, as I said before, her preexisting asthma is a factor in her reaction to the toxic exposure.

Q    Okay.  Did you consider that history though in determining whether the August 2022 incident caused new injury versus simply triggering preexisting asthma?

Page 80

evidence of lung damage from toxic inhalation?

A    Anatomical damage, no.

Q    What objective testing that you have seen is abnormal for Ms. Wooten?

A    I believe that her pulmonary function tests weren't normal.

Q    How many times has Ms. Wooten attempted pulmonary function testing that you know of?

A    I don't recall.

Q    Would you agree that over a period of nearly two years she tried it at least five to six times?

A    Yes.

Q    And she was unable to successfully complete valid testing on any of these occasions, correct?

MS. SEILA:  Objection, form.

A    Correct.

Q    When a patient repeatedly cannot complete PFTs, what are the possible explanations?

A    Severe asthma.

Q    Is that the only?

A    That's the most common one.

Q    Could it be poor effort?

A    Could be.

Q    And anxiety or panic can prevent you from completing the test, right?

Page 111

the patient stabilized, right?

A    Well, again, I really -- I find it -- I'd be shocked if -- it would just be shocking.  So I've never seen it happen.

Q    Can you show me in your report where you ruled out alternative causes?

A    I did not discuss alternative causes in my report.

Q    Can you show me in your report where you distinguished between her preexisting asthma and her alleged new injury?

A    No, I cannot show you that.  No.

Q    And you can't show me in your report where you addressed the August 10 landfill exposure, can you?

A    No, I cannot.

Q    Are you familiar with the concept of differential diagnosis?

A    Very much so.

Q    Can you explain what it is?

A    Well, when someone has shortness of breath, you want to make sure it's not heart disease.

Q    Well, in general, a differential diagnosis is you come up with a list of possible causes of the patient's condition and then systematically rule them out, correct?

Page 112

A    That's correct.

Q    Did you perform a differential diagnosis in this case?

A    I don't think it's -- I don't think it's relevant in this matter really.  Did I list all the possible alternative causations in the report and rule them out one by one, no, I did not.

Q    Is there anything in the report that you're going to show us that you did a differential diagnosis?

A    No, there's nothing in the report.  No.

Q    What alternative causes did you consider for her respiratory symptoms?

A    Cardiac disease.

Q    I'm sorry, what was that?

A    I'm sorry.  Cardiac disease.

Q    Anything else?

A    That was the major concern.

Q    You considered, I think, natural progression of preexisting asthma as a possible cause, right?

A    I thought you meant outside of lung disease. Yes, I did consider it.

Q    Okay.  And you ruled it out because why?

A    Based on her presenting symptoms were so acute.

Q    And I think we've established you did not

Page 113

consider the land fire exposure as a possible cause, correct?

A    Correct.

Q    And you did not consider anxiety and psychiatric disorders as a possible cause, correct?

A    Correct.

Q    How did you rule them out?

A    Based on her presentation.

Q    Can you show me in your report where you ruled them out?

A    No.

Q    You didn't consider deconditioning and obesity as possible causes of her exercise intolerance, did you?

A    No, I did not.

Q    Did you consider sleep apnea as a contributing factor to her symptoms?

A    Sleep apnea would not cause these symptoms. They would cause different symptoms.

Q    What symptoms would sleep apnea cause?

A    Fatigue, irritability, depression, snoring.

Q    Did you review any standardized instruments for measuring anxiety and depression that were conducted on Ms. Wooten?

A    No, I did not.

Q    Do you know if any were ever done?

Page 153

CERTIFICATE OF OATH

STATE OF FLORIDA     )
                     )
COUNTY OF DUVAL      )

I, Stacey G. Williams, Registered Professional Reporter, Notary Public, State of Florida, certify that DR. MARC WILKENFELD, appeared before me via Zoom on this 10th day of November, 2025, and was duly sworn.

Signed this 23rd day of November, 2025.

Stacey G. Williams,
Registered Professional Reporter
Notary Public - State of Florida
My Commission No.:  HH236458
Expires:  03/15/2026


Personally known
OR Produced Identification   X
Type of Identification Produced:
U.S. Passport ID Card

Page 154

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA      )
                      )
COUNTY OF DUVAL       )

       I, STACEY G. WILLIAMS, Registered Professional Reporter, Florida Professional Reporter, certify that I was authorized to and did stenographically report the foregoing video deposition of DR. MARC WILKENFELD via Zoom and that the foregoing transcript, pages 4 through 152 is a true and complete record of my stenographic notes.

       I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

       Dated this 23rd

                         STACEY G. WILLIAMS,
                         Registered Professional Reporter
                         and Notary Public.