**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

NICOLE WOOTEN,

　　　　　　　　Plaintiff,

　　　v.

LIMETREE BAY TERMINALS d/b/a
OCEAN POINT TERMINALS, PORT
HAMILTON REFINING AND
TRANSPORTATION, and WEST INDIES
PETROLEUM, LTD.,

　　　　　　　　Defendants.

Case No. 1:23-CV-00012

**ACTION FOR DAMAGES**

<u>JURY TRIAL DEMANDED</u>

**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals' ("Ocean Point" or "OPT") Motion for Summary Judgment (Doc. No. 274) should be denied because the record contains overwhelming admissible evidence of causation[1], including the opinions of six independent treating physicians, a second-opinion pulmonary examination by her employer's retained physician, the formal acceptance of the claim by the United States Department of Labor, and the expert opinion of Dr. Marc Wilkenfeld, all of which conclude that the August 8, 2022 exposure to petroleum coke smoke at the Limetree Bay Terminals caused Ms. Wooten's severe and permanent respiratory injuries.

**LEGAL ARGUMENT**

**I.　STANDARD OF REVIEW**

To prevail on a motion for summary judgment, a movant must show that there is "no genuine dispute as to any material fact," and that, based on the uncontroverted facts, it is "entitled to judgment as a matter of law." *Honore v. Virgin Islands Housing Finance Authority*, 2024 WL 4186762, at *4 (D.V.I. 2024); see also *Cornett v. Hovensa, LLC*, No. 1:07-CV-00025, 2012 WL 2865887, at *1 (D.V.I. July 12, 2012). "[A] party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Butts v. Sw. Energy Prod. Co.*,



---

[1] Plaintiff incorporates by reference her Response to Ocean Point's Statement of Undisputed Material Facts (RSOF) and her Counter-Statement of Material Facts (CSOF), filed concurrently herewith, as if fully set forth herein.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 2

No. 3:12-CV-1330, 2014 WL 3953155, at *1–2 (M.D. Pa. Aug. 12, 2014). The court must view all facts "in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *Honore*, 2024 WL 4186762, at *5.

## II.   OCEAN POINT ONLY CHALLENGES SPECIFIC CAUSATION

Ocean Point's brief states that "[f]or purposes of this motion only, Ocean Point assumes duty and general causation."[2] (Mot. at 5.) Its motion is therefore limited to a single sub-element: specific causation, with duty, breach, and general causation conceded.[3]

## III.   PLAINTIFF'S TREATING PHYSICIANS MAY TESTIFY AS TO CAUSATION

### A. Treating Physicians Are Competent Causation Witnesses

Ocean Point's brief ignores Plaintiff's six treating physicians, who may testify about what caused her injuries. *See Larson v. United States*, 2025 WL 1017516, at *4 (D.V.I., 2025) (holding that "[i]f the "treating physician [witness] will testify based *only* on [the witness'] personal knowledge acquired through [the witness'] treatment of [Plaintiff, the witness is] not required to prepare expert reports pursuant to Rule 26(a)(2)(B)."). Indeed, "[a] treating physician's opinions regarding causation, degree of permanent disability, and need for future medical care 'are a necessary part of the treatment of the patient.'" *Bharucha v. Holmes*, 2010 WL 1878416, at *2 (D.S.D.,2010).

Courts draw a distinction between "hired guns" who examine a patient for purposes of litigation, and treating physicians whose opinion testimony "is based upon their personal knowledge of the treatment of the patient and not information acquired from outside sources for the purpose of giving an opinion in anticipation of trial." *Id.* In *Pease v. Lycoming Engines*, 2012 WL 162551, at *12 –

---

[2] The evidence of Ocean Point's duty and breach is overwhelming. Ocean Point controlled security and access to the facility. CSOF ¶62. It knew the smoldering emergency had been underway since August 4. CSOF ¶¶ 7c – 7g, 8, 63. CBP agents entered through the front gate daily. CSOF ¶62. Ocean Point never warned Ms. Wooten or any CBP personnel. CSOF ¶63. Its fire chief was "told by his management not to respond to the incident." CSOF ¶65. It demanded $7.9 million in arrears before releasing fire equipment. CSOF ¶65. The factfinder can draw the reasonable inference from this evidence that Ocean Point's breach of duty was a cause in fact of Ms. Wooten's injuries.

[3] In the Virgin Islands, the "foundational elements" of negligence are (1) a legal duty of care to the plaintiff, (2) a breach of that duty of care by the defendant, (3) constituting the factual and legal cause of (4) damages to the plaintiff. *Antilles School, Inc. v. Lembach*, 64 V.I. 400, 409 (V.I. 2016); *see also Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (2014).

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 3

13 (M.D. Pa. 2012), the court determined that testimony regarding a patient's diagnoses, prognosis, and causation inherently involved specialized knowledge within the scope of Rule 702, but the treating physicians were not required to prepare written expert reports under Rule 26(a)(2)(B) since their opinions were formed as part of routine patient care. *See also Schweikert v. Eagle*, No. CV 20-4310, 2022 WL 394751, at *4 (E.D. Pa. Feb. 9, 2022) ("Where treating physicians form their opinion on causation or prognosis as part of the ordinary care of a patient, they are not required to provide Rule 26(a)(2)(B) expert reports.").

The Virgin Islands Superior Court reached the same conclusion in *Gerald v. R.J. Reynolds Tobacco Co.*, 2018 WL 4062154, at *3, holding that "a treating physician's determination of the cause of the diseases of those under his care is the *sine qua non* of the doctor-patient relationship." The court concluded: "Finally, because medical causation is a core issue in this case, [the treating physician's] opinion as [the patient's] treating physician will be of assistance to the jury as trier of fact." *Id.*

In this case, Ms. Wooten's treating physicians formed their causation opinions as part of treating her, not in anticipation of litigation. Dr. Campbell diagnosed reactive airway disease from smoke inhalation on the day of the exposure. CSOF ¶16. Dr. Morton-Acker attributed the asthma exacerbation to the petroleum coke exposure ten days later. CSOF ¶28. Dr. Graham, Dr. Otusanya, and Dr. Garfield each independently reached the same conclusion based on their clinical evaluations and treatment of Ms. Wooten over the ensuing months. CSOF ¶¶32, 35, 38. Dr. Muraina conducted a comprehensive independent medical examination, including spirometry, lung volume measurements, and a six-minute walk test, and found a "direct causal relationship." CSOF ¶42. Their testimony is admissible and independently sufficient to create triable issues on causation.

**B. Treating Physician Opinions Based on Patient History Are Reliable.**

In *Brathwaite v. Xavier*, 71 V.I. 1089, 1098–99 (V.I. 2019), the Virgin Islands Supreme Court addressed what constitutes a reliable basis for a medical expert's opinion on the cause of an injury. The Court held: "[W]e have previously recognized 'a patient's medical history, including subjective

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 4

complaints, to be a sound basis for a medical expert's diagnosis in some instances.'" *Id.* (citing *Suarez v. Gov't of the V.I.*, 56 V.I. 754, 761 (V.I. 2012)). In *Brathwaite*, the treating physician's differential diagnosis was based on the plaintiff's subjective, self-reported symptoms and had not been independently verified by objective imaging. *Id.* at 1096. The Supreme Court held that even where negative test results conflicted with the physician's opinion, "the existence of conflicting evidence does not render the opinions inadmissible." *Id.* at 1098–99. The Court ruled: "Brathwaite was entitled to have the jury weigh for itself the apparently conflicting evidence and reach its own determination as to the credibility of [the treating physician's] conclusions." *Id.* at 1099.

Here, Ms. Wooten's treating physicians relied on their physical examinations, her medical history, her self-reported account of the exposure, diagnostic testing including pulmonary function tests, imaging, and walk tests, and the temporal relationship between the exposure and the onset of symptoms. "Performing physical examinations, taking medical histories, and utilizing laboratory tests all provide significant evidence of a reliable differential diagnosis." *Turbe v. Robert A. Lynch Trucking, Inc.*, 41 V.I. 146, 154–55 (Terr. V.I. 1999) (quoting *In re Paoli R.R. Yard*, 35 F.3d at 758). Ocean Point has not alleged nor demonstrated that any treating physician's opinion is based on unsupported speculation. The jury is entitled to hear and weigh this evidence.

## IV.   PLAINTIFF HAS ADMISSIBLE EVIDENCE OF CAUSATION

Ocean Point asserts that Plaintiff has no "competent evidence" of causation. (Mot. at 1.) That assertion is false. The record contains a wealth of independent medical opinions from treating physicians who never conferred with one another, from the employer's retained expert, from the federal government, and from Plaintiff's retained expert, all reaching the identical conclusion: Ms. Wooten's exposure to petroleum coke smoke on August 8, 2022 caused her injuries.

For instance, Dr. Lyn Campbell diagnosed reactive airway disease from smoke inhalation on August 8, 2022, the very day of the exposure. CSOF ¶16. Dr. Terrie Morton-Acker opined on October 18, 2022 that "Ms. Wooten's exacerbation of her asthma stemmed from the exposure of the chemicals

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 5

found burning at the oil refinery on the Virgin Island." CSOF ¶28. Dr. Olufisayo Otusanya opined on February 9, 2023 that Ms. Wooten's "symptomatology and PFT [are] suggestive of reactive airway dysfunction syndrome" caused by sulfur dioxide exposure. CSOF ¶32. Dr. Jamie Garfield of Temple University Lung Center independently concluded on April 26, 2023 that Ms. Wooten has "severe persistent asthma triggered by exposure to biomass fuel (carbon monoxide, carbon dioxide, sulfur dioxide, and particulate matter)." CSOF ¶35. Dr. Carlette Graham opined on September 20, 2023 that the August 8, 2022 work injury "caused a permanent aggravation to the patient's pre-existing Asthma" and that Ms. Wooten is "unable to return to work in a Law Enforcement Capacity." CSOF ¶38. Dr. Oyekunle Muraina, a board-certified pulmonologist retained by Plaintiff's employer, examined Ms. Wooten on April 19, 2024 and concluded: "There is direct causal relationship between the diagnoses above and the work-related injury of exposure to Petroleum 'coke' burn smoke necessitating prolonged debility with aggravation of the pre-existing asthma and respiratory failure with hypoxia." CSOF ¶¶40–43. The U.S. Department of Labor formally determined that the weight of the medical evidence supported Dr. Muraina's causation opinion, listed the Date of Injury as August 8, 2022, and accepted anxiety disorder, major depressive disorder, and unspecified asthma with acute exacerbation as caused by the work-related exposure. CSOF ¶39.

Finally, Plaintiff's retained expert, Dr. Marc Wilkenfeld, a board-certified occupational and environmental medicine physician, opined to a reasonable degree of medical certainty that the August 8, 2022, petroleum coke exposure caused Ms. Wooten's injuries. CSOF ¶¶49–50. Dr. Wilkenfeld is not the Plaintiff's only causation witness; he is the seventh independent medical professional to reach the same conclusion. Ocean Point does not identify any physicians with differing opinions. It does not address Plaintiff's treating physicians' evidence on causation, or her employer's retained examiner. It does not acknowledge the DOL's acceptance. Defendant has not "affirmatively show[n] the absence of evidence in the record, for summary judgment." *Butts* at *1–2.

### V.    DR. WILKENFELD IS NOT THE ONLY CAUSATION WITNESS

Ocean Point attacks Dr. Wilkenfeld's methodology in the exact same way as it did in the motion to exclude him as an expert witness. (Mot. at 6–10.) [ECF No. 273]. For summary judgment purposes, Defendant's conclusion depends on the premise that excluding Wilkenfeld would leave Plaintiff with no evidence. (Mot. at 13 ("Without that foundation, there is no case.").) That premise is wrong. Moreover, even if Dr. Wilkenfeld's testimony were excluded, which Plaintiff vigorously opposes in her *Daubert* opposition, the record still contains the causation opinions of six treating physicians and the DOL's formal acceptance.

Ocean Point cites *Henry v. St. Croix Alumina, LLC*, 572 F. App'x 114, 120 (3d Cir. 2014), for the proposition that expert testimony on causation is required in a toxic tort case. (Mot. at 1, 5 - 6.) But *Henry* involved claims for long-term, latent injuries from chronic exposure to bauxite dust, not the acute respiratory injury from a single, identifiable exposure event at issue here. *Henry* also did not hold that treating physicians cannot provide causation testimony. The six treating physicians' opinions, the Muraina IME, and the DOL acceptance more than satisfy Plaintiff's burden.

Ocean Point also relies on *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 165 (3d Cir. 1999), and *Smith v. Katz*, 2013 WL 1182074 (D.V.I. 2013). But *Heller* addressed whether the "remaining evidence of record was insufficient to create a material issue of fact on causation." *Id.* Here, the "remaining evidence" without Dr. Wilkenfeld includes seven independent causation opinions. *Smith* involved a plaintiff whose expert failed to provide any quantitative estimate of exposure and whose treating physicians had not linked the injuries to the alleged exposure. Here, six treating physicians have done exactly that.

### VI.    OCEAN POINT'S "CIRCULAR BOOTSTRAPPING" ARGUMENT FAILS

Ocean Point argues that Dr. Wilkenfeld engaged in "circular bootstrapping" by "using Plaintiff's symptoms to prove the very exposure he was supposed to measure." (Mot. at 6.) This mischaracterizes his methodology. Dr. Wilkenfeld did not merely observe that Ms. Wooten had

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 7

symptoms after visiting the refinery and conclude she was exposed. His methodology included review of Ms. Wooten's complete medical history, her test results, the known composition of petroleum coke combustion products, the PHRT Incident Report documenting the smoldering and the substances released, and the EPA Inspection Report documenting the ongoing emissions. CSOF ¶¶49–51. He then evaluated the temporal relationship between the exposure, the immediate onset of symptoms, and the clinical course that followed. His opinion is that the severity and immediacy of Ms. Wooten's clinical response, which required emergency nebulizer treatments and steroid injections for the first time in her life, is clinical evidence of the magnitude of the toxic insult, not a circular assumption.

When a patient with well-controlled asthma drives into thick, visible smoke from burning petroleum coke and immediately develops severe respiratory distress requiring emergency treatment for the first time in her life, the clinical presentation tells the physician something about the exposure. That is not circular reasoning; it is clinical medicine. As the Eighth Circuit recognized in *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 931 (8th Cir. 2001), "the immediacy of [plaintiff's] acute symptoms to her exposure" is itself evidence of causation. The "circular bootstrapping" argument, even if it had merit, would eliminate one of eight independent causation opinions. It would not eliminate the case.

## VII.    OCEAN POINT'S DOSE-RESPONSE EVIDENCE ARGUMENT IS WRONG

Ocean Point argues that "the dose makes the poison" and that "[w]ithout quantifying the dose of any chemical Plaintiff was allegedly exposed to, her claims fail as a matter of law." (Mot. at 7.) This argument is wrong and misplaced in the context of an acute-exposure case. This is not a case of chronic, low-level exposure over months or years, in which dose-response data might be necessary. This is a case of acute exposure to visible, thick smoke from a burning industrial substance, followed by immediate respiratory distress. "[T]here may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology." *Cavallo v. Star Enter.*, 892 F. Supp. 756, 773–74 (E.D. Va. 1995), *aff'd in part*, 100 F.3d 1150 (4th Cir. 1996); *see also Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 931

Case: 1:23-cv-00012-RAM-EAH    Document #: 286    Filed: 05/28/26    Page 8 of 21
*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 8

(8th Cir. 2001) (affirming jury award where "the immediacy of [plaintiff's] acute symptoms to her exposure" was sufficient to establish causation).

The absence of air sampling data is not a deficiency in Plaintiff's case. It is a consequence of Defendants' own failures. Neither Ocean Point nor Port Hamilton performed personal air monitoring on individuals entering the facility during an active smoldering emergency. Ocean Point's air monitors were positioned between the coker and the tugboats, not at Ms. Wooten's location, and showed "nil" readings that, as Plaintiff's engineering expert confirmed, were "very far" from her position and not downwind of the coke dome. CSOF ¶64. A defendant cannot fail to collect exposure data during an emergency it created, and then argue that the absence of that data defeats the plaintiff's claim.

Dr. Wilkenfeld specifically addressed the dose-response issue, testifying that dose-response analysis is not relevant in an acute-exposure case in which the patient had an immediate symptomatic reaction. CSOF ¶49. Port Hamilton's Incident Report identifies the combustion products released, including sulfur dioxide and particulate matter. CSOF ¶60. Multiple treating physicians diagnosed conditions known to result from toxic inhalation. CSOF ¶¶16, 25, 32, 35. General causation, which is that petroleum coke combustion products can cause respiratory injury, is not disputed. Ocean Point concedes it for purposes of this motion. (Mot. at 5.)

Furthermore, quantitative dose reconstruction is not required in acute-exposure cases where measurements are unavailable. *See Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999) ("[W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation."); *Heller,* 167 F.3d at 157 ("[E]ven absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness.") (citing *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 808 (3d Cir. 1997).

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 9

Here, Dr. Wilkenfeld performed a qualitative exposure assessment, which is a well-accepted method in occupational medicine. He relied on the known composition of coke emissions (VOCs, sulfur dioxide, coal tar, coal tar pitch, creosote, PAHs, and metals), the presence of a strong odor (a recognized indicator of airborne contaminants), and, critically, the immediate physiological reaction experienced by Ms. Wooten. OPT attempts to dismiss this as "no quantitative foundation," but Rule 702 does not require experts to convert real-world exposures into parts-per-million calculations where no such data exists. Accordingly, Dr. Wilkenfeld was correct not to rely on such irrelevant data.

## VIII.   SPECIFIC CAUSATION IS ESTABLISHED

Ocean Point argues that Plaintiff cannot establish specific causation because Dr. Wilkenfeld did not perform a differential diagnosis or rule out alternative causes. (Mot. at 9–10.) This argument fails for three reasons. First, Dr. Wilkenfeld addressed and ruled out the alternative causes that Ocean Point identifies. He testified that the likelihood of the landfill fire being the sole cause of Ms. Wooten's symptoms was "so so so so unlikely." CSOF ¶20. He explained that the steroids administered on August 8 remain active for 24–48 hours and that when they wore off, symptom recurrence was expected. CSOF ¶ 20. He characterized the August 10 episode as a "cumulative effect" of the two exposures, not an independent cause. *Id.*

Second, multiple treating physicians effectively performed differential diagnoses during their clinical evaluations. Dr. Garfield's allergy panel results were "essentially all negative except for dust mite sensitization," ruling out allergic causes and confirming that the August 8 chemical exposure was the causative event. CSOF ¶36. Dr. Muraina diagnosed "airway disease due to other specific organic dusts" (ICD-10 J66.8) and stated that Ms. Wooten's "hypoxemia cannot be explained solely by obstructive airway disease due to bronchial asthma," thereby ruling out pre-existing asthma as the sole explanation. CSOF ¶42. Third, Ocean Point's alternative explanations are factual disputes for the jury, not grounds for summary judgment. *See Brathwaite*, 71 V.I. at 1089; *See also Rymer v. Kmart Corp.*, 68 V.I.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 10

571, 579 (V.I. 2018) (reversing grant of summary judgment where court improperly weighed evidence against non-moving plaintiff).

## IX.     THE RADS DIAGNOSIS IS SUPPORTED BY THE MEDICAL EVIDENCE

Ocean Point argues that "the objective evidence required for a RADS diagnosis does not exist in this case" because Dr. Wilkenfeld testified that "[t]here are no objective test results." (Mot. at 8.) This argument misrepresents the record. Dr. Wilkenfeld explained that objective findings on chest imaging are "usually not" present in asthma exacerbation from toxic exposure. (**Exhibit 5**, Wilkenfeld Depo. at 23–24). The absence of findings on bronchoscopy, chest X-ray, and CT is consistent with, not contradictory to, the diagnosis. These tests evaluate lung structure, not airway reactivity. Ms. Wooten's injury is to her airways, not to lung parenchyma. CSOF ¶48.

Moreover, pulmonary function testing showed dramatic objective deterioration. A December 15, 2022 PFT revealed FEV1 at 65% of predicted and FEV1/FVC ratio of 50%, which is a significant decline from the normal PFT five months earlier. CSOF ¶29. Dr. Muraina's examination found an oxygen saturation of 89% at rest, with desaturation to 82% within 2 minutes of walking. CSOF ¶41. A cardiopulmonary exercise test revealed peak VO2 of only 59% of predicted, with the physician's interpretation stating: "Cannot exclude pulmonary mechanical limits to exercise." CSOF ¶37. A six-minute walk test showed Ms. Wooten could walk only 900 feet—47.5% of predicted—requiring eleven pauses. CSOF ¶47. These are objective findings confirming severe pulmonary impairment.

Whether Ms. Wooten's condition is characterized as RADS, severe persistent asthma, or aggravation of pre-existing asthma, the medical evidence uniformly attributes it to the August 8 exposure. The diagnostic label does not change the causation analysis. *See Brathwaite*, 71 V.I. at 1098–99 (conflicting evidence goes to weight, not admissibility).

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 11

## X.    ALTERNATIVE CAUSATION THEORIES ARE JURY QUESTIONS

Ocean Point identifies three alternative explanations: (1) pre-existing asthma and Saharan dust, (2) "rapid recovery" on August 9, and (3) the August 10 landfill fire. (Mot. at 2–3, 9–10.) Each is contradicted by the evidence.

As to point one, Ms. Wooten's childhood asthma was "well managed, under control." CSOF 3. She was never hospitalized for asthma. (*Id.*). Her July 2022 PFT was normal, over 90 percent. She was exercising three to five times per week. CSOF ¶6. After the August 8 exposure, she was diagnosed with severe persistent asthma, chronic respiratory failure with hypoxia, oxygen saturation of 89% at rest, and a prognosis of "poor." CSOF ¶¶41–43. Dr. Muraina stated that "hypoxemia cannot be explained solely by obstructive airway disease due to bronchial asthma." CSOF ¶42.

Ocean Point emphasizes the August 9 ER findings of clear lungs as evidence of "recovery." (Mot. at 3.) Dr. Wilkenfeld explained that Ms. Wooten was "very, very heavily medicated the day before" and that steroids remain active for 24–48 hours. CSOF ¶ 20. When the medications wore off, Dr. Campbell documented an "extreme breathing crisis" on August 10. CSOF ¶18. The August 10 medical record documented "SOB that she has had x2 days," demonstrating continuous symptoms from August 8. CSOF ¶19.

Dr. Wilkenfeld testified that the likelihood that the landfill exposure was the sole cause was "so so so so unlikely." CSOF 20. The treating physician on August 10 documented that Ms. Wooten "was exposed to chemical fire/smoke on monday 8/8/22." CSOF ¶18. The August 10 episode was a continuation of the injury that began on August 8. At most, these alternative theories create factual disputes for the jury. Summary judgment is not for resolving competing medical opinions.

Moreover, Ocean Point has cited contrary medical evidence. It has identified no expert who concluded that the petroleum coke exposure ***did not*** cause her injuries. It has proffered no medical opinion that her severe persistent asthma, chronic respiratory failure with hypoxia, and oxygen desaturation to 82% within minutes of walking are attributable to some cause other than the exposure.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 12

Its motion is based entirely on the premise that Plaintiff's evidence should be excluded, not that it is outweighed by contrary evidence.

### XI.     THE IMMEDIATE ONSET OF MS. WOOTEN'S SYMPTOMS IS WITHIN THE COMMON KNOWLEDGE OF A JURY

Plaintiff submits that this argument is unnecessary because she has abundant expert and medical evidence. But to the extent the Court considers it, under the Federal Rules of Evidence, expert testimony is not always required to establish causation in toxic exposure cases. Under Rule 701, a lay witness may testify to opinions "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701. Expert testimony under Rule 702 is required only when the subject matter is beyond the understanding of the average layperson.

The Sixth Circuit held in *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 430 (6th Cir. 2009), that "[e]xpert testimony is not necessary to allow a reasonable jury to conclude" that filling a space "with airborne poison" constitutes negligence causing injury. Similarly, in *Wade v. Plantation Pipe Line Co.*, No. 2:05-CV-697, 2007 WL 1668815, at *3 (M.D. Ala. 2007), the court held that "the immediacy of the reaction that these plaintiffs experienced and the fact that they all had similar reactions is sufficient to show causation." *See also Arias v. DynCorp*, 928 F. Supp. 2d 1, 7 (D.D.C. 2013) (lay testimony of temporal relationship sufficient for specific causation in toxic tort case); *Cavallo*, 892 F. Supp. at 773–74 ("if one were exposed to a substantial amount of 'chemical X and immediately thereafter developed symptom Y'"); *G.C. ex rel. Johnson v. Wyndham Hotels & Resorts, LLC*, 829 F. Supp. 2d 609, 612–13 (M.D. Tenn. 2011) (lay testimony of symptoms after toxic exposure sufficient without expert testimony).

Here, the causal connection is straightforward: Ms. Wooten drove into thick black smoke, immediately developed severe respiratory distress that her rescue inhaler could not relieve, was rushed

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 13

to urgent care, and has been disabled ever since. CSOF ¶14. A juror does not need specialized medical training to understand this sequence.

### XII. OCEAN POINT'S CLAIM-SPECIFIC ARGUMENTS ALSO FAIL

Ocean Point argues that each of Plaintiff's five claims fails on independent grounds beyond causation. (Mot. at 10–13.) Each argument is without merit.

#### A. Gross Negligence (Count I).

"In the Virgin Islands, gross negligence means wanton, reckless behavior demonstrating a conscious indifference to the health or safety of persons or property." *Brathwaite v. Xavier*, 71 V.I. 1089, 1110–11, 2019 VI 26, ¶ 30, 2019 WL 3287069, at *10 (V.I., 2019). Further, "gross negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention." *Id.* (citing *Yusuf*, 2016 WL 9454143, at *4. The record supports a jury finding that Ocean Point acted with reckless disregard for Plaintiff's safety. George Williams, affirmed that as a maintenance engineering manager for Limetree Bay Terminals/Ocean Point Terminals, reporting to Jeff Charles, the Chief Operating Officer of OPT, his duties included traveling around the facility to check on work and contractors to provide support with labor, tools, and materials, and he tried to spend one to two hours out in the field each day providing support. CSOF ¶¶ 7a-7g.

Mr. Williams testified that in August 2022, while traveling around the facility doing his daily rounds, he noticed something was wrong with a Coke Dome. He could see discoloration on the tank, and it looked like the paint was blistering. While he did not see any black smoke, vapors, or clouds, as he drove by with his windows down on the road that travels north to south to the docks (west of the coke domes), he smelled a sulfur-like odor, experienced a stinging sensation in his nose and throat, watery eyes, and coughed, but that he immediately left the area, was able to recover, and did not report the incident to anyone. CSOF ¶ 7c. He attested that over the next few days, he drove the road that runs east to west to the north of the domes, where he did not observe much activity, did not see any

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 14

vehicles, people, a fire truck, or heavy equipment, and there did not seem to be any urgency to fix the situation. No barricades were in place. CSOF ¶ 7d. There was a hot spot on the north coke dome. (*Id.*)

At Terminals' morning meetings, which were held daily and led by Jeff Charles, the smoldering of the north dome was noted by Jeff Charles and himself, yet he did not observe Terminals taking any action to remedy the situation. CSOF ¶ 7e. Several days or even weeks later, when there was dark smoke coming out of the dome, he finally saw contractors and refinery personnel working at the domes and saw vehicles, heavy equipment, a fire truck, and the area was barricaded off. CSOF ¶ 7f.

Neither Jeff Charles nor anyone else from Terminals asked him to provide additional maintenance personnel to help contain and control the smoldering. CSOF ¶ 7g. On August 4, 2022, between 3:00 and 4:45 a.m., a carbon monoxide alarm automatically activated at Coke Dome #1. By 6:15 a.m., a refinery safety supervisor observed smoke inside the dome. Incident Command was activated by 10:00 a.m. CSOF ¶ 8.

Ocean Point controlled the security gate. It knew a petroleum coke smoldering emergency had been underway for four with fire trucks deployed. It knew the dome was exhibiting charring and blistering. CSOF¶ ¶ 7b-7f. Defendant also knew CBP officers entered the facility daily to perform mandatory inspections. Yet it posted no warnings, placed no signage, restricted no access, and notified no one. When asked why, its COO testified: "No reason to. There's no impact to them." CSOF ¶63. On top of that, Ocean Point's management ordered its fire chief not to respond to the incident (CSOF ¶65), refused to release fire equipment without payment of $7.9 million in arrears CSOF ¶65, and did not execute a mutual aid agreement until thirteen days after Ms. Wooten's exposure CSOF ¶65. A reasonable jury could find that allowing a federal officer to drive unwarned into thick, toxic smoke during an active industrial emergency, while obstructing the fire response, constitutes wanton or reckless indifference to safety, warranting punitive damages.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 15

Ocean Point's argument that it observed "only light vapor and steam" (Mot. at 10) is based on Charles's testimony about the early days of the smoldering, not August 8. By August 8, Ms. Wooten observed thick black smoke. CSOF ¶14. PHRT's Incident Report confirms the dome was charring and blistering. CSOF ¶6.

### B.    Negligence (Count II).

Ocean Point concedes that its negligence argument rises and falls with causation. (Mot. at 11.) For all the reasons set forth in Sections III through XI above, Plaintiff has more than sufficient evidence of causation to survive summary judgment on Count II.

### C.    Failure to Warn (Count III).

Ocean Point argues that failure to warn is "not a separate cause of action" and that "a warning would not have changed her presence at the tugboat dock" because she was executing mandatory CBP inspection authority. (Mot. at 11.) Both arguments fail.

First, whether the failure to warn claim is brought under a separate theory or as a claim for premises liability, the evidence supports it. Ocean Point controlled access, knew of the hazard, and provided no warning. CSOF ¶¶62–63. That is a breach of the duty of care owed to persons entering the facility. *See Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 386, 2014 WL 5282116, at *5 (V.I., 2014) (holding that "[l]iability for ... foreseeable harms is based on the possessor's superior knowledge of the property, as the possessor is in the best position to know of potentially dangerous conditions on the property.").

In the Virgin Islands, even where there is no duty "to maintain and repair" property adjacent to one's property, the land owner still has a "legal duty to warn or report the dangerous condition." *Simkins v. Bank of Nova Scotia*, 79 V.I. 931, 941, 2025 VI 2, ¶ 19, 2025 WL 66764, at *5 (V.I., 2025). In this case, Ocean Point was the landowner and possessor with superior knowledge of the dangerous condition on its land. It is undisputed Ocean Point had actual knowledge of the dangerous condition. It is undisputed Defendant failed to warn of the dangerous conditions to protect Plaintiff.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 16

Second, the argument that a warning would not have changed anything is factually wrong and legally irrelevant. If Ms. Wooten had been warned, CBP could have delayed the inspection, sent an officer equipped with respiratory protection, chosen a different route to the tugboats, or declined to send anyone until conditions were safe. The fact that CBP had mandatory inspection authority does not mean individual officers were required to drive into thick smoke without respiratory protection. Ocean Point's argument underscores its culpability: it knew federal officers were entering the facility daily to perform mandatory duties, and it still provided no warning of the ongoing emergency. That is the very definition of a failure to warn.

If Ms. Wooten had been told at the security gate that a petroleum coke smoldering emergency was underway and that thick smoke was present near the tugboat dock, the probability that she would have driven directly into the smoke without precautions is substantially reduced. Whether a warning would have changed the outcome is a question of fact for the jury, not a basis for summary judgment.

### D.     Strict Liability (Count IV).

Ocean Point argues that strict liability is foreclosed by *Commissioner of DPNR v. Century Aluminum Co.*, 2014 WL 184445 (D.V.I. Jan. 16, 2014), which it characterizes as holding that "petroleum refining and coke storage are not abnormally dangerous activities." (Mot. at 12.) *Century Aluminum* is distinguishable and does not foreclose Plaintiff's claim. First, *Century Aluminum* addressed a fundamentally different kind of harm. That case involved slow groundwater contamination from routine operational leaks at the refinery over decades, Petroleum was seeping into the Kingshill Aquifer beneath the facility. The court's analysis focused on whether the storage and handling of petroleum products that inevitably leak into groundwater constitutes an abnormally dangerous activity. It did not analyze whether the uncontrolled combustion of improperly stored petroleum coke, which was releasing thick, visible toxic smoke into the air for twenty-three consecutive days, constitutes an abnormally dangerous activity. The Restatement limits strict liability to "the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts §

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 17

519(2). The *Century Aluminum* court acknowledged this limitation. *See* 2014 WL 184445, at *7 n.5. Airborne toxic smoke exposure causing acute respiratory injury is a different kind of harm than underground petroleum leaks contaminating an aquifer. The court never addressed it.

Second, the *Century Aluminum* court's analysis of the third Restatement factor, whether reasonable care can eliminate the risk, supports Plaintiff's position. In *Century Aluminum*, the court found that industry practices such as pipe coatings, cathodic protection, and equipment monitoring programs could reduce the risk of groundwater leaks to "tolerable levels," and that this weighed against strict liability. *Id.* at *5. Here, the opposite is true. The smoldering occurred because Defendant failed to use reasonable care to contain it. CSOF ¶¶ 7a-7g. Port Hamilton's Incident Report concluded that the coke was "not being managed properly for long term storage" and that "[n]o provisions were made to maintain the coke at a certain moisture level." CSOF ¶7. The third-party contractor "did not have any procedures addressing the possibility of smoldering." *Id.* The EPA found no preventive maintenance program, no current hazard assessment, no operating procedures, and conditions demonstrating a "systemic lack of maintenance." CSOF ¶61. When reasonable care is completely absent, the third Restatement factor weighs in favor of strict liability, not against it.

Third, the *Century Aluminum* court itself distinguished *Henry v. St. Croix Alumina, LLC*, 2009 WL 2778011 (D.V.I. Aug. 28, 2009), where strict liability was imposed for the storage of toxic "red mud" in open-air sheds at an alumina facility exposed to hurricane dispersal. The *Century Aluminum* court explained that "the dangerous attributes of caustic 'red mud' exposed to dispersion over residential communities by hurricane-force winds" outweighed the economic benefits in *Henry*. 2014 WL 184445, at *6. This case is more analogous to *Henry* than to *Century Aluminum*. Like *Henry*, this case involves the storage of a large quantity of a dangerous industrial byproduct (approximately 13,000 metric tons of petroleum coke) in enclosed domes without adequate safety measures, resulting in the uncontrolled release and dispersion of toxic substances over areas where workers and federal officers routinely traveled. The harm here, like in *Henry*, arose not from routine operations but from the

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 18

foreseeable consequence of storing massive quantities of a combustible material without proper management.

Next, *Century Aluminum* is a District Court opinion. It is not binding Third Circuit or Virgin Islands Supreme Court precedent. And, it fails to address the distinct question presented here: whether the storage of massive quantities of petroleum coke without any safety protocols, resulting in a twenty-three-day uncontrolled combustion event releasing toxic airborne emissions, constitutes an abnormally dangerous activity. For these reasons, *Century Aluminum* does not foreclose Plaintiff's strict liability claim.

### E.    Private Nuisance (Count V).

Ocean Point argues that Plaintiff's nuisance claim fails because she "had no possessory interest in the refinery premises" and was merely "a transient federal officer." (Mot. at 12–13.) Ocean Point analyzes Plaintiff's nuisance claim exclusively as a private nuisance, but the facts establish a public nuisance, for which no possessory interest is required.

To the extent the Second Amended Complaint labels Count V as a claim for "private nuisance," the label does not foreclose a public nuisance theory. Under federal notice pleading standards, the Court examines the substance of the allegations, not the label attached to them. Fed. R. Civ. P. 8(a) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"). The factual allegations underlying Count V state a claim for public nuisance regardless of the heading used.

A public nuisance is "an unreasonable interference with a right common to the general public." *Cifre v. Daas Enters., Inc.*, 62 V.I. 338, 359 (V.I. Super. 2015) (citing *Bell v. Radcliffe*, No. ST-13-CV-392, at 17–20 (V.I. Super. Ct. Apr. 30, 2014)). A public nuisance does not require that the offending activity occur on public land. The location of the activity is irrelevant; what matters is whether it unreasonably interferes with a right common to the public. An industrial facility on private land that releases toxic emissions affecting persons in the surrounding area is a classic public nuisance. *See, e.g., Comm'r of*

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 19

*DPNR v. Century Aluminum Co.*, 2014 WL 184445 (D.V.I. Jan. 16, 2014) (analyzing environmental claims arising from private refinery operations on the same facility at issue here); *Henry v. St. Croix Alumina, LLC*, 2009 WL 2778011 (D.V.I. Aug. 28, 2009) (analyzing tort claims from toxic emissions released from a private alumina facility).

Here, Ocean Point's petroleum coke smoldered uncontrolled for twenty-three days, releasing thick, visible toxic smoke, including sulfur dioxide, carbon monoxide, volatile organic compounds, and particulate matter, across the facility and surrounding areas. CSOF ¶¶60–61. This was an unreasonable interference with the right of the general public, including CBP officers performing mandatory federal duties, emergency responders, contractors, and anyone entering the facility, to breathe air free from toxic industrial emissions. The smoldering affected anyone who came near the facility during the twenty-three-day emergency, and the EPA itself inspected the facility on August 9, 2022, the day after Plaintiff's exposure, documenting the ongoing emissions. CSOF ¶61.

A private individual may maintain an action for public nuisance if she suffered a "special injury" such as a harm that is different in kind, not merely in degree, from the harm suffered by the general public. *See* Restatement (Second) of Torts § 821C(1) (1979) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference."). Ms. Wooten's injuries satisfy this requirement. Ms. Wooten suffered acute and permanent respiratory injury: severe persistent asthma, chronic respiratory failure with hypoxia, oxygen saturation of 89% at rest, and a prognosis of "poor." CSOF ¶¶41–43. She was forced to retire from federal law enforcement. CSOF ¶54. She now requires daily nebulizer treatments and multiple medications. CSOF ¶56. Her injury is different in kind from the general public's.

Ocean Point argues that Plaintiff "voluntarily rolled down her window in the presence of visible industrial emissions without requesting respiratory protection," which it claims precludes a finding of unreasonable interference. (Mot. at 13.) Ms. Wooten rolled down her window to ask refinery

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 20

workers whether it was safe to proceed because no one at the security gate had warned her of any

danger. CSOF ¶ 14. The "unreasonableness" inquiry in nuisance law focuses on the defendants'

conduct, not the plaintiff. The question is whether allowing toxic smoke to drift across areas where

people are authorized to be, without any warning, constitutes an unreasonable interference with public

rights. A jury can easily find that it does. To the extent Ocean Point is raising an assumption-of-risk

or contributory negligence defense, those are affirmative defenses for the jury, not grounds for

summary judgment. For these reasons, Plaintiff's nuisance claim survives summary judgment.

For the foregoing reasons, Plaintiff respectfully requests that this Court **deny** Ocean Point's

Motion for Summary Judgment on all five counts.

RESPECTFULLY SUBMITTED
LEE J. ROHN AND ASSOCIATES, LLC
Attorneys for Plaintiff

DATED: May 28, 2026            BY:    /s/ Lee J. Rohn
                                    Lee J. Rohn, Esq.
                                    VI Bar No. 52
                                    1108 King Street, Suite 3 (mailing)
                                    56 King Street, Third Floor (physical)
                                    Christiansted, St. Croix
                                    U.S. Virgin Islands 00820
                                    Telephone: (340) 778-8855
                                    lee@rohnlaw.com

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**OPPOSITION TO OCEAN POINT'S MOTION FOR SUMMARY JUDGMENT**
Page 21

## <u>CERTIFICATE OF SERVICE</u>

**THIS IS TO CERTIFY** that on May 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:

To All Counsel of Record

BY: ___/s/ Lee J. Rohn_____ (dvn)