**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| NICOLE WOOTEN,<br><br>Plaintiff,<br><br>v.<br><br>LIMETREE BAY TERMINALS d/b/a OCEAN POINT TERMINALS, PORT HAMILTON REFINING AND TRANSPORTATION, and WEST INDIES PETROLEUM, LTD.,<br><br>Defendant. | Case No. 1:23-CV-00012<br><br><br>**ACTION FOR DAMAGES**<br><br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1(b) and Federal Rule of Civil Procedure 56, Plaintiff Nicole Wooten ("Ms. Wooten" or "Plaintiff"), by and through undersigned counsel, respectfully submits the following Consolidated Counter-Statement of Material Facts in opposition to Defendants Port Hamilton Refining & Transportation, LLLP's ("PHRT" or "Port Hamilton") and Limetree Bay Terminals d/b/a Ocean Point Terminals separately filed Motions for Summary Judgment. These facts, drawn from evidence in the record and supported by citations to specific exhibits, demonstrate that genuine disputes of material fact exist on the issue of causation, precluding summary judgment.

### I.   PLAINTIFF'S BACKGROUND AND BASELINE HEALTH

1.    Nicole Wooten is a 40-year-old woman who holds a Bachelor of Science degree in Psychology from Valdosta State University, a Master of Arts in Secondary Education from the University of Phoenix, and a cybersecurity certification from Coursera. (**Exhibit 27**, Vocational Rehabilitation Questionnaire completed by Wooten, Sept. 11, 2025, NW004289.)



*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 2

2.      Prior to the August 8, 2022 exposure, Ms. Wooten had a varied professional career, including positions as a patient coordinator and operations manager in dental offices, an educator, and ultimately as a U.S. Customs and Border Protection ("CBP") Officer, a federal law enforcement position she began in October 2020. (**Exhibit 27**, Vocational Rehabilitation Questionnaire, NW004290–NW004292; **Exhibit 4**, Wooten Hardship Request Memorandum, Aug. 31, 2022, NW001710.)

3.      Ms. Wooten was diagnosed with asthma at approximately five years of age. Before the August 8, 2022, exposure, her asthma was well-controlled; she "rarely" required use of her albuterol inhaler, which was prescribed on an as-needed basis only. As Ms. Wooten wrote in her August 31, 2022 hardship request: "my condition, even as an adult, has yet to require a medication adjustment." (**Exhibit 4**, Wooten Hardship Request Memorandum, NW001710; **Exhibit 15**, Dr. Garfield, Temple University Hospital Records, Apr. 26, 2023 ["asthma well controlled for many years with Albuterol PRN only"].)

4.      On September 14, 2018, as part of her pre-employment screening for CBP, Ms. Wooten underwent a pulmonary function test evaluated by Dr. Albin, which showed "normal flow volumes as well as normal diffusing capacity," and she was cleared to perform all required job tasks for the position of CBP Officer, including frequent walking, stooping, bending, climbing, high-speed automobile operations, boarding moving vessels, and use of firearms. (**Exhibit 35**, CBP Step II Grievance Decision by ADFO Patti Crow, Mar. 23, 2023, NW001521–NW001522; **Exhibit 29**, OWCP Statement of Accepted Facts, Mar. 13, 2024, NW001857.)

5.      On July 15, 2022, twenty-four days before the exposure, Ms. Wooten was evaluated by allergy and immunology physician Dr. Thomas Chacko while visiting Georgia. Dr. Chacko noted worsening

asthma symptoms since Ms. Wooten moved to the Virgin Islands, but her PFT was normal. Dr. Chacko prescribed daily Symbicort for asthma maintenance. (**Exhibit 35**, CBP Step II Grievance Decision, NW001522.) Plaintiff underwent a pulmonary function test in approximately July 2022 because she was concerned about the air quality on St. Croix. (**Exhibit 1**, Wooten Depo. at 29). However, the test results were **normal**. Plaintiff testified: "They told me everything looked normal, it looked fine. . . . I believe my percentage was over 90 percent." (**Exhibit 1**, Wooten Depo. at 33).

6.    Before the exposure, Ms. Wooten was physically active: she played basketball, exercised regularly, including cardio and weight training three to five times per week, and volunteered for additional duties on the job. (**Exhibit 4**, Wooten Hardship Request Memorandum, NW001710 ["I have always exercised, averaging 3-5 times a week, including cardio and weight training"]; **Exhibit 15**, Dr. Garfield Records ["hobbies: basketball and exercise (which she has been unable to do since exposure)"].)

## II.    THE PETROLEUM COKE DOME EMERGENCY

7.    Port Hamilton Refining & Transportation, LLLP operates refining assets at the former Limetree Bay Refinery on St. Croix, U.S. Virgin Islands. Port Hamilton purchased the refinery through a bankruptcy sale on December 21, 2021. Among the items at the refinery were coke storage domes containing petroleum coke, a charcoal-like byproduct of oil refining with inherent combustible qualities. (**Exhibit 6**, Deposition of PHRT VP & Refinery Manager Fermin Rodriguez, at 16–17, 22–25; **Exhibit 7**, PHRT Incident Report, PHRT-Wooten 000001–000009.)

7a. George Williams affirmed that July 2018 to November 2023, he worked as maintenance engineering manager for Limetree Bay Terminals/Ocean Point Terminals ("Terminals" or "OPT"), reporting to Jeff Charles, the Chief Operating Officer of OPT, and that for a short period of time

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 4

around 2020, he was transferred by Terminals to support Limetree Bay Refining, LLC ("LBR"), with approximately 11 to 15 other maintenance technicians and supervisors also transferred to LBR. (**Exhibit 28**, Affirmation of George Williams, dated June 6, 2025).

7b. He further attested that his duties as maintenance engineering manager included traveling around the facility to check on work and contractors to provide support with labor, tools, and materials, and he tried to spend one to two hours out in the field each day providing support. (*Id.*).

7c. Mr. Williams attested that in August 2022, when he was traveling around the facility doing his daily rounds, he noticed that something was off with a Coke Dome. He could see discoloration on the tank and it looked like the paint was blistering and that while he did not see any black smoke, vapors, or clouds, as he drove by with his windows down on the road that travels north to south to the docks (west of the coke domes), he smelled a sulfur-like odor, experienced a stinging sensation in his nose and throat, watery eyes, and coughed, but that he immediately left the area, was able to recover, and did not report the incident to anyone. (*Id.*)

7d. He attested that over the next few days he did not drive the north-south road next to the domes but did drive the road that runs east to west to the north of the domes, where he did not observe much activity, did not see any vehicles, people, a fire truck, or heavy equipment, and there did not seem to be any sense of urgency about the situation and no barricades were in place. (*Id.*) He could see a hot spot on the north coke dome. (*Id.*)

7e. At Terminals' morning meetings, which were held daily and led by Jeff Charles, the smoldering of the north dome was noted by Jeff Charles and himself, yet he did not observe Terminals taking any action to remedy the situation. (*Id.*)

7f. Several days or even weeks later, when there was dark smoke coming out of the dome, he finally saw contractors and refinery personnel working at the domes and saw vehicles, heavy equipment, a fire truck, and the area was barricaded off. (*Id.*).

7g. Neither Jeff Charles nor anyone else from Terminals asked him to provide any additional maintenance personnel to help contain and control the smoldering. (*Id.*)

8.    On August 4, 2022, between 3:00 and 4:45 a.m., a carbon monoxide alarm automatically activated at Coke Dome #1. By 6:15 a.m., a refinery safety supervisor observed smoke inside the dome. Incident Command was activated by 10:00 a.m. (**Exhibit 11**, PHRT Internal Incident Timeline, PHRT-Wooten 000036.)

9.    Port Hamilton lacked adequate fire suppression equipment of its own. On August 5, 2022, PHRT Vice President and Refinery Manager Fermin Rodriguez emailed Ocean Point Terminals' Jeffrey Charles requesting critical fire equipment, including SCBAs with spare cylinders, an industrial fire truck, thermal imaging cameras, and bunker gear. (**Exhibit 11**, Rodriguez email to Charles, Aug. 5, 2022, PHRT-Wooten 000010–000011.)

10.    Ocean Point Terminals conditioned all assistance on payment, citing that PHRT was "significantly in arrears for payment," $7.9 million, and had "no shared service arrangement in place that would include emergency response." On August 4, 2022, the OPT Fire Chief was "told by his management not to respond to the incident." (**Exhibit 11**, Charles email to Rodriguez, Aug. 6, 2022, PHRT-Wooten 000012; **Exhibit 11**, PHRT Internal Incident Timeline, PHRT-Wooten 000036.)

11.    On August 8, 2022, the same day Ms. Wooten was exposed, David Bornn, the Governor's Chief Legal Counsel, emailed Fermin Rodriguez offering Virgin Islands Fire Services assistance. Rodriguez declined, stating PHRT had "on hand the equipment that is needed." PHRT's

and Terminals emergency response capabilities were grossly inadequate: when rescuers later attempted to use a rescue van on August 12, its battery was dead and its fuel tank was empty. (**Exhibit 11**, Rodriguez email to Bornn, Aug. 8, 2022, PHRT-Wooten 000014–000015; **Exhibit 11**, PHRT Internal Incident Timeline, PHRT-Wooten 000036.)

12.     PHRT's press release dated August 12, 2022 confirmed that petroleum coke had been "found smoldering" on August 4, 2022, and that water had been "applied 24 hours a day" since that date. The smoldering continued for approximately twenty-three days after the initial alarm. (**Exhibit 11**, PHRT Press Release, Aug. 12, 2022, PHRT-Wooten 000026; **Exhibit 7**, PHRT Incident Report, PHRT-Wooten 000001–000009.)

### III.     THE AUGUST 8, 2022 EXPOSURE

13.     On August 8, 2022, Ms. Wooten, as part of her duties as a CBP Officer, entered the refinery property and drove toward the U-shaped tugboat area to conduct a control inspection of a cargo vessel. There were no warnings of any dangerous conditions, no signs posted, and she was allowed to enter. (**Exhibit 1**, Wooten Depo. at 39, 42, 44–45; **Exhibit 4**, Wooten Hardship Request Memorandum, NW001710.)

14.     When Ms. Wooten arrived at the concrete road between the docks and the coke domes, she first noticed thick black smoke coming from the dome building. She approached two workers wearing coveralls near the entrance to the parking area and rolled down her vehicle window to ask whether it was safe to proceed. Toxic smoke and gases entered her vehicle. When she rolled the window back up, she immediately began coughing and experiencing shortness of breath. (**Exhibit 1**, Wooten Depo. at 46–49, 53–55.)

15.     Ms. Wooten's albuterol inhaler, which had always previously provided relief, failed to relieve

the tightness in her chest and the wheezing. She experienced shaking, vomiting, chest pain, hives on her arms, and labored breathing. After she vomited in the bathroom, Plaintiff testified, "[A]ll of my clothes felt super tight on my chest," and she had to remove her uniform top and belt before leaving for urgent care. (**Exhibit 1**, Wooten Depo. at 57-58). Officer Michael Henry, the staff emergency medical technician, evaluated Ms. Wooten in the breakroom when she returned to her worksite, observed her distress, and recommended she seek outside medical care because she was "still shaking . . . trembling really bad, nauseous, coughing, chest really tight." (**Exhibit 1**, Wooten Depo. at 57). Her coworker Norma Lozada drove her to urgent care. (**Exhibit 1**, Wooten Depo. at 57, 61; **Exhibit 1**, Wooten Depo. at 24, 56–58, 61; **Exhibit 4**, Wooten Hardship Request Memorandum, NW001710–NW001711.)

16.     At Acute Alternative Medical Group on August 8, 2022, Dr. Lyn Campbell examined Ms. Wooten, who presented "in tears" complaining of "chest tightness" and reporting that symptoms "began after inhaling smoke at work." Her blood pressure was elevated at 146/85, her pulse was 93, and her temperature was 100.4°F. Dr. Campbell administered two DuoNeb nebulizer treatments over sixty minutes and a Kenalog 60mg steroid injection. Dr. Campbell diagnosed Ms. Wooten with reactive airway disease (ICD J45.909) and prescribed a Medrol Dose Pack. (**Exhibit 17**, Dr. Campbell, Acute Alternative Medical Group treatment notes, Aug. 8, 2022, NW004275–NW004278.)

### IV.     CONTINUOUS SYMPTOMS, AND THE AUGUST 10, 2022 VISIT

17.     On August 9, 2022, Ms. Wooten went to the emergency room at Juan F. Luis Hospital with continued shortness of breath, headache, and tremors. She was evaluated by Dr. Lacey Menkinsmith, who noted that Ms. Wooten's exposure to smoke caused an asthma exacerbation. (**Exhibit 24**, Juan F. Luis Hospital ER Records, Aug. 9, 2022, NW004272–NW004274.)

18. On August 10, 2022, Ms. Wooten returned to Dr. Campbell at Acute Alternative Medical Group. The medical record documents her chief complaint as "Difficulty Breathing" and states: "37 y/o female presented for a SOB that she has had x2 days." The record further notes: "Pt states that her work place has been burning for days and was not aware of fire until today 8/10/22. Pt states that she was aware of the smoke but not the actual fire. Pt was exposed to chemical fire/smoke on monday 8/8/22." Dr. Campbell assessed Ms. Wooten as experiencing an "extreme breathing crisis" and administered a second Kenalog 60mg steroid injection, prescribed Augmentin 875mg, Tessalon Perles 100mg, and another Medrol Dose Pack. (**Exhibit 17**, Dr. Campbell treatment notes, Aug. 10, 2022, NW004269–NW004271.)

19. The notation "SOB that she has had x2 days" in the August 10 medical record is critical: it demonstrates that Ms. Wooten's shortness of breath was continuous from August 8 through August 10. It was not a new or intervening event. Ms. Wooten's symptoms on August 10 were a continuation of the respiratory distress that began with the petroleum coke exposure on August 8, 2022. (**Exhibit 17**, Dr. Campbell treatment notes, Aug. 10, 2022, NW004269.)

20. Plaintiff's expert Dr. Jeffrey Wilkenfeld confirmed that the suggestion that a landfill fire on August 10 was the sole cause of Ms. Wooten's symptoms is "so so so so unlikely." (**Exhibit 5**, Wilkenfeld Depo. at 56). Dr. Wilkenfeld testified that steroids of the type administered by Dr. Campbell remain active for approximately 24–48 hours and that when they wore off, symptoms would be expected to recur. (**Exhibit 5**, Wilkenfeld Depo. at 58–59). The symptoms did recur on August 10 and every day thereafter. Dr. Muraina confirmed: "The symptoms however returned, and she went back to the Urgent Care Center on 8/10." (**Exhibit 3**, Muraina IME Report at 1 (NW001738).)

21.     Dr. Jamie Garfield's treatment records further confirm that "the fire was burning this entire time" and that Ms. Wooten "breathed chemicals intermittently throughout the week." The PHRT Incident Report confirms the petroleum coke smoldering continued for twenty-three days after the initial alarm on August 4, 2022. (**Exhibit 15**, Dr. Garfield, Temple University Hospital Records, Apr. 26, 2023; **Exhibit 7**, PHRT Incident Report, PHRT-Wooten 000001–000009.)

22.     On August 14, 2022, Ms. Wooten returned to the Juan F. Luis Hospital emergency room with continued shortness of breath, chest pain, and anxiety. Dr. Menkinsmith ordered a chest x-ray and labs. (**Exhibit 24**, Juan F. Luis Hospital ER Records, Aug. 14, 2022, NW004265–NW004266.)

23.     On August 15, 2022, Ms. Wooten returned to Dr. Campbell, who attempted a pulmonary function test. Ms. Wooten was unable to complete the test due to shortness of breath and chest tightness. (**Exhibit 4**, Wooten Hardship Request Memorandum, NW001711.)

24.     There are no pulmonologists on the island of St. Croix. The nearest pulmonologist is located on the island of Puerto Rico, approximately 100 miles away. On August 16, 2022, Ms. Wooten purchased a last-minute plane ticket and returned to Georgia to obtain treatment from pulmonary specialists. (**Exhibit 4**, Wooten Hardship Request Memorandum, NW001711–NW001712; **Exhibit 35**, CBP Step II Grievance Decision, NW001524.)

## VI.    MEDICAL TREATMENT AND CAUSATION OPINIONS IN GEORGIA

25.     On August 18, 2022, ten days after the exposure, Ms. Wooten was seen by her primary care physician, Dr. Terrie Morton-Acker, at Covington Family Care. Dr. Morton-Acker documented "upper back pain and jittery for weeks. Exposed petroleum Coke burning at her last job Monday 8/8/2022 one week ago." On examination, Dr. Morton-Acker observed Ms. Wooten's "hands

constantly shaking at rest." Dr. Morton-Acker diagnosed moderate persistent asthma with acute exacerbation (J45.41), contact with hazardous chemicals (Z77.098), and restlessness and agitation (R45.1). She referred Ms. Wooten to pulmonologists and prescribed Xopenex inhaler and cyclobenzaprine. (**Exhibit 18**, Dr. Morton-Acker, Covington Family Care treatment notes, Aug. 18, 2022, NW000163–NW000168.)

26.    On August 24, 2022, Ms. Wooten was evaluated by pulmonologist Dr. Carlette Graham at Pulmonary and Sleep Medicine Associates. Dr. Graham documented "chest pain and tightness after exposure to smoke" and noted a history of asthma controlled until Ms. Wooten "was exposed to petroleum." A spirometry test was attempted but could not be completed due to Ms. Wooten's shortness of breath. Chest x-ray showed hyperinflation. Dr. Graham diagnosed cough, shortness of breath, wheezing, and asthma, and prescribed Trelegy Ellipta inhaler. Dr. Graham's discussion notes: "smoke expose w asthma exacerbation sp steroids still w symptoms … reactive airways disease/asthma." (**Exhibit 19**, Dr. Graham, Pulmonary & Sleep Medicine Associates treatment notes, Aug. 24, 2022, NW000160–NW000162.)

27.    Also on August 24, 2022, Ms. Wooten was evaluated by neurologist Dr. David Olson at Dekalb Neurology Group for tremors and daily headaches that began after the August 2022 petroleum coke exposure. Dr. Olson documented "a high-frequency tremor with her arms outstretched" on examination and noted that Ms. Wooten had a prior history of migraines that had resolved, but "following her August 2022 exposure, she began getting daily headaches." He prescribed propranolol for tremor suppression and Nurtec as an abortive. (**Exhibit 20**, Dr. Olson, Dekalb Neurology Group consultation, Aug. 24, 2022, NW000158–NW000159.)

28.     On October 18, 2022, Dr. Morton-Acker provided her medical opinion on causation: "It is of my opinion that Ms. Wooten's exacerbation of her asthma stemmed from the exposure of the chemicals found burning at the oil refinery on the Virgin Island which occurred in August 2022." Dr. Morton-Acker further noted that Ms. Wooten could not lift a ten-pound weight without chest pain, was unable to return to the gym, and had developed depression and anxiety. She diagnosed major depressive disorder and prescribed Buspirone. (**Exhibit 18**, Dr. Morton-Acker, Covington Family Care treatment notes, Oct. 18, 2022, NW004244–NW004246.)

29.     A pulmonary function test (PFT) performed on December 15, 2022 revealed FEV1 at 65% of predicted, FEV1/FVC ratio of 50%, FEF 25–75 at 44%, TLC at 165% of predicted, and residual volume at 263% of predicted, demonstrating moderate obstruction, hyperinflation, and air trapping. This was a dramatic decline from Ms. Wooten's normal PFT just five months earlier in July 2022. (**Exhibit 15**, Dr. Garfield, Temple University Hospital Records; **Exhibit 35**, CBP Step II Grievance Decision, NW001522 [July 2022 PFT was normal].)

30.     On December 22, 2022, Ms. Wooten underwent cardiac evaluation at Atlanta Heart Associates. An echocardiogram revealed normal left ventricular cavity size with ejection fraction of 55% but mild concentric left ventricular hypertrophy. A treadmill stress test was normal but showed "poor exercise tolerance" and exaggerated blood pressure response to exercise. Ms. Wooten stopped the stress test after four minutes due to wheezing and coughing. She was prescribed Amlodipine for blood pressure control. (**Exhibit 22**, Atlanta Heart Associates Records, Dec. 22, 2022.)

31.     On January 12, 2023, Ms. Wooten was unable to complete a six-minute walk test due to tachycardia and dyspnea. (**Exhibit 15**, Dr. Garfield, Temple University Hospital Records.)

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 12

32.     On February 9, 2023, pulmonologist Dr. Olufisayo Otusanya of Piedmont Pulmonary and Critical Care reviewed Ms. Wooten's PFT results and opined that her "symptomatology and PFT [are] suggestive of reactive airway dysfunction syndrome" ("RADS") and that her "history of exposure to sulfur dioxide could be contributing to/aggravating her airflow limitation." (**Exhibit 21**, Dr. Otusanya, Piedmont Pulmonary and Critical Care treatment notes, Feb. 9, 2023; **Exhibit 35**, CBP Step II Grievance Decision, NW001523.)

33.     On February 20, 2023, Ms. Wooten underwent a psychiatric evaluation with psychologist Dr. Bertrina Olivia West at Out of The Box Counseling. She was diagnosed with post-traumatic stress disorder, generalized anxiety disorder, and recurrent major depressive disorder. Ms. Wooten began weekly psychotherapy sessions that continue to date. (**Exhibit 31**, Dr. West, OWCP-5 Work Capacity Evaluation form, Sept. 16, 2024, NW001756.)

34.     On February 27, 2023, nephrologist Dr. Leo Ovadje of Caritas Medical Center evaluated Ms. Wooten for abnormal kidney function. Dr. Ovadje diagnosed hypertensive chronic kidney disease and noted the condition was "possible toxin-induced nephrotoxicity." In a subsequent letter dated May 7, 2024, Dr. Ovadje confirmed that Ms. Wooten "developed hypertension and acute kidney injury which was temporally related to toxin exposure in August 2022." (**Exhibit 30**, Dr. Ovadje, Caritas Medical Center treatment notes, Feb. 27, 2023, NW001844–NW001848; Dr. Ovadje letter, May 7, 2024, NW001832.)

35.     On April 26, 2023, pulmonologist Dr. Jamie Garfield of Temple University Lung Center evaluated Ms. Wooten and independently concluded that Ms. Wooten has "severe persistent asthma triggered by exposure to biomass fuel (carbon monoxide, carbon dioxide, sulfur dioxide, and particulate matter)." Dr. Garfield's evaluation lasted sixty-one minutes. She prescribed three daily

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 13

nebulized medications, Pulmicort, Perforomist, and Yupelri, plus rescue Levalbuterol and a ten-day course of prednisone 60mg. This medication regimen represents a massive escalation from Ms. Wooten's pre-exposure use of a single albuterol inhaler on an as-needed basis. (**Exhibit 15**, Dr. Garfield, Temple University Hospital Records, Apr. 26, 2023.)

36.      Dr. Garfield's records also documented Ms. Wooten's allergy panel results, which were essentially all negative except for dust mite sensitization, ruling out an allergic cause for her severe persistent asthma and confirming that the August 8, 2022 chemical exposure is the causative event. (**Exhibit 15**, Dr. Garfield, Temple University Hospital Records.)

37.      On August 18, 2023, Ms. Wooten underwent a cardiopulmonary exercise test at Emory Sports Cardiology. The test revealed peak VO2 of 13.6 ml/kg/min, only 59% of predicted, demonstrating significantly reduced exercise capacity. Pre-exercise FEV1/FVC was 40%. The physician interpretation stated: "Cannot exclude pulmonary mechanical limits to exercise." Cardiovascular response was normal and there was no ischemia, confirming the exercise limitation is pulmonary, not cardiac. (**Exhibit 25**, Emory Sports Cardiology CPET Results, Aug. 18, 2023.)

38.      On September 20, 2023, Dr. Graham provided a detailed narrative letter with her medical opinion on causation: "It is my medical opinion that the work injury she suffered on August 8, 2022, caused a permanent aggravation to the patient's pre-existing Asthma." Dr. Graham detailed Ms. Wooten's pre-employment pulmonary evaluation that had cleared her for vigorous law enforcement duty and opined that Ms. Wooten is "unable to return to work in a Law Enforcement Capacity … unable to run in pursuit of an individual … not able to defend herself or others." (**Exhibit 19**, Dr. Graham, Pulmonary & Sleep Medicine Associates causation letter, Sept. 20, 2023.)

## VII.    FEDERAL GOVERNMENT ACCEPTANCE OF CAUSATION

39.    The U.S. Department of Labor, Office of Workers' Compensation Programs ("OWCP"), investigated Ms. Wooten's claim under the Federal Employees' Compensation Act and formally accepted the following conditions as caused by the August 8, 2022 work-related exposure: Anxiety Disorder, Unspecified; Major Depressive Disorder, Single Episode, Unspecified; Unspecified Asthma with (Acute) Exacerbation. (**Exhibit 16**, OWCP-5C Work Capacity Evaluation completed by Dr. Muraina, Apr. 22, 2024, NW001743; **Exhibit 29**, OWCP Statement of Accepted Facts, Mar. 13, 2024, NW001857.)

40.    In connection with that acceptance, OWCP commissioned a Second Opinion Pulmonary Examination by Dr. Oyekunle Ismail Muraina, a board-certified pulmonologist and Fellow of the American College of Chest Physicians, who examined Ms. Wooten on April 19, 2024. (**Exhibit 3**, Dr. Muraina, Second Opinion Pulmonary Examination Report, Apr. 19, 2024, NW001738–NW001742.)

41.    Dr. Muraina's physical examination found Ms. Wooten's oxygen saturation at 89% on room air at rest, significantly below normal. During a six-minute walk test, her oxygen saturation dropped to 82% within two minutes, at which point the test was discontinued because Ms. Wooten was "very dyspneic and was complaining of chest tightness." Spirometry was uninterpretable because she could not perform acceptable and reproducible maneuvers. Lung volumes showed a mixed obstructive and restrictive defect with air trapping. (**Exhibit 3**, Dr. Muraina Report, NW001739–NW001740.)

42.    Dr. Muraina diagnosed five conditions causally connected to the work injury: (1) severe persistent asthma (J45.50); (2) chronic respiratory failure with hypoxia (J96.11); (3) airway

disease due to other specific organic dusts (J66.8); (4) contact with and suspected exposure to hazardous chemicals (Z77.098); and (5) shortness of breath (R06.02). He opined: "There is direct causal relationship between the diagnoses above and the work-related injury of exposure to Petroleum 'coke' burn smoke necessitating prolonged debility with aggravation of the pre-existing asthma and respiratory failure with hypoxia." (**Exhibit 3**, Dr. Muraina Report, NW001740.)

43.    Dr. Muraina further opined that Ms. Wooten's work-related condition "has not resolved," that she has reached "a fixed and stable state (maximum medical improvement has been obtained)," and that her "prognosis appears to be poor, especially with evidence of chronic respiratory failure with hypoxemia at rest that worsens with minimal activity." He concluded that Ms. Wooten "is currently incapable of returning to her date of injury job" and that "[t]he most she can perform will be sedentary duties that involve sitting at a desk for most of the workday." (**Exhibit 3**, Dr. Muraina Report, NW001740–NW001741.) When Dr. Muraina examined Plaintiff on April 19, 2024, her oxygen saturation at rest was **89%**, significantly below normal, and dropped to **82%** within two minutes of walking. (**Exhibit 3**, Muraina IME Report at 3 (NW001740)). This makes Dr. Muraina's finding of **89%** oxygen saturation at rest, and **82%** with minimal exertion significant. (**Exhibit 3**, Muraina IME Report at 3 (NW001740). Dr. Muraina stated: "The hypoxemia cannot be explained solely by obstructive airway disease due to bronchial asthma, there must be an underlying pulmonary parenchymal or vascular component responsible for this." (**Exhibit 3**, Muraina IME Report at 4 (NW001741). Prognosis: "poor."

44.    On the OWCP-5C Work Capacity Evaluation form, Dr. Muraina documented that the work injury caused anatomical and functional changes in the cardiovascular and respiratory systems that preclude exposure to temperature extremes, airborne particles, and gas/fumes. Ms. Wooten is

limited to sedentary work only and can walk, stand, reach, push, pull, lift, climb, bend, and drive for no more than 0–1 hours, with a maximum lift of 0–5 pounds. (**Exhibit 16**, OWCP-5C Work Capacity Evaluation, Apr. 22, 2024, NW001743.)

45.     Dr. Graham, Ms. Wooten's treating pulmonologist, concurred with Dr. Muraina's findings. In a letter dated July 22, 2024, Dr. Graham wrote: "I do agree with the second opinion consult by Dr Muraina. She would benefit from working in sedentary job. I believe that at this point she would benefit from working from home for her workday." (**Exhibit 34**, Dr. Graham letter concurring with Muraina findings, July 22, 2024, NW001773.)

## VIII.    ONGOING OBJECTIVE PULMONARY DETERIORATION

46.     Successive pulmonary function tests document persistent objective pulmonary impairment. On December 6, 2023, spirometry showed FEV1 at 66% of predicted and FEV1/FVC ratio of 57.08%, a "moderate obstructive ventilatory defect." On April 18, 2024, a PFT at Emory showed FEV1 at 73% of predicted (2.40L) and FEV1/FVC of 76%, with physician interpretation of a "nonspecific ventilatory defect which may be due to underlying obstruction." The study was limited by the patient's chest discomfort, and she was unable to perform FENO testing. (**Exhibit 19**, Dr. Graham Records; **Exhibit 26**, PFT Results, various dates.)

47.     On June 27, 2024, Ms. Wooten underwent a six-minute walk test. She walked only 900 feet, compared to a predicted distance of 1,893 feet for females, achieving just 47.5% of predicted. She required 11 pauses during the test. Her heart rate rose to 119 bpm. This objective test result confirms severe functional impairment. (**Exhibit 19**, Dr. Graham Records, June 27, 2024.)

48.     A September 1, 2022 CT of the chest revealed no acute pulmonary process—confirming that Ms. Wooten's injury is to her airways, not to lung structure. A December 22, 2022

echocardiogram showed normal cardiac function with ejection fraction of 55% and no pulmonary hypertension, ruling out a cardiac cause for her respiratory symptoms. (**Exhibit 15**, Dr. Garfield Records [CT chest findings]; **Exhibit 22**, Atlanta Heart Associates Records, Dec. 22, 2022 [echocardiogram findings].)

### IX.    EXPERT AND TREATING PHYSICIANS' CAUSATION OPINIONS

49.    Plaintiff's expert, Dr. Jeffrey Wilkenfeld, a board-certified occupational and environmental medicine physician, reviewed the totality of Ms. Wooten's medical records, the PHRT Incident Report, and the EPA Inspection Report, and opined to a reasonable degree of medical certainty that Ms. Wooten's exposure to petroleum coke smoke on August 8, 2022 caused her injuries. Dr. Wilkenfeld's methodology included review of Ms. Wooten's medical history, test results, and the substances to which she was exposed, and his opinion is grounded in the temporal relationship between exposure, immediate onset of symptoms, and the clinical course that followed. (**Exhibit 2**, Wilkenfeld Expert Report; **Exhibit 5**, Wilkenfeld Depo. at 26–29, 61, 110.)

50.    Dr. Wilkenfeld's causation opinion is grounded in the established medical literature on irritant-induced asthma and RADS (Reactive Airway Dysfunction Syndrome), which recognizes that a single high-level exposure to respiratory irritants can cause persistent airway dysfunction in individuals with pre-existing mild asthma. Dr. Wilkenfeld explained that the petroleum coke combustion products—including sulfur dioxide, carbon monoxide, carbon dioxide, and particulate matter—are well-documented respiratory irritants. (**Exhibit 2**, Wilkenfeld Expert Report.) Dr. Wilkenfeld testified that objective findings on chest imaging are "usually not" present in asthma exacerbation from toxic exposure. (**Exhibit 5**, Wilkenfeld Depo. at 23-24).

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 18

51.    In total, six independent treating physicians have causally linked Ms. Wooten's respiratory injuries to the August 8, 2022 petroleum coke exposure: (1) Dr. Campbell diagnosed reactive airway disease from smoke inhalation on August 8, 2022 (**Exhibit 17**); (2) Dr. Morton-Acker opined on October 18, 2022 that Ms. Wooten's asthma exacerbation "stemmed from the exposure of the chemicals found burning at the oil refinery" (**Exhibit 18**); (3) Dr. Otusanya opined on February 9, 2023 that Ms. Wooten's symptomatology and PFT were "suggestive of reactive airway dysfunction syndrome" caused by sulfur dioxide exposure (**Exhibit 21**); (4) Dr. Garfield independently concluded on April 26, 2023 that Ms. Wooten has "severe persistent asthma triggered by exposure to biomass fuel" (**Exhibit 15**); (5) Dr. Graham opined on September 20, 2023 that the August 8, 2022 work injury "caused a permanent aggravation to the patient's pre-existing Asthma" (**Exhibit 19**); and (6) Dr. Muraina opined on April 19, 2024 that there is a "direct causal relationship" between Ms. Wooten's diagnoses and the petroleum coke exposure (**Exhibit 3**).

52.    In addition to these six treating physicians, Plaintiff's expert Dr. Wilkenfeld independently reached the same causation conclusion (**Exhibit 2**), and the U.S. Department of Labor formally accepted Ms. Wooten's claim, determining that the August 8, 2022 exposure caused her accepted conditions (**Exhibit 29**).

## X.    DAMAGES AND CURRENT CONDITION

53.    Ms. Wooten did not return to her CBP duties after August 9, 2022. CBP granted her a hardship transfer from St. Croix to the Port of Atlanta after management concluded that her case "meets the established criteria for medical hardship reassignment" based on the severity of her condition and the lack of pulmonary specialists on St. Croix. (**Exhibit 35**, CBP Step II Grievance Decision by ADFO Patti Crow, Mar. 23, 2023, NW001524.)

54.    On September 18, 2024, CBP confirmed that Ms. Wooten's disability retirement was approved, effective July 27, 2024. As Ms. Wooten documented: "HAD TO RETIRE SINCE I COULDN'T PHYSICALLY DO THE JOB." At the time of injury, Ms. Wooten's salary was $34,916 annually and had risen to $72,553 by the time of her forced retirement. (**Exhibit 33**, CBP email confirming disability retirement, Sept. 18, 2024, NW001753; **Exhibit 27**, Vocational Rehabilitation Questionnaire, NW004290–NW004291.)

55.    Following her forced retirement, Ms. Wooten obtained part-time, work-from-home employment as an investigator with the Georgia Sexual Offender Risk Review Board, earning $25.00 per hour. Even this sedentary, part-time position proved unsustainable: on or about October 26, 2025, Ms. Wooten was terminated for inability to meet case hour quotas despite her best efforts. The Georgia Department of Labor found that she "did not deliberately fail to perform the duties for which hired" and allowed unemployment benefits. (**Exhibit 27**, Vocational Rehabilitation Questionnaire, NW004290; **Exhibit 32**, Georgia Department of Labor Claims Examiner's Determination, Nov. 10, 2025.)

56.    Ms. Wooten currently takes multiple daily breathing medications, including Levalbuterol, Trelegy, Xopenex, and Airsupra, plus cyclobenzaprine for muscle spasms, a dramatic escalation from the single as-needed albuterol inhaler she used before the exposure. She continues weekly psychotherapy with Dr. West for PTSD, anxiety, and depression. (**Exhibit 27**, Vocational Rehabilitation Questionnaire, NW004287; **Exhibit 31**, Dr. West OWCP-5 Form, NW001756.)

57.    Ms. Wooten's self-reported functional limitations, documented in the September 2025 Vocational Rehabilitation Questionnaire, are consistent with the objective medical findings: on a bad day, she cannot sit, stand, or walk at all; on a good day, she can sit for two hours, stand for thirty

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 20

minutes, and walk for fifteen minutes before her symptoms force her to stop. Her current diagnoses include RADS, asthma, anxiety, depression, chest tightness, shortness of breath, cough, inflammation, headaches, and muscle spasms. (**Exhibit 27**, Vocational Rehabilitation Questionnaire, NW004286–NW004288.)

58.     In an email dated September 15, 2025, Ms. Wooten reported that she was also diagnosed with high blood pressure, left ventricular hypertrophy, and Stage 2 kidney disease in 2022, all attributed to "chemical induced toxins." Although her kidney disease has since resolved, she was told there is "always a chance of it coming back." As a consequence of these conditions, Ms. Wooten cannot obtain additional life insurance policies. (**Exhibit 27**, Wooten email to Earl Thompson, Sept. 15, 2025, NW004294.)

## XI.     PORT HAMILTON'S ADMISSIONS

59.     In its Answer to the Complaint, Port Hamilton admitted that it "owned and operated the petroleum refinery on the date of the incident alleged." (**Exhibit 14**, Port Hamilton Answer, Doc. No. 50.)

60.     Port Hamilton's Incident Report confirms that petroleum coke inside the coke dome began smoldering on August 4, 2022 and was not extinguished for approximately twenty-three days. The report identifies the combustion products released, including sulfur dioxide and particulate matter—the very substances identified by Ms. Wooten's treating physicians as the cause of her injuries. (**Exhibit 7**, PHRT Incident Report, PHRT-Wooten 000001–000009.)

61.     The EPA conducted an inspection of the facility on August 9, 2022, the day after Ms. Wooten's exposure, and documented the ongoing emissions from the smoldering petroleum coke. (**Exhibit 8**, EPA Inspection Report, NW001537–NW001543.)

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 21

### XII.    OCEAN POINT'S CONTROL OF FACILITY ACCESS AND FAILURE TO WARN

62.    Ocean Point Terminals (formerly Limetree Bay Terminals) controlled security and access to the entire facility, including the areas where Port Hamilton operated. Jeffrey Charles, Ocean Point's Chief Operating Officer, testified that his responsibilities included "Terminal operations, scheduling of volumetric control and security" and that Ocean Point was responsible for "health safety and environmental" and "emergency response." (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 14–17.) CBP agents entered through the front gate controlled by Ocean Point, were logged in and out, and their information was recorded. (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 19–20.)

63.    Despite its control over facility access and its knowledge of the ongoing smoldering emergency, Ocean Point did not reach out to Customs and Border Protection at any time during August 2022 to warn of the hazardous conditions. When asked why Ocean Point did not contact CBP, Charles testified: "No reason to. There's no impact to them." (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 36.) Ocean Point's security personnel at the front gate allowed Ms. Wooten to enter and proceed toward the tugboat dock without any warning that a petroleum coke smoldering emergency was underway. (**Exhibit 1**, Wooten Depo. at 44–45.)

64.    Ocean Point placed air monitors between the coker and the tugboats. Charles testified that these monitors showed "nil" readings throughout August 2022, and that Ocean Point's HSE personnel reviewed those results. (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 41–42.) However, these monitors were positioned at fixed locations between the coker and the tugboats, not along Ms. Wooten's route of travel or at her location when she encountered the thick smoke. The monitors' zero readings do not establish what Ms. Wooten was exposed to when she drove into visible, thick black smoke near the dome. Plaintiff's engineering expert, Daniel Mahr, P.E., confirmed that the air

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 22

monitors were "very far" from Ms. Wooten's location and were not positioned downwind of the coke dome. (**Exhibit 23,** Deposition of Daniel Mahr, P.E., Feb. 26, at 18:16–25.)

65.    Ocean Point obstructed Port Hamilton's fire response during the emergency. The Rodriguez-Charles correspondence documents that Ocean Point refused to release fire equipment without payment, demanded $7.9 million in arrears before cooperating, refused to refill air bottles for emergency responders, and would not open the firehouse. (**Exhibit 11**, PHRT-Wooten 000016–19.) The OPT Fire Chief was "told by his management not to respond to the incident" on August 4, 2022. (**Exhibit 11**, PHRT Internal Incident Timeline, PHRT-Wooten 000036.) The Mutual Aid Agreement between Ocean Point and Port Hamilton was not executed until August 21, 2022—thirteen days after Plaintiff's exposure. (**Exhibit 13**, PHRT-Wooten 000034–35.)

66.    Ocean Point's own crossclaims against Port Hamilton confirm that Ocean Point knew Port Hamilton was "inept and ill-equipped to operate the Refinery and safely maintain its assets." (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 77–78.) In its crossclaims, Ocean Point alleged that "automatic carbon monoxide alarms had been activated at the North Coke Dome and repeatedly silenced by Port Hamilton employees" in the days preceding the smoldering. (**Exhibit 12**, Charles (LBT 30(b)(6)) Depo. at 78–79.) Despite this knowledge and these concerns, Ocean Point continued to allow individuals, including Ms. Wooten, to enter the facility without warning.

*Wooten, Nicole v. Limetree Bay Terminals, et. al.*, Case No. 1:23-CV-00012
**PLAINTIFF'S CONSOLIDATED COUNTER-STATEMENT OF MATERIAL FACTS**
Page 23

RESPECTFULLY SUBMITTED
LEE J. ROHN AND ASSOCIATES, LLC
Attorneys for Plaintiff

DATED: May 28, 2026                BY:    /s/ Lee J. Rohn
Lee J. Rohn, Esq.
VI Bar No. 52
1108 King Street, Suite 3 (mailing)
56 King Street, Third Floor (physical)
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that on May 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:

To All Counsel of Record

BY:    /s/ Lee J. Rohn       (dvn)