Page 1

DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

NICOLE WOOTEN,
        Plaintiff,
                                Civil Action No.:
    vs.
                                1:23-cv-00012

LIMETREE BAY TERMINALS
d/b/a OCEAN POINT
TERMINALS, PORT
HAMILTON REFINING AND
TRANSPORTATION, and WEST
INDIES PETROLEUM LTD.,

        Defendants.
_____

VIDEOTAPED DEPOSITION OF NICOLE WOOTEN

May 19, 2025

10:09 a.m.

Akerman, LLP

999 Peachtree Street, N.E.

Suite 1700

Atlanta, Georgia

LAURA R. SINGLE, CCR-B-1343

EXHIBIT
1

Page 2

APPEARANCES

For the Plaintiff:
ROBIN P. SEILA, ESQ.
Lee J. Rohn & Associates
56 King Street
Suite 3
Christiansted, VI  00820
340-778-8855
robin@rohn.law.com

For the Defendant Limetree Bay Terminals d/b/a
Ocean Point Terminals:

DONNIE KING, ESQ.
REGINALD E. JANVIER, ESQ.
Akerman, LLP
98 SE 7th Street
Suite 1100, Three Brickell City Centre
Miami, Florida  33131
305-374-5600
donnie.king@akerman.com

For the Defendant Port Hamilton Refining and
Transportation:
ANDREW C. SIMPSON, ESQ.          (Via Zoom)
Andrew C. Simpson Law Office
2191 Church Street
Suite 5
Christiansted, VI  00820
340-719-3900
asimpson@coralbrief.com

Page 3

APPEARANCES

For the Defendant West Indies Petroleum, LTD.:
RYAN STUTZMAN, ESQ.
CSA Associates, P.C.
1138 King Street
Suite 100
Christiansted, VI  00820
340-773-3681
rstutzman@saastx.vi

Also Present:
Jesse Barlow, Videographer
(Veritext Legal Solutions)

Page 4

INDEX

EXAMINATION OF NICOLE WOOTEN          PAGE

BY MR. SIMPSON................................  6
BY MR. KING...................................  79
BY MR. SIMPSON................................ 246

*   *   *

NUMBER          DESCRIPTION          PAGE
For the Defendants:
Exhibit 1     Medical record, 4/18/19     177
Exhibit 2     Medical record, 5/6/19      182
Exhibit 3     Medical record, 1/16/20     185
Exhibit 4     Photographs (NW001544 -     211
              001546)

Exhibit 5     Affirmation of Nicole Wooten   225
Exhibit 6     Medical record, 8/11/22     244

Page 5

PROCEEDINGS

(Pursuant to Article 10(B) of the Rules and Regulations of the Georgia Board of Court Reporting, a written disclosure statement was submitted by the court reporter to all counsel present at the proceeding.)

*   *   *

THE VIDEOGRAPHER:  Today's date is May 19th, 2025, and the time is 10:09 a.m.

This will be the videotaped deposition of Nicole Wooten.

Would counsel please identify themselves for the record.

MS. SEILA:  Robin Seila of Lee Rohn & Associates for the Plaintiff.

MR. SIMPSON:  Andrew Simpson of Andrew C. Simpson, P.C., for Port Hamilton Transportation and Refining.

MR. KING:  Good morning.  This is Donnie King.  Also with me is Reginald Janvier of Akerman on behalf of Ocean Point.

MR. STUTZMAN:  Ryan Stutzman via Zoom here on behalf of WIPL, West Indies Petroleum Company.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

2 (Pages 2 - 5)

Page 6

NICOLE WOOTEN,
Having been first duly sworn to state the truth, was examined and testified as follows:

EXAMINATION

BY MR. SIMPSON:

Q. Good morning, Ms. Wooten. You heard me introduce myself. I'm Andrew Simpson representing Port Hamilton in this case.

Could you please state your name for the record?

A. Good morning. It's Nicole Wooten.

Q. And are you still going by Nicole Wooten?

A. Yes.

Q. And where do you live?

A. Would you like the full address?

Q. Yes, please.

A. 902 Peachtree Forest Terrace in Peachtree Corners, Georgia, 30092.

Q. Have you ever had your deposition taken before?

A. Not that I can recall.

Q. Okay. I'm sure your attorney has described the process for you, but I want to go over a few of the rules just to double-check to make sure that you understand what I want you to understand.

Page 7

This will be a series of questions that I will be asking and then other lawyers will be asking, and you need to give an answer to the questions that are asked. If you don't know the answer to a question that's asked, just tell us that you don't know.

If you don't remember the answer -- you know, something that happened but you're trying to -- trying to remember, you can tell us to the best of your recollection what the answer would be.

If you need to -- need to clarify a question, just tell me and I will clarify the question. If I -- if you don't ask me to clarify the question, I'm going to assume that you understood the question.

Is that fair?

A. Yes.

Q. The -- during the deposition, someone may state an objection. If that happens, unless you're instructed not to answer the question, please go ahead and answer the question. A lot of objections are made for the record for the Court to rule on them later.

If you need to take a break during the deposition, let us know and we'll take a break as

Page 8

long as a question is not pending. If a question is pending, we'll ask you to finish your answer to the question and then we can take a break. Normally we try to break every hour or so. Given the video -- videographer, we'll probably shoot for every hour and a half or so; but if -- again, if you need a break sooner than that, let us know.

So it's important that you give an oral response to the questions because the court reporter -- the court reporter cannot take down a shake of the head or a nod of the head or something like that. So we ask that you answer every question with an oral -- answer every question with an oral response.

Are you under any medications or any other substances that would prevent you from testifying accurately today?

A. No.

Q. I want to start with your background. Where were you born?

A. Northside Hospital here in Georgia.

Q. Okay. And starting with -- did you -- did you graduate from high school?

A. Yes.

Q. And did you go to any college?

Page 9

A. Yes.

Q. Okay. Can you tell us your educational history starting with college?

A. I graduated from Valdosta State University and then I also have a master's. I graduated from University of Phoenix.

Q. Okay. And you got a BS from the first university you mentioned?

A. Yes.

Q. And was that in any particular area?

A. Psychology.

Q. Any minors associated with your college degree?

A. No.

Q. And what did you get your master's in?

A. Secondary education.

Q. And when did you graduate from college for your -- for you BS?

A. I finished in May of 2008.

Q. And when did you get your master's?

A. That was 2014, I believe, yes.

Q. Was your master's an in-person education or was it online?

A. Online.

Q. After you graduated from college in 2008,

3 (Pages 6 - 9)

Page 10

did you have any employment?

A. Yes.

Q. What -- starting with your first job after graduating from college, what was that?

A. I was working as a security guard.

Q. And was that with Norred & Associates?

A. Yes.

Q. And when was that?

A. I can't recall. I can't recall the exact dates.

Q. Did you -- did you have any significant time off between graduating from college and taking that job?

A. I can't recall.

Q. Okay. After -- did you -- did you leave Norred & Associates in August of 2010?

A. Norred & Associates, I had the opportunity to go back. So in between that time, I actually lived in South Korea. I lived and worked in South Korea.

Q. And that was with LCI International Kids Club?

A. Yes.

Q. You went to work for -- you went to work for Norred for a period of time and then took the job in

Page 11

South Korea and then came back to Norred?

A. Yes.

Q. Okay. And am I correct that the second time you were working for Norred that you left in August of 2010?

A. It may have been. I can't for sure remember if that's the case.

Q. Okay. What -- what job did you have after Norred?

A. I worked at the Kia dealership, Kia Atlanta South.

Q. And that was as a receptionist/cashier?

A. Yes.

Q. Okay. And you left them in January of 2012?

A. I can't recall the dates.

Q. Where did you work after you left Kia Atlanta South?

A. I worked at a dentist's office, DentFirst.

Q. And what did you do for DentFirst?

A. I started off being -- it was customer -- in a sense customer service, a patient coordinator. From there I moved up to treatment coordinator. From there I moved up to office manager.

Q. And you resigned from there to work for a nonprofit?

Page 12

A. No. Once I left DentFirst, I went and worked at a charter school in Smyrna.

Q. What was the name of the charter school?

A. I can't recall the name of the school right now.

Q. And when did you leave the charter school?

A. I left there around April of 2017.

Q. And why did you leave the charter school?

A. Classroom management was tough as a new teacher and not having a full support system. I felt like that was difficult as a first-year teacher.

Q. Did you take another job after that?

A. I did.

Q. What was your next job after the charter school?

A. I went back into the dental field and I went back into management at a dentist's office for Great Expressions.

Q. What was the name of that dentist's office?

A. Great Expressions.

Q. And how -- how long did you work for them?

A. Up until September of 2020.

Q. And why did you leave Great Expressions?

A. Because I had the job with Customs and Border Protection.

Page 13

Q. When were you hired by Customs and Border Protection?

A. I started in October of 2020.

Q. And when you started with them, was there a period of training that you had to undergo?

A. Yes. Since it was still COVID, we were actually in a training. The training usually lasted about two weeks prior to us going to academy, but I was in Atlanta for about seven months prior to going to the official academy -- well, until going to pre-academy at my port.

Q. Where -- so you were undergoing training for about seven months in Atlanta? Is that what you said?

A. Correct.

Q. And where -- when and where did you go to the academy?

A. The academy -- FLETC is in Brunswick. I didn't get there until May of 2021.

Q. How long were you at the academy?

A. The academy lasts around 280 class days not including weekends, so that was over four months.

Q. Was there a period where you did some sort of like an orientation or training on St. Croix in 2021?

4 (Pages 10 - 13)

Page 14

A. Yes, I did right before I went to the academy.

Q. Was that while you were at the academy?

A. No. That was before I went to the academy. That was in April of 2021, so the training was a continuation from Atlanta.

Q. And isn't it correct that you were on St. Croix until about September of 2021?

A. No.

Q. How long were you on St. Croix?

A. I was on St. Croix until May of 2021.

Q. When in May did you leave St. Croix?

A. I can't recall the exact date, but it was early in the month of May.

Q. After you completed the academy -- well, first of all, when did you complete the academy?

A. September of 2021, September 29th.

Q. And what was your first assignment with Customs Border Patrol after completing the academy?

A. I don't understand your question.

Q. After you complete the academy, did they assign you to a particular place?

A. Are you saying a particular location or --

Q. Let's start with location.

A. Okay. After training at FLETC, I went to

Page 15

St. Croix -- back to St. Croix because that's my duty -- that was my duty station.

Q. When you did the initial training in St. Croix in April and May of 2021, did you already know that you would be reassigned there after you completed the academy?

A. Yes. I knew that prior to starting with Customs.

Q. And during that initial period on St. Croix, again, April to May -- part of May 2021, where were you working on St. Croix?

A. At the airport.

Q. And what were your job duties there at the airport --

A. I was still --

Q. -- during that time period?

A. I was still in training, so we didn't -- I didn't specifically have any job duties. I wasn't even in uniform. I was in business casual clothing.

Q. Were you on St. Croix when -- in that April, May time period of 2021 when there were a series of pollution events at the refinery?

A. If it was, yes, I was April, May 2021. I don't know what happened at the refinery. I can't tell you that during that time I was there.

Page 16

Q. Do you recall seeing or hearing about, again in the time period when you were assigned to St. Croix prior to going to the academy, about a major discharge from the refinery with -- from a flare with flames shooting out of it?

MS. SEILA: Objection; form.

You can answer.

THE WITNESS: Oh, okay. I don't recall that. I don't recall that.

BY MR. SIMPSON:

Q. In the -- let's turn back to a couple of other areas of background.

What email addresses do you use?

A. A Gmail address, nsshantell10@gmail.com.

Q. Any others?

A. Outside of work emails, no, no others.

Q. What other social media do you use?

A. I use -- I have a TikTok, Instagram, and Facebook.

Q. What is your TikTok identity or user name?

A. I think -- it may be Nikki Shantell.

Q. And what is your Instagram user name or identity?

A. Tell_Nikki.

Q. Are you also on Poshmark?

Page 17

A. I do have an account with Poshmark, but I'm not -- I haven't actively been on Poshmark.

Q. And are you a gamer?

A. I play videogames. That's relaxation, yes.

Q. And what's your gamer name?

A. The gamer name that was created by my brother is Killorbkilled111.

Q. Who is your brother?

A. Royal Smith.

Q. Is your maiden name Smith?

A. Yes.

Q. And are you presently married?

A. No.

Q. You were at one time married to Terrance Wooten?

A. Yes.

Q. When did you get -- well, are you no longer married due to a divorce?

A. Yes.

Q. When did you get divorced?

A. January of 2022.

Q. And do you attribute any of the reasons you got divorced -- I don't want to get into the details of your divorce, but I want to confirm that you don't claim that your divorce was somehow related to the

5 (Pages 14 - 17)

Page 18

incident that you are suing about.

A.  No.

Q.  Is that correct?

A.  That's correct.

Q.  When did -- are you still employed by Customs and Border Protection?

A.  No.  Unfortunately, I had to retire.

Q.  When did you retire from Customs?

A.  Officially, July of 2024.

Q.  Did you say '24?

A.  Yes.

Q.  And you said officially.  How long before July of 2024 had you last been on duty with Customs and Border Patrol -- I mean, Border Protection?

A.  August 10th of 2022.

Q.  What was the reason you retired in July of 2024?

A.  Are you asking me was the reason of the date or are you asking why did I have to retire?

Q.  I'm asking you why you retired.

A.  Because I was unfit for duty because of my lung injury.

Q.  After August 10, 2022, who was your next employer?

A.  I just started working for the State of

Page 19

Georgia as of February of this year, 2025.

Q.  And what are you doing for the State of Florida -- I mean, Georgia?  Sorry.

A.  I'm an investigator.  I get to work from home, and I investigate sexual offense records.  I work for the Sexual Offenders Risk Review Board.

Q.  I'm sorry.  I missed that last part.  For the Sexual Offenders what?

A.  Risk Review Board.

Q.  Is that associated with a particular agency in Georgia?

A.  It's the Behavioral and Health Department.

Q.  I'm sorry.  There's some noise in the background.  Did you say the Behavioral Health Department?

A.  Yes.

Q.  Is that part of the Georgia Department of Health?

A.  No.  We -- it's DB -- I believe it's DBHDD.  That might be the initials of it.  I'm not certain if that's a part of the -- what you just asked me about.

MR. SIMPSON:  Is there -- is there a door open or something?  Because I'm getting a lot of background noise.

MR. KING:  There is not, but let me see if I

Page 20

can get them to -- there are people in the hallway.

BY MR. SIMPSON:

Q.  Between August 10 of 2022 and July 2024, did you receive any sort of compensation from Customs and Border Protection?  In other words, were you being paid disability?  Were you on the payroll but not working?  I'm trying to understand what you were doing during that time period.

A.  I had a Workers' Comp case, so I -- initially, for the first 45 days, you get paid as though nothing happened, as nothing has changed; and then after that, Workers' Comp pays you about a 66 and maybe a half of a percent of your paycheck.  The problem with Workers' Comp, after October they denied my claim.  I was not getting paid from them anymore consistently until October of about 2023.

I was able to get hours donated from coworkers at different ports.  It didn't matter whether they were in the Virgin Islands or stateside, whoever had hours and was willing to donate, I used donated time; and my family had to help me out a lot.

Q.  Did you have any other sources of income during that time?

A.  My brother and I did attempt to try to start

Page 21

a business.  My brother is a chef, so he was trying to find something that I would possibly enjoy in my new life that I would do -- that I could do.  I told him I enjoyed foods.  He knows that I love food, so he wanted to incorporate that.  So we did try to start a business for that, but that was too much on my body.

Q.  What was that business?

A.  It was called Social Society, and it was a private chef experience.

Q.  Private chef experience meaning that you and your brother would go to someone's home or something and prepare meals for them?

A.  So, no, we actually had the location.  The people would come to us, and then he --

Q.  It wasn't like a walk-in restaurant?

A.  No, it was not.

Q.  Got it.

And how did that work out for you?

A.  It didn't work out great because after one event I'm usually down for about a week or two weeks.  So I would try to -- I would have to get help from family, nieces to come in and help us if we did have an -- an event.

Q.  When you say you were down for one to two

6 (Pages 18 - 21)

Page 22

weeks, can you describe to me why you were down? What -- you know, was it physical, mental exhaustion? I'm trying to understand that.

A. Physical exhaustion. It was more physical. Unfortunately, since I have limitations on breathing, any exertion it makes me extremely tired. I get short of breath.

Can we take a break?

Q. Bear with me a minute. I'm reviewing some notes.

MS. SEILA: Can we take a quick break, Andy.

MR. SIMPSON: Sure.

MS. SEILA: Okay.

THE VIDEOGRAPHER: The time is 10:38 a.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 10:48 a.m., and we are on the record.

BY MR. SIMPSON:

Q. I'm going to talk a little bit about your medical history. When were you first diagnosed with asthma?

A. Around the age of five.

Q. And are you currently treating for asthma?

A. Yes; but --

Page 23

Q. Who do you treat with?

A. I see a few different doctors. Dr. Graham is a pulmonary doctor. I have my primary care physician, Dr. Acker. And then I have an upcoming appointment in Philadelphia with a different doctor, Dr. Garfield; and she's a pulmonary doctor.

Q. What is the -- what is the purpose of your appointment with Dr. Garfield?

A. Dr. Garfield was the doctor who actually had me to a point where I was able to talk without having trouble breathing. She recognized the issue right away and she was able to help me, so I want to be able to go see her to see if there's something that can get me back to my normal self or find out if this is going to be my new normal for the rest of my life.

Q. All right. So I take it you have treated with Dr. Garfield in the past?

A. Yes.

Q. What is -- is Dr. -- Dr. Garfield a woman?

A. Yes.

Q. What is her first name?

A. Jamie.

Q. And where did you see her in the past?

A. I got to see her virtually. She accessed all of my records.

Page 24

Q. And is she with a particular practice or a hospital or something like that in Philadelphia?

A. She is with the -- with Temple University.

Q. When did you first see Dr. Garfield?

A. I believe it was April of 2023. I'm not certain of the date.

Q. And how often have you seen Dr. Garfield?

A. I've seen her, I believe, twice.

Q. And you said she was able to help you, correct?

A. Yes.

Q. What is it that she did that assisted you?

A. So prior to all of this, I never had a nebulizer machine; and she figured out that instead of -- well, there's this medication that's called Trelegy. Trelegy is an inhaler that contains three different meds in one; and in order to use the inhaler, you have to inhale, hold your breath about three seconds, and then exhale. But my issue was my medicines of my inhalers were not working because I wasn't able to hold my breath. So she was able to get those medications that are similar to Trelegy in the nebulizer. So then that way I don't have to hold my breath. I can just use the machine and don't have to worry about breathing in the sense of inhaling the

Page 25

medicine.

Q. And how often do you have to use the nebulizer?

A. Frequently. I don't have an exact amount of -- I can't say it's every day. It just depends on how bad my flare-up is. Because if my regular inhaler is not working, I have a rescue inhaler. It's actually -- it has steroids in it. So if that inhaler doesn't work, then I would get on my machine.

Q. Is the nebulizer something you carry with you?

A. Yes. Unfortunately, I have to carry it everywhere I go. I actually bought a travel one as well, one that's more so Bluetooth. It doesn't do the same thing because the home nebulizer, it requires an outlet.

Q. Do you have one or both of the nebulizers with you today?

A. I do.

Q. Have you used the nebulizer today?

A. Not yet. I have used my inhaler so far today.

Q. You say you have used it?

A. I have used my rescue inhaler today, yes.

Q. And how many times have you used the rescue

7 (Pages 22 - 25)

Page 26

inhaler today?

A. One so far.

Q. Was that during the last break?

A. I used it prior to us starting.

Q. You said you were first diagnosed with asthma at the age of five. Growing up how did the asthma affect you?

A. My asthma growing up was well managed, under control. I actually thought it was a thing that you can grow out of asthma at one point because that's how well managed it was.

Q. How was it managed growing up?

A. I didn't have flare-ups. I didn't have that many flare-ups. I can't tell you exact number over the period between 5 and 36, 35 that I've had flare-ups. I can't tell you that, but it was rare that I had to use my inhaler. And this was a regular inhaler, not one that can take steroids.

Q. You said you didn't have many. You said infrequent. Can you give me some sort of, you know, once a year, twice a year, once a month, some sort of estimate?

A. I can't necessarily pinpoint that for certain.

Q. Did you ever have to be hospitalized for

Page 27

asthma?

A. No, not that I -- prior not -- I take that -- not prior to this incident, no.

Q. Prior to the incident, did you ever have to get emergency care for asthma?

A. Yes, I have.

Q. And when did you have to get emergency care for asthma prior to the incident?

A. I remember specifically when I lived in South Korea because there was something like yellow dust that used to travel. I remember that. I was sick a little more there because of that yellow dust. Any other time? The one that I can remember is once we find out that COVID came out right in the about 20 -- I believe it was 2019 I got really sick, and it was really bad then. But usually in the past when I had flare-ups, if I did ever have one, it was because of some extreme weather or, like I said, climate situation that was happening.

Q. What do you mean by extreme weather --

A. Like I stated that --

Q. -- for example --

A. Go ahead. I'm sorry.

Q. For example, you could be talking extreme heat, extreme cold, or rain. I don't know what you

Page 28

mean by that, so I'm trying to get --

A. So all of those factors play a part into asthma; but for me specifically, like I stated, the yellow dust in South Korea. I know there was a -- I had a flare-up while I was in St. Croix back in 2021 around April. I think something came out that there was some Saharan dust that I ended up finding out about later on after that.

Q. So you had a flare-up there on St. Croix in 2021. At the time, you didn't know it was Saharan dust, but later you found that out --

A. Correct.

Q. -- you said?

A. Correct.

Q. And how did you find out that the flare-up was caused by Saharan dust?

A. I can't remember how I found out about the Saharan dust, but that's what I attribute to it. It wasn't that a doctor told me specifically this happened because of this dust.

Q. Got it.

Other than South Korea and what you described on St. Croix that time, have you ever had your asthma flare up because of dust?

A. Not that I can recall.

Page 29

Q. Prior to the incident, had you ever had a pulmonary function test?

A. Yes.

Q. And do you know when?

A. I had it in July of 2022.

Q. You said July of 2020?

A. 2022.

Q. Why did you have a pulmonary function test in July of 2022?

A. At that time, I was concerned that my asthma may have been getting worse, I thought, because of the air quality there; but once I had the test done, they told me that everything was still within my -- my normal range.

Q. Where did you have that particular pulmonary function test done?

A. It was here stateside. I can't remember the doctor's name.

Q. Was it in Georgia?

A. Yes.

Q. What doctors have you seen in Georgia in the last five years?

A. I've seen so many. I've seen pulmonary doctors, kidney doctors, heart doctors, my primary care physician.

8 (Pages 26 - 29)

Page 30

Q. How did you go about identifying a doctor to investigate your asthma concerns in July of 2022?

A. I can't -- I don't recall how I found that particular -- that particular doctor, that specialist. Because at the time, I didn't have a specialist at all that I was seeing on a regular basis or anything. I've never had a pulmonary doctor that I can recall that I just saw on a regular basis. I was under the care of my primary care physician.

Q. Do you remember where this particular doctor was located?

A. I believe it was in Johns Creek.

Q. Did you say Johnson Creek?

A. Johns Creek.

Q. And forgive my ignorance. Is that a town in Georgia?

A. Yes, it is.

Q. Was this doctor associated with a particular practice or hospital?

A. I don't recall.

Q. Was the doctor male or female?

A. Male.

Q. Was it Alex Hebert?

A. That name doesn't sound like the doctor that I saw in July. Alex sounds like a doctor that I

Page 31

possibly -- when I had to get cleared for my asthma in order to work for Customs.

Q. Was that before or after the incident?

A. That was before.

Q. And Dr. -- you saw Dr. Grace Chai, correct?

A. Yes, that was a doctor of mine.

Q. That was also for asthma clearance?

A. Yes. Initially she was, yes; and then she referred me out to a specialist because I never -- I didn't have a specialist to see.

Q. Was that before or after the incident?

A. This was before the incident.

Q. Okay. So you saw Dr. Chai before the incident for asthma clearance, and she referred you to a specialist?

A. I believe so, yes. I'm trying to make sure Dr. Chai is the name of the doctor who was the primary care physician in Norcross. I don't have the records to look at just to make sure that's her name, but that is what I recall. There was a primary care physician that I was working with. I went to her to ask about getting my clearance because it was a requirement in order to get the job. She started the clearance, and then she told me based off of the questions she wanted me to see a specialist. It

Page 32

would better for me to see -- see a specialist.

Q. Okay. And is the specialist that we're talking about the one who administered the pulmonary function test in July of 2022?

A. No. This is a different doctor.

Q. Okay. Do you remember the specialist that Dr. Chai referred you to?

A. No, I don't remember that doctor's name at the...

Q. In your interrogatory responses in this case, you identified Wellstar East Point Health Center in Atlanta, Georgia. When and why did you go to that place?

A. I don't recall.

Q. Okay. Who is Dr. Thomas Chacko?

A. Okay. I think Dr. Chacko may be the doctor who is -- who I saw in July of 2022. He may be. I'm not --

Q. He's --

A. -- too certain.

Q. According to your interrogatory responses, he's at Chacko Allergy, Asthma and Sinus Center of Duluth.

A. Okay. So that may -- that may be him.

Q. Okay. So according to your responses, he's

Page 33

in Duluth, Georgia, not Johns Creek. Does that make sense?

A. It makes sense. That's why I said it may have been Johns Creek.

Q. Okay.

A. But he has different locations, if I'm not mistaken.

Q. Okay. And what were the results of that pulmonary function test that was done in July of 2022?

A. They told me everything looked normal, it looked -- it looked fine. My -- there's a percentage once you do a lung function test and it reflects, I guess, how you're able to breathe the air. I'm not really sure of the medical side of that part; but at that time, I believe my percentage was over 90 percent.

Q. Do you have copies of the results of that test?

A. It should be in the documents that you-all have.

Q. You mentioned a referral to a specialist by Dr. Grace. Did you have a pulmonary function test done as a result of the referral?

A. If Dr. Grace was a primary care physician

9 (Pages 30 - 33)

Page 34

that I used to see in Norcross, I just -- unfortunately, I can't remember right now for sure. But if that's the case, then, yes, she did give me a referral; and that was strictly to get a clearance for my asthma in order to work -- to be able to be hired for Customs and Border Protection.

Q. Your voice kind of dropped down there. Did you say you did have a pulmonary function test as a result of that referral?

A. No. I was stating that if -- if Dr. Chai is the primary care physician that was in Norcross, then, yes, she gave me the referral to see a specialist to get the clearance to work for Customs and Border Protection.

Q. Let me break that down. Did Dr. Chai administer a pulmonary function test?

A. Could you -- do you know for sure the address of Dr. Chai by chance?

Q. In your interrogatory responses, you give 3635 Peachtree Industrial Boulevard in Duluth, Georgia.

A. Duluth. For Dr. Chai?

Q. Yes.

A. So at this moment, I can't say that Dr. Chai is the one that did that. At the time, I was seeing

Page 35

a primary care physician. She was in Norcross, not too far away from my house; and she's the one who gave me the referral for the clearance.

Q. And who was that primary care physician?

A. I cannot think of her name right now, sir.

Q. All right. I'm just looking through to see if I can find a doctor in Norcross, but I don't see one listed.

Prior to the incident and not counting the July 2022 pulmonary function test, did you ever have another pulmonary function test?

A. I had to have one in order to find out that I had -- I believe when I was a kid when I had asthma, but I don't recall taking -- having any pulmonary function tests.

Q. Okay. So as an adult and, again, prior to the incident, the only pulmonary function test you recall is the July 2022 one?

A. No, no, not just the July of 2022. I have July of 2022 and then I believe it was maybe 2018 when I had to get the one -- the clearance for the job.

Q. Have you ever been diagnosed with any other respiratory conditions such as COPD or bronchitis or anything else like that?

Page 36

A. I have been getting bronchitis now lately after the injury more frequently. I don't recall ever having bronchitis, if I had it before. I actually was just diagnosed with bronchitis last week but outside of that no COPD. I was diagnosed with RADS after the injury. That was the diagnosis.

Q. You mentioned COVID. Have you had COVID?

A. Yes, I did get COVID.

Q. I'm sorry. Did you give a date there? I couldn't hear.

A. Oh, no, I didn't give a date. I believe it was in 2022. It was 2022 that I got -- early 2022 that I got COVID. I'm not certain of the date.

Q. Did you say early -- I'm sorry. Did you say early 2022?

A. Yes.

Q. Did you have that while you were on St. Croix?

A. Yes.

Q. Did you get any medical treatment for the COVID?

A. Yes.

Q. And where did you get that from?

A. I believe it was one of the urgent cares on St. Croix. I believe I went to Plessen.

Page 37

Q. Is Plessen one of the urgent care places that you did go to?

A. Are you asking did -- are you saying -- for what timeframe? That's what I'm trying to understand.

Q. Any timeframe.

A. Yes.

Q. Did you ever go to ProHealth on St. Croix?

A. I don't recall the name of ProHealth.

Q. ProHealth is located on the road that runs between Sunny Isle and the refinery off of a side -- a business area there. Does that help you?

A. Is it near that Sunny Isles Plaza? If it's by the Sunny Isles Plaza, then yes.

Q. If you said if near the Sunny Isle what?

A. Plaza. There's a plaza, yes.

Q. Prior to the incident, did you have any other health issues other than asthma? I'm not talking routine colds or anything like that.

A. Okay. I had fibroids. I had to have fibroid surgery. I did that back in October of 2021. I also had my gallbladder removed and that was back in 2013; 2012, 2013.

Q. Were you vaccinated for COVID?

A. Yes, I was.

10 (Pages 34 - 37)

Page 38

Q. Which kind of vaccine did you get?

A. I can't remember.

Q. Pfizer? Moderna? Johnson & Johnson?

A. I'm not sure. I believe it was Pfizer. I definitely remember going to get two shots.

Q. And how many times did you get vaccinated or boosted for COVID?

A. Two shots.

Q. Just two?

A. Yes.

Q. Did that occur while you were on St. Croix?

A. That was prior to me going to St. Croix.

Q. When you first came down to St. Croix before the academy in April of 2021, is that when you got COVID?

A. No. No. I said I got COVID around 2022. I was actually on duty.

Q. I'm sorry.

A. I remember because I was at the airport and a passenger came in who had COVID and then I got it right after.

Q. After you came back to St. Croix after your academy time, where were you assigned?

A. At the airport.

Q. And what did you do there?

Page 39

A. Process passengers and I was still in training.

Q. Did you ever get to the point where you weren't in training?

A. Yes, I did.

Q. When did you complete the training?

A. Possibly, I believe, January 2022.

Q. When you -- when you claim you were exposed to smoke from the refinery, that was on August 8 of 2022, correct?

A. Correct.

Q. And what were you -- what was your job assignment on August 8, 2022?

A. So once -- once we're at the airport, if we're processing passengers, we also have boats or vessels -- we'll call it vessels that would come in, and we would have to inspect vessels. So that particular day I left the airport to go inspect a vessel.

Q. Was that the first time you had ever entered the refinery or terminal area?

A. No, it's not.

Q. When was the first time you entered the refinery or terminal area?

A. I don't recall.

Page 40

Q. Can you give me an estimate as to how many months or days or weeks before August 8 you first went down there?

A. I can't, but I can tell you at that point I was already going. I had been there a few times already between training going with someone and also going on my own.

Q. Approximately, how many times had you entered the refinery/terminal area before August 8th, 2022?

A. Over five times.

Q. Over 20?

A. No; over five.

Q. Okay. Less -- less than 20?

A. I'm not too certain, sir.

Q. In your complaint, you refer to going for facial control on a tugboat. What does that mean?

A. So as part of our duties with Customs and Border Protection, people that are coming in, whether you're coming via airport or you're coming on a vessel, if you are not a U.S. citizen, we have to inspect your passport and make sure that you're the person that's in the passport, make sure your passport is valid. If you're supposed to have a visa, make sure your visa is in there.

Page 41

Q. So take me through August 8, 2022, starting from when you were told you needed to go to the refinery/terminal area to do this passport inspection.

A. So you want to know what happened once I left the airport? Is that what you're asking?

Q. Yeah. So let's start with what time you left the airport and go from there.

A. Okay. I'm not certain of the time that I left the airport. The supervisor told me to go ahead and do the vessel because someone else -- the vessel wasn't in at the time when someone else left to go do it, so the supervisor told me that I can go do it. They told me I can go pick up food. I went at the top of -- I left the airport in the work truck. I went going down the road by the Home Depot. I apologize. I don't recall street names. And I stopped first at the Limetree restaurant that's right at the top of the hill by the refinery. I grabbed the food. I went straight down to the security gate. I stopped by with security. I showed him my badge. He checked me in, and then I made my way towards the area where the tugboats are.

Upon getting --

Q. Let me -- let me if I can interrupt and just

11 (Pages 38 - 41)

Page 42

ask you a couple of follow-up questions.

You said you stopped at the security gate?

A. Yes.

Q. Was that -- were you in a vehicle at the gate or did you have to get out and go through the administration building?

A. I was in the vehicle.

Q. So you showed a security guard at the vehicle gate your credentials and he let you in?

A. Yes.

Q. And did you have any conversation with that gentleman or woman at the security gate?

A. Nothing out of the regular process that I would do outside of showing him my badge and going in.

Q. Were you given any instructions as to what you should do after you went through?

A. No.

Q. Had you ever been given any orientation of the refinery/terminal area?

A. Are you asking from someone from the refinery or someone from my job?

Q. Either.

A. With my job, yes. Well, I have trained with someone who showed me the process of what we need to

Page 43

do once we get to the refinery and how we go around.

Q. Did you ever watch any safety videos at the refinery or terminal?

A. We did watch -- I believe we had to watch safety videos about going to a refinery or -- well, not a refinery per se because not all locations are refinery but how to inspect the vessel properly.

Q. That was a Customs and Border Protection video?

A. Yes. So that was a standard video for all ports even though the ports look different so that was just standard.

Q. Did you ever watch any video actually at the refinery or terminal?

A. No.

Q. When did you first learn that there was smoldering coke at the refinery?

A. I didn't know it was smoldering coke. I saw smoke once I arrived to the tugboat area.

Q. I'm sorry. You said you saw smoke when you got to the tugboat area?

A. Yes.

Q. Had you read anything in the newspaper or online or heard anything prior to entering the refinery or terminal regarding the incident that was

Page 44

ongoing there?

A. No.

Q. When you went through security, did anyone tell you anything about what was going on at the coke domes?

A. No.

MS. SEILA: Do you want to take another break?

MR. SIMPSON: Take a break?

MS. SEILA: Is that okay? Yes, please. Thank you.

THE VIDEOGRAPHER: The time is 11:28 a.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 12:23 p.m., and we are on the record.

BY MR. SIMPSON:

Q. Good afternoon, Ms. Wooten. When we took the break, I understand you used your nebulizer?

A. Yes. Hello.

Q. Go ahead.

A. Oh, I said hello and yes.

Q. Okay. Does using the nebulizer -- having just used it, does that affect in any way your ability to give accurate testimony now?

Page 45

A. No, it would not.

Q. Okay. When we broke, we were talking about your entrance into the refinery on the day of the incident, August 8, 2022. And I believe I just asked you -- I'll just go ahead and ask again to make sure I got an answer.

When you entered through the gate, did anyone tell you anything about what was going on inside the gate --

A. No.

Q. -- in terms of the smolder?

A. No, they didn't.

Q. Could you tell at the time you approached the refinery and terminal or as you were going through the gate that there was some sort of incident going on?

A. No, I couldn't tell upon approaching -- approaching the refinery.

Q. Okay. You didn't see any smoke or anything like that as you approached?

A. Not that I noticed. I wasn't looking in the air.

Q. Certainly, if you had seen black smoke coming from the refinery or terminal, you would have noticed something like that, right?

12 (Pages 42 - 45)

Page 46

A. I can't say yes or no in a sense. Possibly the smoke that you see out in the air all the time.

Q. After you went through the gate, what did you do?

A. I drove towards the tugboat area.

Q. At some point as you were driving towards the tugboat area, did you realize that there was some sort of emergency response going on --

A. I didn't --

Q. -- within the --

A. I'm sorry. I'm sorry. Go ahead.

Q. Did you notice as you approached the tugs that there was some sort of emergency response going on within the refinery?

A. Once I got close to the tug area, that's when I noticed because of the fire trucks.

Q. And what did you observe?

A. I first saw fire trucks. I saw some people standing towards the side and then the street that I usually would park on, once I made it there, I saw -- I saw workers. They looked like they worked at the refinery, so I assume they did. They had on like onesies or something. And I asked the question then if everything would be okay for me to proceed forward. In order to ask that question, I'm sorry, I

Page 47

rolled down my window.

Q. You referred to onesies. Do you mean a jumpsuit?

A. Yes.

Q. Okay. What color was -- were the jumpsuits that you saw?

A. I don't recall the color.

Q. And you said you rolled down your window and spoke to two people?

A. I definitely -- one person responded to me. I believe there may have been two people that was standing right there, but I can't recall for sure.

Q. And what -- what specifically did you ask them?

A. I asked them if -- in summary, I would say I asked them if everything would be okay to proceed.

Q. Did you inform them that you had asthma?

A. No.

Q. Did you -- by the way, did Customs and Border Protection provide you with any personal protective gear?

A. We have all of that at the airport, but I did not have anything with me.

Q. At any time when you entered the refinery and terminal, did you request that someone provide

Page 48

you with personal protective gear?

A. No. I've never had to do that before.

Q. Were the two people you speaking to wearing any personal protective gear that you could tell?

A. I don't recall the -- them having on masks. I didn't -- I believe I didn't see the mask until I looked closer towards the dome area.

Q. About how far away from the dome area were you at this time?

A. I'm not good with feet, but it's close. But it's going to be -- it seemed like it's a walk. It's not as close -- like, the dome is right there by -- you can visibly see the dome. You can see the entrance, but it's right behind the tugboat area.

Q. The tugboats are located in kind of a -- on a dock that's kind of U-shaped, correct?

A. I don't recall.

Q. Okay. You were on a concrete road that ran between the coke dome and the dock where the tugs were?

A. Yes.

Q. So you had already turned onto that road at the time you made -- you asked this question?

A. Yes.

Q. Did you have to go around the coke dome to

Page 49

get to the tugs?

A. No.

Q. Had you pulled into the parking area for the tugs at the time you asked this question?

A. I was at the entrance of where the parking area is, where the Main Street is where the tug is.

Q. Had you had to drive across a firehose to get to the tugs?

A. I don't recall.

Q. What were the weather conditions at the time?

A. I don't recall the weather. I know it was -- excuse me, it was nice outside. It wasn't raining or anything.

Q. And what did you observe in the area of the coke dome regarding this incident other than the fire fighting equipment?

A. Thick -- this black smoke that's thick. In some areas it looked black. In some areas it looked gray. It kind of remind me of like this CS gas we had to go through in training.

Q. I'm sorry. It reminded you of what that you went through in training?

A. CS gas. It's like a crowd control gas.

Q. And you went through that in training?

13 (Pages 46 - 49)

Page 50

A. Yes. It was a requirement.

Q. And were you actually exposed to this CS gas?

A. Yes. It was a requirement. We were right in the middle of the CS gas. So you take a group of us -- I can't remember how many, but we were -- there were two rows and in the two rows we had to kneel down on one knee. The instructors all had on gas masks and then they would pop the pin on the gas and the container is in like a -- it looks like a shovel. I don't know what that was, but they'll put that container in that shovel and they'll shake it. And then they will go around the whole group in a circle and we had to still kneel until they told us to get up. We would then get up. They would tell us to repeat certain things, certain commands because they want to see us actually talking through the smoke. So we did that as well. And then we would head to the wash station and we'll have -- we basically kept hands on the person in front of us, their shoulder, so we can be able to maneuver as a team. And then someone who was -- already basically went prior to my group, they will lead us to the water station.

Q. When you said you had to maintain contact with the other people, was that because it was also

Page 51

dark and you couldn't see?

A. I'm not sure why they have us do it like that. I assume it was probably because of us being able to bond in -- in that time, but also because we're training -- the training is for crowd control, and so our group has to be tight for crowd control.

Q. What I'm trying to understand is did this gas obscure your sight?

A. Oh, yes. It -- okay. Yes, it does affect sight. It affects breathing. I remember the group prior to me that went -- I noticed the -- there was this big guy who was in my group, a really big guy -- big as far as muscular, strong. And I saw him -- his eyes were super watery. He was crying. There was snot coming out of his nose. He turned red. So, yes, it affects your eyes. It affects your breathing. It affects your -- I guess your entire nervous system in a sense.

Q. And how did you react to exposure to this CS gas?

A. Prior to it happening, I was scared in a sense because I saw that reaction of the bigger guy. I -- but once I went through, I didn't have any issues. I actually -- the instructor -- instructor gave me the pin out of the OC gas to keep as a

Page 52

keepsake.

Q. And why did he give you that?

A. Because I did voice a concern. I told him that I had asthma and since I had asthma that was the main concern of me going through that gas at that time after seeing the reaction of the other people. So if those people who didn't have asthma reacted that way, I was concerned on how I would react.

Q. So you told the instructor that before you were exposed to the gas?

A. Yes.

Q. So did the gas make your eyes tear up?

A. Yes.

Q. Did it affect your breathing?

A. I don't think it was as worse as everybody else's. I felt like the instructor probably was a little lenient on my group. The other groups, they went around the circle -- around the group twice. They only went around my group once.

Q. Did the gas affect other people in your group by making them cough and things like that?

A. A lot of -- yes. A lot of the class members, yes.

Q. But did you have -- did you have any respiratory problems from exposure to this gas?

Page 53

A. I did not end up with any respiratory problems from that gas or the OC spray that we had to endure.

Q. So it didn't even make you cough?

A. It possibly made me cough. I don't remember, but I didn't have any reaction that I was worried about prior to going through it, I should say.

Q. Was the gas clear or was it smoke? How did it appear?

A. No. The gas is -- is smoke. It's smoke because you want to be able to get people to disperse and a part of that is also if people can't see -- if you feel like if you can't see that will help you get away from that area.

Q. So you -- you said you thought you saw thick black smoke. Where from the coke dome or wherever -- someplace else that perhaps did you see this thick black smoke coming from?

A. Just -- just from the dome area.

Q. From the -- from the top of the dome or someplace else?

A. It's like from the door. So the -- the -- where the firemen -- where I saw them standing at and the other team members, whomever was out there, there

14 (Pages 50 - 53)

Page 54

was a door that you can see that -- it was like an opening. I wouldn't call it a door but an opening; and in that opening, you can see it flowing out.

Q. And did you actually go through this thick black smoke?

A. No.

Q. Did it come into your car?

A. I didn't think I went through the smoke at all not realizing how smoke travels. Because as it was coming out of the refinery, it looked like it was getting lighter. I didn't realize that the smoke had actually entered the vehicle until I rolled the windows back up.

Q. What happened while you were -- if anything, while you were talking to these two individuals?

A. Nothing happened while we were talking.

Q. So did you then roll your window up and continue or what happened?

A. I rolled my window up; and then as soon as I rolled the window up, that's when I start coughing.

Q. And what did you do at that point?

A. I left. I turned around from the area and I started leaving the refinery. I called back up to the port to try to speak to a supervisor to try to let them know what was going on, to let them know I

Page 55

couldn't do the tugboat and that I was coughing and that there was a fire there.

Q. So you never got out of the vehicle?

A. No, I never got out of the vehicle.

Q. About how long did you talk to these two individuals?

A. It was less than one minute. It was probably just seconds, just time to ask the question to get an answer and then roll my window back up.

Q. And so how long was the window rolled down?

A. Just during that time. I didn't have the window down until I got in front of those individuals.

Q. So it was also less than a minute?

A. Yes.

Q. Do you think it was less than 30 seconds?

A. It may very have been because it was a short time.

Q. Who -- you said you called the port. Do you mean the airport?

A. Yes.

Q. And who did you call?

A. I called our main line and I spoke with Officer Cox.

Q. Did you say Cox?

Page 56

A. Yes.

Q. Is that C-O-X or C-O-X-E?

A. C-O-X.

Q. And do you know his or her first name?

A. Damian.

Q. What did Officer Cox tell you to do?

A. He told me to go ahead and make my way back to the airport. He noticed that I was coughing right away upon calling. He asked me am I okay. I told him no. That's when I told him what was going on. I asked to speak to a supervisor. He told me the supervisor wasn't -- that they were in a meeting and that he was going to put the acting supervisor at that time, who was standing in while the supervisor was in the meeting, Officer McSween -- he was going to put him on the phone. And Officer -- I believe Officer McSween was on the phone with me. It was either him or -- there's one more officer. I'm sorry. There's one more officer. I'm trying to think of her name. Herman, Officer Herman. One of those officers stayed on the phone with me the entire time until I got back to the airport.

They had my bookbag because I didn't -- I didn't take my inhaler with me. My -- I usually just keep my inhaler in my bookbag more so for working out

Page 57

if anything happens. And they had my bookbag ready for me. I grabbed my inhaler out as soon as I pulled up to the front of the airport. We usually park in the back; but they told me not to worry about parking the car just pull up to the front.

Q. And when you used the inhaler, did that provide you with relief?

A. No, it didn't.

Q. So what did you do after that?

A. Well, I went in. I had to go vomit, so I went to the bathroom to vomit. I went into the break room and I sat down. Officer Henry, who is also trained -- a trained EMT. He came in to check my blood pressure, check my vitals; and at that time, I was still shaking. I was trembling really bad, nauseous, coughing, chest really tight. And they told me to go ahead and go to the urgent care, which I did. One of my coworkers drove me to the urgent care.

Q. What happened when you got to the urgent care?

A. They took me back immediately. Actually, they noticed the distress that I was in. Because at this point, all of my clothes felt super tight on my chest, so I went ahead -- prior to leaving, I took my

15 (Pages 54 - 57)

Page 58

top -- uniform top off. I had to take off my belt. And then once I made it into the urgent care, they took me straight back. I told them what happened at the refinery. They gave me -- they put me on the nebulizer machine in the office. I believe there was about four vials that they gave me that day, and then the -- it may have started off with two vials initially, and it wasn't working. They ended up giving me a steroid shot and after the steroid shot I ended up getting two more vials, I believe, of the inhalation medication at the time, which totaled it to four. And I was feeling a little better after the steroid shot. So then after my visit, then I ended up -- I left the office.

Q. I'm sorry. After that you ended up what?

A. Leaving -- leaving the office.

Q. And I assume you did not go back to the airport at that point?

A. My car was there. I had to go back to the airport because my car -- all of my items to be able to get in my house, everything was there. I had to go get my stuff.

Q. Okay. So you went back to the airport and got your stuff, but then you went home?

A. I can't recall exactly what I did that day.

Page 59

I don't remember if I clocked back in to work a little bit because I thought I felt better and I was scheduled for overtime or if I went home; but if we can get the time from the supervisors, that would definitely cover to say what I did.

Q. Okay. Where were you living at the time on St. Croix?

A. I lived with this nice family that took me in. It was in Kings Hill. So where I lived, the house, I can literally stand in the front yard and I can see the refinery.

Q. Prior to that day, had you ever stood in your front yard and seen the refinery and seen smoke, black smoke, coming from it?

A. Not that I can recall because I usually worked out in the front yard. Well, on the -- there's a deck, and you can still see the front yard and the refinery. So that's where I usually would work out.

Q. Do you know the address of the property?

A. Not off the top of my head.

Q. Do you know -- what were the names of the people that took you in?

A. The Georges, Mr. and Mrs. George. Mr. George's first name is Patrick, and I cannot

Page 60

think of Mama George's first name right now.

Q. When you say they took you in, were you renting from them?

A. Yes. So -- yes.

Q. How thick was this black smoke you saw at the coke dome?

A. What do you mean how thick?

Q. Could you see through it?

A. I don't recall if I could or not.

Q. Did the two people you -- you were speaking to have any reaction like you did coughing or anything like that?

A. I don't know if they had any reaction to it at the time.

Q. You did -- you did not observe them coughing, correct?

A. I don't remember if they coughed while I was talking to them or not.

Q. Did you tell anyone at the refinery or terminal that you were having a health issue?

A. No, I did not.

Q. Do you know if anyone there saw you having -- you know, coughing and reacting to this incident?

A. I don't -- I don't think so.

Page 61

Q. You said you were taken to the urgent care by a coworker. Was that Mr. Sweeny [sic]?

A. No. It was Norma Lozada, L-O-Z-A-D-A.

Q. And do you recall the name of the urgent care facility you went to?

A. No, I don't recall the name.

Q. Or its location?

A. I -- I couldn't tell you the street, the name of the street. I just remember going past the movie theater. The movie theater would be on my left-hand side, I believe.

Q. And the urgent care place was on the right-hand side of that same road?

A. I believe so, yes.

Q. Bear with me one moment, please.

A. Okay.

Q. Sorry about that.

After that first trip to the urgent care on the day of the incident, when was the next time you sought medical treatment for this condition?

A. It was either the 9th, that exact next day. I can't remember for certain if I ended up in the emergency care. That -- the urgent -- I'm sorry, the emergency room because I did go to the emergency room. I started -- I was having really bad

16 (Pages 58 - 61)

Page 62

headaches. And then I also kept going to the doctor from there, so August the 10th I was back in. I had a visit with my primary care physician around August the 11th or the 12th.

I had to go back to the urgent care another time for another nebulizer treatment and steroid injection. I had to go back to the urgent care a different day to try to do an exercise test, which I could not complete; and they tried to also do the lung test -- I can't think of the name of it right now -- to determine how your lungs were functioning, the pulmonary function test.

I had to go and get a chest x-ray on a different visit, and then I ended up one more visit in the emergency room. So total prior to me leaving the island, I probably saw a doctor or had a doctor visit around eight times.

Q. And when did you return to the United States from the U.S. Virgin Islands, the continental United States?

A. I believe the date was August the 16th.

Q. Did you ever return -- re-enter the refinery or terminal facility after leaving the day you were exposed?

A. No.

Page 63

Q. Did you have any problems -- you said you left St. Croix on August 16th, 2022?

A. Yes.

Q. Did you have any troubles with the flight, medical problems while flying?

A. I can't remember on that particular flight if I did or not.

Q. Have you ever had medical problems while flying?

A. Yes.

Q. When?

A. When I had to go back to St. Croix in October of 2022, flying in and leaving out. And that's it that I can think of on a flight.

Q. And what -- what kind of medical problems did you have flying into St. Croix on October -- in October of 2022?

A. So I was having chest pains and shortness of breath that was coming in, but it could have been I was having an anxiety attack. The unfortunate part for me -- what the doctors explained to me is that I don't have the luxury anymore of having anxiety attacks or getting overworked because of my oxygen. My lungs only take in a certain -- it's taking in the oxygen, but it's not releasing it in time. So then

Page 64

my lungs are basically full of air and not enough air leaving out in time like it's supposed to. So me having anxiety attacks or panic attacks will contribute to me being unable to breathe.

Q. Had you had anxiety attacks before August 8, 2022?

A. I had one that I can recall.

Q. And when was that and what caused it?

A. This was -- I can definitely say it was before 2020. I ended up -- I was on the highway. I was in the far left lane on the highway and my tire went flat. It popped on the highway, and my steering wheel was kind of moving. I felt like I was losing control of the car; and then I had to try to maneuver from the left-side lane all the way to the right lane to the shoulder, so I was in a panic.

Q. And how did the anxiety attack manifest itself during that incident?

A. I don't understand your question.

Q. What were your symptoms as a result of that panic attack or anxiety attack?

A. I only remember hyperventilating. I didn't recall -- it wasn't necessary for me to get on a machine. I didn't have to use an inhaler. I just needed to calm down.

Page 65

Q. How has this incident affected you emotionally or mentally?

A. We're going to be here all day. It's affected a lot. My goal was to retire -- and I'm retired now; but, you know, they say tell God your plan and he'll laugh at you. But my goal was to retire from Customs within -- after putting in 20 to 21 years.

My goal was to be a able to enjoy TDYs, meaning I can go to different places and work in different areas and be able to go and work in Abu Dhabi or the Bahamas or a lot of different places. The options were endless. Because in my everyday life prior to all of this, that's what I did. I would always make my way up. I've always been a person who wanted to work. I didn't mind working for someone and retiring from that. I never wanted to have my own business or anything like that, but everything has changed for me.

I don't -- I don't have the luxury of doing everything that I used to and me not realizing it was a luxury. Like, mentally I'm -- I'm shot. I hold my breath if I am outside on the street and I still see smoke. Like, that still bothers me to this day. There was a chemical fire in Conyers a few months

17 (Pages 62 - 65)

Page 66

ago. I had to stay in the house and, like, quarantine the whole time as though I lived in Conyers. Conyers is about a 30-minute ride from me. I missed my mom's birthday party because I had to be in the house.

I -- I don't get to clean like I'm used to cleaning. I have to hire a cleaning lady. I can't play basketball. I was playing basketball in July of 2022. I was playing kickball prior to going there. I used to box. I worked out five days a week. I ran. I did pushups. I had to work hard to get my job.

Like, I chose that job for a reason; and all of it has been ripped away from me, so mentally I am shot. The first -- from October of 2022 up until maybe May of 2023, I spent that time in the house outside of going to the doctor for doctors' appointments. I stayed in my closet crying days and days because I didn't understand what was going on. Like, I was healthy. Mentally, I'm messed up. Physically, I'm messed up.

My blood pressure has taken effect. I have high blood pressure now. My kidneys have went to kidney failure because of this. Like, I was a healthy human being. Nobody couldn't tell me --

Page 67

like, if you would have told me that this was going to happen to me, I would never believe it. I'm --

Q. Who --

A. Yeah.

Q. I'm sorry. Go ahead.

A. Go ahead.

Q. Have any doctors said that your kidney condition is related to inhaling something at the refinery or terminal?

A. So the understanding from my understanding of what the doctor has stated, once he started looking at my kidney numbers, he doesn't see how my kidneys started to fail as fast as they did at that time prior to me never having high blood pressure prior, never having to be on any kind of high blood pressure medication. And the only reason I know this is because of all of the emergency visits that I have went to the ER.

The ER will tell you you're okay because you're not dying. Their concern is to make sure you don't die in that moment. But what I noticed is that on all of my blood work my kidneys started failing. I saw the numbers start declining, and I Googled it. I talked to my mom about it. She knew the kidney specialist. I went ahead and went and saw him, and I

Page 68

showed him all of my blood work prior to. And that's what he -- from my understanding, that's what he felt like; but now I'm always at risk even though my -- I'm no longer at stage 2 kidney disease. I'm always at risk because he stated once it happens there's always a risk it can happen again.

Q. Which doctor was this?

A. This is -- he's in Stockbridge; Stockbridge, Georgia. And the doctor's office, I know for certain it starts with, I believe, a C. I can't think of the name of it right now.

Q. Did you say B or Z?

A. C as in Charlie.

Q. C. I'm sorry.

Is that Dr. Graham?

A. No. She's the pulmonary.

Q. You have a -- in your interrogatory responses, you have a Dr. Leo Ovadje, O-V-A-D-J-E, in Stockbridge, Georgia. Is that the one?

A. I believe that's his name, yes.

Q. What do you do on a day-to-day basis presently?

A. Well, I can talk about the last 2 weeks. Monday I was supposed to work. I had to take off of work for the next 2 weeks because mentally it messed

Page 69

me up thinking that I was going to have to fly to the U.S. Virgin Islands to do this. So what I've been doing since the last 2 weeks is I've been in the house playing videogames.

Q. I'm sorry. You have been in the house what?

A. Playing videogames. Well, a videogame.

Q. How about before the last 2 weeks?

A. My day-to-day usually consists of working. I usually work. I start after 10:00 because mornings are tough. I have thick mucus that's building up from being asleep all night, so -- well, when I can sleep. So I start work around 10:00. I usually end work about 6:00. I play videogames. Outside of that, if I do anything, I might go out to a restaurant because I love food. That's about it.

Q. Do you have any problems health-wise if you go out to a restaurant?

A. I did just recently. So sometimes if I have a flare-up and it's bad, I can't eat because I can't swallow. It feels like I'm choking. I've had times when I couldn't drink out of a straw at one point. I had times when I couldn't enjoy a steak because I like my steak medium, but it was still just too thick to try to swallow.

Q. Do you ever have any reaction to odors?

18 (Pages 66 - 69)

Page 70

A. Yes. As soon as I walked in this place, you could smell downstairs. So the -- after the -- after the initial exposure, my sense of smell was super strong, so everything bothered me, perfumes, smells. I can smell a landfill. I can smell incense. Everything was super strong. Now it's gotten better that I can withstand some smells; but if I have a flare-up, then I can't. I will have to leave.

Q. And what happens if you're exposed to an odor and you can't leave?

A. I haven't been in that.

Q. Okay. So you mentioned you couldn't clean now. Why is it that you can't clean now, clean the house?

A. Because we exert a lot of energy as we're doing things on a day-to-day basis that we don't realize we need our lungs for. So you trying to get down on your knees and deep clean like you want or sweeping up throughout the house, that's an exertion of energy; and I'm limited --

Q. Are there any --

A. -- on exertion of energy.

Q. I'm sorry.

Are there any things that trigger your asthma now?

Page 71

A. Yes. And first I want to say I don't even think it's -- I don't look at it as though it's my asthma anymore. It's not asthma to me because the asthma that I knew was nowhere near this. This is something totally different, and there's a lot of things that will trigger it. It's the same certain smells. I remember going into a visit to have a -- I believe a CT scan or ultrasound and someone had on perfume; and it was so thick I couldn't even finish my visit because I couldn't lay down on the table at that point. Even though the person wasn't there and I couldn't smell it anymore, it had already affected me. It was too late. So I couldn't even -- I couldn't finish that visit. They tried. I had to leave and reschedule.

Certain smells will do it. Like, for instance, going to -- I love getting my hair and my nails done because that's something that my therapist and I -- we talk about that's something I always like doing, but it's a way to kind of try to keep me mentally together as a way to feel like I have a sense of self. But I have been to the nail shop before and the smells are so bad that I have to tell the tech I can't finish and then I will just have to walk out. I can't stay. There's times I can't make

Page 72

appointments because I can't go in there.

Q. If you do go in there -- I'm trying to understand -- what happens to you?

A. The same thing. I start getting shortness of breath, chest tightness, my hands start turning blue. That's a sign that my oxygen is dropping. I can start getting lightheaded.

Q. What about coughing?

A. Couching definitely just because what I just realized -- I asked my doctor recently does that mean I'm wheezing. Because the wheezing that I'm used to prior -- like, with my regular asthma, what it was, I can tell I was wheezing. This now doesn't seem like a wheezing to me, so I was unsure. So my doctor just told me anytime you're just coughing and your coughing is uncontrollable you're wheezing.

Q. What doctor told you that?

A. Dr. Acker, my primary care.

Q. Now, in February when you got the job with the State, you were concerned because your hair was dyed blue at the time, right? You thought that might affect your ability to get the job, right?

A. Right.

Q. Did you have to bleach your hair before dying it blue?

Page 73

A. That wasn't my hair. That was not my real hair. That was a sew-in and a closure.

Q. Have you had -- have you dyed your hair since August 8th of 2022?

A. I have dyed my hair.

Q. And prior to dying it, did you bleach it?

A. Yes.

Q. How many -- how many times have you dyed your hair since August 8th, 2022?

A. I'm not certain of how many times.

Q. Before you do that each time, you need to bleach it, right?

A. Yes. She would.

Q. And where do you go to get it bleached or do you do it yourself?

A. No, I don't do it. There's a hairstylist, Ms. Vanessa. She would do it for me.

Q. Where is she located?

A. In Lithonia, Georgia.

Q. Does she work for a particular salon or something like that?

A. Essence. I can't think of the first name, but I know it's Essence that's in there.

Q. What about -- what about doing your nails; do you put polish on your nails since August 8, 2022?

19 (Pages 70 - 73)

Page 74

A. Well, I don't use regular polish; but, yes, I use some polish.

Q. Do you need to use nail polish remover on occasion before you're doing that?

A. No.

Q. How much are you paid by the State of Georgia?

A. $25 an hour.

Q. On average how many hours a week or a month do you work?

A. So it's a part-time job, so we have to work a minimum of 29 a week. We can't go over 40. The most that I've done in a week so far was 35 hours, and that was just about two weeks ago.

Q. What types of things did you used to do that you don't do now because of your medical condition?

A. I haven't been able to travel solo. I had gotten used to traveling solo when I was at work. We used to get four-day weekends, so I would -- it was nothing for me to pick up and take a flight anywhere that I wanted to go. So I haven't been on a solo trip.

I can't -- I don't get to work out like I was working out even though all the doctors keep telling me, oh, you need to work out at some -- you

Page 75

have to work out to maintain your blood pressure, but I'm limited on being able to do that. Like, I can't --

Q. Do you work out at all?

A. No, I have not. The last thing that I did was walk. My doctor, she wanted me to walk -- start walking 15 minutes; and I stopped that because the last time I had a flare-up -- it's like every time -- if I'm getting lightheaded coming into the house, then there's no purpose in trying to do it.

I don't grocery shop. I have had a couple of incidents going to the grocery store where I got lightheaded between trying to pick up the items, putting them in the basket, and walking around. So I usually try to order on Instacart. My brother shops for me. If I grab something out of the grocery store, it has to be something that's quick; but I'm usually not in a grocery store.

I'm on social media all the time, so I love the fact that I see people out enjoying their life; but the other side of it is I can't do certain things. Like, I wanted to go and jump out of an airplane. I'm not going to get a chance to do that. Like, it's just so much stuff that I'm limited with doing. Sex, that's limited. I don't even know who I

Page 76

am anymore. I'm trying to find myself. So all of the things that I used to love doing sports-wise, that was my thing. It was my ability to have an outlet. It was my ability to be able to keep weight off. I've gained over 210 pounds between getting steroid injections every three months. I finally ended up losing the weight, but I had to change the way that I eat to do that. So I can't necessarily eat how I used to eat all the time. I used to eat whatever I wanted to eat whenever I wanted to. I can't do that anymore. I'm on an eating schedule now. I try to eat after 1:00 at the earliest time.

I don't feel like I can go and -- I can't apply for any -- just any job. Like, I don't have that luxury of going to just any job. When I was looking for a job, I had to look at the job description and see does it have a restriction on weight, does it have a restriction on stress. Like, those are all these things that I have to consider that I never thought I had to consider before.

I don't get to -- I had a three-year plan prior to all of this happening. It was wrote down in my phone. I was on track. I was on track.

Q. Has any health professional told you that your reaction to the smoke in August of 2022 was

Page 77

psychosomatic?

MS. SEILA: Objection to form.

You can answer.

THE WITNESS: I never heard that being told to me at all. What does that mean? Are you saying that it's in my mind?

BY MR. SIMPSON:

Q. That's what I'm asking you if any doctor has told you that, any health professional has told you that?

A. No.

Q. I'm just reviewing my notes. I'm getting pretty close to done.

Did you take any --

A. I'm sorry.

Q. Did you take any photographs or videos while you were inside the refinery or terminal on August 8th, 2022?

A. No.

Q. Have you taken any photos or videos to try to document your condition at all since August 8th, 2022?

A. Yes.

Q. And what have you -- what have you taken?

A. I did take a -- I had a video of me when I

20 (Pages 74 - 77)

Page 78

was on my nebulizer machine on August the 8th when I first went in or maybe it was a picture. I have pictures of me having to be on the nebulizer machine. I have videos of when the ambulance had to come out and help me. I have some notes that I wrote down of when I've had certain flare-ups, but I didn't write all of them down because it's a lot.

MR. SIMPSON: This is probably a good time for me to break. I probably have a few follow-ups when I review my notes; but in the interest of time, I'll tender the witness.

And I'll inquire what we want to do about lunch. I don't mind working through, but we have a court reporter and videographer and witness and lawyers who might feel otherwise.

MR. KING: I think we should at least take a very short lunch so that we can -- I mean, a lot of us here brought, so it shouldn't take very long.

MS. SEILA: Do you want to do lunch now?

MR. KING: Yeah.

MS. SEILA: Okay.

THE VIDEOGRAPHER: Do we want to go off the record?

MR. KING: Yes.

Page 79

THE VIDEOGRAPHER: The time is 1:21 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 1:50 p.m., and we are on the record.

EXAMINATION

BY MR. KING:

Q. Good afternoon.

A. Good afternoon.

Q. I'm going to go back over a few things that you spoke about this morning in an effort to oftentimes either clarify or get some more detail. Is that okay?

A. That's okay.

Q. Is there anything that happened on the break that would prevent you from testifying truthfully and completely?

A. No.

Q. Okay. Do you understand that you are still under oath?

A. Yes.

Q. And by that I mean you are still subject to the -- you are being asked to tell the truth and you are subject to the same penalties of perjury if you did not tell the truth.

Page 80

Q. Do you understand that?

A. Yes.

Q. Okay. Now, I'm going to go all the way back to basic. You were asked about your name, and you stated that your name is Nicole Wooten; is that accurate?

A. Yes.

Q. Have you ever gone by any other names?

A. Nicole Smith.

Q. Do you have any nicknames?

A. Nikki.

Q. Any others?

A. Outside of Nikki Shantell, that would be it.

Q. You provided your current address. Are there any other addresses that you lived at since August of 2022?

A. I may have stayed in my mom's place, but that would be probably about it.

Q. And where is that?

A. 2748 Pattie, P-A-T-T-I-E, Court, Ellenwood, Georgia, 30294.

Q. Have you ever testified in court before?

A. Not that I remember, no.

Q. Have you ever been a party to a lawsuit before?

Page 81

A. Yes.

Q. When was that?

A. This was 2010, I believe.

Q. And what was the name of that -- who was that case against? Were you the plaintiff or were you the defendant?

A. I don't know what I was in that case. It was a car accident case.

Q. Were you suing or was somebody suing you?

A. It was both, I think.

Q. Okay. Do you -- what was the names of the parties?

A. I don't recall.

Q. And where -- where was that case pending?

A. I believe it was out of -- what's that called? I can't think of that area, the name of the area. What is that? I can't think of it.

Q. Was it in Georgia?

A. Yes, it was in Georgia.

Q. And who was your attorney in that case?

A. Scott Williamson. Is his last name Williamson? His last name is either Williams or Williamson.

Q. And what was the outcome of that case?

A. I got --

21 (Pages 78 - 81)

800-726-7007                                                                                                    305-376-8800

Page 82

Q.  I'm sorry?
A.  My -- I got my medical covered.  Is that what you're asking me?
Q.  Yes.  Did it settle or did it actually go to trial?
A.  It was settled.
Q.  And it sounded like you obtained some money; is that fair?
A.  Yes.
Q.  How much?
A.  I don't recall.
Q.  What were your -- did you suffer injuries as a result of that car accident?
A.  Yes.
Q.  What were some of those injuries?
A.  It was something that happened with my -- with me back.  I can't remember.  It was something with a spine number.
Q.  Anything else?
A.  Not that I can recall.
Q.  Did you complain of headaches?
A.  I don't remember.
Q.  Have you been a party to any other lawsuits?
A.  Not that I can remember outside of that one.
Q.  Have you testified either at deposition or

Page 83

at trial in any other lawsuits?
A.  Not that I can recall.
Q.  Have you ever been arrested?
A.  No.
Q.  Have you ever been charged with a felony?
A.  No.
Q.  Have you ever been charged with a misdemeanor?
A.  No.
Q.  In preparing to testify here today, what, if anything, did you do?
A.  I increased my visits to my psychiatrist -- I'm sorry, my -- my therapist and I spoke with Attorney Seila.
Q.  Repeat that.
A.  I spoke with my attorney as well.
Q.  How many times?
A.  Three.
Q.  For how long?
A.  At least an hour.
Q.  Each time?
A.  Yes.
Q.  Did you review anything in preparation for your deposition?
A.  Reviewed in what way?  What do you mean?

Page 84

Q.  Did you look at any documents in this case?
A.  Oh, yes, I did.
Q.  What documents did you review?
A.  I reviewed some of my journal -- well, my journal entries.  I journal.  So I reviewed some of my personal journal entries.  I reviewed my documentation that I sent to Customs for when I was trying to get a transfer.  I think that's all that I can recall.
Q.  When -- when did you begin journaling?
A.  I've been journaling since I was a kid.
Q.  And you still have the journal entries from when you were a kid?
A.  No, I don't.
Q.  How far back do the journal entries that you have go?
A.  I'm not sure how far they go back.  The ones that I was looking at was after this injury that happened.
Q.  Do you have any that predate?
A.  I may have some.  I have different books.
Q.  What did your journal entries say?
A.  It talk about how on August 8th the incident happened that changed my life and basically how things aren't the same now.

Page 85

Q.  Did you review any journal entries that predated August 8th?
A.  No.
Q.  You mentioned journaling or having a three-year plan, and I think you said it's on your phone.
A.  Yes.
Q.  Do you still have that?
A.  Yes.
Q.  What was that three-year plan?
A.  It was by the first year to have my credit cards paid off by December of 2022.  I believe my second year was to have -- I can't remember what the second and third year in detail what it was, but it revolved around having rental property because I wanted rental property in St. Croix and here and also to be able to go and work what we call pre-clearance --
Q.  Uh-huh (affirmatively).
A.  -- which is where I might end up in like different locations like Abu Dhabi or Canada or something like that.
Q.  Do you have any journal entries or -- well, let me go back.
Do you have any notes in your phone about

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

Page 86

this case?

A. I have -- yes, yes.

Q. What kind of notes do you have?

A. I have notes in reference to what has happened to me personally on certain days when I've had flare-ups.

Q. And what caused you to create those notes?

A. To be able to have a record of it because I'm a recordkeeper outside of this. That's something that I've always done. I'm organized.

Q. And you did that on your -- just your own; nobody asked you to do that?

A. Yes, on my own.

Q. That's both for the notes that are in your phone and your journal notes; is that fair?

A. Yes.

Q. Okay.

A. And then also for me to be able to tell the doctor, hey, what's going on and then -- because at one point I was having memory issues, too.

Q. Okay. Now, what about -- you mentioned photographs and videos leading to certain events. Are those on your phone as well?

A. Yes.

Q. And you still have those?

Page 87

A. Yes.

Q. Okay. And you took those photographs and videos why?

A. Well, I don't know why the beginning, why I took it in August; but I guess so I can just have proof of what's going on because I did have to leave my job and show them. So just in case, I assume.

Q. And what about later on? You said you didn't know about early on, but what about later on?

A. Because I need -- I need records for myself.

Q. And you did that again on your own; nobody asked to you do that?

A. Correct.

Q. Okay. Prior to this deposition in preparation for your deposition, outside of your attorney, did you speak with anyone else about this case?

A. My therapist.

Q. And remind me the name of your therapist. Is that Dr. West?

A. Yes.

Q. Do you have any other therapists?

A. No. I've seen -- I did have to see two psychiatrists, one for Social Security and one for the Department of Labor.

Page 88

Q. Before August 8th of 2022, have you ever gone to a psychiatrist or a psychologist or a therapist of any kind?

A. Yes.

Q. When was the first time you went to a therapist?

A. I don't recall the year when it was, but it had to be maybe around after 2015 possibly.

Q. And who was that?

A. I don't recall the name.

Q. But it wasn't Dr. West?

A. No, it was not Dr. West.

Q. Where was that doctor located?

A. The one doctor was in Norcross and then I -- that was the second time I tried one and then the first doctor, I can't remember where he was.

Q. Okay. So you had one doctor that started around 2015 that you used for a little while and then there was a second doctor. Do you know when you started with that second doctor?

A. (Witness shakes head negatively.)

Q. Approximately?

A. (Witness shakes head negatively.)

Q. In 2015 when you started going to a therapist or a psychologist or a mental health

Page 89

counselor, why did you go there?

A. Because I wanted to be a better person in a sense for myself to improve and also we were -- my husband and I at the time was also trying to seek marriage counseling.

Q. All right. I'm going to come back to that in a moment.

You spoke earlier about your educational history. Do you remember that?

A. Yes.

Q. I think you -- what was the school that you said you graduated from in 2008?

A. Valdosta State University.

Q. Repeat that again.

A. Valdosta.

Q. Can you spell that?

A. V, as in Victor, A-L-D, as in dog, O-S-T-A.

Q. Did you have any schooling at a prior school -- a school prior to that, any college?

A. (Witness shakes head negatively.)

Q. No associate's degree, nothing like that?

A. No. I'm sorry.

Q. And you said that degree was in psychology; is that fair?

A. Yes.

23 (Pages 86 - 89)

Page 90

Q. You then said you worked as a security guard. Do you remember that?

A. Yes.

Q. Can you tell me about the training that you had to become a security guard?

A. It was more like an office training that I can recall, and I don't recall it being anything extrenuous [sic].

Q. Did you have any training in -- in regards to how to deal with an emergency situation?

A. Not that I can recall. That was for -- the job was for trucks, like Kroger trucks delivering food to a warehouse.

Q. After that job you went and you started school at the University of Phoenix?

A. That was years later. I didn't start the --

Q. Okay. That's -- that's the timeline I want to work on.

Okay. So you were at Valdosta State until 2008?

A. Yes.

Q. Okay. And then you began a job as a security guard at Norred?

A. Yes.

Q. When did you start that job?

Page 91

A. Not too long after graduating from college.

Q. Okay. So around 2008, 2009?

A. Yes.

Q. And how long were you there?

A. Up until I left and moved to South Korea, so it was some months.

Q. Okay. So still in -- did you move to South Korea in 2008?

A. Did I move in 2008? I believe I did. Yes, I did.

Q. Okay. So you graduated in -- was it May of 2008?

A. Yes.

Q. And then for the summer you were a security guard?

A. (Witness nods head affirmatively.)

Q. Is that fair?

A. Yes.

Q. And then at the end of the summer you moved to South Korea --

A. Yes.

Q. -- is that fair?

A. That's fair.

Q. In South Korea, once you left in 2008, what were you doing?

Page 92

A. Teaching.

Q. And what were you teaching?

A. English.

Q. To what level of student?

A. I had kindergarten up until elementary age.

Q. So like kindergarten to fourth grade?

A. I can't remember what grade they stopped at. It was a private school, so this was after their main school for the elementary kids.

Q. Okay. And when did you leave South Korea?

A. 2009, I believe.

Q. Do you remember around what month? Did you make it through the school year?

A. My contract ended. I think it was probably around the end of October, early November.

Q. And is that when you left or did you leave before your contract --

A. No. I left after my contract was finished.

Q. And after you left South Korea in September, October of 2009, what did you do next?

A. I went -- oh, I didn't work for -- I can't remember how many months, but there's some months that I didn't work. Then I started working at Macy's for the holidays in the perfume and cologne department.

Page 93

Q. Okay. So just to double back, your contract ends in South Korea in September, October of 2009.

A. Uh-huh (affirmatively).

Q. And then for the holidays, which I assume is November, December?

A. (Witness nods head affirmatively.)

Q. After about two months you started working at Macy's; is that fair?

A. Okay.

Q. Is that fair?

A. Yes.

Q. And what was your role at Macy's?

A. Customer -- salesperson, customer service, sales for the perfume, cologne.

Q. Okay. Did you work past the holiday season or did you --

A. It was a temporary just for that -- they hired for that holiday period, so I didn't work past the holiday season for them, I should say.

Q. Okay. So by January of 2010, you would have left; is that fair?

A. I can't remember the exact date that I left.

Q. Okay. But after the holidays?

A. Yes.

Q. Okay. What did you do next?

24 (Pages 90 - 93)

Page 94

A.  I think I ended up going back to the security job.

Q.  And that's at Norred?

A.  Correct.  I was -- because my supervisor loved me.  I called her and told her how I needed a job.  She offered for me to come back.  She understood it was -- it was temporary.  I did that, and then I also worked at the Kia dealership.  So at one point I worked two jobs at one point.

Q.  How long after you left Macy's before you rejoined Norred?

A.  I don't recall.

Q.  Do you remember if it was several months or was it more like weeks or days?

A.  It may have been months, but I'm not certain.

Q.  Okay.  And then you were working at Norred and then at some point in time, you took on a second job at Kia --

A.  Yes.

Q.  -- is that fair?

Which job did you leave first?  Is there a particular job you left before the other one?

A.  I believe I left Norred and I ended up working at Kia full-time.  Yes, I ended up working at

Page 95

Kia full-time.

Q.  Okay.  And when you were working at Norred and Kia the first time at the same time, they were both part-time or was one full-time and was one part-time?

A.  Kia was part-time.

Q.  And Norred was full-time?

A.  Yes.

Q.  Okay.  When did you leave Norred?

A.  I don't remember.

Q.  Okay.  And then Kia -- you started at Kia?

A.  Yes.

Q.  Well, you were already at Kia.  You started at Kia full-time?

A.  Yes.

Q.  How long were you at Kia full-time?

A.  Up until I went to the dentist's office.

Q.  Which was when?

A.  I don't recall the dates, but it was some possibly months.  I'm not sure.

Q.  Why did you leave Norred?

A.  It was a job that was $8 an hour and I had a college degree.  I'm trying to do something with my college degree.

Q.  So you quit?

Page 96

A.  Yes, I did retire.

Q.  And then when you left Kia, why did you leave?

A.  Was no room for opportunity for growth.

Q.  Okay.  So you quit from there, too?

A.  Yes.

Q.  Okay.  And then you started at a dentist's office?

A.  Yes.

Q.  And you seemed like you were elevating; is that fair?  You were treatment coordinator, an office manager, and maybe another job.

A.  Yes.

Q.  What was the other job?

A.  The office manager.

Q.  Okay.  So I got treatment coordinator, office manager.  Wasn't there one more?

A.  Patient coordinator.

Q.  Patient coordinator was first?

A.  Yes.

Q.  Okay.  And you left there, right?

A.  Yes.

Q.  Why did you leave there?

A.  Because I received the opportunity to use my master's degree to teach and I wanted to try to teach

Page 97

stateside.

Q.  Where was the dentist's office?

A.  Jonesboro, Georgia.

Q.  Okay.

A.  When I -- when I say stateside, I mean the difference between Korea -- teaching there versus here.

Q.  Okay.  So you quit at the dentist's office; is that fair?  You were not terminated; is that fair?

A.  No, I was not terminated.

Q.  You had no disciplinary issues?

A.  I had possibly one disciplinary issue the whole time I was there.

Q.  And what was that?

A.  I went on the computer to look up a restaurant menu to see about ordering food; but before I even had the chance to order my food or look up the restaurant, my supervisor saw that I searched about the restaurant and then -- that was the situation.

Q.  Okay.  And when did you start at the charter school?

A.  That was around July 2016.

Q.  What did you teach while there?

A.  Reading.

25 (Pages 94 - 97)

Page 98

Q. And to what grade level?

A. Seventh and eighth.

Q. And you left in April of 2017; is that fair?

A. Yes.

Q. Why did you leave?

A. Because it was a lot of -- I felt like it was lack of support from the administrators. We had one administrator who was -- she was our assistant principal, but she was part-time. She did the best that she could at that time while she was there, but I feel like it was a lack from the others for me as a new teacher.

Q. In what way? Like, what were you struggling to -- to receive?

A. No one teaches you -- you -- you go through these classes about classroom management, but that's the most difficult thing to have 12-, 13-year-olds in your class all at one time. Once they get excited, it's hard to calm them down.

Q. Okay. The -- the therapist that you had mentioned seeing, so you started seeing that therapist when you were working at the dentist's office.

A. I don't recall. I said it could have been around 2015.

Page 99

Q. Okay. Well, did you quit from the charter school?

A. You say did I quit?

Q. Yes.

A. Yes, I did. I did resign.

Q. And there were no disciplinary issues while there?

A. There was no disciplinary issues, but I did -- excuse me. Excuse me. I found out once I was going through this job that she put something in my record that was inaccurate that almost cost me -- when I say this job but Customs -- that almost cost me that job possibly.

Q. And what was that that she put in your record?

A. I'm not certain what it was. I'm thinking it had to do with me quitting. Any job that I've ever quit I give them two weeks' notice. I gave her the same, and when I went to give her my notice, she called me selfish. And after that I left, and then I found out by one of the investigators that something was in my record, but I have no idea what it is.

Q. So if you haven't seen it, how do you know it's not true? If you don't know what it is, how do you know it's not true?

Page 100

A. Because I've never been disciplined before in person and for something to appear after I've already left, what could it be?

Q. Okay. And you left there in April of 2017 and then what did you do?

A. I went to Great Expressions working as an office manager.

Q. Okay. And you were there for some time?

A. Yes.

Q. When did you start at Great Expressions? Did you start immediately or was it -- did it take you awhile?

A. It was probably immediate within weeks.

Q. Okay. And you were there until September of 2020?

A. Yes.

Q. And why did you leave?

A. Because it was always one of my goals to have a federal government job -- job and I finally got it with Customs.

Q. And you left, you said, September of 2020, right?

A. Yes.

Q. And so you quit from there; is that fair?

A. Yes.

Page 101

Q. Okay. And the job that you got was with Customs and Border Patrol?

A. Yes.

Q. Now, you said that you started -- you technically got the job in 2020. October of 2020 is when you started; is that right?

A. Yes.

Q. And you were talking about training, pre-training. Can you kind of walk me through from October of 2020 what you did?

A. So once I entered on duty, I started at the Atlanta airport; and at the airport they had a section for all of us who entered on duty around the same time to sit there and do trainings on the computer. So I did trainings on the computer, but I found a way to want to learn more. And I was able to go and help out at the -- it's called tag and seals office.

Q. Uh-huh (affirmative).

A. Just because I didn't want to have to sit down and -- if we finish the training already, I didn't want to continue sitting there, so I went and helped out at the tag and seals office.

Q. Okay. So were working at Customs and Border Patrol from October 2020 and you were doing some

26 (Pages 98 - 101)

Page 102

computer training that lasted how long?

A. They just had training set up for -- it wasn't supposed to last that long. That's the thing. The only reason it was going is because of COVID.

Q. Okay. But how long did it last?

A. I don't recall the whole time, I guess, we were -- I don't know if it was the whole time I was still in the Atlanta airport or not. I'm not sure.

Q. Okay. When did you leave the Atlanta airport?

A. April of 2021.

Q. So from October 2020 to April 2021, you did the training and you assisted with tag and seals?

A. Correct.

Q. Okay. And then what happened in April of 2021?

A. I had to move to the Virgin Islands to St. Croix.

Q. You said you had to move. Was it a forced move or did you go --

A. Oh, no. That was the duty station that I selected.

Q. Okay. And you were there for a month?

A. Around a month.

Q. So between April 2021 to May of 2021?

Page 103

A. Yes.

Q. And what were you doing there for that month?

A. Training, more training. And when I wasn't in training, I'll make sure I was standing near our area basically helping out customers maneuver, tell them where to walk, answering phones. I found a way to be busy.

Q. And you were training always at the airport for that month or those -- those two months --

A. Yes.

Q. -- is that fair?

And at this point in time, you never went to the oil refinery?

A. No.

Q. Then what happened in May of 2021?

A. I went home first to pack my bags and then after that I went and drove to FLECT, which is in Brunswick, Georgia.

Q. You keep saying FLETC. What's FLECT?

A. Federal Law Enforcement Training Center.

Q. And when was that?

A. This was from May of 2021 until September 29th of 2021.

Q. Okay. And then when you left FLECT, what

Page 104

did you do?

A. I left FLECT. I took a vacation.

Q. Uh-huh (affirmatively).

A. So I went -- I came home and then -- I can't remember if it was one week or two weeks and then after that I went to the Virgin Islands.

Q. So you started in the Virgin Islands in October of '21?

A. Yes.

Q. Where did you go on vacation?

A. Home.

Q. To Atlanta?

A. Atlanta.

FLECT was closed down for a little while because of COVID.

Q. Did -- when you started at St. Croix, did you do any -- any other training before you worked?

A. Yes. So we have what's called post-academy training.

Q. And what was the period of time where that existed?

A. That went -- that definitely went around -- at least a month prior to me being able to work the line by myself.

Q. So when would that have been?

Page 105

A. I want to say around January, possibly February 2020 --

Q. '2?

A. Yes.

And we still had other trainings. I still had other trainings to do, but it's kind of like a continuation thing. Every port is different.

Q. Okay. When you were doing -- so -- well, let me finish and then I'll go back to that.

What happen in February of '22? Is that when you started officially working on the job?

A. Oh, yeah. That I could work the line by myself, yes.

Q. You keep saying work the line. What does that mean?

A. Process passengers. So if you ever come into contact with Customs traveling internationally, then as a passenger you get to talk to us each time.

Q. Okay. So you started to work on your own in February of '22?

A. Yes.

Q. So at some time after February of '22 would be when you caught COVID, is that fair? Because you said you were talking to passengers on your own.

A. Yes.

27 (Pages 102 - 105)

Page 106

Q. Okay. Now, in February '22 you're working on passengers on your own. When was the first time -- at any point in time prior to this, did you ever work at the refinery?

A. I don't remember the first time someone took me to the refinery. I'm not sure.

Q. Okay. Between February '22, you said you had more training to do.

A. Yes.

Q. Talk to me about that.

A. So we also -- we have different teams. We have AT sec. Those -- that's the team that -- they pretty much go anywhere. So they'll be at the airport. You'll go to the refinery. You'll go to the post office. That -- that team is a special team.

Q. So that started after February of '22?

A. I believe so.

Q. So you would have been doing some trainings at the refinery after February of '22; is that fair?

A. Say that again.

Q. You would have been doing trainings -- you said you were going to the refinery. You would have been doing trainings going to the refinery after February of 2022?

Page 107

A. After February, yes.

Q. And that would have been the first time you were going to the refinery for training or no?

A. I'm not certain.

Q. Okay. When were you ultimately able to go to the refinery on your own?

A. I don't recall the date, but it wasn't -- I don't think it was too far in between my training.

Q. Okay. Okay. Starting back in -- back to October of 2022. Can you -- can you tell me of any training that you had that pertained to either emergency response or how to deal with an emergency situation? Did they ever cover that in your training?

A. We definitely have an emergency responder training, but I just can't recall the dates or what exactly it was.

Q. Did any of that emergency response training pertain to the refinery itself?

A. Not -- no, not that I can recall.

Q. What about generically being around potentially hazardous chemicals or smoke; did anything pertain to that?

A. We get the -- not necessarily. Well, yes, we do. We do get that -- that training. That comes

Page 108

with the book. I can't think of the name of the book, but it's like an emergency book that has different things on it.

Q. Okay. And so you would have had this training before flying to St. Croix the second time or after?

A. I think this was possibly before.

Q. Okay.

A. I think that training was before FLECT.

THE COURT REPORTER: I'm sorry?

THE WITNESS: I'm sorry. I was talking to myself in a sense trying to remember. I said I think it was before FLECT. I'm sorry. While I was in FLECT. That's what I'm trying to say.

BY MR. KING:

Q. The training that you received, what did it say -- what was -- what was required of you upon encountering a hazardous situation?

A. Well, the training that we received were based off of the labels, if we saw certain labels. So that book showed us we had to look up that label, see what requirement it was for that label. Say, for instance, if you had to stay back a certain amount of feet, that's what that training was about.

Q. Did the training -- did it include training

Page 109

on what to do in the event of a terroristic -- like, a terror plot?

A. That's two separate types of trainings.

Q. But you undergo -- did you undergo that training?

A. I wouldn't necessarily say it was a terroristic plot that -- training that we went through. I don't recall.

Q. How would you describe it?

A. We discussed terrorism and we discussed countries that we -- that may be a threat in a sense of terrorism.

Q. Did they -- did your training discuss what you should do if you were to encounter potentially dangerous chemicals or have any type of exposure?

A. If it had that particular label on it, the label that we know from the book. So we actually had this orange book that came with our training.

Q. Was there any requirement that if you saw any potentially dangerous situation that you would call anyone, a supervisor, or anything like that if you were sent to a particular place?

A. So we have also the ability -- can you repeat that question? I want to make sure I understood it.

28 (Pages 106 - 109)

Page 110

Q. Is there any requirement in your training that would -- anything that either suggests or requires you to call a supervisor or anyone else in the event that you encounter a potentially hazardous situation?

A. Yes. We had a training that said that -- yes, that would suggest us to call if we felt necessary.

Q. Okay. I'm going to rewind and I'm going to come back to this, too.

At where you currently live, who lives with you?

A. My brother.

Q. And your brother's name again remind me.

A. Royal, R-O-Y-A-L, Smith.

Q. How many brothers do you have?

A. One brother.

Q. He's your only brother?

A. Yes.

Q. How many sisters?

A. One sister. And I have step. I don't know if you're asking me that question --

Q. Sure.

A. -- based off of that. I have step-siblings.

Q. And their names?

Page 111

A. I have Jasmine Jackson.

Q. Jasmine Jackson?

A. Yes.

Ronnie Crawford.

Q. Ronnie Crawford.

Who else?

A. Anquinette Martin.

THE COURT REPORTER: What's the first name?

THE WITNESS: Anquinette.

Antonio Martin and Michelle. And their last names could be Martin -- I'm trying to think -- or Wade, one or the other. Wade, W-A-D-E.

BY MR. KING:

Q. Is there a Mae? Is that the same as Michelle? Who is Mae Wade?

A. My mom.

Q. Your mom, okay.

Do you have any kids?

A. No.

Q. And you said that you were married at some point?

A. Yes.

Q. When did you get married?

A. 2013.

Q. And when was your divorce ultimately

Page 112

finalized?

A. In January of 2022.

Q. Have you ever smoked?

A. Yes.

Q. When -- when was the first time you smoked?

A. College, I believe.

Q. Have you ever stopped smoking?

A. Yes.

Q. When did you stop?

A. I didn't smoke while I was in South Korea. I don't smoke now. And throughout the time that I smoked, it wasn't an everyday thing, so it's plenty of times. It's just in between.

Q. And did you ever smoke cigarettes?

A. Yes.

Q. How long did you smoke cigarettes?

A. It wasn't a -- I can't give a length because it was never I'm going through a whole pack of cigarettes. That was never the case.

Q. So what was it?

A. It would take me months to finish a pack of cigarettes. There was a -- I can't give a timeframe, but it would definitely would take me months to go through one pack of cigarettes.

Q. What about marijuana; do you ever smoke

Page 113

marijuana?

A. Yes.

Q. When did you start smoking marijuana?

A. Probably in college.

Q. Did you smoke marijuana in St. Croix?

A. No.

Q. When was the last time you smoked marijuana?

A. Around 2016, 2017.

Q. And would that be around the same time you smoked cigarettes, after -- since the last time you smoke cigarettes, or did you smoke cigarettes after that?

A. I think I smoked cigarettes around the same -- no. I probably smoked after, cigarettes possibly after. I don't recall if I did put the cigarettes -- I know I did hookah after. I'm sorry.

Q. When was the last time you smoked hookah?

A. At FLECT 20 -- around 2021 and it wasn't consistent or anything because it gave me headaches.

Q. When you would smoke hookah -- I know it's social -- who would you generally smoke with?

A. Other people that were at FLECT.

Q. Did you ever smoke with any family members or anything like that?

A. No.

Veritext Legal Solutions

800-726-7007                                                                   305-376-8800

Page 114

Q. Did you ever smoke cigarettes, hookah, marijuana at all on St. Croix?

A. Not that I can recall, no.

Q. Have you smoked anything at all since 2022?

A. No.

Q. Do you drink alcohol?

A. Occasionally.

Q. When was the last time you drank?

A. Maybe 3 weeks ago.

Q. And where were you?

A. At a restaurant called Paper Plates, I believe or Paper Planes.

Q. How often would you say you drink?

A. Not often. Socially.

Q. What does not often mean?

A. Not every day, not -- not two, three times out of the day. I mean, I'm saying out the day. Out of the week.

Q. But weekly you would drink?

A. Say that again.

Q. You drink weekly?

A. No. No.

Q. Okay. How often was it? Every couple of weeks? Every --

A. It depends. Like, the last -- yeah, it just

Page 115

depends. The last -- like I said, the last time I drunk was 3 weeks ago. I haven't had anything, so...

Q. Okay. You were asked about your nails and whether you do your nails. You said that you put polish on your nails?

A. (Witness nods head affirmatively.)

Q. But you said you don't use nail polish remover. So how do you get the polish off your nails?

A. It's something that's like polish, though. It's a -- well, first they do a material. I don't know what that is, the fill-in. And then if I do get polish, then they just drill it off. They don't use acetone to get it off; and it's a gel polish, not a regular polish.

Q. Do you do acrylics?

A. Yes.

Q. You change your hair color pretty frequently; is that fair?

MS. SEILA: Objection to form.

You can answer.

THE WITNESS: Okay. What's frequently, though?

BY MR. KING:

Q. Let me ask you how often have you changed

Page 116

your hair color?

A. I don't know how to say how often. Are you asking me how many hair colors I may have had? I don't know.

Q. Over the past 12 months, how many times have you colored your hair?

A. In the year, maybe twice, three times.

Q. That's changing the color or is that coloring whatsoever?

A. Coloring whatsoever.

Q. You mentioned having difficulty having sex. I'm sorry. I have to ask you about this. Since your divorce in -- what year was your divorce again?

A. 2022.

Q. 2022.

January '22?

A. Yes.

Q. Have you had any intimate partners?

A. Yes.

Q. Who are they?

A. You want the names?

Q. Yes.

A. My husband, my ex-husband.

Q. That's Terrance Wooten?

A. Yes.

Page 117

Marz, M-A-R-Z.

Q. Last name?

A. I don't know his last name. And -- I'm drawing a blank on his name right now. Give me a minute. I'm drawing a blank.

Q. Do you have his first name?

A. It's the last name. That's why I keep thinking last name because we work together. I apologize. I cannot think of this man's name to save my life right now.

Q. Okay. So we've got Terrance Wooten and Marz and somebody -- someone else?

A. Yes.

Q. And we don't know Marz's last name?

A. No. I can't think of his last name right now.

Q. The last person is a coworker; is that fair?

A. The -- oh, you're talking about the last name?

Q. Yes.

You said it was a co-worker?

A. Yes.

Q. And there's no one else since '22?

A. Since when?

Q. Since 2022.

30 (Pages 114 - 117)

Page 118

A. No. It was another coworker in the VI.

Q. And what's that person's name?

A. Oh, my gosh. Cruz is his last name, C-R-U-Z.

Q. There's a lot of Cruzes on St. Croix.

A. The other coworker was Horace. Horace was his first name.

Q. Spell that.

A. H-O-R-A-C-E.

Q. So we've got Terrance Wooten, Marz, Horace, and somebody with the last name Cruz?

A. Uh-huh (affirmative).

Q. We don't know Marz's last name, we don't know Horace's last name, and we don't know Cruz's first name?

A. Horace's last name is Austin.

Q. Austin.

And we don't know Cruz's first name; is that fair?

A. I know it. I just cannot think of it right now.

Q. Where does Terrance Wooten live?

A. Here in Georgia.

Q. What's his last address?

A. I'm not sure.

Page 119

Q. Do you know the area that he lives in?

A. Midtown.

Q. So he lives around here?

A. Yes.

Q. Do you know the name of the building?

A. No, I don't recall.

Q. When did he move to Midtown?

A. I'm not certain.

Q. And the last time you saw him was?

A. Possibly it was either October or November of last year.

Q. Do you remember what street the building is on?

A. No.

Q. What about Marz; where does he live?

A. Macon.

Q. Macon, Georgia?

A. Yes.

Q. And what's his address?

A. I'm not certain.

Q. When was the last time you've seen him?

A. Early of last year. I can't remember the month.

Q. Early 2023 -- I mean, 2024?

A. 2024.

Page 120

Q. Do you remember which street he lives on in Macon, Georgia?

A. No.

Q. And Horace, Horace Austin, where does he live?

A. Hampton, Georgia.

Q. And his address?

A. I don't recall.

Q. And the last time you saw him?

A. I think it was 2024.

Q. Do you remember if it was the summer, the fall, the spring?

A. Early before -- it was before March of 2024, before March 1st.

Q. And the gentleman with the last name Cruz?

A. That was in 20 -- that was sometime in St. Croix while I was still living in St. Croix. I can't remember the dates.

Q. And he would have been your only partner while in St. Croix?

A. Yes.

Q. Terrance Wooten, what does he -- what does he do for a living?

A. The last I know he was working at the post office.

Page 121

Q. Which post office?

A. Doraville post office.

Q. Do you remember what street?

A. I don't recall the name of the street.

Q. What does he do at the post office?

A. A carrier.

Q. And that's United States Postal Service, right?

A. Yes.

Q. What about Marz? We don't have his last name. What -- where does he work?

A. He's a barber.

Q. At what barbershop?

A. It's a barbershop in Jonesboro, Georgia.

Q. And what's the name of the shop?

A. I don't recall. It's something with Chicago in it, but I don't recall the name of it.

Q. Chicago something barbershop in Jonesboro?

A. Yes.

Q. Where does Horace Austin work?

A. At the Atlanta airport.

Q. What does he do there?

A. He's a Customs officer as well.

Q. And then the gentleman with the last name Cruz and we don't have the first name, where does he

31 (Pages 118 - 121)

Page 122

work?

A. I believe he's in -- he's stationed in Puerto Rico now.

Q. Is he from St. Croix?

A. He's from Puerto Rico.

Q. He's from Puerto Rico.

He's stationed with Customs and Border Patrol?

A. The last that I know of, yes.

Q. Which was last year, March of last year or before March of last year?

A. No. That was before I left St. Croix.

Q. Okay. When you say you have difficulty in your sexual relations, what are you talking about?

A. So my first concern was being able to have sex at all because it's a workout. It's like knowing cardio, so you can't breathe. That was my first concern. I informed my therapist of it, and the reason it was a -- the reason it was a concern is because I tried to masturbate in the shower and I got out of breath, so it scared me.

Q. And at some point in time, were those concerns alleviated?

A. It's still a concern because it's still a workout either way you put it. So I don't get to

Page 123

just go straight and keep going until I'm done. I have to take breaks.

Q. Terrance -- Terrance Wooten, how many times would you say that you have been intimate with Terrance Wooten since August of 2022?

A. I'm not certain the amount of times.

Q. Is it more than five?

A. I don't think so.

Q. Do you think it's about five?

A. Possibly.

Q. What about Mr. Marz; since August of '22, how many times would you say you've been intimate?

A. Twice, I believe.

Q. And Mr. Horace Austin?

A. Twice, I believe.

Q. And Mr. Cruz?

A. Once.

Q. And to be clear there's no one else since August of '22?

A. One more person and he worked for ICE, but I can't think of his name. I can't think of his name right now either, and it was once.

Q. He worked for ICE of which office?

A. A different state.

Q. What state?

Page 124

A. I can't remember what state he was in.

Q. How did you meet him?

A. I met him at the academy.

Q. And how long ago was that time?

A. That was in -- last year.

Q. In 2024?

A. Yes.

Q. Was it early 2024, summer, fall?

A. Possibly going into the summer.

Q. The ICE gentleman that you don't remember his name, where did you see him?

A. He came here.

Q. He came here.

And so he stayed -- did he stay with you?

A. No.

Q. Do you have your phone with you today?

A. Yes.

Q. If you were to have your phone, would you know -- be able to give me folks' names?

A. Curtis is his first name. I just thought of it. Curtis for the ICE.

Q. Last name?

A. That actually might be his last name. We're so used to saying last names. Curtis is his last name. Aaron is his first name.

Page 125

Q. And you don't know what city he lives in?

A. No; because I think he moved to a different one since.

Q. Where was the place that you knew?

A. Possibly Louisiana.

Q. You don't know where he moved to?

A. I think Jacksonville or something in Florida, but I don't know if he took it or not.

Q. Can you answer the rest of my question?

A. What's the rest of the question?

Q. Are you able to give me folks' names if you have your phone?

A. Yes. Yes. Well, who are you looking for outside of that?

Q. I got a Marz without a last name.

A. I don't have his last name.

Q. I got a Cruz without a first name.

A. No; because all my coworkers -- people that work for law enforcement, we usually go by last names. I couldn't -- I wouldn't -- I know his first name. I just can't recall it right now. So, no, saving it in my phone won't help.

Q. Do you have -- where is your phone?

A. My mom has it.

Q. I'd like to go off -- well, let me say it on

32 (Pages 122 - 125)

Page 126

the record first.  I would like you to get your phone because I want to get these gentlemen's phone numbers.

A.  Okay.

THE VIDEOGRAPHER:  The time is 2:56 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 2:57 p.m., and we are on the record.

BY MR. KING:

Q.  On the break were you able to get your cell phone?

A.  Yes.

Q.  Can you please look up Tremain Wooten and let us know his telephone number?

A.  Terrance?

Q.  Terrance Wooten, sorry.

A.  (404) 503-5780.

Q.  Before you move on from there, does it say anything else about Terrance, an address?  Does it provide a job?  Does it provide anything else in that contact?

A.  I didn't even pull him up.  I know his number.

Q.  Can you pull him up, please?

Page 127

A.  No, no additional information.

Q.  No additional numbers?

A.  No.

Q.  Okay.  What about Marz, the barber in Jonesboro?  No; the barber in Macon.

A.  (904) 609-0788.  No additional information.

Q.  How do you spell his name?

A.  M-A-R-Z.

Q.  It doesn't say the name of the barbershop?

A.  No.  It says, Marz barber.

Q.  And no additional numbers?

A.  No.

Q.  What about Horace Austin?

A.  His name is saved under George.  His number is (470) 257-4087.

Q.  4?

A.  087.

Q.  Any additional information about Horace Austin?

A.  No.

Q.  It doesn't say where he works?

A.  He works for Customs and Border Protection.

Q.  Okay.  You mentioned that Horace was saved under George.

A.  Uh-huh (affirmatively).

Page 128

Q.  Why is Horace saved as George and not as Horace or Austin?

A.  Because I start calling him George.

Q.  Why did you start calling him George?

A.  I can't recall why.

Q.  And we don't have the first name for Cruz, but what do you have in there for Cruz?

A.  I don't think he's in here anymore.

Q.  So we don't have a first name for --

A.  There we go.

Q.  You have it?

A.  I found it.

Q.  Okay.

A.  Luis, L-U-I-S.

Q.  L-U-I-S Cruz, C-R-U-Z?

A.  Yes.

Q.  And the telephone number?

A.  (787) 634-1248.

Q.  Do you have an address for him?

A.  No.

Q.  Do you have a place of employment for him?

A.  Customs and Border Protection.

Q.  Does it have any other info?

A.  No.

Q.  No other telephone numbers?

Page 129

A.  No.

Q.  And Aaron Curtis?

A.  (601) 597-4018.

Q.  Any other info on him?

A.  No.

Q.  No job info?

A.  No.

Q.  No address?

A.  No.

Q.  No other telephone numbers?

A.  No.

Q.  And just to be clear, those are all of the -- all of your intimate partners since 2022?

A.  Yes.

Q.  And there's no one else?

A.  No.

Q.  I want to talk about your travel.

THE COURT REPORTER:  I'm sorry?

MR. KING:  Travel.

BY MR. KING:

Q.  I want to talk about your travel.  Please tell me all the places that you visited by airplane since -- since 2022.

A.  Are we saying before this incident or after?

Q.  Let's just do -- do you know what?  Let's

33 (Pages 126 - 129)

Page 130

start at August 8th, 2022, every place you ever jumped on an airplane.

A. I came home.

Q. Home is Atlanta?

A. Yes. So there was a layover, so that means I had to be in Florida.

Q. Okay.

A. I've been to New York and back to St. Croix. And there was probably a layover again, so I was probably in Florida again when I came back to St. Croix. And Louisiana.

Q. That's everywhere?

A. Yes.

Q. Have you traveled outside the country at all?

A. No.

Q. Did you travel to anybody's birthday to any states?

A. No. You said for their birthday?

Q. Or your birthday.

A. Uh-uh (negative). I took my mom to New York. That was an early birthday trip for her, but her birthday isn't until October.

Q. All right. Why did you go to Louisiana?

A. It was a trip to kind of just celebrate

Page 131

being out of the house in a sense.

Q. Being out of the house. When was this trip?

A. I believe this was 2023.

Q. You wanted to celebrate being out of the house you said?

A. Yes.

Q. Did you see Aaron Curtis while in Louisiana?

A. No.

Q. What did you do in Louisiana?

A. Ate at restaurants. I spent most of the time going to restaurants.

Q. And what airline did you take?

A. I don't recall the airline.

Q. And who did you go with?

A. Shamia, S-H-A-M-I-A.

Q. Who is that?

A. A friend of mine.

Q. Last name?

A. Gathers, G-A-T-H-E-R-S.

Q. How did you celebrate? What did you guys do? You ate. What else did you do?

A. That's the majority of the things that we did.

Q. Did you travel to Louisiana to eat?

Page 132

A. I have never been to Louisiana as an adult, so it was her idea. She's like you've never been, let's go.

Q. What did you see while there? What cities? Where were you in Louisiana?

A. On Bourbon Street.

Q. So you went to New Orleans?

A. Yes.

Q. Do you remember what month you went to New Orleans?

A. No, I don't recall.

Q. Do you remember if it was in the spring, fall, winter, summer?

A. It wasn't cold outside. That's what I can remember. I don't remember when. Possibly shorts, so it wasn't cold outside.

Q. Was it Mardi Gras?

A. No.

Q. Was it around Mardi Gras?

A. No.

Q. So was it hot outside?

A. I guess so. It was probably hot.

Q. Did you guys go to bars in Louisiana?

A. Yeah. I guess restaurants. I consider them restaurants more so than bars.

Page 133

Q. Was there anyone else there?

A. No.

Q. Did you meet anyone there?

A. We met random people.

Q. Like who?

A. Nobody I could necessarily remember.

Q. Where did you meet them?

A. On the street.

Q. Just walking down the street?

A. On the street or in a restaurant.

Q. Why were you just meeting people down the street?

A. I wasn't meeting people. People were meeting me. I don't --

Q. She's from there?

A. She --

Q. Shamia is from there?

A. No, she's not.

Q. What do you mean people were meeting you but you weren't meeting them?

A. So I don't walk up to people and say, hi, my name is Nicole.

Q. You don't?

A. People would walk up to me and say something, but I'm not walking up to them to say

34 (Pages 130 - 133)

Page 134

anything.

Q. Okay. So walk me through this trip. Okay? You get on a plane. You don't remember the airline.

A. Uh-huh (affirmative).

Q. Fair?

A. Fair.

Q. How many days were you there?

A. I don't recall how long we stayed.

Q. Okay. It was hot outside?

A. Yes, it was hot.

Q. Okay. And you spent a lot of your time on Bourbon Street?

A. No, I wouldn't say that; but the trip -- my time was spent there. That's along where the hotel was, but a lot of my time was spent in the hotel if I wasn't at a restaurant.

Q. Okay. What hotel was it?

A. I don't recall the name of the hotel.

Q. Was it in the French Quarter?

A. Is that on Bourbon Street?

Q. Kind of.

A. I'm not -- I don't make me laugh, please.

Q. I'm trying to not to give too much info.

A. I don't -- I don't recall. I don't remember.

Page 135

Q. Okay. But you went to restaurants while there?

A. Yes.

Q. Okay. And went to some bars?

A. Yes.

Q. Did you dance?

A. Yes.

Q. You can tell me.

A. No. I'm thinking. I'm thinking. Yes, I danced for a little bit. Yes, I did. That's probably why I ended up on my machine later that night, but go ahead.

Q. Do you remember where you went, where you danced?

A. No, I do not.

Q. Was it only one night of dancing or did you dance on a couple of nights?

A. I probably danced one night.

Q. Okay. But you don't specifically recall how many nights; is that fair?

A. I can strongly say I probably danced one night.

Q. Okay. Did you do any tours while there?

A. No.

Q. Any excursions? Did you see the city? Did

Page 136

you walk the city?

A. No. I can't do any of that.

Q. So you didn't walk around at all? You didn't do any driving tours?

A. No driving tours.

Q. Okay. You said Florida a few times, but you always said you went to Florida -- have you driven to Florida?

A. Just recently, yes. I didn't drive, but I rode with my brother and my dad.

Q. And what city did you go to in Florida?

A. I can't think of the name of it. It was my first time visiting this city.

Q. Do you know if it was north Florida, south Florida, central Florida?

A. Are we talking about for flights or are we talking about just the drive --

Q. Just this past trip.

A. Okay.

Q. Your flights you said you just flew through, right?

A. Yes.

Q. So this was your first time in the state of Florida since 2022 to visit?

A. Yes.

Page 137

Q. So you went to Florida?

A. Yes.

Q. Recently?

A. Yes.

Q. How recently?

A. April for my aunt's birthday.

Q. April what?

A. This year, 2025.

Q. What date?

A. Around the 12th or so.

Q. Okay. And you drove down with your dad and your brother?

A. Yes.

Q. And dad's name is?

A. Royal Smith.

Q. Royal Smith, okay.
Why did you go to Florida?

A. To celebrate my aunt's 65th birthday.

Q. Who is your aunt?

A. Cynthia Hoskins, H-O-S-K-I-N-S.

Q. All right. And what -- what did you do there?

A. After this can we take a break?

Q. Yes.

A. Okay. I didn't get to do as much as

35 (Pages 134 - 137)

Page 138

everybody else unfortunately. I did -- I stayed in the house a majority of the time. I went to the grocery store with my brother. I rode in the car with him. I think I went to -- once we first got there, we did a grocery run. I pretty much stayed to my side while everybody else did the big shopping. Everybody else was going to the beach. I stayed by the pool at the house because the beach was a walk. I did go to the beach one day because we took pictures on the beach for my aunt while we were there. I slept on the couch because the place that my aunt rented was three levels; and when I first got there, I went upstairs to go see where I was sleeping and I was out of breath, so I didn't go back up except for one more time to go get my computer bag so I can try to work.

Q. You went to any restaurants?

A. Did we -- if we grabbed -- oh, we did. We went -- I thought about it. We did go to a restaurant. We met my aunt and my dad and them at a restaurant, my brother and I.

Q. Okay. Did you go to -- to any bars while there?

A. No, I did not.

Q. No bars, no club, nothing like that?

Page 139

A. No, I did not.

Q. Your trip to New York.

A. Yes.

Q. Tell me about that. You wanted to take a break. Do you want to take a break now?

A. Yes, please.

MR. KING: Let's take a break.

THE VIDEOGRAPHER: The time is 3:13 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 3:20 p.m., and we are on the record.

BY MR. KING:

Q. Can I ask you about some -- some of these -- just a follow-up on some of these gentlemen. Mr. Marz, did you have intimate relations with him before August of 2022?

A. No.

Q. What about Mr. Horace Austin?

A. No.

Q. And what about Aaron Curtis?

A. No.

Q. So all of those were after August of '22?

A. Yes.

Q. Okay. What about Cruz?

Page 140

A. Before August.

Q. That was before August?

A. (Witness nods head affirmatively.)

Q. Before and after?

A. No. That was just before.

Q. Just before.

Okay. We were -- we were talking about some of your trips and we were on New York. But before we get there, the place that you listed for me so far are Atlanta, Florida, New York, St. Croix, and Louisiana. Is that everywhere you have taken a flight since August of '22?

A. Yes.

Q. Did you go to Charlotte?

A. No.

Q. Okay. Did you go to a Dear Black Woman chapter information session?

A. No.

THE COURT REPORTER: I'm sorry. I need you to say that again.

MR. KING: Dear Black Woman chapter information session.

THE COURT REPORTER: Thank you.

BY MR. KING:

Q. Okay. Now -- okay. Back to New York. Tell

Page 141

me about that. When was it?

A. Around August the 25th or so of 2022.

Q. August 25th of 2022.

And who did you go with?

A. My mom, Mae Wade, M-A-E.

Q. And you guys flew in the plane together?

A. I think we had separate flights because I initially had this trip booked.

Q. Got it.

She met you there? Who got there first?

A. I don't recall.

Q. Did anybody else fly with you guys?

A. No.

Q. Okay. So you flew up first and then -- one of you flew up first and then one of you followed?

A. Yes.

Q. Okay. Did you fly up on the same day?

A. Yes.

Q. Okay. Before I go into this, Louisiana -- did Shamia fly with you?

A. Yes.

Q. Okay. Talking about New York, when you got -- what was the purpose of your trip to New York?

A. My mom has never been, so it was to celebrate -- an early birthday celebration for her.

36 (Pages 138 - 141)

Veritext Legal Solutions

800-726-7007                                                                305-376-8800

Page 142

Q. Okay. And where did you guys stay?
A. A hotel called The Manhattan, I believe.
Q. Okay. And what did you do while there?
A. Went and ate. We went to restaurants and ate, and we went to -- what's this place called? A comedy show.
Q. Did you explore the city at all?
A. We did by bus.
Q. Is that the hop on/hop off bus or something else?
A. No; the one that you stay on.
Q. Did you get out by Times Square?
A. We were -- our hotel is right there. The hotel is by Times Square.
Q. Did you walk around the hotel -- outside of the hotel?
A. I did have to walk to the restaurants.
Q. Outside but did you -- did you also walk to the comedy club?
A. Yes, we did.
Q. Outside of going to restaurants and the comedy club, what else did you do?
A. That's it.
Q. And the tour, the tour by bus?
A. Yes. That's it.

Page 143

Q. How many days were you there?
A. I don't recall. I think at least three.
Q. How about flying back; did you guys fly back together?
A. Yes, I think we flew back together.
Q. And what airline did you take?
A. I don't remember what airline. It may have been American. I'm not certain.
Q. Do you have an American advantage number.
A. I don't think for American.
Q. What airline do you have an advantage number with?
A. Delta.
Q. And what is it?
A. I don't recall. It's in my phone.
Q. How many times have you been back to St. Croix since August of 2022?
A. Once.
Q. And when was that?
A. October of 2022.
Q. And what was the purpose of that?
A. I had to move my stuff.
Q. You went down alone?
A. No. My mom and my brother came.
Q. Does your brother have an Instagram?

Page 144

A. Yes.
Q. What's his Instagram name?
A. Dreamwork Celebrate.
THE COURT REPORTER: Dreamwork?
THE WITNESS: Celebrate.
BY MR. KING:
Q. Celebrate?
A. Yes.
Q. And what's his name on Facebook?
A. Royal Smith.
Q. Does he have a TikTok?
A. No, I don't think so.
Q. What about your mom; your mom got an Instagram?
A. I don't think so. I don't think so.
Q. What's her name on Facebook?
A. Mae Wade.
Q. M-A-E?
A. Yes.
Q. Have you published any articles or books or --
A. I'm working on a book now.
Q. What's the title of the book?
A. Dear Black Woman but it's a compilation of other authors. I'm not the only one.

Page 145

Q. Have you published anything else?
A. I have an e-book if that counts.
Q. It counts.
A. It's called "Lie" on Etsy.
Q. It's called "Lie," L-I-E?
A. Yes.
Q. And what is the book about?
A. How to be able to detect when someone is lying.
Q. And you're the author of that book?
A. Yes.
Q. Is it -- what -- what genre would you classify that?
A. I have no idea. I don't even --
Q. But it's not like a fiction book or anything that it's giving advice; is that fair?
A. Say that again.
Q. It's giving advice?
A. Not advice. It giving pointers.
Q. What are some of the pointers that detect a liar?
A. It could be -- well, one thing I would say is it depends on the person; but I made reference to someone saying do you know what I mean after every time they made a statement. That's based off of my

37 (Pages 142 - 145)

Page 146

experience with that particular person. That's how I knew that person was lying. It talks about psychological factors that come into play and it talks about the artery that pops out possibly if someone is lying.

Q. What was before artery? What did you say before that one? You said factors?

A. I don't remember what I said.

MR. KING: Do you have it?

MR. JANVIER: I've got before and after.

MR. KING: Could read that back to us what she said?

(The record was read back by the court reporter.)

BY MR. KING:

Q. Before we get into psychological factors, tell me about this artery.

A. The artery that's on the side of your neck?

Q. Uh-huh (affirmatively).

A. I can't think of the pronunciation right now, carotid -- carotid artery. But if it pops out, sometimes it can be pulsating.

Q. And that's a sign of a liar?

A. It could be a sign. My book doesn't say that it's a sign you can go to. There's plenty of

Page 147

factors that play into that.

Q. Talk to me about other factors.

A. That can play into that?

Q. Uh-huh (affirmative).

A. People sometimes -- that can happen and they're nervous.

Q. Uh-huh (affirmatively).

A. So I wouldn't want to tell somebody, especially if you're trying to catch your significant other in a lie and base it off of this. It's a lot of stuff. You've got to kind of know the person. I don't -- this is stuff that was based off of training for me.

Q. And that's the training that you had in school or elsewhere or both?

A. A combination, I guess. Possibly a combination because some of it is psychological based.

Q. So where would you say that you learned to -- where are the different places where you would say you learned how to detect a liar?

A. The majority of the time it was used in Customs and Border Protection.

Q. And what are the other -- you said majority. Where are the other periods of time where you learned

Page 148

this?

A. Maybe off of Google.

Q. So you used Google how to defect a liar?

A. I wouldn't say that's what I did, but I don't know how I came across -- it could be something that I came across when I was doing the book.

Q. You mentioned psychological factors. Tell me about that.

A. Sweating, fidgeting. Those could be some factors, but that also could be resulting if somebody is nervous.

MR. STUTZMAN: I'm sorry to interrupt. This is Ryan. I'm getting a lot of feedback from the witness.

THE WITNESS: Is it because I'm touching the cord?

MR. KING: It might be because the mic is on the shirt as opposed to away from the shirt, so it might be dragging --

THE VIDEOGRAPHER: The mic is only going into the camera. What he's hearing is from that little silver one on the table.

THE WITNESS: Oh, okay.

MS. SEILA: We haven't touched it today.

MR. SIMPSON: Actually, if you could move

Page 149

that closer to the witness, that would help.

MR. KING: I think --

MS. SEILA: I think that's it.

MR. KING: Sometimes they unplug and reconnect. Let me see if this is one of the ones that can do that.

THE VIDEOGRAPHER: Do we want to go off the record?

MR. KING: Sure.

THE VIDEOGRAPHER: The time is 3:33 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 3:37 p.m., and we are on the record.

BY MR. KING:

Q. Good afternoon again.

Are there any other trips by plane that we did not speak about?

A. No.

Q. What about by car?

A. I have been to Alabama possibly, I want to say, two times. We take an annual trip for my grandmother's birthday.

Q. How do you get there?

A. By car.

38 (Pages 146 - 149)

Page 150

Q. And who drives?

A. My brother.

Q. You still drive, right?

A. Yes, I do.

Q. And anywhere else?

A. Alabama, Florida. No, I think that's it.

Q. Florida is that same trip for your aunt's birthday, right?

A. Yes.

Q. Okay. Okay. Do you have a gym membership?

A. No.

Q. When is the last time you had a gym membership?

A. Possibly before COVID.

Q. So around 2019?

A. Probably so.

Q. What gym was that?

A. LA Fitness.

Q. You talked about gaming. Do you make any money from gaming?

A. I just made 14 cents.

Q. Have you ever made any other money from gaming?

A. No.

Q. Do you have any other -- since -- let me go

Page 151

back.

Since August of '22, you say you only had one job and that's the job you currently have; is that fair?

A. I had the business.

Q. Oh, the business and then what you currently have; is that fair?

A. Yes.

Q. And can you remind me when you left Customs and Border Patrol?

A. My last day was -- working or when I retired?

Q. Let's do working first and then retire.

A. August 10, 2022. July -- I don't know the exact date -- of 2024.

Q. I want to spend some time talking about -- August -- since August of '22, outside of those two, did you have any other side hustles or anything that was bringing you any type of money?

A. No.

Q. Okay. Now, when you were -- when did you and your brother create your business? When was the formation of the business? Let me go backwards.

What was it called again?

A. Social Society.

Page 152

Q. Social Society.

And that was opened here in Georgia?

A. Yes.

Q. And when did you -- when did you open it?

A. Sometime in 2023.

Q. So in 2023 you opened it?

A. Yes.

Q. On the Georgia Division of Corporations website, they have a few Social Societies. Is it #SocialSociety, LLC, or is it a different one?

A. Maybe Social Society ATL.

Q. Social Society ATL, LLC; is that fair?

A. I --

Q. Yes.

And it has an address of 3455 Peachtree Road, Northeast, on the fifth floor.

A. That sounds -- yes, that sounds correct.

Q. Okay. And according to this, it was opened in February of 2023. Does that sound about accurate?

A. That sounds about correct.

Q. So this was before you retired from Customs and Border Patrol; is that right?

A. Yes.

Q. And 5 months after you stopped working; is that right?

Page 153

A. About 6 months.

Q. 6 months, okay.

And you were the person who formed this and were the registered agent; is that right?

A. Yes.

Q. How did you get this building?

A. It's one of the buildings that you can pay to use their address.

Q. Now, you said you owned the building.

A. No, I didn't.

Q. I'm sorry. You said you had -- you had control of the space; is that fair?

A. No.

Q. Explain to me how it worked.

A. It's like a -- the company is call Regus, I believe.

Q. Uh-huh (affirmatively).

A. And you can use them for -- if you want to get your mail sent there or you can use the space. Like, they may have office spaces that are open and if you pay a certain amount, you can use -- come in and use the office space.

Q. Okay. So that's the office space. I think I'm talking about -- you mentioned something about like a private dining experience. Was that at the

39 (Pages 150 - 153)

Page 154

same address?

A. No.

Q. Okay. Where was that?

A. At my aunt's house in Decatur.

Q. What was that address?

A. I can't think of her address.

Q. Do you have a street?

A. Black -- I think it's Blackwood Road. It's about maybe 2987, but I can't really remember her address.

Q. Okay. So tell me what this business model was. You had your -- you were -- just tell me.

A. Give me a minute.

Okay. You get a ticket, purchase a ticket to the event, and then you come in and there was a six -- six-course meal that included wine pairings with each meal. And you can buy tickets to bring -- you can bring other people with you or you can be sitting at the table with random people who also got tickets as well.

Q. What was your aunt's name?

A. Cynthia Hoskins.

I'm getting lightheaded, y'all.

MR. KING: Do you want a break?

THE WITNESS: (Nods head affirmatively.)

Page 155

MR. KING: Okay.

THE VIDEOGRAPHER: The time is 3:46 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 4:08 p.m., and we are on the record.

BY MR. KING:

Q. Good afternoon again.

A. Good afternoon.

Q. When we took that break, we were in the middle of discussing the business that you started with your brother in February of 2023. Do you remember that?

A. Yes.

Q. And can you please tell us one more time what the name of that business was?

A. Social Society ATL.

Q. Okay. And you were telling us about the business model, which was using your aunt's house; is that fair?

A. Yes.

Q. And was your aunt living in the house at the time?

A. Yes.

Q. Okay. And folks would buy a ticket to the

Page 156

event and they would get a six-course meal I believe you said; is that right?

A. That was the setup, yes.

Q. Okay. You said it was you and your brother, Royal Smith; is that fair?

A. Yes.

Q. Was there anyone else involved in that?

A. We had help.

Q. But you were the only owners?

A. Yes.

Q. Did you have -- you said you had help. Did you have any employees?

A. No. We didn't make -- I think we probably made enough to cover what we initially spent. We didn't make any money.

Q. No profit?

A. (Witness shakes head negatively.)

Q. You broke even?

A. Yes.

Q. And your aunt allows you to use her house without paying for it or --

A. No. It was -- we offered to pay her the rate as you would pay for an Airbnb in the area. I don't even recall her ever taking the money from us.

Q. Okay. And your brother was the chef? Who

Page 157

was the cook?

A. The initial plan was to get different chefs in so he wouldn't have to cook, but that plan didn't work out. We paid someone for the first event that was supposed to take place, and they never -- they took our money basically and told us they were in a car accident and they never showed.

Q. Did they return that money?

A. I had to go through my bank in order to get the money back.

Q. From that point forward, did your brother always cook?

A. No, he wasn't the only one. We did have a chef who was -- she came to the first event; and she liked the concept, so she was willing to cook. So she did cook one time for us.

Q. Did you ever cook?

A. No.

Q. Did you ever assist in the cooking?

A. I may helped with prep. That's it.

Q. Do you cook?

A. My brother cooks for me.

Q. Why is that?

A. When this first happened it was because of -- I was scared of the smoke from cooking or any

40 (Pages 154 - 157)

Page 158

smoke, but now it's -- my brother is the better cook.

Q. When you were trying to get Social Society off the ground -- well, let me start before that.

When you stopped working at Customs and Border Patrol in October of '22, did you apply for any jobs at that point in time?

A. You said October of 2022?

Q. Yeah.

When did -- when did you leave Customs and Border Patrol, not retired; stopped working? I thought you said it was August.

A. Yes.

Q. Sorry about that. Thank you.

After leaving Customs and Border Control in August 10th of '22, did you apply for any jobs prior to starting Social Society?

A. No. I thought I was going back to work.

Q. And then you started Social Society in February of 2023, right?

A. Yes.

Q. And that's even though you thought you were going to go back to work, right?

A. Around this time is when I started realizing that I was not possibly going back to work as an officer.

Page 159

Q. Okay. Once you started Social Society -- I know you didn't apply for any jobs before starting Social Society. When you were trying to get Social Society off the ground for that -- it looks like you were open for about 18 months; is that fair?

A. Oh, no. We stopped way before.

Q. Okay. You officially dissolved in September of '24; is that fair?

A. Yes; for the official dissolve.

Q. When did you stop trying to do Social Society events?

A. It was probably July of 2023.

Q. Okay. Between February of 2023 when you started Social Society through July of 2023 when you stopped doing Social Society events, did you apply to work at any other jobs?

A. No. I was in the process of waiting for -- I thought Customs and Border Protection was looking for another job for me. That was my understanding until I found out around February they weren't.

Q. Okay. So you stopped Social Society in July of 2023. When did you begin looking for other jobs?

A. It happened after my retirement packet was approved. Now, my retirement packet was put in before I got the official retirement date of July

Page 160

2024, so I can't give you the exact date; but it was before.

Q. How far before would you say? A couple of months? A year before? What are we talking about?

A. Can you repeat the -- what was the main question again?

Q. The main question was, when did you -- I'm trying to remember the main question.

MR. KING: Can you let me know what the main question was?

(The record was read back by the court reporter.)

MR. KING: Yes.

THE WITNESS: I don't remember the exact dates, but I did start trying to apply for some government jobs that were work from home.

BY MR. KING:

Q. Okay. And I think you were saying that was just sometime before July of '24 when it was official is when you started applying?

A. Give me a minute, please. I can't recall when I started. I just remember my timeframe of trying to see if Customs was going to get me another job to be able to transition without having to apply.

Q. Once you started applying for other jobs,

Page 161

what are some places that you applied to work and what were the jobs?

A. I don't remember what type of jobs. I know I definitely did IT because -- yeah. I did IT. I ended up getting a certificate for IT at one point, so I applied for some IT jobs and anything that I could find that was work from home.

Q. Did you apply to any non-work from home jobs?

A. No, I don't recall, like, me doing that.

Q. Do you remember any of the companies where you applied to work?

A. Initially, it was all federal jobs.

Q. Federal government jobs?

A. Yes.

Q. Do you have a LinkedIn?

A. Yes.

Q. What's your name on LinkedIn?

A. I changed it. I can't remember if it's Nikki -- it may be Nikki Shantell.

Q. Why did you change it?

A. I got paranoid. There was -- when I got my retirement plaque, it had my full government name on there; and I posted it online to show the retirement plaque. And I still have my name showing, so I

41 (Pages 158 - 161)

Page 162

didn't want anyone to be able to find me based off of my name. There was a situation in the Virgin Islands where an officer's house was shot up at one point. So that was a big concern of mine, so I try to limit my government name because it's easy to find you.

Q. Why do you have a LinkedIn?

A. I don't -- I don't even remember setting up a LinkedIn. I think it was just one of those things.

Q. But is it fair to say that you got it to help you get jobs?

A. I don't recall. I had LinkedIn for a while.

Q. How many places would you say you applied to before getting your current job?

A. At least three maybe.

Q. You applied to three jobs between August of '22 until you got your most recent job earlier this year?

A. I wouldn't say August of 2022, but that didn't start until around after -- definitely after 2022, but yes.

Q. And you said they were mostly government jobs? Two of them were government jobs?

A. I also applied for -- it's called Pearson.

Q. Uh-huh (affirmatively).

A. They're a testing facility. They're the

Page 163

ones that if you go in and do some type of standardized test, and they'll grade your -- you can have your test graded.

Q. Why did you only apply to three jobs?

A. I may have applied to more. I'm not sure, but it's hard getting a work-from-home job. And then the other side of it is when you read the job descriptions, they have certain restrictions in there that apply to me that I can't work.

Q. Do you remember ever posting on your LinkedIn about difficulty you had received about -- about difficulty you -- sorry.

Do you remember ever posting on your LinkedIn about difficulty of the job market?

A. I responded to someone's post to -- the classmate's post and I told him I agree something or something of that nature, that it had been difficult because the jobs that I did apply for I wasn't getting back. I got an offer for Pearson, but it was only part-time.

Q. Did you have difficulty in the three jobs you applied to even getting an interview?

A. The Pearson one, I got offered the job. I don't know how they do that one, but I don't recall ever having an interview for that. But outside of

Page 164

that, I never had any interviews with anybody else outside of -- until I got this job.

Q. I think you expressed frustration that you were applying and you had yet to land one interview. Do you remember that?

A. Uh-huh (affirmative). That's possible that I said that.

Q. You mentioned that being something that was mentally tough?

A. Definitely tough, yes.

Q. Okay. I want to talk about you applying for Customs and Border Patrol.

A. Okay.

Q. Customs and Border Patrol expressed some skepticism upon your application of whether or not you were actually medically fit to be one of their agents; is that fair?

MS. SEILA: Objection to form.

You can answer.

THE WITNESS: No, I don't think that would be accurate.

BY MR. KING:

Q. How would you describe it?

A. Everyone has this process of you have to answer medical questions; and based off of your

Page 165

medical, that's when they determine if further evaluation is necessary. So in my situation it wasn't that I was unfit. Because if I was unfit, they wouldn't have gave me the job. It was because they had further questions that they have to make sure through the doctor that certain --

Q. Okay. You mentioned -- you mentioned having respiratory issues that predate your job at Customs and Border Patrol; is that fair?

A. Yes.

Q. In fact, some of those respiratory issues date back to as far as to when you were five years old, right?

A. Yes.

Q. And -- I'm sorry. I'm trying to find something in particular.

Some of the -- some of the issues that you had prior include asthma; is that fair?

A. Yes.

Q. And it also included high blood pressure; is that fair?

A. No.

Q. You never had high blood pressure before the incident?

A. No.

42 (Pages 162 - 165)

Page 166

Q.  Okay.  And anxiety before the incident?

A.  I have had anxiety before, yes.

Q.  And depression disorder before the alleged incident?

A.  Yeah.  I think that was a single episode, yes.

Q.  What about RADS; did you have any RADS before?

A.  No.

Q.  Okay.  What injuries do you claim to have suffered as a result of the alleged August 8th, 2022, incident?

A.  Mental health, my lungs have been compromised, and my blood pressure.  Even though it's under control, the under control is based off of the here and now, not what it was prior to all of this happening.  And the fact that my kidney could fail again.

What was the question?  Can you say it one more time, please?

Q.  All the injuries that you believe you suffered as a result of this incident.

A.  Are we strictly physical?

Q.  Well, you mentioned mental health.  You can describe any injuries, physical, not physical,

Page 167

anything that you feel like you encountered.

A.  Financially, heart, kidney, mental, lungs.  I believe that's it.

Q.  You said heart?

A.  That's part of the --

Q.  So heart, kidney, lungs, mental health, blood pressure, and financial?

A.  Right; and the blood pressure is going to go with my heart.

Q.  And the lung injuries we're talking about are what?

A.  My lungs aren't functioning like they were prior to this happening.  They're not even functioning based off of how they were in July of 2022.  There was one point that my lungs weren't even registering.  Like, the machines at the doctor's office, they thought it was broke because they -- it was not registering my breath at all.

Q.  Okay.  Let's talk about your kidneys for a little bit.  When was the first time you heard about any issues with your kidneys, any issue whatsoever?

A.  The date when I first saw Dr. Ovadje.

Q.  Dr.?

A.  Ovadje.  I think it's O-V-A-D-J-E.

Q.  So this would have been around 2023?  Does

Page 168

that make sense?

A.  That sounds like it.  It was around that time.

Q.  Do you have any kidney failure issues in your family at all?

A.  Yes, we do.

Q.  And who has those?  Tell me about that.

A.  I know my mom and my aunt.  I can't remember who else.  I think another aunt may have had it, possibly my grandmother.

Q.  Which aunt is that?

A.  My aunt who stays with my mom.  Her name is Wanda, W-A-N-D-A.

Q.  Wanda's last name?

A.  Steepson, S-T-E-E-P-S-O-N.

Q.  Do you -- does anyone in your family suffer high blood pressure?

A.  I think my -- I can't -- my mom, my Aunt Wanda.  I'm not sure if my dad does.

Q.  Anyone else?

A.  Those are the only two people that I can think of.  It may have been my paternal grandmother, but I'm not -- I can't remember.

Q.  What about heart issues; anyone in your family suffer from heart issues?

Page 169

A.  Not that I can -- outside of high blood pressure, that's what I consider a heart issue.  So you're saying outside of high blood pressure?

Q.  Is that what you're considering your heart issue, too, the high blood pressure?

A.  That was one and I had what's called LVH.

Q.  That's the left ventricular hypertrophy?

A.  Yes.

Q.  Which is what?

A.  It's like -- from my understanding, it's like the outside of -- the lining of your heart is bigger than what it's supposed to be.  That's my understanding of it.

Q.  Okay.  Do you know if anyone in your family has suffered that?

A.  No, I don't know.

Q.  Are you alleging that that was caused by this -- by this incident?

A.  Your blood pressure controls a lot of things in your body and so, yes, that was part of it that goes along with the heart.

Q.  Does anyone in your family suffer from anxiety?

A.  Not that I know of.

Q.  What about depression disorders?

43 (Pages 166 - 169)

Page 170

A. Not that I know of.

Q. What about any mental health disorders?

A. My aunt my mom takes care of does. She's --

Q. Who?

A. My aunt who my mom takes care of, she does. She's schizophrenic.

Q. So she has depression disorders, but she doesn't have anxiety?

A. No. I never said if she has depression.

Q. Oh, you said she has mental health issues?

A. Yes.

Q. Okay. Anyone else?

A. I have a cousin who has -- who is schizophrenic -- who has schizophrenia, too.

Q. What about your fatty liver disease; you're not claiming that's caused by the incident, are you?

A. The liver -- that's the liver, fatty liver. No. We talked about the kidney. The fatty liver disease, what's the name of it?

Q. That's what it's called, fatty liver disease.

A. That was something that I -- I don't know. I don't recall. It's probably something that they told me, but -- Dr. Acker did tell me that, fatty liver, yes.

Page 171

Q. Are you attributing your fatty liver to this incident?

A. Yes.

Q. Why is that?

A. Because prior to this incident happening, I was a perfectly healthy individual and I strongly believe that if this wouldn't have happened, I wouldn't be sitting here; I wouldn't have to talk to you-all about all this stuff; and I would be living my regular life.

Q. Okay. So prior to August of '22, you were in your mind a perfectly healthy individual?

A. Yes.

Q. Okay. In August of '22 -- I'm sorry. In 2022 you say that you had COVID sometime after February of '22. Do you recall testifying to that?

A. Yes.

Q. And you said -- and I quote -- that you got really sick. Do you remember that?

A. No. I said I got really sick when we -- prior to COVID coming out us, knowing about that. That's two different situations.

Q. Okay. Tell me about the first situation.

A. This was probably 2019 maybe. I remember -- what do I remember? I remember having to use my

Page 172

nebulizer but -- not nebulizer, I'm sorry -- my inhaler but I think I had to go and get a steroid shot. I didn't have a nebulizer at the time, and I definitely went. I believe I saw Dr. Acker for that, but I was experiencing some shortness of breath. That's what I can remember. I can't remember what was the...

Q. You were having daily headaches at that time?

A. No.

Q. It's a different time?

A. I had migraines at one point. That was in 2017.

Q. Okay. So you had -- let me get that sheet. Okay. So in 2019 -- in 2019 you got really sick. Tell me -- tell me what caused that, where you were. Tell me what you remember.

A. I remember going to Texas. I think we were in Texas, my ex and I. I got sick or he got sick.

THE COURT REPORTER: I'm sorry. I can't hear.

THE WITNESS: I'm trying to -- I'm sorry. I'm trying to figure out if that was when I got sick or when he got sick.

I don't remember if I was in Texas or if I

Page 173

was here. I don't remember.

BY MR. KING:

Q. Okay. And when was the first time you were feeling -- what symptoms were you experiencing?

A. Shortness of breath. I was -- I had an asthma attack --

Q. Okay.

A. -- pretty much during that time, so I had shortness of breath and chest tightness. That's what I remember.

Q. Okay. And this caused you to do what?

A. I actually went to go see my doctor, my primary care physician. I believe it was her; and if I am not mistaken, I had to get -- I probably had to get a steroid shot.

Q. Okay. So you had to get -- leave Texas and get on a plane and go see Dr. Acker?

A. No. That's why I was saying I don't remember if I was in Texas then or if I was here.

Q. Okay.

A. I'm kind of getting another situation with of ex -- he got sick, too. So I don't remember if we were in Texas when he got sick or was it me.

Q. Okay. While in Texas, did you go -- did he or you go to a hospital to be treated?

44 (Pages 170 - 173)

Page 174

A.  No.

Q.  Neither of you?

A.  No.  Somebody got sick the day we were leaving the hotel or something on the plane.  That was him.  He got sick.  He was sick on the plane, so it was not me in Texas.

Q.  All right.  I'm going to take a step further back again.  You were talking about South Korea.  Do you remember that?

A.  Yes.

Q.  And what year were you -- what years were you in South Korea?

A.  2008 to 2009.

Q.  Okay.  You described a medical incident that you had while in South Korea?

A.  Okay.  Yes.

Q.  Okay.  And you said that it was caused by yellow --

A.  Yellow dust.

Q.  -- yellow dust in the air?

A.  (Witness nods head affirmatively.)

Q.  And in the past you've had issues with things like pollen or dust or chemicals; is that fair?

MS. SEILA:  Objection to form.

Page 175

You can answer.

THE WITNESS:  No.

BY MR. KING:

Q.  You've never had issues with pollen?

A.  No.

Q.  Okay.  You've never had issues with dust?

A.  No.

Q.  What was spurring your attacks?  The dust that you just spoke about caused you issues.

A.  But there's different types of dust.  You have house dirt, house dust.  You have dust mites.  Like, there's different types of dust.

Q.  Okay.  So what types of dust caused you issues?

A.  It was more so the dust that's up, I guess, in the air.  I don't know what type of dust.  I don't know what yellow dust is.

Q.  Okay.  And tell me about what happened.  Where were you when you started experiencing symptoms?

A.  I don't recall where I was.  I just remember having to go to the hospital.  I don't recall -- well, yeah, their hospital.  I don't recall what they did either, though, whether they -- I do recall that it was during the holidays because I was sick for

Page 176

Christmas in 2008.

Q.  Okay.  So it was around December of 2008?

A.  Yes.

Q.  Okay.  And what were the symptoms that you experienced?

A.  It was one of the times I was -- I don't recall.  I don't -- I don't recall.

Q.  But you know that one was difficulty breathing --

A.  Yes.

Q.  -- and respiratory issues?

A.  It was definitely respiratory issues.

Q.  Were you put on a nebulizer at that time?

A.  I don't remember.

Q.  Do you remember any type of treatment that you got at that time?

A.  No, unfortunately, I don't.

Q.  Okay.  And then at some point in time you moved back to the States; is that fair?

A.  Yes.

Q.  And this was 2008, right?

A.  I moved back around 2009.

Q.  Okay.  And kind of fast forwarding, I'm going to move along pretty fast.  Now in 2015, right?

A.  Right.

Page 177

Q.  And you start to see a psychiatrist or mental health counselors around that time?

A.  Okay.

Q.  Is that fair?

A.  Around that time, yes.

Q.  At one point in time, you saw one and then you left that one and switched to another?

A.  Yes.

Q.  And you don't have any recollection of why you were seeing them outside of marital issues?

A.  Correct.

Q.  Okay.  Either of them?

A.  Correct.

Q.  Okay.  And --

A.  Well, I did tell you I wanted to just be a better version of me, though.

Q.  Right.

And fast forwarding in 2019 you went to your primary care physician and you complained of migraines.

A.  I don't recall; but if it's in the records, that will definitely tell.

(A discussion was held off the record with the court reporter.)

(Exhibit 1 was marked for

45 (Pages 174 - 177)

Page 178

identification, attached at the end of the original transcript.)

MS. SEILA: Do you have a copy for me?

MR. KING: I do.

We'll take a five-minute break.

THE VIDEOGRAPHER: The time is 4:45 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 5:01 p.m., and we are on the record.

BY MR. KING:

Q. Okay. Before we went on that break, you were telling me about a time that you were really sick in 2019 with respiratory issues. Do you remember that?

A. Yes, I remember.

Q. Then I asked you that -- if there was a point in 2019 if you were experiencing migraines or headaches potentially at a daily basis. Do you remember that?

A. Yes, I remember you asking me.

Q. I'm showing you now what has been premarked as Exhibit Number 1, and I would like you to take a look and tell us what date of treatment that is.

A. April the 18th, 2019.

Page 179

Q. Okay. And what was the reason for that appointment?

A. This says, patient is complaining of a migraine once a week --

Q. Okay.

A. -- it looks like it says.

Q. And in the history of present illness, this would be what you told the doctor; is that fair?

A. Yes.

Q. And it says that at this point in time in April of 2019 that they did a depression screening on you; is that right?

A. Yes.

Q. And they said for more than half the days you had little interest or pleasure in doing things. Do you see that?

A. Yes.

Q. It also says that for more than half the days you feel down, depressed, or hopeless. Do you see that?

A. No, not like that. Where is that?

Q. First line.

A. First line, I see it, yes.

Q. It also says that for more than half the days you have trouble falling and staying asleep --

Page 180

A. Yes.

Q. -- or that you sleep too much.

A. Yes. It says that here.

Q. It also says that for more than half the days you feel tired or have very little energy.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And for more than half the days you either have a poor appetite or that you're overeating. Do you see that?

A. Yes.

Q. If you go a little further down, it says for several days you are moving or speaking so slowly that other people could have noticed or you're so fidgety and restless that you've been moving around more than usual. Do you see that?

A. Yes.

Q. The interpretation from the doctor of that was that you had depression; is that fair?

A. Yes.

Q. I want you to turn to page 2 and under assessments it says that you were suffering from migraines; is that fair?

Page 181

A. Yes.

Q. It also says that she encountered you for a medical examination and she had abnormal findings; is that fair?

A. Yes.

Q. And it also said that you had major depressive disorder. Do --

MS. SEILA: Objection to form.

BY MR. KING:

Q. Do you see that?

A. Single episode, yes.

Q. And that you were -- if you go farther down, you were to follow-up in two weeks. Do you see that?

A. Yes.

Q. And this was Dr. Terrie Acker, right?

A. Yes.

Q. So this is your primary care physician, right?

A. Yes.

Q. And I think I read at some point in time that she was seeing you for more than -- she knew you for more than 20 years; is that accurate?

A. She's been a family doctor for a long time, yes.

46 (Pages 178 - 181)

800-726-7007                                                                    305-376-8800

Page 182

Q. She knew you for 20 years?

A. I can't -- I don't want to say for sure if it's been 20 years; but she has been a family doctor, so, yeah, she's been knowing me for a long time.

Q. Okay. Do you have any personal relationship with Dr. Acker?

A. No, I don't.

Q. Have you ever seen Dr. Acker outside of her practice?

A. No, I haven't.

Q. Okay. But she's been seeing you from the time you were in high school?

A. I don't remember when I specifically started seeing Dr. Acker.

Q. Okay. But this was her findings in 2019; is that fair?

A. Yes.

(Exhibit 2 was marked for identification, attached at the end of the original transcript.)

BY MR. KING:

Q. I want to show you what has been marked as Exhibit 2. And can you tell me what's the date on that?

A. May 6 of 2019.

Page 183

Q. Okay. And you were supposed to follow-up in two weeks, and that is close to two weeks; is that fair?

A. Close.

Q. Okay. And in history of present illness, this would be what you told Dr. Acker; is that fair?

A. This is a copy of exactly what -- it's the same. That's just a continuation.

Q. I'm sorry?

A. It's a continuation. So since this is two weeks, so the history of present illness is a continuation under the history of --

Q. It's talking about what you were suffering two weeks either, right?

A. Yes.

Q. Except it gives some more information; is that fair?

A. I don't see what's different.

Q. The May 6 record says that you have a headache located on the left side of your head.

Do you see that?

A. Yes.

Q. That's not in the April 2019 record.

A. It's on -- it's on there.

Q. It's on there? Where is it?

Page 184

A. The headache is located on the left side of the head under headaches and migraines.

Q. Okay. This one says that the headache is moderate. It says it causes lost time from work.

Do you see that?

A. Yes, I see that.

Q. It says, the nature of the headache is pain over eyes.

Do you see that?

A. Yes.

Q. And that it's stress related?

A. Yes.

Q. And it says the headache syndrome is daily. It looks like it repeats a few times by accident but daily, daily, daily, daily.

A. Yes.

Q. And then again it repeats the frequency of the headache is daily.

A. Yes.

Q. A little bit farther down, it says, associated factors include stress.

Do you see that?

A. Yes.

Q. Photophobia.

Do you see that?

Page 185

A. Yes.

Q. Nausea and vomiting.

Do you see that?

A. Yes.

Q. And it says that your overall condition is worsening.

Do you see that?

A. Yes. It's the same as on April the 18th.

Q. Okay. And, again, your assessment is major depressive disorder and migraines; is that fair?

A. Yes.

Q. I'm going to fast forward in time.

(Exhibit 3 was marked for identification, attached at the end of the original transcript.)

BY MR. KING:

Q. I'm showing you what has been marked as Exhibit 3. Can you please tell us the date of this service?

A. January 16th of 2022. I'm sorry, 2020.

Q. Okay. And the reason for this appointment is that you were experiencing chest congestion and a cough with nasal congestion.

Do you see that?

A. Yes.

47 (Pages 182 - 185)

Page 186

Q.   This is with Dr. Acker who had known you for about 20 years or so; is that fair?

A.   Yes.

Q.   And it said, new symptom, 34-year-old with asthma had developed pleuritic chest pain, wheezing and coughing.

Do you see that?

A.   Yes.

Q.   It said that she had recently put you on Amoxacillin and that you had pain in the left side of your chest and centrally but you were denying fever or chills.

Do you see that?

A.   Yes.

Q.   She did a general examination of you.  Do you see further down the page?

A.   Yes.

Q.   And she stated that you had poor inspiratory effort.

Do you see that?

A.   Yes.

Q.   And you had a force expiratory wheeze.

Do you see?

A.   Yes.

Q.   And her assessment was that you had asthma

Page 187

with exacerbation.

Do you see that?

A.   Yes.

Q.   And chest pain on breathing?

A.   Yes.

Q.   And this was in January of 2020; is that right?

A.   Yes.

Q.   Now, have you ever been diagnosed with any autoimmune disorders?

A.   No.

Q.   Okay.  You mentioned an incident that you had in St. Croix with Saharan dust that I want to say -- when was that?

A.   I believe April of 2021.

Q.   April of 2021.

MR. SIMPSON:  I don't -- I don't know if you missed me, but I'm back.  We had an internet outage here.

MR. KING:  Thank you, Andy.

BY MR. KING:

Q.   What can you tell us about that?  When was the first time you started to experience symptoms?

A.   What was the question?  What was the initial --

Page 188

Q.   Symptoms -- well, what were the symptoms that you were experiencing from the Saharan dust?

A.   Oh, the April 2021.  Chest -- chest tightness, shortness of breath, and I can't remember what else.

Q.   But you had issues breathing; is that fair?

A.   Yes, I did.

Q.   And you got treatment, right?

A.   Yes, I did.

Q.   Who did you get treatment from?

A.   One of the urgent cares on the island.

Q.   I think you mentioned that it was one near Sunny Isles?

A.   I can't remember if it was -- there's a couple going towards Sunny Isles, so I don't remember exactly which one it was.

Q.   Do you remember what that treatment was?

A.   I had to get on my nebulizer machine at that time.  Well, not mine but their nebulizer machine.

Q.   And when you got on the nebulizer, did your condition improve?

A.   I can't remember if they gave me a steroid shot or not that day, but I do know that my condition did improve after using the machine.

Q.   Okay.  Did you stay on St. Croix after that

Page 189

or did you immediately leave?

A.   I was still on the island.

Q.   For how long?

A.   Up until May 2020 --

Q.   Other than this initial day, did you have other issues?

A.   Not that I can recall.

Q.   And this was April or May of '21?

A.   Yes.

Q.   Okay.  Now, in early 2022 now you get COVID; is that fair?

A.   Yes.

Q.   Early or mid of '22?

A.   Yes.

Q.   Okay.  And tell me about some of the symptoms that you experienced from COVID.

A.   I remember coughing.  The COVID felt like I just had a cold.  I don't remember what else, but I specifically remember just feeling like I had a cold.

Q.   Did you experience fatigue?

A.   I don't recall.

Q.   Did you experience any respiratory issues?

A.   I don't recall them.

Q.   And you said that you were treated by Plessen Urgent Care for that?

48 (Pages 186 - 189)

Page 190

A. I think it was Plessen that -- well, when I went and got tested. It wasn't -- I don't even think it was even a treatment for COVID necessarily at the time. It was you get tested, they tell you if you have it or not, and then you quarantine.

Q. Now, after you experienced COVID, at some point in time before this incident -- I think we said it was in July -- you had a pulmonary function test.

A. Correct.

Q. Do you remember testifying to that?

A. Yes.

Q. And you said the reason you got a pulmonary function test at this point in time is because you were concerned that you would have a really bad flare-up again and you felt like your condition was getting worse.

A. I don't recall saying it that way; but I do feel like my -- my asthma was probably going to get worse during that time, which is what prompted me to go get tested.

Q. Okay. So you went and you got a pulmonary function test in July of 2022 really weeks to days before this incident because you were concerned.

A. Well, it just so happens to fall on the time that I was going home for vacation; and while I'm

Page 191

home, I usually try to get my doctor visits in. So that was a part of that. It wasn't the fact that I flew home specifically to go get that test done.

Q. Okay. But you got it done because you were concerned?

A. Yes.

Q. And can you remind me what doctor you got that done with?

A. It may have been Dr. Thomas Checko, Chacko. I believe that was him.

Q. Is that the one that you were saying is in Johns Creek or -- is that where you got that done?

A. I believe so.

Q. What made you feel like your asthma was getting worse or your lung function was getting worse?

A. Because since I was on island, it seems like it was -- I don't know at that time, but -- I don't know why I thought that now thinking about it.

Q. So you returned back to St. Croix after you got this pulmonary function test; is that fair?

A. Yes.

Q. And within your first few days back from work -- back to work, they asked you to go to the refinery?

Page 192

A. This was weeks at this point.

Q. So early July pulmonary function and then early August?

A. Yes.

Q. Okay. Once you got to St. Croix at some point in time, they asked you to go to the oil refinery?

A. Yes.

Q. Okay. I want you to walk me through that day. Okay? It's August 8th, 2022. Do you remember what you did that morning when you woke up?

A. Get ready for work like I normally would.

Q. Okay. What is your routine?

A. It would be to get up, shower, either iron my clothes or find -- changing into a new uniform or put on the same uniform that I possibly had on that day before if it's not dirty or messy.

Q. Okay. Then what did you do?

A. I don't know if I went straight to work. Sometimes I stop and get coffee at Sunny Isles at this coffee shop that's by the house. After that I went to work.

Q. Where did you go to work? At the airport?

A. At the airport.

Q. Okay. What was the weather like?

Page 193

A. I think it was just a regular sunny day.

Q. Okay. So you went to work at the airport. When you're working at the airport, are you -- well, where are you?

A. As soon as you walk into -- at the front -- right at the front as soon as you walk into the door inside the airport, our booths are right there.

Q. Okay. So you're doing the custom checks? You're seeing -- you're seeing passengers going through?

A. Yes.

Q. Okay. So you're inside, so there's two sets of doors in between where you're at?

A. Yes.

Q. Okay. And what happens -- how long are you there?

A. In the airport?

Q. Uh-huh (affirmative).

A. My whole shift depending upon what's going on. We were allowed to take breaks, so we can walk around the -- well, I wouldn't consider it a break, but we look at it as inspecting the perimeter of the building. So I would use that time at some points to -- to walk around and get some exercise in.

Q. Okay. Do you remember if you did that on

Veritext Legal Solutions

800-726-7007                                                                305-376-8800

Page 194

August 8th?

A. I don't recall.

Q. Okay. At some point in time, I think you mentioned earlier you were asked to go inspect the tugboat?

A. Yes.

Q. Okay. Do you remember around what time that was?

A. This was, I believe, before 1:00 in the afternoon.

Q. Okay. And then who told you this? Who asked you?

A. This was Officer McSween.

Q. McSween?

A. Yes.

Q. Okay. And based on this what did you do? What did you do next?

A. I got the truck keys and I went to the refinery.

Q. Okay. So you left the airport and went straight to the refinery?

A. Well, no. I went -- I stopped at the restaurant first. That's right by the refinery.

Q. That's the Limetree Bar & Restaurant on --

A. Yes.

Page 195

Q. -- the hill?

A. Yes.

Q. Okay.

A. And from there, once I --

Q. Was anyone with you?

A. No, no one was with me.

Q. Okay.

A. The food order had already been called in, so the food was ready. I just needed to go in and pay and go out, and that's what I did. And then I made my way to the security booth.

Q. Okay. Did you see anything unusual driving up?

A. No, I didn't.

Q. Okay. So then you get to a security booth?

A. (Witness nods head affirmatively.)

Q. Tell me what happened there.

A. They check in, regular process. The security checks my ID.

Q. Who was at security that day?

A. I'm not certain.

Q. Do you know what he looked like --

A. No, I don't.

Q. -- or what she looked like?

A. I'm not certain.

Page 196

Q. Was it a man?

A. I don't recall.

Q. Okay. So I assume you don't know their name?

A. Not at all.

Q. Okay. What was that conversation like?

A. It's usually not a conversation with security. It's just here's my badge because I'm already in the car. Here's my ID and then they're checking my name. They write down the name, and I go where I need to go.

Q. As a member of Customs, are you entitled to be able to enter that refinery for --

A. Yes.

Q. And upon entering tell me what you did next.

A. I started driving towards the tugboat area.

Q. Okay. And you were describing where you -- okay. Go ahead. Tell me what happened. You started driving towards the tugboat area. Tell me where you first -- what you were seeing, where you were when you were seeing things. So you're driving towards the tugboat area. What happened next?

A. Once I got to the tugboat area? Is that what you're asking?

Q. When is the first time you saw anything

Page 197

unusual? Where were you?

A. Right there by the tugboats.

Q. So you had already gotten all the way by the tugboats?

A. Yes.

Q. And were you in your car at this point?

A. Yes.

Q. Okay. Where by the tugboats?

A. I wish I could draw a picture.

MR. KING: Do we have a map?

MR. JANVIER: No.

THE WITNESS: So there's this -- this street. You're going down all the turns. You get to the tugboat. You go down this street right here, so I made a left. Once you make this left on the street, this is where I can see the fire trucks because they're -- there's not a far distance. They're really close at this point on the street. So I see the fire truck that's parked there. I can't remember how many. I definitely see the fire truck, and I see some people that's standing right here on the corner. So that street is here and the parking for the tugboat is going in this direction.

BY MR. KING:

50 (Pages 194 - 197)

Page 198

Q. Okay. So the parking for the tugboat is perpendicular to the street that you were on?

A. Yes.

Q. Okay. I think I know where you're talking about. It's a concrete road?

A. I don't know if it's all concrete. I feel like a lot of the refining area is also asphalt.

Q. Right. Okay.

A. But once I got to turn on the street to try to park, that's where I asked the refinery worker if that was -- if they were -- if there was anything that I needed to know.

Q. Did you see anybody that you knew?

A. (Witness shakes head negatively.)

Q. Anybody that you recognized?

A. No.

Q. Do you remember what -- I know you said people were wearing jumpsuits. You didn't remember the color; is that fair?

A. No, I didn't remember the color.

Q. And do you know what anyone else was wearing?

A. I remember seeing the firemen that were -- by the time I got -- once I asked them if it was okay, I saw the firemen right there by the entrance

Page 199

of the dome.

Q. Okay. You said you spoke to -- you know for sure one person responded, but you felt like you spoke to two people?

A. I don't think the other person, yeah, talked; but I think it was two people that were standing there together.

Q. Right.
Do you remember what they looked like?

A. No, I don't.

Q. Okay. Do you remember if they were men or women?

A. I don't remember.

Q. Okay. And what happened next?

A. I rolled the window down. I asked if it was okay for me to proceed because I saw the fire trucks.

Q. And this is at the entrance to the parking lot?

A. Yes.

Q. Okay.

A. And the person that responded stated they told us just don't go near the dome; and I said, okay, thank you. And I rolled my window back up.

Q. Okay. And then what happened?

A. Then I started coughing.

Page 200

Q. Did anyone see you coughing?

A. If they can see me in the window, that's the only way; but at that point, I rolled the window back up. And I can't remember if the vehicle I was in -- if the windows are tinted or not.

Q. Okay. So then what happened?

A. I turned around in the parking lot and then I started heading back out of the refinery.

Q. Okay. So you never went to the boat?

A. No; and I called on my way as I was heading back -- back to the port.

Q. Let me talk about your exit. Did you have to stop at the guard to exit?

A. I don't think I went to that exit. I think the exit I went out was over there by that place I used to run at. It starts with a V. I didn't go in the same exit.

Q. Okay.

A. Yeah. I went in the opposite direction.

Q. Do you know how you would be logged in and out if you didn't take the same exit?

A. No.

Q. Are you certain you didn't take the same exit?

A. I'm not a hundred percent positive, but I

Page 201

believe I just took the opposite exit because it's closer towards the airport.

Q. Okay. So you exit out without speaking with anyone; is that fair?

A. Yes. They'll let us leave. We don't -- I don't recall having them ever have to check the ID for us to leave --

Q. Right.

A. -- especially if they see the vehicle.

Q. Right.
Okay. But was there somebody at the gate or no?

A. I don't even recall because I don't even -- I don't think I stopped at all. I think I just kept going. That's our a regular thing.

Q. Okay. And then you -- and then you -- so you got yourself together and you started driving from the refinery straight to the airport?

A. Yes.

Q. Okay.

A. I would say the only time if I did stop it was just for them to let the gate open or something but not for them to come and write my name down again.

Q. Okay. And you spoke with one of your

51 (Pages 198 - 201)

Page 202

colleagues -- at least a few of your colleagues on the phone -- phone on the way to the airport, right?

A. Yes.

Q. And who are all the people that you spoke to?

A. Damian Cox.

Q. Uh-huh (affirmatively).

And then there was an acting supervisor, McSween, you spoke to?

A. McSween.

Q. And an Officer Herman?

A. Correct.

Q. Was there anyone else?

A. No, not that I remember.

Q. You asked them to get your inhaler together for you?

A. Yes.

Q. Okay. Anything else happen between the refinery and the airport?

A. No.

Q. Okay. Then you got your inhaler when you got there?

A. Yes.

Q. You said you went to the bathroom and did you throw up?

Page 203

A. Yes.

Q. Okay. And then there was an Officer Harry, right?

A. Henry, yes.

Q. Henry, okay.

And he checked your vitals?

A. Yes.

Q. And your vitals were okay; but because of your symptoms, they were suggesting that you go to urgent care?

A. My vitals weren't okay.

Q. They were not okay. So tell me about your vitals.

A. I think I had -- at that time, my blood pressure had increased.

Q. Do you know what to?

A. No, I don't; but there is -- there should be documents that's in there, a sheet that he has it on there.

Q. Okay. And then you -- Norma Lozada drove you to urgent care?

A. Yes, she did.

Q. Okay. And did y'all talk on the way to urgent care? If so, what did you talk about?

A. We didn't talk. I couldn't talk. The only

Page 204

thing I remember telling her is something doesn't feel right, something doesn't feel right.

Q. Okay. I just want to go through a few of these people and a few other people.

Start with Officer Cox. How did you first meet Officer Cox?

A. I met him at the port in St. Croix.

Q. Okay. And around what age is Officer Cox?

A. I'm not sure.

Q. Is he an older gentleman, a younger gentleman, middle aged?

A. Older than me maybe.

Q. 40s?

A. Possibly.

Q. Did you ever hang out with Officer Cox outside of work?

A. No.

Q. What about Officer McSween?

A. What about --

Q. Did you ever hang out with him outside of work?

A. Yes. He helped me when I -- he's the one that helped me when I first got to the island to locate a place and stuff like that. So not on a personal level, like, hanging out like we're friends

Page 205

but he was helpful.

Q. Okay. Outside of that, did you ever go grab drinks or go to restaurants with Officer McSween?

A. I don't know if McSween particularly showed up to an event when all of us were together. I can't recall that, but I think we grabbed breakfast one time together.

Q. Okay. And what about Officer Herman; did you ever hang out with him outside of work?

A. She. Herman just got -- she had just got there not too long, so I don't remember -- I think we probably did hang out at one club.

Q. Officer -- do you remember Officer Herman's first name?

A. Felicia, I believe.

Q. And McSween?

A. Merlin or Vernon, one of those.

Q. That was the question I had because one thing says Vernon and the other one says Merlin?

A. I can't --

Q. Okay. Before we get into Officer Henry, you mentioned that vitals -- your blood pressure was high?

A. Yes; from what I recall Officer Henry telling me.

52 (Pages 202 - 205)

Page 206

Q. Would it surprise you that Officer Henry's notes does not have your blood pressure as being high?

A. What does the blood pressure state?

Q. Is that the number right there? That's the pulse.

So he told you this verbally --

A. I guess --

Q. -- or did you see this in writing somewhere?

A. I can't remember. He brought the blood pressure cuff and everything.

Q. I have notes from Officer Henry, and it looked like he was planning to write down the blood pressure, but it's looking like he may have only wrote down the pulse. So I stand corrected on that.

Officer Henry, did you ever hang out with him outside of work?

A. Yes.

Q. And what was his first name?

A. I can't remember.

Q. Okay. And what was the things that you would do outside of work?

A. Go to different restaurants on the island, like going to The Fred, going to go eat, going to a pool party. We would go to parties and hang out as a

Page 207

group. It wasn't never us solo.

Q. Okay. Who else would party with you guys?

A. Other officers. We had Officer De La Cruz. Well, he's an agriculture specialist. Lozada, who is an agriculture specialist. Who else would show up? Officer Rojas. We had a good relationship, so a lot of us would get together.

Q. You said Officer Lozada. Is that Norma Lozada, the same person that drove you to urgent care?

A. Yes.

Q. Okay. Did you ever go out with Officer Henry alone?

A. No.

Q. Never to restaurants alone?

A. No.

Q. Okay. What about Norma Lozada; did you ever hang out with her? Yes, you have hang out with her outside of work; is that fair?

A. Yes.

Q. What were some of things that you would do?

A. Exercise. There's a couple of us that would go together to exercise together. So we would go to exercising to exercising classes or going walking or go to restaurants.

Page 208

Q. Okay. Did -- have you seen Officer Cox since August of '22?

A. No, I haven't.

Q. Have you seen Vernon McSween since August of '22?

A. No, I haven't.

Q. Have you seen Felicia Herman since August of '22?

A. On video.

Q. Why did you see her on video?

A. One of our coworkers was in town, and I got to see her on video.

Q. Was that FaceTime?

A. Yes.

Q. What did you speak about?

A. When she's going to come here to visit.

Q. Did she ever visit?

A. No, not yet.

Q. Okay. Outside of that one time, have you seen her?

A. No.

Q. What about Officer Henry; have you seen him since August of '22?

A. No, I haven't.

Q. Okay. And Norma Lozada --

Page 209

A. Wait. I'm sorry. Officer Harry, I saw him on FaceTime because Norma called me on FaceTime one time and they were together. And they called to say they miss me.

Q. Okay. And other than that one time --

A. No.

Q. -- you have never seen them?

A. No.

Q. Norma Lozada, have you seen her since August of '22 outside of that one FaceTime call?

A. I have seen her on FaceTime.

Q. Multiple times?

A. Maybe three total since August of 2022.

Q. When did you first get a lawyer in regards to the incident?

A. I don't remember the date, but it was -- it wasn't in August, and I don't think it was in September either. I think it was possibly at the end of the year maybe.

Q. Okay. And that pertains to the workman's comp issues, too? Because you had a lawyer for that, too, right?

A. I got a Workers' Comp lawyer -- I probably didn't get them until 2023.

Q. Huh?

53 (Pages 206 - 209)

Page 210

A. Maybe 2023.

Q. Okay. Was that the first lawyer you hired or did you hire Attorney Rohn first?

A. I don't remember.

Q. Who was your workman's comp lawyer?

A. I had -- I started off with one and I got another. I don't have her name, but I can provide it later possibly. I don't remember her name. I know she was with the Lincoln Law Firm, I believe.

Q. It was someone in the States?

A. Yes.

Q. Someone in Georgia?

A. Yes.

Q. Okay. And how did you get in contact with them?

A. I believe a Google search.

Q. I'm sorry if you answered this. Who did you hire first? Was it the workman's comp lawyer or was it Attorney Rohn?

A. I don't remember.

Q. How did you hear of Attorney Rohn?

A. I can't remember if somebody told me or if I Googled them either. I'm usually a Google person.

Q. Who helped you find the workman's comp lawyer?

Page 211

A. I found them on my own.

Q. Okay. And you don't know if somebody told you in regards to Attorney Rohn's office; is that fair?

A. Yes, that's fair to say.

(Exhibit 4 was marked for identification, attached at the end of the original transcript.)

BY MR. KING:

Q. I'm showing you what has been marked as Exhibit 4, and it's been produced as Bates numbers NW0001544. Let me know when you have a chance to flip through these pictures.

A. Yes.

Q. What date were these photos taken?

A. I don't remember, and I can't tell on here.

Q. Do you know where this was?

A. It was in a hospital, but I don't know -- I don't remember which one.

Q. Do you know if this was a hospital in St. Croix or in the States?

A. It was here stateside.

Q. Okay. So this when you were in Georgia?

A. Yes.

Q. Do you remember if this was taken before the

Page 212

incident or after the incident?

A. After.

Q. Okay. I want to go and talk to you about this. The photograph on the first page, why did you take that picture?

A. I didn't take any of these pictures.

Q. Who took this picture?

A. My mother took this picture.

Q. Those are pictures that are on your phone or her phone?

A. They may be on my phone maybe. Maybe she took them with my phone.

Q. Okay.

A. No. She -- she took these with her phone because she sent them via Google.

Q. Okay. So your mom has pictures of you --

A. Yes.

Q. -- in the hospital at least on this occasion and maybe other occasions?

A. Yes.

Q. Okay. And do you know how close this might have been to the incident if this was something that happened?

A. I'm not sure.

Q. Okay. So you don't know the hospital, you

Page 213

don't know the date; is that fair?

A. Yes.

Q. But you know it was stateside?

A. Yes.

Q. Why do you know it's stateside?

A. Because of my hair.

Q. What about your hair?

A. It was finger waved.

Q. What --

A. It was finger waved. No one in St. Croix that I knew of was doing finger waves.

Q. Okay. And you never went back from the States to St. Croix with finger waves?

A. In October I did of 2020 -- 2022.

Q. Okay. So this -- did you go to the hospital in St. Croix in October of '22?

A. No.

Q. Okay. So this -- you believe this hairdo was done in October of '22 in Georgia?

A. No. I don't know where the hair was done. I just know that I was here in Georgia.

Q. Okay. But you've had -- you had this hairdo in St. Croix, you said?

A. Only in October of 2022.

Q. So you've done it several times?

54 (Pages 210 - 213)

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 214

A. I've done it only stateside. I didn't do it there. That's what I am stating.

Q. Understood.

But you did it more than once or you only did it one time? Is this a one-time hairdo or --

A. No. I did it a few times. Finger waves, that was my go-to style.

Q. Okay. And in that color?

A. That was one of the colors, yes.

Q. Okay. You've done this color several times?

A. I don't -- I'm sure. Yes. I don't know how many times, but yes.

Q. Okay. Have you done other colors?

A. Yes, I have done other colors.

Q. What other colors have you done?

A. I've had a purple and a pink.

Q. Okay. What does -- what does it take to do this hairstyle starting from scratch?

A. I don't know what all the stylist has to do. She does that.

Q. Okay. Does she have to bleach your hair?

A. I can't remember if she has to bleach it every time, but they're -- bleaching was involved at one point.

Q. Okay. And dying is involved; is that fair?

Page 215

A. Yes.

Q. Do you know what brand of bleach or dye that you typically use for your hair?

A. No.

Q. Or that your hairdresser uses?

A. No.

Q. Who is your hairdresser?

A. Ms. Vanessa.

Q. You mentioned Ms. Vanessa. Do you have her last name?

A. I can't think of her last name right now.

Q. And do you know her shop?

A. Shear Essence.

Q. Shear Essence?

A. Yes.

Q. And where is that located?

A. In Lithonia.

Q. That's in Georgia?

A. Yes.

Q. Okay. Do you know why she took these photographs?

A. No.

Q. Did you ask her to take these photographs?

A. No.

Q. Did you know that she was taking these

Page 216

photographs?

A. No. My mom will pull out her phone in a heartbeat and start taking pictures.

Q. At one point in time earlier, you were speaking about bronchitis. Do you remember that?

A. Yes.

Q. I think you said you had it before the incident, but you feel like you've had it more frequently since; is that fair?

A. No.

Q. You've never had it ever before the incident? What -- what is it?

A. I don't recall having bronchitis prior to this incident; but since this incident, I've had it at least three times.

Q. Okay. And if the medical records show that you have had bronchitis before this, they would speak for themselves?

A. Yes.

Q. Okay. Now, you mentioned that you had -- you were diagnosed with bronchitis recently.

A. Yes.

Q. How recently was that?

A. Last week.

Q. Last week?

Page 217

A. It may have been Tuesday or Wednesday last week.

Q. Okay. And were you medicated for that?

A. Yes.

Q. And what were you given?

A. Steroids and I also have antibiotics.

Q. Have you been cleared from that diagnosis? Has -- have they retested you?

A. I go back -- they told me two weeks from last week, so I'll be going back soon.

Q. So you might have bronchitis right now?

A. Possibly, yes.

Q. I want to talk to you about -- you mentioned earlier being exposed to CS gas in your training.

A. Yes.

Q. Do you recall how many times that happened?

A. Once.

Q. And when was that?

A. I don't remember how far along we were in training when that happened.

Q. Do you remember where you were?

A. We did it outside.

Q. Was it in outside in Georgia or outside in St. Croix?

A. Georgia. We were at FLECT.

55 (Pages 214 - 217)

Veritext Legal Solutions

800-726-7007                                                        305-376-8800

Page 218

Q. Is CS gas the same thing as teargas?

A. It may be.

Q. Did anyone ever tell you that exposure to CS gas can cause either permanent or prolonged effects on anyone who has asthma?

A. No.

Q. Do you remember if your exposure to CS gas was before your April to May of 2021 training in St. Croix?

A. No.

Q. You don't remember?

A. No, it wasn't.

Q. It was after?

A. It was after.

Q. Was it before or after your academy completion in September of '21?

A. Before completion.

Q. Okay. So your exposure to CS gas occurred sometime between May and September of 2021; is that fair?

A. Yes.

Q. And this was before you had COVID, right?

A. Yes.

Q. Did you have COVID any other times?

A. Not to my knowledge unless I was tested.

Page 219

Q. When you were exposed to that CS gas, you said that you were worried prior to being exposed. Do you remember that?

A. Yes.

Q. And you said that you think the instructor may have taken it light on you or your particular group.

A. Yes.

Q. Okay. You said the reason that you were worried you were scared you were going to have a bad reaction or flare-up again.

A. After noticing how everyone else reacted who I know they didn't have asthma, yes.

Q. Okay. So you had flare-ups before this, right?

A. Yes.

Q. And we spoke about a few; is that fair?

A. Yes.

Q. We spoke about the Saharan dust. We spoke about South Korea.

A. Yes.

Q. Are there any other flare-ups that you've had?

A. Any flare-ups, they should all be in my medical records.

Page 220

Q. So you --

A. Because if it was bad -- for that to flare up like that, I would have went to a doctor.

Q. Okay. Sorry. I want to go back to what you saw when you approached the coke dome. You keep mentioning this black smoke. You said the black smoke was coming out of the door?

A. Like, it's not a door; but it looks -- how the dome look, it looks like it's just an opening where a door would be, I guess, like a big door.

Q. You said a big door. Is it -- so it's not like a standard size door?

A. (Witness shakes head negatively.)

Q. Is it a door big enough for somebody to drive through it?

A. It looks like -- yes, that whole place looked like it was big enough for someone to --

Q. Okay. So you're talking about a big opening and you saw black smoke?

A. Yes; black and gray.

Q. This is at -- this is on August 8th?

A. Yes.

Q. Okay. Did any doctor tell you that any of the issues that you are complaining about in this case was caused by your exposure to petroleum coke?

Page 221

A. I have doctors that said that they definitely believe it was caused -- that they believe it was caused by that, yes.

Q. And who are those doctors and which -- which ailment do they think caused -- did they tell you was caused by petroleum coke?

A. No, they didn't say specifically this is what is -- what it is; but Dr. -- Dr. Acker -- there was a Department of Labor doctor. I can't think of his name right now. He's a pulmonologist. I saw him in Macon. He stated it to me and Dr. Garfield.

Q. He's the one in Philly?

A. Yes.

Q. Did Dr. Garfield ever see you in person?

A. Not yet.

Q. Those are the three doctors that told you that ailments were caused because of your exposure to petroleum coke?

A. And Dr. Ovadje, the kidney doctor, as well.

Q. Any others?

A. There's a nurse practitioner who I started seeing at the heart doctor. She stated that -- and this is all based off of me asking, like, do you -- what do you think about this situation, so yes.

Q. What's her name?

56 (Pages 218 - 221)

Page 222

A.  Amanda.  I can't think of Amanda's last name.

Q.  Where does she work?

A.  She's at the Atlanta Heart Associates.

Q.  Say that first word again.

A.  Atlanta.

Q.  Oh, Atlanta.

Which ailments did Dr. Acker say is caused by exposure to petroleum coke?

A.  My lungs being compromised.

Q.  Any others?

A.  I can't recall right now.  I'm sure we talked about my full medical history, but I just can't recall on the others.

Q.  Okay.  What about your pulmonologist doctor for the Department of Labor in Macon; what -- what ailment did he say was caused by an exposure to petroleum coke?

A.  My lungs.

Q.  Anything else?

A.  No.

Q.  Dr. Garfield, what ailment did he say was caused by exposure to petroleum coke?

A.  My lungs.

Q.  Anything else?

Page 223

A.  No.

Q.  Dr. Ovadje, what ailment did he or she say is caused by exposure to petroleum coke?

A.  My kidney failure and not necessarily that it's the petroleum coke that's the cause but it's what led me to go into high blood pressure, which then led me into going into kidney failure.

Q.  Dr. Ovadje told you that petroleum coke caused your high blood pressure?

A.  Not in those words because I don't even know if he knew what petroleum coke was.  I just told him what the situation was.

Q.  Did Dr. Acker know what petroleum coke was?

A.  (Witness shakes head negatively.)

Q.  What about the pulmonologist doctor?  I'm sorry.  I did need a verbal response.

Did Dr. Acker tell you -- did Dr. Acker know what petroleum coke was?

A.  I'm not certain.

Q.  What about your pulmonologist doctor; did they know what petroleum coke was?

A.  I'm not certain.

Q.  What about Dr. Garfield; did they know what petroleum coke was?

A.  I'm not certain.

Page 224

Q.  Amanda at Atlanta Heart, what ailment did she say was caused by petroleum coke?

A.  And, again, not necessarily -- it created a ripple effect from my heart, so she felt like the high blood pressure was happening based off of my understanding of it because of that petroleum coke exposure.

Q.  She -- she told you that petroleum coke caused your high blood pressure?

A.  No.  That's not what she said.  I told her what -- what happened, and she said that based off of what I've told her and for me to have high blood pressure and not to have it that she believes that the exposure is what has happened and triggered everything.

Q.  Does she have any experience with petroleum coke?

A.  I'm not certain.

My therapist, Dr. West -- and that was for the mental health side of it because of me not being able to do the things that I usually would do prior to the exposure.

Q.  Did Dr. West ever see you before August 8th of 2022?

A.  No.

Page 225

Q.  She only knew you after that?

A.  Yes.

MR. KING:  Do you have the affidavit?  I'll do this quick.

Do you know what number we're on?

MS. SEILA:  5.

(Exhibit 5 was marked for identification, attached at the end of the original transcript.)

BY MR. KING:

Q.  I'm showing you what has been premarked as Exhibit 5.

MS. SEILA:  Sorry.  Can I get a copy?

MR. KING:  Oh, yeah, sure.

BY MR. KING:

Q.  Which is an affirmation under penalty of perjury that you signed last week; is that fair?

A.  Yes.

Q.  And is that an e-signature it looks like maybe?

A.  Yes.

Q.  And you had -- through your counsel, you indicated that you could not travel to St. Croix.

A.  Yes.

Q.  Okay.  And you said that the reason that

Veritext Legal Solutions
800-726-7007                    305-376-8800

Page 226

you -- according to this, that you said that Dr. Olivia West has specifically advised you not to travel to St. Croix because of your mental health disability.

Do you see that?

A. Yes.

Q. When did she advise you of that for the first time?

A. I don't remember the dates, but I believe it was -- it was sometime in 2023.

Q. Okay. Have you spoken to her about that since then?

A. Yes.

Q. When was the most recent time?

A. I think it was sometime after Monday last week.

Q. What did she tell you?

A. This still stands.

Q. Is this only in regards to St. Croix or is it in regards to an aircraft anywhere?

A. St. Croix.

Q. Specific to St. Croix; is that fair?

A. Yes.

Q. Did any other doctor tell you that you should not travel to St. Croix?

Page 227

A. Dr. Acker may have stated it. I'm not too certain if she did.

Q. And when was that?

A. Possibly 2023.

Q. But you don't remember if she did or didn't; is that right?

A. Yes; between her and Dr. -- and Dr. Graham.

Q. Both of them or either of them?

A. Both.

Q. And what was her reason?

A. Initially, they really -- their reasons were because they thought that my job was trying to get me to come back there to work.

Q. And you didn't want to work at that job any --

A. It's not that I didn't want to work at that job. I loved -- I actually liked my job. I could not go back to St. Croix and work, specifically St. Croix. I can't go back. I have people that are still there that ask, oh, you're going to come and visit like the Georges. I'm not coming back.

Q. Okay. You said Dr. Acker and Dr. Graham. Were their recommendations specific to St. Croix?

A. Yes.

Q. Okay. So they're okay with you traveling to

Page 228

New York and Louisiana and those other places?

A. We never talked about travel anywhere else.

Q. Okay. So it's a specific St. Croix problem?

A. Yes.

Q. And at some point in time, you tried to file a workman's comp claim; is that fair?

A. Yes.

Q. Okay. And when you filed that workman's comp claim initially Customs and Border Patrol denied you, right?

A. No. They paid out for the first 45 days.

Q. Did they ever decline to cover you?

A. Yes, they did.

Q. And when was that?

A. I believe this was October of 2023.

Q. Okay. So do you remember when you filed the claim?

A. Before I left the island.

Q. Okay. But they paid you for the first 45 days and then made a determination that in their belief you have preexisting conditions; is that fair?

A. Yes.

Q. Okay. And subsequent to that you hired a lawyer?

A. Yes.

Page 229

Q. And after you hired a lawyer and they made a complaint, there was a resolution to your matter?

A. No.

Q. Okay. Tell me what happened.

A. I wrote a letter to one of the congresswomen, I believe, and let them know what was going on with the Department of Labor; and then from there from that letter, I got a phone call from a supervisor from the Department of Labor.

Q. And they resolved your complaint based on that?

A. No, it's not based on that.

Q. Okay.

A. It was based on the fact that they needed additional time to get in documents. So my issue wasn't just they saw precondition -- a precondition and assumed that's what it was. It was also that there's a timeframe that you have to get documentation in to the Department of Labor.

Q. Okay.

A. If you don't get the documentation in that timeframe that they're specifically looking for wording-wise, I guess, then you don't get -- they can deny your claim.

Q. Okay.

58 (Pages 226 - 229)

Veritext Legal Solutions

800-726-7007                                                                 305-376-8800

Page 230

A. And so what the supervisor explained to me is that they have a process that they give you 30 days; and unfortunately in my situation, my 30 days wasn't enough time for me the prove my case because I was traveling from St. -- St. Croix to here and having to see so many doctors.

Q. Is it fair to say that at least in part -- I think you already agreed to this, but is it fair to say that at least in part they indicated that your claim was denied because they believed that you had preexisting conditions?

A. Yes.

Q. Okay.

MR. KING: Can I have 5 minutes?

MS. SEILA: Uh-huh (affirmative).

THE VIDEOGRAPHER: Going off the record?

MR. KING: Yes.

THE VIDEOGRAPHER: The time is 6:13 p.m., and we are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 6:33 p.m., and we are on the record.

BY MR. KING:

Q. Before the August 8, 2022, incident, had you ever missed time from work as a result of respiratory

Page 231

issues?

A. Yes; that situation that happened in April.

Q. That's the one with the Saharan dust that happened in April of 2021?

A. Yes.

Q. Were there any other times where you missed time from work as a result of respiratory issues?

A. Not that I can recall.

Q. What about from COVID; did you miss time from COVID because of COVID?

A. Yes. We had to quarantine.

Q. And when was that?

A. Between January and February of 2022 somewhere.

Q. Actually, I think we said it was more towards March to June. Does that sound right or --

MS. SEILA: I don't think so.

MR. KING: No?

MS. SEILA: (Shakes head negatively.)

MR. KING: Okay.

BY MR. KING:

Q. Is that a yes or a no?

A. Oh, no.

Q. Okay. Let me see something.

Yes. So earlier you testified that you

Page 232

didn't complete your training that allowed you to see customers -- passengers one on one until January or February of 2022.

Do you remember saying that?

A. Yes.

Q. And you said that when you got COVID it was when you were finally allowed to see customers one on one and one of the passengers got you sick. Do you remember that?

A. Yes.

Q. So it's fair to say that you got COVID sometime after February of 2022; is that fair?

MS. SEILA: Objection to form.

THE WITNESS: It could be in February. I'm not sure.

BY MR. KING:

Q. So either in February or after?

MS. SEILA: Objection to form.

THE WITNESS: Possibly, yes.

BY MR. KING:

Q. Okay. We spoke earlier about tobacco and marijuana. Do you ever vape?

A. No.

Q. Latonya Skrine, is that your sister?

A. Yes.

Page 233

Q. What's her Instagram?

A. Natural Obsession, I believe.

Q. And what's her TikTok?

A. I don't know if my sister has a TikTok. It may be her name Latonya Ellis. Her maiden name is Ellis, E-L-L-I-S. Not her maiden name. I'm sorry, her married name.

Q. Okay. Is that what her Facebook is? Is it Latonya Ellis?

A. It may be.

Q. Okay. Any other possible names?

A. No.

Q. Okay. Quita Stevens, who is that?

A. She was -- she's a friend and she was also a coworker.

Q. And how did you meet?

A. We actually -- we met in the Atlanta port, and she ended up being my roommate at FLECT and we used to work out together.

Q. Did she ever live in St. Croix?

A. No, not that I know of.

Q. You named her in your interrogatories as somebody who might have information about this case. Why would she have information?

A. Because she knows how hard we used to work

59 (Pages 230 - 233)

Page 234

out at FLECT.

Q. Anything else?

A. No.

Q. And how -- how long have you known her?

A. Since October of 2020.

Q. When was the last time you spoke to her?

A. Sometime in April.

Q. Of this year?

A. Yes.

Q. About what?

A. Her birthday.

Q. When was the last time you spoke about this case?

A. I don't recall us speaking about it.

Q. Officer Rojas. That wasn't an officer you named earlier, but that came up in your interrogatories. Who is Officer Rojas?

A. A coworker. We used to -- he's one of the people who I hang out with that's in a group setting.

Q. Did you ever hang out with him alone?

A. No.

Q. What's his first name?

A. I can't think of his first name.

Q. Does he still live on St. Croix?

A. To my knowledge.

Page 235

Q. When was the last time you spoke to him?

A. I don't recall.

Q. Is it since the incident?

A. Yes. Since April -- I'm sorry, since August the 8th, yes.

Q. Did you talk to him this year?

A. No.

Q. Did you speak to him last year?

A. I don't remember.

Q. Has he ever come to see you in Atlanta?

A. No.

Q. And you don't remember his name, his first name?

A. No.

Q. Who is Giselle Lopez?

A. That was my supervisor at the time.

Q. Did you know her before she became your supervisor?

A. No.

Q. What does she know about this case?

A. I know that she was one of the supervisors I had to tell when Dr. Acker told me I needed to be off work for 30 days.

Q. Is that why? You gave her your doctor notes?

Page 236

A. Yes.

Q. Does she know anything else?

A. I don't know what else she may know outside of my doctor. I mean, that initial thing happening.

Q. When was the last time you spoke to her?

A. I don't recall. It was -- it could have been in 2023 or 2024. I'm not certain.

Q. What did you speak about?

A. I'm not certain.

Q. Did you guys hang out outside of work ever?

A. No.

Q. Did you talk about this case?

A. No.

Q. Have you ever spoken to her about this case?

A. In what ways? What are you asking?

Q. Have you ever spoken to her about this lawsuit?

A. No.

Q. Did Michael Henry -- did he examine you more than once on different days?

A. Yes. I believe he did it again on the August 10th date, if I'm not mistaken.

Q. Let's talk about August 10th. On August 10th you had another respiratory incident; is that fair?

Page 237

A. Yes.

Q. And it was due to fumes from a nearby landfill that caused you chest tightness and tremors; is that fair?

A. That's what I associated it with.

Q. Okay. And you went and you saw Dr. Campbell?

A. Again, yes.

Q. And you told Dr. Campbell that there was a fire at the landfill; is that right?

A. That they were burning something, yes.

Q. And you did not know what they were burning; is that right?

A. Correct.

Q. And this is 2 days after your incident; is that right?

A. Yes.

Q. And to this day you still don't know what they were burning; is that fair?

A. Yes.

Q. She said that your lung exam showed decreased air movement; is that fair?

A. If that's what you have, yes.

Q. And she diagnosed you with asthma and reactive airway disease?

60 (Pages 234 - 237)

Page 238

A. Was it on that date?

Q. Yes.

Is that fair?

A. I would have to make sure based off of the medical records, and it's a he.

Q. Oh, he. Sorry. I would rather assume that way.

And she noted that you were having an extreme breathing crisis?

A. Yes, he did.

Q. He noted, sorry.

And you were treated with a steroid injection?

A. Yes.

Q. You received four vials of the medicine?

A. Yes.

Q. And then your first visit with Dr. Acker after the August 8th incident also occurred after the August 10th incident; is that fair?

A. Yes.

Q. The landfill that was burning something was right across from the airport where you worked; is that right?

A. I believe it is.

Q. And you stated that you could smell fumes

Page 239

coming through the AC unit in the car as you drove to work on August 10th.

A. Yes.

Q. You said once at work you could still smell the fumes and that your chest started to get tight again.

A. Yes.

Q. You said that?

A. Yes.

Q. And you began shaking with tremors; is that fair?

A. Yes.

Q. And as a result of this, you were given an order to have a chest x-ray completed.

A. Yes.

Q. And you were scheduled for a pulmonary function test to determine how well your lungs were working.

A. Yes.

Q. Did you inspect any vessels at the refinery prior to August 8th, 2022?

A. Yes.

Q. Do you remember about how many times you did it before that date?

A. Uncertain.

Page 240

Q. Do you remember if it was more than five?

A. I'm not sure.

Q. Okay. I only have a few more questions.

In terms of your day-to-day living, I know you said -- I think you said that your brother cooks for you because he's the better cook, but generally speaking you're able -- you're able to cook if you need to; is that fair?

MS. SEILA: Objection to form.

THE WITNESS: Yes.

BY MR. KING:

Q. Okay. Do you dress yourself?

A. Yes.

Q. Do you bathe yourself?

A. Yes.

Q. Okay. Do you feed yourself?

A. Yes.

Q. How much were you making at Customs and Border Patrol?

A. I can't remember at the time of the injury how much I was making because that October I was due for a $10,000 raise. We usually get a $10,000 raise each year up until we get to a GS 12 step 1, I believe.

Q. Do you have an estimate of how much you were

Page 241

making in August of 2022?

A. August 2022. I started in '20 at a five, 2021 I was a seven. 2021 to 2022, maybe 45 on the low end.

Q. 45 on the low end. What on the high end?

A. I'm not certain because we had overtime potential.

Q. Is it more than 60?

A. I don't recall.

Q. About 60?

A. I'm not sure. We had a base number and then after that I would just -- I was used to working overtime.

Q. What about more than 70?

A. I don't think it was more than -- it may not have been more than 70 just yet.

Q. Okay. Your job that you currently have now you said is a part-time job?

A. Yes.

Q. Are you working to find -- are you trying to find a full-time job?

A. I haven't actively been applying for jobs since this one, no.

Q. Why not?

A. Because I haven't even had a chance to focus

61 (Pages 238 - 241)

Page 242

on getting healthy yet. Everything has been a battle since 2022. So I don't want to commit to a full-time job and I'm still trying to find out how to maintain my mental and physical health.

Q. So you've still only applied to the three jobs?

A. It may have been more. I'm not certain but at least three.

Q. How much -- how much did you say you make at the current job?

A. $25 an hour.

Q. $25 hour?

A. Yes.

Q. And you said you have to work how many hours at minimum?

A. 29.

Q. 29 at minimum?

A. Yes.

Q. And the highest you've gotten is 35?

A. Yes.

Q. And how long have you been there?

A. Since February the 3rd of 2025.

Q. Have you worked there without interruption or did you take time off?

A. I took time off for this for the last 2

Page 243

weeks.

Q. For this?

A. Yes.

Q. What were you doing over the past 2 weeks to get ready for this that required you to take 2 weeks off?

A. Mentally I needed to be able to focus on me and I thought that I was going to have to fly to St. Croix. So that really messed me up because I had plans on working and not taking this much time off.

Q. Okay. Do you plan to go back to work tomorrow?

A. Not after today. No.

Q. When do you plan to go back to work?

A. I told them that I was taking this full week.

Q. So next week?

A. Yes.

Q. Outside of the past 2 weeks, is there any other time that you've taken off since you started February 23rd, 2025?

A. I may have adjusted my schedule during the week, but that's about it.

MR. KING: I didn't actually show her those documents, so I think we're still at 6.

Page 244

(Exhibit 6 was marked for identification, attached at the end of the original transcript.)

BY MR. KING:

Q. I think this is my last stuff.

I'm showing you what has been marked as Exhibit 6 to this deposition. Can you read the date of service on this document?

A. August 11th of 2022.

Q. Okay. So this would have been 3 days after your incident at the refinery; is that fair?

A. Yes.

Q. And this also would have been one day after you were exposed to fumes from the fire in the landfill; is that fair?

A. Yes.

Q. And this was a virtual telehealth visit?

A. Yes.

Q. Okay. Dr. Acker has some information here, and I'm curious of how she received it. She has some very detailed notes in terms of when the petroleum coke started to -- where there was a fire and petroleum coke burning.

Do you see that?

A. Yes.

Page 245

Q. Where did she get this information?

A. I told her.

Q. And where did you get that information that it started on -- a fire started on August 4th?

A. I think around this time an article had either came out or one of the supervisors at Customs and Border Protection had went and had a meeting.

Q. Okay. What strikes me about this document is that you never mention to Dr. Acker the August 10th, 2022, fire.

Do you see that?

A. Yes.

Q. In fact, it is completely absent from Dr. Acker's records for the past 3 years. Why didn't you tell her about it?

A. I can't recall if I did tell her, but it's a possibility I did. I'm not sure.

MR. KING: Ryan, that's all I've got.

MR. STUTZMAN: I have no questions. Thank you.

MS. SEILA: I don't have any questions.

MR. KING: Andy, I know you were reserving for potential follow-up.

MR. SIMPSON: I'm going to be brief, but I do have -- I just -- I really have one question.

62 (Pages 242 - 245)

Page 246

Let me just see my notes here.

EXAMINATION

BY MR. SIMPSON:

Q.   When you visited Dr. Campbell on August 10th of 2022, you told him that the landfill had been burning for 2 days, but you weren't aware of it until that day, correct?

MS. SEILA:  Objection to form.

THE WITNESS:  No.

You said the landfill?

BY MR. SIMPSON:

Q.   Yeah.  My question was about the landfill.

A.   I don't recall telling him that the landfill had been burning for 2 days.

Q.   Do you recall telling him that your work had been on fire for 2 days but you hadn't learned about it until August 10th, 2022?

A.   No, I don't recall.

Q.   Okay.

MR. SIMPSON:  I have no further questions.

Thank you.

MS. SEILA:  Nothing further for me.

THE VIDEOGRAPHER:  This concludes this video deposition.

The time is 6:59 p.m., and we are off the

Page 247

record.

*    *    *

THE COURT REPORTER:  Do y'all want to order the transcript?

MS. SEILA:  Yes.

MR. KING:  Yes.

MR. SIMPSON:  Yes, please.

MR. STUTZMAN:  I don't need one at this time.

(Proceedings concluded at 6:59 p.m.)

*    *    *

Page 248

COURT REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:

Article 10(B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms) OCGA 9-11-28(c) (disqualification of reporter for financial interest) OCGA 15-14-37(a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified reporter in the State of Georgia.
- I am a subcontractor for Veritext Legal Solutions.
- I have been assigned to make a complete and accurate record of these proceedings.
- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
- I have no direct contract with any party in this action and my compensation is determined solely by the terms of my subcontractor agreement.

Page 249

FIRM DISCLOSURES

- Veritext was contacted to provide reporting services by the noticing or taking attorney in this matter.
- There is no agreement in place that is prohibited by OCGA 15-14-37(a) and (b). Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.
- Password-Protected Access:  Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.

*    *    *

63 (Pages 246 - 249)

Page 250

CERTIFICATE
STATE OF GEORGIA:
COUNTY OF GWINNETT:
        I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.
        I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.
        I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
        I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.
        Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.
        This the 26th day of May, 2025.

_____

LAURA R. SINGLE, CCR-B-1343

Page 251

ERRATA
I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.
___ The following changes are noted:

        Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any Changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.
Page _____ Line _____ Change
_____
Reason for change_____
Page _____ Line _____ Change_____
_____
Reason for change_____
Page _____ Line _____ Change
_____
Reason for change_____
Page _____ Line _____ Change_____
_____
Reason for change_____
Page _____ Line _____ Change
_____
Reason for change_____

Page 252

Page _____ Line _____ Change
_____
Reason for change_____
Page _____ Line _____ Change_____
_____
Reason for change_____
Page _____ Line _____ Change
_____
Reason for change_____
Page _____ Line _____ Change_____
_____
Reason for change_____
Page _____ Line _____ Change _____
_____
Reason for change_____
Page _____ Line _____ Change _____
_____
Reason for change_____

        _____

NICOLE WOOTEN

Sworn to and subscribed before me this ___ day of _____, _____.

_____

NOTARY PUBLIC
My Commission Expires:_____

64 (Pages 250 - 252)