IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

NICOLE WOOTEN, )
        Plaintiff, )
  vs. ) Case No. 1:23-CV-00012
LIMETREE BAY TERMINALS d/b/a )
OCEAN POINT TERMINALS, PORT )
HAMILTON REFINING and )
TRANSPORTATION, and WEST INDIES )
PETROLEUM, LTD., )
        Defendants. )

THE ORAL DEPOSITION OF

LIMETREE BAY TERMINALS, d/b/a OCEAN POINT TERMINALS as a 30(b)(6) witness through its representative, JEFFREY ARHMAD CHARLES, also personally, was taken on the 14th day of April, 2025, at the Law Offices of Andrew C. Simpson, 2191 Church Street, Suite 5, Christiansted, St. Croix, U.S. Virgin Islands, and via Zoom teleconference, between the hours of 9:29 a.m. and 12:03 p.m. AST, pursuant to Notice and Federal Rules of Civil Procedure.

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands  00820
(340) 773-8161

---

APPEARANCES

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

Law Offices of
Lee J. Rohn & Associates, LLC
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

BY:  Robin P. Seila

For the Defendant Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals:

Law Offices of Akerman
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, Florida  33301

By:  Donnie King
     Eric D. Coleman

For the Defendant Port Hamilton Refining and Transportation:

Law Offices of
Andrew C. Simpson
2191 Church Street, Suite 5,
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson

---

APPEARANCES

For the Defendant West Indies Petroleum, Ltd.:

Law Offices of
CSA Associates, P.C.
1138 King Street, Suite 100
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Ryan C. Stutzman (Via Zoom)

Also Present:  Nicole Wooten (Via Zoom)
               Fermin Rodriguez (Via Zoom)

---

INDEX

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
| --- | --- | --- |
| Direct | by Ms. Seila | 7 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
| --- | --- | --- |
| 178 – | Notice of 30(b)(6) Deposition of Limetree Bay Terminals, LLC | 43 |
| 1 – | Bates Stamp PHRT-Wooten 001541 | 43 |
| 2 – | Bates Stamp PHRT-Wooten 000540-000535 | 44 |
| 10 – | Bates Stamp PHRT-Wooten 001921 | 44 |
| 11 – | Bates Stamp PHRT-Wooten 001525 | 45 |
| 13 – | Bates Stamp PHRT-Wooten 001532-001555 | 45 |
| 14 – | Bates Stamp PHRT-Wooten 000539-001558 | 46 |
| 15 – | Bates Stamp PHRT-Wooten 001875-001575 | 46 |
| 16 – | Bates Stamp PHRT-Wooten 000001-000009 | 46 |
| 17 – | Bates Stamp LBT_000235-000236 | 47 |
| 18 – | Bates Stamp PHRT-Wooten 000431-000483 | 48 |
| 19 – | Bates Stamp LBT_001112-001115 | 48 |
| 20 – | Bates Stamp LBT_001213-001214 | 53 |
| 23 – | Bates Stamp LBT_000253-000256 | 54 |
| 24 – | Bates Stamp PHRT-Wooten 001872-001873 | 55 |

Susan C. Nissman, RPR-RMR
(340) 773-0161



EXHIBIT
12

INDEX

| 25 – | Bates Stamp PHRT-Wooten 000012-000013 | 55 |
| 27 – | Bates Stamp PHRT-Wooten 000014-000015 | 57 |
| 32 – | Bates Stamp PHRT-Wooten 001869-001870 | 59 |
| 38 – | Bates Stamp PHRT-Wooten 000016-000019 | 60 |
| 39 – | Bates Stamp PHRT-Wooten 001595-001596 | 67 |
| 40 – | Bates Stamp PHRT-Wooten 001526 | 68 |
| 41 – | Bates Stamp PHRT-Wooten 001871 | 68 |
| 43 – | Bates Stamp PHRT-Wooten 000024-000025 | 68 |
| 46 – | Bates Stamp PHRT-Wooten 000027 | 69 |
| 50 – | Text Messages | 69 |
| 53A – | Bates Stamp LBT_000517 | 70 |
| 57 – | Bates Stamp PHRT-Wooten 001864 | 70 |
| 61 – | Bates Stamp LBT_001108 | 71 |
| 65 – | Bates Stamp PHRT-Wooten 000036 | 72 |
| 70 – | Bates Stamp LBT_000540-000546 | 73 |
| 72 – | Bate Stamp PHRT-Wooten 000034-000035 | 73 |
| 73 – | Bates Stamp PHRT-Wooten 001641-001655 | 74 |
| 78 – | Bates Stamp LBT_000048-000131 | 75 |
| 79 – | Bates Stamp PHRT-Wooten 001922-001928 | 75 |

INDEX

| 86 – | Ocean Point's Responses and Objections to Plaintiff Nicole Wooten's First Set of Interrogatories | 76 |
| 87 – | Ocean Point's Second Amended Responses and Objections to Plaintiff Nicole Wooten's First Set of Interrogatories | 77 |
| 93 – | Ocean Point's Crossclaims Against Port Hamilton Refining and Transportation | 78 |
| 180 – | Bates Stamp LBT_000209-000216 | 82 |

---

7

LBT, LLC/OPT/J. CHARLES -- DIRECT

LIMETREE BAY TERMINALS, LLC, D/B/A OCEAN POINT TERMINALS, through its representative, JEFFREY ARHMAD CHARLES, called as a witness, having been first duly sworn, testified on his oath as follows:

DIRECT EXAMINATION

BY MS. SEILA:

Q.  Hi.  Good morning --

A.  Good morning.

Q.  -- Mr. Charles.  My name is Robin Seila, and I'm one of the attorneys working on this case on behalf of the plaintiff.

Can you please state and spell your name for the record?

A.  Jeffrey Arhmad Charles.  J-E-F-F-R-E-Y; A-R-H-M-A-D; C-H-A-R-L-E-S.

Q.  Thank you.

And what month were you born?

A.  September.

Q.  And what year were you born?

A.  1980.

Q.  Have you ever been deposed before?

A.  Yes.

Q.  Approximately how many times?

A.  Once.

Q.  Okay.  And how long ago was that?

---

8

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.  2021.

Q.  Okay.  So that wasn't so long ago, but I'll just go over a few of the ground rules to refresh your recollection on those.

So we are in an informal setting today, but this is part of a formal court proceeding, and the court reporter has sworn you in to tell the truth.

Do you understand that?

A.  Yes.

Q.  Okay.  And everything is being recorded by the court reporter, so it's really important that we not speak over one another, so that she can take down a clear record.

Do you understand that?

A.  Yes.

Q.  Okay.  And I'm not trying to trick you with any questions here today, so if I ask an unclear question, which very well could happen, please ask me to clarify my question, so that you can provide a meaningful response?

A.  Understood.

Q.  Okay.  And do you understand that you're here on behalf of your -- of Limetree Bay Terminals, doing business as Ocean Point Terminals, as well as in your individual capacity?

A.  Yes.

Q.  Okay.  And you understand that if you provide

9

LBT, LLC/OPT/J. CHARLES -- DIRECT

responses as a representative of, we'll call it LBT, meaning Limetree Bay Terminals, that those responses are binding on Limetree Bay Terminals?

A.   Yes.

Q.   Okay.  Have you been involved in any other cases, either as a plaintiff, a defendant, or in any criminal cases?

A.   No.

Q.   Okay.  What did you do to prepare for this deposition?

A.   Talked to counsel and reviewed the documents provided.

Q.   Okay.  What documents did you review?

A.   They were numerous.  If they come up, I can let you know if we took a look at them or not.

Q.   Okay.  Did you talk to anyone, other than counsel?

A.   No.

Q.   Okay.  Was there someone that you wanted to talk to, but you could not reach them to discuss this case with them?

A.   No.

Q.   Did you also review photographs to prepare for today?

A.   If they were associated with the documents provided, yes.

10

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Okay.  And did you review any videos?

A.   If they were associated with the documents provided, yes.

Q.   Tell me about your educational background, starting with where you went to high school, please?

A.   I went to high school in Michigan, Anchor Bay, and finished up at Meade Senior High School in Maryland.

Q.   Okay.  And what year did you graduate?

A.   '99.  1999.

Q.   Okay.  And did you seek additional schooling after -- after high school?

A.   Yes.  Graduated from the U.S. Navel Academy in 2004.

Q.   Okay.  And then after that, did you go into the Navy?

A.   Yes.

Q.   And how many years did you serve in the Navy?

A.   Six.

Q.   And what were your positions?

A.   MP propulsion officer; axillary officer; assistant operations officer; combat information officer; and that's it.

Q.   Okay.  And why did you leave the Navy?

A.   Made a family decision.

Q.   Okay.  Where were you stationed while you were in

11

LBT, LLC/OPT/J. CHARLES -- DIRECT

the Navy?

A.   Norfolk, Virginia.

Q.   The entire six years?

A.   Yes.

Q.   Okay.  Did you seek any other additional schooling after graduating from the U.S. Navel Academy?

A.   MBA from Drexel University.

Q.   Okay.  What year did you graduate from that program?

A.   2014.

Q.   Okay.  And since obtaining your MBA from Drexel, have you attended or sought any additional schooling after that?

A.   Vermont Law School, energy regulation and law, but did not finish that degree.

Q.   Okay.  Are you still in that program --

A.   No.

Q.   -- or have you abandoned it?

A.   Yes, I'm complete.

Q.   Okay.  And why did you decide to not continue?

A.   Prioritizing work.

Q.   Have you authored any research papers?

A.   No.

Q.   Have you ever served as an expert witness in any case?

12

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.   No.

Q.   Okay.  Tell me about your employment history after you left the Navy.

A.   Joined the Hess Corporation, so it was a management training program.  So I worked at multiple facilities.

Q.   Okay.  What year did you start that?

A.   This is 2009.

Q.   And how long was that program?

A.   So I was there for approximately three years at Hess.

Q.   Okay.  And what did you do after Hess?

A.   Joined Buckeye Partners.

Q.   And what was your position there?

A.   Multiple positions, and oil and gas terminals.

Q.   And where is Buckeye Partners based?

A.   In Houston.

Q.   Okay.  And how long did you work there?

A.   Approximately five years.

Q.   After Buckeye Partners, where did you work?

A.   Limetree Bay Terminals.

Q.   Okay.  And when -- when did you start working at Limetree Bay?

A.   On August 5th, 2019.

Q.   And what position were you hired for?

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. Vice president of operations.

Q. And who did you report to?

A. At the time of hire, Darius Sweet.

Q. Who did you report to in 2022?

A. 2022, beginning of 2022, was Jeff Rinker. The end of 2022, was Todd Dillabough.

Q. And what are your -- are you still VP of operations, or has that position changed?

A. It's changed.

Q. Okay. What's your current position?

A. Chief operating officer.

Q. Okay. When did you become chief operating officer?

A. Approximately the beginning of 2022.

Q. Okay. When you were VP of operations, what were your duties?

A. I was responsible for tank field operations, marine operations, scheduling, and volumetric control.

Q. What else?

A. That's all.

Q. Okay. And how many people reported to you when you were VP of operations?

A. I don't have, specifically.

Q. Was it more or less than 10?

A. More.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay. More or less than 50?

A. Maybe approximately 50.

Q. Okay. And now that you are chief operations officer, what are your duties?

A. In addition to the duties listed, I'm also responsible for business services, security, HS&E.

Q. You said HSE?

A. HS&E, health safety and environmental. Fire.

Q. Anything else?

A. That's all.

Q. Okay. Let's take these one at a time. When you say tank field, what does that mean?

A. It's the actual storage tanks that we store product in. So operating the tank field. Maintenance and operations of the tanks, valves, pumps, and then moving the product around the tanks and pipelines.

Q. Okay. And when you say "product," what products are you referring to?

A. So we store gasolines, gasoline components, jet distillates, propane, butane, crude oil.

Q. Okay. Now, when you say, "gasoline components," are there specific components that you store?

A. Not necessarily. It's just different octanes that blend into, you know, one finished octane.

Q. I see. Okay.

LBT, LLC/OPT/J. CHARLES -- DIRECT

When you say, "marine operations," what are you referring to there?

A. Operation of the loading docks: Tugboats, pilots, utility boats, scheduling. Just in general maintenance and operations of the dock.

Q. Okay. And then you said scheduling and volumetric control. What does that mean?

A. It is scheduling the product movements around the facility, and also an interface to the customer.

Q. And who is the customer?

A. There are various, so all of the -- all of the -- it could be majors, mid majors, trading firms. So we're a merchant facility, so anyone wishing to store product or receive some of the services that we can provide, they can be a potential customer of ours, so there are numerous, and it changes.

Q. Okay. Okay. Then the next thing you said was business services. What does that entail?

A. Business services is -- has responsibility of company housing, event planning, operations and maintenance of certain buildings.

Q. Okay. Anything else?

A. No.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. And then security, what sorts of duties do you have to deal with when it comes to security?

A. It's just compliance with the facility security plan.

Q. Anything else?

A. That's all.

Q. And then you mentioned health, safety, and the environment. What duties do you have there?

A. Just compliance with all OSHA, EPA, and other regulations.

Q. So does that include DPNR?

A. Yes.

Q. And when you say fire, what sorts of duties do you have to do, related to fire?

A. Just emergency response. So maintenance of equipment and operations of the equipment and training of personnel.

Q. Okay. Is all of the fire equipment kept in one location, or do you have various locations where fire equipment is kept?

A. It could be various.

Q. Okay. Do you have any other paid positions at any other company?

A. I don't understand the question.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Oh.  Do you have -- do you have any other jobs, basically?

A.   Do I have any other jobs?

Q.   Yes.

A.   I do not.

Q.   Okay.  Do you have any volunteer positions that you work -- work with or on?

A.   Not -- not long term.

Q.   Okay.  What volunteer positions have you had?

A.   So we've got volunteer opportunities at the -- at work, such as building out the kids park in Frederiksted, things like that.  Um-hum.  Beach cleanups.

Q.   Okay.  In August of 2022, who was part of the management team at Limetree Bay Terminals?

MR. KING:  Objection.  The Court ruled that on the motion to compel against Port Hamilton, that the leadership team was irrelevant with Lee Rohn, Andy Simpson, so I object.

Q.   (Ms. Seila) What entity is listed on your paycheck?

A.   I can't recall.  I don't look at it.

Q.   Okay.  In August of 20 -- in August of 2022, who did you report to?

A.   In August of 2022?

Q.   Yes.

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.   Is there a date?

Q.   Did your supervisor change throughout the month of August of 2022?

A.   It did not.  Is there a date?

Q.   Well, let's say August 4th.

A.   Okay.  So August 4th, it would have been Todd Dillabough.

Q.   Okay.  And who reported to you in -- on August 4th of 2022?

A.   August 4th of 2022:  George Maillard; Billy Noelien; Krishna Singh; Maria Aloyo; George Williams.  I think that's it.

Q.   Okay.  In August of 2022, what was the nature of the work performed by Customs and Border Patrol?

A.   I'm not aware.

Q.   Do you ever interact with personnel from Customs and Border Patrol?

A.   I do not, personally.

Q.   Okay.  Does Limetree Bay Terminals interact with personnel from Customs and Border Patrol?

A.   Yes.

Q.   Okay.  How do they interact with them?

A.   So we interact with their entry and exit into the facility.

Q.   Anything else?

19

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.   And ensure they go to their appropriate spots within the facility, or we understand where they're going within the facility.

Q.   Anything else?

A.   And that we're complying with any Customs rules that might be required of the facility.

Q.   Okay.  Can you walk me through how -- how a Customs and Border Patrol agent would enter the facility?  In other words, what's the process?

A.   They'll enter just like everyone else at the front gates.  Check in with the guard.  They'll be logged in and out, and their information recorded, and they'll provide the location where they're going.

Q.   Okay.  And then you mentioned that you ensure that they're going to their -- the appropriate spot, correct?  How do you do that?

A.   So they're going to tell us their location, so we can make sure there's actually something in that vicinity.  To make sure they got the right -- right spot, and then they'll proceed.

Q.   If there's a new Customs and Boarder Patrol agent, do you ever escort them to make sure they understand where they need to go?

A.   I could not answer that question.

Q.   Okay.  In August of 2022, who was working at the

20

LBT, LLC/OPT/J. CHARLES -- DIRECT

front gate?

A.   I don't have that name.

Q.   Okay.  Do you have logs, or timesheets that would be able to tell you who was working at the front gate in August of 2022?

A.   Yes, there should be logs, and the security officer's name should be on that logbook.

Q.   Is that information that you have access to?

A.   Yes.

Q.   Okay.  I'll ask that you please provide that to your attorney for -- and we'll do another document request related to that.

And then you mentioned some Customs rules that you have to comply with.

Can you explain what those are?

A.   Yeah.  So there's rules related to product coming in and out of the facility, to make sure it clears Customs, so we just need to make sure our product either clears Customs before we can operate, as provided by Customs agents.

Q.   Are there specific areas at the facility where Customs and Border Patrol agents normally go?

A.   The docks.

Q.   Okay.  Anything else besides the docks?

A.   Not necessarily.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   When you say, "not necessarily," what does that mean?

A.   Yeah, if it's -- if it's more irregular, if there's meetings, then they would be in the office, but day-to-day is the docks.

Q.   Okay.  And what kind of meetings does Customs and Border Patrol have?

A.   Nothing -- nothing normal.  They're just doing like a touch base, or if they had an issue they need to talk through, something along those lines.  It rarely happens.

Q.   And who do they normally have those meetings with when they have them?

A.   Depends on the topic.

Q.   Okay.  Do they ever have meetings with Limetree Bay Terminals?

A.   Yes.

Q.   Did Customs and Border Patrol have meetings with Limetree Bay Terminals in August of 2022?

A.   No.

Q.   Okay.  Is there a point of contact at Customs and Border Patrol that you interact with?

A.   Not that I interact with.

Q.   Okay.  Is there a contact at Customs and Border Patrol that Limetree Bay Terminal interacts with?

A.   Not a single point of contact.  Typically, the

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

agents will reach out to Customs, and communicate back and forth.

Q.   Okay.  So there's not like a agent supervisor?

A.   There probably is, but it's not our main point of contact.

Q.   How often would you say that Limetree Bay Terminals communicates with Customs and Border Patrol?

A.   Not very often.

Q.   Okay.

A.   Other than the front gate.

Q.   How often does -- does an agent or someone from Customs and Border Patrol come to the facility?

A.   Most likely daily.

Q.   Okay.  And you said that that's to inspect product coming in?

A.   Yes.  Clear the ships and product.

Q.   And so does Limetree Bay Terminals have product coming in on a daily basis?

A.   There are ships with customers who bring in products on a daily basis.  Ocean Point Terminals does not own any product.

Q.   I see.  Thank you.  Thank you for that clarification.

Can you explain what the relationship was between Limetree Bay refining and Limetree Bay Terminals?

---

23

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.   I don't understand the question.

Q.   So I understand that now Port Hamilton Refining and Transportation is at the facility.  And prior to that, it was Limetree Bay Refining; is that correct?

A.   So PHRT was previously Limetree Bay Refining, that is correct.

Q.   Okay.  And so what is the relationship between Limetree Bay Terminals and PHRT?

A.   Is the question for today?

Q.   Well, let's go back to August of 2022, please.  What was the relationship between Limetree Bay Terminals and PHRT?

A.   So PHRT and Limetree Bay Terminals are completely separate entities.

So Ocean Point Terminals provides essentially warehousing and customer services to customers.  So to the extent that PHRT was a customer of ours, we would be providing services.  They were not.  So we are two separate entities.  We are operating.  Port Hamilton is not, and they are not currently a customer of ours.

Q.   Okay.  They're not currently a customer, and are you saying they were not a customer in August of 2022, either?

A.   They were not a customer of ours in August of 2022.

---

24

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Okay.  Can you explain how to access PHRT?  In other words, do you have to go through Limetree Bay Terminals to get to PHRT?

A.   No.

Q.   So someone coming from off the street can go directly to PHRT without going through a gate controlled by Limetree Bay Terminals?

A.   Yeah.  So there would be access control that the terminal is reasonable for, but PHRT is not like one location.  So you can go straight through access control to PHRT, and you can go through access control to Ocean Point Terminals.

Q.   Okay.  And who controls access control?

A.   Ocean Point Terminals.

Q.   Okay.  And are the employees that work at access control, are they directly employed by OPT, or are they contract employees through some other company?

A.   Directly employed.

Q.   Okay.  When Limetree Bay Refining was in existence, did you -- did you work with Limetree Bay Refining?

A.   Can you be more specific?

Q.   Was Limetree Bay Refining a customer?

A.   Yes.

Q.   Okay.  What was the nature of their business as a

LBT, LLC/OPT/J. CHARLES -- DIRECT

customer?

A. So they required operations of the dock that we provided as a service, and they required storage and movement of the products, which we provided.

Q. Okay. And what products were they storing and moving?

A. Crude oil and various cleaning products.

Q. Do you know what cleaning products?

A. Gasoline jet diesel.

Q. I understand that a Limetree Bay Refining was also storing petroleum coke; is that correct?

A. I'm not aware.

Q. Okay. Do you know what petroleum coke is?

A. Not specifically.

Q. Okay. Do you know what petroleum coke is used for?

A. Not specifically.

Q. Do you know what the proper storage procedures are for petroleum coke?

A. Not specifically.

Q. Does Limetree Bay Terminals work with any other companies on a regular basis?

A. Can you be more specific?

Q. Does Limetree Bay Terminals work with Pinnacle on a regular basis?

LBT, LLC/OPT/J. CHARLES — DIRECT

A. We do not.

Q. What, if any, relationship, did Limetree Bay Terminals have with Pinnacle in August of 2022?

A. Can you repeat the question?

Q. What, if any, relationship or, like business relationship, did Limetree Bay Terminals have with Pinnacle in August of 2022?

A. We were not actively working with Pinnacle at that point.

Q. Okay. What's your understanding of the nature of the business that Pinnacle is engaged in?

A. I have no comment for Pinnacle.

Q. Have you heard of Savage Services?

A. Yes.

Q. What's the nature of the work that Savage Services does?

A. My understanding of Savage is, they were responsible for operating the coke for the coker assets for the refinery. And at some point, they took off, and that's it. No -- no interaction with Ocean Point.

Q. When did the -- when did Savage Services take off?

A. I don't know.

Q. Why did Savage Services take off?

A. No relationship with the terminal. I wouldn't have those details.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay. Did Ocean Point Terminals or Limetree Bay Terminals have any contracts with Savage Services?

A. Not that I'm aware of.

Q. Okay. NIS, what is the nature of the work that NIS does?

A. NIS is a general contractor.

Q. Does Limetree Bay Terminals have any work that they do with NIS?

A. Yes.

Q. What kind of work does Limetree Bay Terminals do with NIS?

A. Maintenance and projects.

Q. What kind of projects?

A. Various. It's annual regulatory compliance projects or growth projects.

Q. You said "or growth projects"?

A. Yes.

Q. So when you say, "annual regulatory projects," what does that include?

A. Could be tank maintenance. Could be oily sewer work.

Q. And what about "growth projects," what does that mean?

A. It could be we put a dock back in service, or we install heating capacity in the facility.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Why would you need heating capacity in the facility?

A. If a customer wants to store product that is viscous, we heat the product up, to make sure that we can continue to move it quickly.

Q. Okay. And what is the nature of the work that PHRT does?

A. I don't know, specifically.

Q. Okay. What relationship does Limetree Bay Terminals have with PHRT?

A. They're a separate entity. To the extent that they will operate, they will be a customer.

Q. Okay. And in August of 2022, I think you said they were not a customer? Did I understand that correctly?

A. That's correct.

Q. Okay. And Williams Fire, what is your understanding of what that company does?

A. Respond to fires.

Q. And where are they based?

A. I'm not aware.

Q. Has Limetree Bay Terminals ever contracted with Williams Fire?

A. I don't know, specifically.

Q. Okay.

A. We have a relationship with Williams, and we have

29

LBT, LLC/OPT/J. CHARLES -- DIRECT

access to them, just like everyone in the industry does, but I'm not familiar with the details around any agreement.

Q.   When did Limetree Bay Terminals start working with Williams Fire?

A.   I don't have an answer to that.  I'm not aware.

Q.   Okay.  How often does Limetree Bay Terminals communicate with PHRT?

A.   Can you be more specific?

Q.   So when did PHRT take over the refinery?

A.   I do not have a date.

Q.   Okay.  Approximately when was that?

A.   I believe beginning of February 2022, or February of 2022.

Q.   Okay.  So in February of 2022, can you describe what the relationship was like between Limetree Bay Terminals and PHRT?

A.   Two separate entities, and they were not a customer of ours at that point.

Q.   In February of 2022, did Limetree Bay Terminals communicate with PHRT on a regular basis?

A.   Can you be more specific?

Q.   So like what sorts of things would Limetree Bay Terminals and PHRT communicate about in February of 2022, when PHRT took over?

A.   From -- from my view, my lens, my viewpoint, there

Susan C. Nissman, RPR-RMR
(340) 773-8161

30

LBT, LLC/OPT/J. CHARLES -- DIRECT

were conversations happening around developing a shared service arrangement between the two companies.

Q.   Okay.  And why was there interest in developing a shared service agreement?

A.   So that the two separate entities had a document that guided on day-to-day operations, and so that certain things were available, such as insurances, indemnities, and methodology to provide services back and forth.

Q.   Did PHRT and Limetree Bay Terminals ever come to an agreement concerning a shared service agreement?

A.   So there were interim agreements.

Q.   Okay.

A.   And then there was an agreement that was quickly removed, due to lack of payment.

Q.   Okay.  Anything else?

A.   And there was not another agreement entered into.

Q.   When did the last interim agreement end?

A.   I do not have those dates, specifically.

Q.   Do you recall approximately when it ended?

A.   No.

Q.   Okay.  And you said the agreement ended, due to lack of payment.

Do you recall what -- what you were expecting payment for?

A.   Can you be more specific?

Susan C. Nissman, RPR-RMR
(340) 773-8161

31

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   What sorts of services or items were you expecting payment for that were not received?

A.   Yeah, all the services listed in the appendices.

Q.   Okay.  And do you recall approximately how much was outstanding?

A.   I do not.

Q.   Okay.  How is the shared service agreement, how is that different from the ICP?

A.   They are completely different.  Shared services agreement between the two companies, specifically to this location, the ICP is a industry practice that companies employ.  They're -- they're completely different.

Q.   Okay.  When did you first become aware of the smoldering coke in August of 2022?

A.   I can't remember the date, exactly.

Q.   Okay.  Can you describe for me step-by-step what you recall when you found out about the smoldering coke?

A.   Can you be more specific?

Q.   In other words, when you think back to when you became aware of the smoldering coke, where were you?  What were you doing?  What were you told?  Who told you?

MR. KING:  For clarification, are you asking him in his individual capacity, or are you asking him in his corporate representative capacity what he actually knew, or are you saying what the company knew?  'Cause obviously he's

Susan C. Nissman, RPR-RMR
(340) 773-8161

32

LBT, LLC/OPT/J. CHARLES -- DIRECT

reviewed incidents reports.

Q.   (Ms. Seila) Right.  Let's start with what you personally knew.  Thank you.

A.   So, again, I don't have the actual date, but at some point, I was made aware that there was something going on with the coker.  There was some level of smoldering.  We had the fire chief at the time visit the site.  Provided guidance on how to respond to the event.  And also how not to respond to the event.  And also there was requests for some equipment that we released to PHRT.

Q.   Were you on island during August of 2022?

A.   Yes.

Q.   Okay.  Did you go out to that area of the facility?  Did you see the -- could you see anything related to the smoldering coke?

A.   Yes, I was out there on various days.

Q.   Okay.  Can you describe for me what you saw?

A.   On which day?

Q.   So let's say, let's take the first instance that you, personally, went out to the coker area.

What did you see?

A.   Is there a date?

Q.   Do you remember whether or not you went out there on the first day, on August 4th?

A.   August 4th?  So August 4th, or earlier in August,

Susan C. Nissman, RPR-RMR
(340) 773-8161

LBT, LLC/OPT/J. CHARLES -- DIRECT

you can tell that the -- there was some temperature in the coke pit. You could see light vapor, that I could see.

Q. Can you describe what that light vapor looked like?

A. Just light -- light steam.

Q. And how far up or out did that extend?

A. Not far at all.

Q. Okay. What was your reaction to seeing that light vapor?

A. No real reaction to it. It's light vapor.

Q. Did you go out to the coker on the following day, on August 5th, 2022?

A. No, no.

Q. Okay. What about on August 6th, 2022?

A. Yeah, so I didn't go to the coker. I have no reason to be at the coker. It has nothing to do with my company or my terminal, so I would have gone to the extent of the docks and looked that direction. But I would be out there on various days. We do have our tugboats that are adjacent to the coker. We have personnel that live on those tugboats, so as long as there is no impact to those tugboats, then the response itself is on PHRT.

Q. Okay. So when was the next time that you saw vapor or anything emanating from the -- from the coker?

A. Throughout the month, they were responding to it,

LBT, LLC/OPT/J. CHARLES -- DIRECT

so it would have been throughout the month.

Q. What, specifically, do you recall seeing?

A. Light vapor.

Q. Anything else?

A. Towards the end of the month, it escalated to where it was heavier vapor.

Q. Did you ever see any fire or thick smoke?

A. Yeah, towards the end of the month, it increased to fire and -- and smoke.

Q. Okay. Do you recall when fire and -- when you saw fire and smoke?

A. I do not recall the date, but towards the end of the month.

Q. Okay. You mentioned earlier that you have personnel that live on tugboats in the area?

A. Yes.

Q. Did they have to be relocated?

A. No.

Q. Okay. Did you conduct -- you, meaning, Limetree Bay Terminals, conduct any investigations into the causes of the smoldering?

A. No. The -- the event itself is unrelated to our operation.

Q. Okay. Okay. You mentioned that -- I think you mentioned that you spoke with the fire chief; is that

LBT, LLC/OPT/J. CHARLES -- DIRECT

correct?

A. Yes.

Q. Okay. And who's the fire chief?

A. At the time, it was Stewart Tanner.

Q. Okay. What did you and Stewart Tanner discuss?

A. So he provided to PHRT advice to water and flip the pile, and he also provided to PHRT not to just water it, but water and flip it.

And then, again, the equipment request came through the fire chief, which we provided to PHRT.

Q. What equipment was requested?

A. I can't recall, specifically.

Q. Okay. How soon after the request was received was the equipment provided to PHRT?

A. I don't have the date, specifically, but shortly after the request.

Q. Okay. Did you reach out to Customs and Border Patrol at any time during the smoldering in August of 2022?

A. No.

Q. Why not?

A. No reason to.

Q. Why do you say that?

A. There's no reason to. There's no impact to them.

Q. Okay. I read in the discovery that there were several requests to increase water pressure.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Does OPT control the water pressure at the facility?

A. Yes, we're currently operating the seawater intake pumps.

Q. Okay. What's the process to increase or decrease the water pressure for the sea intake pumps?

A. Can you be more specific?

Q. Can you walk me through how one would -- would increase or decrease the water pressure related to the seawater intake pumps?

A. Physically, you would add additional pumps to increase pressure.

Q. And does Limetree Bay Terminals have additional pumps at the facility that they can add to increase pressure?

A. Yes.

Q. Okay. How many water pumps does Limetree Bay Terminals have that can be used for this purpose, to increase water pressure?

A. I don't have specifically, but approximately five to six.

Q. And how many pumps are normally in the -- or are normally being used?

A. Can you be more specific?

Q. So on a -- throughout a, you know, normal time

LBT, LLC/OPT/J. CHARLES -- DIRECT

period, how many water pumps are used to get to -- on the seawater intake pumps?

A. Normally, we have one pump on, to just maintain pressure.

Q. And do you know what the water pressure is with one pump?

A. Approximately a hundred pounds.

Q. Okay. And when you add more pumps, how does that change the water pressure?

In other words, if you add a second pump, does that make it 200 pounds, or does it affect it differently?

A. I don't know, specifically, by adding one more pump, but the pressure will increase.

Q. If you were using all six pumps at the same time, do you know what the water pressure -- water pressure would be?

A. I do not.

Q. Okay. I believe you mentioned earlier that Ocean Point Terminals has emergency response personnel on site; is that correct?

A. Yes.

Q. Okay. And where are they located in relation to the coker? The north dome coker?

A. We have -- well, can you be more specific for

LBT, LLC/OPT/J. CHARLES -- DIRECT

emergency response personnel?

Q. So tell me about the emergency response personnel that OPT has on site?

A. Yes, so there's a combination of fire professionals.

Q. Okay.

A. Employees from various departments, who participate on a response team; and contractors who participate on the response team.

Q. Okay. And you mentioned the fire emergency response personnel.

Where are they located in relation to the north dome coker?

A. They are on the northwest side of the facility.

Q. And approximately how far away are they?

A. I'm not sure distance between the two.

Q. If you were to drive from the fire emergency response personnel to the north dome coker, how long would that take, approximately?

A. Five minutes.

Q. You mentioned that you have other employees that participate in emergency response.

Are they -- tell me about those employees. Are they just random employees? How does that work?

A. Yeah. They volunteer to participate, or if they

39

LBT, LLC/OPT/J. CHARLES -- DIRECT

stay in housing, they have to participate.

Q. And do you get training?

A. Yes.

Q. Okay. What kind of training do they get?

A. Local training at the facility from the fire professionals, and in some cases, off-site training.

Q. And where does that off-site training take place?

A. Texas.

Q. And how often are they trained? Do they get a refresher, or is it a one-time thing?

A. There's multiple trainings per year, so it's quarterly.

Q. And is it mandatory to attend the trainings?

A. Yes.

Q. And then you mentioned that there's some contractors.

Who are those contractors?

A. Various. They're just volunteers.

Q. Oh, they're volunteers?

A. Yes.

Q. Approximately how many contractors are volunteers?

A. I don't have the breakdown between full time and contractors, but approximately 35 in total.

Q. Okay. And I know we're here talking about the fire and the smoldering, but what sorts of other emergencies

40

LBT, LLC/OPT/J. CHARLES -- DIRECT

require the response of emergency response personnel?

A. I don't understand your question.

Q. So other than fire, what other types of emergencies are there in general at OPT, or could there be at OPT, that you need response personnel for?

A. Yeah, so the -- the -- there's a potential for releases. That's about it.

Q. Anything else besides releases?

A. Medical.

MR. KING: Is this a good time for a break?

MS. SEILA: Sure.

(Short recess taken.)

Q. (Ms. Seila) So we're here for an incident that happened with the plaintiff, Ms. Nicole Wooten.

Did you, on behalf of Limetree Bay Terminals, conduct any investigation into her entry to the facility on August 8th, 2022?

A. Can you be a little more specific?

Q. What, if any, investigation did you conduct on behalf of Limetree Bay Terminals into the allegations set forth by Nicole Wooten?

A. Yes, we did not do any investigation related to the actual coker event. That would have been for PHRT to do. When we were made aware of an issue, which was the time of this lawsuit, we investigated the logs to determine when

LBT, LLC/OPT/J. CHARLES -- DIRECT

the Customs agent came into the facility, and then also the -- as a part of our look on that day, in general, we had monitors between the coker and the tugboats. And as reviewed by our HSE personnel, all those monitors showed nil, so no issue.

Other than that, the investigation would have been on behalf of PHRT for the coker event.

Q. Okay. And you said you looked at logs. So you were able to tell what time Ms. Wooten entered and exited the facility?

A. Yes.

Q. And who maintains those logs?

A. Security.

Q. Okay. And you mentioned that you have monitors. Can you explain what those are?

A. They're air monitors adjacent or in between the coker and the tugboats.

Q. And what are they measuring?

A. Do not remember all the constituents they're measuring, but they're air quality.

Q. And what happens if the air quality is not good?

A. It depends on the reading.

Q. Okay. So is there like an audible noise or an alert or something that goes off? Can you just explain how the monitors work?

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. Yeah. I'm not sure if this monitor has an audible noise, but the readings are all recorded, so you can see visibly what the readings are.

Q. Okay. Has the air -- did those air monitors ever report air quality that was concerning?

A. No.

Q. They never reported any air quality that was concerning throughout the entire month of August 2022?

A. That's correct.

Q. Okay. And who advised you that the air monitors did not report any air quality that was concerning throughout August 2022?

A. We have a air quality specialist, and a HSE supervisor who reviewed those documents.

Q. And who is the air quality specialist?

A. I'll have to get the name.

Q. Are they employed by OPT or someone else?

A. Contract.

Q. Do you know who the employer is for that person?

A. NES.

Q. NES?

A. Yes.

Q. Okay. And you mentioned the health -- health and safety person, correct?

A. Yes.

43

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. And who is the health and safety person?

A. Maria Aloyo.

Q. And is she employed by OPT?

A. Yes.

Q. How long has she been working as the health and safety person?

A. I don't have her start date.

Q. Okay. Let's go to some exhibits. So this is Exhibit 178.

(Deposition Exhibit No. 178 was marked for identification.)

Have you seen this document before?

MR. SIMPSON: Is that a new one?

MS. SEILA: It should be in the folder.

A. Yes.

Q. (Ms. Seila) Okay. Are these the topics that you prepared to answer today?

A. We did review this document.

Q. Okay. Exhibit 1, have you seen this document before?

(Deposition Exhibit No. 1 was marked for identification.)

A. I don't know if I've seen this one.

Q. Okay. Exhibit 2.

44

LBT, LLC/OPT/J. CHARLES -- DIRECT

(Deposition Exhibit No. 2 was marked for identification.)

Have you seen this document before?

A. No.

Q. Okay. So is Ocean Point Terminals, they're not involved in job safety analyses?

A. Not -- for our jobs, yes. Not PHRT jobs.

Q. Okay. I see. Exhibit 10.

(Deposition Exhibit No. 10 was marked for identification.)

Have you seen this document before?

MR. KING: Robin, is this ours, or is this Port Hamilton's?

MS. SEILA: So it doesn't appear to have -- oh, PH -- the Bates Stamp is on one of the last pages, says, PHRT-Wooten 001920.

MR. KING: Okay. So these are Port Hamilton's results.

A. Yeah, so Port Hamilton, I'm seen air results that are ours. I have not seen -- these three documents are related to Port Hamilton's response, and we're not included in their response.

Q. (Ms. Seila) Okay. So they're not OPT documents?

A. That's correct.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.  Okay.  Exhibit 11.

(Deposition Exhibit No. 11 was marked for identification.)

Have you seen this document before?

So at the top, it says, "Open Actions Tracker," and it's to be used by the incident commander.

Was OPT involved in --

A.  No, we were not involved in PHRT's incident command.

Q.  Okay.  Exhibit 13.

(Deposition Exhibit No. 13 was marked for identification.)

At the top, it says, "Coke Dome Personnel Registry."  Is this a document that Ocean Point Terminals is responsible for?

A.  No.

Q.  Okay.  So this document is separate from the initial entry point?  I believe you called it the access point?

A.  Yeah.  This is all related to the coker event.  Access is access to the facility, in general.

Q.  Okay.

A.  Has nothing to do with the coker.

Q.  Exhibit 14.

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

(Deposition Exhibit No. 14 was marked for identification.)

Is this document related to accessing the facility or the coker?

A.  It's not related to accessing the facility, but it's not our document, so I don't know what it's referring to.

Q.  Okay.

A.  But it's not OPT or access into the facility.

Q.  Fifteen.

(Deposition Exhibit No. 15 was marked for identification.)

Exhibit 15.  Is this a document that Ocean Point Terminals is involved in the preparation of?

A.  No, this is -- this is not an OPT document.  I'm not sure what this is.

Q.  Okay.  All right.  Exhibit 16.

(Deposition Exhibit No. 16 was marked for identification.)

Have you seen this document before?

A.  No.

Q.  So Ocean Point Terminals was not provided with this document?

A.  Yeah.  This -- so I've seen the cover of this document, but I have not reviewed this document.  It is

---

47

LBT, LLC/OPT/J. CHARLES -- DIRECT

unrelated to my operation.

Q.  Okay.  All right.  Exhibit 17.

(Deposition Exhibit No. 17 was marked for identification.)

Is this a document that Ocean Point Terminals is involved in the preparation of?

A.  No, we're not.

Q.  Okay.  Have you ever seen this document before?

A.  Yes.

Q.  Okay.  When was the first time you saw this document?

A.  I don't have the date.  We were sent it via email, not by request, and that's the extent of it.

Q.  And who sent you this document?

A.  I don't recall the person.

Q.  Was it someone working at PHRT or --

A.  Yes.

Q.  Okay.  And why were you sent this document?

A.  I can't answer that.  I didn't -- we did not ask for it.

Q.  Okay.  What did you do in response to being sent this document?

A.  Nothing.  Just received it.

Q.  Okay.  Did you respond to -- to the person that had sent you the document?

---

48

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.  I did not.

Q.  Okay.  Were you personally sent this document?

A.  I do have it sent to my email, along with others.

Q.  Okay.  Did you speak to anyone as a result of receiving this document via email?

A.  No.

Q.  Okay.  Exhibit 18.

(Deposition Exhibit No. 18 was marked for identification.)

Have you seen this document before?

A.  No.  This is not an OPT document.

Q.  Okay.  Exhibit 19.

(Deposition Exhibit No. 19 was marked for identification.)

Have you seen this document before?

A.  Yes.

Q.  When was the first time you saw this document?

A.  I don't recall the exact date I would have seen it, but -- but obviously the date on here is for August 4th, for Thursday, so around that time, probably.

Q.  Okay.  And it says it's created by J. Peacock, LBT/OPT Marine Manager.

What are J. Peacock's duties?

A.  So he's the marine manager, so this -- all the duties I listed for marine operations, he would have been

LBT, LLC/OPT/J. CHARLES -- DIRECT

responsible for that.

Q. Okay. And who does J. Peacock report to?

A. At this time, it was me.

Q. Okay. And does J. Peacock, around this time, did he have any people that reported to him?

A. Yes.

Q. Okay. Approximately how many people reported to him?

A. Five full-time employees, approximately.

Q. Okay. Did you have any discussions with Mr. Peacock about this PHRT coker incident timeline?

A. The coker timeline, yes, which was to just make sure we're documenting from our perspective the events, but that's it.

Q. Okay.

A. And not the events inside the response, just how it's -- it's how we see it related to us, but not the actual response.

Q. Okay. So what specific events did you begin documenting, as a result of this incident timeline?

A. Any -- as you can see here, any alarms that we heard. As I mentioned before, we started documenting air results. And as I mentioned before, we documented the recommendation given by the fire chief of what to do, and also the recommendation given by the fire chief of what not

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

to do.

Q. Anything else?

A. And anything that we could see visually.

Q. There are a few names listed on this report. For example, Curtis Green.

Did you ever speak to Mr. Green about this incident, or in response to this incident?

A. Are you asking if I spoke to him?

Q. Yes, you?

A. I have not.

Q. Okay. Have you ever spoken to Cecil Sweeney?

A. I have not, personally, talked to him.

Q. Okay. Have you spoken to -- I believe you said you did speak to Stewart Tanner; is that right?

A. Yes.

Q. Okay. And have you spoken to Christine Goodrich?

A. Yes.

Q. Okay. What did you and Ms. Goodrich talk about?

A. We talked about the -- as I mentioned before, the -- the recommendation of what to do and the recommendation of what not to do.

Q. Okay.

A. And then also about the equipment that was requested and provided.

Q. Okay. And what is Ms. Goodrich's position?

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. She's one of the fire professionals.

Q. Okay. And how long has she been a fire professional?

A. I do not have a date.

Q. Okay. And Fermin Rodriguez, did you have any conversations with Mr. Rodriguez?

A. At what time?

Q. Throughout the month of August, related to this incident?

A. Yes.

Q. Okay. And what did you and Mr. Rodriguez discuss?

A. Various conversations.

Q. Okay. What's the first conversation that you remember?

A. I'm not sure if I could say what the first one was.

Q. Okay. Walk me through how this situation evolved, and the extent of your communications with Mr. Rodriguez.

A. Yes. We had requests that came in for materials, I believe two separate requests, and those materials were provided to PHRT.

Further conversations were related to the lack of a shared service agreement. And due to the lack of a shared service agreement, conversations to figure out what to do next, in order to get them equipment.

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. What else?

A. Really, that's the extent of it.

Q. Okay. And what did you do to get them equipment related to the lack of the shared services agreement?

A. Eventually, they signed a mutual aid agreement, so that we could respond with the appropriate indemnities, insurance, and agreement in place, in order to do so.

Q. Okay. And what happened once that mutual aid agreement was signed?

A. Could you repeat the question?

Q. What happened? What changed once the mutual aid agreement was signed?

A. You would have to ask PHRT that.

Q. Did you provide additional resources to PHRT once that agreement was signed?

A. Yes. So we provided resources before and after the agreement, so -- but, yes, after the agreement, we continued to provide resources.

Q. Okay. So what resources were provided before the agreement was signed, versus after the agreement was signed?

A. I don't recall specifically, but it is documented.

Q. Okay. All right. And then on the next page here there's a PHRT employee by the name of Sloan Schoyer that is referenced.

Did you have any conversations or

LBT, LLC/OPT/J. CHARLES -- DIRECT

interactions with Mr. Schoyer?

A. I did not.

Q. Okay. And then Savage employees were on site. Did you have any interactions with Savage employees on site?

A. No. That would have been a PHRT contractor.

Q. Okay. And then on the following page, it references bringing in some Vivot equipment. Did you have any interaction with Vivot?

A. No. That would have been requested by PHRT. I'm not sure what they requested, but was uninvolved.

Q. Okay. So you don't have any knowledge what equipment was brought in from Vivot?

A. I don't.

Q. Okay. And then on -- finally, on the last page, a gentleman named Mark Johansen is mentioned. Did you have any interactions with Mark Johansen about the smoldering coker incident?

A. I did not.

Q. Okay. Do you know who Mark Johansen is?

A. He works for PHRT.

Q. Okay. Exhibit 20.

(Deposition Exhibit No. 20 was marked for identification.)

All right. I'll give you a moment to look

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

over this email.

MR. SIMPSON: What exhibit?

MS. SEILA: Number 20.

A. (Witness complies.)

Okay.

Q. Does this refresh your recollection as to what equipment was provided to PHRT?

A. So this is on August 5th, so this is the list of the equipment provided or requested, and so I believe there was a response that they would receive this equipment, so, yes.

Q. And in this email to you, Mr. Rodriguez says, "Let me know when we could discuss." Do you recall what happened as a response to his request to discuss this with you?

A. I believe we provided the equipment.

Q. Okay. Did you speak with him on the phone or --

A. I can't recall, but if there's no response on the email, then, yes.

Q. Okay.

A. Or it was just provided.

Q. Exhibit 23.

(Deposition Exhibit No. 23 was marked for identification.)

Was Ocean Point Terminals involved in the

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

55

LBT, LLC/OPT/J. CHARLES -- DIRECT

preparation of this document?

A. No.

Q. Was Ocean Point Terminals provided with a copy of this document?

A. I do not recall this one.

Q. Okay. Exhibit 24.

(Deposition Exhibit No. 24 was marked for identification.)

Have you seen this document before?

A. I don't believe so.

Q. Okay. Was Ocean Point Terminals involved in the preparation of this document?

A. No.

Q. Twenty-five.

(Deposition Exhibit No. 25 was marked for identification.)

This email is two pages, so if you want to start on the second page.

A. (Witness complies.)

Q. So this first email on Saturday, August 6th, 2022, does that refresh your recollection as to any discussions that you had with Fermin concerning the utilization of the fire truck?

A. Yes. Yes.

Q. Okay. And what did you and Fermin discuss?

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

56

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. So we discussed, as you can see here on August 6th, that we would assist with one -- based off the nature of this, with one pumper truck and -- and fuel on board. And so also the fuel for the operations of the seawater intake pumps. Not for utilization of the fire truck, but the fuel on board.

Q. Okay. And can you explain what a pumper truck is?

A. A fire truck.

Q. Okay. And I understand the incident began on August 4th, 2022. Why did it take two days to come to this agreement?

A. The request came in. We went through the process, as you can see here, and equipment was issued.

Q. Okay. And why did PHRT have to agree to provide the driver?

A. So they can drive. So they can drive the truck.

Q. Why didn't OPT provide the driver?

A. They had their own response personnel. And also at this point, there is no obligation between the two companies, as far as shared services, who's going to do what, who's going to offer what, who's going to pay for what, how it all works, insurance and indemnities and the lack of that means you have to go through that process realtime. So what you're seeing right now is us going

Susan C. Nissman, RPR-RMR
(340) 773-8161

LBT, LLC/OPT/J. CHARLES -- DIRECT

through the process of a lack of shared service agreement.

Q. Okay. Okay. Exhibit 27.

(Deposition Exhibit No. 27 was marked for identification.)

Was Ocean Point involved in any discussions with Mr. David Bornn at the V.I. Government?

MR. KING: I don't think anybody from Ocean Point is on this.

MS. SEILA: Yeah, that's why I'm wondering if he had any involvement with the -- with Mr. David Bornn or the VI Fire Services.

A. We were not a part of this conversation.

Q. (Ms. Seila) Did Ocean Point have any separate conversations with the VI Fire Services?

A. We did not talk directly to the VI Fire Services, no.

Q. Okay. Did Ocean Point have any other conversations or correspondence with David Bornn, related to this smoldering?

A. Yeah. So we let David Bornn know where we were, as far as not having an agreement, and that we would be trying to get an agreement, just so that they were aware of our position.

Q. And when did you let David Bornn know that?

A. I did not -- I did not do that specifically,

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

myself, so I don't have a date.

Q. Okay. Do you know who did that?

A. I do not.

Q. How do you know it was done?

A. I was made aware that it was -- that it was done.

Q. Okay. During this time period, was Ocean Point having periodic meetings about the unfolding situation?

A. Could you be more specific?

Q. What, if any, internal discussions or meetings was Ocean Point having throughout the smoldering incident?

A. Related to the incident?

Q. Yes.

A. There really were no specific meetings related to the smoldering incident. If there were any comments, it was just during normally scheduled meetings.

Q. Okay. And how often does Ocean Point Terminals have normally scheduled meetings?

A. Daily.

Q. Okay. Do you recall if there is anything related to the smoldering that was discussed at the regularly scheduled meetings?

A. I wouldn't recall. Other than we were operating as normal. The reading at the tugboats are fine, so no issue by the tugboats. And that's it.

And so if equipment was issued, then

---

59

LBT, LLC/OPT/J. CHARLES -- DIRECT

equipment was issued, so we would have mentioned that, which you can kind of see here on the 8th, they say they have all the equipment that they needed, so.

Q. Okay. Thirty-two.

(Deposition Exhibit No. 32 was marked for identification.)

All right. Exhibit 32.

Do you know what a -- an FLIR K65 thermal camera is for?

A. So FLIR is forward-looking infrared, and can be used to detect heat. I don't know why PHRT requested this one on this date.

Q. Okay. Do you know what, in general, this type of camera is used for?

A. To detect heat.

Q. Okay. And is this a piece of equipment that Ocean Point Terminals does not have on hand?

A. I don't recall, specifically, but I thought there was a camera, so I'm not sure if they're buying this, or just asking.

Q. Okay. Did you ever have any interactions with Wendy Pontefract about this incident?

A. Not that I'm aware of.

Q. Okay. Did you ever have any interactions with Fred Flint about this incident?

---

60

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. Not that I'm aware of.

Q. Okay. Exhibit 38.

(Deposition Exhibit No. 38 was marked for identification.)

Okay. I'll give you a moment to review these text messages.

A. (Witness complies.)

Okay.

Q. Okay. So your name is on -- at the top, correct?

A. That is my name.

Q. Okay. And your responses are on the left unshaded; is that right? Or not as shaded? Does that make sense?

A. Yes.

Q. Is that right?

A. Yes.

Q. Okay. Up at the top, we see a name, Barry Guilbeau.

Who is that? Do you know him?

A. He's a contractor for PHRT.

Q. Okay. And do you know what his job is?

A. Not specifically, I don't.

Q. Okay. Do you have any idea of what he is hired to do?

A. I do not.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay. Okay. The second text there says, "Jeff need you to reapprove," I think that's a typo, "for PHRT to refill the air bottles."

What is Mr. Rodriguez referring to?

A. Self-contained breathing apparatus bottles.

Q. And what are those used for?

A. Storing air.

Q. And how are they refilled?

A. At the station.

Q. And that's an OPT station?

A. It's -- it's at the station. The station is a shared asset. OBT maintains the compressor, and operation and maintenance of the pressure.

Q. Okay. And approximately how many bottles needed refilling?

A. I don't know.

Q. What's the cost to refill each bottle?

A. I don't know.

Q. Okay. Okay. And then you wrote to Fermin on August 10th. Can you explain what that text message is about?

A. Yes. So it's asking him to send a formal request via email versus chat. And it's also asking for any word on payments in arrears.

Q. And what payments in arrears is that referring to?

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. Services that we were providing that are not being paid for.

Q. What specific services were not being paid for?

A. Services listed within the shared service agreement.

Q. So as of August 10th, you did have a shared services agreement in place?

A. There's no shared service at this point. These are previous payments.

Q. Okay. And how long had those payments been in arrears?

A. Quite a few months, but I don't have specifically.

Q. Do you know the amount that was in arrears?

A. As per this document, at this point in time, it was approximately 7.9 million.

Q. And his response is, "Ok we are keeling track if usage to pay."

What does that mean on August 11th?

A. Yeah. You would have to ask him, but I'm assuming that meant keeping track of the equipment.

Q. Okay. And do you know specifically what he was -- what usage he was keeping track of?

A. Of the equipment they requested.

Q. I see.

Okay. And then on the next page, you say,

---

63

LBT, LLC/OPT/J. CHARLES -- DIRECT

"we originally discussed the camera and one pumper."

Do you know what camera you were referring to?

A. Probably a FLIR camera.

Q. Okay. So the same kind of camera that they had ordered?

A. Most likely.

Q. Okay. And then you say, "Looks like PHRT was already breached that agreement."

How did PHRT breach an agreement?

A. Some of the materials that were listed, it was reported that more materials were taken than what was requested.

Q. Oh, what additional materials were taken?

A. I can't state them, specifically, at this point, but there was a list.

Q. Have you provided the list to your attorney to produce in this lawsuit?

A. No. I'm not sure if it's documented, but there was a list of things that the fire professional said, these were taken, and they were not on the list.

Q. Do you know who, specifically, of those fire professionals, said, this is a list of items that were taken?

A. I do not.

---

64

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay. And then in that next paragraph, you say, "we didn't agree to open up the full fire house."

Why did you agree to open up the full firehouse?

A. Right. So the -- there were certain things that were requested. Those things were provided. Those are the things that were requested for the response.

We have a operating facility, and you can't just take everything out, because you may have to respond to multiple events.

Q. I see.

A. So you have to control what comes and goes, to make sure you have response where needed.

Q. Okay.

A. Not just for the terminal, but even for PHRT. So you have to track what comes and goes, so you can make sure you can respond appropriately to multiple events.

Q. Okay. And who's responsible for tracking what comes and goes out of the firehouse?

A. In this case, we are part of that, but you can also see that PHRT is also tracking.

Q. Do you know who, specifically, from --

A. I don't know who we had at that day.

Q. Does it change each day, from day to day, who's tracking?

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.    It could.

Q.    Okay. Okay. And who has the key to the firehouse? I assume there's a key, and the firehouse is locked.

Who has that key?

A.    The fire professionals and security.

Q.    Okay. Okay. And then farther down, you say, "Any update on the power allocation agreement?"

What was that?

A.    So this is all related to the shared service agreement. This, specifically, is the power allocation as a subset of the shared service agreement. So it's related to getting an agreement, so that the payment in arrears does not continue to get bigger.

Q.    Okay. Then the next sentence says, "Any update on the RMP transition?"

What is that?

A.    I can't recall specifically. This is related to PSM. It's unrelated to the response, but it's something that Fermin, in his previous capacity, assisted the terminal, and he was transitioning that over to OPT in the system, so.

Q.    Okay. And then, finally, "Any update on the security audit?"

What's a security audit?

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.    Yeah. So, again, in Fermin's previous capacity as a consultant, he provided security audits. He completed it. Actually, did not complete. We paid for it, but he had not completed it.

Q.    Okay.

A.    But that's historical.

Q.    Did he ever provide the security audit?

A.    Yeah, at some point, this was all completed.

Q.    Okay. And then later on, on August 12th, it says, "I have $200,000 for the fuel cost and," I think that should say and, "electricity of the response at the dome."

A.    Um-hum.

Q.    How was that $200,000 calculated?

A.    I'm not sure. He calculated that. You'll have to ask him.

Q.    Okay. And it says that you were going to speak on the phone before he deposited it.

What do you recall about that conversation?

A.    I don't recall that.

Q.    Okay. And then on August 13th, it says, "I just sent you an email. I will have a check $5,000."

Is that separate from the 200,000 for the fuel?

A.    Yes.

Q.    And that 5,000 was for use of the gas station?

67

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.    Yes.

Q.    So PHRT had to pay extra, just to use the gas station to obtain the fuel, is that a correct understanding, or can you explain that?

A.    Yeah. No, there's no extra. There's just paying for what's being consumed. So there's gasoline at the gas tanks that we already paid for.

Q.    Oh, I see.

A.    So, yeah, we only charged what's consumed. Nothing more.

Q.    Okay. Okay. And then on August 17th, says, "Jeff, I did not bother earlier as I know a request to you to get some wear. Sent you an email with what is needed to keep the rescue team at night. Need your approval to your personnel."

What is he referring to there?

A.    I'm not sure.

MR. KING: I'm going to object to any further questions on the remainder of this. It's nine days after the incident at this point. Completely irrelevant to anything that has to do with this, and I'll instruct him not to answer. If you want to go to the Court, you can.

Q.    (Ms. Seila) Okay. Exhibit 39.

(Deposition Exhibit No. 39 was marked for identification.)

68

LBT, LLC/OPT/J. CHARLES -- DIRECT

Have you seen this document before?

A.    No. This is a PHRT document. Unrelated to our operation.

Q.    Exhibit 40.

(Deposition Exhibit No. 40 was marked for identification.)

Were you aware that there was a meeting with Customs on Wednesday, August 10th, between PHRT and Customs?

A.    No.

Q.    Okay. Exhibit 41.

(Deposition Exhibit No. 41 was marked for identification.)

Have you seen this document before?

A.    No. This is not an OPT document.

Q.    Okay. Forty-two.

Actually, I think we already talked about this. We'll skip that.

Okay. 43.

(Deposition Exhibit No. 43 was marked for identification.)

Can you explain why Mr. Rodriguez needed -- needed re-approval for PHRT personnel to refill the air-breathing cylinders?

MR. KING: Same objection. This post dates the incident.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. (Ms. Seila) You can answer, if you remember.

A. I don't, but I do see this is for the 11th.

Q. Okay. Exhibit 46.

(Deposition Exhibit No. 46 was marked for identification.)

Do you recall this email?

A. So this is the same time period on the 12th.

Q. Okay.

A. But I'm not on this email.

Q. It says to Fermin Rodriguez and Jeffrey Charles.

A. Oh, I do see my name. Yes.

Q. So was this the payment for the fuel, the 200,000?

A. Same number.

Q. Exhibit 50.

(Deposition Exhibit No. 50 was marked for identification.)

This looks like it's a group text. Can you look through those, and tell me if you're on that group text?

A. (Witness complies.)

It doesn't appear so.

Q. Okay. That's not you?

A. I don't know what this is.

Q. Okay. Fifty-three A.

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

(Deposition Exhibit No. 53A was marked for identification.)

Do you recognize this document?

A. Yes.

Q. Okay. Do you know who created this document?

A. I do see the date for this, is August 21st. I don't know who wrote it, but it would have come from the desk of the communications department.

Q. Okay. Who's --

A. Later in -- later in the month.

MR. KING: I'm going to object on this, too, and instruct you not to answer. This is now, again, 13 days after the incident.

Q. (Ms. Seila) Fifty-seven.

(Deposition Exhibit No. 57 was marked for identification.)

Okay. On March -- the bottom email is dated March 1st, 2022.

Did you review Limetree Bay's Tier II report for the reporting year of 2021?

A. Yes. So, I'm not on this email, but, yes, I would have been part of the approval process for the Tier II reporting.

Q. Okay. It looks like you're copied on the email. Do you see that?

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

A. The top one?

Q. The bottom one. The March 1st, 2022 at 5:35 p.m.

A. Yes. The March 1st one, yes; top one, no.

Q. Did you have any concerns when you reviewed that Tier II report for the reporting year of 2021?

A. Not that I can recall.

Q. Okay. Sixty-one.

(Deposition Exhibit No. 61 was marked for identification.)

MR. KING: I'd like to note for the record that this is the log sheet that was indicated earlier that I was told we didn't produce that has the officer's name on the top right corner.

Q. (Ms. Seila) Okay. I was just going to ask if this is the log that you were referring to earlier, so, thank you.

A. Yes, um-hum.

Q. So I believe you testified earlier that this states where each person is going.

Is that in that remarks section, that last category?

A. Yes.

Q. And so Ms. Wooten was going to the tugs on August 8, 2022; is that correct?

A. Yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay. And so is this gate vehicle/visitor log, is this the only document that Ocean Point Terminals maintains related to visitors on site?

A. No.

Q. Okay. What other -- what other documents are -- does OPT maintain?

A. If someone has a issued badge, then those badge swipes are all collected.

Q. Okay.

A. But if they don't have a badge, if they're more intermittent, then we just use the log sheets to log them in and out with their appropriate information.

Q. Okay. And so people from Customs and Border Patrol, would they ever be issued badges?

A. No. It should all be sign in.

Q. Okay. Okay. Sixty-five.

(Deposition Exhibit No. 65 was marked for identification.)

Have you seen this document before?

A. I don't believe so. It looks to be a PHRT document.

Q. Okay. And at the very bottom, it's very faint, but it says Mark Beharry.

Who is that?

A. Employee of PHRT.

Susan C. Nissman, RPR-RMR
(340) 773-8161

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Oh, okay.  And then over here on August 21st, 2022, it says, "Everbridge Emergency Notification was activated by Limetree Bay Terminals personnel."

What is Everbridge?

A.   What date?

Q.   August 21st, 2022, at 9:23 a.m.

MR. KING:  You can answer what Everbridge is, but I object to anything further on that on the same basis.  I instruct you not to respond.

A.   Yeah, so Everbridge is a system to notify responders or to pass on any information -- doesn't have to be a response.  It's a messaging system.

Q.   (Ms. Seila)  Okay.  Exhibit 70.

(Deposition Exhibit No. 70 was marked for identification.)

Is this a document that you've seen before?

A.   No.  This -- this -- this is a EPA document sent to Port Hamilton, it appears.

Q.   And was Ocean -- Ocean Point Terminals was not copied on this document?

A.   Not that I'm aware of.

Q.   Okay.  Exhibit 72.

(Deposition Exhibit No. 72 was marked for identification.)

Is this the mutual aid agreement that you

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

were referencing earlier?

A.   Yes.  This is the mutual aid, so this is a August 21st document.

Q.   Okay.  Okay.  And then in the No Obligation to Respond section, it says, "this Agreement shall not obligate Ocean Point to provide such assistance until authorized by an authorized representative of Ocean Point."

Do you know who that authorized representative of Ocean Point would be?

MR. KING:  Same objection.  I instruct you not to respond.

Q.   (Ms. Seila)  Seventy-three.

(Deposition Exhibit No. 73 was marked for identification.)

Have you seen this document before?

MR. STUTZMAN:  What exhibit number are we on, Robin?

MS. SEILA:  Seventy-three.

MR. STUTZMAN:  Thanks.

A.   Yes.

Q.   (Ms. Seila)  Were you involved in the negotiations concerning this integrated contingency plan?

A.   Well, there's no negotiations.

Q.   Oh, there aren't?

A.   No.

---

75

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Why is that?

A.   It's not a document that we negotiated.  It's a response.  It's a collection of response plans.  It's not a -- it's not a negotiation.

Q.   Okay.  I see.

All right.  Exhibit 78.

(Deposition Exhibit No. 78 was marked for identification.)

Have you seen this document before?

A.   Yes.

Q.   Okay.  And is this -- was this shared services agreement renewed after -- this one's dated November 30th, 2018.  Was it ever modified or renewed after this?

A.   There are letter agreements and updates to it, but at the time of the discussion, we had nothing in place.

Q.   Seventy-nine.

(Deposition Exhibit No. 79 was marked for identification.)

Okay.  Can you tell me what this document is?  It's dated January 23rd, 2022.

A.   Yeah.  So it's a letter agreement agreeing to certain services back from January of 2023.

Q.   Okay.  And you're saying that prior to August of 2022, OPT and PHRT did not enter into another shared services agreement; is that right?

---

76

LBT, LLC/OPT/J. CHARLES -- DIRECT

A.   So there were extensions.  I just can't recall if there were -- there was another complete full agreement.  Either way, there was no agreements at the time of the incident.

Q.   I see.  Okay.  Eighty-six.

(Deposition Exhibit No. 86 was marked for identification.)

Okay.  Have you seen this document before?

A.   Yes.

Q.   Okay.  And is this your signature on Page 15?

A.   Yes.

Q.   Okay.  And your responses to these questions, were they true and accurate, to the best of your knowledge, at the time that you executed this document?

A.   Yes.

Q.   I had some questions for you on this document, but I think we've already covered them, so.

Okay.  In your response to Number 15, you mention a news release.

Do you know who or what publication published that new release?

A.   What's your question again?

Q.   Do you know what news publication published a news release?

A.   I do not.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. I'm sorry?

A. I do not.

Q. Okay. What's the basis for your statement that "Port Hamilton issued a news release stating that a pile of petroleum coke was found smoldering at the refinery"?

MR. KING: Robin, it's the Complaint. You guys said it.

Q. (Ms. Seila) So nothing else? No other basis for that statement, other than it's in the Complaint?

A. Yes.

Q. Okay. Okay. And in your response -- Number 87.

(Deposition Exhibit No. 87 was marked for identification.)

Okay. In your response to Number -- okay. In your response to Number 20, you direct us to review several documents, but can you explain, in your own words, why you contend that "'Port Hamilton has proven that it is inept and ill-equipped to operate the Refinery -- the Refinery and safely maintain its assets'"?

A. Can I see the exhibits?

Q. Well, I think --

MR. KING: I object to this. You're insinuating that this is a response by Mr. Charles. This is a Complaint. You're talking about a Complaint that we filed in this case that's based on EPA documents that have been

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

produced. That's a hundred percent the basis. It's not any independent feelings of Mr. Charles.

MS. SEILA: Okay. Or any independent knowledge of Mr. Charles?

MR. KING: Correct.

Q. (Ms. Seila) Okay. And in your response to Number 21, you state, "At this time, Ocean Point does not know the identity of the third parties engaged by Port Hamilton to assist it with the smoldering coke incident." Since you responded to these questions, have you done any further investigation into the identity of any third parties?

A. We did not do any further investigation.

Q. Okay. All right. I think I'm almost done. Should we take another break, and then we'll finish up?

MR. KING: Sure.

(Short recess taken.)

Q. (Ms. Seila) Okay. I'm going to show you Exhibit 93.

(Deposition Exhibit No. 93 was marked for identification.)

Is this a document that you have reviewed?

A. Yes, I've seen this.

Q. What's the basis for your allegation in Paragraph Number 41, that "Upon information and belief, for several

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

days preceding August 4th, 2022, automatic carbon monoxide alarms had been activated at the North Coke Dome and repeatedly silenced by Port Hamilton employees"?

A. Yeah, so, again, upon information. So this is aligned with John Peacock's statement for the alarms that were heard.

Q. And what is your understanding of what a -- what the carbon monoxide alarm was indicating?

A. In general, detection of carbon monoxide.

Q. And what is your understanding of the danger of the presence of higher-than-normal levels of carbon monoxide?

MR. KING: Objection. He's not an expert.

Q. (Ms. Seila) You can answer as to your understanding, if you have one.

A. Yeah, I don't. You have a carbon alarm, just like you do at home. If you hear an alarm, then you respond.

Q. Okay. Who is responsible for maintaining the sprinkler system?

A. Not OPT. We have no operation of any sprinkler system associated with the coke dome. So I don't know who's responsible for that. Not OPT, though.

Q. You mentioned earlier that OPT does some maintenance with valves; is that right?

A. OPT does maintenance on our valves.

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q. Okay.

A. Um-hum.

Q. Okay.

A. But nothing to do with the coker.

Q. Okay. Was OPT involved in the 2022 EPA inspection?

A. I'm not sure which one that is. If we have an inspection and report, then, yes. If we're not associated with inspection, then no. I'm not sure what inspection you're talking about.

Q. Is it your position that PHRT should have sought the assistance of local fire-fighting authorities?

A. Can you repeat the question?

Q. Is it your position that PHRT should have sought the assistance of local fire-fighting authorities?

A. I'm not sure I understand. They did use fire fighting. They did use local firefighters.

Q. Okay. And when did they start using local firefighters?

A. You'll have to get that from them.

Q. Did you, on behalf of OPT, ever perform a hazard identification of any part of the area that is controlled by PHRT?

A. Not that I'm aware of.

Q. When you think about the smoldering coke, was

Susan C. Nissman, RPR-RMR
(340) 773-8161

LBT, LLC/OPT/J. CHARLES -- DIRECT

there a time when you became concerned about the level of smoke and fire at the north coke dome?  From your personal observation?

A.   At some point, it did become more escalated, but they did have the responsive equipment on site, and responding to it, so.

Q.   And on what date?

A.   Much -- much past the date that we're talking about.

Q.   Okay.

A.   This is later in the month.

Q.   Okay.  All right.  I want to turn your attention to insurance policies that you have in place at OPT.

Do you have a general liability policy in place, or did you in August of 2022?

A.   Yeah.  We had -- I couldn't state them all, but we have all the applicable insurances required to operate for Ocean Point Terminals.

Q.   And what -- what insurance companies are those through?

A.   I couldn't give you all those details.

Q.   Okay.  Is that something that you can provide to your counsel?

MR. KING:  He already gave it to you guys.

Q.   (Ms. Seila) Let me show you Exhibit Number 180.

LBT, LLC/OPT/J. CHARLES -- DIRECT

(Deposition Exhibit No. 180 was marked for identification.)

Have you seen this document before?

A.   No, I don't believe so.

Q.   Okay.  At the top, it says, "Liberty Mutual Insurance."

Does that help refresh your recollection as to what insurance policies you had in place?

A.   Not particularly, but I see the -- I see the headline.

Q.   Okay.  Do you know how many insurance policies you had in place in August of 2022?

A.   I do not.

Q.   Was it more than one?

A.   I do not know.

Q.   Okay.  Did you put any other insurance carriers on notice of this lawsuit, other than Liberty Mutual Insurance?

A.   I'm not aware.

Q.   Okay.  Do you have understanding of what the generally accepted industry practice is concerning coke storage?

A.   No, I have no operations with coke.  You have to ask that to the refinery.

Q.   Do you have any knowledge of any warnings from the EPA concerning the north -- the coke at the north dome,

LBT, LLC/OPT/J. CHARLES -- DIRECT

prior to August of 2022?

A.   I'm not aware.  We would not have received those.  If it's to the EPA, to the refinery, it would have gone directly to them.  So Ocean Point has not received any information related to the coker.

Q.   Okay.

A.   That I'm aware of.

Q.   Concerning the safety audit that you said you received from Mr. Rodriguez, when did you receive that?

A.   We had no safety audit from him.

Q.   Oh, okay.  Do you have knowledge of any OSHA inspections concerning the north dome coker, prior to August of 2022?

A.   Not that I'm aware of, but we would not have received any audit, as it's not our operations.

Q.   Is there anyone else at Limetree Bay Terminals that PHRT would have requested aid or equipment from, besides yourself?

A.   Can you ask the question again?

Q.   Is there anyone else at Limetree Bay Terminals that PHRT would have requested an aid or assistance or equipment from, other than yourself?

A.   There are contractors on site that they can ask for aid.  And if equipment was requested during the time of the discussion as listed from the fire chief, that would be.

LBT, LLC/OPT/J. CHARLES -- DIRECT

Q.   Do you know specifically which contractors they would have requested aid or equipment from?

A.   No, no.  Yeah, I wouldn't be a part of any of those conversations for their request for contract support.

Q.   Okay.  Prior to the incident in August of 2022, had you received any complaints about the coke in the north dome?

A.   Prior to what date?

Q.   To August of 2022?

A.   I have not.

Q.   Okay.  Does Limetree Bay Terminals review any of the safety data sheets concerning chemicals that -- or substances that are being stored at PHRT?

A.   No.

MS. SEILA:  Okay.  I think those are all the questions I have for you.  I'm not sure if some other attorneys might have some questions for you, but thank you for your time today.

THE WITNESS:  Okay.

MR. SIMPSON:  I have no questions.

Ryan?

MR. STUTZMAN:  No, thank you.

MR. KING:  Nothing for me.

MS. SEILA:  Okay.

LBT, LLC/OPT/J. CHARLES -- DIRECT

(Whereupon the deposition concluded
at 12:03 p.m.)

Susan C. Nissman, RPR-RMR
(340) 773-8161

C-E-R-T-I-F-I-C-A-T-E

I, SUSAN C. NISSMAN, a Registered Merit Reporter and Notary Public for the U.S. Virgin Islands, Christiansted, St. Croix, do hereby certify that the above named witness, LIMETREE BAY TERMINALS, LLC, d/b/a OCEAN POINT TERMINALS through its representative, JEFFREY ARHMAD CHARLES, also personally, was first duly sworn to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Merit Reporter on this the 17th day of April, 2025, at Christiansted, St. Croix, U.S. Virgin Islands.

My Commission Expires:        Susan C. Nissman, RPR-RMR
June 28, 2027                  NP-644-23