IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

NICOLE WOOTEN,

PLAINTIFF,

VS.

LIMETREE BAY TERMINALS, LLC, ET AL.

DEFENDANTS.

CASE NO. 1:23-CV-00012

PORT HAMILTON'S REPLY TO OPPOSITION TO MOTION TO EXCLUDE
THE OPINION AND TESTIMONY OF MARC WILKENFELD, M.D.

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      The 2023 amendment to Rule 702 forecloses Wooten's
        "weight, not admissibility" response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Wilkenfeld's opinion does not satisfy Rule 702(b):
        it is not based on sufficient facts or data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Wilkenfeld's opinion does not satisfy Rule 702(c):
        it is not the product of reliable principles and methods. . . . . . . . . . . . . . . . . . . . . . . 5

        A.     Wilkenfeld applies no methodology other than *ipse dixit*. . . . . . . . . . . . . . . . . 5

        B.     Wilkenfeld's opinion is circular . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     Wilkenfeld's opinion does not reliably address either general or specific causation . . . 8

        A.     General and specific causation are distinct requirements:
               a differential etiology cannot substitute for the absent general causation proof. . . 8

B.     General causation: literature describing measured exposures lasting weeks or months does not establish that a seconds-long exposure can cause permanent injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.     Specific causation: Wilkenfeld performed no reliable differential etiology. . . . . 10

    1.     Wilkenfeld could not reliably rule the exposure in . . . . . . . . . . . . . . . . . . . 11

    2.     Wilkenfeld failed to rule out the documented alternatives . . . . . . . . . . . . . . 14

D.     There is no reliable basis for the opinion that the injury is permanent. . . . . . . . . 17

V.    Wilkenfeld's admission that Wooten does not meet the diagnostic criteria for RADS illustrates the unreliable, results-driven nature of his opinion; Wooten's "semantics" rejoinder does not save it. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.    Susceptibility is a rule of damages, not a substitute for proof of causation. . . . . . . . . . 19

VII.    Rule 403 provides an independent basis for exclusion; the argument is not waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VIII.  A *Daubert* hearing is unnecessary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

**CASES**

*Allen v. Foxway Transp., Inc.*, 2024 WL 388133 (M.D. Pa. Feb. 1, 2024) . . . . . . . . . . . . . . . . . 2

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 3

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 19

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33 (D.N.H. 1995). . . . . . . . . . . . . . . . . . . . . 7

*Hammerhead Construction, LLC v. Hoffman,*
    2026 WL 296193 (D.V.I. 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 9

*Higgins v. Koch Dev. Corp.*, 794 F.3d 697 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Mirena IUS [sic] Levonorgestrel-Related Products Liab. Litig. (No. II),*
    341 F. Supp. 3d 222 (S.D.N.Y. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 8, 10, 16

*In re Paulsboro Derailment Cases*, 746 F. App'x 94 (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . 16

*In re Valsartan, Losartan, & Irbesartan Products Liability Litigation,*
    2025 WL 3141002 (D.N.J. Nov. 10, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.,*
    579 F. Supp. 3d 675 (E.D. Pa. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 16

*Keenan v. City of Philadelphia*, 983 F.2d 459 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kolesar v. United Agri Prods., Inc.*, 412 F. Supp. 2d 686 (W.D. Mich. 2006),
    *aff'd*, 246 F. App'x 977 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

*Leake v. United States*, 843 F. Supp. 2d 554 (E.D. Pa. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791 (E.D. Wis. 2010) . . . . . . 18

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . 9, 10, 12

*McGregor for Est. of Yawer v. City of Chicago*, No. 16 C 4956,
   2020 WL 10110999 (N.D. Ill. July 8, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006) . . . . . . . . . . . . . . . . . . . . 12

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Power v. Hewlett-Packard Co.*, 2024 WL 4040432 (W.D. Pa. Sept. 4, 2024). . . . . . . . . . . . . . . . 1

*Pritchard v. Dow Agro Scis.*, 705 F. Supp. 2d 471 (W.D. Pa. 2010),
   *aff'd*, 430 F. App'x 102 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 11

*Wells v. SmithKline Beecham Corp.*, 601 F.3d 375 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 8

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 13

*Young v. Burton*, 567 F. Supp. 2d 121 (D.D.C. 2008),
   *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Zellers v. NexTech Ne., LLC*, 533 F. App'x 192 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 13

**RULES**

Fed. R. Evid. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 7, 15, 17, 19, 20

**INTRODUCTION**

Wooten's Opposition to Port Hamilton's motion to exclude Dr. Wilkenfeld actually confirms the very deficiency that requires exclusion. Unable to point to a quantified dose, a duration analysis, a single study of acute petroleum-coke exposure, or any "rule-in/rule-out" differential etiology, Wooten falls back on the tired and rejected refrain that Port Hamilton's criticisms "go to weight, not admissibility." Doc. No. 284 at 1. That refrain is foreclosed by the 2023 amendment to FED. R. EVID. 702. Because Wilkenfeld cannot close the admitted gaps in his methodology and factual foundation, Wooten failed to meet her burden under Rule 702.

**ARGUMENT**

## I.   THE 2023 AMENDMENT TO RULE 702 FORECLOSES WOOTEN'S "WEIGHT, NOT ADMISSIBILITY" RESPONSE

Wooten relies upon a premise abrogated by the 2023 amendment to Rule 702. An expert's methodological deficiency is neither "for the jury" nor "properly explored through cross-examination." Doc. No. 284 at 1, 26. The Advisory Committee corrected that misperception in 2023. *See* FED. R. EVID. 702 advisory committee's note to 2023 amendment (explaining that "many courts" had incorrectly applied Rules 702 and 104(a) and held that questions of the sufficiency of an expert's basis, and the application of the expert's methodology were questions of weight and not admissibility).

The amended rule fixed this error: the proponent of an expert must demonstrate "*to the court* that it is more likely than not" that the opinion complies with Rule 702. *Id.* (emphasis added). Courts in this Circuit recognize the 2023 amendment means that expert testimony is no longer "presumably admissible." *Power v. Hewlett-Packard Co.*, 2024 WL 4040432, at *3 (W.D. Pa. Sept. 4, 2024). The proponent must establish reliability by a preponderance of the evidence; deficiencies in factual basis

1

and methodology are admissibility questions for the court, not weight questions for the jury. *See Allen v. Foxway Transp., Inc.*, 2024 WL 388133, at \*3 (M.D. Pa. Feb. 1, 2024) (explaining the reason for the 2023 amendment).

In a post-2023 amendment decision, *In re Valsartan, Losartan, & Irbesartan Products Liability Litigation*, 2025 WL 3141002 (D.N.J. Nov. 10, 2025), the plaintiff proffered a specific causation expert who, like Wilkenfeld, (1) opined that an exposure caused the plaintiff's disease without quantifying the dose and (2) purported to "rule out" alternative causes without a reliable basis for doing so. The court rejected the argument that such deficiencies are for cross-examination because deferring to the jury "would amount to a total abdication of its gatekeeping responsibility," and defeat "[t]he entire purpose of Rule 702." *Id.* at \*12. So too, here.

Wooten's reliance upon *Hammerhead Construction, LLC v. Hoffman*, 2026 WL 296193 (D.V.I. 2026) proves the point by contrast. *Hammerhead* did not involve medical causation. The expert's construction-defect opinion was admitted because—unlike Wilkenfeld— he tethered his opinion to a reliable, checkable foundation—the opposing expert's design-load calculations. *Id.* at \*4. *Hammerhead* demonstrates the reliable application of a method to facts; Wilkenfeld's testimony is its mirror image.

All questions of an expert's reliability are for the Court. Wooten failed to meet her burden of establishing reliability.

## II. WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(B): IT IS NOT BASED ON SUFFICIENT FACTS OR DATA

Rule 702(b) requires that an opinion rest on "sufficient facts or data." An opinion built on an inadequate factual foundation "is nothing more than *ipse dixit*." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Wilkenfeld's testimony confirmed that his opinion lacked an adequate foundation.

Wilkenfeld's central conclusion is that a brief exposure on August 8, 2022 caused permanent, disabling lung injury. But the duration of exposure determines the dose and Wilkenfeld ignored duration in his report. In his deposition, Wilkenfeld agreed that "the duration of the exposure is important" (Exh. 4 at 12:16–18), but could not recall how long Wooten's window was down; what she told her providers about the exposure; or any detail of the event other than "immediate onset." *Id.* at 16:21–17:14. He could not find the dose in his report [because it is not there] and defaulted to "[a]ll I know is that she had immediate onset of symptoms after the exposure." *Id.* at 17:8–14. When pressed for a number, he offered a guess, "[p]robably a matter of minutes" (*id*. at 30:7–10). That estimate is no substitute for knowledge and is wrong: "a matter of minutes" overstates a record that describes seconds. *See* Exh. 2 at 55:5–9. An expert who never recorded the dose-determining fact in his report and could supply only an unsupported, overstated estimate has not grounded his opinion in "sufficient facts."

Wilkenfeld also ignored records that contradicted his narrative. He conceded he reviewed Wooten's medical records from the months before August 8, 2022, but did not include them in his report and could not recall what they showed about the status of her asthma. Exh. 4 at 21:24–22:14. Those records matter: In July 2022—weeks before the incident—Wooten was "concerned that my asthma may have been getting worse . . . because of the air quality" and underwent a pulmonary function test. Exh. 2 at 29:10–15. The antithesis of a sufficient factual basis is selecting only facts that support a predetermined conclusion. *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (affirming exclusion where expert ignored contradictory weather data); *In re Mirena IUS [sic] Levonorgestrel-Related Products Liab. Litig. (No. II)*, 341 F. Supp. 3d 222, 242 (S.D.N.Y. 2018) (stating that "[w]here an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted").

In addition to ignoring contradictory facts, Wilkenfeld exaggerated supportive facts. His repeated testimony that providers administered "intravenous steroids so that [Wooten] could stay alive" and undertook "life-saving measures" is grossly exaggerated. Exh. 4 at 18:18–21, 21:6, 48:17–21. The contemporaneous records and Wooten's testimony describe no life-threatening emergency. *See* Exh. 11 (the date-of-incident record, stating "Air movement is mildly decreased").[1] Wilkenfeld conveniently omits that Wooten's only symptom at the time of the exposure was coughing (Exh. 2 at 54:16–55:2; 199:25; 202:18–20); and that instead of proceeding directly to the nearby hospital or urgent care facilities, Wooten drove to the airport (where she describes the onset of other symptoms). And only then did she go to Acute Alternative Care— for "life-saving treatment."

The "life-saving treatment" was a single intramuscular Kenalog injection in the gluteus (not an intravenous application as claimed by Wilkenfeld), a nebulizer treatment, and an oral Medrol dose pack, with a discharge home to "follow up PRN."[2] Exh. 11. There were no *intravenous* steroids administered in response to the incident. *See* Exh. 3, 10–13 (medical records from August 8–14, 2022). It is hyperbole to suggest under these facts that Wooten needed treatment "to stay alive" or as a "life-saving measure." An expert's inflammatory mischaracterization of the plaintiff's condition bears directly on reliability under Rule 702.

The contemporaneous record contradicts the severe, ongoing crisis Wilkenfeld portrays. The findings on the days he reviewed were benign: oxygen saturation of 100% and lungs "clear on auscultation"notwithstanding her claims of shortness of breath and chest tightness on August 8 (Exh. 11); a chief complaint of "headache" on August 9, with the record noting that her shortness of breath

---

[1] Exhibits 11–13 are filed with this reply. Exhibits 1–10 were filed with Port Hamilton's original motion.

[2] PRN means "as needed."

had "resolved after treatment" the day before (Exh. 10); and oxygen saturation of 98%, lungs clear, "[n]o chest wheezes bilaterally," "[a]ir movement is mildly decreased," and "[t]remors are absent" on August 10—even after her admitted exposure to the landfill fire (Exh. 12). Against this record, recasting a routine, discharged-home urgent-care course as an emergency, "life-saving" intervention is shaping the facts to fit the opinion, and it bears directly on reliability under Rule 702.

These are not mere "errors." They represent the absence of the exposure facts a proper causation opinion depends upon; the omission of contradictory records; and an exaggeration of the treatment record. Taken together, these establish that the opinion is not "based on sufficient facts or data" and is therefore unreliable.

### III.    WILKENFELD'S OPINION DOES NOT SATISFY RULE 702(C): IT IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

#### A.    WILKENFELD APPLIES NO METHODOLOGY OTHER THAN *IPSE DIXIT*

Wooten casts Wilkenfeld as applying "accepted clinical principles." Doc. No. 284 at 1. But he followed no methodology. Wilkenfeld, an associate professor, was asked if he teaches medical students that "the dose makes the poison" and gave a *seemingly* equivocal answer, "[d]epending on the poison, yes." But then he admitted that "[i]t depends on the exposure" and explained his answer by saying "[t]here are substances where a very tiny, tiny exposure can cause a disease." Exh. 4 at 10:17–24. In other words, there must be *some* dose. He further agreed that to establish a dose-response relationship, the doctor needs to know "what substance was inhaled"; that it would be "helpful" to know how much was inhaled; and that the duration of exposure "was important." *Id.* at 12:2–18. But he did not know the answer to any of these questions.[3] Exh. 4 at 10:17–12:18. He

---

[3] Wilkenfeld claimed "we know what's contained in coke emissions." *Id.* at 13:9–10. But his knowledge was based upon "experience"; he could not recall relying upon any sources for his knowledge; and he did not know whether the components of coke emissions depend upon the type

testified that the Bradford Hill criteria are "a reliable methodology," (*id.* at 14:11–13) but did not apply them. His own testimony reveals he did not perform a differential etiology. *Id.* at 112:4–10. *See* Section IV.C. The bottom line is Wilkenfeld applied *no* methodology: he could not describe a method, insisting only that "every case is different." Exh. 4 at 12:24–13:6.

When asked if his opinion was testable or if someone reached a different conclusion how it could be ascertained who was right and who was wrong, Wilkenfeld responded, "I don't know the answer to that question," and volunteered, "there's no way of telling." Exh. 4 at 133:13–134:4. He does not know if his conclusion has an error rate and no study has ever assessed the method he used in this case to determine one. *Id.* at 134:15–20. He dismissed peer review as "irrelevant" because what he prepared was, in his telling, a non-peer-reviewable "case report." *Id.* at 135:4–16. An opinion that the expert cannot say is testable; that carries no known error rate; that was never peer-reviewed; and that satisfies none of the Bradford Hill factors he himself called a reliable method is the antithesis of "reliable principles and methods."

Wooten argues that Wilkenfeld's "no" answered only a narrow question about a "named, codified protocol," and that his actual method—reviewing the history, test results, and substances and then giving an opinion—"is the methodology . . . taught in every occupational medicine residency." Doc. No. 284 at 11–12. But the record will not bear that gloss. Asked whether he followed "any specific scientific methodology," he said no; asked whether he followed any established guidelines, he said no; and asked to describe the methodology he did follow, he answered: "I just said no . . . I said no." Exh. 4 at 25:13–25. Reviewing records, conducting a physical exam, and announcing a conclusion is not a methodology.

---

of coke. *Id.* at 34:22–35:13.

Nor can Wilkenfeld supply the missing method by asserting that his approach is "done thousands and thousands of times every year so . . . if that means it's accepted, then there it is." Exh. 4 at 28:7–15. General acceptance cannot be established by the *ipse dixit* of the expert whose opinion is under review. *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 38 (D.N.H. 1995) (stating, "an expert cannot establish that a fact is generally accepted merely by saying so"). That a clinician routinely forms working impressions in the course of treatment says nothing about whether that approach reliably answers the litigation question of specific causation. As the Sixth Circuit explained, the "low threshold" that "serves well in the clinic" does not satisfy Rule 702 when opining on legal causation. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010).

Wilkenfeld's own scholarship underscores the gap. Confronted with the contrast between his report and his own peer-reviewed publications—which set out an explicit methodology—he could not show where his report applied any comparable discipline. Exh. 4 at 105:6–106:16. An expert who applies transparent methodology when peers will check his work, but discards it for litigation, offers no method the court can evaluate.

### B.  WILKENFELD'S OPINION IS CIRCULAR

Wooten defends Wilkenfeld's statement that Wooten "was exposed to levels many times higher than those that are toxic." But as noted in Section II, he did not know either the dose or the toxicity level. Nevertheless, he believed the exposure was "many times higher" without knowing either figure—"[b]ecause of her reaction to it." *Id.* at 39:14–17. Reasoning backwards using symptoms and ailments to justify a conclusion that exposure was sufficient (and thus the cause of the symptoms) is circular reasoning that is neither scientifically nor medically acceptable. *Young v. Burton*, 567 F. Supp. 2d 121, 132 (D.D.C. 2008), *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009) (adopting the defense

7

expert's explanation of "[t]he flaw" in the plaintiff's expert's logic).[4]

## IV.    WILKENFELD'S OPINION DOES NOT RELIABLY ADDRESS EITHER GENERAL OR SPECIFIC CAUSATION

Wilkenfeld's dose-and-duration failure runs throughout both the general and specific causation inquiries. But before turning to the substance, one predicate must be cleared. Wooten repeatedly asserts in her opposition that Port Hamilton "concedes" an acute injury caused by the exposure. Doc. No. 284 at 16–17, 19, 21. It does not. Port Hamilton's motion made a narrower, hypothetical point: that the most a brief, sub-minute exposure could possibly do is provoke transient discomfort or a temporary asthma flare—not the permanent, disabling injury Wilkenfeld claims. Mot. at 11. That possibility is a ceiling on what such an exposure is capable of producing; it is not an admission that the brief exposure in fact caused Wooten any compensable injury, much less that the exposure—rather than her documented anxiety and pre-existing, worsening asthma—produced the symptoms she reported. Port Hamilton does *not* (and did not) concede specific causation of any injury, and the temporal proximity Wooten invokes is not proof of it.

### A.    GENERAL AND SPECIFIC CAUSATION ARE DISTINCT REQUIREMENTS: A DIFFERENTIAL ETIOLOGY CANNOT SUBSTITUTE FOR THE ABSENT GENERAL CAUSATION PROOF

A toxic tort plaintiff must prove both general causation—that the agent is capable of causing the *type* of injury alleged; and specific causation—that it caused *this* plaintiff's injury. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 752 (3d Cir. 1994) (plaintiff must show the chemicals "can cause the types of harm" alleged and "in fact did cause" the harm). *See also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) ("Sequence matters: a plaintiff must establish general causation before moving to specific causation. Without the predicate proof of general causation, the

---

[4] Compounding this error, Wilkenfeld conceded Wooten was predisposed to react. *Id.* at 39:18–22.

tort claim fails.") (footnote omitted). The two are proved by different means: general causation through epidemiology, dose-response data, and the like; specific causation through a differential etiology—a process of elimination that identifies the most likely cause of this plaintiff's condition.

Because a differential etiology is a process of elimination, it operates only among causes already shown capable of producing the injury (*i.e.* after the causes capable of producing the injury are identified by the general causation methodology). It proceeds in two steps: the expert must reliably *rule in* each candidate cause and then *rule out* the alternatives. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010). A cause cannot be ruled in without a reliable basis that it can cause the injury at the relevant exposure—the general causation showing. The differential etiology method therefore *assumes* general causation; it cannot establish it. *Leake v. United States*, 843 F. Supp. 2d 554, 564 (E.D. Pa. 2011) (a properly performed differential etiology "is built upon a reliable general causation finding—it does not establish general causation"). To "rule in" a cause without that basis is circular and yields only *ipse dixit*.

Both failures are present here. As explained in Section IV.B, *infra*, Wooten has no evidence of general causation. Specific causation independently fails because Wilkenfeld could neither reliably rule in the exposure (Section IV.C.1) nor rule out the documented alternatives (Section IV.C.2). And even the claim that any injury is permanent lacks a reliable basis (Section IV.D).

### B. GENERAL CAUSATION: LITERATURE DESCRIBING MEASURED EXPOSURES LASTING WEEKS OR MONTHS DOES NOT ESTABLISH THAT A SECONDS-LONG EXPOSURE CAN CAUSE PERMANENT INJURY

General causation requires reliable evidence that the agent is capable of causing the claimed injury at exposure levels comparable to those experienced by the plaintiff. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005) ("[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal

facts necessary"). Wooten asserts that coke emissions are "capable of causing the injury at issue" and points to the studies in Wilkenfeld's report (Morphew, Johnson, and Byrwa-Hill). Doc. No. 284 at 12–13. But Wilkenfeld agreed that "all the studies you cited involved exposures measured in weeks or months." *Id.* at 32:11–15. He also conceded that he did not know if Wooten's circumstances could be compared to the exposures described in the long-term studies. *Id.* at 33:8–11. A court may exclude an opinion if there is "too great an analytical gap between the data and the opinion." *Joiner*, 522 U.S. at 146. Wilkenfeld's opinion has exactly that gap: it lacks the "minimal facts" *McClain* identifies as fatal. 401 F.3d at 1241.

### C.   SPECIFIC CAUSATION: WILKENFELD PERFORMED NO RELIABLE DIFFERENTIAL ETIOLOGY

Specific causation turns on a reliable differential etiology, and invoking the method is not enough. As the Sixth Circuit explained, claiming to use "the differential diagnosis method is not some incantation that opens the *Daubert* gate"; the label "prompts three more" reliability questions—whether the expert accurately diagnosed the disease; reliably *ruled in* the possible causes; and reliably *ruled out* the rejected alternatives. A negative answer to any one requires exclusion. *Tamraz*, 620 F.3d at 674 (cleaned up).

The distinction between diagnosis and etiology is important to understand. A differential *diagnosis* asks what *condition* the patient has; a differential *etiology* asks the different question on which causation turns—what *caused* the condition. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1044 n.1 (9th Cir. 2025) (a differential diagnosis is "a method of diagnosing an ailment, not determining its cause," whereas a differential etiology "is a causation-determining methodology" (quoting *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015))). Older court decisions often use the single term "differential diagnosis" for this same causation analysis—the ruling in and ruling out of candidate causes—that the later cases call a "differential etiology." *See Heller v. Shaw Indus., Inc.*,

10

167 F.3d 146, 156 (3d Cir. 1999) (expert must rule out "obvious alternative causes"); *Paoli*, 35 F.3d at 756 (summarizing trial court's description of "differential diagnosis which is used to rule in or out alternative *causes*" as "the hallmark of internal medicine") (emphasis added).

The label a court uses is immaterial: The specific causation analysis requires the identification of reasonably plausible causes of the injury ("rule-in") and the exclusion of such causes until only one of the reasonably plausible causes is left ("rule-out"). Wilkenfeld performed neither step. Diagnosing Wooten's condition as asthma or RADS establishes the *condition* but does not establish that the brief exposure *caused* it; competence "to diagnose [a condition] for purposes of treatment does not guarantee" a reliable opinion about its cause, because the "low threshold . . . serves well in the clinic but not in the courtroom, where decision requires . . . at least a preponderance of the evidence." *Tamraz*, 620 F.3d at 673.

Wooten refuses to acknowledge that Wilkenfeld skipped the analysis; she asserts he "perform[ed] a reliable differential etiology" and "expressly considered and ruled out other plausible explanations." Doc. No. 284 at 17. The record is to the contrary. Wilkenfeld agreed the method was to "come up with a list of possible causes . . . and then systematically rule them out" (Exh. 4 at 111:22–112:1), then admitted he did not do it: "Did I list all the possible alternative causations in the report and rule them out one by one, no, I did not." *Id*. at 112:4–7. He confirmed there is "nothing in the report" reflecting any such *analysis* (*id*. at 112:8-10; *see id.* at 111:7–8), and excused the omission on the ground that the obligation applies only "[f]or chronic *diseases*" (*id*. at 60:9–12)—which is not the law, *see* Sections IV.A-B, *supra*. He satisfied neither step, as the next two subsections show.

### 1.   WILKENFELD COULD NOT RELIABLY RULE THE EXPOSURE IN

Specific causation fails for a reason independent of general causation. Even if a brief

coke-emission exposure were capable of causing the claimed injury in someone—and the chronic-exposure literature does not establish that it can (Section IV.B)—Wilkenfeld never established that Wooten's own exposure was sufficient to cause her injury. He took no air reading, performed no modeling, and rested entirely on the proposition that the exposure was "over the odor threshold." Exh. 4 at 12:14–13:17. But he conceded that odor thresholds for the relevant chemicals lie far below their harmful thresholds—for sulfur dioxide, the focus of his opinion, on the order of 100 to 1,000 times below. *Id*. at 42:3–43:5. Smelling an odor therefore says nothing about whether the exposure reached a harmful dose. *See Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606, 611, 613 (M.D. La. 2006) (odor threshold met, but measured quantities "well below" levels "capable of causing physical injury"; plaintiff failed to prove "exposure to a harmful level," and temporal proximity did not cure the gap).[5] The "mixture" of additional chemicals Wooten invokes (Doc. No. 284 at 16) supplies no methodology; pointing to more *unmeasured* substances does not quantify or bound the dose. *Cf. McClain*, 401 F.3d at 1246 (describing methodological "problem" that arises with small differences in a substance's chemical structure because those differences can radically change the substance's properties). And Wilkenfeld conceded he did not know what dose was required to cause Wooten's injury even in a susceptible asthmatic. Exh. 4 at 33:11–13. An expert who knows neither the dose received nor the dose required has not ruled in the exposure using any reliable method.

The failure to bound the exposure did not stem from a lack of recognized benchmarks—it stemmed from Wilkenfeld's not using them. Established harmful exposure limits exist for the

---

[5] While in *Molden* the level of exposure was quantified, the case demonstrates why proof that the odor threshold was reached is insufficient to show exposure to a harmful level—the measured levels were above the odor threshold but below the harmful level.

chemicals he identified, yet he could not state them: he could not identify the OSHA permissible exposure limit; the NIOSH recommended exposure limit; or the NIOSH immediately-dangerous-to-life-and-health level for sulfur dioxide—the chemical at the center of his opinion; and he conceded he never determined that Wooten's exposure exceeded any regulatory limit for the chemicals at issue. Exh. 4 at 40:17–41:17. Ruling in an exposure requires some reliable measure of whether it reached a harmful level. An expert who can neither identify the recognized harmful thresholds for the chemicals he blames nor determine whether the exposure crossed them has not bounded the dose; he has skipped the analysis.

Ruling in a cause is an affirmative step: it requires a reliable basis to include the exposure as a cause of the injury. Wilkenfeld offered none. That is why Wooten's reliance on *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) and *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009) is misplaced. In *Westberry* the expert did a differential etiology; the court allowed a qualitative-exposure opinion because the expert supplied what Wilkenfeld did not—a reasoned *bounding* of a substantial exposure. 178 F.3d at 264; *see Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 198 n.8 (4th Cir. 2013) (explaining that the record in *Westberry was* "replete with evidence of . . . substantial exposure"). That is a far cry from Wooten's admitted exposure of "less than one minute . . . probably just seconds," Exh. 2 at 55:5–9, with an onset of most symptoms not occurring until after she returned to the airport. Wooten leans heavily on *Best* (Doc. No. 284 at 15-16), but it proves the point: Wilkenfeld did not do the three things that supported the admission of the expert's opinion in *Best*: (1) objective verification of the injury; (2) ruling in the chemical on a reliable basis (safety-data sheets plus experience treating injured patients exposed to a similar chemical); and (3) ruling out alternative causes. *Best*, 563 F.3d at 179-81. The reliable rule-in provided a link that substituted for the lack of a numeric dose—a link Wilkenfeld never forged.

13

### 2. WILKENFELD FAILED TO RULE OUT THE DOCUMENTED ALTERNATIVES

The only alternative Wilkenfeld says he weighed was "[c]ardiac disease," which he called "the major concern." Exh. 4 at 112:11-17. But distinguishing a cardiac from a pulmonary source of breathlessness is a differential *diagnosis*—it identifies the *condition* (heart vs. lung problem), not the *cause* of the condition. Ruling out the heart told Wilkenfeld only that the problem was in the lungs; it said nothing about whether a seconds-to-minutes coke-emission exposure, rather than Wooten's chronic asthma, the August 10 landfill fire, or her documented anxiety, produced it. *Heller* does not rescue Wilkenfeld's opinion; it highlights the flaw in it. *Heller* confirms the value of clinical judgment where a proper differential etiology is performed—the step Wilkenfeld's testimony proves he skipped. Exh. 4 at 112:2–10; *Heller*, 167 F.3d at 156 (noting that if expert "employed sufficient diagnostic techniques to have good grounds for his or her conclusion," the expert need not rule out *all* possible causes).

The real alternatives were documented in the record, much of it by Wooten's own testimony. Critically, two of them bracket the August 8 event. Weeks before, Wooten sought a pulmonary function test because she believed her asthma was already worsening "because of the air quality" on St. Croix. Exh. 2 at 29:10–15. Two days after, she suffered what she called an "extreme breathing crisis" from a landfill fire that Wilkenfeld himself called "a different exposure." Exh. 2 at 237:15–239:10; Exh. 4 at 17:17–20. A reliable differential etiology needed to separate the brief August 8 exposure from the documented respiratory causes on each side of it. Wilkenfeld did neither: he omitted the pre-incident records (Exh. 4 at 21:24–22:14); and as to the landfill fire, he had no information about it and did not investigate it (*id.* at 62:13–22). In fact, Wilkenfeld was unaware Wooten had reported landfill-smoke exposure as far back as 2021 (agreeing it "would have been helpful to know," *id. at* 146:6–147:9), and admitted he never considered it as a cause at all (*id.*

14

at 112:25–113:3). The remaining documented alternatives he dismissed without analysis or did not know about:

- Wooten has a history of anxiety with hyperventilation (Exh. 2 at 63:18–64:25), and a February 16, 2023 record described her as "very anxious appearing, hyperventilating" (Exh. 4 at 96:11–14). Wilkenfeld gave that record "[n]o effect," while conceding anxiety can cause chest tightness and interfere with pulmonary function testing. Exh. 4 at 96:19–98:10. Wooten herself concedes Wilkenfeld "did not perform a formal written differential ruling out" anxiety and PTSD. Doc. No. 284 at 17–18.

- He dismissed her February-May 2022 COVID-19 infection as irrelevant without analysis (*id*. at 144:4-13).

- He deemed a 2021 Saharan-dust exposure "irrelevant" (*id*. at 139:17–24) even though St. Croix routinely sustains incursions of Saharan dust.

- He was also unaware of her smoking history—cigarettes, marijuana, and hookah (Exh. 2 at 112:3–114:5).

- Wilkenfeld conceded he did not consider deconditioning or obesity as possible causes of Wooten's exercise intolerance. Exh. 4 at 113:12–14.[6]

A reviewing physician, Paramesh, identified the leading alternative expressly, concluding Wooten's complaints were "more compatible with either the natural progression of her underlying asthma or possibly work-related exacerbated asthma." Exh. 4 at 90:24–91:2. Wilkenfeld read that

---

[6] Wooten responds that the record "forecloses" deconditioning and obesity because she described a high level of pre-incident activity. Doc. No. 284 at 17. But that misframes the Rule 702 question. The deficiency is methodological: Wilkenfeld never performed the ruling out—he admitted he never considered them—so his opinion supplies no reasoned basis for excluding them. A differential etiology requires the expert to perform that analysis; it is not satisfied by counsel's after-the-fact assembly of favorable record evidence.

conclusion and simply disagreed, offering no methodology for excluding natural progression—only his contrary belief. *Id.* at 91:2–3. That is the failure condemned in *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 579 F. Supp. 3d 675, 698-99 (E.D. Pa. 2021) (placing an alternative "on the differential" without a reasoned basis to rule it out is *ipse dixit*); *accord Pritchard v. Dow Agro Scis.*, 705 F. Supp. 2d 471, 492 (W.D. Pa. 2010), *aff'd*, 430 F. App'x 102 (3d Cir. 2011) (excluding expert who, *inter alia*, failed to rule out plausible alternative causes).

Wooten's fallback—that "Bradford Hill . . . expressly contemplates consideration—not categorical elimination—of alternatives" (Doc. No. 284 at 24)—misstates the standard. Under *Paoli* and *Heller*, where a defendant identifies a plausible or obvious alternative cause, the expert must rule it out or explain why it was not the sole cause; "consideration" that names an alternative without a grounded explanation to exclude it is *ipse dixit*. *Paoli*, 35 F.3d at 758 n.27 ("where a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable"). The very case Wooten invokes proves the point: in *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997), the court sustained a causation opinion without a ruling out of alternative causes only because the defendant did not identify any. And, as the court explained in *In re Paulsboro Derailment Cases*, 746 F. App'x 94, 99 (3d Cir. 2018), the pesticide in *Kannankeril* was a recognized toxin, whereas whether a seconds-long coke-emission exposure can cause permanent injury is exactly what remains unproven (Section IV.B).

Wooten's susceptibility argument only deepens the problem. She contends her preexisting asthma made her "more susceptible to injury at lower exposure levels." Doc. No. 284 at 6. But heightened susceptibility makes the rule-out obligation more exacting, not less: where a plaintiff's airways are already reactive and have been provoked by multiple documented triggers, an expert

16

must do more to attribute a permanent change to one brief exposure rather than to the underlying disease or its other provocations. Wilkenfeld did less—indeed, nothing.

### D. THERE IS NO RELIABLE BASIS FOR THE OPINION THAT THE INJURY IS PERMANENT

Even setting aside causation, the opinion that Wooten suffered permanent injury fails Rule 702(d). Wilkenfeld conceded there are "no objective test results" establishing permanent lung injury. Exh. 4 at 127:5–17. He testified that his permanence opinion rests on another physician's (Muraina's) "diagnosis of severe permanent disability." *Id.* at 85:8–9. But he then conceded that:

- the underlying desaturation finding by Muraina "ha[s] never been replicated before or since" (*id*. at 85:18–20);

- genuine chronic respiratory failure with hypoxia would be expected to appear on repeat oxygen-saturation measurements, on CPET, and on bronchoscopy (*id*. at 85:21–87:5) but he had seen no such evidence; and

- given normal oxygen saturations on all other visits, a normal bronchoscopy, normal CT scans, and a CPET showing no pulmonary limitation, chronic respiratory failure with hypoxia "would be unusual." *Id.* at 87:3–5.

The treating bronchoscopist, for his part, described the relationship between any inhalation injury and Wooten's current symptoms as "unclear." *Id.* at 74:4–6. An opinion of permanence that rests on an unreplicated finding, contradicted by every other objective measure and disclaimed by the treating specialist, is not the reliable application of a method to facts. It is *ipse dixit* layered on another physician's conclusion the expert never independently verified.

### V. WILKENFELD'S ADMISSION THAT WOOTEN DOES NOT MEET THE DIAGNOSTIC CRITERIA FOR RADS ILLUSTRATES THE UNRELIABLE, RESULTS-DRIVEN NATURE OF HIS OPINION; WOOTEN'S "SEMANTICS" REJOINDER DOES NOT SAVE IT

Wooten defends Wilkenfeld's diagnosis of Reactive Airways Dysfunction Syndrome by

17

characterizing the distinction between RADS and an asthma exacerbation as "a matter of semantics" describing a "clinically overlapping condition." Doc. No. 284 at 19. But Wilkenfeld's own testimony refutes that characterization. Wilkenfeld conceded each element that takes this case outside RADS. He conceded that:

- a diagnostic criterion of RADS is that the patient have no prior history of asthma or airways disease. Exh. 4 at 88:24–89:2.

- Wooten's steadily worsening asthma between 2018 and the month before the incident would make a RADS diagnosis "less likely." *Id.* at 89:18.

- Wooten's history did not fall within the diagnostic criteria for RADS. *Id.* at 89:19–21.

- the "usual definition" of RADS requires a high-level acute exposure. *Id.* at 90:1–3.[7]

When an expert concedes the patient does not satisfy the diagnostic criteria for a disease and still diagnoses the patient with the disease, the expert has not made a "semantic" choice. Courts exclude exactly this type of opinion. *Kolesar v. United Agri Prods., Inc.*, 412 F. Supp. 2d 686, 697 (W.D. Mich. 2006) (RADS diagnosis "made for convenience (to support a pre-existing notion) rather than one supported by scientific fact"), *aff'd*, 246 F. App'x 977 (6th Cir. 2007); *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 805 (E.D. Wis. 2010) (diagnosing RADS despite known pre-existing asthma was a "striking flaw" in methodology).

Wilkenfeld's fallback label—"exacerbation of preexisting asthma"—does not itself require the absence of prior disease. But that misses the broader point: An expert willing to attach a diagnostic label whose defining criterion he admits is not met provides a window into the unreliability of the

---

[7] Wilkenfeld quibbled about this standard definition of RADS and claimed it was possible to have a lower-level exposure because "[w]e've seen it before" but, when pressed, he could not identify any literature that supported this claim. *Id.* at 90:2–8. This is, again, *ipse dixit*.

18

methodology *as a whole*, including the "exacerbation" theory that depends upon the same unbounded dose and absent differential etiology analysis addressed above.

## VI.   SUSCEPTIBILITY IS A RULE OF DAMAGES, NOT A SUBSTITUTE FOR PROOF OF CAUSATION

Wooten repeatedly invokes her heightened susceptibility as if it answers the reliability question. Doc. No. 284 at 5–6, 25. It does not. The eggshell-plaintiff principle is a rule of *damages* that presupposes causation has been reliably established; it is not a substitute for the methodology Rule 702 requires. It cannot relieve a plaintiff of proving that the exposure caused the injury. *See McGregor for Est. of Yawer v. City of Chicago*, No. 16 C 4956, 2020 WL 10110999, at *3 (N.D. Ill. July 8, 2020) ("The eggshell-skull principle does not affect causation."); *see also Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 274 (1st Cir. 2000) (rejecting argument that the district court erroneously substituted the eggshell skull doctrine for a finding of causation).

## VII.   RULE 403 PROVIDES AN INDEPENDENT BASIS FOR EXCLUSION; THE ARGUMENT IS NOT WAIVED

Wooten contends Port Hamilton's Rule 403 argument is "waived" as a "two-sentence" point. Doc. No. 284 at 25. Not so. The argument was raised and developed in the motion as the natural consequence of the Rule 702 showing, and it *incorporated* the detailed reliability analysis that precedes it. "[T]he crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the district court." *Keenan v. City of Philadelphia*, 983 F.2d 459, 471 (3d Cir. 1992). Here, Port Hamilton summarized the issues regarding Wilkenfeld's opinion ("deceptive presentation of favorable facts while ignoring unfavorable facts, combined with the lack of rigor in arriving at his opinion") and identified the 403 balancing test with specific reference to the problem ("Any minimal probative value is substantially outweighed by the danger of confusing the issues and misleading the jury."). Port Hamilton's Rule 403 point is tied to, and follows from,

19

the Rule 702 analysis it summarized.

## VIII.   A *DAUBERT* HEARING IS UNNECESSARY

Wooten requests, in the alternative, a *Daubert* hearing. Doc. No. 284 at 27 n.15. A hearing is not required here, however, because the deficiencies appear on the face of Wilkenfeld's report and his sworn testimony, and the dispositive facts are his own admissions, not contested matters requiring live resolution. Where the record is fully developed, "nothing more [i]s required." *Oddi v. Ford Motor Co*., 234 F.3d 136, 154–55 (3d Cir. 2000); *see Padillas v. Stork-Gamco, Inc*., 186 F.3d 412, 418 (3d Cir. 1999) (hearing important where ruling turns on unresolved factual disputes). Wilkenfeld's concessions—on dose, duration, the absence of a differential etiology, the absence of objective evidence of permanence, the RADS criteria, and the treatment record—are equally apparent whether the Court rules on the papers or hears him directly.

### CONCLUSION

Wooten bore the burden of establishing, by a preponderance, that Wilkenfeld's opinion rested on sufficient facts, employed a reliable method, and reliably applied that method to the facts. Wooten did not carry that burden; she asks the Court to send the deficiencies to the jury under the pre-amendment "weight, not admissibility" rubric that Rule 702 now forecloses. Wilkenfeld's opinion fails to meet the requirements of FED. R. EVID. 702(b)–(d). His opinion and testimony should be excluded.

Respectfully submitted,

**ANDREW C. SIMPSON, P.C.,**
Counsel for Port Hamilton Refining
and Transportation, LLLP

Dated: June 25, 2026

   /s/ Andrew C. Simpson
By:  Andrew C. Simpson, Esq.

20

VI Bar No. 451
ANDREW C. SIMPSON, P.C.
2191 Church Street, Suite 5
Christiansted, VI 00820
Tel: 340.719.3900
asimpson@coralbrief.com

21